IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE UNENCUMBERED ASSETS TRUST; and ERWIN I. KATZ, LTD., Trustee of the Unencumbered Assets Trust,

Plaintiffs

v.

JP MORGAN CHASE BANK; BANK ONE, N.A.; CREDIT SUISSE FIRST BOSTON CORP.; CREDIT SUISSE FIRST BOSTON (USA), INC.; CREDIT SUISSE FIRST BOSTON LLC; KAYE SCHOLER, LLP; PRICEWATERHOUSECOOPERS, LLP; THE BEACON GROUP III-FOCUS VALUE FUND L.P.; INTERCONTINENTAL INVESTMENT ASSOCIATES; HEALTHCARE CAPITAL L.L.C.; FLOHAZ PARTNERS L.L.C.; SOUTH ATLANTIC INVESTMENTS, L.L.C.; THOR CAPITAL HOLDINGS L.L.C.; KACHINA INC.; LANCE K. POULSEN; BARBARA L. POULSEN; DONALD H. AYERS; REBECCA S. PARRETT; and TASK HOLDINGS LTD.,

Defendants.

**Civil Action No.: C2-04-1090**

District Judge James L. Graham
Magistrate Judge Abel

**ORAL ARGUMENT REQUESTED**

**<u>MOTION TO DISMISS OF JPMORGAN CHASE BANK, N.A.</u>**

Defendant JPMorgan Chase Bank, N.A. (the "Bank"), incorrectly named in the Complaint as JPMorgan Chase Bank, respectfully submits this motion seeking an order dismissing all of the claims asserted against it, pursuant to Fed. R. Civ. P. 12(b)(6), 8(a) and 9(b). The basis for this motion is set forth in the accompanying Memorandum of Law. In an effort to consolidate briefing, the Bank has consulted with counsel for other defendants and, where indicated, incorporates by reference arguments set forth in other defendants' motions.

Dated: March 31, 2005

Respectfully submitted,

s/ John M. Callagy
John M. Callagy
William A. Escobar
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
(212) 808-7800 (voice)
(212) 808-7897 (facsimile)

Michael A. Pearce
JPMorgan Chase Legal Department
One Chase Manhattan Plaza, 26th Floor
New York, New York 10081
(212) 552-2852 (voice)
(212) 552-5964 (facsimile)

and

William C. Wilkinson (0033228)
O. Judson Scheaf, III (0040285)
THOMPSON HINE LLP
10 West Broad Street, 7th Floor
Columbus, OH 43215
(614) 469-3266 (voice)
(614) 469-3361 (facsimile)

*Attorneys for JP Morgan Chase Bank, N.A.*

# TABLE OF CONTENTS


**Page**

I. PRELIMINARY STATEMENT ..... 1

II. SUMMARY OF ARGUMENTS ..... 3

III. THE COURT NEED NOT ACCEPT THE COMPLAINT'S INCONSISTENT AND ILLOGICAL STATEMENTS AS TRUE ON A MOTION TO DISMISS ..... 8

IV. THE UAT'S CLAIMS AGAINST THE BANK ARE BARRED BY THE DOCTRINE OF *IN PARI DELICTO* ..... 9

A. The *In Pari Delicto* Doctrine Bars All The Claims Asserted By The UAT ..... 9

B. The UAT Concedes That The Officers And Inside Directors Of NPF VI And NPF XII Orchestrated The Wrongdoing ..... 11

C. The UAT's Attempts To Evade The *In Pari Delicto* Doctrine Are Unavailing ..... 15

1. The Adverse Interest Exception Is Inapplicable ..... 15

2. The Alleged Presence of An Alleged Innocent Outside Director Does Not Avoid The I*n Pari Delicto* Doctrine ..... 18

V. THE UAT'S CLAIMS FAIL BECAUSE THEY HAVE NOT AND CANNOT ALLEGE THE NECESSARY ELEMENT OF INJURY TO NPF VI AND NPF XII ..... 19

A. Absent A Cognizable Injury, The UAT Has No Viable Claim For Relief ..... 19

B. The Allegations In The Amended Complaint Establish Only That The Bank Conferred Benefits On NPF VI, Not Legally Cognizable Injuries ..... 20

1. The UAT Only Benefited From The Bank's Alleged Misconduct ..... 20

VI. CLAIMS UNDER RICO AND THE OHIO PCA MUST BE DISMISSED ..... 21

VII. THE NPF VI INDENTURE BARS THE BREACH OF CONTACT CLAIM ASSERTED AGAINST THE BANK ..... 21

A. The Bank Did Not Breach Any Obligations By Following Directions Of NPFS As The Servicer To Effectuate Transfers ..... 23

B. The UAT Fails To Plead Circumstances That Would Have Required The Bank To Notice An Event of Default ..... 25

1. The UAT Does Not Allege Any Circumstances That Required The Bank To Give Notices With Respect To Alleged Shortfalls ..... 25

2. The UAT Does Not Allege Circumstances Demonstrating That The Bank Had Actual Knowledge Of An Event Of Default ..... 30

a. Weekly "Collateral Coverage Reports" Did Not Require The Bank To Give Notices ..... 30

b. Investor Reports Delivered By NPFS As The Servicer Did Not Require Of A Notice Of An Event Of Default ..... 32

**TABLE OF CONTENTS**
**(continued)**

**Page**


c. The Delivery Of The February 1999 Investor Report Did Not Require The Bank To Notice an Event of Default ................ 32

d. The Bank Did Not Assume Fiduciary Obligations ...................... 36

C. The UAT's Allegations Concerning Transfers Between NPF VI And NPF XII Accounts Do Not State A Claim Against The Bank .................................... 37

1. The Transfers Were Made At The Direction Of NPFS As The Servicer ........................................................................................ 38

2. The UAT's Allegations That The Bank Had Actual Knowledge Of The Scheme Do Not State A Claim Against The Bank ........................... 38

D. The Bank Was Not Obligated To Monitor The Purchase Of Receivables .......... 41

VIII. THE TORT CLAIMS ASSERTED BY THE UAT SHOULD BE DISMISSED ........... 43

A. The UAT's Tort Claims Are Duplicative Of The Contract Claim ...................... 43

1. The UAT's Fraud Claims Duplicate Its Breach Of Contract Claim ........ 44

2. The UAT's Other Tort Claims Duplicate Its Breach Of Contract Claim ............................................................................................ 45

B. Even If Not Impermissibly Duplicative Of Its Breach Of Contract Claims, All The UAT's Tort Claims Must Still Be Dismissed ........................................ 47

1. The Bank Did Not Owe A Fiduciary Duty To NPF VI ........................... 47

2. The UAT's Fraud Claims Should Be Dismissed .................................... 50

a. The Fraud Claim Based On The Failure To Disclose Does Not State A Claim ........................................................................ 50

b. The Promissory Fraud Claim Should Be Dismissed .................... 53

3. The UAT Fails To State A Claim For Conversion ................................. 56

a. The Bank Did Not Exercise Dominion Over The Funds By Following Instructions Of NPF VI And NPFS ............................ 57

b. The Bank's Did Not Act Wrongfully By Following Directions ........................................................................................ 58

c. The Funds Are Not Specific And Identifiable ............................ 59

4. The Negligence Claims Are Precluded By The Economic Loss Rule ........................................................................................................ 62

5. The Civil Conspiracy Claim Should Be Dismissed ................................ 63

6. The UAT's Aiding And Abetting Claims Should Be Dismissed ............ 64

IX. CONCLUSION ............................................................................................................ 65

# TABLE OF AUTHORITIES

**Page**

## CASES

*9310 Third Avenue Associates, Inc. v. Schaffer Food Serv. Co.*, 210 A.D.2d 207, 620 N.Y.S.2d 255 (2d Dep't 1994) ..... 59

*Aetna Casualty & Surety Co. v. Leahey Construction Co.*, 219 F.3d 519 (6th Cir. 2000) ..... 62

*American Tissue, Inc. v. Arthur Andersen, LLP*, 275 F. Supp. 2d 398 (S.D.N.Y. 2003) ..... 10

*Arcanum National Bank v. Hessler*, 69 Ohio St. 2d 549, 433 N.E.2d 204 (Ohio 1982) ..... 11

*Argonaut Partnership L.P. v. Bankers Trustee Co. Ltd.*, No. 96 Civ. 1970 (LLS), 2001 WL 585519 (S.D.N.Y. May 30, 2001) ..... 29, 42, 48

*Avery v. Rossford, Ohio Transportation Improvement District*, 145 Ohio App. 3d 155, 762 N.E.2d 388 (Ohio. Ct. App. 2001) ..... 46

*Board of Trustees Sabis International School v. Montgomery*, 205 F. Supp. 2d 835 (S.D. Ohio 2002) ..... 50

*Bell v. Ohio Department of Rehabilitation & Corrections*, No. 2002-09854-AD, 2004 Ohio Misc. LEXIS 179 (Ohio Ct. Cl. Apr. 26, 2004) ..... 19

*Belluardo v. Blankenship*, No. 72601, 1998 WL 289397 (Ohio Ct. App. June 4, 1998) ..... 52

*Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994) ..... 24

*Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704 (S.D.N.Y. 2001), *aff'd*, *In re Bennett Funding Group, Inc.*, 336 F.3d 94 (2d Cir. 2003) ..... 18

*Broadbeech v. Hartford Casualty Insurance Co.*, 773 F. Supp. 882 (S.D. Mass. 1991), *aff'd*, 979 F.2d 209 (5th Cir. 1992) ..... 29

*Cairns v. Ohio Savings Bank*, 109 Ohio App. 3d 644, 672 N.E.2d 1058 (Ohio Ct. App. 1996) ..... 47

*Captiva, Inc. v. Viz Communications, Inc.*, No. 01-4084, 2004 U.S. App. LEXIS 477 (6th Cir. Jan. 8, 2004) ..... 44, 53

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982)....................................18

*Chemtrol Adhesives, Inc. v. America Manufacturers Mutual Insurance Co.*, 42 Ohio St. 3d 40, 537 N.E.2d 624 (Ohio 1989) ............................................................62

*Chronister Oil Co. v. Unocal Refining & Marketing*, 34 F.3d 462 (7th Cir. 1994) ..........20

*Citizens Federal Bank, F.S.B. v. Brickler*, 114 Ohio App. 3d 401, 683 N.E.2d 358 (Ohio Ct. App. 1996) ..................................................................................10

*Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 462 N.E.2d 407 (1984) .................................50

*Collins v. National City Bank*, No. 19884, 2003 WL 22971874 (Ohio Ct. App. Dec. 19, 2003)..........................................................................47, 58

*Consolidated Jewelers, Inc. v. Standard Finance Corp.*, 325 F.2d 31 (6th Cir. 1963) ........................................................................................23

*Cordoba v. Dillard's, Inc.*, No. 6:01CV1132ORL19KRS, 2003 WL 21295143 (M.D. Fla. Feb. 24, 2003), *affd*, No. 03-11105, 2003 WL 22240335 (11th Cir. 2003) ..........................................................................................30

*DeCastro v. Wellston City School District Board of Education*, 94 Ohio St. 3d 197, 761 N.E.2d 612 (Ohio 2002)...............................................................19

*Delahunt v. Cytodyne Technologies*, 241 F. Supp. 2d 827 (S.D. Ohio 2003) ..................49

*Firsdon v. Mid-American National Bank & Trust Co.*, No. WD-98-035, 1998 Ohio App. LEXIS 6028 (Ohio Ct. App. Dec. 18, 1998).............................................19

*Fisher v. Big Squeeze (N.Y.), Inc.*, 349 F. Supp. 2d 483 (E.D.N.Y. 2004) ........................63

*Floor Craft Floor Covering, Inc. v. Parma Community General Hospital Association*, 54 Ohio St. 3d 1, 560 N.E.2d 206 (Ohio 1990)......................................61

*Gean v. Hattaway*, 330 F.3d 758 (6th Cir. 2003) .............................................................8

*Global View Ltd. Venture Capital v. Great Central Basin Exploration, LLC*, 288 F. Supp. 2d 473 (S.D.N.Y. 2003)...........................................................59

*Gouge v. Bax Global Inc.*, 252 F.Supp.2d 509 (N.D. Ohio 2003)....................................56

*Greenberg v. Life Insurance Co. of Virginia*, 177 F.3d 507 (6th Cir. 1999).....................47

*Grindstaff v. Green*, 133 F.3d 416 (6th Cir. 1998) .........................................................19

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Hamilton Foundry & Machine Co. v. International Molders & Foundry Workers Union*, 193 F.2d 209 (6th Cir. 1951) ....................8

*Hanlin v. Ohio Builders & Remodelers, Inc.*, 196 F. Supp. 2d 572 (S.D. Ohio 2001) ....................43

*Harriet & Henderson Yarns, Inc. v. Castle*, 75 F. Supp. 2d 818 (W.D. Tenn. 1999) ....................22, 48

*Haul Transportation of Virginia, Inc. v. Morgan*, No. CA 14859, 1995 WL 328995 (Ohio Ct. App. June 2, 1995)....................60

*In re Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987) ....................19

*In re Bennett Funding Group, Inc.*, 336 F.3d 94 (2d Cir. 2003)....................10, 11, 18

*In re CBI Holding Co.*, 311 B.R. 350 (S.D.N.Y. 2004).................... *passim*

*In re Hedged-Investments Associates, Inc.*, 84 F.3d 1281 (10th Cir. 1996) ....................10, 12

*In re National Century Finance Enterprises, Inc.*, 310 B.R. 580 (Bankr. S.D. Ohio 2004) ....................60

*In re Richardson*, 216 B.R. 206 (Bankr. S.D. Ohio 1997)....................10

*In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997) ....................16

*Jonassen v. Bankers Trust Co.*, No. 90 Civ. 2242 (LBS), 1990 WL 180150 (S.D.N.Y. Nov. 13, 1990) ....................44, 53, 54

*Knauer v. Jonathon Roberts Financial Group, Inc.*, 348 F.3d 230 (7th Cir. 2003) ....................12

*Krieger v. Gast*, No. 4:99-CV-86, 2000 WL 288442 (W.D. Mich. Jan. 21, 2000) ....................54

*LNC Investments, Inc. v. First Fidelity Bank, N.A.*, 935 F. Supp. 1333 (S.D.N.Y. 1996) ....................37, 49

*LaSalle National Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y 1996)....................50, 51

*Lightbody v. Rust*, No. 80927, 2003 WL 21710601 (Ohio Ct. App. July 24, 2003) ....................46

*Lippe v. Bairnco Corp.*, 218 B.R. 294 (S.D.N.Y. 1998)....................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Lutz v. Chitwood (In re Donahue Sec., Inc.)*, 318 B.R. 667 (Bankr. S.D. Ohio 2004) ....46, 47

*Lutz v. Munninghoff Lange & Co. (In re Donahue Sec., Inc.)*, Adv. Nos. 02-1179, 02-1179, 2003 Bankr. LEXIS 964 (Bankr. S.D. Ohio July 21, 2003) .... *passim*

*Master Consolidated Corp. v. BancOhio National Bank*, 61 Ohio St. 3d 570, 575 N.E.2d 817 (Ohio 1991)....22

*Meckel v. Continental Resources Co.*, 758 F.2d 811 (2d Cir. 1985) ....22, 51

*Mengel Co. v. Nashville Paper Products & Specialty Workers Union, No. 513*, 221 F.2d 644 (6th Cir. 1955) ....8

*Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB), 2004 WL 1444868 (S.D.N.Y. June 25, 2004)....45, 46

*Minger v. Green*, 239 F.3d 793 (6th Cir. 2001)....54

*Moore v. United States*, No. 1:02 CV 1334, 2002 WL 31934172 (N.D. Ohio Nov. 4, 2002) ....8, 30

*Mulbarger v. Royal Alliance Associates, Inc.*, No. C-2-96-0739, 1999 WL 33432317 (S.D. Ohio Dec. 22, 1999) ....54

*North American Produce Corp. v. Nick Penachio Co., Inc.*, 705 F. Supp. 746 (E.D.N.Y. 1998)....8

*NCR Corp. v. AT&T Co.*, 761 F. Supp. 475 (S.D. Ohio 1991)....19

*NPF IV Inc. v. Transitional Health Services*, 922 F. Supp. 77 (S.D. Ohio 1996).... *passim*

*New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003) ....14

*Nilavar v. Mercy Health System-Western Ohio*, 142 F. Supp. 2d 859 (S.D. Ohio 2000) ....62

*ON Marine Serv. Co. v. EVTAC Mining, LLC*, No. 2:01-CV-934, 2002 WL 31412437 (S.D. Ohio Sept. 30, 2002)....23

*Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003) ....11

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir. 2001)....10, 12, 15

*Pereira v. United Jersey Bank*, 201 B.R. 644 (S.D.N.Y. 1996) .... *passim*

*Philip v. L.F. Rothschild & Co.*, No. 90 Civ. 0708, 1999 WL 771354 (S.D.N.Y. Sept. 29, 1999) ....36

*Plassman v. City of Wauseon*, 73 F.3d 629 (Table), No. 95-3736, 1996 WL 254662 (6th Cir. 1996)....14, 30

*R.J. Wildner Contracting Co. v. Ohio Turnpike Commission*, 913 F. Supp. 1031 (N.D. Ohio 1996) ....56

*Regions Bank v. Blount Parrish & Co.*, No. 01 C 0031, 2001 WL 726989 (N.D. Ill. June 27, 2001) ....36

*Schmidt v. Fleet Bank*, No. 96 Civ. 5030(AGS), 1998 WL 47827 (S.D.N.Y. Feb. 4, 1998) ....60

*Semi-Tech Litigation, LLC v. Bankers Trust Company*, No. 02 CIV. 0711(LAK), 2005 WL 121750 (S.D.N.Y. Jan. 21, 2005) ....36

*Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003)....51

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991) ....12

*Shriver v. Tingley (In re Shriver)*, 46 B.R. 626 (Bankr. N.D. Ohio 1985) ....20

*Smith v. American National Bank & Trust*, 982 F.2d 936 (6th Cir. 1992) ....52

*Stewart Coach Industries, Inc. v. Moore*, 512 F. Supp. 879 (S.D. Ohio 1981) ....53, 55

*Strock v. Pressnell*, 38 Ohio St. 3d 207, 527 N.E.2d 1235 (Ohio 1998) ....46

*Terlecky v. Hurd (In re Dublin Securities, Inc.)*, 133 F.3d 377 (6th Cir. 1997).... *passim*

*Umbaugh Pole Building Co., v. Scott*, 58 Ohio St. 2d 282, 390 N.E.2d 320 (Ohio 1979) ....47

*United Republic Insurance Co. v. Chase Manhattan Bank*, 168 F. Supp. 2d 8 (N.D.N.Y. 2001), *aff'd*, 40 Fed. Appx. 630 (2d Cir. 2002), *vacated and remanded on other grounds*, 315 F.3d 168 (2d Cir. 2003)....60, 61

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Vennittilli v. Primerica, Inc.*, 943 F. Supp. 793 (E.D. Mich. 1996)..................................54

*Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34 (S.D.N.Y. 1997)....................................................................................................18

*Wright v. Heyne*, 349 F.3d 321 (6th Cir. 2003) ...............................................................30

**STATUTES**

Fed. R. Civ. P. 9(b) ...........................................................................................................53

Ohio Rev. Code Ann. § 2305.09(C) .....................................................................................55

**MISCELLANEOUS**

6 Am. Jur. 2d *Assignments* § 149 (1999) ..............................................................................10

37 Am. Jur. 2d *Fraud and Deceit* § 204 (2003)...................................................................51

American Bankers' Association, Corporate Trust Committee, *The Trustee's Role in Asset-Backed Securities*, Mar. 12, 2003 ..........................................................22, 52

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 (3d ed. 2004)..........................................................................................................30

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2004)............................................................................................................9

3 *Collier on Bankruptcy* ¶ 323.03[2] (Lawrence P. King, ed., 15th ed. 2004)..................10

23 Ohio Jur. 3d *Creditors' Rights and Remedies* § 34 ......................................................10

23 Ohio Jur. 3d *Creditors' Rights and Remedies* § 93 ......................................................10

Restatement (Second) of Conflict of Laws § 145(2) (1971).............................................45

Restatement (Second) of Contracts § 336(2) (1981) ........................................................10

Restatement (Second) of Torts § 892A (1979) ..................................................................20

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 18 (5th ed. 1984) .............................................................................................................................20

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS OF JPMORGAN CHASE BANK, N.A.**

## I. PRELIMINARY STATEMENT

The Unencumbered Assets Trust ("UAT") is a post-confirmation trust established to pursue certain legal claims assigned and transferred to it by a number of entities, including NPF VI, Inc. ("NPF VI") and NPF XII, Inc. ("NPF XII"). The UAT was created when the Bankruptcy Court confirmed the Fourth Amended Joint Plan of Liquidation of National Century Financial Enterprises, Inc. and its Debtor Subsidiaries. The fact that the UAT was assigned certain claims by the NCFE Debtors, however, does not mean that these claims are necessarily meritorious, nor does it deprive any party of defenses that would be available in an action brought directly by the NCFE Debtors.

In its prolix 350-plus page Amended Complaint[1], the UAT attempts to assert these assigned claims against JPMorgan Chase Bank, N.A. (the "Bank"), which served as the indenture trustee for notes issued by NPF VI. Using bald, unsupported allegations, the UAT asserts the incredible proposition that the Bank joined a conspiracy hatched by Lance Poulsen and other founders, inside directors and officers of National Century Financial Enterprises, Inc. ("NCFE"), NPF VI and NPF XII, to loot billions of dollars of assets from NPF VI and NPF XII, rendering them insolvent and unable to pay their debts, allegedly motivated by the modest indenture trustee fees ordinarily charged to all its customers for these ministerial duties. As discussed below, the UAT's claims against the Bank fail for several independent reasons.

---

[1] The UAT filed its "Original Complaint" on November 17, 2004 (D.E. 1). On January 14, 2005, the UAT filed an "Amended Complaint" (D.E. 20), naming Kaye Scholer as an additional defendant and adding new allegations concerning Kaye Scholer. Citations herein are to the Amended Complaint and are cited as "Amend. Compl. ¶ __."

First, the doctrine of *in pari delicto* bars the claims asserted by the UAT against the Bank because the UAT stands in the shoes of its assignors, NPF VI and NPF XII, which are charged with the knowledge and wrongful conduct of their executives. The Amended Complaint concedes that the alleged conspiracy was orchestrated by the founders, the entire senior management, all officers and inside directors at NPF VI and NPF XII, the companies' authorized agent National Premier Financial Servicers, Inc. ("NPFS"), and the companies' sole shareholder, NCFE.

Second, the UAT does not allege any injury to NPF VI and NPF XII caused by the Bank, which is an essential element of all its claims.[2] Rather, the UAT alleges that the Bank's supposed misconduct actually benefited NPF VI and NPF XII, enabling them to gain access to misappropriated funds and to continue to do business (by not issuing default notices).

Third, although annexed as an exhibit to its Amended Complaint, the UAT conspicuously ignores or intentionally misconstrues the controlling terms and explicit language of the Master Indenture between NPF VI, the Bank and NPFS (the Servicer) dated as of June 1, 1998 (the "NPF VI Indenture") and attempts to impose obligations against the Bank that simply do not exist. In a spasm of remarkable candor, the UAT admits that its characterizations of the NPF VI Indenture may be wrong:

> All descriptions and explanations herein of the Indentures and their exhibits are hereby qualified in their entirety to the extent that they are inconsistent with the terms of the Indentures and their exhibits (Amend. Compl. ¶ 44, n.1).

Of course, under governing pleading rules, the Court need not accept allegations by the UAT that are inconsistent with the NPF VI Indenture. Rather, the rights and obligations

---

[2] The UAT's panoply of tort claims fail not only because the UAT cannot establish the element of injury, but also because they are duplicative of the UAT's contract claim and in any event fail to properly state claims.

of the Bank are governed by the language of the NPF VI Indenture which provides that the Bank shall have no implied obligations, that the Bank was entitled to rely on the instructions from NPFS to transfer funds, that the responsibility for maintaining minimum account balances belonged to NPF VI and NPFS, not the Bank, and that the Bank could not give notice of Events of Default except under the specific circumstances set forth in the NPF VI Indenture. The Amended Complaint impermissibly attempts to impose obligations on the Bank to give notices of Events of Default based on speculation and inferences, even though the Bank was specifically barred from taking such actions under the terms of the NPF VI Indenture. Indeed, the UAT also fails to attach to its Amended Complaint many of the documents upon which it purports to rely and specifically identifies. The reason for this omission is that these documents on their face contradict many of the UAT's allegations.

## II. <u>SUMMARY OF ARGUMENTS</u>

### The UAT's Claims Against The Bank Are Barred By The Doctrine Of *In Pari Delicto*

The Amended Complaint concedes that the entire senior management at NPF VI and NPF XII orchestrated and executed the alleged fraudulent scheme. Under the doctrine of *in pari delicto* and controlling Sixth Circuit law, the malfeasance of a corporation's senior management team is directly attributable to the corporation itself, and such a corporation is barred from bringing claims against third parties, like the Bank, for their supposed participation in that wrongdoing. *See Terlecky v. Hurd (In re Dublin Securities, Inc.)*, 133 F.3d 377, 380 (6th Cir. 1997). The NCFE Debtors (including NPF VI and NPF XII) were the original owners of these legal claims asserted in the Amended Complaint, but then transferred them to a trust they created in their bankruptcy plan – the UAT. The UAT now stands in the shoes of NPF VI and NPF XII and is subject to the same defenses as those companies. Thus, the doctrine of *in pari delicto* requires dismissal as a matter of law. *See* Point IV.A-B, *infra*, at pp. 9-15.

Although the Amended Complaint attempts to paint NPF VI and NPF XII as victims of the fraud perpetrated by their corrupt management, the narrow adverse interest exception to the *in pari delicto* doctrine is not applicable since the UAT admits that the entire senior management participated in the scheme to defraud. The UAT also alludes to the presence of an 'innocent' outside director – Vincent Margello – in an apparent attempt to avoid application of the *in pari delicto* doctrine. This tactic fails as a matter of law because the "innocent decision-maker" exception to the *in pari delicto* doctrine has not been adopted in this jurisdiction, the Amended Complaint does not allege that Margello was a part of management, or allege any facts to show that Margello would have stopped the alleged wrongdoing, and admits that the alleged scheme to defraud continued long after Margello left the boards of NPF VI and NPF XII. *See* Point IV.C, *infra*, at pp. 15-19.

**The UAT Does Not Allege Injury To NPF VI And NPF XII Caused By The Bank**

Injury is an essential element of every claim alleged in the Amended Complaint against the Bank. However, the Amended Complaint alleges no injury sustained by NPF VI or NPF XII caused by the Bank. Instead the Amended Complaint alleges that these companies actually benefited from the alleged conduct. Specifically, the Bank allegedly allowed NPF VI to access funds that were otherwise unavailable for its use and failed to issue default notices that would have restricted or ended NPF VI's businesses. In light of these allegations, the Amended Complaint cannot establish any injury. *See* Point V, *infra*, at pp. 19-21.

**The Breach Of Contact Claim Asserted Against The Bank Must Be Dismissed**

Despite its length and the detail derived from extensive Bankruptcy Rule 2004 discovery, the UAT does not allege anywhere the facts showing that the Bank breached obligations or failed to declare any Event of Default that it was contractually required to declare.

For example, although the UAT alleges that the Bank executed various transfers out of the Equity, Seller Credit Reserve and Offset Reserve Accounts at the direction of NPFS, as the Servicer, which supposedly were not permitted, the NPF VI Indenture explicitly provides that the Bank may "conclusively rely" on such directions. It also places responsibility for the establishment and maintenance of these accounts upon NPF VI and NPFS. Finally, it absolves the Bank from liability with respect to such instructions (NPF VI Indenture §§ 5.04(b)(i), 5.09(e), 8.01(c)(i), 8.01(i), 8.03). In any event, the transfers , characterized as wrongful, are not prohibited by the NPF VI Indenture. *See* Point VII.A, *infra*, at pp. 23-25.

The UAT also asserts that the Bank breached its obligations in failing to give notice of an Event of Default and Principal Amortization Event ("PAE") based on the failure of NPF VI to maintain required minimum balances in the Equity, Seller Credit Reserve and Offset Reserve Accounts. However, it fails to allege the circumstances and specific NPF VI Indenture provisions that actually required the Bank to give such notices. The Bank's obligation to give notices with respect to shortfalls in the accounts was extremely circumscribed by the NPF VI Indenture, and the events that would have required such notices are not alleged to have occurred. *See* Point VII.B.1, *infra*, at pp. 25-29.

Unable to allege that the Bank breached any actual contractual obligation to give notices as to shortfalls, the UAT attempts to impose obligations on the Bank to deduce alleged irregularities in the accounts based on patterns of transactions, reports and communications. The Bank had no obligation to give notices of Events of Default based on inferences and speculation. Indeed it was prohibited from doing so by the NPF VI Indenture. *See* Point VII.B.2, *infra*, at pp. 29-37.

The UAT next alleges that the Bank's execution of transfers between NPF VI and NPF XII were part of a kiting scheme that violated the NPF VI Indenture. Again, the UAT concedes that all such transfers were made at the direction of NPFS (the Servicer) – directions upon which the Bank, under the NPF VI Indenture, was entitled to rely. Moreover, such transfers did not violate the NPF VI Indenture and even if they did, the UAT does not allege circumstances requiring the Bank to give notice of an Event of Default (*Id.* §§ 4.11(c), 7.01(i), 7.02). The Amended Complaint alleges that the Bank had "actual knowledge" of the purported scheme, but again, none of the facts pled by the UAT indicate knowledge of the existence of the alleged kiting scheme; instead again the UAT attempts to imply an unwritten obligation on the Bank to deduce the scheme based on inferences gleaned from reports and instructions from NPFS and/or patterns of transactions. *See* Point VII.C, *infra*, at pp. 37-40.

Finally, contrary to the UAT's meritless assertions, the Bank cannot be liable for transferring funds out of NPF VI, at the direction of NPFS, that may have been used to purchase ineligible receivables. The Amended Complaint fails to identify any provision of the NPF VI Indenture that prohibited such transfers. Indeed, the NPF VI Indenture: (1) does not require the Bank to supervise the purchase of receivables by NPF VI, (2) makes clear that the Bank has no responsibility with respect to such purchases, and (3) provides that the Bank is expressly entitled to rely on instructions from NPFS. *See* Point VII.D, *infra*, at pp. 40-42.

**All Tort Claims Asserted By The UAT Must Be Dismissed**[3]

The UAT's claims of breach of fiduciary duty, fraud, negligence, gross negligence, conversion and civil conspiracy, should be dismissed because the allegations

---

[3] For the reasons set forth in the Motion to Dismiss of Bank One, N.A., incorporated herein by reference, the RICO and the Ohio PCA claims asserted against the Bank must be dismissed. *See* Point VI., *infra, at* p. 21.

supporting these claims are based on the same "facts" supporting their breach of contract claim. *See* Point VIII.A, *infra*, at pp. 43-46.

The substantive allegations of each of the UAT's tort claims are also inadequate. The UAT's claim for breach of fiduciary duty against the Bank must be dismissed because the Bank, as an indenture trustee, did not owe NPF VI or NPF XII, as the Issuers, any such duty, and nothing in the NPF VI Indenture supports that claim. *See* Point VIII.B.1, *infra*, at pp. 46-49. The UAT's concealment fraud claim is based, in part, on the bizarre notion that the Bank had a duty to disclose to NPF VI and NPF XII the fraud that they were perpetrating through their senior management. The Bank had no such duty. And the UAT's promissory fraud claim that the Bank entered into the NPF VI Indenture without the present intention of performing its obligations fails because: (i) the UAT only supports that claim with the allegation that the Bank did not perform its obligations; (ii) the claim is not pled with sufficient particularity; and (iii) the UAT cannot – and does not – plead the elements of justifiable reliance. *See* Point VIII.B.2, *infra*, at pp. 49-55.

The UAT's common law conversion claim also must be dismissed because: (i) the Bank did not exercise "dominion" over funds deposited and/or transferred by NPF VI; (ii) following the instructions of the customer cannot, as a matter of law, form the basis of *wrongful* dominion; and (iii) the UAT fails to identify the specific money allegedly converted or even the *dollar amount* of the allegedly converted funds. *See* Point VIII.B.3, *infra*, at pp. 56-61. The negligence-based claims violate the "economic loss rule." *See* Point VIII.B.4, *infra*, at pp. 61-62. The UAT's civil conspiracy claim also must be dismissed because, as noted, the UAT does not successfully plead the necessary underlying tort claim against the Bank. *See* Point VIII.B.5, *infra*, at pp. 62-63.

Finally, the aiding and abetting fraud and knowing participation in a breach of fiduciary duty (Counts XIV and XV) both should be dismissed for the same reasons. It appears that Ohio does not recognize a claim for aiding and abetting. To the extent such a claim exists under Ohio law, the UAT does not (and cannot) adequately plead the elements of that claim – namely that (i) the Bank had actual knowledge of the underlying fraud or the breach of a fiduciary duty by another, or (ii) that the Bank substantially assisted the alleged scheme to defraud by executing transfers at the direction of NPFS or failing to issue notices. *See* Point VIII.B.6, *infra*, at p. 63.

## III. THE COURT NEED NOT ACCEPT THE COMPLAINT'S INCONSISTENT AND ILLOGICAL STATEMENTS AS TRUE ON A MOTION TO DISMISS

The standard for deciding a motion to dismiss is well-briefed in the numerous motions before the Court in this and related NCFE cases. Allegations that are inconsistent or contradicted by the documents integral to the complaint need not be accepted as true, and the documents control. *See Mengel Co. v. Nashville Paper Prods. & Specialty Workers Union, No. 513*, 221 F.2d 644, 647 (6th Cir. 1955); *Hamilton Foundry & Mach. Co. v. Int'l Molders & Foundry Workers Union*, 193 F.2d 209, 215-16 (6th Cir. 1951). The Court need not accept "legal conclusions or unwarranted factual inferences." *Gean v. Hattaway*, 330 F.3d 758, 765 (6th Cir. 2003). Here, the NPF VI Indenture (along with other documents specifically referenced but not attached by the UAT to the Amended Complaint) are integral to the Complaint and may be considered by the Court in this motion. *Moore v. United States*, No. 1:02 CV 1334, 2002 WL 31934172, at *1 (N.D. Ohio Nov. 4, 2002).

Furthermore, in deciding a motion to dismiss, the Court need not abandon common sense. *See N. Am. Produce Corp. v. Nick Penachio Co., Inc.*, 705 F. Supp. 746, 750 (E.D.N.Y. 1998) ("Although in a motion to dismiss a court cannot acknowledge any factual

allegation made on behalf of the non-moving party, a court can still use its own common sense."); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 (3d ed. 2004) ("The district court will not accept as true pleading allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading.")

## IV. THE UAT'S CLAIMS AGAINST THE BANK ARE BARRED BY THE DOCTRINE OF *IN PARI DELICTO*

Under Sixth Circuit law, the claims asserted by the UAT against the Bank must be dismissed because the UAT's Amended Complaint concedes that the entire senior management at NCFE, NPF VI, NPF XII and NPFS as Servicer, orchestrated and executed the alleged wrongdoing on which these claims are premised. *Terlecky*, 133 F.3d at 380; *Lutz v. Munninghoff Lange & Co. (In re Donahue Sec., Inc.)*, Adv. Nos. 02-1179, 02-1179, 2003 Bankr. LEXIS 964 (Bankr. S.D. Ohio Jul. 21, 2003).

### A. The *In Pari Delicto* Doctrine Bars All The Claims Asserted By The UAT

Pursuant to the NCFE Debtors' Fourth Amended Joint Plan of Liquidation of National Century Financial Enterprises, Inc. And Its Debtor Subsidiaries, As Modified, confirmed on April 16, 2004 (the "Plan"), the NCFE Debtors, including NPF VI and NPF XII, transferred and assigned their assets, including the litigation claims asserted here, to a trust they, themselves, created – the UAT. *See* Plan, § IV.D.4 ("Upon the Effective Date . . . the Debtors shall assign and transfer to the Unencumbered Assets Trust all of their rights, title and interest in and to all of their remaining Assets . . . ). Indeed, the Amended Complaint concedes that "the claims brought herein are the claims that belonged to NPF VI and/or NPF XII prior to the bankruptcy" (Amend. Compl. ¶ 13).

As a matter of law, the UAT, as an assignee, stands in the shoes of the NCFE Debtors, including NPF VI and NPF XII, (the assignors) and takes the assignors' claims subject to any defenses available against the assignors. *See generally* 6 Am. Jur. 2d *Assignments* § 149 (1999) ("if the assignor could not have maintained an action against the obligor on the chose assigned, the assignee also cannot sue him or her on it."); 23 Ohio Jur. 3d *Creditors' Rights and Remedies* § 93 ("The assignee is subject to defenses available against the assignor"); *see also* 23 Ohio Jur. 3d *Creditors' Rights and Remedies* § 34 (same); Restatement (Second) of Contracts § 336(2) (1981); *In re Richardson*, 216 B.R. 206, 216 (Bankr. S.D. Ohio 1997) (same); *Citizens Fed. Bank, F.S.B. v. Brickler*, 114 Ohio App. 3d 401, 410, 683 N.E. 2d 358, 364 (Ohio Ct. App. 1996) (same).

In circumstances analogous to this case, the Sixth Circuit and many other courts have routinely applied this rule and the doctrine of *in pari delicto* to dismiss claims presented by a trustee that succeeded to the claims of a culpable bankruptcy debtor. *See Terlecky*, 133 F.3d at 380 (holding that Chapter 7 trustee's claims on behalf of corporation were barred where complaint conceded that bankrupt corporation's officers participated in the alleged fraud); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) ("Even if there is damage to the corporation itself, the trustee [asserting claims on behalf of the corporation] cannot recover if the malfeasor was the corporation's sole shareholder and decision maker"); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 354-60 (3d Cir. 2001); *In re Hedged-Investments Assocs., Inc.*, 84 F.3d 1281, 1285 (10th Cir. 1996); *Am. Tissue, Inc. v. Arthur Andersen, LLP*, 275 F. Supp. 2d 398, 404 (S.D.N.Y. 2003) ("Debtor-in-possession lacks standing to sue third parties for defrauding the debtor if the debtor's principals had a hand in the misconduct"); 3 *Collier on Bankruptcy* ¶ 323.03[2] (Lawrence P. King, ed., 15th ed. 2004);

(bankruptcy trustees "stand[] in the shoes of the debtor and … [are] subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor").

**B. The UAT Concedes That The Officers And Inside Directors Of NPF VI And NPF XII Orchestrated The Wrongdoing**

The Sixth Circuit, in applying the *in pari delicto* doctrine, held that when "the officers and directors so dominated and controlled the corporation that the corporation had no separate mind, will, or existence of its own . . . the officers and directors were the 'alter egos' of the debtor corporation [] and any malfeasance on their parts is directly attributable to the debtors themselves." *Terlecky*, 133 F.3d at 380. This application of the doctrine rests on the axiomatic principle that "a corporation can act only through its officers and agents, and the knowledge of the officers of a corporation is at once the knowledge of the corporation." *Arcanum Nat'l Bank v. Hessler*, 69 Ohio St. 2d 549, 557, 433 N.E.2d 204, 211 (Ohio 1982). Further, "the principal is chargeable with and bound by the knowledge of or notice to his agent received by the agent in due course of his employment, with reference to matters to which his authority extends." *Lutz*, 2003 Bankr. LEXIS 964, at *10; *see also In re Bennett Funding Group*, 336 F.3d at 100 (it is a "fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation."); *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 165 (2d Cir. 2003) ("[W]here, as here, the persons dominating and controlling [a] corporation orchestrated the fraudulent conduct, their knowledge is imputed to the corporation…").

*Terlecky* is squarely on point. In that case, principals of the bankrupt corporation, Dublin, used misleading information to sell stock at grossly inflated prices, without registering the stock with the Ohio Division of Securities. *Terlecky*, 133 F.3d at 379. After this scheme was discovered, Dublin lapsed into bankruptcy and its senior managers were convicted on various

state criminal charges for their fraudulent activities. *Id*. Dublin's bankruptcy trustee sued Dublin's lawyers, alleging that they were responsible for damages resulting from the fraud. *Id.* at 69. The Sixth Circuit affirmed the dismissal of the complaint on *in pari delicto* grounds because the complaint admitted that "that the debtors' own actions were instrumental in perpetuating the fraud…" *Id.*, at 380.

Similarly, in *Lutz*, the trustee sought damages from an accounting firm and one of its principals (the "Lange Defendants") for professional malpractice and negligence related to its audits of a bankrupt corporation, DSI. 2003 Bankr. LEXIS 964, at *2-3. The Lange Defendants argued that the claim should be barred by Donahue's misconduct as sole shareholder of DSI under the *in pari delicto* doctrine. *Id*. at *7-8. In opposition to a motion to dismiss, the trustee argued that Donahue's malfeasance, which was alleged in the complaint, should not be imputed to DSI, since Donahue acted adversely to DSI's interests. *Id*. at *10. The court disagreed, holding that that the *in pari delicto* defense applied because the "trustee's rights are limited to those enjoyed by the debtor." *Id*. at *19.[4]

The facts here closely resemble those in *Terlecky* and *Lutz*. The essence of the Amended Complaint is that Lance Poulsen, the President of NCFE, President, Treasurer, and sole director of NPFS the Servicer, and President and Treasurer of NPF VI and NPF XII, led the entire senior management team that orchestrated and executed the fraud that led to the collapse

---

[4] Other courts have similarly held that the doctrine of *in pari delicto* bars claims brought on behalf of a debtor when that debtor, through its agents, is implicated in the alleged fraud. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) (applying the doctrine now known as the "*Wagoner* rule" in the Second Circuit to bar a debtor corporation from asserting a claim "against a third party for defrauding a corporation with the cooperation of management"); *Knauer v. Jonathon Roberts Fin. Group, Inc*., 348 F.3d 230 (7th Cir. 2003) (Receiver's claims for fraud were barred when the complaint alleged that the founders and officers of the debtor corporation participated in the alleged fraud, and where their conduct was imputed to the corporation because those founders and officers dominated the corporation); *R.F. Lafferty & Co.,* 267 F.3d at 356-58 (11 U.S.C. § 541 requires the application of the *in pari delicto* doctrine to prevent the enlargement of claims beyond those possessed by the debtor prior to bankruptcy); *In re Hedged-Investments Assocs.*,84 F.3d at 1285 (same).

of NCFE and injured the noteholders (Amend. Compl. ¶¶ 376-377, 411-12). The small, tightly knit management team is described as follows:

- Lance Poulsen the alleged "principal architect" of "the scheme" (*Id*. ¶ 848) served as President, Treasurer and Director of NPF VI and NPF XII (*Id.* ¶¶ 377-77);

- Barbara Poulsen, Lance Poulsen's wife, served as secretary, treasurer, and a director of NCFE Inc. (*Id.*¶ 30) and as "an officer of the Servicer" (*Id.* ¶ 378);

- Donald H. Ayers ("Ayers") was a Vice President of NPF XII and a director of NPF VI and XII and shareholder of NCFE; Rebecca Parrett ("Parrett") was Vice President of NPF VI and a director of NPF VI and NPF XII and a shareholder of NCFE. (*Id.* ¶¶ 31-32, 380-383, 411 and 750); and

- Lance and Barbara Poulsen, Ayers and Parrett were owners of NPF VI and NPF XII by virtue of their ownership stake in NCFE, the sole shareholder of NPF VI and NPF XII, and are described as the "Founders" of the business (*Id.* ¶¶ 30-33, 37).

The Amended Complaint alleges that Poulsen orchestrated the scheme and that the "Defendants functioned in an ongoing, coordinated manner in carrying out Poulsen's directions, as head of the Enterprise" (Amend. Compl. ¶ 412). In numerous explicit allegations, the Amended Complaint concedes that Poulsen and the small, inner circle of executives carried out the alleged scheme:

- "These Defendants, as members of the Enterprise, each had designated roles…Poulsen gave the Enterprise its primary direction and provided instructions to all other members…All other members reported directly to Poulsen. Poulsen also ran the Servicer…" (*Id.* ¶ 411);

- "Ayers's role was to run the Servicer as directed by Poulsen." (*Id.*);

- "Parrett's role was to run the Servicer as directed by Poulsen." (*Id.*);

- "The Founders [Poulsen, Ayers and Parrett] operated and managed the Servicer." (*Id*. ¶ 384);

- "…the Founders knew of, participated in, and directed the Servicer to make the illegal transfers from NPF VI and NPF XII to these companies owned by the Founders." (*Id.* ¶ 390);

- "Poulsen and Ayers…participated in the kiting scheme…Parrett knew of and authorized this conduct, as well." (*Id.* ¶ 395);

- "…Poulsen, Parrett and/or Ayers provided the instructions for the unauthorized transfers from the NPF VI Equity Account through use of the wires or mail to Chase, who executed the unauthorized transfers…" (*Id.* ¶ 421);

- "Poulsen solicited an agreement from Defendants Ayers, Parrett and Chase to operate and manage the business of NPF VI…according to extra-contractual operating procedures directed by Poulsen." (*Id.* ¶ 439);

- NCFE, the parent and sole shareholder of NPF VI and NPF XII is alleged to have assisted the scheme by making "fraudulent transfers" (*Id.* ¶¶ 676-90; 700-18); and

- "… the Founders [Poulsen, Parrett and Ayers] knew of, authorized, and participated in various transactions…that were prohibited by the Master Indentures." (*Id.* ¶ 386).

In addition, several other senior officials of NCFE, the parent of NPF VI, have already pled guilty to criminal charges and have admitted that they conspired with other executives and founders of NCFE to defraud investors and misled the trustees.[5] *See* Stucke Statement of Facts at 2-3; Gibson Statement of Facts at 2-3 (attached hereto as Exs. A and B, respectively).[6]

---

[5] The Court may consider these plea agreements on a motion to dismiss. *See New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

[6] Other plaintiffs in related matters pending before this Court have explicitly alleged that NPF VI and NPF XII participated in the alleged fraud. For example, the SEC filed claims against John A. Snoble, Brian J. Stucke, and Sherry L. Gibson, alleging that "senior National Century officials" "controlled and directed the activities of NPF VI and NPF XII." See SEC Stucke Compl. 14; SEC Snoble Compl. 14; and SEC Gibson Compl. 13 (attached hereto as Exs. C, D and E, respectively). The Court may take judicial notice, pursuant to Fed. R. Evid. 201, of the Securities and Exchange Commission's complaints filed against John A. Snoble, Brian J. Stucke, and Sherry L. Gibson, Case Nos. C2-04-1089, C2-03-1161, and C2-03-00737, respectively, filed in the United States District Court for the Southern District of Ohio, Eastern Division. *See Plassman v. City of Wauseon*, 73 F.3d 629 (Table), No. 95-3736, 1996 WL 254662, at *3 (6th Cir. May 14, 1996) (unpublished opinion) ("[f]ederal court may take judicial notice of the proceedings in other courts of record"). The SEC specifically alleges that NCFE officials and personnel systematically defrauded the purchasers of notes issued by NPF VI and NPF XII, created shortfalls in the reserve accounts of as much as $400 million dollars, took deliberate steps to hide these shortfalls by transferring funds between NPF VI and NPF XII, overstated the collateral securing the notes, created false documents, and misrepresented the status of the reserve accounts and collateral base in personal contacts with trustees and others.

(footnote continued on next page)

Perhaps more striking, the very same counsel that signed and filed the Amended Complaint, Gibbs & Bruns LLP, also signed and filed three separate complaints on behalf of various noteholders alleging that NPF VI and NPF XII were the wrongdoers. *E.g. Proposed Second Amended Complaint*, ¶ 156, *City of Chandler, v. Bank One, N.A.*, Case No. 2:03-MD-1565-JLG-MRA (D.E. 310) ("NCFE, NPF XII and NPF VI were engaged in fraud, resulting in enormous shortfalls in the collateral securing the Notes"). According to those papers, Poulsen, Parrett and Ayers were "aware of the state of NCFE, NPF VI and NPF XII, because each of them controlled NCFE and/or NPF VI and NPF XII through their positions as officers and/or directors of NCFE, NPF VI or NPF XII." *Id*. ¶ 79.[7]

### C. <u>The UAT's Attempts To Evade The *In Pari Delicto* Doctrine Are Unavailing</u>

#### 1. <u>The Adverse Interest Exception Is Inapplicable</u>

Recognizing that the *in pari delicto* doctrine applies here, the UAT attempts to plead around the doctrine by advancing the remarkable position that NPF VI and NPF XII were *victims* of the alleged fraud (*see, e.g.*, Amend. Compl. ¶ 2). However, this argument – known as the adverse interest exception – does not apply here.

"The adverse interest exception is a narrow one; for it to apply, 'the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes.'" *In re CBI Holding Co.*, 311 B.R. 350, 369 (S.D.N.Y. 2004) (citation omitted). The Court in *CBI Holding* went on to state that "*Even when an agent is defrauding his principal*, unless the agent has totally abandoned the interests of the principal and is acting entirely in his

(continued from prior page)
*See* Ex. C, SEC Stucke Compl. ¶¶ 25-30; Ex. D, SEC Snoble Compl. ¶¶ 25-30; and Ex. E, SEC Gibson Compl. ¶¶ 24-29.

[7] The *in pari delicto* doctrine bars all of the UAT's claims – both sounding in contract and in tort. *See e.g., R.F. Lafferty & Co.*, 267 F.3d at 354-55.

own, or another person's, interest, that agent is acting within the scope of his agency" *Id.* at 373 (emphasis added). Here, the UAT has not only failed to allege that Poulsen, Parrett and Ayers had "totally abandoned" the interests of NPF VI and NPF XII, but affirmatively alleges that NPF VI and NPF XII were *engaged* in the fraud (*see, e.g.*, Amend. Compl. ¶¶ 642-43, 656-57) and its counsel signed pleadings alleging that NPF VI and NPF XII were participants in the fraud. *See* Point IV.B, *supra*. These allegations themselves preclude the application of the adverse interest exception.

Second, even if the Amended Complaint had alleged that the agents had "totally abandoned" the interests of NPF VI and NPF XII, their malfeasance would nevertheless be attributable to NPF VI and NPF XII because they comprise every single relevant decisionmaker at the companies – *all* of the officers and inside directors – and worked in tandem with the companies' sole shareholder, NCFE. When a company's sole shareholder and entire management is involved in a fraud, the wrongdoers and the company are deemed to be "one and the same" and the adverse interest exception does not apply. *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997) (actions of sole shareholder acting as agent of corporation imputed to corporate principal even though agent allegedly acted against its interests because "principal and agent are one and the same").

In *Terlecky*, the Sixth Circuit specifically rejected the trustee's claim that an "adverse interest exception" should apply, holding that that the officers and directors "were the 'alter egos' of the debtor corporations and any malfeasance on their parts is directly attributable to the debtors themselves." *Terlecky*, 133 F.3d at 380; *see also Lutz*, 2003 Bankr. LEXIS 964, at *12-16 (recognizing that if the agent controls or dominates the principal, the conduct of the agent will be imputed to the principal regardless of whether the interest of the agent is adverse to its

principal). Similarly, in *CBI Holding*, the court held that when all of a corporation's owners and managers are involved in a fraud, it is "nonsensical to refrain from imputing the agent's acts of fraud to the corporation, despite the agent's total abandonment of the corporation's interests, because the agent is identical to the corporation." 311 B.R. at 373. Here, as in *Terlecky* and *CBI*, it is undisputed that all of the managers and founders of NPF VI and NPF XII were involved in the fraud. The UAT concedes that Poulsen, Parrett and Ayers – the companies' entire management and indirect owners – were complicit. It also admits that NCFE, the sole direct shareholder of both companies, played a role.

Third, the idea that some NCFE entities were innocent and that other NCFE entities were involved in the scheme, where the entire senior management of all NCFE Debtors are alleged to have orchestrated the alleged fraud, defies common sense. It defies common sense to conclude that Lance Poulsen, Barbara Parrett and Donald Ayers – the "Founders" as the UAT calls them – were engaged in fraud and looting when acting on behalf of themselves, NCFE, and NPFS, but became innocent actors of pure motive when acting on behalf of NPF VI and NPF XII, as alleged in the Complaint. For instance, Exhibit A to the Amended Complaint – the NPF VI Indenture – was signed by Lance Poulsen on behalf of *both* NPF VI and NPFS (Amend. Compl. Ex. A at p. 81). The UAT asks this Court to accept that when Mr. Poulsen executed the NPF VI Indenture on behalf of NPFS, he was a wrongdoer committing part of a scheme to defraud NPF VI and NPF XII and his wrongdoing should be imputed to NPFS, but also that, when he simultaneously executed that document on behalf of NPF VI, his mind was pure and no wrongdoing should be imputed to that company. The UAT cannot have it both ways. The same Founders ran all the NCFE entities. Their alleged bad acts are imputed to all the NCFE entities, including NPF VI and NPF XII.

### 2. **The Alleged Presence of An Alleged Innocent Outside Director Does Not Avoid The I*n Pari Delicto* Doctrine**

The UAT also attempts to avoid the *in pari delicto* doctrine by alleging that a single independent outside director of NPF VI and NPF XII – Vincent Margello – was not a party to the fraud and would have taken steps to terminate the scheme (Amend. Compl. ¶¶ 396-402). These allegations attempt to establish the "innocent decision-maker" exception. First, Ohio has never recognized nor addressed such an exception to the clear rule set forth in *Terlecky*. Second, several courts have explicitly rejected this exception. *See, e.g., CBI Holding*, 311 B.R. at 372 ("[M]isconduct by those given authority to make decisions on behalf of a company should be imputed to the company even if innocent members of management could and would have prevented the fraud had they been aware of it."); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 454-56 (7th Cir. 1982) (same).

Moreover, to the extent this exception even applies, the plaintiff must make non-conclusory allegations that the innocent individual or individuals were "relevant," meaning the innocent decision maker could have, or would have, stopped the fraud, and had the power to do so. *See Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 710 (S.D.N.Y. 2001), *aff'd*, *In re Bennett Funding Group, Inc.*, 336 F.3d 94 (2d Cir. 2003). Indeed, the innocent decision maker must be, at a minimum, "in a management role or amongst the shareholders" and must be able to stop the fraud. 336 F.3d at 101; *see also Lippe v. Bairnco Corp.*, 218 B.R. 294, 302 (S.D.N.Y. 1998) (motion to dismiss granted where complaint failed to allege "that innocent members of management would have been able to prevent the fraud had they known about it") .

The UAT fails to allege any facts that explain how Margello "could and would have brought the fraud to an end." *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 36 (S.D.N.Y. 1997). Despite extensive pre-complaint discovery through

Bankruptcy Rule 2004, the only allegation is the conclusory one that had Margello known of the fraud he "would have taken steps to ensure that the Defendants' manipulation of NPF VI and NPF XII was discontinued" (Amend. Compl. ¶ 402). Such a blatantly conclusory allegation is insufficient. Moreover, the UAT concedes Margello was an outside director for NPF VI and NPF XII only until June 2001 – *more than one year before the fraud was uncovered* – leaving a period of more than a year during which Margello could have done nothing to stop the alleged fraud (*Id.* ¶ 399). Finally, within the Sixth Circuit, "outside directors" are found, by definition, to be non-management."[8] Accordingly, for all of the foregoing reasons, the Amended Complaint should be dismissed pursuant to the *in pari delicto* doctrine.

## V. THE UAT'S CLAIMS FAIL BECAUSE THEY HAVE NOT AND CANNOT ALLEGE THE NECESSARY ELEMENT OF INJURY TO NPF VI AND NPF XII

### A. Absent A Cognizable Injury, The UAT Has No Viable Claim For Relief

It is well-recognized that a plaintiff cannot establish either a tort or breach of contract claim without alleging a cognizable injury. *Bell v. Ohio Dep't of Rehab. & Corr.*, No. 2002-09854-AD, 2004 Ohio Misc. LEXIS 179, at *4 (Ohio Ct. Cl. Apr. 26, 2004) ("No recovery can be had [in tort] where it is not certain plaintiff suffered any damages"); *Firsdon v. Mid-American Nat'l Bank & Trust Co.*, No. WD-98-035, 1998 Ohio App. LEXIS 6028, at *6 (Ohio Ct. App. Dec. 18, 1998) ("Unquestionably, damages are an essential element of a breach of contract claim"). Moreover, an essential element of any cause of action is the existence of a proximately caused injury. It is not enough to pursue some nominal injury resulting from an alleged breach of contract. *DeCastro v. Wellston City Sch. Dist. Bd. of Educ.*, 94 Ohio St. 3d

---

8 *See, e.g., Grindstaff v. Green*, 133 F.3d 416, 419 n.5 (6th Cir. 1998) ("The third member was an 'outside' director. . . . [The company] agreed to add two additional 'outside,' i.e., non-management, members to the Board.…"); *In re Baldwin-United Corp*., 79 B.R. 321, 328 (Bankr. S.D. Ohio 1987) ("An initial question was raised as to whether the same law firm should represent both managerial and outside directors"); *NCR Corp. v. AT&T Co*., 761 F. Supp. 475, 491 (S.D. Ohio 1991) (information was "not presented to the outside Directors by management").

197, 201-02, 761 N.E. 2d 612, 617 (Ohio 2002) (a party cannot maintain a cause of action for breach of contract resting upon a claim for nominal damages where actual damages have not been sustained). Further, as is the case here, a person who actually benefits from the allegedly tortious conduct or a breach of contract has likewise not suffered a cognizable injury. *See e.g. Chronister Oil Co. v. Unocal Refining & Mktg.*, 34 F.3d 462, 464-66 (7th Cir. 1994) (reversing trial court's damage award because the defendant actually benefited from the plaintiff's breach of contract). As discussed below, the UAT alleges that NPF VI actually benefited, and was not harmed, by the alleged misconduct.[9]

### B. The Allegations In The Amended Complaint Establish Only That The Bank Conferred Benefits On NPF VI, Not Legally Cognizable Injuries

#### 1. The UAT Only Benefited From The Bank's Alleged Misconduct

According to the Amended Complaint,[10] the Bank's misconduct largely consisted of:

- transferring funds at the direction of the Servicer, NPFS, out of the Reserve Equity, Seller Credit Reserve and Offset Reserve Accounts to purchase receivables, to create false impressions in reporting requirements, and to hide shortfalls in those accounts (Amend. Compl. ¶ 158);
- participating in a "kiting scheme" whereby funds were transferred between NPF VI and NPF XII accounts to mask shortfalls in the accounts (*Id.* ¶ 217); and
- disregarding obligations under the NPF VI Indenture such as declaring Events of Default and declaring Principal Amortization Events which would have

[9] The Amended Complaint is replete with allegations that the Bank's alleged misconduct was borne directly out of instructions from NPFS and NPF VI. Like the injury requirement, it is also a fundamental principle that *volenti non fit injuria* – to one who is willing, no wrong is done. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 18 (5th ed. 1984). By definition, consensual conduct is not harmful conduct – at least not harmful conduct for which the law provides a remedy. Absent such harm, a person has no cause of action as a matter of law. *See, e.g.,* Restatement (Second) of Torts § 892A (1979) ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort…."); *Shriver v. Tingley (In re Shriver)*, 46 B.R. 626, 629 (Bankr. N.D. Ohio 1985) (consent is an absolute defense to a breach of contract claim and to the intentional torts of conversion and trespass).

[10] Of course, the Bank denies the allegations made against it, but for purposes of this argument, accepts the allegations as true only so as to demonstrate the legal madness that ensues when an admitted tortfeasor sues an alleged tortfeasor for assisting in the commission of the wrongdoing.

terminated the program, despite shortfalls in the accounts and other indenture violations (*Id.* ¶ 157-58).

When viewed from the perspective of NPF VI, at the time the Bank was fulfilling the Servicer's instructions, all the alleged misconduct of the Bank benefited NPF VI. For example, the supposed harm caused by the alleged transfer of funds is nothing more than NPF VI using funds that it needed but allegedly was not entitled to use – a benefit. The harm supposedly caused by the alleged "kiting" scheme is nothing more than NPF VI masking shortfalls that allegedly would have led to an Event of Default and Principal Amortization Event – another benefit to NPF VI.

Likewise, the alleged failure to give notice of Events of Default and a Principal Amortization Event *benefited* NPF VI and, it continued its business rather than "shut[ting] down the operation of [NPF VI]" (Amend. Compl. ¶ 134) . The UAT therefore, standing in the shoes of NPF VI, has failed to allege any harm *to it* as a matter of law.

## VI. CLAIMS UNDER RICO AND THE OHIO PCA MUST BE DISMISSED

For the reasons in the Motion to Dismiss of Bank One, N.A. at Point II, incorporated herein by reference, the RICO and Ohio PCA claims asserted against the Bank (Counts I, II, IV-VI and VIII) must be dismissed. The allegations underlying the UAT's RICO claims against Bank One and the Bank are likewise similar in all material respects. Therefore, the arguments raised by Bank One apply with equal force to the Bank.

## VII. THE NPF VI INDENTURE BARS THE BREACH OF CONTACT CLAIM ASSERTED AGAINST THE BANK

The UAT admits, as it must, that the Bank acted as an indenture trustee for the notes issued by NPF VI (Amend. Compl. ¶ 51). As set forth in the Bank's motion to dismiss several noteholders actions, which is incorporated herein by reference (*see* Consolidated Motion to Dismiss of JPMorgan Chase Bank, Point II at pp. 10-12) (MDL D.E. 250), the duties of an

indenture trustee are strictly limited to those set out in the indenture agreement. *See Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) ("[A]n indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement"); *Master Consol. Corp. v. BancOhio Nat'l Bank*, 61 Ohio St. 3d 570, 580, 575 N.E.2d 817, 824-25 (Ohio 1991) (refusing "to impose on the indenture trustee a duty of inquiry that operates to override the provisions of a trust indenture"); *Harriet & Henderson Yarns, Inc. v. Castle*, 75 F. Supp. 2d 818, 829-30 (W.D. Tenn. 1999) (same).[11]

Consistent with these principles, § 8.01(c)(i) of the NPF VI Indenture states:

> Except during the continuance of an Event of Default which results in the declaration of a Principal Amortization Event with respect to all Series of Notes (i) [the Bank] undertakes to perform such duties and only such duties as are specifically set forth in this Master Indenture, and no implied covenants or obligations shall be read into this Master Indenture against [the Bank]

The Bank's duties under the NPF VI Indenture were limited. The Bank's role was like a stakeholder: to hold funds of NPF VI in several different accounts established and maintained by NPF VI and NPFS (NPF VI Indenture, Article VI); administer those accounts pursuant to the directions of NPFS as Servicer (*id.*, § 6.01(a)); receive periodic financial reports

---

11 *See also* American Bankers' Association, Corporate Trust Committee, *The Trustee's Role in Asset-Backed Securities*, Mar. 12, 2003 at 7 (Ex. F hereto):

> The responsibilities of the trustee, as set forth in typical asset-backed securities transaction documents . . . are narrowly circumscribed as to each role and are traditionally stated to be limited to those expressly accepted by the trustee. These duties are ministerial in nature and do not require or permit the trustee to verify, investigate or monitor the actions of the seller or the servicer. Indeed, the trustee and the other transaction participants do not want the trustee to exercise judgment or discretion. In tacit recognition that the trustee's duties are so circumscribed, asset backed securities transaction documents usually provide for expert input from independent accountants or others in circumstances where information needs to be audited or verified. Trustee judgments are virtually never required or invited in the transaction documents.

from NPF VI (*id.*, § 4.12); make payments to noteholders (*id.*, § 6.06(a)); and perform certain arithmetical recalculations of certain reports received from NPFS (*id.*, at Exhibit 7).

The NPF VI Indenture is explicit that the Bank is not responsible for the duties of NPF VI and NPFS, including the use by NPF VI of the proceeds from note issuances, maintaining required amounts in accounts and purchasing receivables (*id.*, §§ 5.04(e), 5.04(b), 8.04). In addition, the NPF VI Indenture is absolutely clear that the Bank can conclusively rely on the instructions, directions, opinions, certifications and statements it received from NPF VI and NPFS (*id.*, §§ 8.01(c)(ii), 8.03(a)). Contrary to the UAT's allegations, the Bank was not required to act as a "gatekeeper" to prevent NPF VI and NPFS from violating their obligations, nor was it required to give notice of "breaches" "violations" or "defaults." Indeed, the entire structure and explicit language of the NPF VI Indenture severely constrained the Bank from giving notice of Events of Default (*id.*, §§ 7.01, 7.02, 8.01, 8.02).

Ignoring the NPF VI Indenture, and the legal principles that recognize the limited duties of an indenture trustee, the UAT seeks to hold the Bank liable for breaches of contractual obligations that, as a matter of law and the explicit terms of the NPF VI Indenture, do not exist.[12]

### A. The Bank Did Not Breach Any Obligations By Following Directions Of NPFS As The Servicer To Effectuate Transfers

Careful to avoid quoting the NPF VI Indenture, the UAT alleges that the Bank breached its obligations by executing transfers from the Equity Account, the Seller Credit Reserve Account, and the Offset Reserve Account at the direction of NPFS as Servicer which

[12] This Court may decide issues relating to the NPF VI Indenture on a motion to dismiss. *See ON Marine Serv. Co. v. EVTAC Mining, LLC*, No. 2:01-CV-934, 2002 WL 31412437, at *3 (S.D. Ohio Sept. 30, 2002) (dismissing contract claims finding that that the terms of the contract at issue barred plaintiff's claims for relief (citing *Consol. Jewelers, Inc. v. Standard Fin. Corp.*, 325 F.2d 31, 36 (6th Cir. 1963)). Thus, the Court need not accept as true the UAT's mischaracterizations of the NPF VI Indenture which the UAT itself admits may be "inconsistent with the terms of the Indentures and their exhibits" (Amend. Compl. ¶ 44, n.1).

were "not permitted under the Indenture" (Amend. Compl. ¶¶ 162-63). This argument is precluded by the NPF VI Indenture itself.

First the UAT admits that all transfers made by the Bank were pursuant to directions from NPFS. *See, e.g.*, Amend. Compl. ¶ 411 ("the Servicer provided instructions to the Indenture Trustee on how to disburse the trust accounts of NPF VI."); *id.* at ¶ 412. The NPF VI Indenture explicitly states that the Bank may "conclusively rely" on such instructions. *See* NPF VI Indenture §§ 8.01(c)(i), 8.03.[13]

Moreover, the NPF VI Indenture places responsibility for the establishment and maintenance of these accounts upon NPF VI, defined as the "Company," and NPFS as Servicer, not the Bank. *See* NPF VI Indenture §§ 6.01(a), 6.03(a). The Bank is to administer such accounts pursuant to written directions. *Id*. §§ 6.01(a), 6.03(a), 6.05(c). Section 5.04(b)(i) requires NPFS, not the Bank, to "mak[e] all determinations of actual and required amounts in each of the accounts established pursuant to this Master Indenture."

Finally, the NPF VI Indenture absolves the Bank from liability with respect to such duties. *Id.* § 5.04(e) ("the Trustee shall [not] be obligated to perform any of the obligations of the Servicer"); § 8.01(i) ("Trustee shall have no liability in connection with malfeasance or

[13] The UAT attempts to create an issue by alleging that a Bank representative has testified that it had a "standing policy" to verify, by reviewing the terms of the NPF VI Indenture, that any transfer request was permitted and authorized by the Indenture (Amend. Compl. ¶¶ 80, 163). That is untrue. The Bank's designated representative testified during Bankruptcy Rule 2004 discovery proceedings that if the Bank received an instruction signed by NPFS as the Servicer, there was no requirement to determine whether such instruction conformed with the terms of the entire Indenture (Ex. G at pp. 66-67), and further, that unless the transfer was specifically "prohibited" by the NPF VI Indenture, the Bank would be entitled to rely on the instruction from NPFS to make the transfer. (*Id.* at pp. 129-30; errata sheet). The Court may consider this testimony since it is specifically referenced in the Complaint. *See Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994) (considering deposition transcript and affidavit referenced in complaint on 12(b)(6) motion to dismiss), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

The UAT also alleges, without support, that the NPF VI Indenture "*expressly provides* that Chase was not entitled to rely on any transfer or withdrawal instruction from the Servicer where the requested transfer was not

(footnote continued on next page)

nonfeasance by the Servicer"); § 8.04 (The Trustee shall not be accountable for the use or application by the Company of the Notes or the proceeds thereof).[14]

### B. The UAT Fails To Plead Circumstances That Would Have Required The Bank To Notice An Event of Default

The UAT next alleges that the Bank breached its obligations under the NPF VI Indenture in failing to give notice of an Event of Default and Principal Amortization Event ("PAE") despite the failure of NPF VI to maintain the reserve accounts at the minimum balances required by the Indenture (Amend. Compl. ¶¶ 178-206). As the UAT itself acknowledges in the Amended Complaint, its claim conflicts with the controlling provisions of the NPF VI Indenture and must be dismissed. *See* Amend. Compl. ¶ 44, n.1 ("All … explanations of the Indentures … are hereby qualified in their entirety to the extent that they are inconsistent with the terms of the Indentures…").

#### 1. The UAT Does Not Allege Any Circumstances That Required The Bank To Give Notices With Respect To Alleged Shortfalls

The thrust of the UAT's claim that the Bank should have delivered a notice of default due to shortfalls that occurred in the NPF VI accounts (Amend. Compl. ¶¶ 178-88) is:

---

(continued from prior page)

authorized under the Indenture" (Amend. Compl. ¶ 162) (emphasis added). This is plainly incorrect. *See* NPF VI Indenture §§ 8.03, 8.01(c)(i).

[14] The NPF VI Indenture does not prohibit the transfers alleged in the Complaint. The UAT alleges that the Bank breached its obligations by executing transfers out of the Equity Account on "days other than a Monthly Payment Date" and to locations other than those listed in Section 6.06(a) (Amend. Compl. ¶¶ 166-68). But nothing in § 6.06(a) prohibits the Trustee from executing transfers at the direction of NPFS as the Servicer on days other than a Monthly Payment Date, or to other accounts other than those listed in that section. Section 6.06(a) only specifies what must be done on a Monthly Payment Date, nothing more. The UAT also alleges that withdrawals were made from the Seller Credit Reserve Account for reasons other than to cover a Credit Deficiency (Amend. Compl. ¶ 171), and from the Offset Reserve Account for reasons other than to cover amounts due by a Seller in respect of Rejected Receivables (*Id*. ¶ 174). But the UAT does not (and cannot) cite a single provision of the NPF VI Indenture which contains these alleged restrictions, nor any restrictions on withdrawals from these two accounts at the direction of NPFS, nor any requirement that the Bank try to determine the reasoning behind the NPFS' instructions. Instead of relying on the NPF VI Indenture, the UAT makes conclusory allegations that according to several noteholders, the Bank agreed that withdrawals were limited (Amend. Compl. ¶¶ 166, 168). That

(footnote continued on next page)

> A failure to maintain, at any time, the minimum specified balances in the NPF VI Reserve Accounts constituted an Event of Default under the NPF VI Indenture ... Upon the occurrence of any failure of the NPF VI Reserve Accounts to be maintained at or above their required levels, which would constitute an Event of Default, Chase would be required to declare a Principal Amortization Event, or alternatively make a determination whether to declare a Principal Amortization Event . . . (Amend. Compl. ¶¶ 178-180).

The UAT then alleges that the Bank breached its obligations because it did not give notice of an Event of Default even though the "NPF VI Reserve Accounts" "fell below [their] required minimum balance[s] on [numerous] occasions" (Amend. Compl. ¶¶ 182, 185, 188). These allegations completely distort the NPF VI Indenture. First, the obligations of the Bank under the NPF VI Indenture with respect to the Equity Account and the Seller Credit Reserve and Offset Reserve Accounts, including an obligation to give notice of an Event of Default with respect to shortfalls, vary.[15]

<u>Equity Account</u>: The Company (NPF VI) and the Servicer (NPFS), not the Bank, were obligated to ensure that the Equity Account was maintained at specified levels. *See* NPF VI Indenture §§ 6.03(a), 5.04(b)(i), 5.04(b)(xii) (Servicer required to "monitor[] . . . Specified Series Equity Account Balances, and the Specified Aggregate Equity Account Balance").[16]

Under the NPF VI Indenture, the Company was only obligated to maintain a single Equity Account with the Trustee. *See* NPF VI Indenture, § 6.03(a). Thus, aside from

---

(continued from prior page)

unsupported allegation, however, ignores the fact that all transfers were made at the direction of NPFS upon which the Bank was entitled to conclusively rely (NPF VI Indenture § 8.03(a)).

[15] This is significant because the UAT incorrectly groups all three accounts into a self-serving term called the "NPF VI Reserve Accounts." No such term exists under the NPF VI Indenture. In fact, while the Seller Credit and Offset are called "Reserve" accounts, the Equity Account is not. *See* NPF VI Indenture, Article I at 6, 10 and 15.

[16] "Specified Aggregate Equity Account Balance" means "an amount equal to the sum of all Specified Series Equity Account Balances to be on deposit in the Equity Account. . . ." NPF VI Indenture, p. 16. Each Supplemental Indenture contained a definition for "Specified Series Equity Account Balance" for that particular series. *See, e.g.*, Sixth Supplemental Indenture at p. 2 (attached hereto as Ex. H).

information contained in the monthly Investor Report relating to one day out of the month, the Bank did not have any means to ascertain what the "Specified Series Equity Account Balances" were on days other than the date specified in the Investor Report.

Further, the definition (and hence maintenance) of the "Specified Series Equity Account Balance" for each Series of Notes as set forth in the Supplemental Indenture (and thus for entire the Equity Account) depended on information about the "Net Value of Purchased Receivables," "Defaulted Receivables" and "Rejected Receivables." *See* Ex. H hereto at p. 2. That information was exclusively maintained by NPFS as the Servicer on behalf of the Company, not the Bank.[17]

The UAT does not plead, nor can it, that the Bank, as the indenture trustee, was required to have or obtain such information on a daily basis, nor that it was obligated to calculate such information. Indeed, the NPF VI Indenture explicitly exempts the Bank from liability in connection with the purchase of receivables. NPF VI Indenture § 8.01(i). Rather, as the UAT itself admits, information with respect to "receivables" and the "Specified Equity Account Balance" for each Series of Notes was provided to the Trustee only through the monthly Investor Report, prepared and delivered by NPFS as the Servicer to the Trustee (and the Rating Agency) once a month. *See* NPF VI Indenture § 5.04(b)(xiii); Amend. Compl. ¶ 112; *see, e.g.*, Ex. I hereto. Each Investor Report provided such information "as of" one day out of each month. *Id.* It is not alleged that the Bank was provided with, nor required to obtain, any information to independently verify such reported balances or the value of receivables and specified balances.

---

[17] *See* NPF VI Indenture § 5.01(a) ("The Company hereby appoints the Servicer as its agent to service the Purchased Receivables . . . ."); i*d.*, § 5.04(a) ("The Servicer shall conduct the servicing, administration and collection of the Purchased Receivables . . . "); *id.*, § 5.04(b)(iii) (The Servicer shall "perform[] due diligence as to whether Receivables presented for Purchase by each Seller are Eligible Receivables, determining which Eligible

(footnote continued on next page)

In sum, according to the Amended Complaint, the Bank did not possess any information which would allow it even to determine, let alone know about, any required balance in the Equity Account except for one day out of every month via an Investor Report that was prepared and delivered to the Trustee by the Servicer. The UAT does not allege that the Bank had, or was ever required to have, any such information on any other day of the month.

Moreover, the ability of the Bank to give notice of an Event of Default based on a shortfall in the Equity Account is severely constrained by the NPF VI Indenture. Under § 7.01(j) of the NPF VI Indenture an Event of Default with respect to a shortfall in the Equity Account could only be noticed "upon review and based solely upon any Investor Report" – which as noted above, the Bank only received once a month and which reported specified balances only "as of" one day out of each month. Aside from one incident addressed below (*see* Point VII.B.2.c, *infra*), the UAT does not allege that any Investor Report reported a shortfall in the Equity Account. Thus, the UAT does not allege any circumstance that required the Bank to give a notice of an Event of Default or a PAE with respect to a shortfall in the Equity Account.

<u>Seller Credit Reserve/Offset Reserve Accounts</u>: Nor does the UAT allege the circumstances that required the Trustee to give notice of an Event of Default as a result of alleged shortfalls in either the Seller Credit Reserve and Offset Reserve Accounts. Under the NPF VI Indenture, the Servicer was obligated to monitor required balances in these two accounts. *See* NPF VI Indenture § 5.04(b)(i). Further, the Company (NPF VI), not the Bank, is obligated to maintain these two reserve accounts at specified levels. *Id.* § 4.03(t).

---

(continued from prior page)

Receivables will be purchased by the Company and calculating the Net Value of Purchased Receivables from each Seller").

Again, as in the case of the Equity Account, and as the UAT admits, the maintenance of the specified or required balances in these two accounts depended on information about receivables which was maintained by NPFS on behalf of the Company. *See id.*, §§ 5.01(a), 5.04(a), 5.04(b)(iii); Amend. Compl. ¶¶ 91, 99. As with the Equity Account, aside from the Investor Report (which reports only as of one day of each month), the UAT does not and cannot plead that the Bank was given or was required to obtain such information. Aside from these reports, the UAT does not plead any facts which showed that the Bank had information necessary to determine that these two accounts "fell below their required percentages on numerous occasions" (Amend. Compl. ¶¶ 185, 188).

Even if the Company breached its obligation under § 4.03(t), the Bank was not required to deliver notice of such event under § 8.02 since it never received written notice of such breach, nor is any such notice alleged by the UAT. Moreover, a breach by the Company of a representation under § 4.03(t) becomes an Event of Default only under § 7.01(g). Assuming *arguendo* that a § 7.01(g) Event of Default did exist, under § 7.02, the Bank was only required to deliver notice of an Event of Default pursuant to § 7.01(g) if it had actual knowledge of such event and the holders of a majority of the outstanding notes gave the Bank an instruction to do so. No such instruction is alleged by the UAT. To the extent the Bank had an option to give notice, there is no actionable breach because the matter was within the indenture trustee's discretion. In *Argonaut Partnership L.P. v. Bankers Trustee Co. Ltd.*, No. 96 Civ. 1970 (LLS), 2001 WL 585519, at *2 (S.D.N.Y. May 30, 2001), the court dismissed a claim that an indenture trustee breached an obligation to take enforcement action "because under the Indenture that was a matter solely within [the indenture trustee's] discretion." *C.f. Broadbeech v. Hartford Casualty*

*Ins. Co.* 773 F. Supp. 882, 905 (S.D. Mass. 1991), *aff'd*, 979 F.2d 209 (5th Cir. 1992) ("'may' means may, not must").

**2. The UAT Does Not Allege Circumstances Demonstrating <u>That The Bank Had Actual Knowledge Of An Event Of Default</u>**

Unable to plead a breach of the specific duties in the actual Indenture, the UAT attempts to impose implied, unwritten obligations on the Bank to deduce or speculate as to alleged irregularities in NPF VI accounts. The Bank had no such obligations. The UAT alleges, in conclusory fashion, that Chase had "actual knowledge" from several "sources" of shortfalls in the accounts (Amend. Compl. ¶ 189) – requiring it to give notice of an Event of Default. The "sources" identified by the UAT however, do not, on their face, support this allegation.[18]

**a. Weekly "Collateral Coverage Reports" <u>Did Not Require The Bank To Give Notices</u>**

For example, the UAT claims that certain "collateral coverage reports" delivered by NPFS as Servicer to the Bank each week "routinely reported" that the NPF VI Reserve Accounts were out of compliance with the Indenture" (Amend. Compl. ¶ 189). That is false. Such reports (which the UAT has but does not attach to the Complaint) do not state that the reserve accounts were short. Rather, as reflected in the example of a collateral coverage report annexed hereto as Exhibit J, and as the UAT itself admits, those reports reported the "current

---

18 "Actual knowledge" in an analogous context has been defined by the Sixth Circuit to require "*specific knowledge of the actual breach of duty.*" *Wright v. Heyne*, 349 F.3d 321, 326 (6th Cir. 2003) (emphasis added) (citation omitted). By contrast, "[w]hen the law says that someone or some entity has 'constructive knowledge,' it means that the person or entity 'did not but should have known' about something." *Cordoba v. Dillard's, Inc*., No. 6:01CV1132ORL19KRS, 2003 WL 21295143, at *10 (M.D. Fla. Feb. 24, 2003), *affd*, No.03-11105, 2003 WL 22240335 (11th Cir. 2003). Although the UAT concludes that the Bank had "actual knowledge" throughout the Amended Complaint, at best, the UAT merely alleges circumstances in which the Bank purportedly "should have known" of an Event of Default. The Bank was under no obligation (and was prohibited) to declare an Event of Default based on "constructive knowledge."

cash balances" of each account as of a date every week. *See* Amend. Compl. ¶ 116 ("weekly Collateral Coverage Reports . . . [listed] "balances" in the trust reserve accounts").[19]

The UAT appears to argue that the Bank should have taken steps to determine whether there were shortfalls by comparing balances as reflected as of a certain date on the monthly Investor Report, with the "balances" as of a certain date each week reflected in the collateral coverage reports received *during* the month (Amend. Compl. ¶ 191). Under the NPF VI Indenture, the Bank had no obligation to make such comparisons – and the UAT does not allege any such obligation either.

Moreover, comparing "balances" reflected in weekly collateral coverage reports with those in the monthly Investor Reports (as of the one day at the beginning of the month) would not provide "actual knowledge" that shortfalls existed. As noted above (*see* Point VII.B.1, *supra*), "specified balances" (and thus shortfalls) depended not just on "balances" but on information about receivables, which was only in the possession of the Company and NPFS as the Servicer. Finally, the UAT's allegation also wrongly assumes that the specified balances in the accounts were required by the NPF VI Indenture to remain constant throughout the month, and indeed constant on every day over a 7-month period (as reflected in the self-serving chart crafted by the UAT after ¶ 191 of the Amended Complaint). Because specified balances

---

[19] The Court may consider this document in this 12(b)(6) motion since it is specifically referenced in the Complaint. *See Plassman*, 1996 WL 254662, at *3; Moore, 2002 WL 31934172, at *1 ("[D]ocuments whose contents are alleged in a complaint . . . but are not physically attached to the pleading, may be considered in ruling on a rule 12(b)(6) motion to dismiss."); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327 (3d ed. 2004) ("[w]hen the plaintiff fails to introduce a pertinent document as part of her pleading . . . the defendant may introduce the document as an exhibit to a motion attacking the sufficiency of the pleading . . .").

depended on the value of receivables, those balances would necessarily fluctuate – which the UAT itself acknowledges in its chart after ¶ 196 of the Complaint.[20]

**b. Investor Reports Delivered By NPFS As The Servicer <u>Did Not Require Of A Notice Of An Event Of Default</u>**

The UAT next alleges that the Bank had actual knowledge that reserve balances were not maintained at specified levels as a result of certain Investor Reports. Beyond the February 1999 investor report (*see* Point VII.B.2.c, *infra*), the UAT mentions only two specific Investor Reports – those for September and October 1999 – that allegedly reported a shortfall in the Seller Credit Reserve Account. Again, the Bank is only *required* to deliver notice of an Event of Default pursuant to § 7.01(g) if it has actual knowledge of such event, and the holders of a majority of the outstanding notes give the Bank an instruction to do so (*Id*; § 7.02). No such instruction is alleged by the UAT. [21]

**c. The Delivery Of The February 1999 Investor Report <u>Did Not Require The Bank To Notice an Event of Default</u>**

The UAT also alleges that the February 1999 investor report required the Bank to have given certain notices. That is incorrect for multiple reasons.

First, the UAT alleges that this investor report issued by NPFS was 9 days late, resulting in an "Event of Servicer Default" (Amend. Compl. ¶ 199).[22] That is wrong. Section

---

[20] The UAT also bases its claim on the allegation that "Chase was required to review and recalculate the Collateral Coverage Reports" (Amend. Compl. ¶ 189). But under the NPF VI Indenture, the Bank's sole responsibility with respect to collateral coverage reports was to perform an arithmetical recalculation based on the information in the report. *See* NPF VI Indenture, Ex. 7, § III.B. Since the collateral coverage report says nothing about "specified balances" in "reserve accounts," nothing about the recalculation itself would provide any information necessary to determine shortfalls in the accounts either.

[21] The September 1999 investor report shows a shortfall of .37% and the October 1999 report shows a shortfall of .95%. The UAT does not allege any circumstances requiring the Bank to have given notice of Event of Default and PAE based on such minute shortfalls – which the UAT admits would have resulted in "the termination of the programs" (Amend. Compl. ¶ 180).

[22] Without support, the UAT also alleges that NPFS' failure to deliver a collateral coverage report when due "was also a Servicer Event of Default." That allegation is also unsupported by the NPF VI Indenture. Under 5.09(a)

(footnote continued on next page)

5.09(e) defines an Event of Servicer Default as the "fail[ure] to deliver an Investor Report ...." Notably, the plain language of section 5.09(e) *does not* define an Event of Servicer Default as a failure to deliver an investor report by a specific day of the month. Moreover, the first sentence to § 5.09 states that the Event of Servicer Default must exist and "be continuing." As the UAT admits, the Bank received this report from NPFS as the Servicer "[o]n March 29, 1999" (Amend. Compl. ¶ 199).

Next, the UAT alleges that upon receipt of this Investor Report, the Bank learned that there was a shortfalls in the Seller Credit Reserve and Equity Accounts (*Id.* ¶ 201). With respect to the Equity Account, the UAT alleges:

> Because Chase knew on 3/29/99 that the Equity Account balance was $28.5 million below the specified minimum as of the month end February Monthly Payment Date, as well as in the seven days thereafter, and remained below the minimum level as of 3/29/99, *Chase was obligated under the NPF VI Indenture to give immediate notice of this Event of Default to the Servicer and declare a Principal Amortization Event on the next business day*. Chase gave no such notice nor did it declare a Principal Amortization Event (*Id*. ¶ 203) (emphasis added).

This is also wrong. As noted, an Event of Default under § 7.01(j) must be based "solely" upon an Investor Report (*see* p. 28, *supra*). The UAT admits that the Investor Report the Bank received on March 29, 1999 "stated that the balances in the NPF VI Reserve Accounts were greater than or equal to the minimum balances specified in the NPF VI Indenture as of

---

(continued from prior page)

of the NPF VI Indenture, it is an Event of Servicer Default if "the Servicer shall fail to perform or observe any material term, covenant or agreement contained in this Master Indenture or any Supplemental Indenture." Even if such failure to timely deliver such reports was an Event of Servicer Default, the UAT does not allege any facts or cite any provision of the NPF VI Indenture which required the Bank to take any action.

[2/28/99]" (Amend. Compl. ¶ 200). Thus, the Bank could not have issued notice of an Event of Default under § 7.01(j) based on that Investor Report.[23]

Even if an Event of Default did exist under § 7.01(j) based on the February 1999 Investor Report received on March 29, the UAT does not (and cannot) support its allegation that the Bank was required to deliver "immediate notice" of such event and declare a PAE the next day (Amend. Compl. ¶ 203). That is because the opposite is true. Under the plain language of the NPF VI Indenture, the Bank was only obligated to deliver notice of a § 7.01(j) Event of Default if (1) it had actual knowledge that such an event had occurred or had received written notice thereof from the Company or NPFS , and (2) the event was "continuing" *See* NPF VI Indenture § 7.02. It was neither required to give (and was in fact *prohibited* from giving) immediate notice of such event, nor obligated to declare PAE the "next business day" (Amend. Compl. ¶ 203). The UAT alleges no facts demonstrating that any Event of Default under § 7.01(j) was "continuing."

In fact, the UAT admits that any shortfalls which may have existed in the NPF VI accounts as of March 29 were corrected on March 30, 1999, *the day after* it alleges the Bank received the February 1999 Investor Report (Amend. Compl. ¶ 204).[24] The UAT also admits that, on April 6, 1999, NPFS issued a new Investor Report for March 1999 and represented to the

---

[23] Also, based solely on an Investor Report, there must exist a shortfall (in a Series Equity Subaccount) on the Monthly Payment Date and for seven consecutive days for a § 7.01(j) Event of Default to exist. The UAT admits that the Investor Report received on March 29 stated, "account balances ... as of [2/28/99]." *Id.*, ¶ 200. The UAT does not (and cannot) allege that based "solely" on that Investor Report, there was a shortfall in a Series Equity Subaccount on the Monthly Payment Date and for seven consecutive days thereafter. Although the UAT alleges in conclusory fashion that the Bank "knew" that the "account balances" (not the Series Equity Subaccount balances) on the February 1999 report were incorrect as of the Monthly Payment Date and for seven days thereafter, it admits that such knowledge was not based any Investor Report. *Id.*, ¶¶ 200-01.

[24] Thus, even the UAT's misguided interpretation of the Bank's obligations with respect to providing notice of an Event of Default and declaring a PAE would not require such notice. Since § 7.02 provides a one-day cure period for the Servicer to correct any Events of Default under § 7.01(j), and the UAT admits the shortfalls no longer

(footnote continued on next page)

Bank "that the NPF VI Reserve Accounts were then compliant and that the Collateral Coverage test was now met" and that the reason for the shortfalls were "timing issues" with respect to "receivables." *Id.,* ¶ 205. Thus, the UAT concedes that less than one week after receiving the February 1999 Investor Report, the alleged shortfalls no longer existed in the accounts and NPFS represented to the Trustee that the account and collateral coverage tests were satisfied. The Bank, therefore, was not obligated to (and could not) have given a notice of an Event of Default or a PAE under the terms of the NPF VI Indenture.[25]

The UAT alleges that given the size of the shortfalls, NPFS' explanation "could not possibly" be true (Amend. Compl. ¶ 206). It alleges that the Bank "made no effort to correct these statements or to attempt to determine the actual cause of the reserve shortfalls and the failure of the Collateral Coverage Test." *Id.* Under the NPF VI Indenture, however, there was absolutely no obligation for the Bank to verify NPFS' statements as to receivables or determine the cause of reserve shortfalls – and the UAT points to none. Indeed, because such information was in the possession of NPFS as the Servicer, the Bank could not have done so. Moreover, the parties to the NPF VI Indenture explicitly agreed that the Bank could "conclusively rely" on statements, instructions and certifications of NPFS. *See* NPF VI Indenture §§ 8.01(c)(ii), 8.03.[26]

---

(continued from prior page)

existed the day after the report was received, the Bank could not have declared PAE "the next business day" because the shortfall was cured (Amend. Compl. ¶ 203).

[25] The UAT also alleges that Chase received a revised February 1999 Investor Report which reported shortfalls in the accounts (Amend. Compl. ¶ 204). The UAT fails to allege when this report was received but based on its assertion that this revised Investor Report was "the second notice to Chase in a single month that it was required to declare an Event of Default" *id.*, it apparently was delivered on March 30 or 31 This second Investor Report does not alter the fact that the Bank could not have issued a notice since, as described above, any shortfalls in the accounts were admittedly corrected by March 30, 1999 and thus were not "continuing."

[26] Likewise, the UAT alleges in conclusory fashion that the Bank knew the shortfalls were corrected as a result of an infusion of $180 million in cash from a new note issuance (Amend. Compl. ¶¶ 812-13), but does not allege any facts to support this claim, nor does it (or can it) allege what provision of the NPF VI Indenture obligated the Bank to give a notice even if the Bank did know that the shortfalls were corrected in this manner.

With respect to the Seller Credit Reserve Account, the UAT fails to allege how this alleged shortfall amounted to an Event of Default under the NPF VI Indenture which required the Bank to give a notice. As set forth above (*see* Point VII.B.1, *supra*), a breach by the Company of its representation in § 4.03(t) only becomes an Event of Default under § 7.01(g). Under 7.02, the Bank was required to give notice of a § 7.01(g) Event of Default if the Holders instructed the Bank to do so. The UAT does not allege that the Holders gave such an instruction. Finally, the UAT admits that the shortfall was corrected the next day, thereby prohibiting the Bank from declaring a PAE (Amend. Compl. ¶ 206; NPF VI Indenture § 7.02).

**d. <u>The Bank Did Not Assume Fiduciary Obligations</u>**

Recognizing that that the language of the NPF VI Indenture undermines its allegations, the UAT alleges that the Bank assumed some broad, undefined obligation to act under a "prudent man standard" immediately upon learning of these shortfalls:

> Each of these reserve shortfalls was an Event of Default, triggering Chase's obligation to act under the prudent man standard in determining what action it should or was required to take (Amend. Compl. ¶ 201).

The UAT's allegations, once again, contradict the explicit terms of the NPF VI Indenture. The Bank's powers and duties, even after an Event of Default, are still limited to the terms of the NPF VI Indenture. Section 8.01(d) of the NPF VI Indenture explicitly states:

> In case an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers *vested in it by this Master Indenture*, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs, . . . .

Indeed, until there is both an Event of Default which results in a PAE with respect to all Series of Notes issued by the Company, the Bank's duties are expressly limited to those set forth in the NPF VI Indenture *and no implied covenants* may be imposed on the Bank. *Id.* § 8.01(c)(i).

Several cases underscore this point. In *Semi-Tech Litigation, LLC v. Bankers Trust Company*, No. 02 CIV. 0711(LAK), 2005 WL 121750, at *7 n.58 (S.D.N.Y. Jan. 21, 2005), the court noted that there are no implied duties imposed on the indenture trustee even in determining whether an event of default had occurred. *Id.* Similarly, in *Regions Bank v. Blount Parrish & Co.*, No. 01 C 0031, 2001 WL 726989 (N.D. Ill. June 27, 2001), the Court held:

> Though courts have recognized that an indenture trustee's duties change after a default occurs, the change does not authorize an indenture trustee to take actions not otherwise contemplated by the indenture.

*Id.* at *6; *see also Philip v. L.F. Rothschild & Co.*, No. 90 Civ. 0708, 1999 WL 771354, at *2 (S.D.N.Y. Sept. 29, 1999) (rejecting plaintiff's "broad characterization" of an indenture trustee's post-default duties and noting that "the scope of those obligations are still circumscribed by the indenture"); *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 935 F. Supp. 1333, 1348 (S.D.N.Y. 1996) (duty after Event of Default is "defined by reference to the indenture").[27]

### C. The UAT's Allegations Concerning Transfers Between NPF VI And NPF XII Accounts Do Not State A Claim Against The Bank

The Amended Complaint alleges that in late 1999, Poulsen and NPFS as Servicer implemented a so-called "kiting scheme," which violated the NPF VI Indenture, whereby funds were transferred back and forth between NPF XII and NPF VI accounts near the end of each month (at the direction of the Servicer) "in amounts sufficient to allow" the reserve accounts to

[27] The UAT also alleges that the Bank knew of shortfalls in reserve accounts, and thus should have declared an Event of Default, based on certain communications it had with NPFS as the Servicer or internally about account balances (Amend. Compl. ¶¶ 194-96). The UAT also alleges that certain internal memoranda, which it fails to attach to the Complaint, reported "average balances" in each of the accounts (*id.*, ¶¶ 195-96). Notably, the UAT does not (and cannot) plead that any of these communications reference "specified balances." Information as to "actual" or "average" balances alone, however, does not provide the necessary information to determine whether shortfalls in the reserve accounts existed. *See* Point VII.B.1, *supra*. The UAT also alleges that based on the "pattern and practice of the Servicer" in making transfers and preparing Investor Reports, the Bank should have declared an Event of Default with respect to alleged shortfalls in the reserve accounts (Amend. Compl. ¶ 198). The alleged obligation to declare an Event of Default based on a "pattern" of transfers simply does not exist anywhere in the NPF VI Indenture.

meet their specified minimum tests (Amend. Compl. ¶¶ 207-08, 217). The Amended Complaint alleges that the Bank and Bank One joined this scheme, but does not allege the circumstances of when or who at the banks did so. These allegations do not state a claim against the Bank.

### 1. **The Transfers Were Made At The Direction Of NPFS As The Servicer**

First, the UAT admits that transfers that form the basis of this allegation were made at the direction of NPFS as Servicer. *See* Point VII.A, *supra*. The NPF VI Indenture expressly allows the Trustee to rely on such instructions. *See* NPF VI Indenture §§ 8.01(c)(ii), 8.03. Moreover, provisions of the NPF VI Indenture relating to "inter-corporate" transactions between NPF VI and NCFE or its Affiliates impose obligations only on NPF VI, *not* the Bank. *See id.* §§ 4.04(d), 4.11(c), 4.11(d) and 4.11(e)).[28] The UAT does not allege how such "breaches" became Events of Default that required the Bank to take any action.

Indeed, the UAT cannot dispute that the transfers: are not prohibited under the NPF VI Indenture; were made at the direction of NPFS; and that, as discussed below, NPFS represented that the transfers were for "reconciliation purposes" or to purchase receivables.

### 2. **The UAT's Allegations That The Bank Had Actual Knowledge Of The Scheme Do Not State A Claim Against The Bank**

Unable to assert that the Bank breached an obligation with respect to these transfers, the UAT resorts to conclusory allegations that the Bank had "actual knowledge" of the alleged scheme (Amend. Compl. ¶ 209). Again, the sources cited by the UAT do not, on their face, support this claim and rest on the notion that the Bank had an implied obligation to deduce

---

28 In any event, the NPF VI Indenture does not, contrary to the UAT's claim, "expressly prohibit" transactions between NPF VI and NPF XII (*see* Amend. Compl. ¶ 217). The *actual* language of the NPF VI Indenture – as opposed to the misleading description in the Amended Complaint– does in fact authorize intercorporate transactions between NPF VI and NPF XII that are related to the Master Indenture. *See* NPF VI Indenture § 4.11(c).

the scheme based on interpretations of documents or patterns of transactions. No such obligation exists under the NPF VI Indenture or the law governing indenture trustees.

For instance, the UAT claims that certain "lockbox receipts reports" prepared by NPFS as the Servicer, demonstrate that the Bank knew about the "fraudulent transfers" because they show large transfers from Bank One as the "source bank" which the Bank allegedly knew to be trustee for NPF XII, such amounts dwarfed other incoming deposits from other banks, the transfers occurred regularly and no seller is identified on the report with respect to the deposits from Bank One (Amend. Compl. ¶¶ 210-211).[29]

These allegations do not adequately plead that the Bank had "actual knowledge" of any scheme. Notably, there is no allegation that the lockbox receipt report itself states that the purpose of these transfers is to perpetrate a fraudulent kiting scheme. To the contrary, the UAT admits that NPFS represented that the purpose of the transfers from Bank One was for "Reconciliation" (Amend. Compl. ¶ 211), which the Bank could "conclusively rely" upon, and which the NPF VI Indenture *expressly permitted*. *See* NPF VI Indenture § 5.04(b)(viii) (the Servicer shall "direct[] the Trustee to make any necessary adjustments, transfers and/or reconciliation as determined by the Servicer").

As the UAT itself recognizes, the sum total of the Bank's responsibilities with respect to lockbox receipts reports was to reconcile amounts received by the Bank to those reported by NPFS on the report. *See* NPF VI Indenture, Exhibit 7, § II.C; *see also* Amend. Compl. ¶ 210. The Bank was not obligated to investigate the pattern or purpose of these incoming wires, compare one deposit to another or challenge the NPFS' representation that the

---

[29] The UAT does not attach a single lockbox receipts report to the Complaint. As reflected in Exhibit K hereto, such reports merely show amounts being received from certain "source banks" and list a total amount of deposits which, under the NPF VI Indenture, the Bank was required to reconcile with NPFS as the Servicer.

transfers were for anything other than reconciliation purposes. Accordingly, the UAT's claim that the Bank had actual knowledge of an alleged fraudulent scheme based on these reports must fail.

The UAT also alleges that the Bank knew of the scheme by virtue of communications from NPFS to the Bank instructing either that the Bank would receive funds from Bank One or that it should send funds to Bank One (Amend. Compl. ¶ 212). Again, despite conducting extensive pre-filing discovery, the UAT conspicuously fails to attach any of these communications to its Complaint. The UAT does not allege (and cannot) that any of these communications from NPFS as the Servicer, on their face, demonstrate actual knowledge of a scheme. Nor does the UAT allege that the communications instruct the Trustee that the purpose of the transfers to and from Bank One were to effectuate the scheme. At best, these communications simply show that the Bank periodically received "wire transfers from Bank One" (Amend. Compl. ¶ 212) and/or that NPFS periodically directed the Bank to send wires to Bank One (*see id.* ¶ 216).

The UAT also alleges that certain money transfer memoranda (which again, it does not attach to its Complaint) demonstrate that the Bank "knew that the funds it was receiving from and returning to Bank One were the proceeds of a fraud, because Chase knew they originated in NPF XII trust account" (Amend. Compl. ¶ 215). These memos were the Bank's form to effectuate transfers of NPF VI funds which, as the UAT admits, the Bank was directed to do by NPFS as the Servicer and as agent for NPF VI. *See* Point VII.A, *supra*. Moreover, the UAT admits that the memoranda note only that funds were "being directed to 'XII Collection.'"

*Id.* Thus, according to the UAT, the memoranda, on their face, do not evidence a fraud and certainly do not demonstrate that funds sent to Bank One originated from NPF XII accounts.[30]

The UAT also alleges that the Bank wrongfully accepted Investor Reports that were dated on the last day of the month instead of the Monthly Payment Date (first business day of the month) (Amend. Compl. ¶¶ 218-24). There is no requirement in the NPF VI Indenture, nor does the UAT cite to any, that required the Investor Reports to be dated on the Monthly Payment Date. The responsibility to deliver the Investor Report was NPFS', not the Bank's. Moreover, the UAT does not allege, because it cannot, by reference to the Indenture itself, what steps the Bank was required to take as a result of these supposedly misdated Investor Reports.

### D. <u>The Bank Was Not Obligated To Monitor The Purchase Of Receivables</u>

The UAT also alleges that the Bank breached its obligations under the NPF VI Indenture because it knowingly transferred funds out of NPF VI trust accounts for purposes that "were *expressly* prohibited by the Indenture," namely: "(a) for the purchase of ineligible receivables and (b) for the purchase of receivables from ineligible, affiliated sellers" (Amend. Compl. ¶¶ 224, 227-29, 231-32, 234) (emphasis added). The UAT alleges that the Bank further breached its obligations by failing to give notices even though such transfers violated the NPF VI Indenture (*see id.*, ¶¶ 230, 233, 237). These claims are meritless for several reasons.

First, the UAT fails to identify any specific provisions of the NPF VI Indenture which "expressly" prohibited such transfers.[31] Second, the NPF VI Indenture does not require

---

[30] The Amended Complaint conveniently neglects to mention that all of these wire transfer memoranda derived from written directions from NPFS as the Servicer to the Bank that indicated that the transfers were for the purpose of purchasing receivables – clearly an activity related to the NPF VI Indenture.

[31] The UAT relies on NPF VI Indenture § 6.09 (and §§ 2.7, 6.2, 6.3 of the Sale & Subservicing Agreement, an agreement to which the Bank was not even a party) (Amend. Compl. ¶ 100), but the express language of these provisions does not limit withdrawals from the Offset Reserve Account at all. They simply provide situations for withdrawal from the Offset Reserve Account at the direction of NPFS, but do not in any way limit or prohibit the

(footnote continued on next page)

the Bank to control or supervise the purchase of receivables by NPF VI. Those duties are assigned to NPF VI as the Company and NPFS as the Servicer (*see* NPF VI Indenture, §§ 5.01, 5.04(a) and 5.04(b)(iii)). Third, the NPF VI Indenture makes clear that the Bank has no responsibility with respect to the disbursement of funds for the purchase of receivables (*see id.*, § 8.01(i)). Fourth, the UAT admits that all such transfers were made at the direction of NPFS, and the Bank, as indenture trustee, is expressly entitled to rely on such instructions. *See* Point VII.A, *supra*.

The UAT also fails to allege, based on the NPF VI Indenture, that the Bank was required to give notice of an Event of Default. Nor can it. Under § 5.09, if an Event of Servicer Default exists, the Trustee "may" – and thus is not required to – give notice of such event which if uncured for a certain period can result in termination of the servicing responsibilities of the Servicer. Importantly, an Event of Servicer Default does not ripen into an Event of Default unless and until the Servicer is terminated (*see* NPF VI Indenture § 7.01(i)). The Bank cannot have violated a duty that it was not required to perform. *See Argonaut Partnership L.P.*, 2001 WL 585519, at *2. Moreover, even if the Bank had terminated the Servicer resulting in an Event of Default under § 7.01(i), the Bank *still* was not required to give notice of that event or declare a PAE. *See* NPF VI Indenture § 7.02 (giving the Bank discretion to give notice of an Event of Default under § 7.01(i)).[32]

---

(continued from prior page)

Bank from following instructions to make withdrawals for other reasons.

[32] The UAT alleges that the Bank "knew" that NPF VI was re-purchasing "defaulted" or "rejected" receivables and purchasing "pro-forma" receivables based on two letters from NPFS (Amend. Compl. ¶ 230, 233). Notwithstanding that the UAT severely misrepresents these letters (which again it fails to attach to the Complaint), the UAT admits that they are not requests to transfer; rather the UAT alleges that the letters inform the Trustee what NPF VI was doing. Further, the UAT fails to identify any provision of the NPF VI Indenture prohibiting the "re-purchase" of "defaulted" or "rejected" receivables or the purchase of "pro-forma" receivables. Nor does the UAT allege how these letters *required* the Bank to take any action under the terms of the NPF VI Indenture. The UAT also alleges that the Bank knew that NPF VI was advancing funds to "affiliated sellers" based on "a series of

(footnote continued on next page)

In sum, when the actual provisions of the NPF VI Indenture are examined, as they must be, the allegations by the UAT fail to state any claim against the Bank. The inaccurate and self-serving descriptions of the NPF VI Indenture is not a substitute for properly pleading a breach of contract claim, particularly here where by the UAT's admissions, the Bank was merely acting under NPFS' instructions on which it was entitled to rely.

## VIII. THE TORT CLAIMS ASSERTED BY THE UAT SHOULD BE DISMISSED[33]

### A. The UAT's Tort Claims Are Duplicative Of The Contract Claim

The UAT's claims of conversion (Count IX), fraud (Count X), civil conspiracy (Count XI), breach of fiduciary duty (Count XIII), negligence and gross negligence (Count XIV),[34] should be dismissed because the allegations supporting these claims are based on the identical "facts" supporting their breach of contract claim. "[U]nder Ohio law, the existence of a contract action generally excludes a cause of action based upon the same conduct sounding in tort." *Hanlin v. Ohio Builders & Remodelers, Inc.*, 196 F. Supp. 2d 572, 579 (S.D. Ohio 2001).

---

(continued from prior page)

meetings" prior to the execution of the NPF VI Indenture and from reports received in May 2000 from Poulsen (which predictably, the UAT does not attach to its Complaint). The UAT, however, does not identify which provision of the NPF VI Indenture prohibited the purchase of receivables from sellers affiliated with NCFE, and further, what provisions of the indenture required the Bank to take any action in that regard.

The UAT also selectively quotes the testimony of Craig Kantor that the NPF VI Indenture prohibited the purchase of receivables from affiliated sellers (Amend. Compl. ¶ 67). The UAT, which fails to attach that testimony to the Complaint, conveniently neglects to disclose that Mr. Kantor testified that prior to September 2002 the Bank was unaware of such purchases and that the Bank was permitted to rely on the instructions of the Servicer with respect to the purchase of receivables (Ex. L at 183:11-14; 119:25-120:8).

[33] For purposes of this motion, Ohio law presumably applies to the UAT's tort claims. Factors to consider include the place where the injury occurred, the place where the conduct causing the injury occurred, the location of the parties, and the place where the relationship of the parties is centered. Restatement (Second) of Conflict of Laws § 145(2) (1971). Thus, as most of the common law claims in the Amended Complaint deal with events that occurred in the state of Ohio, the parties' relationships are centered in Ohio, the balance of interests weighs in favor of applying Ohio law.

[34] The Amended Complaint mistakenly identifies both its "Concert of Action/Knowing Participation in Breach of Fiduciary Duty" count (Amend. Compl. ¶¶ 614-618) *and* its "Negligence and Gross Negligence" count (*Id.* ¶¶ 625-30) as Count XIV.

*See* Consolidated Motion to Dismiss of JPMorgan Chase Bank (MDL D.E. 165) at 23-29 (incorporated herein by reference).

### 1. The UAT's Fraud Claims Duplicate Its Breach Of Contract Claim

Under Ohio law, a fraud claim cannot be maintained if the alleged fraud is premised on an alleged breach of the parties' contract. *See* Consolidated Motion to Dismiss of JPMorgan Chase Bank ("Bank Motion") (MDL D.E. 165) at 26 (incorporated herein by reference). Here, the Amended Complaint asserts two types of fraud claims against the Bank: (1) that the Bank concealed facts that they had a "duty to disclose" (*i.e.* a failure to disclose); and (2) that the Bank made "false representations" by "entering into the [NPF VI] Master Indenture[] without a present intent to perform" (*i.e.* promissory fraud) (Amend. Compl. ¶¶ 584-86). Both are duplicative of the breach of contract claims.

The essence of the UAT's fraud claim based on failure to disclose is that the Bank failed to disclose to NPF VI and NPF XII that the Defendants were not complying with the Master Indentures (Amend. Compl. ¶ 586-87). To prove this type of fraud against the Bank, the UAT will necessarily have to rely on the same facts – that the Bank breached its obligations under the NPF VI Indenture – as those that support the breach of contract claim. *See* Amend. Compl. ¶ 607.[35]

Likewise, the mere allegation that the Bank had no intention to perform its obligations under the NPF VI Indenture when it executed that contract will not transform a breach of contract claim into a promissory fraud claim. *See Captiva, Inc. v. Viz Communications, Inc.*, No. 01-4084, 2004 U.S. App. LEXIS 477, at *15 (6th Cir. Jan. 8, 2004)

---

[35] The UAT also alleges that a "kiting scheme" "was not only a fraud on NPF VI…it also violated numerous provisions of the NPF VI Indenture" (Amend. Compl. ¶ 217). This allegation, on its face, duplicates the contract claim.

(attached hereto as Ex. M); *Jonassen v. Bankers Trust Co.,* No. 90 Civ. 2242 (LBS), 1990 WL 180150, at *5 (S.D.N.Y. Nov. 13, 1990) (motion to dismiss granted because "if naked allegations of intent not to perform were sufficient, then every breach of contract action could be transformed into a fraud claim through the addition of one sentence to the complaint").

The UAT's promissory fraud claim is that the Bank entered into the NPF VI Indenture without an intention to perform its obligations (Amend. Compl. ¶ 149). As to the supposed misrepresentation, the UAT simply alleges that the Bank "agreed prior to signing the Master Indenture to ignore the mandates of the Master Indenture" (*Id.* ¶ 585). Albeit vague and conclusory, the UAT's allegations appear to equate the Bank's supposed "misrepresentations" with the "obligations" in the NPF VI Indenture that the Bank allegedly failed to perform. Thus, the UAT will, by necessity, rely on the same facts to support this type of fraud claim and its breach of contract claim.[36]

**2. The UAT's Other Tort Claims <u>Duplicate Its Breach Of Contract Claim</u>**

The UAT's other tort claims also impermissibly duplicate the contract claim. *See* Bank Motion (MDL D.E. 165) at 23-29 (incorporated herein by reference).

For example, the UAT alleges that the Bank breached its fiduciary duties by "devising a scheme to defraud," "misappropriating assets" and "kiting funds" (Amend. Compl. ¶ 612). However, the alleged scheme is the same as the alleged agreement to "disregard and breach the NPF VI Indenture" (Amend. Compl. ¶ 157), the misappropriation of funds from NPF VI and XII and intercompany transfers are based on provisions of the NPF VI Indenture (Amend. Compl. ¶¶ 162, 217, 224). Similarly, the UAT's claims for negligence and gross negligence

[36] Further, since the UAT's fraud claims do not seek special damages that they must be dismissed. *See* Bank Motion (MDL D.E. 165) at 27-28 (incorporated herein by reference).

allege that the Bank failed to exercise care in carrying out obligations under the NPF VI Indenture (Amend. Compl. ¶¶ 239, 628-29). That too duplicates the contract claim.

*Metropolitan West Asset Management, LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB), 2004 WL 1444868 (S.D.N.Y. June 25, 2004), is instructive. In that case, the plaintiff-noteholder brought claims for breach of contract, breach of fiduciary duty and negligence against an indenture trustee. *Id.* at 1. The noteholder asserted that the indenture trustee breached the contract by "failing to send out an Accountant's Certificate prior to the liquidation," which was the same allegation used to support the tort claims. *Id*. at *8. The court dismissed the tort claims because the plaintiff did not allege acts or omissions other than those created by the Indenture. *Id.* at *8-9.

Likewise, a claim for conversion must be dismissed if it is predicated on a breach of contract. *Lightbody v. Rust*, No. 80927, 2003 WL 21710601, at *5-6 (Ohio Ct. App. July 24, 2003). Here, the UAT bases its conversion claim on the same allegations that the Bank misappropriated funds which the UAT acknowledges violated the NPF VI Indenture (Amend. Compl. ¶¶ 578-79).

Finally, the only act specifically attributable to the Bank that supports the UAT's conspiracy count is "the unauthorized transfers" (*Id.* ¶ 599), which are the same allegations that form the basis of the breach of contract claim. *See Id.* ¶¶ 163; 166-77. For purposes of civil conspiracy, "the underlying unlawful act must be a tort." *Avery v. Rossford, Ohio Transp. Improvement Dist.*, 145 Ohio App. 3d 155, 165, 762 N.E.2d 388, 395 (Ohio. Ct. App. 2001).

**B. Even If Not Impermissibly Duplicative Of Its Breach Of Contract Claims, All The UAT's Tort Claims Must Still Be Dismissed**

**1. The Bank Did Not Owe A Fiduciary Duty To NPF VI**

The UAT's claim for breach of fiduciary duty against the Bank must be dismissed for the additional reason that the Bank did not owe NPF VI or NPF XII any such duty. In order to adequately plead a claim for breach of fiduciary duty, a plaintiff must allege: 1) the existence of a duty arising from a fiduciary relationship; 2) failure to observe that duty; and 3) injury resulting proximately therefrom. *Lutz v. Chitwood (In re Donahue Sec., Inc.),* 318 B.R. 667, 676-77 (Bankr. S.D. Ohio 2004) (citing *Strock v. Pressnell*, 38 Ohio St. 3d 207, 216-17, 527 N.E.2d 1235, 1243 (Ohio 1998)).

A fiduciary relationship "is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence acquired by virtue of this special trust." *NPF IV Inc. v. Transitional Health Servs.*, 922 F. Supp. 77, 83 (S.D. Ohio 1996) (Graham, J.). If a relationship between two parties "possesses the qualities of a typical arm's-length transaction," then the parties have not entered into a fiduciary relationship and a claim for breach of fiduciary duty must therefore be dismissed. *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 521 (6th Cir. 1999) (dismissing claim for breach of fiduciary duty since the plaintiffs "fail[ed] to demonstrate the existence of a special relationship of trust," beyond the defendant's contractual duties); *see also Umbaugh Pole Bldg. Co., v. Scott*, 58 Ohio St. 2d 282, 287, 390 N.E.2d 320, 326 (Ohio 1979) (remanding breach of fiduciary duty cross-claim for judgment against cross-claimant where the evidence showed that the parties were "in a commercial context . . . deal[ing] at arms length").

Courts in Ohio routinely dismiss claims by customers for breach of fiduciary duty against defendant-banks. In *Cairns v. Ohio Savings Bank*, 109 Ohio App. 3d 644, 672 N.E.2d

1058 (Ohio Ct. App. 1996), the plaintiffs alleged that the bank's "management and control over [plaintiffs'] escrow account [] g[ave] rise to fiduciary duties of honesty, loyalty, and trust." *Id*. at 649, 672 N.E.2d at 1062. The court rejected plaintiffs' argument, holding that:

> [t]here is nothing in the mortgage agreement which expressly gives rise to a fiduciary relationship between the parties. Ohio Savings Bank is required by the terms of the mortgage agreement to disburse funds to pay the [plaintiffs'] property taxes and their homeowner's insurance; however, this does not create a relationship in which "special confidence and trust is reposed in the integrity and fidelity" of Ohio Savings Bank.

*Id*., 672 N.E.2d at 1062*; see also Collins v. Nat'l City Bank*, No. 19884, 2003 WL 22971874, at *2 (Ohio Ct. App. Dec. 19, 2003) (dismissing plaintiff's claim for breach of fiduciary duty against defendant-bank, since under Ohio law a "bank owes no fiduciary duty to its own customers in a commercial context when the parties deal at arm's length") (citation omitted); *Chitwood*, 318 B.R. at 677 (dismissing plaintiff-customers' breach of fiduciary duty claim against defendant-broker dealers since the defendants only owed a duty to their employer, not to the plaintiffs).

The Bank, as an indenture trustee, did not owe fiduciary duties to NPF VI. *See Harriet & Henderson Yarns, Inc.*, 75 F. Supp. 2d at 831 ("[b]road and abstract requirements of a 'fiduciary' character ordinarily can be expected to have little or no constructive role to play in the governance" of an indenture trustee) (citation omitted); *see also Argonaut Partnership L.P.*, 2001 WL 585519, at *3 ("no more than a conventional business relationship" existed between the indenture trustee and the servicer).

Also, the UAT has not, and cannot, allege that any special relationship existed between NPF VI and the Bank. As the Amended Complaint concedes, it was the effectuation of the contract that established the contractual relationship at issue in the Amended Complaint between the parties. *See* Amend. Compl. ¶ 152 ("the execution of the NPF VI Indenture began

Chase's service under this new 'Master' Indenture"). Once the NPF VI Indenture was signed, the Bank, in the limited role of indenture trustee, did not owe a fiduciary duty to the issuer, NPF VI. As noted, the duties of the Bank were exclusively defined by the Indenture as a matter of law and by virtue of the contract itself. *See* Point VII, *supra*, at pp. 21-23; *see also* NPF VI Indenture §8.01(c)(i).[37] There are no provisions in the NPF VI Indenture that impose a fiduciary obligation on the Bank to NPF VI or NPF XII, and the UAT points to none.[38]

The UAT appears only to rely on § 8.01(d) of the NPF VI Indenture, pertaining to the Trustee's post-Event of Default duties for its proposition that a fiduciary duty exists. The UAT alleges that "[b]ecause Chase knew that NPF VI was in a continuous and uncured state of default, at all times relevant to this Complaint Chase owed NPF VI a general fiduciary duty" (Amend. Compl. ¶ 239). This is nonsense and would stand the NPF VI Indenture on its head. As noted above, § 8.01(d) is subject to § 8.01(c)(i) and does not impose broad, abstract, unwritten obligations on the Bank. *See* Point VII.B.2.d, *supra*.[39] Second, with respect to the indenture trustee's duty to the noteholders, the "trustee must in the post-default context act prudently, but only in the exercise of those rights and powers granted in the indenture." *LNC Invs., Inc.*, 935 F. Supp. at 1347. *See* Point VII.B.2.d, *supra.* The UAT's claim that the Bank

---

[37] The NPF VI Indenture is replete with provisions revealing that the indenture only constituted an arms-length transaction between the Bank and NPF VI. *See e.g.*, NPF VI Indenture § 8.01(c)(ii), (authorizing the trustee to rely on all certificates, opinions, notices, instructions and agreements). *Id.*, § 8.03 (same); *id.*, § 8.04 ("The Trustee shall not be accountable for the use or application by the Company of the Notes or the proceeds thereof").

[38] The Bank did not have any relationship with NPF XII, contractual or otherwise. Hence, there cannot possibly be a fiduciary relationship between the Bank and NPF XII.

[39] Further, due to the ability of NPF VI to make appointments, provide directions, and control the reporting of information under the NPF VI Indenture, if anything, NPF VI occupied a position of superiority and influence over the Bank. At the initiation of the securities transaction, it is the issuer of the trust that occupies the position of superiority and influence that is required to impose a fiduciary duty. *See* American Bankers' Association, Corporate Trust Committee, *The Trustee's Role in Asset-Backed Securities*, Mar. 12, 2003, at 7 (Ex. F hereto). The UAT's claims that the Bank owed NPF VI a fiduciary duty reveals a complete misunderstanding of the limited nature of the indenture trustee's role under the NPF VI Indenture.

owed NPF VI, the Issuer, a fiduciary duty on account of an Event of Default resulting from NPF VI's own misconduct is nonsensical.

### 2. The UAT's Fraud Claims Should Be Dismissed

The fraud-based claims asserted in the Amended Complaint should be dismissed because the Amended Complaint does not properly allege the elements of such claims against the Bank. To bring a common law fraud claim, a plaintiff must plead "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827, 834 (S.D. Ohio 2003) (quoting *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 169, 462 N.E.2d 407, 409 (1984)); *Bd. of Trs. Sabis Int'l Sch. v. Montgomery*, 205 F. Supp. 2d 835, 854-55 (S.D. Ohio 2002) (same). Here, neither of the two types of fraud claims against the Bank: ((i) failure to disclose; and (ii) present intent not to perform) state a claim against the Bank.

#### a. The Fraud Claim Based On The Failure To Disclose Does Not State A Claim

The UAT's fraud claim based on failure to disclose is premised on the extraordinary notion that the Bank had a duty to disclose to NPF VI and NPF XII the fraud that was being committed by NPF VI and NPF XII, through its officers and inside directors, and that the Bank breached that duty by concealing NPF VI's fraud from NPF VI. Specifically, the UAT alleges that "Defendants each entered into an agency relationship and a relationship of trust and confidence with NPF VI and NPF XII" (Amend. Compl. ¶ 586), and as a result of that

relationship, "Defendants committed fraud in failing to disclose to NPF VI and NPF XII that the Defendants were, on a routine and systematic basis, not operating and managing the business of NPF VI and NPF XII as they agreed to in the Master Indentures." *Id*. This fraud claim does not state a cause of action against the Bank for multiple, independent reasons.

**(i) The Bank Was Not A General Agent For NPF VI**

First, as indenture trustee, the Bank did not act as NPF VI's general agent (Amend. Compl. ¶ 586). No such general agency relationship can be found anywhere in the NPF VI Indenture. *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y 1996), is instructive. There, a bond rating service argued that an agency relationship existed between the indenture trustee and the bondholders. *Id*. at 1083-84. The court disagreed, stating that "an indenture trustee is different from an ordinary trustee in that 'an indenture trustee is more like a stakeholder whose duties and obligations are *exclusively defined* by the terms of the indenture agreement.'" *Id*. at 1083 (emphasis in original) (quoting *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985)). After analyzing specific provisions of that indenture, the *LaSalle* court concluded that no such general agency relationship existed. *Id*. at 1083-84.

Under the NPF VI Indenture the Bank acted as a Liquidation Agent (NPF VI Indenture § 5.10) and a Payment Agent (*Id.* § 8.12). The Bank's duties in both these instances, however, were governed by and limited to the terms of the NPF VI Indenture. *See id.* § 8.01(c)(i). The Bank's status as both a Liquidation Agent and a Payment Agent imposed very specific and limited duties on the Bank, such as fulfilling the duties of the Servicer by administering receivables if the Servicer has terminated pursuant to other sections of the Indenture, and making payments on the notes. These limited duties in no way transformed the Bank into a general agent of NPF VI or imposed any additional duties on the Bank, such as a general duty to disclose information, that were not provided for in the NPF VI Indenture.

**(ii) The Bank Owed No Duty To Disclose To NPF VI**

Second, the Sixth Circuit has held that a "duty to disclose arises in three distinct circumstances: (1) '[w]here there is a previous definite fiduciary relation between the parties,' (2) '[w]here it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other,' and (3) '[w]here the contract or transaction is intrinsically fiduciary and calls for perfect good faith.'" *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003) (internal citations omitted). None of these circumstances are present in this case.

As noted, nothing in the NPF VI Indenture makes the Bank a fiduciary for NPF VI. *See* Point VIII.B.1, *supra*. Moreover, "those who do not look to a person for information and expect no disclosure from that person cannot properly complain of the person's silence or successfully contend that the person has suppressed the truth." 37 Am. Jur. 2d *Fraud and Deceit* § 204 (2003); *see also Smith v. Am. Nat'l Bank & Trust*, 982 F.2d 936, 943 (6th Cir. 1992) ("[A] person who does not undertake to furnish any information, and who is not aware of what information has been furnished, is under no duty to disclose material information in his possession") (citation omitted). The UAT does not allege that NPF VI ever sought information from the Bank. Indeed, it was NPF VI and NPFS that were required to provide information to the Bank, not vice versa. In the absence of any fiduciary or other duty to disclose provided for in the NPF VI Indenture, the UAT's allegations are insufficient to support a common law fraud claim.

**(iii) The UAT Cannot Establish Justifiable Reliance**

As noted above, the UAT concedes that the entire senior management of NPF VI controlled NPF VI and perpetrated the alleged fraudulent scheme. Their knowledge of the scheme, therefore, is charged to NPF VI and NPF XII. *See* Point IV, *supra*. Because NPF VI and NPF XII knew about the scheme, the UAT cannot assert a claim against the Bank for its

alleged fraudulent concealment of that scheme from NPF VI. Assuming *arguendo* that the Bank knew about the scheme *and* had a duty to disclose it, NPF VI and NPF XII could not have justifiably relied on the concealed matter. *Belluardo v. Blankenship*, No. 72601, 1998 WL 289397 (Ohio Ct. App. June 4, 1998) (claimant's fraudulent concealment claim failed because she already knew about the supposedly concealed fact). Simply put, a claimant may not recover damages for injuries allegedly suffered as a result of "concealing" from the claimant information already known by the claimant.

#### b. <u>The Promissory Fraud Claim Should Be Dismissed</u>

Even if not impermissibly duplicative, the UAT's fraud claim based on the Bank's alleged "present intent not to perform" – the so-called "promissory fraud" claim – does not state a claim and should be dismissed for several reasons.

##### (i) The Promissory Fraud Claim Must Be Dismissed Because The UAT Simply Alleges Nonperformance Of The Contract

Under Ohio law, "[r]epresentations which are promissory in nature are not actionable as fraud simply because they are not performed, unless the promises are also false representations of present intention, *i.e.*, if there is no intention to perform when the promises are made." *Stewart Coach Indus., Inc. v. Moore*, 512 F. Supp. 879, 885 (S.D. Ohio 1981).

Allegations of nonperformance are insufficient to state a claim for promissory fraud because *nonperformance does not establish intent not to perform*. *See Jonassen*, 1990 WL 180150, at *5 (emphasis added); *see also Captiva*, 2004 U.S. App. LEXIS 477, at *15 ("It would be as wrong morally as well as legally, as offensive to logic as to law, to hold that mere denial and nonperformance are evidence that, if a promise was made, it was made fraudulently.") (citation omitted).

As previously discussed, the UAT makes no non-conclusory allegations to support its promissory fraud claim other than allegations of nonperformance with the terms of the NPF VI Indenture. *See* Point VII, *supra*. The UAT fails to allege any additional representations made by the Bank. The lack of these additional allegations is fatal to this claim. *Jonassen*, 1990 WL 180150, at *5; *Captiva*, 2004 U.S. App. LEXIS 477, at *11-12.

**(ii) The Promissory Fraud Claim Fails Because It Was Not Pled With Particularity**

The UAT's promissory fraud claim also must be dismissed because it was not pled with the particularity required under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 9(b) ("in all averments of fraud . . . the circumstances constituting fraud or mistake shall be pled with particularity"). To adequately plead fraud under Fed. R. Civ. P. 9(b), the UAT must: "(1) detail the statements (*or omissions*) the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (*or omissions*) were made, and (4) explain why the statements (*or omissions*) were fraudulent." *Mulbarger v. Royal Alliance Assocs., Inc.*, No. C-2-96-0739, 1999 WL 33432317, at *2 (S.D. Ohio Dec. 22, 1999) (emphasis added); *see also Minger v. Green*, 239 F.3d 793, 800 (6th Cir. 2001); *Vennittilli v. Primerica, Inc.*, 943 F. Supp. 793, 798 (E.D. Mich. 1996). The UAT must allege each element of their claim with the requisite particularity. *Krieger v. Gast*, No. 4:99-CV-86, 2000 WL 288442, at *4 (W.D. Mich. Jan. 21, 2000). A claim for promissory fraud must contain specific allegations of fact from which a "strong inference" of intent not to perform may be inferred. *Jonassen*, 1990 WL 180150, at *5.

Here, the UAT does not plead with particularity any specific facts from which a strong inference of intent not to perform the Bank's promises under the NPF VI Indenture may be inferred. The UAT provides no specific facts supporting the conclusion that the Bank had an undisclosed intention not to perform its obligations (*see* Amend. Compl. ¶ 585). General

allegations regarding unspecified communications with the Founders (Amend. Compl. ¶¶ 156-159) that fail to identify specific dates, times and parties are insufficient. After significant Bankruptcy Rule 2004 discovery in which the UAT had access to millions of pages of documents, the best the UAT can muster is that:

> On or about May 1998, Poulsen solicited an agreement from each of the other Defendants to operate and manage the business of NPF VI, not in compliance with the Master Indenture as they were contractually required to do, but rather according to extra-contractual operating procedures directed by Poulsen (Amend. Compl. ¶ 504).

The UAT does not identify a single document or communication evidencing this supposed agreement, any specific meetings where this agreement was discussed, nor the specifics as to any communications between Poulsen and the Bank. Since the UAT cannot identify with specificity any facts sufficient to demonstrate that the Bank entered into the NPF VI Indenture without a present intent to perform, the promissory fraud claim must be dismissed.

**(iii) The Promissory Fraud Claim Is Time-Barred**

The UAT's promissory fraud claim should be dismissed for the additional reason that it is time barred pursuant to Ohio's four year statute of limitations for fraud. *See* Ohio Rev. Code Ann. § 2305.09(C). Under Ohio law, that statute is calculated "not at the time when the promises are proven to have been false, but at the time when the false representations of intent to perform are made and acted upon." *Stewart Coach Indus.*, 512 F. Supp. at 885. Here, the UAT alleges that the Bank allegedly manifested its intention not to perform when it signed the contract on June 1, 1998 (Amend. Compl. ¶¶ 156-57, 585). The UAT's claim therefore fails since the Bank executed the NPF VI Indenture over six years ago, more than two years beyond the applicable statute of limitations period. Although section 2305.09 allows for the tolling of the statute of limitations for a fraud claim until the plaintiff discovers the fraud, nowhere in the 350

pages of the complaint does the UAT even mention, much less particularly plead, the date that NPF VI "discovered" the Bank's alleged fraud. *See Stewart Coach Indus.*, 512 F. Supp. at 886 ("it becomes the duty of the plaintiff who seeks to rely on the 'discovery rule' to affirmatively and particularly plead the date of discovery…or face dismissal of the complaint"). Moreover, any claim that NPF VI discovered the fraud after-the-fact is precluded by reason of its principals' complicity in the scheme. Because as the Complaint concedes NPF VI's principals orchestrated the fraud, NPF VI is charged with knowledge of the scheme from its inception. (*See* Point IV, *supra*).[40]

### 3. <u>The UAT Fails To State A Claim For Conversion</u>

Even if not duplicative of its breach of contract claim, the UAT's claim for common law conversion (Count IX) against the Bank should be dismissed because the UAT has not alleged wrongful dominion over its property by the Bank, nor does it specifically identify the funds allegedly converted. Under Ohio law, conversion requires "a wrongful exercise of dominion over property in exclusion of the right[s] of the owner, or withholding it from his possession under a claim inconsistent with his rights." *NPF IV*, 922 F. Supp. at 80-81; *see also R.J. Wildner Contracting Co. v. Ohio Turnpike Comm'n*, 913 F.Supp. 1031, 1043 (N.D. Ohio 1996). Specifically, a claim for common law conversion must allege: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a

---

40 For the same reasons, the essential element of reliance is missing for purposes of stating a "fraud" claim. The Complaint established both that Lance Poulsen was the architect of the fraud, and that he entered into the Trust Indenture on behalf of NPF VI (Amend. Compl. ¶¶ 158a, 417; NPF VI Indenture at p. 81). It is not legally possible for Poulsen to simultaneously be both aware of the fraud and oblivious to it. Accordingly, taking as true that there was an agreement wherein the Bank had no present intention of performing under the Indenture, NPF VI, through Poulsen, was fully aware of that fact and could not have been mislead as a matter of law. *See Gouge v. Bax Global Inc.*, 252 F.Supp.2d 509, 518 (N.D. Ohio 2003) ("[e]ven if the alleged statements constituted false representations, or the alleged concealment occurred in violation of a duty to disclose, to establish a claim for fraudulent inducement, plaintiff must show justifiable reliance").

wrongful act or disposition of plaintiff's property rights; and (3) damages. *NPF VI*, 922 F. Supp. at 81.

**a. The Bank Did Not Exercise Dominion Over The Funds By Following Instructions Of NPF VI And NPFS**

The UAT fails to allege any acts on the part of the Bank that constitute dominion or control over the funds in question. Banks do not exercise "dominion" over deposited funds when they merely follow the instructions of the customer.

In *Pereira v. United Jersey Bank*, 201 B.R. 644 (S.D.N.Y. 1996), the plaintiffs were former customers of Payroll Express Corporation ("Payroll"), a check cashing and payroll distribution business accused of engaging in a check-kiting scheme. *Id*. at 652-53. Payroll received advanced funds from customers (*i.e.* by wire transfers) prior to each customer's payday, and was supposed to use those funds to provide endorsed paychecks back to the customers on that company's payday. Instead, officers of Payroll diverted these advanced funds for personal use, which led to large cash shortages. *Id*. at 653-54. To conceal its illicit use of customer funds, Payroll allegedly engaged in a check-kiting scheme using accounts at United Jersey Bank ("UJB") and National Westminster Bank New Jersey ("NatWest"), depositing on a daily basis worthless checks from its account at one bank into its account at the other bank and vice versa, taking advantage of the provisional credits extended pending clearance of the checks. *Id*. at 654. In doing so, Payroll misled the banks into thinking that the account balances were higher than they actually were. *Id*. at 657-58.

The court in *Pereira* dismissed the customers' conversion claims against UJB and NatWest, noting that Payroll, not the banks, exercised dominion over the customers' advanced

funds. *Id*. at 676.[41] In accepting customer wire transfers into Payroll's UJB account, the bank "did exactly as the [c]ustomers' payment orders instructed" and acted in a manner consistent with the customers' rights in the funds. *Id*. at 675. The court stressed that "[i]f this conduct were sufficient to constitute conversion, then any bank which accepted for deposit checks and cash which its depositor converted automatically would be saddled with liability based on its depositors' wrongdoing." *Id*. at 676.

Here, the UAT repeatedly admits that the Bank executed transfers only pursuant to directions from NPFS as the Servicer. *See* Point VII.A, *supra*. The UAT does not allege – nor could it – that the Bank, acting on its own initiative, transferred funds. Such actions are inconsistent with the exercise of dominion over the funds.

**b. The Bank's Did Not Act Wrongfully By Following Directions**

Furthermore, absent *unauthorized or wrongful* conduct, the UAT's conversion claim must be dismissed. Following the directions of the customer, cannot form the basis of *wrongful* dominion. *Pereira*, 201 B.R. at 675-76.

In *Collins v. Nat'l City Bank*, a bank customer, DTA, deposited forged checks into an escrow account and directed the defendant bank to issue checks drawn on the account's provisional credit. 2003 WL 22971874, at *1. Shortly thereafter, the bank learned that the escrow account had been drained of funds, and DTA filed for bankruptcy. *Id*. Plaintiff Collins was owed funds formerly in DTA's escrow account and sued the bank in conversion for authorizing withdrawals in excess of the balance of the account. *Id*. at *1, 3. The court of appeals affirmed the trial court's dismissal of the claim, in part, because the bank "simply

---

[41] Although the court applied New Jersey tort law, the elements of conversion in New Jersey are essentially the same as those in Ohio and New York. *See Pereira*, 201 B.R. at 667, 675.

followed the instructions of its customer." *Id*. at *3. Since the bank did not wrongfully exercise control over the funds in the escrow account, the plaintiff failed to state a claim for conversion. *See id*.

Here again, the Amended Complaint repeatedly admits that such transfers were made at the direction of NPFS as the Servicer. *See* Point VII.A, *supra*. NPFS and NPF VI, not the Bank, were responsible for the accounts. The NPF VI Indenture not only absolved the Bank from liability for such duties, but also the entitled Bank to rely on NPFS' instructions with respect to transfer of funds. *See* Point VII.A, *supra.* Thus, the Bank's execution of transfers pursuant to the instructions of NPFS, as agent of NPF VI, and its compliance with the customer's requests with respect to the funds, cannot form the basis for a claim of "wrongful" conversion of funds. *Pereira*, 201 B.R. at 675; *Collins*, 2003 WL 22971874, at *3.

**c. <u>The Funds Are Not Specific And Identifiable</u>**

**(i) The UAT Fails to Identify The Converted Funds**

Even had the UAT adequately pled wrongful dominion, which it has not, where money is the subject of the alleged conversion, the claim will not withstand a motion to dismiss unless "identification [of the money] is possible and there is an obligation to deliver the *specific money in question*." *NPF IV*, 922 F. Supp. at 81 (emphasis added); *9310 Third Ave. Assocs., Inc. v. Schaffer Food Serv. Co.*, 210 A.D.2d 207, 208, 620 N.Y.S.2d 255, 256 (2d Dep't 1994) (dismissing conversion claim where the funds are "incapable of being 'described or identified in the same manner as a specific chattel'") (citation omitted); *Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, LLC*, 288 F. Supp. 2d 473, 480 (S.D.N.Y. 2003) (same).

Here, the UAT fails to identify – because it cannot – the specific money allegedly converted or even the *dollar amount* of the allegedly converted funds. While the UAT purports to "identify" various allegedly improper transfers for various amounts, such as $501 million

(Amend. Compl. ¶ 166), $227 million (Amend. Compl. ¶ 167), $50.8 million (Amend. Compl. ¶ 170), or the difference between the $4.25 billion allegedly transferred from NPF VI to NPF XII and the $4.18 billion transferred from NPF XII to NPF VI (Amend. Compl. ¶ 208), it is not clear if any of the above amounts are what the UAT alleges are subject to the conversion claim, which states only that "The NPF VI and XII funds are identifiable because ... the funds were required to be sequestered. . ." (Amend. Compl. ¶ 578). Such general identification is plainly insufficient. *NPF IV Inc.*, 922 F. Supp. at 82 ("An action for conversion ... requires that the defendant have an obligation to deliver specific money as opposed to merely a certain sum of money."); *Global View Ltd. Venture Capital*, 288 F. Supp. 2d at 480. The UAT has not – and cannot – specifically identify any allegedly converted funds.

**(ii) Any Allegedly Converted Funds Cannot Be "Specifically Identified"**

Even had the UAT identified a specific dollar amount and "specific money" – which it does not – its claim fails because it alleges that such funds were commingled and thus, are no longer specifically identifiable. *In re Nat'l Century Fin. Enters., Inc.*, 310 B.R. 580, 603 (Bankr. S.D. Ohio 2004) ("it is well settled that the action [for conversion of money] will not lie 'unless identification is possible and there is an obligation to deliver the specific money"') (citation omitted); *NPF IV*, 922 F. Supp. at 81-82 (dismissing conversion claim where funds received from plaintiff were commingled in defendant's general account); *Haul Transp. of Virginia, Inc. v. Morgan*, No. CA 14859, 1995 WL 328995, at *3 (Ohio Ct. App. June 2, 1995) ("In this state, an action for conversion of money will only lie 'if identification is possible and there is an obligation to deliver the specific money in question."') (citation omitted); *Schmidt v. Fleet Bank*, No. 96 Civ. 5030(AGS), 1998 WL 47827, at *14 (S.D.N.Y. Feb. 4, 1998) (plaintiff

did not state a conversion claim against the bank where the funds were not sufficiently specific and identifiable in relation to the bank's other funds).

In *United Republic Insurance Co. v. Chase Manhattan Bank*, 168 F. Supp. 2d 8 (N.D.N.Y. 2001), *aff'd*, 40 Fed. Appx. 630 (2d Cir. 2002), *vacated and remanded on other grounds*, 315 F.3d 168 (2d Cir. 2003), Lawrence Group, Inc. ("LGI") owed $27 million in loans to the defendant banks. *Id*. at 12. LGI received a loan from plaintiff United Republic Insurance Company ("URIC") for $14 million and placed the URIC funds in a trust along with a separate $13 million loan received from another entity. *Id*. The trust forwarded the $27 million to LGI, and LGI then paid off its loans to the defendant banks. *Id*. at 12-13. Subsequent to the repayment of the loans, the New York State Insurance Department concluded that the trust was illegal and ordered LGI to return the $14 million to URIC. *Id*. LGI defaulted on these loans and URIC sought recovery from the lender banks. *Id*. at 13. Ruling on the lender banks' motion to dismiss, the court held that the plaintiff was unable to identify the specific funds allegedly converted by the bank and dismissed the conversion claim, stating that since the $14 million from URIC was commingled in the trust with the $13 million from the other entity, loaned to LGI, and then paid to the lender banks, "[t]he funds [were] so dispersed that they [were] not identifiable or segregated." *Id*. at 19.

Here, the UAT affirmatively and repeatedly asserts, and repeatedly relies on, allegations that the allegedly converted unidentified funds were both commingled with NPF XII funds and were commingled by being held in a variety of accounts both at the Bank and at Bank One. *See, e.g.*, Amend. Compl. ¶¶ 208, 217, 250, 315, 317 (alleging that the kiting system resulted in "commingling" of assets with NPF XII). The UAT also asserts that the allegedly converted unidentified funds were improperly transferred between accounts *within* the Bank (*see*

*e.g.*, Amend. Compl. ¶ 158(b)(iii) (transfers from NPF VI Equity Account to the NPF VI Seller Credit Reserve Account), ¶ 158(c)(ii) (transfers from NPF VI Seller Credit Reserve Account to the NPF VI Equity Account), ¶ 158(c)(i) (transfers from NPF VI Seller Credit Reserve Account to the NPF VI Offset Reserve Account), ¶ 158(d)(i) (transfers from NPF VI Offset Reserve Account to the NPF VI Seller Credit Reserve Account)). The UAT's affirmative allegations of commingling of funds between banks and within accounts at Bank is fatal to its claim for conversion.

**4. <u>The Negligence Claims Are Precluded By The Economic Loss Rule</u>**

The UAT's negligence-based claims are also precluded as a matter of law by the "economic loss rule." The Ohio Supreme Court has made it very clear that a claimant may not recover for purely economic losses sounding in negligence. *See Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n.*, 54 Ohio St. 3d 1, 3, 560 N.E.2d 206, 208 (Ohio 1990). There is no tort duty to protect against purely economic loss, which includes indirect, consequential losses such as lost profits. *See Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 43-44, 50, 537 N.E.2d 624, 629, 635 (Ohio 1989) ("[I]n the absence of injury to persons or damage to other property, the commercial buyer may not recover for economic losses premised on tort theories of strict liability or negligence"). The UAT suggests that the Bank was liable in tort "in carrying out [its] obligations under the NPF VI Indenture" (Amend. Compl. ¶¶ 628-29), but does not allege either personal injury or property damage. Instead it alleges purely economic losses flowing from the purported negligence (Amend. Compl. ¶¶ 630)

### 5. **The Civil Conspiracy Claim Should Be Dismissed**

To establish a claim of civil conspiracy, the UAT must allege the following elements: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Nilavar v. Mercy Health System-Western Ohio*, 142 F. Supp. 2d 859, 888 (S.D. Ohio 2000). Here, the UATs' civil conspiracy claim against the Bank is based on the allegation that the Bank either entered into an agreement (or, "tacit understandings") with others to facilitate the so-called "kiting scheme." (Amend. Compl. ¶¶ 596-97). Even if this claim was not duplicative of the contract claim – which it is – it still must be dismissed for several, independent reasons.

First, "[a] civil conspiracy claim cannot succeed without an underlying unlawful act." *Nilavar*, 142 F. Supp. 2d at 889; *see also Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 534 (6th Cir. 2000). The conspiracy alleged by the UAT is premised on the alleged "tortious acts of Defendants" (Amend. Compl. ¶ 597). As previously set forth however, the UAT cannot allege that the Bank committed any tortious acts. *See* Point VIII.B.1-4, *supra*. The UAT's breach of fiduciary duty claim fails because the Bank did not owe NPF VI any such duty. The UAT's common law fraud allegations fail because: (1) they do not establish the elements of that claim against the Bank and; (2) they are insufficient under Fed. R. Civ. P. 9(b). *See* Point VII.B.2, *supra*.

Moreover, the UAT's breach of fiduciary duty, fraud, and negligence claims are all duplicative of the breach of contract claim. *See* Point VIII.A, *supra*. Where, as here, underlying the tort is duplicative of the breach of contract, both the civil conspiracy and the underlying tort must be dismissed. *See, e.g., Fisher v. Big Squeeze (N.Y.), Inc.*, 349 F. Supp. 2d 483, 489 (E.D.N.Y. 2004).

**6. <u>The UAT's Aiding And Abetting Claims Should Be Dismissed</u>**

For the reasons in the Consolidated Motion to Dismiss of JPMorgan Chase Bank, at Point III.C (M.D.L. D.E. 165), incorporated herein by reference, the UAT's aiding and abetting claims (Count XV, Aiding and Abetting Fraud, and first Count XIV, Aiding and Abetting Breach of Fiduciary Duty), should be dismissed because (i) it appears that Ohio does not recognize such claims; (ii) the UAT does not sufficiently plead that that the Bank had actual knowledge of the fraud or breach of fiduciary duty; and (iii) the UAT fails to adequately plead that the Bank substantially assisted the primary violator in committing the tortious act.

## IX. CONCLUSION

For all of the reasons herein, JPMorgan Chase Bank, N.A. respectfully requests that Counts I, II, IV (Federal RICO); Counts V, VI, VIII (Ohio PCA); Count IX (Conversion); Count X (Fraud); Count XI (Conspiracy); Count XII (Breach of Contract); Count XIII (Breach of Fiduciary Duty); (first) Count XIV (Knowing Participation in Breach of Fiduciary Duty); Count XV (Aiding and Abetting); and (second) Count XIV (Negligence/Gross Negligence) as alleged against JPMorgan Chase Bank, N.A. be dismissed with prejudice.

Dated: March 31, 2005

Respectfully submitted,

s/ John M. Callagy

John M. Callagy
William A. Escobar
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
(212) 808-7800 (voice)
(212) 808-7897 (facsimile)

Michael A. Pearce
JPMorgan Chase Legal Department
One Chase Manhattan Plaza, 26th Floor
New York, New York 10081
(212) 552-2852 (voice)
(212) 552-5964 (facsimile)

and

William C. Wilkinson (0033228)
O. Judson Scheaf, III (0040285)
THOMPSON HINE LLP
10 West Broad Street, 7th Floor
Columbus, OH 43215
(614) 469-3266 (voice)
(614) 469-3361 (facsimile)

*Attorneys for JP Morgan Chase Bank, N.A.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2005, I electronically filed the foregoing *Memorandum Of Law In Support Of The Motion To Dismiss Of JPMorgan Chase Bank* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to registered counsel electronically. Pursuant to that notification, to any party or counsel not receiving electronic service from CM/ECF, a true and exact copy of the foregoing was mailed by ordinary U.S. Mail, this 31st day of March, 2005.

_/s *William C. Wilkinson*____________________
Counsel for JPMorgan Chase Bank, N.A.

998961