**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **In re:**<br>**National Century Financial Enterprises, Inc. Investment Litigation** | **Case No. 2:03-MD-1565-JLG-MRA**<br>**Judge Graham**<br>**Magistrate Judge Abel** |

| | |
|---|---|
| **The Unencumbered Assets Trust, *et al.*,**<br>**Plaintiff,**<br><br>**v.**<br><br>**J.P. Morgan Chase Bank, *et al.*,**<br>**Defendants.** | **Case No. 2:04-cv-01090-JLG-MRA**<br>**Judge Graham**<br>**Magistrate Judge Abel** |

**MOTION TO DISMISS OF DEFENDANTS, LANCE POULSEN, BARBARA POULSEN, SOUTH ATLANTIC INVESTMENTS LLC, THOR CAPITAL HOLDINGS LLC, KACHINA, INC., FLOHAZ PARTNERS LLC, HEALTHCARE CAPITAL LLC, AND INTERCONTINENTAL INVESTMENT ASSOCIATES LTD.** [1]

Defendants, Lance Poulsen, Barbara Poulsen, South Atlantic Investments LLC ("South Atlantic"), Thor Capital Holdings LLC ("Thor"), Kachina, Inc. ("Kachina"), Flohaz Partners LLC ("Flohaz"), Healthcare Capital LLC ("HCC") and Intercontinental Investment Associates Ltd. ("IIA") (Lance Poulsen, Barbara Poulsen, South Atlantic, Thor, Kachina, Flohaz, HCC and IIA are collectively referred to as "Movants" in this Motion), by counsel, pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, move the Court to dismiss plaintiffs' Amended Complaint (the "UAT Amended Complaint") as to Movants. The grounds for this Motion are set forth in the Memorandum in Support that accompanies this Motion.

[1] The Movants incorporate by reference the arguments made by the other defendants in their Motions to Dismiss and Memoranda in Support.

Dated: March 31, 2005

***/s/ John E. Haller***

John E. Haller (Ohio Bar #0031289)
SHUMAKER LOOP & KENDRICK LLP
41 South High Street, Suite 2210
Columbus, OH 43215
Tel: 614.463.9441
Fax: 614.573.7228
Email: jhaller@slk-law.com
Attorneys for Defendants, Lance Poulsen, Barbara Poulsen, South Atlantic Investments LLC, Thor Capital Holdings LLC, Kachina, Inc., Flohaz Partners LLC, Healthcare Capital LLC and Intercontinental Investment Associates Ltd.

**CERTIFICATE OF SERVICE**

On March 31, 2005, the undersigned electronically filed this document with the Court using the CM/ECF system. any party or counsel not receiving electronic service from the CM/ECF system was mailed a copy of this document by ordinary U.S. Mail, on March 31, 2005.

***/s/ John E. Haller***

John E. Haller

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS, LANCE POULSEN, BARBARA POULSEN, SOUTH ATLANTIC INVESTMENTS LLC, THOR CAPITAL HOLDINGS LLC, KACHINA, INC., FLOHAZ PARTNERS LLC, HEALTHCARE CAPITAL LLC, AND INTERCONTINENTAL INVESTMENT ASSOCIATES LTD.[1]**

Defendants, Lance Poulsen, Barbara Poulsen, South Atlantic Investments LLC ("South Atlantic"), Thor Capital Holdings LLC ("Thor"), Kachina, Inc. ("Kachina"), Flohaz Partners LLC ("Flohaz"), Healthcare Capital LLC ("HCC") and Intercontinental Investment Associates Ltd. ("IIA") (Lance Poulsen, Barbara Poulsen, South Atlantic, Thor, Kachina, Flohaz, HCC and IIA are collectively referred to as "Movants" in this Memorandum in Support), by counsel, pursuant to Rules 12(b)(6), 8(a) and 9(b) of the Federal Rules of Civil Procedure request the Court to dismiss all claims asserted in the UAT Amended Complaint.

[1] The Movants incorporate by reference the arguments made by the other defendants in their Motions to Dismiss and Memoranda in Support.

# TABLE OF CONTENTS


| | Page |
|---|---|
| **Table of Authorities ........................................................................** | **iii** |
| **I. Statement of the Case ........................................................................** | **1** |
| **A. The Parties ........................................................................** | **1** |
| **1. Plaintiffs ........................................................................** | **1** |
| **2. Movants ........................................................................** | **1** |
| **B. Factual Allegations and Claims Applicable to This Motion ........................** | **3** |
| **II. Argument ........................................................................** | **5** |
| **A. Standard for Motion to Dismiss ........................................................** | **5** |
| **B. The Claims in the UAT Amended Complaint Are Barred for Lack of Standing and by the Doctrine of *in Pari Delicto* ........................................** | **6** |
| **1. The Trustee Lacks Standing to Bring the Claims Asserted in the UAT Amended Complaint ........................................................................** | **7** |
| **2. The Doctrine of *In Pari Delicto* Bars the Claims in the UAT Amended Complaint ........................................................................** | **10** |
| **C. Plaintiffs' Federal and State RICO Claims Fail, as a Matter of Law ..............** | **12** |
| **1. The Statute of Limitations Has Run as to All RICO Claims Regarding Alleged Acts Prior To November 17, 1998 ........................................** | **13** |
| **2. Fraudulent Concealment Does Not Toll the RICO Statute of Limitations .** | **16** |
| **3. Plaintiffs Have Not Alleged a RICO Association-in-Fact Enterprise ........** | **17** |
| **4. Plaintiffs Have Not Plead Fraud with Particularity against Barbara and Lance Poulsen and Therefore Plaintiffs' RICO Fraud Claims Must Fail ...** | **18** |
| **5. Plaintiffs' RICO Fraud Claims against Barbara Poulsen Must Fail .........** | **20** |
| **6. Plaintiffs Have Failed to Plead Sufficiently RICO Fraud against Lance Poulsen ........................................................................** | **21** |

7. **Plaintiffs Fail to Show Detrimental Reliance on Any Alleged Fraudulent Representation ………………………………………………………………... 23**

8. **Ohio RICO Statutes ………………………………………………………….. 23**

D. **Plaintiffs' Claims for Fraudulent Transfers Fail, As a Matter of Law ………... 25**

1. **Claims under Federal Bankrupty Law (Count 18) ………………………… 25**

2. **Claims against the Poulsens for Alleged Transfers in Which They Were Not the Initial Transferee Should be Dismissed (Counts 18-23) ………….. 26**

E. **Plaintiffs' Common Law Claims ………………………………………………… 30**

1. **Common Law Fraud (Count 10) and Other Fraud-Related Claims ........... 30**

2. **If the Majority of the Officers and Directors of NPF VI and NPF XII Knew about the Alleged Fraud in Disregarding the Terms of the Master Indentures, Such Knowledge Is Imputed to NPF VI and NPF XII, and All Claims Based on the Alleged Concealment of This Fraud Must Be Dismissed ………………………………………………………………… 32**

3. **The Civil Conspiracy Claim Should Be Dismissed (Count 10) …………… 35**

4. **Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty (Counts 13, 14 and 22) ......................................................................................... 36**

5. **The Claim for Aiding and Abetting Should Be Dismissed (Count 15) …… 36**

6. **The Claim for Unjust Enrichment Should Be Dismissed (Count 23) ……. 36**

III. **Conclusion ……………………………………………………………………… 37**

**Certificate of Service ………………………………………………………………….. 38**

## TABLE OF AUTHORITIES

**Page**

**Federal Cases**


*Ad Hoc Committee of Concerned Teachers v. Greenburgh No. 11 Union Free School Dct.*, 873 F.2d 25 (2nd Cir. 1989) …………………………………………………...... 9

*Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315 (6th Cir. 1999) ………………………………………………………………………………. 6

*Agency Holding Corporation v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ……………………………………………………….. 13

*AIG Aviation, Inc. v. Boorom Aircraft, Inc.*, 1998 U.S. App. LEXIS 2143 (6th Cir. Feb. 11, 1998) ………………………………………………………………………… 24

*Andersons Inc. v. Consol, Inc.*, 348 F.3d 496 (6th Cir. 2003) …………………………... 36, 37

*Andrews v. State of Ohio*, 104 F.3d 803 (6th Cir. 1997) ……………………………….. 5

*Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776 (6th Cir. 2000) ………………… 5

*Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) ………………………. 19, 23

*Big Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988) ………….. 27

*Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356 (6th Cir. 2001) ……………………. 6

*Carr v. Countrymark Cooperative*, 1998 U.S.Dist.LEXIS 23000 (S.D.Ohio Jan. 29, 1998) ……………………………………………………………………………......... 19

*Caplin v. Marine' Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) …………………………………………………………………………. 7

*Christopher v. Laidlaw Transit, Inc.*, 899 F. Supp. 1224 (S.D.N.Y. 1995) ……………. 5

*Cissell v. American Home Assur. Co.*, 521 F.2d 790 (6th Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976) …………………………………………. 8

*C.I.T. Corp. v. Janis*, 418 F.2d 960 (6th Cir. 1969) ……………………………………... 33

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 2005 U.S.App.LEXIS 1814 (6th Cir. Feb. 4, 2005) ……………………………………………………………….. 20

*Collyer v. Darling*, 98 F.3d 211 (6th Cir. 1996) …………………………………………. 35

*Cosmas v. Hassett*, 886 F.2d 8 (2nd Cir. 1989) ………………………………………… 5

*Detko v. Blimpies Restaurant*, 924 F. Supp. 555 (S.D.N.Y. 1996) …………………….. 6

*DSQ Property Co. Ltd, v. DeLorean*, 891 F.2d 128 (6th Cir. 1989) …………………… 7

*Eva v. Midwest National Mortgage Banc, Inc.*, 143 F.Supp.2d 862 (N.D. Ohio 2001) ... 17, 19, 21, 22, 23, 24

*Farah v. Martin*, 122 F.R.D. 24 (E.D.Mich. 1988) …………………………………….. 36

*Firestone v. Galbreath*, 747 F.Supp. 1556 (S.D. Ohio 1990) ………………………….. 19

*Fraley v. Ohio Gallia County*, 1998 U.S.App.LEXIS 28078 (6th Cir. Oct. 30, 1998) …. 13

*FRC Int'l, Inc. v. Taifun Feurloschgeratebau und Vertruebs GmbH*, 2002 U.S.Dist.LEXIS 17559 (N.D.Ohio 2002) ……………………………………………… 17, 19, 23

*Gagliardi v. Village of Pawling*, 18 F.3d 188 (2nd Cir. 1994) ………………………….. 5

*Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S. Ct. 1601, 60 L.Ed.2d 66 (1979) …………………………………………………………………….………….. 7

*Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343 (6th Cir. 2000) …………………. 30

*Harner v. Prudential-Bache Sec., Inc.*, 1994 U.S.App.LEXIS 25266 (6th Cir. Sept. 9, 1994) ………………………………………………………………………………… 13, 14, 15

*Havenick v. Network Express, Inc.*, 981 F.Supp. 480 (E.D.Mich. 1997) ………………. 14

*Hellenic Inc. v. Bridgeline Gas Distrib. LLC (In re Hellenic Inc.)*, 252 F.3d 391 (5th Cir. 2001) ……………………………………………………………………………….. 34

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2nd Cir. 1995) .....……………………. 7, 8

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3rd Cir. 1999) ………………………….. 31

*In re Argo*, 134 B.R. 776 (Bnkrtcy.S.D.N.Y. 1991) ……………………………………. 13

*In re ARM Financial Group, Inc. Sec. Litig.*, 2002 U.S.Dist.LEXIS 13451 (W.D.Ky. 2002) ………………………………………………………………………………. 14

*In re Bullion Reserve of North America*, 922 F.2d 544 (9th Cir. 1991) ………………… 27

*In re Cendent Corp. Sec. Litig.*, 190 F.R.D. 331 (D.N.J. 1999) ………………………… 31

*In re Coin Phones, Inc.*, 153 B.R. 135 (Bnkrtcy.S.D.N.Y. 1993) ……………………… 13

*In re D.H. Overmyer Telecasting Co., Inc.*, 56 B.R. 657 (Bnkrtcy.N.D.Ohio 1986) …... 7

*In re Dyna Corp.*, 200 B.R. 750 (Bnkrtcy.D.N.H. 1996) ……………………………..... 13

*In re GNK Enterprises, Inc*, 197 B.R. 444 (Bnkrtcy.S.D.N.Y. 1996) ………………….. 13

*In re Party City Sec. Litig.*, 147 F. Supp.2d 282 (D.N.J. 2001) ………………………… 32

*In re Richmond Produce Co.*, 118 Bankr. 753 (Bnkrtcy.N.D.Cal. 1990) ………………. 27

*In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010 (N.D.Ohio 2000 ………………… 31

*Isaak v. Trumbull Savings & Loan Co.*, 169 F.3d 390 (6th Cir. 1999) ………………….. 14, 15

*Javitch v. First Montauk Fin. Corp.*, 279 F.Supp.2d 931 (N.D.Ohio 2003) ……………. 35

*Jensen v. Snellings*, 636 F.Supp. 1305, 1309 (E.D.La. 1986) ………………………….. 14

*Jones v. Hyatt Legal Services*, 132 B.R. 853 (Bnkrtcy.S.D.Ohio 1991) ……………….. 10

*Jordan v. Global Natural Resources, Inc*., 564 F.Supp 59 (S.D.Ohio 1983) ...………… 33

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994), *cert. denied*, 516 U.S. 810, 116 S.Ct. 58; 133 L.Ed.2d 21 (1995) ………………………………………………………….. 18

*Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384 (6th Cir. 1996) ……………………… 19, 23

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 1993, 138 L.Ed.2d 373 (1997) ……………………………………………………………………………… 16

*Matthews v. New Century Mortg. Corp.*, 185 F. Supp.2d 874 (S.D.Ohio 2002) ………. 30

*Melamed v. Lake County Nat'l Bank*. 727 F.2d 1399 (6th Cir. 1984) ………………….. 9

*Murray v. Bank One*, 99 Ohio App.3d 89, 649 N.E.2d 1307 (1994) …………………… 37

*O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) .. 33

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3rd Cir. 2001) ……………………………………………………………………………… 6

*Poth v. Russey*, 2004 U.S.App.LEXIS 5861 (4th Cir. Mar. 30, 2004) ………………….. 34

*Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576 (S.D.N.Y. 1995) . 9

*Rent Stabilization Assoc. of New York v. Dinkins*, 5 F.3d 591 (2nd Cir. 1994) ………… 9

*Rieser v. Milford (In re Chari)*, 276 B.R. 206 (Bnkrtcy.S.D.Ohio 2002) ………………. 26

*Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) ……………. 14

*Semegen v. Weidner*, 780 F.2d 727 (9th Cir. 1985) ……………………………………... 18

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2nd Cir. 1991) ……………... 7

*Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124 (2nd Cir. 1994) ……………….......... 31

*Shonac Corp. v. AMKO Int'l, Inc.*, 763 F. Supp. 919 (S.D.Ohio 1991) ………………... 36, 37

*Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) …………………………………….. 7

*Terlecky v. Hurd (In re Dublin Securities, Inc.)*, 133 F.3d 377 (6th Cir. 1997) ………… 10, 11, 12

*Thompson v. County of Franklin*, 15 F.3d 245 (2nd Cir. 1994) …………………………. 9

*Turner v. Phoenix Fin., LLC (In re Imageset, Inc.)*, 299 B.R. 709 (Bnkrtcy.D.Me. 2003) ……………………………………………………………………………………. 27

*Ullmo v. Gilmour Academy*, 273 F.3d 671 (6th Cir. 2001) ……………………………… 18

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634 (6th Cir. 2003) ... 6

*Vandenbroeck v. Common Point Mortgage Co.*, 210 F.3d 696 (6th Cir. 2000) ………… 17, 19, 23

*Vild v. Visconi*, 956 F.2d 560 (6th Cir. 1992) …………………………………………… 18

*Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) …….. 7

*Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld*, 212 B.R. 34 (S.D.N.Y. 1997) ….. 8

**Ohio Cases**

*Andonian v. A.C. & S., Inc.*, 97 Ohio App.3d 572, 647 N.E.2d 190 (1994) ……………. 36

*Arcanum National Bank v. Hessler*, 69 Ohio St.2d 549, 433 N.E.2d 204 (1982) ……… 33, 34

*Avery v. Rossford*, 145 Ohio App.3d 155, 762 N.E.2d 388 (2001) …………………….. 36

*Black v. Cosentino*, 117 Ohio App.3d 40, 689 N.E.2d 1001 (1996) ……………………. 32

*Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 462 N.E.2d 407 (1984) …………………….. 30

*Federated Mgmt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 366, 738 N.E.2d 842 36

(2000) ……………………………………………………………………………………

*Friedland v. Lipman*, 68 Ohio App.2d 255, 429 N.E.2d 456 (1980) …………………... 30

*London & Lanceshire Indemnity Co. of America v. The Fairbanks Steam Shovel Co.*, 112 Ohio St. 136, 147 N.E. 329 (1925) ………………………………………………… 33

*Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985) …………… 32

*Sease v. John Smith Grain Co*., 17 Ohio App.3d 223, 479 N.E.2d 284 (1984) ………… 34

*The First Nat'l Bank of New Bremen v. Burns*, 88 Ohio St. 434, 103 N.E. 93 (1913) ….. 34

*United Coach, Inc. v. N.Y. City Transit Auth., Inc.*, 90 Ohio App.3d 284, 629 N.E.2d 28 (1993) …………………………………………………………………………………… 24

*Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859 (1998) ……………….. 35

**Federal Statutes**

11 U.S.C. § 108(a) ……………………………………………………………....... 13

11 U.S.C. § 548 ………………………………………………………………………. 26

11 U.S.C. § 548(a)(1) ………………………………………………………………… 26

11 U.S.C. § 550 ………………………………………………………………………. 27

**State Statutes**

Ohio Rev.Code § 1336.04 ……………………………………………………………. 28, 29

Ohio Rev.Code § 1336.09 ……………………………………………………………. 29

**Miscellaneous**

Rule 9(b), F.R.Civ.P. ………………………………………………………………... 6, 18, 19, 21, 30, 31, 32, 36

# I. Statement of the Case[1]

## A. The Parties

### 1. Plaintiffs

According to the UAT Amended Complaint:

> The Unencumbered Assets Trust is a post-confirmation trust endowed with the power to pursue claims on behalf of a number of entities. Erwin Katz, Ltd., is its trustee. On behalf of NPF VI and NPF XII, the Unencumbered Assets Trust and Katz seek to recover in damages what the Defendants' wrongful acts destroyed: the value of two lawful businesses, the $3 billion of worthless debt they were forced to incur, the billions of dollars of assets that were looted from them, and the fraudulent transfers and preferences that were made not for the benefit of NPF VI and NPF XII or their affiliates but, rather, for the benefit of their faithless agents or for creditors who had no legal right to receive them.

*UAT Amended Complaint*, ¶ *1*. In short, the UAT is the assignee of NCFE and, therefore, stands in its shoes.

### 2. Movants

The following parties are the Movants to and join in this Motion to Dismiss:

| Person/Entity | UAT Amended Complaint Description | Comments[2] |
| --- | --- | --- |
| Lance Poulsen<br>Barbara Poulsen | Defendants Lance K. Poulsen ("Poulsen") and Barbara L. Poulsen ("Barbara Poulsen") are husband and wife and currently reside in Ohio and/or Florida. Poulsen at all relevant times served as an officer, director and shareholder of NCFE Inc. and certain other affiliates of NCFE Inc. Barbara Poulsen at all relevant times served as secretary, treasurer, and a director of NCFE Inc. Poulsen and Barbara Poulsen regularly do business in this state and have committed acts within this state from which Plaintiffs' claims arise. *UAT Amended Complaint*, ¶ *30*. | The Poulsens do not reside in Ohio; they reside in Florida. Barbara Poulsen was not always an officer or director of NCFE. |

[1] The factual assertions in the Statement of the Case are from the UAT Amended Complaint. However, to the extent that these factual assertions are incorrect, an attempt has been made to correct them in this Memorandum in Support.
[2] While the Court is to assume the truth of the facts in the UAT Amended Complaint, the allegations of the UAT Complaint are simply not accurate. The "Comments" column is designed to correct the misstatements contained in the UAT Amended Complaint.

| Person/Entity | UAT Amended Complaint Description | Comments[2] |
|---|---|---|
| South Atlantic | Defendant South Atlantic Investments, L.L.C. ("South Atlantic") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. South Atlantic has committed acts in this state from which Plaintiffs' claims arise, including a substantial portion of the acts alleged below. *UAT Amended Complaint*, ¶ *27.* | South Atlantic has its principal place of business in Florida. It never conducted any business with NCFE. Neither Parrett nor Ayers are member of South Atlantic. None of its members reside in Ohio. |
| Thor | Defendant Thor Capital Holdings L.L.C. ("Thor") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Thor has committed acts in this state from which Plaintiffs' claims arise, including a substantial portion of the acts alleged below. *UAT Amended Complaint*, ¶ *28*. | Thor's principal place of business is in Florida. None of its members reside in Ohio. |
| Kachina | Defendant Kachina Inc. ("Kachina") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Kachina has committed acts in this state from which Plaintiffs' claims arise, including a substantial portion of the acts alleged below. *UAT Amended Complaint*, ¶ *29*. | Kachina is not a limited liability company. Lance Poulsen, Barbara Poulsen, Donald Ayers and Rebecca Parrett are not members, and none of them reside in Ohio. |
| Flohaz | Defendant Flohaz Partners L.L.C. ("Flohaz") is a Delaware limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Flohaz has committed acts in this state from which Plaintiffs' claims arise, including a substantial portion of the acts alleged below. *UAT Amended Complaint*, ¶ *26*. | Flohaz's principal place of business is in Florida. None of its members reside in Ohio. Flohaz never conducted any business with NCFE or its subsidiaries. |
| HCC | Defendant Healthcare Capital L.L.C. ("HCC") is a Nevada limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. HCC has committed acts in this state from which Plaintiffs' claims arise, including a substantial portion of the acts alleged below. *UAT Amended Complaint*, ¶ *25*. | HCC's principal place of business is in Florida. None of its members reside in Ohio. |

| Person/Entity | UAT Amended Complaint Description | Comments[2] |
|---|---|---|
| IIA | Defendant Intercontinental Investment Associates ("IIA") is a Nevada limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. IIA has committed acts in this state from which Plaintiffs' claims arise, including a substantial portion of the acts alleged below. *UAT Amended Complaint*, ¶ *24*. | IIA's principal place of business is in Florida. None of its members reside in Ohio. |

## B. Factual Allegations and Claims Applicable to This Motion

The UAT Amended Complaint sets forth 47 counts against various defendants. The following chart indicates which counts of the UAT Amended Complaint apply to a particular Movant, the nature of the claim asserted and the section in this Memorandum in Support in which the legal insufficiencies of the particular claim are discussed:

| Count | Movant | Other Defendants | Claim |
|---|---|---|---|
| 1 | Poulsen[3] | Ayers<br>Parrett<br>Chase | Federal RICO Enterprise: 18 U.S.C. § 1962(c) The Operation and Management of NPF VI Enterprise |
| 2 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | Federal RICO Conspiracy: 18 U.S.C. § 1962(d) Conspiring to Violate § 1962(c) The Operation and Management of NPF VI Enterprise |
| 3 | Poulsen | Ayers<br>Parrett<br>Bank One | Federal RICO Enterprise: 18 U.S.C. § 1962(c) The Operation and Management of NPF XII Enterprise |
| 4 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | 18 U.S.C. § 1962(d) Conspiring to Violate § 1962(c) The Operation and Management of NPF XII Enterprise |
| 5 | Poulsen | Ayers<br>Parrett<br>Chase | Ohio Corrupt Practices Act: Ohio Rev.Code § 2923.34(B); 2923.32(A)(1) The Operation and Management of NPF VI Enterprise |
| 6 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | Ohio Corrupt Practices Act: Ohio Rev. Code §§ 2923.34(B); 2923.32(A)(1) Conspiring to Violate § 2923.32(A)(1) - The Operation and Management of NPF VI Enterprise |

[3] In this chart, "Poulsen" refers to Lance Poulsen.

| Count | Movant | Other Defendants | Claim |
|---|---|---|---|
| 7 | Poulsen | Ayers<br>Parrett<br>Bank One | Ohio Corrupt Practices Act: Ohio Rev. Code §§ 2923.34(B); 2923.32(A)(1) The Operation and Management of NPF XII Enterprise |
| 8 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | Ohio Corrupt Practices Act: Ohio Rev. Code §§ 2923.34(B);2923.32(A)(1) Conspiring to Violate § 1962(c) The Operation and Management of NPF XII Enterprise |
| 10 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | Common Law Fraud |
| 11 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | Civil Conspiracy |
| 13 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | Breach of Fiduciary Duty |
| 14 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | Concert of Action/Knowing Participation in Breach of Fiduciary Duty |
| 15 | Poulsen | Ayers<br>Parrett<br>Chase<br>Bank One | Aiding and Abetting |
| 18 | Founders[4]<br>Affiliated Entities[5] | Undefined | Avoidable Transfers Under Bankruptcy Code Section 544 and 550 |
| 19 | Founders<br>Affiliated Entities | Undefined | Avoidable Transfers Under Ohio Rev. Code §§ 1336.04 and 1336.07 |
| 20 | Founders<br>Affiliated Entities | Undefined | Avoidable Transfers Under Ohio Rev. Code §§ 1336.05 and 1336.07 |
| 21 | Founders<br>Affiliated Entities | Undefined | Avoidable Transfers Recovery of Unlawful Dividends: Ohio Rev. Code 1701.33(c) & 1701.95(d) |
| 22 | Founders | Undefined | Breach of Fiduciary Duty |
| 23 | Founders | Undefined | Unjust Enrichment |
| 24 | Founders | Undefined | Ohio Corrupt Practices Act: Ohio Rev. Code §§ 2923.34(B); 2923.32(A)(1) |

[4] The terms “Founders” and “Affiliated Entities” is not defined in the UAT Amended Complaint.

It is significant to note that the terms "Founders" and "Affiliated Entities" while prominent in the UAT's Amended Complaint are simply not defined. However, those terms were defined in the complaints that plaintiffs' counsel filed in the three Arizona noteholder cases. *See Exhibits A.* It is important to note that in those cases, the same counsel that here argues injury on behalf of the UAT because of damage caused to NPF VI and NPF XII, is the ***same counsel*** that alleged that NPF VI and NPF XII were part of a scheme to defraud its noteholder clients. *MDL Docket Entry 310*, ¶ *156* ("NCFE, NPF XII and NPF VI were engaged in fraud, resulting in enormous shortfalls in the collateral securing the Notes").

## II. Argument

### A. Standard for Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a court "must construe the complaint in the light most favorable to the plaintiffs, accept all factual allegations as true, and determine whether the plaintiffs undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Andrews v. State of Ohio,* 104 F.3d 803, 806 (6th Cir. 1997); *Gagliardi v. Village of Pawling*, 18 F.3d 188, 191 (2nd Cir. 1994). Nonetheless, a complaint must include direct or inferential allegations regarding every material element necessary to sustain a plaintiff's recovery, *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 779 (6th Cir. 2000), and "the allegations must constitute more than bare assertions of legal conclusions." *Tahfs v. Proctor,* 316 F.3d 584, 590 (6th Cir. 2003) (quotation omitted). The court should not weigh the evidence but should instead accept the facts as they appear in the complaint as true, to find whether the plaintiff has alleged sufficiently all of the legal elements necessary to state a claim under the law. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2nd Cir. 1989); *Christopher v. Laidlaw Transit, Inc.*, 899 F. Supp. 1224, 1226 (S.D.N.Y. 1995).

Based on the foregoing standards, the Court must analyze the UAT Amended Complaint, to determine whether it has alleged any set of facts, along with any reasonable inferences which may be drawn in their favor, which are sufficient to entitle plaintiffs to relief. *See Detko v. Blimpies Restaurant*, 924 F. Supp. 555, 556 (S.D.N.Y. 1996).

Under Rule 9(b) of the Federal Rules of Civil Procedure, allegations of fraud must be pled with particularity. Each plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (quotation omitted). This standard is designed to afford the defendant adequate notice of the fraud allegations, thereby allowing for the preparation of a pleading in response. *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999). Moreover, "[p]laintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud. Generalized and conclusory allegations that the Defendants' conduct was fraudulent do not satisfy Rule 9(b)." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001).

### B. The Claims in the UAT Amended Complaint Are Barred for Lack of Standing and by the Doctrine of *in Pari Delicto*

Regardless of how the Court analyzes this issue, the *in pari delicto* doctrine bars all of the UAT's claims whether such claims sound in contract or in tort. *Official Comm. Of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3rd Cir. 2001). This argument applies to each count of the UAT Amended Complaint that is asserted against Movants.

**1. The Trustee Lacks Standing to Bring the Claims Asserted in the UAT Amended Complaint**

A trustee in bankruptcy "stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2nd Cir. 1991). To have standing, "'[a] plaintiff must always have suffered a "distinct and palpable injury to himself" . . . .'" *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1091 (2nd Cir. 1995); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Thus, "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims ***held by the bankrupt corporation itself***." *Shearson Lehman Hutton, Inc. v. Wagoner*, *supra* at 118 (emphasis added); *Caplin v. Marine' Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972); *In re D.H. Overmyer Telecasting Co., Inc.*, 56 B.R. 657 (Bnkrtcy.N.D.Ohio 1986); *DSQ Property Co. Ltd, v. DeLorean*, 891 F.2d 128 (6th Cir. 1989); *Hirsch v. Arthur Andersen & Co.*, *supra*.

In *Wagoner*, the Second Circuit upheld dismissal of the trustee's claim on behalf of the debtor corporation against Shearson Lehman Hutton, Inc. for aiding, abetting and unduly influencing the corporation's sole stockholder, director and president in wrongfully dissipating corporate funds. The Second Circuit stated:

> To the extent the demand alleges money damages [to the debtor corporation] itself, it is uncontested that [the debtor corporation's] sole stockholder and decisionmaker . . . not only knew of the bad investments, but actively forwarded them. A claim against a third party for defrauding a corporation with the cooperation of management accrues to the creditors, not to the guilty corporation.

944 F.2d at 120.

The Second Circuit addressed the standing issue and concluded that under the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation and has standing to bring any

suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy, *citing Caplin v. Marine Midland Grace Trust Co.*, *supra*, and *Cissell v. American Home Assur. Co.*, 521 F.2d 790 (6th Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976). The Second Circuit ultimately found that the trustee lacked standing to bring claims that belonged to the noteholders.

The Second Circuit's rationale in upholding dismissal of the aiding and abetting claim in *Wagoner* also served as the basis for its affirmance of the dismissal of professional malpractice claims in *Hirsch v. Arthur Andersen & Co.*, *supra*. In *Hirsch*, two general partners had perpetrated illegal Ponzi schemes through their partnership, involving the sale of limited partnership interest in real estate investments. 72 F.3d at 1088. The trustee of the consolidated estates of the two partners and the partnership sued the partnership's accountants and lawyers for, *inter alia*, professional malpractice. *See id.* at 1088-92. Ultimately, the Second Circuit concluded that the malpractice claims should be dismissed, stating that "the Wagoner rule should be applied . . . because of the Debtors' collaboration with the defendants-appellees in promulgating and promoting the [partnership's] Ponzi schemes." *Id.* at 1094.

In summary, *Wagoner* prohibits a corporation from suing a third party for damages caused to the corporation only where the corporation's shareholders are alleged to have participated with the defendants in the alleged wrongdoing. *See Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld*, 212 B.R. 34, 44 (S.D.N.Y. 1997).

In *Caplin*, the bankruptcy trustee sued a third party indenture trustee, claiming that the latter's misconduct had enabled the bankrupt corporation (which issued the debentures) to misrepresent to the debenture holders (ultimately the creditors in the bankruptcy) that it was complying with the indenture agreement. The trustee claimed that the debenture holders' claims in the bankruptcy (the equivalent of the claims of the NCFE investors) constituted an injury to

the estate which enabled him to pursue claims against the third party indenture trustee. The Supreme Court rejected the bankruptcy trustee's claim, holding that he lacked standing to pursue an action against the indenture trustee and recognizing that the debenture holders themselves were the only proper parties to pursue claims against the indenture trustee.

Other courts have reached the same conclusion. *Melamed v. Lake County Nat'l Bank*. 727 F.2d 1399, 1404 (6th Cir. 1984) ("[t]he trustee has no standing . . . to sue on behalf of creditors. . . . He stands in the shoes of the bankrupt, not of its creditors"); *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 585 (S.D.N.Y. 1995), *citing Thompson v. County of Franklin*, 15 F.3d 245, 247 (2nd Cir. 1994); *Rent Stabilization Assoc. of New York v. Dinkins*, 5 F.3d 591, 593 (2nd Cir. 1994); *Ad Hoc Committee of Concerned Teachers v. Greenburgh No. 11 Union Free School Dct.*, 873 F.2d 25, 26 (2nd Cir. 1989).

In summary, the real issue is: who sustained the injury? In this case, as in *Wagoner* and *Caplin*, the answer to who sustained the injury is the investors, ***not*** the trustee. This lack of standing is particularly true where, as here, the claims which the trustee seeks to assert belong to defrauded investors and not to the debtors.

In this case, there is no question but that the investors who the UAT plaintiffs now purport to represent have filed a number of lawsuits seeking relief. In fact, in no less than three of these lawsuits, counsel who filed the UAT Amended Complaint is the same counsel who filed the lawsuits on behalf of the investors. Other investors are also suing. The Court currently has numerous motions to dismiss these complaints pending before it. The investors are pursuing their claims, and plaintiffs in the UAT Complaint simply lack standing to pursue these claims. It would appear the UAT Amended Complaint is superfluous to the investors' already filed litigation and is designed solely to enrich the UAT plaintiffs' counsel. If trustees' counsel were

to recover, the recovery would not necessarily go to the creditors, it would first flow to the UAT's plaintiffs' counsel.

Dismissal of the UAT Amended Complaint on the grounds that the UAT plaintiffs lack standing is a just result. Allowing the trustee to sue when the creditors themselves can and have brought their own claims will only foster multiple litigation and will create a substantial risk of confusion and inconsistent results. The UAT plaintiffs' action does not preempt suits by the individual creditors; they are still entitled to pursue their claims. Even if there was a settlement with the UAT plaintiffs, the investors could still continue to pursue their claims.

These problems can all be avoided if the Court applies the standing requirement to this case. If the does so, it must conclude that the UAT plaintiffs lack standing to pursue this claim. Accordingly, the UAT Amended Complaint should be dismissed.

### 2. The Doctrine of *In Pari Delicto* Bars the Claims in the UAT Amended Complaint

Even if it could be argued that plaintiffs in the UAT Amended Complaint have standing, their claims against Movants are still barred by the doctrine of *in pari delicto*. *In pari delicto* is an equitable defense whereby a plaintiff trustee is barred from asserting a claim if the plaintiff bears fault for the claim. *See Terlecky v. Hurd (In re Dublin Securities, Inc.),* 133 F.3d 377, 380 (6th Cir. 1997) (referred to as "*Dublin Securities*"). Under the *in pari delicto* doctrine, the law will not aid a party who is fraudulently or criminally culpable in its efforts to recover from an alleged joint tortfeasor. Thus, when, as here, a party is of equal (or greater) fault than the defendant, the *in pari delicto* doctrine bars all claims. *Dublin Securities, supra*; *see also Jones v. Hyatt Legal Services*, 132 B.R. 853, 860 (Bnkrtcy.S.D.Ohio 1991).

In *Dublin Securities*, the chapter 7 bankruptcy of three corporations devised and carried out initial public stock offerings that the bankruptcy trustee alleged to be fraudulent. The trustee of

Dublin Securities brought an action against two law firms that represented the debtor corporations and against individual attorneys in those firms in relation to the sale of securities by those corporations. Among other claims, the trustee advanced a claim for professional negligence.

The defendants in *Dublin Securities* moved to dismiss the trustee's complaint, arguing that the trustee's claims were barred by the doctrine of *in pari delicto.* The district court dismissed the complaint.

On appeal, the Sixth Circuit affirmed the dismissal of the trustee's complaint. *Dublin Securities, supra*. Before the Sixth Circuit, the trustee argued *in pari delicto* was a fact-specific defense that required an evidentiary hearing to determine its applicability, *Dublin Securities,* 133 F.3d at 380, but on review, the Sixth Circuit found that an evidentiary hearing was unnecessary where the trustee's complaint contained allegations sufficient to establish the substantive applicability of the defense. *Id***.** The Sixth Circuit reasoned that although the individual officers and directors were alleged to have acted adversely to the corporation's interest, the trustee also alleged, as here that the individual officers and directors dominated and controlled the corporations involved. *Id*. at 380. The Sixth Circuit concluded that the officers and directors were the "alter egos" of the debtor corporations and, therefore, their malfeasance was directly attributable to the debtor corporations. *Id.* Simply put, the doctrine of *in pari delicto* barred the trustee's complaint.

The facts of *Dublin Securities* are similar to the facts alleged in UAT's Amended Complaint. In *Dublin Securities,* the complaint alleged that Dublin Securities, the bankrupt entity, devised and carried out fraudulent initial public stock offerings. By 1992, Dublin Securities had made approximately $60 million in allegedly fraudulent sales in Ohio. Late that year, authorities seized the records of the companies, and Dublin Securities was eventually forced to file for bankruptcy

pursuant to the provisions of Chapter 7 of the Bankruptcy Code. Some of the principals of Dublin Securities were also convicted on various state criminal charges as a result of their activities. Myron Terlecky was appointed trustee in the Dublin Securities cases and eventually filed suit against the defendants, claiming that individuals sued knew or should have known of the illegal nature of the activities in which the companies were engaged.

The UAT Amended Complaint makes essentially the same claims as were made in *Dublin Securities*. The claims are asserted for the benefit of the UAT's creditors. The Court should apply *Dublin Securities* and dismiss the UAT Amended Complaint. The individual creditors and investors have demonstrated their capability of protecting their individual interests by filing lawsuits seeking to recover their alleged losses.

Accordingly, the UAT Amended Complaint should be dismissed in its entirety with respect to Movants.

### C. Plaintiffs' Federal and State RICO Claims Fail, as a Matter of Law

The arguments in this section apply to all federal and state RICO claims asserted in Counts 1-8 of the UAT Amended Complaint. For the reasons stated below, all of these claims should be dismissed.

### 1. The Statute of Limitations Has Run as to All RICO Claims Regarding Alleged Acts Prior To November 17, 1998[5]

In this case all civil RICO claims based upon acts that occurred more than four years prior to the filing of the bankruptcy petitions of NCFE and its subsidiaries are barred by the statute of limitations.

A civil RICO claim is subject to a four-year statute of limitations. *Agency Holding Corporation v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121, 134 (1987); s*ee also Fraley v. Ohio Gallia County*, 1998 U.S.App.LEXIS 28078 (6th Cir. Oct. 30, 1998) (attached as Exhibit B). The statute of limitations begins to run when the RICO plaintiffs are put on "inquiry notice" of the "possibility of fraud." *Fraley v. Ohio Gallia County*, *supra*; *quoting Harner v. Prudential-Bache Sec., Inc.*, 1994 U.S.App.LEXIS 25266 (6th Cir. Sept. 9, 1994) (attached as Exhibit C).

In the instant case, the foundation upon which plaintiffs attempt to build their RICO case consists of acts for which the statute of limitations has already run.[6] Plaintiffs gain nothing by arguing that the statute does not begin to run until they received notice of a broad pattern of wrongful conduct and injury to a number of parties. In its most recent decision regarding the RICO statute of limitations, the Supreme Court rejected the use of an injury and pattern

[5] When a bankruptcy trustee sues as the successor to a debtor's claims, the trustee may be eligible to extend the period in which the action may be commenced. 11 U.S.C. § 108. Under Section 108, a trustee may receive an additional two years in which to file an action if the applicable statute of limitations would have tolled during the bankruptcy period. 11 U.S.C. § 108(a). However, if the statutory period of a cause of action expires prior to the bankruptcy, Section 108(a) will not extend the period in which a claim can be brought. *In_re GNK Enterprises, Inc*, 197 B.R. 444, 448 (Bnkrtcy.S.D.N.Y. 1996). The court outlined a two part analysis: first, whether a claim in favor of the debtor was still viable on the petition date under the applicable non-bankruptcy law, and second, if a two-year extension was "warranted." *In re Argo*, 134 B.R. 776, 784 (Bnkrtcy.S.D.N.Y. 1991) (citation omitted); *In re Coin Phones, Inc.*, 153 B.R. 135 (Bnkrtcy.S.D.N.Y. 1993), *In re Dyna Corp.*, 200 B.R. 750 (Bnkrtcy.D.N.H. 1996); *Baehr v. Touche & Ross*, 62 B.R. 793 (E.D.Pa. 1986). In the instant case, NCFE and its subsidiaries were placed into bankruptcy on November 18, 2002. Any acts or claims that accrued prior to November 17, 1998 had run prior to the NCFE's entry into bankruptcy. Because our statute of limitations argument is limited to alleged acts prior to November 17, 1998, Section 108 is not applicable.

[6] The following paragraphs contain allegations regarding acts occurring prior to November 17, 1998:

> 152, 154-156, 159-160, 185, 188-189, 192, 234, 242, 372, 408, 417, 410, 428, 439, 451, 495, 497, 504, 517, 525, 537, 768, 773, 775, 779, 793, 795, 805, 847, 853, 903, 905, 912, 915-917, 919, 921-946, 948-949, 1022, 1075, 1087, 1095.

discovery rule. *Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). In *Rotella*, the Supreme Court reasoned that the injury and pattern discovery rule ties,

> ***the start of the limitations period to a plaintiff's reasonable discovery of a pattern [,] rather than to the point of injury or its reasonable discovery, [thereby] extend[ing] the potential limitations period for most civil RICO cases well beyond the time when a plaintiff's cause of action is complete*** . . . [Such an extension of the limitations period] would bar repose, prove a godsend to stale claims, and doom any hope of certainty in identifying potential liability. Whatever disputes may arise about pinpointing the moment a plaintiff should have discovered an injury to himself would be dwarfed by the controversy inherent in divining when a plaintiff should have discovered a racketeering pattern that might well be complex, concealed or fraudulent, and involve harm to parties wholly unrelated to an injured plaintiff.

528 U.S. at 558-559, 120 S.Ct. at 1082-1083, 145 L.Ed.2d 1057-1058 (emphasis added).

For inquiry notice, a plaintiff need only have a "low level of awareness. . . the clock begins to tick when a plaintiff senses 'storm warnings,' not when he hears thunder and sees lightning." *Isaak v. Trumbull Savings & Loan Co.*, 169 F.3d 390, 399 (6th Cir. 1999), *quoting Jensen v. Snellings*, 636 F.Supp. 1305, 1309 (E.D.La. 1986). "Storm warnings," sufficient to serve as inquiry notice have been defined as "any substantial or concrete indication of serious problems ahead" contained in documents such as SEC filings, prospectus, subsequent press releases and reports. *In re ARM Financial Group, Inc. Sec. Litig.*, 2002 U.S.Dist.LEXIS 13451, at p. 10 (W.D.Ky. Jul. 18, 2002) (attached as Exhibit D), *quoting Havenick v. Network Express, Inc.*, 981 F.Supp. 480, 514 (E.D.Mich. 1997). When a company's prospectus and investor fact sheets contained "contradictory information," plaintiffs were held to have had notice of the fraud as a matter of law from the time they received the documents. *In re ARM Financial Group, Inc. Sec. Litig., supra* at p. 9, *citing Harner v. Prudential Bache Sec., Inc., supra*.

In *Harner*, plaintiffs received a prospectus and brochure regarding the same investment. The documents contained conflicting information regarding the quality and prospective value of the investment. *Harner v. Prudential Bache Sec., Inc., supra* at pp. 3-6. Subsequent letters regarding the changed financial conditions of investment also contradicted the prospectus. *Id.*

The district court held, and the Sixth Circuit affirmed, that plaintiffs were on inquiry notice of the fraud at the time they first received the prospectus. *Harner v. Prudential Bache Sec., Inc.*, *supra* at p.18; *see also Isaak v. Trumbell Savings & Loan*, *supra* at 400-401 (where plaintiffs had "abundant access to information concerning fraudulent activity at the Campgrounds, including widespread newspaper reports of the state investigation into illegal sales practices" as well as their own personal experiences with the defendants, plaintiffs "reasonably should have discovered . . . the existence and source of their RICO injuries" before the statute of limitations had run.).

In the instant case, plaintiffs allege defendants' plots and actions rendered NCFE and its subsidiaries insolvent as early as NCFE's inception, or in January, 1995. *UAT Amended Complaint*, ¶¶ *148-150*, *156-161*, *773*.[7] This fact by itself constitutes sufficient notice to place plaintiffs' predecessor entities, two subsidiaries of NCFE, on inquiry notice of wrongdoing. Further information available to the plaintiffs' predecessors included the following: (i) each report by the rating agencies indicating that NCFE was not in perfect compliance with the provisions of its indentures; (ii) actual lockbox cash collections which were reported on a monthly basis to the investors through the indenture trustee and were contained in the Investor Reports; (iii) without conceding that any money transfers violated the terms of the Indenture, any research into transfers between bank account would have revealed multiple money transfers of large amounts of money at the end of each month so that money would be in the proper account on the determination date, *UAT Amended Complaint*, ¶¶ *111*, *112*, *114*, *116*, *118*; (iv) the Master Indentures required NPF VI and NPF XII provide the Trustee a consolidated, audited financial statement of NCFE, including NPF VI, NPF XII, and the Servicer, *UAT Amended Complaint*, ¶*127*; (v) identification by auditors Deloitte & Touche and Price Waterhouse Coopers, L.L.P. of

[7] Note, however, that these allegations seem to contradict the opening statement in the UAT Amended Complaint: "When they began, NPF VI and NPF XII were healthy, solvent, limited purpose companies." *UAT Amended Complaint*, ¶ *1*.

related party transactions based on the purchase of receivables from companies in which NCFE's officers and directors had some interest as early as 1995, *UAT Amended Complaint,* ¶¶ *919-925, 939-940*. Plaintiffs attempt to use these "red flags" to prove defendants' long-term scheme of wrongdoing and fraudulent acts. However, all that plaintiffs succeeds in arguing is the existence of widespread knowledge of what he alleges to be fraudulent acts, many years prior to taking action by filing this lawsuit.

Such claims are barred by the applicable statute of limitations and should be dismissed.

**2. Fraudulent Concealment Does Not Toll the RICO Statute of Limitations**

Any claim for fraudulent concealment by plaintiffs must fail because fraudulent concealment can only be pled if a plaintiff shows "he neither knew nor, in the exercise of due diligence, could have reasonably known of the offense." *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 194, 117 S.Ct. 1984, 1993, 138 L.Ed.2d 373, 386 (1997) (citations omitted). Plaintiffs cannot allege this, as its debtors had access to every aspect of NCFE's business. First, as director, officer and president of NCFE, NPF XII and NPF VI, Lance Poulsen had access to all of this information; it is impossible to say that debtors did not have access to same. In the twelve months preceding Mr. Poulsen's resignation, CSFB alone was involved in more than 107 documented due diligence investigations at NCFE. In addition, CSFB visited and performed due diligence at NCFE's top ten clients. Hundreds of people had access and reviewed NCFE's financial documents. The Trustees of NPF VI and NPF XII had copies of every financial statement, all notes and all indentures. The Trustees NPF VI and NPF XII also had all of the details regarding related party disclosures, stock ownership, personal financial statements, trustee records, auditor notes, as well as their own observations. *UAT Amended Complaint,* ¶ *345.*

Not only did plaintiff have notice of any alleged irregularities, hundreds of other people did as well. Plaintiffs' inquiry notice regarding alleged irregularities at NCFE began at NCFE's

inception. The Trustees of NPF VI and NPF XII knew each account balance at the end of each business day. When NCFE was potentially going public, hundreds of hours and thousands of documents were scrutinized. CSFB literally had the keys to NCFE's door. No other nonpublic company had the degree of due diligence and scrutiny which took place at NCFE. With the hundreds of people involved in different aspects of NCFE, NPF XII and NPF VI's business, it is virtually impossible that any wrongdoing could have occurred that due diligence would not have revealed. For these reasons, plaintiffs' claim of fraudulent concealment must fail.

### 3. Plaintiffs Have Not Alleged a RICO Association-in-Fact Enterprise

To prove a RICO association-in-fact enterprise and violations caused by such enterprise, plaintiffs must show, (1) two or more predicate offenses within ten years of the last predicate act; (2) the existence of an "enterprise"; (3) a "nexus between the pattern of racketeering activity and the enterprise"; and (4) that an injury to business or property occurred as a result of the above three factors. *FRC Int'l, Inc. v. Taifun Feurloschgeratebau und Vertruebs GmbH*, 2002 U.S.Dist.LEXIS 17559, at p. 35 (N.D.Ohio Sept. 4, 2002) (copy attached as Exhibit E) *citing Vandenbroeck v. Common Point Mortgage Co.*, 210 F.3d 696, 699 (6th Cir. 2000). In other words, plaintiffs must allege facts that "suggest" that the defendants' acts are coordinated and "function as a continuing unit" or that "demonstrate a chain of command or other evidence of a hierarchy." *Eva v. Midwest National Mortgage Banc, Inc.*, 143 F.Supp.2d 862, 875 (N.D. Ohio 2001).

In this case, plaintiffs' detail in making these claims, without more, proves the absurdity of the allegations. Lance Poulsen, as president of NCFE, is alleged to have created an enterprise (or alternately three enterprises) involving no less than three different global financial institutions, two rating agencies, one large New York City law firm and two of the four largest accounting firms in the United States. *UAT Amended Complaint*, ¶¶ *407-408, 454-456*. Mr. Poulsen is

alleged to have co-opted dozens if not hundreds of employees in all these organizations to do his bidding, each in dereliction of their respective fiduciary and professional duties, each under the watchful eyes of their own firm controls and checks and balances, on an incredibly grand scale. Such a claim must fail, on its face, if only because the grand scale of the allegations shows its absurdity.

#### 4. Plaintiffs Have Not Plead Fraud with Particularity against Barbara and Lance Poulsen and Therefore Plaintiffs' RICO Fraud Claims Must Fail

Plaintiffs' RICO claims are based on fraud allegations, and therefore must comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that "all averments of fraud . . . be stated with particularity." Rule 9(b), Fed.R.Civ.P. "Rule 9(b) ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). In addition, Rule 9(b) is used to prevent plaintiffs from filing complaints to obtain discovery regarding "unknown wrongs," thereby protecting "potential defendants . . . from the harm that comes from being charged with the commission of fraudulent acts." *Id*. To comply with Rule 9(b), the complaint must state specifically "the times, places, contents and victims of the underlying fraud" *Vild v. Visconi*, 956 F.2d 560, 567 (6th Cir. 1992); *see also, Ullmo v. Gilmour Academy*, 273 F.3d 671 (6th Cir. 2001); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994), *cert. denied*, 516 U.S. 810, 116 S.Ct. 58; 133 L.Ed.2d 21 (1995); *U.S. ex rel. Branhan v. Mercy Health Sys. of Southwest Ohio*, 1999 U.S.App.LEXIS 18509 at p. 31 (6th Cir. Aug. 5, 1999) (Clay, J., dissenting in part) ("[A] plaintiff alleging fraud must establish a connection between fraudulent acts or statements and each defendant, or must establish facts that inform each defendant of its participation in the fraud.") (attached as Exhibit F).

To satisfy Rule 9(b), a RICO plaintiff must not only make "specific allegations as to which defendant made which telephone calls or mailings, [but] how each call or mailing furthered the fraudulent scheme." *Carr v. Countrymark Cooperative*, 1998 U.S.Dist.LEXIS 23000 at p. 9 (S.D.Ohio Jan. 29, 1998) (attached as Exhibit G). Plaintiffs must give notice of the "time, place and contents of the misrepresentation(s) upon which he relied." *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984).

In RICO cases alleging "mail fraud and wire fraud as the 'predicate acts,' the underlying fraud claims must be plead with particularity." *FRC Int'l, Inc. v. Taifun Feurloschgeratebau und Vertruebs GmbH*, *supra*. To plead fraud, plaintiffs must specify the "time, place speaker or content of the alleged misrepresentations or omissions. *Firestone v. Galbreath*, 747 F.Supp. 1556, 1578 (S.D. Ohio 1990). Even where sufficient facts to plead constructive fraud have been plead, such allegations may not be sufficient to assert predicate acts under RICO. *Firestone v. Galbreath*, *supra* at 1579.

Proof of mail fraud and wire fraud, requires one to show "a scheme or artifice to defraud combined with either a mailing or an electronic communication for the purpose of executing the fraudulent scheme. *Vandenbroeck v. Common Point Mortgage Co.*, *supra* at 701; *see also Eva v. Midwest National Mortgage Banc, Inc.*, *supra*. A scheme to defraud is:

> intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end. *Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 389-90 (6th Cir. 1996).

*Id*.

Plaintiffs have failed to meet their burden of pleading fraud in their Amended Complaint. Accordingly, the RICO claims must be dismissed.

### 5. Plaintiffs' RICO Fraud Claims against Barbara Poulsen Must Fail

While plaintiffs do not allege facts against many defendants with the requisite particularity, they have failed to allege anything against Barbara Poulsen at all. There is not a single specific allegation that Barbara Poulsen did or said anything in any way connected to their alleged losses. Of the 1144 paragraphs of plaintiffs' Amended Complaint, only 31 even mention Barbara Poulsen. Of those 31 paragraphs, eight allege that Barbara Poulsen owned or was a member of the following companies: Intercontinental Investment Associates, Healthcare Capital LLC, Flohaz Partners, LLC, South Atlantic Investments, LLC, Thor Capital Holdings, LLC, Kachina, Inc., and Home Medical of America, Inc. *UAT Amended Complaint,* ¶¶*24-29, 86, 1087*. One paragraph alleges she is married to Lance Poulsen, resides either in Florida or Ohio and regularly does business in Ohio and has committed acts within Ohio from which Plaintiffs' claims arise. *UAT Amended Complaint,* ¶*30*. Four paragraphs incorrectly allege Barbara Poulsen was both an officer and director of NCFE, the Servicer, NPF XII, NPF X, and NPF VI. *UAT Amended Complaint,* ¶¶*30, 45, 196*.[8] Four paragraphs allege that Barbara Poulsen, among other defendants, had fiduciary duties, was required to exercise her duties in the best interest of NPF VI, NPF X, NPF XII and NCFE, breached said fiduciary duties by "engaging in self-dealing transactions" and failed to discharge said duties with the "degree diligence, care and skill required under the law." *UAT Amended Complaint,* ¶¶ *197-198, 202-203*. In 15 paragraphs, plaintiffs allege that Barbara Poulsen, among other defendants, benefited in some way from money or stock transfers. *UAT Amended Complaint,* ¶¶*84, 88, 92, 101, 101-102, 112-113, 120-121, 137, 139, 162-163, 199, 205*. There are no allegations that Barbara Poulsen, at any time instructed anyone in a face-to-face meeting, or by means of telephone, U.S. mail, electronic

---

[8] Simply alleging a defendant is an officer or employee does not meet pleading requirements. *Eva v. Midwest National Mortgage Banc, Inc., supra* at 879 ("titles alone do not identify with particularity [a defendant's] alleged involvement in the scheme to defraud."); *See also City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 2005 U.S.App.LEXIS 1814 (6th Cir. Feb. 4, 2005)

mail, wire or facsimile, to transfer money. There are no allegations that Barbara Poulsen at any time sold, or induced someone to purchase, whether in a face-to-face meeting, or by means of telephone, U.S. mail, electronic mail, wire or facsimile notes offered by NCFE and its subsidiaries. There are no allegations that Barbara Poulsen at any time at any time made any representations, true, or false, regarding the financial health of NCFE or any of its affiliates, whether in a face-to-face meeting, or by means of telephone, U.S. mail, electronic mail, wire or facsimile. There are no allegations that Barbara Poulsen, at any time made any representations to anyone, true, or false, regarding NCFE or any of its affiliates' compliance with any Master Indenture, whether in a face-to-face meeting, or by means of telephone, U.S. mail, electronic mail, wire or facsimile. In short, there are no allegations that Barbara Poulsen, at anytime, in person, via telephone, facsimile, mail, e-mail or wire, did or said anything to anyone. Nor are there any allegations regarding her alleged role in the alleged fraud of which plaintiffs complain.

In the instant case, no allegations have been made regarding Barbara Poulsen. For example, while plaintiffs allege a scheme to defraud, *UAT Amended Complaint, ¶ 148*, they do not include Barbara Poulsen in that allegation. She has not been given the requisite fair notice of the "date, place, time and content" of any alleged misrepresentation upon which plaintiffs relied. *Eva v. Midwest National Mortgage Banc, Inc.*, *supra* at 878.

In sum, plaintiffs have not pled RICO fraud against Barbara Poulsen with *any* specificity, and all such claims must be dismissed.

#### 6. Plaintiffs Have Failed to Plead Sufficiently RICO Fraud against Lance Poulsen

Plaintiffs have not adequately pled fraud, and RICO claims against Lance Poulsen. To satisfy Rule 9(b)'s requirements, a complaint alleging fraud must,

(copy attached as Exhibit J). Plaintiffs' allegations regarding Barbara Poulsen's corporate positions, beyond being factually incorrect, do not meet the Rule 9(b) pleading requirements.

> (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.

*Gupta v. Terra Nitrogen Corp.*, 10 F.Supp.2d 879 (N.D.Ohio 1998), *quoting Acito v. Imcera Group, Inc.*, 47 F.3d 47, 51 (2nd Cir. 1995).

Paragraphs such as those that refer to "defendants" or the "Founders" are not sufficient. A complaint:

> may not rely upon blanket references to acts or omissions by all of the "defendants," for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.

*Benoay v. Decker*, 517 F.Supp. 490, 493 (E.D.Mich. 1981) (citations omitted).

While plaintiffs make many allegations in its Amended Complaint, they fail to plead with the required specificity. For example, in many paragraphs of the Complaint, plaintiff begins alleging multiple offenses by "Defendants." *UAT Amended Complaint,* ¶¶ *421, 423-24, 508, 510, 553*. As the allegation continues, plaintiffs allege that either "Poulsen, Parrett and/or Ayers provided the instructions for the unauthorized transfers through the use of wires or mail." Likewise, the RICO fraud allegations are replete with references to "Bank One, Poulsen and the Servicer," without any breakout of their respective roles in the alleged scheme. *UAT Amended Complaint,* ¶¶ *312, 313, 314, 315*. Similarly, undefined references to the "VI O&M Enterprise" totally fail to explain the alleged roles of its respective numbers. *UAT Amended Complaint,* ¶¶ *412-415*. The paragraphs neither give specific dates nor do they explain to whom and in what manner such instructions were given. This type of group pleading does not meet the requisite standard for pleading fraud and must be dismissed. *Eva v. Midwest National Mortgage Banc, Inc.*, *supra* at 879.

Plaintiffs' failure to plead fraud with particularity renders all of the claims against Movants subject to dismissal. The counts in the complaint either allege fraud itself, or are predicated on

the occurrence of alleged fraud. None of the claims, however, are properly pleaded. The UAT Amended Complaint should, therefore, be dismissed as to Movants in their entirety.

**7. Plaintiffs Fail to Show Detrimental Reliance on Any Alleged Fraudulent Representation**

RICO plaintiffs must show facts establishing their detrimental reliance on the fraudulent statements. ." *Eva v. Midwest National Mortgage Banc, Inc.*, *supra* at 877, *quoting Kenty v. Bank One, Columbus, N.A.*, *supra* at 389; *see also Bender v. Southland Corp.*, *supra*. To state a viable fraud claim, plaintiffs must not only show NCFE made a "material misrepresentation of fact that was calculated or intended to deceive persons of reasonable prudence and comprehension," but that the plaintiffs actually "relied upon that material misrepresentation." *Vandenbroeck v. Common Point Mortgage Co.*, *supra*; *Kenty v. Bank One, Columbus, N.A.*, *supra*.

Plaintiffs cannot show detrimental reliance in this case. While plaintiffs attempt to distinguish between NPF XII and NPF VI and defendants, this contention lacks merit. For example, plaintiffs allege that defendant Lance Poulsen was the "head of [NCFE] XII" and that he ran the Servicer in his role as President, Treasurer and Sole Director of same. *UAT Amended Complaint, ¶ 456*. It is disingenuous and absurd for plaintiffs to claim they detrimentally relied upon Lance Poulsen's representations when he *was* in charge of plaintiffs' predecessors' operations. Plaintiffs' predecessors, despite its arguments to the contrary, cannot be distinguished from Lance Poulsen, and therefore cannot have relied upon anything Lance Poulsen said, or did, to its detriment.[9]

**8. Ohio RICO Statutes**

Ohio courts applying Ohio's Pattern of Corrupt Activities law ("PCA") look to federal cases applying RICO for guidance. *FRC Int'l, Inc. v. Taifun Feurloschgeratebau und Vertruebs*

*GmbH, supra*. Therefore, in cases in which both claims are brought, the analysis for both claims is likely to be the same.

Civil conspiracy in Ohio consists of (1) a malicious combination; of (2) two or more persons; (3) injury to person or property and (4) the existence of an unlawful act independent from the actual conspiracy. *Eva v. Midwest National Mortgage Banc, Inc., supra* at 898, *citing United Coach, Inc. v. N.Y. City Transit Auth., Inc.*, 90 Ohio App.3d 284, 292; 629 N.E.2d 28, 33 (1993).

When a case has state law and RICO claims, plaintiffs will not be able to get a double recovery. Both the claims and the damagers are in the alternative; plaintiff "will recover the larger either the state-claim damages or the RICO damages." *AIG Aviation, Inc. v. Boorom Aircraft, Inc.*, 1998 U.S. App. LEXIS 2143 at pp. 15-16 (6th Cir. Feb. 11, 1998) (copy attached as Exhibit H).

In the instant case, plaintiffs' Amended Complaint cites to alleged acts by defendants that occurred prior to 1998. *See fn. 2, supra*. Not only do they have no viable claim regarding such acts, ***no harm exists***. The NCFE Offerings from many of the years in which harm is alleged, ***were fully paid off***. Investors in these program received all of the monies due to them. *Exhibit A.* The note creditors of NPF XII and NPF VI did not receive their money because NCFE and its affiliates were forced into bankruptcy.

Accordingly, the Ohio RICO claims and civil conspiracy claims in counts 1-8 of the UAT Amended Complaint must be dismissed.

---

[9] For the reasons discussed elsewhere, plaintiffs lack standing, as bankruptcy trustee, to pursue claims based on injuries, if any, that did ***not*** occur to the bankrupt entities for which plaintiffs purport to speak, i.e. NPF VI and XII.

### D. Plaintiffs' Claims for Fraudulent Transfers Fail, As a Matter of Law

The alleged transfers involving the undefined Founders and the Affiliated Entities are time barred. The UAT Amended Complaint alleges the following fraudulent transfers with respect to Movants:

| Date of Transfer | UAT Amended Complaint Allegations | Transferee |
|---|---|---|
| 03.1999 | 632-639 | IIA |
| 04.1999 | 640-655 | Home Medical |
| 07.1999 | 656-667 | IIA |
| 02.2000 | 668-675 | IIA |
| 03.1999<br>02.2000<br>03.2001[10] | 691-699 | Poulsen<br>Barbara Poulsen<br>IIA<br>HCC<br>Thor<br>Flohaz<br>South Atlantic |

For the reasons stated below, plaintiffs' claims in the UAT Amended Complaint with respect to these transfers should be dismissed.

#### 1. Claims under Federal Bankruptcy Law (Count 18)

Because the alleged fraudulent transfers fall outside of the statutory "look back" period of one year from the date of the filing of the bankruptcy petition, the claims for fraudulent transfer in Count 18 are time barred. The Bankruptcy Code provides, in pertinent part, as follows:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within ***one year*** before the date of the filing of the petition …[.]

[10] This transfer may not be time barred under Ohio law, but, as with all other claims in the UAT Amended Complaint, the claims are barred because plaintiffs lack standing and because of the doctrine of *in pari delicto*.

11 U.S.C. § 548(a)(1) (emphasis added). This section of the Bankruptcy Code has a maximum one year "look back" period for the recovery of fraudulent transfers. 11 U.S.C. § 548(a)(1); *see Rieser v. Milford (In re Chari)*, 276 B.R. 206, 212 (Bnkrtcy.S.D.Ohio 2002).

In the case at bar, the debtors filed their voluntary petition on or about November 18, 2002. Accordingly, the "look back" period for recovery of fraudulent transfers pursuant to the Bankruptcy Code includes any transfers that may have occurred between November 18, 2001 and November 18, 2002. As noted in the chart above, in this case, plaintiffs allege that the transfers took place between March 1999 and March 2001. There is no question but that all of the dates of the alleged fraudulent transfers to Movants occurred before November 18, 2001.

Any transfer that occurred more than one year before the bankruptcy is not recoverable as a fraudulent transfer under 11 U.S.C. § 548. Accordingly, those transfers are not recoverable under 11 U.S.C. § 548 and Count 18 should be dismissed.

**2. Claims against the Poulsens for Alleged Transfers in Which They Were Not the Initial Transferee Should be Dismissed.**

Most of the alleged transfers from NCFE were made to business entities of which Lance and Barbara Poulsen were members. As a result, the claims based on these transfers should be dismissed because the Poulsens were not the initial transferees. The Bankruptcy Code provides, in pertinent part, as follows:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under sections 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550. "A subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer." *In re Bullion Reserve of North America*, 922 F.2d 544, 548 (9th Cir. 1991); *Big Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988); *In re Richmond Produce Co.*, 118 Bankr. 753, 760 (Bnkrtcy.N.D.Cal. 1990) (a subsequent transferee can never be an entity for whose benefit the initial transfer was made). Simply put, the statute separates initial transferees and beneficiaries, on the one hand, from immediate or mediate transferees, on the other. *In re Bullion Reserve of North America*, *supra*.

Furthermore, the courts have also held that "the individuals' rights as interest holders in [an] LLC is not alone sufficient to qualify them as persons 'for whose benefit the transfers were made' within § 550(a)(1)'s meaning." *Turner v. Phoenix Fin., LLC (In re Imageset, Inc.)*, 299 B.R. 709, 718 (Bnkrtcy.D.Me. 2003). In *Phoenix*, the court indicated that "as a general rule, if others (i.e., creditors) held claims against [the LLC], their right to payment would be superior to [the LLC's] members' rights to, or expectation of, distributions by virtue of their membership status." *Id*.

Accordingly, the Court should dismiss all of the counts in which it is alleged that the Poulsens are liable for an avoidable transfer because the "entity for whose benefit such transfer was made" was a limited liability company of which the Poulsens were merely members.

None of the transfers as indicated on the chart above was made directly to the Poulsens. It is only alleged that the transfers were made to various entities of which the Poulsens may have been members.

### 3. Claims under Ohio Law (Counts 19-21)

The claims based on the alleged fraudulent transfers involving Movants are time barred under Ohio law.

A creditor may bring a cause of action to recover a transfer and/or obligation that is fraudulent as to the creditor. Ohio Rev.Code § 1336.04. The statute provides:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
>
> (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
>
> (b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. (B) In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:
>
> (1) Whether the transfer or obligation was to an insider;
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer;
>
> (3) Whether the transfer or obligation was disclosed or concealed;
>
> (4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) Whether the transfer was of substantially all of the assets of the debtor;
>
> (6) Whether the debtor absconded;
>
> (7) Whether the debtor removed or concealed assets;
>
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Ohio Rev.Code § 1336.04.

Under Ohio law, such claims are subject to a statute of limitations. Ohio Rev.Code § 1336.09. The applicable statute provides:

A claim for relief with respect to a transfer or an obligation that is fraudulent under section 1336.04 or 1336.05 of the Revised Code is extinguished unless an action is brought in accordance with one of the following:

(A) If the transfer or obligation is fraudulent under division (A)(1) of section 1336.04 of the Revised Code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or reasonably could have been discovered by the claimant;

(B) If the transfer or obligation is fraudulent under division (A)(2) of section 1336.04 or division (A) of 1336.05 of the Revised Code, within four years after the transfer was made or the obligation was incurred;

(C) If the transfer or obligation is fraudulent under division (B) of section 1336.05 of the Revised Code, within one year after the transfer was made or the obligation was incurred.

Ohio Rev.Code § 1336.09.

Plaintiffs alleged that the fraudulent transfers involving Movants occurred on the following dates:

| **Date of Transfer** | **UAT Amended Complaint Allegations** | **Transferee** |
|---|---|---|
| 03.1999 | 632-639 | IIA |
| 04.1999 | 640-655 | Home Medical |
| 07.1999 | 656-667 | IIA |
| 02.2000 | 668-675 | IIA |

| Date of Transfer | UAT Amended Complaint Allegations | Transferee |
|---|---|---|
| 03.1999 | 691-699 | Poulsen |
| 02.2000 | | Barbara Poulsen |
| 03.2001 | | IIA |
| | | HCC |
| | | Thor |
| | | Flohaz |
| | | South Atlantic |

The UAT Amended Complaint was filed on November 17, 2004. As a result, all of the fraudulent transfers involving Movants are time barred with the possible exception of the March 2001 transfers. However, any claim with respect to the March 2001 transfer is barred by the doctrine of *in pari delicto*.

## E. The Common Law Claims in the UAT Amended Complaint Should Be Dismissed

### 1. Common Law Fraud Against Lance Poulsen (Count 10) and Other Fraud-Related Claims

Plaintiffs' "averments of fraud" fall woefully short of the heightened pleading requirements of Rule 9(b) and should be dismissed. Under Ohio common law, a claim for fraud requires that a plaintiff allege the following:

> (a) a representation or, where there is a duty to disclose, concealment of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 169, 462 N.E.2d 407, 409 (1984); *Friedland v. Lipman*, 68 Ohio App.2d 255, 429 N.E.2d 456 (1980); *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343 (6th Cir. 2000); *Matthews v. New Century Mortg. Corp.*, 185 F.Supp.2d 874 (S.D.Ohio 2002).

Plaintiffs fail to state a cause of action for fraud for several reasons. First, plaintiffs fail to plead with the requisite particularity the specific representations that are allegedly attributable to Lance Poulsen and upon which Plaintiffs allegedly relied. The allegations of fraud are only conclusory or are tied into general allegations supposedly specific to all defendants.

Second, Plaintiffs fail to plead specific facts that would support an allegation that Poulsen knew that the representations he allegedly made were false, or that he intentionally concealed material information. Rather than plead facts alleging specifically what knowledge Lance Poulsen allegedly had and when, where and how he allegedly acquired it, Plaintiffs instead rely upon his positions with NCFE to infer that he knew or must have known about the circumstances of the alleged fraud. But, as one court has noted:

> Allegations that a [particular] defendant, because of his position within the company, 'must have known' a statement was false or misleading are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny."

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3rd Cir. 1999); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1028 (N.D.Ohio 2000) (agreeing with officer-defendants that conclusory allegations that they "had the opportunity, not only to control the accounting treatment accorded to Telxon's financial data, but to be aware of the substantial improprieties in that treatment," standing alone, were not sufficient to justify an inference of scienter). Plaintiffs may not "lump the defendants together and [make] general conclusory allegations of wrongdoing." *In re Cendent Corp. Sec. Litig.*, 190 F.R.D. 331, 335 (D.N.J. 1999).

Finally, and perhaps most fatal to Plaintiffs' fraud claims, Plaintiffs have made no allegations other than unsupported, conclusory statements that Lance Poulsen had any intent to mislead Plaintiffs, or that Plaintiffs relied on any alleged misrepresentations of Lance Poulsen specifically. Without more, their fraud claims fail as a matter of law. *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129 (2nd Cir. 1994) (finding that plaintiff's "pleading technique"

of coupling a factual statement with a conclusory allegation of fraudulent intent does not satisfy Rule 9(b) and that, in the context of a securities fraud claim, such allegations are "so broad and conclusory as to be meaningless"); *In re Party City Sec. Litig.*, 147 F. Supp.2d 282, 315-16 (D.N.J. 2001) (stating that a plaintiff cannot simply couple factual statements with conclusory allegations of fraudulent intent to adequately plead such intent under Rule 9(b)).

Plaintiffs simply fail to specify what it was that Lance Poulsen said or did. Making broad and sweeping allegations against all defendants is simply not sufficient. Plaintiffs' claim against Lance Poulsen for fraud in Count 10 and all other fraud related claims must be dismissed.

**2. If the Majority of the Officers and Directors of NPF VI and NPF XII Knew about the Alleged Fraud in Disregarding the Terms of the Master Indentures, Such Knowledge Is Imputed to NPF VI and NPF XII and All Claims Based on the Alleged Concealment of This Fraud Must Be Dismissed.**

Counts 1-8, 10-11, 8-15, and 18-24 of the Amended Complaint are all premised on a fraudulent scheme allegedly entered into by Lance Poulsen. More specifically, Plaintiffs allege that Defendant Ayers, along with all of the officers and directors of NPF VI and NPF XII other than one, entered into a scheme to defraud these companies of billions of dollars. *UAT Amended Complaint,* ¶ *3.*

In order to substantiate a claim for fraud, plaintiffs must establish the following:

- a representation or, where there is a duty to disclose, concealment of fact,
- which is material to the transaction at hand,
- made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
- with the intent of misleading another into relying upon it,
- justifiable reliance upon the representation or concealment, and
- a resulting injury proximately caused by the reliance.

*Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985); *Black v. Cosentino*, 117 Ohio App.3d 40, 689 N.E.2d 1001 (1996).

In this case, Plaintiffs have not and cannot claim that the alleged fraud was concealed from NPF VI or NPF XII, or that these entities detrimentally relied on any implied representations of Poulsen. In fact, Plaintiffs have alleged quite the opposite.

Plaintiffs allege that NCFE was the sole shareholder of NPF VI and NPF XII, and that at all times relevant hereto, Poulsen, Ayers, and Parrett were officers and directors of NCFE, NPF VI and NPF XII. *UAT Amended Complaint, ¶¶ 37, 376-383*. Plaintiffs also allege that prior to the execution of the NPF VI and NPF XII Master Indentures, the documents that govern the operations of the NPF VI and NPF XII, Poulsen, along with defendants Ayers and Parrett and others, agreed to disregard material terms of the indentures.[11] *UAT Amended Complaint, ¶¶ 156-157, 245-246*. Plaintiffs then allege that this decision to "disregard" of the indentures terms provides the basis for NPF VI and NPF XII's claims. *Id*.

A corporation can only act through its agents. *C.I.T. Corp. v. Janis*, 418 F.2d 960 (6th Cir. 1969); *Jordan v. Global Natural Resources, Inc.*, 564 F.Supp 59 (S.D.Ohio 1983). Furthermore, while courts differ as to the effect of knowledge acquired by rank and file employees of a corporation, Ohio courts have determined that the knowledge of directors or key officers, such as the president and vice president, ***is imputed to the corporation***. *London & Lanceshire Indemnity Co. of America v. The Fairbanks Steam Shovel Co.,* 112 Ohio St. 136, 147 N.E. 329 (1925).[12]

For example, in *Arcanum National Bank v. Hessler*, 69 Ohio St.2d 549, 433 N.E.2d 204 (1982), the sole issue before the court was whether the plaintiff, Arcanum National Bank, was a holder in due course of the promissory note sold to it by the John Smith Grain Company, Inc. Hessler, the appellant, alleged that Arcanum National Bank had knowledge, actual or implied, that the John Smith Grain Company failed to give consideration for appellant's note. Appellant

---

[11] Of course, one interpretation of this scenario might be that the Master Indentures were modified by the agreement of all involved.

[12] Ohio law will control under what circumstances the knowledge of fraud on the part of the corporate directors will be imputed to the corporation. *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83-84, 114 S.Ct. 2048, 129 L.Ed.2d 67(1994).

argued that Arcanum National Bank could not have acquired the note in good faith as a holder in due course.

The court, after examining the relationship between Arcanum National Bank and the John Smith Grain Company, concluded that the facts established that Arcanum National Bank had knowledge of the underlying infirmity in Hessler's note prior to acquiring it. The court based this conclusion upon the fact that C. North, Jr., a director of the John Smith Grain Company, had actual knowledge that there was no consideration given by the John Smith Grain Company for the note and therefore his knowledge was imputed to all the directors of the John Smith Grain Company. H.K. Smith, who was both a director for the John Smith Grain Company and Arcanum National Bank, was therefore found to have knowledge of the infirmity in the note, such knowledge also being imputed to Arcanum National Bank. *Id.* at 557-558.[13]

Thus, if Ohio courts were willing to impute knowledge to the bank in *Hessler* based on the fact that one of the bank's officers was a director of a company that had imputed knowledge of the fraud, surely imputing knowledge of the alleged fraud to NPF VI and NPF XII is warranted here where all but one of the officers and directors are alleged to have knowledge of the fraud. *The First Nat'l Bank of New Bremen v. Burns*, 88 Ohio St. 434, 436, 103 N.E. 93, 94 (1913) ("it is well-established in Ohio a corporation can act only through its officer and agents, and the knowledge of the officers of a corporation is at once the knowledge of the corporation"); s*ee also Poth v. Russey*, 2004 U.S.App.LEXIS 5861 at p. 31 (4th Cir. Mar. 30, 2004) ("Ordinarily knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation.") (attached as Exhibit I); *Hellenic Inc. v. Bridgeline Gas Distrib. LLC (In re Hellenic Inc.)*, 252 F.3d 391 (5th Cir. 2001) (finding that while courts generally differ

---

[13] The above case synopsis of *Hessler* was taken, verbatim, from the analysis in *Sease v. John Smith Grain Co*., 17 Ohio App.3d 223, 224-225, 479 N.E.2d 284, 287 (1984).

as to the effect of knowledge acquired by rank and file employees, there is agreement that the knowledge of directors or key officers, such as the president and vice president, is imputed to the corporation).

Accordingly, the knowledge of the alleged fraud acquired by Poulsen, Ayers, and Parrett prior to and after the execution of the Master Indentures must be imputed to NPF VI and NPF XII as these defendants are all alleged to have been the officers and directors of NPF VI and NPF XII during all relevant times in question. As such, Plaintiffs, whose rights are no greater than NPF VI and NPF XII, cannot claim that defendants concealed material facts from NPF VI and NPF XII or that NPF VI and NPF XII relied on defendants' alleged representations regarding the Master Indentures.

Accordingly, Counts 1-8, 10-11 and 13-15 of the UAT Amended Complaint that are based on this alleged fraud should be dismissed.

**3. The Civil Conspiracy Claim Should Be Dismissed (Count 10)**

Even if Plaintiffs successfully stated a claim for the underlying unlawful acts, their conspiracy claim is still deficient because they fail to plead specific facts that would support an allegation that Lance Poulsen entered into any agreement with other defendants to commit an unlawful act. A claim of civil conspiracy rests upon an actual agreement to participate in a wrongful activity, *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 700 N.E.2d 859 (1998), which can be established by demonstrating that defendants shared a common understanding or design to commit an unlawful act. *Collyer v. Darling*, 98 F.3d 211, 229 (6th Cir. 1996); *Javitch v. First Montauk Fin. Corp.*, 279 F.Supp.2d 931, 941 (N.D.Ohio 2003). But, as one court has noted:

> [A] general allegation of conspiracy, without a statement of facts constituting that conspiracy, is only an allegation of a conclusion. The complaint should include some details of time, place, and the alleged effect of the conspiracy.

*Farah v. Martin*, 122 F.R.D. 24, 26 (E.D.Mich. 1988). Plaintiffs' make only conclusory allegations about any alleged conspiracy and without more, do not satisfy the particularity requirements of Rule 9(b). *See Avery v. Rossford*, 145 Ohio App.3d 155, 762 N.E.2d 388 (2001).

Plaintiffs have failed to plead properly a claim for civil conspiracy. Accordingly, Count 11 Should be dismissed.

**4. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty (Counts 13, 14 and 22)**

Poulsen incorporates by references the arguments of defendant Donald Ayers with respect to the breach of fiduciary duty.

5**. The Claim for Aiding and Abetting Should Be Dismissed (Count 15)**

The Supreme Court of Ohio "has never expressly approved" aiding and abetting liability. *Andonian v. A.C. & S., Inc.*, 97 Ohio App.3d 572, 573, 647 N.E.2d 190, 191 (1994). "Ohio does not recognize a claim for aiding and abetting common law fraud." *Federated Mgmt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 366, 381, 738 N.E.2d 842, 853 (2000).

Plaintiffs' claims for aiding and abetting common law fraud should therefore be dismissed for failure to state a cognizable claim.

**6. The Claim for Unjust Enrichment Should Be Dismissed (Count 23)**

Under Ohio law, a plaintiff asserting a cause of action for unjust enrichment must establish that: "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit 'under circumstances where it would be unjust to do so without payment.'" *Andersons Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003); *see also Shonac Corp. v. AMKO Int'l, Inc.*, 763 F. Supp. 919, 945 (S.D.Ohio 1991) ("The essence of unjust enrichment is the retention of some benefit by a person where it is in some way

undeserved, and rightly belongs to another"). "The plaintiff must show that the substantial benefit to the defendant is 'causally related' to the substantial detriment to the plaintiff." *Andersons Inc. v. Consol, Inc., supra*; *see also Shonac Corp. v. AMKO Int'l, Inc.*, 763 F. Supp. at 945 ("As ordinarily defined, the concept of unjust enrichment includes not only gain on one side but loss on the other, with a tie of causation between them.").

The UAT Amended Complaint does not establish that Movants in any way unjustly "retained" a benefit. *Murray v. Bank One*, 99 Ohio App.3d 89, 649 N.E.2d 1307 (1994) (affirming dismissal of unjust enrichment claim where plaintiff failed to demonstrate that it conferred any benefit on defendant).

Accordingly, plaintiffs' Complaint for unjust enrichment should be dismissed.

## III. Conclusion

For the reasons stated above, Movants' Motion to Dismiss should be granted and all claims against Movants should be dismissed with prejudice.

Dated: March 31, 2005

***/s/ John E. Haller***

John E. Haller (Ohio Bar #0031289)
SHUMAKER LOOP & KENDRICK LLP
41 South High Street, Suite 2210
Columbus, OH 43215
Tel: 614.463.9441
Fax: 614.573.7228
Email: jhaller@slk-law.com
Attorneys for Defendants, Lance Poulsen, Barbara Poulsen, South Atlantic Investments LLC, Thor Capital Holdings LLC, Kachina, Inc., Flohaz Partners LLC, Healthcare Capital LLC and Intercontinental Investment Associates Ltd.

## CERTIFICATE OF SERVICE

On March 31, 2005, the undersigned electronically filed this document with the Court using the CM/ECF system. any party or counsel not receiving electronic service from the CM/ECF system was mailed a copy of this document by ordinary U.S. Mail, on March 31, 2005.

***/s/ John E. Haller***
John E. Haller

# EXHIBIT A

**Exhibit 7.** ***HCABS Issuance Since 1995***

| Deal | Date | Amount | Ratings | Rated By | Pricing |
|---|---|---|---|---|---|
| NPF V (Series 2) | 15-Mar-95 | $ 20.00 | AA | S&P | NA |
| NPF VI (Series 1) | 15-May-95 | 73.00 | AAA | DCR | NA |
| NPF VI (Series 2) | 4-Jan-96 | 50.00 | AAA | DCR | NA |
| NPF VIII | 30-May-96 | 50.00 | A | DCR | NA |
| NPF IX | 27-Jun-96 | 125.00 | AAA/AA | DCR, Fitch | NA |
| NPF XI | 6-Jun-97 | 112.10 | AAA/AA/A | DCR, Fitch | NA |
| NPF IX (Series 2) | 29-Jul-97 | 85.00 | N/A | DCR | NA |
| NPF VIII (Series 2) | 23 Dec 97 | 25.00 | N/A | DCR | NA |
| DVI Business Credit Receivables Corp. III | 12-Feb-98 | 75.00 | AAA/A/BBB- | DCR, Fitch | 1ML +35/70/150 |
| Daiwa Healthco-3 LLC | 1-Mar-98 | 105.00 | AA/BBB | DCR/Fitch | NA |
| NPF VI (Series 3) | 31-Mar-98 | 77.00 | N/A | DCR | NA |
| NPF VI 1998 1 | 1-Jun 98 | 300.00 | AAA/AA- | DCR | 3yr +73/88 |
| NPF VI Series 1998-2 | 14-Aug-98 | 125.00 | AAA/AA- | DCR | 5yr +85/+92 |
| NPF VI Series 1998 4 | 4 Nov-98 | 50.00 | AAA/AA- | DCR/Fitch | 5yr +200/260 |
| NPF VI Series 1998-3 | 4-Nov-98 | 114.60 | AAA/AA- | DCR/Fitch | 3yr +175/230 |
| NPF XII Series 1999-1 | 10-Mar-99 | 100.00 | AAA/AA- | DCR | 5yr +120/150 |
| NPF VI Series 1999-1 | 25-Mar-99 | 180.00 | AAA/AA- | DCR/Fitch | 3yr +125/ 1ML + 90 |
| NPF XII Series 1999-2 | 28-Jun-99 | 350.00 | AAA/AA- | DCR | 3yr +147/167 |
| DVI Business Credit Receivables Corp III | 10-Nov-99 | 88.00 | AAA/AA/A/BBB | DCR/Fitch | 1ML +68/130/180/295 |
| NPF XII Series 1999-3 | 23-Nov-99 | 200.00 | AAA/AA- | DCR | 1ML +65/95 |

Source: Credit Suisse First Boston

# EXHIBIT B

**DENNIS O. FRALEY, Plaintiff-Appellant, v. OHIO GALLIA COUNTY, et al., Defendants-Appellees.**

**No. 97-3564**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

***1998 U.S. App. LEXIS 28078***

**October 30, 1998, Filed**

**NOTICE: [*1]** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1998 U.S. App. LEXIS 37415.*

**PRIOR HISTORY:** Southern District of Ohio. 97-00041. Holschuh. 5-2-97.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff prisoner sought review of the judgment from the United States District Court for the Southern District of Ohio that found in favor of defendant county officials and dismissed his *42 U.S.C.S. § 1983* civil rights action and his Racketeer Influenced and Corrupt Organizations Act (RICO) action under *18 U.S.C.S. § 1964* as frivolous pursuant to *28 U.S.C.S. § 1915*(e)(2).

**OVERVIEW:** The prisoner had filed an action claiming that the county officials violated his civil rights and were involved in an unlawful RICO enterprise. The district court sua sponte dismissed the prisoner's complaint as frivolous pursuant to *28 U.S.C.S. § 1915*(e)(2). In affirming, the court held that the district court properly dismissed the prisoner's complaint. The court found that the prisoner had alleged that the county officials were involved in a conspiracy to deprive him of his rights. However, the prisoner's civil rights and civil RICO complaint was not filed until over five years later. Therefore, the district court properly concluded that the action was untimely.

**OUTCOME:** The court affirmed the judgment of the district court.

**LexisNexis(R) Headnotes**

**COUNSEL:** DENNIS O. FRALEY, Plaintiff - Appellant, Pro se, Lexington, KY.

**JUDGES:** Before: BOGGS, SUHRHEINRICH, and SILER, Circuit Judges.

**OPINION:**

ORDER

Dennis O. Fraley, a Kentucky prisoner proceeding pro se, appeals a district court opinion and order dismissing his *42 U.S.C. § 1983* civil rights and *18 U.S.C.A. § 1964* (West 1998) civil Racketeer Influenced and Corrupt Organizations Act ("RICO") complaint as frivolous pursuant to *28 U.S.C.A. § 1915*(e)(2) (West 1998). The case has been referred to a panel of the court pursuant to Rule 9(a), Rules of the Sixth Circuit. Upon examination, this panel unanimously agrees **[*2]** that oral argument is not needed. *Fed. R. App. P. 34(a).*

On January 14, 1997, Fraley filed a complaint claiming that several private individuals residing in Gallipolis, Ohio, and various officials of Gallia County, Ohio, violated his civil rights and were also involved in an unlawful RICO enterprise. Fraley's claims stem from

a foreclosure action that resulted in a December 1991 judgment against him and order to sell the subject property, in which Fraley claims partial ownership. Fraley asserts that all of the parties involved in the foreclosure action conspired to deprive him of his civil rights and also violated the RICO Act. The district court sua sponte dismissed Fraley's complaint as frivolous pursuant to § 1915(e)(2). Fraley subsequently filed two motions for relief from judgment and a stay, which the district court denied. Fraley has filed a timely appeal, asserting that: 1) the district court did not properly review all of the pleadings because twenty-nine exhibits and Fraley's affidavit were not before the court; 2) the district court misconstrued and misapprehended the facts in the complaint; and 3) the law does not support the district court's handling of the complaint **[*3]** and dismissal of the action as frivolous.

This court reviews de novo a judgment dismissing a suit as frivolous under § 1915(e)(2). *McGore v. Wrigglesworth, 114 F.3d 601, 604 (6th Cir. 1997).* A complaint "is frivolous where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* Where a particular claim is barred by the applicable statute of limitations, it does not present an arguable or rational basis in law or fact and therefore may be dismissed as frivolous under § 1915(e)(2). *Ashiegbu v. Kim, 1998 U.S. App. LEXIS 8381, No. 97-3303, 1998 WL 211796* (6th Cir. Apr. 24, 1998) (unpublished order), *cert. denied, 119 S. Ct. 138, 142 L. Ed. 2d 112, 1998 U.S. LEXIS 5427, 1998 WL 334106 (U.S. 1998).* Furthermore, a sua sponte dismissal of an in forma pauperis complaint is appropriate where the complaint bears an affirmative defense such as the statute of limitations and is therefore frivolous on its face. *Pino v. Ryan, 49 F.3d 51, 53 (2nd Cir. 1995); see also McGore, 114 F.3d at 609.* **[*4]** "Courts have no discretion in permitting a plaintiff to amend a complaint to avoid a sua sponte dismissal." *McGore, 114 F.3d at 612; accord 28 U.S.C.A. § 1915*(e)(2).

RICO actions brought under *18 U.S.C.A. § 1964* (West 1998), are subject to a four year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156, 97 L. Ed. 2d 121, 107 S. Ct. 2759 (1987).* "[A] civil RICO cause of action begins to accrue as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." *Caproni v. Prudential Sec., Inc., 15 F.3d 614, 619 (6th Cir. 1994)* (quoting *Agristor Fin. Corp. v. Van Sickle, 967 F.2d 233, 241 (6th Cir. 1992)).* For § 1983 actions arising in Ohio, the appropriate statute of limitations is two years. *Ohio Rev. Code Ann. § 2305.10*; *Browning v. Pendleton, 869 F.2d 989, 990 (6th Cir. 1989).*

Upon review, we conclude that the district court properly dismissed Fraley's action sua sponte as frivolous pursuant to § 1915(e)(2). **[*5]** *McGore, 114 F.3d at 604.* Fraley alleges that, as early as July 1991, various individuals and Gallia County officials were involved in a conspiracy to deprive him of his rights. However, Fraley's civil rights and civil RICO complaint was not filed until January 14, 1997. Therefore, the district court properly concluded that Fraley's action was untimely. Even if Fraley did in fact file his action in February 1996, his suit was filed beyond the applicable statutes of limitation and the district court properly dismissed the suit as frivolous pursuant to § 1915(e)(2)(B). We need not address the merits of Fraley's civil rights and RICO allegations since both claims are barred by their respective statutes of limitation.

Accordingly, we hereby affirm the district court's judgment. Rule 9(b)(3), Rules of the Sixth Circuit.

# EXHIBIT C

**DONALD G. and YVONNE M. HARNER, DANIEL P. BERA, LAVERN BOOMS, RAYMOND R. and BARBARA J. SHIDELER, DOUGLAS L. MILES, MARTIN BECKER, BEN A. and LOUISE F. BLUESTEIN, WILLIAM E. and DIANE W. BENTON, WINSTON and ALICE L. BRADSHAW, LILA P. ADVANI and EARL C. and HAZEL M. HART, individually and on behalf of all others similarly situated, Plaintiffs-Appellants v. PRUDENTIAL-BACHE SECURITIES, INC., PRUDENTIAL-BACHE LEASING, INC., BACHE GROUP, INC., POLARIS INVESTMENT MANAGEMENT CORPORATION and POLARIS AIRCRAFT LEASING CORPORATION, Defendants-Appellees**

**NO. 92-1353, NO. 92-1910**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

***1994 U.S. App. LEXIS 25266***

**September 9, 1994, Filed**

**NOTICE: [*1]** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *35 F.3d 565, 1994 U.S. App. LEXIS 32546.*

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN. District No. 90-71629. Rosen, District Judge.

**DISPOSITION:** AFFIRMED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors appealed the dismissal of their securities fraud action, as well as their pendent state law fraud claim, against defendants, securities firms aircraft leasing company, by the United States District Court for the Eastern District of Michigan. The district court found that plaintiffs' federal claims were time barred and lacking in justifiable reliance upon defendant's alleged misrepresentations in an investment brochure.

**OVERVIEW:** A prospectus for an investment in a partnership of defendant securities firm and defendant airline leasing company had the statements about risk. Some plaintiff investors also received a supposedly internal fact sheet that gave glowing reports about the airline leasing industry. Plaintiffs bought the shares. Plaintiffs received letters from defendants that described poor market conditions and lower returns. Plaintiffs filed a federal securities fraud action against defendants. Plaintiffs also asserted state law claims for fraud, breach of fiduciary duty, and negligence. The district court dismissed plaintiffs' federal claims as time-barred and plaintiffs lacked justifiable reliance on the claims in the brochure. The district court also dismissed plaintiffs' pendent state law claims. The court affirmed. The court held that plaintiffs were on notice when they received the brochure, so the federal claims were time-barred. The court found that no "reasonable investor" could have been misled by the cautionary language of the prospectus. Dismissal of the state law claims was proper because plaintiffs did not raise a genuine issue of material fact on their state law claims.

**OUTCOME:** The court affirmed the dismissal of plaintiff investors' federal securities fraud claims against defendants, securities firm and airline leasing company, because plaintiff's claims were time-barred and they

lacked a justifiable reliance in alleged misstatements in an investment brochure. The court dismissed plaintiffs' pendent state law fraud, breach of fiduciary duty, and negligence claims, for the claims did not raise issues of material fact.

**LexisNexis(R) Headnotes**

**JUDGES:** BEFORE: JONES and NORRIS, Circuit Judges; and JARVIS, District Judge. *

> * The Honorable James H. Jarvis, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation.

**OPINIONBY:** JAMES H. JARVIS

**OPINION:**

**JARVIS,** District Judge. Plaintiffs, individual investors in four limited partnerships, appeal summary judgment for defendants-appellees Prudential-Bache Securities, Inc. ("Prudential"), Prudential-Bache Leasing, Inc. ("Bache"), Bache Group, Inc. ("BGI"), Polaris Investment Management Corporation ("Polaris"), and Polaris Aircraft Leasing Corporation ("PALC") on their securities fraud claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C. § § 1961* **[*2]** -1968 and Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j*(b). Plaintiffs also asserted state law claims for fraud, breach of fiduciary duty, and negligence, which were also dismissed by the district court. For the reasons that follow, we affirm.

I.

Background

In 1983 and 1984, plaintiffs purchased shares in four related partnerships known as the Prudential-Bache/Polaris Aircraft Investors II - A, B, C and D partnerships (the "Partnerships"). The Partnerships were formed to acquire business and commercial aircraft under short-term leases to third parties, and ultimately to sell the aircraft.

At the time of purchase, all of the plaintiffs received a prospectus dated June 15, 1983 ("Prospectus") that detailed the risks and specifics of the investment. Plaintiffs also received a brochure ("Brochure") that cautions the prospective investors to "thoroughly review the enclosed Prospectus." Some of the plaintiffs also received a "Fact Sheet" from Prudential, which was labeled "FOR BROKER/DEALER USE ONLY -- NOT FOR DISTRIBUTION TO THE PUBLIC." Plaintiffs contend that defendants knew such "internal use only" materials -- *i.e.*, the **[*3]** Fact Sheet -- were routinely sent by brokers to customers and prospective investors. Brokers were allegedly told to repeat the material contained in the Fact Sheet. The Fact Sheet contained estimated pro forma returns for the average $ 10,000 investor, as well as glowing reports as to why the aircraft leasing industry was a good investment, including such statements as "AIRCRAFT RESIDUAL (RESALE) VALUES HAVE CONTINUED TO BE HISTORICALLY HIGH. LET'S EXAMINE WHY. . . ."

According to plaintiffs, these and other similar statements were false and misleading. They contend that there was no "excellent market" and resale values were not high, but rather had sharply slumped in the three years prior to the formation of the Partnerships. Plaintiffs contend that the aircraft market was in the worst depression in the market's history.

The offering materials received by plaintiffs, however, including the Prospectus and the accompanying Brochure, warned potential investors of the speculative nature of the investment. Among other lengthy, detailed cautionary information, the Prospectus contained the following warnings:

> THE SECURITIES OFFERED HEREBY ARE SPECULATIVE SECURITIES AND INVOLVE A HIGH **[*4]** DEGREE OF RISK. THE RISKS ASSOCIATED WITH THIS OFFERING ARE REFERRED TO ON THE FOLLOWING PAGE AND ARE DESCRIBED IN THIS PROSPECTUS IN THE SECTION ENTITLED "RISK FACTORS."
>
> * * *
>
> THIS OFFERING INVOLVES VARIOUS RISKS, INCLUDING RISKS OF AIRCRAFT OWNERSHIP AND LEASING, FEDERAL AIRCRAFT REGULATION RISKS, PARTNERSHIP AND CONTRACTUAL RISKS, AND FEDERAL INCOME TAX RISKS. See "Risk Factors," "Investors Suitability Standards," and "Summary of the Partnership Agreements -- Transferability of Units." IN ADDITION, THERE WILL BE TRANSACTIONS BETWEEN THE PARTNERSHIPS AND THE GENERAL PARTNERS AND THEIR AFFILIATES WHICH WILL INVOLVE CONFLICTS OF INTEREST. See "Conflicts of Interest" and "Compensation and Fees of the General Partners and Their Affiliates."

The Brochure paints a rosier picture, but it too starts off with a warning:

> *This brochure does not constitute an offer to sell nor a solicitation of an offer to sell any securities. An offer can be made only by the Prospectus for Prudential-Bache Polaris Aircraft Investors II. The use of this brochure is authorized only when preceded or accompanied by the Prospectus. Additionally, none of the aircraft depicted herein are owned by Prudential-Bache* **[*5]** *Polaris Aircraft Investors II.*

The Brochure goes on to state that "aircraft have historically retained high resale values while maintaining a fine record of longevity and productivity. The accompanying graphs bear this out." The graphs show "Selected Commercial" and "Selected Business" aircraft, representing three airplanes, maintaining their value over a ten year period. Again, however, this upbeat description is accompanied by a disclaimer: "The used values of the commercial and business aircraft specified in the above graph are not necessarily indicative of the used values of other models of aircraft." The Brochure then goes on to tell investors the investment objectives of the Partnerships, ending with the warning that "there can be no assurance that any of these objectives will be achieved." It then states first among the procedures for investing that one should "thoroughly review the enclosed prospectus."

In 1985 and 1986, plaintiffs received letters from the Partnerships describing poor market conditions and significantly lower return on the investment than had initially been expected. Nevertheless, brokerage account statements continued to show the "value" of the investment **[*6]** remaining steady at the purchase price. It was not until June 8, 1990, however, that plaintiffs brought suit against the two general partners, Bache and Polaris, as well as Prudential and PALC.

Plaintiffs claim to have purchased securities in reliance on Prudential employees' recommendations and representations, as well as on the Prospectus, Brochure, and Fact Sheet. Plaintiffs appeal the dismissal with prejudice of their securities fraud claims under Section 10(b), as being either time-barred or as failing to show justifiable reliance on any material representation. They also appeal from the dismissal of their RICO claims as time-barred and as substantively failing for lack of justifiable reliance. Finally, plaintiffs appeal the dismissal of their pendent state law claims. n1

n1 The procedural history of this case is somewhat complex because the Supreme Court announced a federal statute of limitations for securities frauds during the pendency of this case. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991).* The district court applied the statute of limitations retroactively, as it was required to do by *Lampf*, and the fraud counts were dismissed. *Harner v. Prudential Securities, Inc., 785 F. Supp. 626, 629 (E.D. Mich. 1992).* Congress then enacted legislation that permits *Lampf* to be applied only prospectively. The Act was designated as an amendment to § 27A of the Securities Exchange Act. Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. 102-242, § 476 (1991). Plaintiffs met the statutory deadlines for filing created by the amendment. In the meantime, the district court had found that plaintiffs knew of the fraud upon receiving the Prospectus and that, therefore, the RICO claims were outside of the four-year statute of limitations and the pendent state law claims all sounded in fraud and therefore failed for lack of reasonable reliance, as would the RICO claims were they not time-barred. *Harner, 785 F. Supp. 626.* Upon enactment of the amendment to § 27A, the district court reinstated the Section 10(b) claims as to plaintiffs William and Diane Benton, but dismissed them for failure to satisfy the substantive elements of Section 10(b).

**[*7]**

II.

Summary Judgment Standard

This court's review of a grant of summary judgment is *de novo. Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993).* Under *Fed. R. Civ. P. 56(c)*, summary judgment is proper if there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The facts and all reasonable inferences to be drawn therefrom are viewed in a light most favorable to the non-moving party in determining if a genuine issue of material fact exists. *Kunz v. United Food & Commercial Workers, Local 876, 5 F.3d 1006, 1008-09 (6th Cir. 1993).* The standard is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Street v. J. C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).*

III. **[*8]**

Statutes of Limitations

Plaintiffs first contend that the district court erred by finding their claims under RICO and Section 10(b) were time-barred. This court held in *Herm v. Stafford, 663 F.2d 669 (6th Cir. 1981),* that "[a] court may properly determine the commencement date for a statute of limitations on summary judgment in the context of a securities case." *Id. at 682.* n2 (Citations omitted). The court went on to state that "the facts upon which the district court may rely must be sufficient to enable a court to conclude as a matter of law that a reasonably diligent person should have discovered the participation of the particular defendant by the date the fraud should have been discovered." *Id.*

n2 Because this is, essentially, a fraud case, plaintiffs' state of mind is at issue. To prove a Section 10(b) claim based on misrepresentation, plaintiffs must establish ordinary fraud. *See Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir. 1991).* The same is true with respect to plaintiffs' RICO claims, since securities fraud was pleaded as the predicate act. J.A. at 40. In determining when a statute of limitations begins to run in a fraud case, the question becomes when the plaintiff knew or should have known of the fraud. It is now clear that such so-called "state of mind" issues are in the proper case appropriate for summary judgment. *Street, 886 F.2d at 1479.*

**[*9]**

The district court found that the statute of limitations for plaintiffs' RICO actions, which are governed by a four-year federal statute of limitations, accrued as of the date they received the Prospectus or, at the latest, the date they received letters from the Partnerships indicating the poor condition of the aircraft leasing market and the lower-than-expected returns on their investments. *Harner v. Prudential Securities, Inc., 785 F. Supp. 626, 635-36 (E.D. Mich. 1992).* By that time, the court held, they knew or should have known of the possible existence of fraud. *Id.*

Although there is some question as to the applicability of various state statutes to the individual plaintiffs' claims depending on their state of residence, the basic issue is the same in the context of their Section 10(b) claim. Thus, in analyzing whether or not their claims were time-barred, we must first determine the appropriate statute of limitations, and then consider what information would place an investor on inquiry notice of fraudulent activity in order to start the running of the statute of limitations and the point at which plaintiffs were on inquiry notice. n3

n3 Even as to plaintiffs' Section 10(b) claims, federal law determines the date on which a statute of limitations in a securities case begins to run. *Herm, 663 F.2d at 682.*

**[*10]**

Plaintiffs do not dispute defendants' contention that the discovery rule is the appropriate accrual standard to be applied as to their RICO claims. n4 Because this is a pre-Lampf case, n5 however, we must look to state law to determine which statute of limitations should apply to the Section 10(b) claims. In this case, plaintiffs are residents of Michigan, New York and Oklahoma. As to all Section 10(b) claims, the district court applied Michigan's six-year statute of limitations for common law fraud, *Mich. Comp. Laws Ann. § 600.5813* and § 600.5827 (West 1987), and its two-year statute of limitations for fraudulent concealment. *Mich. Comp. Laws Ann. § 600.5855* (West 1987). n6

n4 In *Agristor Fin. Corp v. Van Sickle, 967 F.2d 233, 241 (6th Cir. 1992),* however, we applied the accrual rule set forth in *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Fla, Inc., 906 F.2d 1546, 1554-55 (11th Cir. 1990), cert. denied, 500 U.S. 910 (1991).* The *Bivens* rule differs from the discover rule in that the former "requires that a plaintiff discover, or be in a position to discover, the existence of a pattern of racketeering activity in addition to the existence and source of the injury." *Caproni v. Prudential Securities, Inc., 15 F.3d 614, 619-20 (6th Cir. 1994).* As discussed below, the distinction is of no significance here since defendants' alleged misrepresentations were made in at least three documents delivered to plaintiffs, who thus "should have known that they were pan of a pattern of misrepresentation." *Id. at 620.* **[*11]**

n5 *See supra* note 2.

n6 With respect to the New York and Oklahoma plaintiffs, the district court used Michigan's borrowing statute. *Mich. Comp. Laws Ann. § 600.5861* (West 1987). This statute requires Michigan courts to apply the shorter of

either the limitations periods of plaintiffs' state of residence or Michigan. New York has the same limitations period for common law fraud as Michigan. N.Y. (CPLR Law § 213(8)) (McKinney). Oklahoma's fraud statute of limitations requires that all actions be filed within two years from the date of discovery of the fraud. *OKLA Stat. Ann. title 12, § 95* (West).

Plaintiffs contend that the six-year statute of limitations should be used, and that the statute should begin running from the time the fraud should have been discovered. Defendants, on the other hand, argue that the two-tier statute of limitations should be used. Consequently, they argue that plaintiffs had two years from the time of discovery of the fraud to file suit, and that they had an absolute cut-off of six years from the date of the fraud to file suit.

IV.

Inquiry Notice

A. Plaintiffs' **[*12]** RICO Claims.

The district court considered "whether the 'storm warnings' in this case were sufficient to alert a reasonable investor as to the possibility of fraud . . . ." *Harner, 785 F. Supp. at 634.* The district court correctly applied the four-year limitations period and the discovery rule to plaintiffs' RICO claims, holding that they received inquiry notice of the alleged fraud in 1983-84, when plaintiffs received the Prospectus, and in 1985-86, when plaintiffs received the reports describing disappointing results due to poor market conditions. *Id. at 636.*

A number of circuits have applied an objective standard as to when a plaintiff should reasonably have discovered fraud in connection with a securities case. This court in *Herm* employed an objective test, given that we refer in that case to the "reasonably diligent person" standard. *Herm, 663 F.2d at 682.* Similarly, *Gaudin v. KDI Corp., 576 F.2d 708 (6th Cir. 1978),* discusses treatment of the plaintiff as a person with "ordinary intelligence" when reviewing whether or not he should have discovered **[*13]** the alleged fraud. *Id. at 713.* The courts have also found that once a plaintiff has acquired facts that should put him on notice of an irregularity or problem with an investment, he is on inquiry notice of the fraud and anything he could have discovered by a diligent search will be imputed to him. *See Myers v. Finkle, 950 F.2d 165, 167 (4th Cir. 1991); Kennedy v. Josephthal & Co., 814 F.2d 798, 802 (1st Cir. 1987); Brown v. E. F. Hutton Group, Inc., 991 F.2d 1020 (2d Cir. 1993).*

Thus, the running of the statute of limitations begins when a plaintiff is put on inquiry notice -- that is, when the plaintiff has been presented with evidence suggesting the *possibility* of fraud. *Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987).* "Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Kennedy, 814 F.2d at 802.* (Citations omitted). As one court has stated:

> The plaintiff need only possess a low level of awareness; he need not **[*14]** fully learn of the alleged wrongdoing. Knowledge of *all* facts is not required to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses "storm warnings," not when he hears thunder and sees lightning.

*Jensen v. Snellings, 636 F. Supp. 1305, 1309 (E.D. La. 1986)* (emphasis in original; citation omitted); *see also Platsis v. E. F. Hutton & Co., 642 F. Supp. 1277, 1291 (W.D. Mich. 1986), aff'd, 829 F.2d 13 (6th Cir. 1987), cert. denied, 485 U.S. 962, 99 L. Ed. 2d 427, 108 S. Ct. 1227 (1988)* (plaintiff need not have before him all facts necessary to establish that a statement was untrue or omitted before the limitations period accrues).

Defendants contend, and the district court agreed, that plaintiffs were on inquiry notice when they bought their Partnership interests because the Prospectus warned investors of the risks in the depressed aircraft market. The district court found that the Prospectus, the Fact Sheet, and the Brochure, together with any oral representations from Prudential employees, **[*15]** were enough to put plaintiffs on notice of possible problems with the investment. *Harner, 785 F. Supp. at 634.* The assertions that the aircraft re-leasing market outlook was generally good should have been weighed, according to the district court, against the disclosures in the Prospectus that the market was depressed, and might continue to be so, and that certain commercial airlines were failing. *Id. at 635-36.* The district court found that this information should have put a reasonable investor on notice of the potential discrepancies between the sales material and the Prospectus. *Id.*

In doing so, the district court explicitly adopted a two-part standard for deciding when a plaintiff should have been aware of the fraud. As to inquiry notice, the court applied an objective test: "Whether the facts were sufficient to raise the possibility of fraud will be determined by an objective standard. The sophisticated stock broker and the uninitiated rube will both be judged by the same standard, *i.e.,* the 'reasonable investor' standard." *Id. at 634.* As to due diligence, the court

applied a **[*16]** subjective test, taking into account the particular plaintiff's ability to exercise diligence in attempting to evaluate the facts discovered. *Id.* n7

n7 Defendants contend that plaintiffs did not do anything to attempt to discover the fraud. Plaintiffs do not contest this. In fact, plaintiffs offered no evidence of "any effort whatsoever to investigate" the alleged fraud. *Id.* at 636 n.21. Accordingly, we focus solely on the objective standard for inquiry notice.

Plaintiffs complain that the Prospectus does not directly refute all of the information contained in the Brochure and Fact Sheet and that they therefore had no notice of the alleged misrepresentations -- the exact poor state of the aircraft leasing market in 1983. In analyzing this argument, the district court stated:

> The applicable standard is the degree of inconsistency that would alert a reasonable investor to the fact that there is a possibility of fraud and the need to exercise due diligence so as to determine whether or not a fraud actually **[*17]** exists. To focus exclusively on the word "directly" is to confuse semantics with substance.

*Harner, 785 F. Supp. at 637* (discussing *Platsis, 642 F. Supp. at 1292).*

Given the contradictory information contained in the Prospectus, the Brochure, and the Fact Sheet, as a matter of law plaintiffs were on notice of the potential fraud. The Prospectus' details concerning potential risks are not, as plaintiffs contend, mere boilerplate, but rather disclose the poor state of the aircraft leasing market and seriously call into question representations concerning the current and future strength of that market. Even an unsophisticated investor should have been put on notice under such circumstances. n8

n8 Plaintiffs' reliance on *Mosesian v. Pete Marwick, Mitchell & Co., 727 F.2d 873, 878* (9th Cir.), *cert. denied, 469 U.S. 932, 83 L. Ed. 2d 265, 105 S. Ct. 329 (1984),* is misplaced. Plaintiffs contend that this case and a series of other Ninth Circuit cases stand for the proposition that the decline in their investment, without more, does not constitute inquiry notice of the original fraud. But here there was more. As explained above, the tension between the market condition disclosed in the Prospectus and the market condition as represented in the Fact Sheet and the Brochure reveal sufficient contradictions to have put plaintiffs on inquiry notice.

**[*18]**

The critical risks with which plaintiffs were faced were thus adequately "red-flagged." Here, as in *Kennedy,* plaintiffs were not free to sit back, ignore the differences, and choose to rely on the optimistic statements in the offering materials while closing their eyes to the possibility of fraud. "There was an abundance of cautionary warnings as to the dicey nature of the aircraft lease market in the Prospectus." *Harner, 785 F. Supp. at 639.* We hold, therefore, that plaintiffs were on inquiry notice when they received the Prospectus in 1983-84, and having failed to file suit until 1990, their RICO claims are time-barred.

The district court also held that plaintiffs had failed to demonstrate a genuine issue of fact with respect to their claim of fraudulent concealment. *See Friedman v. Estate of Presser, 929 F.2d 1151, 1159 (6th Cir. 1991)* ("Plaintiffs have the burden of proving the elements of fraudulent concealment . . ."). To prove fraudulent concealment, plaintiffs must establish that: "(1) the defendant concealed the conduct that constitutes the cause of action; (2) defendant's concealment prevented plaintiff from **[*19]** discovering the cause of action within the limitations period; and (3) until discovery, plaintiff exercised due diligence in trying to find out about the cause of action." *Pinney Dock & Transport Co. v. Penn Cent. Corp., 838 F.2d 1445, 1465* (6th Cir.), *cert. denied, 488 U.S. 880, 102 L. Ed. 2d 166, 109 S. Ct. 196 (1988)* (citation omitted). Each element must be pled with particularity. *Id.*

This court has declined to modify this test based upon the differences between active and passive fraudulent concealment. *Campbell v. Upjohn Co., 676 F.2d 1122, 1127 (6th Cir. 1982).* In fact, it is questioned whether concealment can exist at all without some act by the defendant that denies the plaintiff access to the relevant knowledge. *Id.* Here, it is clear that the state of the airline industry was public knowledge that plaintiffs could have discovered from some of the many newspaper articles they now rely on to claim fraud.

Plaintiffs contend that actions of fraudulent concealment tolled the statutes of limitations concerning their RICO and Section 10(b) claims because **[*20]** defendants concealed the existence of the cause of action. They claim in effect that defendants' notices to them in 1985 and 1986 regarding the Partnerships' poor

performance and the brokerage houses' failure to re-evaluate the Partnerships' shares on the brokerage statements served to lull them into believing all was well with their investment.

However, plaintiffs have made no showing of due diligence in discovering their cause of action, and after opportunity for discovery, pleaded no facts sufficient to warrant an inference of concealment by defendants. Moreover, because plaintiffs were on inquiry notice of the alleged fraud at the time they received the Prospectus, they cannot satisfy the second element of fraudulent concealment -- failure to discover the operative facts. *See Electric Power Bd. v. Monsanto Co., 879 F.2d 1368, 1377-78 (6th Cir. 1989), cert. denied, 493 U.S. 1022, 107 L. Ed. 2d 743, 110 S. Ct. 724 (1990).* We hold, therefore, that plaintiffs have failed to plead any facts sufficient to demonstrate fraudulent concealment, much less create a genuine issue of material fact as **[*21]** to that issue.

B. Section 10(b).

After the Supreme Court's decision in *Lampf*, the parties stipulated to the dismissal of plaintiffs' Section 10(b) claims as time-barred. Plaintiffs later moved to reinstate these claims pursuant to recently enacted Section 27A. The district court granted the motion as to the Section 10(b) claims of plaintiffs William and Diane Benton, New York residents, who jointly purchased Partnership units within six years of filing the action. n9 The remaining plaintiffs' Section 10(b) claims, however, were not reinstated on the ground that the Michigan six-year statute for fraud ran from the point at which plaintiffs were on inquiry notice after purchasing their shares in the Partnerships in 1983 and 1984. Having been on inquiry notice in 1984 at the latest, plaintiffs should have discovered the alleged fraud by the exercise of due diligence well before 1990. Again, plaintiffs offered no evidence whatsoever demonstrating any due diligence effort to uncover the fraud. *Harner, 785 F. Supp. at 636 n.21.* Therefore, because all plaintiffs except for William and Diane Benton purchased their Partnership interests more than six years **[*22]** before bringing this action, their Section 10(b) claims are time-barred.

> n9 The court then dismissed their claim for lack of reasonable reliance.

V.

Reasonable Reliance

In addition to finding that most of plaintiffs' claims were time-barred, the district court also found that all of plaintiffs' claims were substantively deficient. The elements for a securities fraud case based on misrepresentation are: (1) that the defendants made a misrepresentation of material fact; (2) with scienter; (3) on which plaintiff reasonably relied; (4) which proximately caused plaintiff's injury. *See Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir. 1991).*

In *Molecular Technology Corp. v. Valentine, 925 F.2d 910 (6th Cir. 1991),* we adopted a recklessness standard for determining when a plaintiff has justifiably relied on a misrepresentation or omission. *Id. at 918.* We there adopted an eight-part test to help determine the recklessness **[*23]** of reliance:

> (1) The sophistication of (sic) expertise of the plaintiff in financial and securities matters;
>
> (2) The existence of long-standing business or personal relationships;
>
> (3) Access to the relevant information;
>
> (4) The existence of a fiduciary relationship;
>
> (5) Concealment of the fraud;
>
> (6) The opportunity to detect the fraud;
>
> (7) Whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and
>
> (8) The generality or specificity of the misrepresentations.

*Id.*

The district court did not attempt to address all eight factors set forth in this test. Rather, it found the numerous specific warnings about the risk of the investment and the risks attendant to the aircraft leasing market to be so pervasive that to ignore them and to rely only on the more favorable statements in the Brochure and Fact Sheet was unreasonable given "the mix of information available to them." *Harner, 785 F. Supp. at 642.* The district court stated:

> In sum, there was no reasonable reliance by the investors on the Defendants' representations sufficient to support a claim of misrepresentation. The Prospectus and other sales materials **[*24]** made clear that the investment was risky

> and that the aircraft market was unfavorable.
>
> * * *
>
> The Plaintiffs in the instant case were given abundant warning that their investment was speculative and risky. They knew or should have known that the market was depressed and that competition was keen. To the extent that they relied on prognoses, written or oral, that the market was good and that they were assured a steady stream of income, this reliance was unreasonable in the context of the mix of information available to them.

*Id. at 641, 642.*

Stated another way, "if the investor already possesses information sufficient to call the representations into question, he cannot claim later that he relied on or was deceived by the lie." *Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir. 1985).* The Second Circuit has similarly stated that "we are not inclined to impose liability on the basis of statements that clearly 'bespeak caution.'" *Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986).*

The First Circuit in *Kennedy v. Josephthal & Co.* found reliance to be unjustified **[*25]** as a matter of law on facts similar to those involved in this case and stated: "When [the plaintiffs] closed their eyes and passively accepted the contradictions between [the broker's] statements and the offering memorandum, [the plaintiffs] could not be said to have justifiably relied on the misrepresentations." *814 F.2d at 805.*

Indeed, courts have routinely held that when materials like a prospectus "bespeak caution," Section 10(b) claims can be rejected. See *Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1040 (6th Cir. 1991); Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 (1st Cir. 1991)* (summary judgment affirmed; "Although the offering materials were optimistic . . . , [they] unquestionably warned potential investors in a meaningful way that economic conditions in the horsebreeding industry were uncertain."). Here, too, the Prospectus "bespoke caution" by containing both general warnings concerning the risky nature of the investment as well as specific disclosures which "red-flagged" the risks arising from the depressed demand for aircraft and the "dicey nature" of the aircraft leasing **[*26]** market. *Harner, 785 F. Supp. at 639.* As a matter of law, then, no reasonable investor in plaintiffs' position could have been misled in the face of this cautionary language describing depressed demand for aircraft in the marketplace.

VI.

State Law Claims

Finally, plaintiffs argue that the district court improperly dismissed their pendent claims, contending that, under the circumstances, they were unfairly deprived of an opportunity to plead additional state law claims. Plaintiffs also claim that the district court did not, as it purported to do, grant summary judgment on their federal claims, but rather dismissed those claims for failure to state a claim upon which relief can be granted because it failed to rely on information outside the pleadings.

Plaintiffs' argument that the district court did not properly grant summary judgment is incorrect. The judge clearly received and relied on evidence and information outside the pleadings. *Harner, 785 F. Supp. at 629.* In addition, because defendants captioned their dispositive motion as one to dismiss or, in the alternative, for summary judgment, plaintiffs cannot claim they **[*27]** were not given sufficient opportunity to present all material made pertinent to defendants' summary judgment motion. Indeed, plaintiffs had no right to assume that the district court would not reach and resolve the pendent claims. While defendants did, in fact, ask the district court to refrain from exercising pendent jurisdiction, they also asked, in the alternative, for dismissal of those claims. Moreover, plaintiffs affirmatively requested the district court to exercise pendent jurisdiction over the state claims. The district court's decision to reach the merits of the pendent claims was not, therefore, unfair.

This court has upheld the dismissal, on the merits, of pendent state law claims after the federal claims have been dismissed. *Aschinger, 934 F.2d at 1412-13; Province v. Cleveland Press Publishing Co., 787 F.2d 1047, 1055 (6th Cir. 1986).* Where the dismissal of the federal claims is on the merits, the court has allowed the exercise of pendent jurisdiction to foster judicial economy and avoid multiple litigation over the same issues.

Because the genesis of plaintiffs' state law claims all sound in fraud, as do their **[*28]** federal RICO and securities fraud claims, the exercise of pendent jurisdiction here was not an abuse of discretion by the district court. Clearly it would have been necessary to prove many of the same elements in both the state and federal claims. Therefore, judicial economy is served by dismissing them all.

In dismissing plaintiffs' pendent claims, the district court stated:

The Court has already found that the Plaintiffs have not raised a genuine issue of material fact sufficient to withstand the Defendants' Motion for Summary Judgment on the predicate act of their RICO claim. It similarly finds that the Plaintiffs have failed to make a satisfactory claim under the elements of their common law fraud claim. (Footnote omitted).

*785 F. Supp. at 643*. Accordingly, we hold that judicial economy is served by dismissing all of plaintiffs' state law claims.

VII.

The judgment of the district court is AFFIRMED.

# EXHIBIT D

**IN RE: ARM FINANCIAL GROUP, INC. SECURITIES LITIGATION**

**CIVIL ACTION NO. 3:99CV-539-H**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY, LOUISVILLE DIVISION**

***2002 U.S. Dist. LEXIS 13451***

**July 18, 2002, Decided**

**DISPOSITION: [*1]** Defendants' motion to dismiss sustained in part and denied in part. Claims under § § 11 and 12(a)(2) of Securities Act of 1933 dismissed with prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In consolidated actions, plaintiff investors sued defendants, investment companies and officers, alleging violations of § § 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act) and violations of § § 11 and 12(a)(2) of the Securities Act of 1933 (1933 Act). The investment companies moved to dismiss the investors' third amended complaint as untimely.

**OVERVIEW:** After a chief executive officer and directors of a financial company resigned, the investment companies fully divested itself of their interest in the financial company. Subsequently, the financial company lost millions of dollars due to risky ventures. The investors alleged fraudulent misstatements and omissions. The court determined that the claims asserted under the 1934 Act were not subject to dismissal, because the investment companies failed to persuade the court that the investors were on inquiry notice of any misconduct by the investment companies one year before the 1934 Act claims were filed. However, the 1933 Act claims were untimely because suit was not filed within one year of inquiry notice and the 1933 Act claims did not relate back to the prior complaint under *Fed. R. Civ. P. 15(c)*.

**OUTCOME:** The court sustained in part the motion to dismiss and dismissed the 1933 Act claims. The court denied the motion as to all other claims.

**LexisNexis(R) Headnotes**

**COUNSEL:** For HELENE GOTTLIEB, TRUST ADVISORS EQUITY PLUS, LLC, CHARLES A. SHAHEEN, JR., JOHN SCHUMACHER, plaintiffs: Ronald R. Parry, Parry, Deering, Futscher & Sparks, Covington, KY.

For HELENE GOTTLIEB, plaintiff: Steven G. Schulman, Samuel H. Rudman, Andrea McBarnette, Deborah Clark-Weintraub, Elaine Simek Kusel, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY.

For HELENE GOTTLIEB, JOHN SCHUMACHER, plaintiffs: Marc S. Henzel, Philadelphia, PA.

For HELENE GOTTLIEB, plaintiff: Lee S. Shalov, Shalov, Stone & Bonner, New York, NY.

For HELENE GOTTLIEB, plaintiff: Beverly R. Storm, Arnzen, Parry & Wentz, Covington, KY.

For GERALDINE KEHOE, plaintiff: Fred Taylor Isquith, Gregory Mark Nespole, Daniel W. Krasner, David A.P. Brower, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY.

For GERALDINE KEHOE, GREGORY YURKOSKI, ALLEN GROSS, ELOI CHAVETON, JOHN SCHUMACHER, plaintiffs: Richard S. Wayne, William K. Flynn, Strauss & Troy, Cincinnati, OH.

For TRUST ADVISORS EQUITY PLUS, LLC, JOHN SCHUMACHER, **[*2]** plaintiffs: Andrew M. Schatz, Jeffrey S. Nobel, Schatz & Nobel, Hartford, CT.

For AL GALLI, JOHN SCHUMACHER, plaintiffs: Jeffrey Krinsk, Arthur L. Shingler, Finkelstein & Associates, San Diego, CA.

For AL GALLI, JOHN SCHUMACHER, plaintiffs: P. Stephen Gordinier, Louisville, KY.

For AL GALLI, JOHN SCHUMACHER, plaintiffs: Paul J. Geller, Shepherd & Geller, Boca Raton, FL.

For ALLEN GROSS, ELOI CHAVETON, plaintiffs: Joseph H. Weiss, Jack I. Zwick, Weiss & Yourman, New York, NY.

For ALLEN GROSS, ELOI CHAVETON, JOHN SCHUMACHER, plaintiffs: Jules Brody, Stull, Stull & Brody, New York, NY.

For CHARLES A. SHAHEEN, JR., JOHN SCHUMACHER, plaintiffs: Paul F. Bennett, Steven O. Sidener, Joseph M. Barton, Gold, Bennett Cera & Sidener, LLP, San Francisco, CA.

For NORMAN TASMAN, ALICE TASMAN, RON FADEL, GERALD MANSBACH, ROBERT JONES, plaintiffs: Edward J. Smith, Louisville, KY.

For NORMAN TASMAN, ALICE TASMAN, RON FADEL, GERALD MANSBACH, ROBERT JONES, JOHN SCHUMACHER, plaintiffs: Clifford B. Altfeld, Leonard, Felker, Altfeld, Greenberg & Battaile, Tucson, AZ.

For JOHN SCHUMACHER, plaintiff: Janice M. Weiss, Gray & Weiss, Louisville, KY.

For JOHN SCHUMACHER, **[*3]** plaintiff: Keith Fleischman, Elaine Simek Kusel, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY.

For JOHN SCHUMACHER, plaintiff: Jack I. Zwick, Weiss & Yourman, New York, NY.

For JOHN SCHUMACHER, plaintiff: Fred Taylor Isquith, Gregory Mark Nespole, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY.

For JOHN SCHUMACHER, plaintiff: Lee S. Shalov, Ralph M. Stone, James P. Bonner, Shalov, Stone & Bonner, New York, NY.

For MARTIN H. RUBY, DAVID E. FERGUSON, WILLIAM H. PANNING, JOHN R. LINDHOLM, EDWARD L. ZEHMAN, BARRY G. WARD, defendants: Janet P. Jakubowicz, John K. Bush, Greenebaum Doll & McDonald, Louisville, KY.

For MARTIN H. RUBY, DAVID E. FERGUSON, WILLIAM H. PANNING, JOHN R. LINDHOLM, EDWARD L. ZEHMAN, BARRY G. WARD, defendants: John F. Hartmann, Robert J. Kopecky, Andrea R. Wood, Kirkland & Ellis, Chicago, IL.

For MORGAN STANLEY DEAN WITTER & CO., MORGAN STANLEY LEVERAGED EQUITY FUND II, L.P., MORGAN STANLEY CAPITAL PARTNERS III L.P., MORGAN STANLEY CAPITAL INVESTORS, L.P., ALAN GOLDBERG, ROBERT H. NIEHAUS, defendants: K. Gregory Haynes, Michelle DeAnn Wyrick, Wyatt, Tarrant & Combs, Louisville, KY.

For MORGAN STANLEY DEAN WITTER & **[*4]** CO., defendant: Karin A. DeMasi, Keith R. Hummel, Evan R. Chesler, Daniel Slifkin, Cravath, Swaine & Moore, New York, NY.

For MORGAN STANLEY LEVERAGED EQUITY FUND II, L.P., MORGAN STANLEY CAPITAL PARTNERS III L.P., MORGAN STANLEY CAPITAL INVESTORS, L.P., ALAN GOLDBERG, ROBERT H. NIEHAUS, defendants: Daniel Slifkin, Cravath, Swaine & Moore, New York, NY.

For COLLIN F. RAYMOND, defendant: Martin Flumenbaum, Danya E. Perry, John D. Tortorella, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY.

**JUDGES:** JOHN G. HEYBURN II, CHIEF JUDGE, U.S. DISTRICT COURT.

**OPINIONBY:** JOHN G. HEYBURN

**OPINION:**

**MEMORANDUM OPINION**

The claims here arise from the demise of ARM Financial Group, Inc. ("ARM"), a Louisville-based financial services company. The Court is advised that ARM and several other individual defendants have already settled with Plaintiffs. The remaining Defendants, Morgan Stanley Dean Witter & Co.; Morgan Stanley Leveraged Equity Fund II, L.P.; Morgan Stanley Capital Partners III, L.P.; Morgan Stanley Capital Investors, L.P.; and MSCP III 892 Investors, L.P. (collectively "Morgan Stanley"), move the Court to dismiss Plaintiffs' third amended complaint. This opinion examines only **[*5]** Morgan Stanley's first defense: that the claims are untimely. In subsequent opinions, the

Court will consider the merits of various other defenses which the motions raise.

I.

In 1993, Morgan Stanley purchased a 95% interest in ARM, a financial company engaged in asset accumulation and management. ARM sold financial products -- annuities, life insurance policies, and guaranteed investment contracts, primarily -- and invested the monies in higher yielding securities. In 1997, ARM held an initial public offering of 9.2 million shares at $ 15 per share. Morgan Stanley's interest in ARM dropped to 53%.

ARM co-founders and chief executive officers, John Franco and Martin Ruby, came to disagree over investment strategies, with Franco preferring conservative strategies and Ruby urging more risk-taking. Franco and two of ARM's eight directors resigned on February 10, 1998. Patricia Winter, Franco's deputy, was promoted to executive vice president and took over implementation of Franco's strategies. On February 20, two managing directors of Morgan Stanley, Alan Goldberg and Robert Niehaus, became directors of ARM, filling the two board vacancies. As board members they joined Colin Raymond, **[*6]** a Morgan Stanley employee and ARM director since 1997, and five non-Morgan Stanley directors.

On May 8, 1998, ARM held a secondary offering of 12.4 million shares at $ 22 per share, and Morgan Stanley fully divested itself of its interest. Goldberg and Niehaus resigned that same day. Three weeks later, Winter resigned. With Franco and his deputy gone, ARM engaged in allegedly riskier ventures. Specifically, ARM focused on guaranteed investment contracts, which improved its bottom line in the short term but left it highly vulnerable to major losses if and when a substantial number of the contracts were redeemed.

On July 29, 1999, ARM announced a net loss of $ 173.9 million, or $ 7.30 per share. By August 25, the stock price had fallen to 25 cents per share, a decline in value of over 98%. The next day, the New York Stock Exchange suspended trading of ARM stock.

On August 18, 1999, Plaintiffs filed their first complaints against ARM and some of its officers, alleging violations of § § 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"). In April 2000, Plaintiffs filed a Consolidated and Amended Class Action Complaint, alleging numerous fraudulent misstatements and **[*7]** omissions between October 27, 1998 and August 3, 1999. On June 2, 2000, Plaintiffs Norman and Alice Tasman filed their own action against Morgan Stanley and certain individuals. The following month, this Court consolidated that action, styled *Tasman v. Ruby*, with the present action.

On September 15, 2000, Plaintiffs filed a Second Amended Complaint, which added § § 10(b) and 20(a) claims against Morgan Stanley and alleged a class period of February 10, 1998 to August 3, 1999. Specifically, Plaintiffs alleged that Morgan Stanley had "engineered" ARM's "dramatic collapse" by ousting Franco and moving ARM to jettison its conservative investment strategy in favor of a riskier approach. On May 4, 2001, Plaintiff John Schumacher filed a class action against all Defendants, asserting claims against under § § 11 and 12(a)(2) of the Securities Act of 1933 (the "1933 Act") on behalf of himself and others who purchased shares of ARM in its secondary offering of May 8, 1998. Plaintiffs filed a Third Amended Complaint on June 8, 2001, to include these claims.

II.

The limitations period on claims asserted under § 10(b) of the 1934 Act is one year after the fraud is reasonably discoverable, **[*8]** or three years after the fraud is perpetrated, whichever comes first. See *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991).* Because § 20(a) claims are derivative, they take on the limitations period of the underlying claim. See *Theoharous v. Fong, 256 F.3d 1219, 1228 n.12 (11th Cir. 2001).* By statute, the one-year/three-year limitations period applies to claims under § § 11 and 12(a)(2) of the 1933 Act. *See* 15 U.S.C. § 77m.

Morgan Stanley argues that the alleged fraud was reasonably discoverable by August 26, 1999, at the latest; thus, because the 1934 Act claims against it were filed September 15, 2000, and the 1933 Act claims against it were filed May 4, 2001, all of the claims must fail.

It is well settled that where untimeliness is asserted as a defense to a claim of fraud, "the running of the statute of limitations begins when a plaintiff is put on inquiry notice -- that is, when the plaintiff has been presented with evidence suggesting the possibility of fraud." *Isaak v. Trumbull Sav. & Loan Co., 169 F.3d 390, 399 (6th Cir. 1999)* (citing *Harner v. Prudential-Bache Sec., Inc., 35 F.3d 565 (table), 1994 WL 494871,* **[*9]** at *4 (6th Cir. Sept. 8, 1994)). The Sixth Circuit has explained:

> The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing. Knowledge of all facts is not required to set off the

> prescriptive clock. Thus, the clock begins to tick when a plaintiff senses "storm warnings," not when he hears thunder and sees lightning.

*169 F.3d at 399* (citation omitted). Once a plaintiff is on inquiry notice, "anything he could have discovered by a diligent search will be imputed to him." *Harner, 35 F.3d 565, 1994 WL 494871* at *4 (citations omitted).

Storm warnings come in various forms. *See 35 F.3d 565, id.* at *5 ("Given the contradictory information contained in the Prospectus, the Brochure, and the Fact Sheet, as a matter of law plaintiffs were on notice of the potential fraud."); *Isaak, 169 F.3d at 400* (plaintiffs' awareness of resort developers' extremely lavish lifestyle constituted inquiry notice); *Havenick v. Network Express, Inc., 981 F. Supp. 480, 514 (E.D. Mich. 1997)* (storm warning is "any substantial or concrete indication of serious problems ahead for the company [such as a document **[*10]** filed with the Securities and Exchange Commission ("SEC")], the Prospectus, or subsequent press releases and reports . . ."); *but see Berti v. VideoLan Techs., Inc., 1998 U.S. Dist. LEXIS 18066*, at *17-*19 (W.D. Ky. 1998) (cryptic statement in SEC filing that company could not guarantee "significant" sales did not put plaintiffs on inquiry notice); *Picard Chem., Inc., Profit Sharing Plan v. Perrigo Co., 940 F. Supp. 1101, 1118 (W.D. Mich. 1996)* (drop in stock price alone does not place plaintiffs on inquiry notice).

The defense that the relevant limitations period has expired is an affirmative defense. See *Hoover v. Langston Equipment Assoc., Inc., 958 F.2d 742, 744 (6th Cir. 1992).* Thus, the burden lies with Morgan Stanley to prove when Plaintiffs were on inquiry notice -- that is, when the storm warnings sufficed to alert a reasonable investor as to the possibility of fraud. Clearly, Plaintiffs suspected fraud of some kind by the end of August 1999, as is evident from the fact that they filed an action against ARM and certain of its officers by that time. The real question is whether Defendants need only show that Plaintiffs were **[*11]** on inquiry notice of the possibility of fraud generally, or whether Defendants must show that Plaintiffs were on inquiry notice of the possibility of Morgan Stanley's involvement in that fraud.

The Sixth Circuit has said that when determining the commencement date for a statute of limitations in a securities case, "the facts upon which the district court may rely must be sufficient to enable a court to conclude as a matter of law that a reasonably diligent person should have discovered the participation of the *particular* defendant by the date the fraud should have been discovered." *Herm v. Stafford, 663 F.2d 669, 682 (6th Cir. 1981)* (emphasis added) (citation omitted). *Also see City of Painesville v. First Montauk Financial Corp., 178 F.R.D. 180, 195 (N.D. Ohio 1998).* In *Herm*, the Sixth Circuit considered the facts giving inquiry notice as to the misconduct of each defendant or group of defendants, and evaluated inquiry notice as to the involvement of each. *See 663 F.2d at 682-83.* Thus, for the reasons that follow, this Court concludes that Morgan Stanley must prove that Plaintiffs should have discovered its participation in the alleged fraud **[*12]** prior to September 15, 1999 as to the 1934 Act claims and prior to May 4, 2000 as to the 1933 Act claims.

III.

In their Second Amended Complaint, which stated claims against Morgan Stanley and alleged fraudulent misstatements and omissions predating Morgan Stanley's divestment of its interest in ARM, Plaintiffs based their claims on specific factual allegations:

> . Morgan Stanley, with motive to "dress up" ARM for profitable sale, pushed a plan for more aggressive profit-making strategies through ARM's board of directors in November 1996, over Franco's objections.
>
> . Morgan Stanley engineered the ouster of conservative analyst Franco, and knowingly concealed the subsequent abandonment of asset/liability risk procedures.
>
> . Morgan Stanley had frequent contact with its employee directors of ARM in order to ensure its scheme went smoothly.

If Plaintiffs' claims against Morgan Stanley were premised only upon the fact of Morgan Stanley's status as majority shareholder, inquiry notice could be fairly said to have arisen by August 1999, because other shareholders were on inquiry notice of that fact. However, that is not our case. Plaintiffs' claims rest on specific factual **[*13]** allegations. Therefore, Morgan Stanley must convince this Court that, acting with reasonable diligence, Plaintiffs should have discovered those facts before September 15, 1999.

As this Court has observed, in the fact-intensive context of securities fraud, the question of inquiry notice is often "ill-suited for determination on a motion to dismiss." *Berti, 1998 U.S. Dist. LEXIS 18066* at *18. It is difficult to determine whether facts which are as yet unproven could have been discovered with reasonable diligence prior to a time specific. The Court finds too many disputed circumstances and inferences to reach a clear picture of what facts Plaintiffs could have

discovered prior to September 15, 1999. At this juncture, Morgan Stanley has not persuaded the Court that Plaintiffs were on inquiry notice by September 15, 1999, of any misconduct by Morgan Stanley.

IV.

The Court now considers whether the 1933 Act claims were timely filed. Schumacher alleges that he and others similarly situated purchased shares of ARM in its secondary offering of May 8, 1998, in reliance upon misleading statements in ARM's prospectus and registration statement filed with the SEC. Plaintiffs **[*14]** concede that Schumacher did not file suit within one year of inquiry notice. Rather, Plaintiffs argue that these claims "relate back" to a prior complaint within the meaning of *Rule 15(c) of the Federal Rules of Civil Procedure*. That rule provides, in pertinent part:

**Relation Back of Amendments.** An amendment of a pleading relates back to the date of the original pleading when

> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, **[*15]** the action would have been brought against the party. . . .

Plaintiffs first justify the augmentation of 1933 Act claims by stating that they relate back to the Tasmans' complaint, which was timely filed. Essentially, Schumacher seeks to "piggyback" his claims onto another action. The Court must reject this tactic for reasons well articulated by another court in similar circumstances.

In *Morin v. Trupin, 778 F. Supp. 711 (S.D.N.Y. 1991)*, the court considered § 10(b) claims by several groups of fraudulently induced investors in a commercial real estate enterprise. The first group of plaintiffs filed timely claims, while other groups who filed later did not. The court consolidated all of the cases, and the plaintiff class submitted a consolidated amended complaint which argued that the latter, untimely claims should survive dismissal because they related back to the first plaintiffs's complaint under Rule 15(c). *Id. at 732-33*. The court rejected this argument, distinguishing between the purposes of Federal Rules 15(c) and 42:

> The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than **[*16]** on procedural technicalities. The consolidation rule, on the other hand, has as its end to give the court broad discretion to decide how cases on its docket are to be tried so that the business of the court may be dispatched with expedition and economy while providing justice to the parties. Thus, while Rule 15 may be said to have substantive objectives, consolidation is a trial management device for which the policies of Rule 15 have no relevance.

*Id. at 733-34* (internal quotation marks, citations omitted). The court then noted the inconsistency of Plaintiffs' argument with Supreme Court precedent:

> Moreover, allowing relation back of claims of plaintiffs in consolidated, untimely actions totally defies the reasoning and import of *Lampf*. The *Lampf* Court provided that claims under § 10(b) and Rule 10b-5 must be brought no later than three years after the accrual of the cause of action and specifically rejected the equitable tolling doctrine as "fundamentally inconsistent with the 1-and-3-year structure." This decisive limitation would be rendered meaningless if a plaintiff who discovers fraud after the three-year period has elapsed may effectively **[*17]** benefit from the equitable tolling doctrine by piggybacking his action which, if tried separately, would be clearly barred, on a timely one through consolidation.

*Id. at 734* (citation omitted). This Court agrees with *Morin*: consolidation is not a tool for undercutting the public policy purposes behind the limitations period established in *Lampf.*

Alternatively, Plaintiffs contend that the 1933 Act claims relate back to the Second Amended Complaint. While Rule 15(c) permits the "change[of] the party or the naming of the party against whom a claim is asserted . . . but for a mistake concerning the identity of the proper party," it does not envision the addition of a new plaintiff with new claims. See *Collyer v. Darling, 98 F.3d 211, 220 (6th Cir. 1996)* ("Amendments will not survive preclusive application of the statute of limitations unless the amendments are corrections of misnomers."). Plaintiffs cite *Miller v. American Heavy Lift Shipping, 231 F.3d 242 (6th Cir. 2000),* in which the Sixth Circuit permitted plaintiffs to amend their complaint to include causes of action which would have been untimely unless they related **[*18]** back to the original complaint. In *Miller,* however, the new causes of action were stated by the original plaintiffs, not by new plaintiffs with entirely different causes of action. *Id. at 248-250.* Accordingly, the Court finds that the 1933 Act claims are untimely, and must be dismissed.

The Court will enter an Order consistent with this Memorandum Opinion.

JOHN G. HEYBURN II

CHIEF JUDGE, U.S. DISTRICT COURT

**ORDER**

Defendants Morgan Stanley Dean Witter & Co.; Morgan Stanley Leveraged Equity Fund II, L.P.; Morgan Stanley Capital Partners III, L.P.; Morgan Stanley Capital Investors, L.P.; and MSCP III 892 Investors, L.P., have moved to dismiss Plaintiffs' claims because they are barred by the statute of limitations. In its accompany Memorandum Opinion, the Court has discussed Defendants' main arguments as to the statute of limitations issues. The Court being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion to dismiss is SUSTAINED IN PART and the claims under § § 11 and 12(a)(2) of the Securities Act of 1933 are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the motion is DENIED IN PART and all other claims, including those **[*19]** under § § 10(b) and 20(a) of the Securities Exchange Act of 1934, shall remain.

This 18th day of July, 2002.

JOHN G. HEYBURN II

CHIEF JUDGE, U.S. DISTRICT COURT

# EXHIBIT E

**FRC International, Inc., Plaintiff, v. Taifun Feuerloschgeratebau und Vertriebs GmbH, et al., Defendants.**

**Case No. 3:01 CV 7533**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, WESTERN DIVISION**

***2002 U.S. Dist. LEXIS 17559***

**September 4, 2002, Decided**
**September 4, 2002, Opinion Filed**

**NOTICE: [*1]** FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendants' motion to dismiss granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff purchaser filed an action alleging common law fraud against two defendants, a German corporation and its owner; a civil Racketeer Influenced and Corrupt Organizations Act (RICO) violation against both defendants; another civil RICO violation against the owner; and breach of contract against the corporation. The defendants moved to dismiss.

**OVERVIEW:** The corporation agreed to supply reclaimed bromotrifluoromethane, but the purchaser was later informed that the product delivered was suspected to be virgin bromotrifluoromethane from China, a substance subject to a confiscatory excise tax. The purchaser alleged that defendants never disclosed the substitution. The court first denied defendants' motion to dismiss for lack of personal jurisdiction. Next, looking to an international convention, the court rejected defendants' insufficiency of process and insufficiency of service of process arguments. The court then examined the adequacy of the pleadings. Count I alleged fraud, and was not dismissed for failure to comply with *Fed. R. Civ. P. 9(b)*. As to a fraud scheme under RICO in Count II, the court found that the purchaser failed to allege an enterprise. As to another fraud scheme pursuant to *RICO, 18* U.S.C.S. § 1961 et seq., alleged in Count III, the court found that it could not be dismissed for failure to plead a pattern of racketeering activity or for failure to plead fraud with particularity. Count IV alleged breach of contract, and the owner adequately alleged damages. The court found that the purchaser had standing.

**OUTCOME:** The motion to dismiss Counts I, III, and IV was denied. The motion to dismiss Count II was granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For FRC International, Inc, Plaintiff: John J. McHugh, III, Stephen B. Mosier, McHugh, DeNune & McCarthy, Sylvania, OH.

For Taifun Feuerloschgeratebau und Vertriebs, Defendant: John M. Carey, Robert W. Bohmer, Watkins, Bates & Carey, Toledo, OH.

For Lothar Georg Gudemann, Defendant: Robert W. Bohmer, Watkins, Bates & Carey, Toledo, OH.

**JUDGES:** James G. Carr, United States District Judge.

**OPINIONBY:** James G. Carr

**OPINION:**

ORDER

Plaintiff FRC International, Inc. brings this action against Taifun Feuerloschgeratebau und Vertriebs GmbH ("Taifun") and Lothar Georg Gudemann for common law fraud, civil violations of the Racketeer Influenced and

Corrupt Organizations Act, *18 U.S.C. § 1961* et seq. ("RICO") and *O.R.C. § § 2923.32* and 2923.34, and breach of contract. Pending is defendants' motion for dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)*, (4), (5), and (6). For the following reasons, defendants' motion shall be granted as to Count II and denied as to Counts I, III, and IV.

**BACKGROUND**

Plaintiff is a Delaware corporation **[*2]** with its principal place of business in Ohio. Taifun is a German company with its principal place of business in Germany. Gudemann is a German citizen and owner of Taifun.

In July, 1995, plaintiff entered into a contract with the Defense Logistics Agency ("DLA") of the United States to provide to DLA 1,650,000 pounds of reclaimed bromotrifluoromethane. Bromotrifluoromethane is an ozone depleting substance subject to a confiscatory excise tax. Reclaimed bromotrifluoromethane is not, however, subject to this tax.

On August, 14, 1996, plaintiff solicited reclaimed bromotrifluoromethane by proposals faxed to international sources. On August 15, 1996, plaintiff received a preliminary offer of sale for four hundred metric tons of reclaimed bromotrifluoromethane from defendants. Plaintiff's president, Richard M. Marcus ("Marcus"), traveled to Frankfurt, Germany to meet with Gudemann. Plaintiff alleges that Gudemann verbally assured Marcus that the bromotrifluoromethane was recycled and not virgin. Gudemann also stated this in writings transmitted by mail and interstate wire services. Gudemann took Marcus to the site from which the reclaimed bromotrifluoromethane would be shipped.

On August 28, 1996, plaintiff **[*3]** submitted a purchase order to defendants for four hundred metric tons of reclaimed bromotrifluoromethane. On September 12, 1996, Taifun accepted the order through telephone, mail, or both.

On August 30, 1996, plaintiff provided the DLA with a confirmation of availability of supplies. On November 14, 1996, plaintiff submitted another purchase order, which following revisions on November 15, 1996, became the final agreement. Taifun agreed to supply plaintiff with forty-eight metric tons of reclaimed bromotrifluoromethane. Plaintiff engaged German counsel to advise plaintiff on German law regarding exportation of reclaimed bromotrifluoromethane. Taifun agreed to arrange for importation of the reclaimed bromotrifluoromethane in accordance with United States laws.

On November 14, 1996, plaintiff submitted an application to the United States Environmental Protection Agency to import forty-eight metric tons of reclaimed bromotrifluoromethane from Taifun. On December 11, 1996, the EPA issued a non-objection notice to the import petition, authorizing importation of the forty-eight metric tons of reclaimed bromotrifluoromethane from Germany through Taifun. Plaintiff then made arrangements **[*4]** to ship the reclaimed bromotrifluoromethane from Germany to the United States through an international carrier contracted for by defendants.

At some time prior to December 31, 1996, defendants determined that they would not or could not deliver any of the reclaimed bromotrifluoromethane. Plaintiff alleges that defendants made a plan to smuggle virgin bromotrifluoromethane into Germany from China. Defendants subsequently engaged in other communications with plaintiff assuring plaintiff that Taifun would deliver reclaimed bromotrifluoromethane. On October 21, 1996, defendants ordered forty-eight metric tons of virgin bromotrifluoromethane from China to be substituted for the reclaimed bromotrifluoromethane promised to plaintiff. Plaintiff alleges that defendants never disclosed this substitution to plaintiff. Defendants made three shipments of virgin bromotrifluoromethane to the United States under the agreement with plaintiff during March, April, and June, 1997. The material supplied to plaintiffs was delivered to the DLA.

In March, 2001, a United States Attorney informed plaintiff that the Department of Justice, the Environmental Protection Agency, and Customs Service suspected that **[*5]** the material plaintiff supplied to the DLA was virgin bromotrifluoromethane from China.

Plaintiff filed this action on October 5, 2001, alleging common law fraud against both defendants, a civil RICO violation against both defendants, another civil RICO violation against Gudemann, and breach of contract against Taifun.

Defendants have filed a motion to dismiss under *Fed. R. Civ. P. 12* on the basis of several arguments: 1) insufficiency of process and service of process; 2) failure to state a fraud claim; 3) failure to state a RICO claim; 4) failure to state a breach of contract claim; 5) lack of personal jurisdiction; and 6) lack of standing.

**DISCUSSION**

**I. Personal Jurisdiction**

Defendants argue that this court does not have personal jurisdiction over either defendant.

As the party asserting jurisdiction, the plaintiff bears the burden of showing that personal jurisdiction exists. *Suarez Corp. Indus. v. McGraw, 71 F. Supp. 2d 769, 774 (N.D. Ohio 1999)* (citing *CompuServe, Inc. v. Patterson,*

*89 F.3d 1257, 1261-62 (6th Cir. 1996); Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991)).* A plaintiff generally must **[*6]** prove jurisdiction by a preponderance of the evidence. *Suarez, 71 F. Supp. 2d at 774* (citing Dean v. Motel 6 Operating L.P., 134 F.3d 1269, 1272 (6th Cir. 1998)).

"A district court ruling on a Rule 12(b)(2) motion without conducting an evidentiary hearing must consider the pleadings and affidavits in a light most favorable to the plaintiff." *Suarez, 71 F. Supp. 2d at 774* (citing *Dean, 134 F.3d at 1272* (citing *CompuServe, 89 F.3d at 1262));* see also *Welsh v. Gibbs, 631 F.2d 436, 438, 19 Ohio Op. 3d 333 at 333-39 (6th Cir. 1980)* (On a motion to dismiss for lack of personal jurisdiction, the court treats the allegations contained in plaintiff's complaint, affidavits, and depositions as true, and any factual disputes are resolved in the favor of the plaintiff.). The plaintiff can defeat a motion to dismiss for lack of personal jurisdiction by making a prima facie showing of jurisdiction. *Suarez, 71 F. Supp. 2d at 774* (citing *Dean, 134 F.3d at 1272); Glasstech, Inc. v. TGL Tempering Sys., Inc., 50 F. Supp. 2d 722, 725 (N.D. Ohio 1999).*

A district court sitting in diversity **[*7]** must apply the law of the forum state when determining whether personal jurisdiction exists over a defendant. *Welsh, 631 F.3d at 439.* Personal jurisdiction exists over a defendant if the defendant's conduct meets the requirements of the Ohio long-arm statute and the due process requirements of the Fourteenth Amendment to the United States Constitution. *Compuserve, 89 F.3d at 1263.* In *Cole v. Mileti, 133 F.3d 433, 436 (6th Cir. 1998),* the Sixth Circuit recognized that the Ohio Supreme Court held the Ohio General Assembly did not intend for Ohio's long-arm statute to extend to the limits of due process. "Nevertheless, in evaluating whether personal jurisdiction is proper under Ohio's long-arm statute, [the Sixth Circuit has] consistently focused on whether there are sufficient minimum contacts between the nonresident defendant and the forum state so as not to offend 'traditional notions of fair play and substantial justice.'" *Bird v. Parsons, 289 F.3d 865, 871 (6th Cir. 2002)* (citing *Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000)* (quoting *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945));* **[*8]** *Cole, 133 F.3d at 436).*

Depending on the nature of the contacts that a defendant has with Ohio, personal jurisdiction can be general or specific. *Bird, 289 F.3d at 873* (citing *Conti v. Pneumatic Prods. Corp., 977 F.2d 978, 981 (6th Cir. 1992)).*

General jurisdiction arises when "a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." Third Nat'l Bank in *Nashville v. WEDGE Group, Inc., 882 F.2d 1087, 1089 (6th Cir. 1989)).*

Plaintiff does not contend that this court has general personal jurisdiction over Taifun or Gudemann, so the inquiry is limited to whether there is specific personal jurisdiction over Taifun and Gudemann so that exercise of jurisdiction meets due process requirements.

Specific personal jurisdiction arises when the suit arises out of or is related to a defendant's contacts with Ohio. *Bird, 289 F.3d at 874* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984)).* **[*9]** In *Southern Machine Company v. Mohasco Industries, Inc., 401 F.2d 374, 381 (6th Cir. 1968),* the Sixth Circuit established a three-part test for specific personal jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

The purposeful availment requirement prevents a defendant from being haled into court due to "'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)* (quoting *Keeton v. Hustler Magazine, 465 U.S. 770, 774, 79 L. Ed. 2d 790, 104 S. Ct. 1473 (1984)).* A defendant purposefully avails himself or herself of Ohio when the defendant's conduct creates a "substantial connection" with Ohio so that the defendant should reasonably anticipate being haled into court **[*10]** in Ohio. *Compuserve, 89 F.3d at 1263* (citing *Burger King, 471 U.S. at 474-75).*

The second requirement mandates examining whether the plaintiff's claims arise from the defendant's contacts with Ohio. *Bird, 289 F.3d at 875.* The Sixth Circuit has stated, "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contracts." *Compuserve, 89 F.3d at 1267;* see also *Third Nat'l Bank, 882 F.2d at 1091* ("The cause of action [need not] formally 'arise from' defendant's contacts with the forum; rather, this criterion requires

only 'that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities.'") (quoting *Mohasco, 401 F.2d at 384 n.27).*

The third requirement examines whether the exercise of jurisdiction is reasonable in view of the connection between a defendant and Ohio. *Bird, 289 F.3d at 875*. "An inference arises that the third factor is satisfied if the first two requirements are met." Id. (citing *Compuserve, 89 F.3d at 1268).* **[*11]** The Sixth Circuit uses several factors to determine this requirement: "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *Compuserve, 89 F.3d at 1268.*

**A. Taifun**

Plaintiff argues that Taifun's actions meet several provisions of Ohio's long-arm statute, including the provision allowing exercise of personal jurisdiction over a person who "causes tortious injury by an act or omission in this state." *O.R.C. § 2307.382*. Plaintiff alleges fraud against Taifun and alleges the fraud occurred through mail and facsimile communications transmitted to plaintiff in Holland, Ohio. Doc. 22 at 37. Plaintiff alleges, "Defendants intended to and did commit fraudulent acts in Ohio on an ongoing, repetitive and continuous basis over a substantial period of time, and did transact business in this judicial district in Ohio." Doc. 22 at 37. These allegations suffice under Ohio's long-arm statute to establish jurisdiction over Taifun as a defendant who caused tortious injury by an act in Ohio.

If the exercise of personal jurisdiction **[*12]** also meets due process requirements, jurisdiction may be extended, under the long-arm statute, to the breach of contract claim against Taifun because Taifun meets one of the provisions of the long-arm statute. *U.S. Sprint Comms. Co. v. Mr. K's Foods, Inc., 68 Ohio St. 3d 181, 185, 624 N.E.2d 1048 (1994)* ("We hold that once an Ohio court acquires personal jurisdiction over a nonresident defendant for claims arising in Ohio, Civ. R. 18(A) permits joinder of related claims that do not arise in Ohio, as long as granting jurisdiction for all claims does not deprive defendant of the right to due process of law.").

I find that Taifun meets the due process requirements established in *Mohasco, 401 F.2d at 381.* Taifun purposefully availed itself of the privilege of acting in Ohio or caused a consequence in Ohio. Taifun's contact with Ohio was not random, fortuitous, or attenuated. Plaintiff alleges that Taifun entered into a contract with plaintiff and consequently sent many communications relating to the contract to Ohio. "Making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant **[*13]** where the phone calls and faxes form the bases for the action." *Neal v. Janssen, 270 F.3d 328, 332 (6th Cir. 2001)* (citations omitted). Thus, "when the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment." Id. The communications between Taifun and plaintiff form the bases of the fraud and breach of contract actions. Taifun therefore purposefully availed itself Ohio because Taifun's conduct created a "substantial connection" with Ohio so that Taifun reasonably should have anticipated being haled into court in Ohio.

Plaintiff's cause of action arises from Taifun's activities in Ohio. Taifun "did not make just one phone call to plaintiff[] in [Ohio] in an effort to solicit business from [it]. The undisputed facts demonstrate that [Taifun] engaged in a course of conduct over a period of time that involved a single business transaction . . . with plaintiff[], conducted by [mail] and fax." *Neal, 270 F.3d at 332*. The fact that Taifun physically was not present in Ohio does not prevent personal jurisdiction because "when a foreign defendant purposefully **[*14]** directs communications into the forum that cause injury within the forum, and those communications form the 'heart' of the cause of action, personal jurisdiction may be present." *Id. at 333.* Such is the case here: Taifun's contacts with Ohio relate directly to the operative facts of the controversy.

Finally, Taifun's acts or their consequences had a substantial enough connection with Ohio so that the exercise of jurisdiction over Taifun is reasonable. Taifun does not argue that defending this action in Ohio will be overly burdensome. Taifun is an international business. Ohio has an interest in having the litigation continue here. Plaintiff clearly has an interest in obtaining relief. The facts that Taifun engaged in a business relationship with plaintiff, hoped to benefit financially from it, and allegedly defrauded plaintiff, make it reasonable for Ohio to exercise personal jurisdiction over Taifun. Id.

Defendants' motion to dismiss for lack of personal jurisdiction shall be, therefore, denied as to Taifun.

**B. Gudemann**

Plaintiff argues that Gudemann's actions meet several provisions of Ohio's long-arm statute, including the provision allowing exercise **[*15]** of personal jurisdiction over a person who "causes tortious injury by an act or omission in this state." *O.R.C. § 2307.382*. Plaintiff alleges fraud against Gudemann and alleges the fraud occurred through mail and facsimile communications transmitted to plaintiff in Holland, Ohio. Doc. 22 at 37. Plaintiff alleges, "Defendants intended to and did commit fraudulent acts in Ohio on an ongoing, repetitive and continuous basis over a

substantial period of time, and did transact business in this judicial district in Ohio." Doc. 22 at 37. I find that these allegations meet Ohio's long-arm statute allowing jurisdiction over Gudemann as a defendant who caused tortious injury by acts in Ohio.

Defendants initially argue that Gudemann is shielded from personal jurisdiction because he was acting as Taifun's officer and agent. This argument is not well taken. The Sixth Circuit has stated that a corporate agent can be amenable to personal jurisdiction under certain circumstances. *Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 698 (6th Cir. 2000).* The Sixth Circuit stated:

> While it is true that "jurisdiction over the individual officers of a corporation cannot **[*16]** be predicated merely upon jurisdiction over the corporation," . . . we hold that the mere fact that the actions connecting defendants to the state were undertaken in an official rather than personal capacity does not preclude the exercise of personal jurisdiction over those defendants.

Id. (citing *Weller v. Cromwell Oil Co., 504 F.2d 927, 929 (6th Cir. 1974)).*

An out-of-state agent can be amenable to suit when that agent actively and personally is involved in the conduct which is the basis for the claim and the exercise of personal jurisdiction meets traditional notions of fair play and substantial justice. Id.

Plaintiff alleges that its president traveled to Germany and met with Gudemann to review terms and conditions of the agreement. Plaintiff further alleges:

> On numerous occasions, Gudemann, acting on behalf of Taifun and with actual and apparent authority, verbally assured [plaintiff's president] that the agent was not virgin, but reclaimed material. Gudemann later committed said representation to writings which were issued to plaintiff both through the United States mail and by interstate wire transmission, and received by plaintiff **[*17]** at its corporate headquarters in Holland, Ohio.

Doc. 22 at P 9.

Plaintiff further alleges, "Defendants caused three (3) shipments of the substituted virgin bromotrifluoromethane to be transported to the United States, through the port of Detroit, Michigan, for delivery to plaintiff in Holland, Ohio, and plaintiff received the shipments in March, April, and June, 1997." Doc. 22 at P 29. Plaintiff alleges, "Gudemann's mail and wire fraud continued for a number of months, included numerous individual correspondence, and victimized plaintiff, EPA, and WESCO." Doc. 22. at P 68.

Plaintiff attached several exhibits to the first amended complaint which illustrate Gudemann's activities. These exhibits include confirmation of shipment of reclaimed bromotrifluoromethane and are signed by Gudemann. Doc. 19 at Exs. F-1, F-2, F-3. Treating the allegations contained in plaintiff's second amended complaint and exhibits as true and resolving any factual disputes in the favor of plaintiff, I find that Gudemann actively and personally was involved in the conduct which is the basis for plaintiff's claims. So long as the exercise of personal jurisdiction meets due process requirements, this **[*18]** court has jurisdiction over Gudemann. n1

> n1 Because I find that the exercise of personal jurisdiction over Gudemann meets the requirements set forth in Mohasco, I decline to address plaintiff's argument that RICO and the national contacts test, a broader test for personal jurisdiction, mandate the exercise of personal jurisdiction. See, e.g., *Suarez Corp. v. McGraw, 71 F. Supp. 2d 769, 777 (N.D. Ohio 1999)* ("Thus, RICO permits a broader interpretation of personal jurisdiction than applies in a traditional jurisdictional analysis. This broader jurisdiction is measured by national contacts rather than the traditional test examining minimum contacts with the forum state.").

Gudemann purposefully availed himself of the privilege of acting in Ohio or caused a consequence in Ohio. Gudemann's contact with Ohio was not random, fortuitous, or attenuated. Plaintiff alleges that Gudemann negotiated the agreement between Taifun, and Gudemann consequently sent many communications to Ohio. "The acts of **[*19]** making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action." *Neal, 270 F.3d at 332* (citations omitted). The communications between Gudemann and plaintiff form the basis of the fraud and RICO claims. Gudemann therefore purposefully availed himself of Ohio because

Gudemann's conduct created a "substantial connection" with Ohio. Gudemann should, accordingly, reasonably have anticipated being haled into court in Ohio.

Plaintiff's cause of action arises from Gudemann's activities in Ohio. Gudemann "did not make just one phone call to plaintiff[] in [Ohio] in an effort to solicit business from [it]. The undisputed facts demonstrate that [Gudemann] engaged in a course of conduct over a period of time that involved a single business transaction . . . with plaintiff[], conducted by [mail] and fax." *Neal, 270 F.3d at 332.* The fact that Gudemann physically was not present in Ohio does not prevent personal jurisdiction because "when a foreign defendant purposefully directs communications into the forum that **[*20]** cause injury within the forum, and those communications form the 'heart' of the cause of action, personal jurisdiction may be present." *Id. at 333.* Gudemann's contacts with Ohio are related to the operative facts of the controversy.

Finally, Gudemann's acts or their consequences had a substantial enough connection with Ohio that the exercise of jurisdiction over Gudemann is reasonable. Gudemann does not argue that defending this action in Ohio will be overly burdensome. Ohio has an interest in having the litigation continue here. Plaintiff clearly has an interest in obtaining relief.

Defendants' motion to dismiss for lack of personal jurisdiction shall be, therefore, denied as to Gudemann.

**II. Service of Process**

Defendants contend that the complaint must be dismissed under Rules 12(b)(4), for insufficiency of process, and 12(b)(5), for insufficiency of service of process. Defendants argue that process and service of process were insufficient because plaintiff did not comply with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

*Fed. R. Civ. P. 4(h)(2)* requires that foreign corporations be served **[*21]** in the same manner as individuals in a foreign country under *Fed. R. Civ. P. 4(f).* Rule 4(f)(1) provides that individuals in a foreign country may be served "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." I thus must look to the Hague Convention to determine whether both process and service of process were sufficient.

Article 3 of the Hague Convention provides, "The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalisation or other equivalent formality." Article 5 provides:

> The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either--
>
> (a) by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or
>
> (b) by a particular method requested by the applicant, unless such **[*22]** a method is incompatible with the law of the State addressed.
>
> Subject to sub-paragraph (b) of the first paragraph of this article, the document may always be served by delivery to an addressee who accepts it voluntarily.
>
> If the document is to be served under the first paragraph above, the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.
>
> That part of the request, in the form attached to the present Convention, which contains a summary of the document to be served, shall be served with the document.

To serve process via the Hague Convention rules, a plaintiff, through a requesting authority, sends a request to serve process to the Central Authority of a country. The Central Authority reviews the request for conformance with the model annexed to the Hague Convention and its other provisions. If the request does not conform, the Central Authority informs the plaintiff. If the request conforms, the Central Authority will effect service through the method chosen by the plaintiff and indicated on the request.

Each signatory to the Hague Convention may require that a request **[*23]** and accompanying document be translated into the official language of that country. Germany requires this translation. *Pennsylvania Orthopedic Assoc. v. Mercedes-Benz, 160 F.R.D. 58, 60 (E.D. Pa. 1995)* ("The German resolution enacting the Hague Convention states, 'Formal Service (paragraph 1 of Article 5 of the Convention) shall be permissible only if the document to be served is written in or translated into, the German language.'") (citing Federal Civil Judicial Procedure and Rules at 42).

**A. Taifun**

Defendants contend service of process was insufficient as to Taifun because only an "authority or judicial officer competent under the law of the state in which the documents originate" could serve plaintiff's complaint on the Central Authority of Germany, which would forward the complaint to defendants. Doc. 26 at 15.

Plaintiff contends that a private attorney is competent under the Hague Convention for service of process. Plaintiff further argues that only the German Central Authority may object to a Request for Service.

Defendants' argument is not well taken.

In *Greene v. Le Dorze, 1998 U.S. Dist. LEXIS 4093,* at *5-6, No. CA 3-96- CV-590-R (E. **[*24]** D. Pa. Mar. 24, 1998), the defendants argued that the person who forwarded process to the French Ministry of Justice, the entity designated as France's Central Authority, was not an "authority or judicial officer competent under the law of the State in which the documents originate." Alan Crowe, of Crowe Foreign Services, forwarded the process. Id. at *2. The court held that anyone eligible to serve process under *Fed. R. Civ. P. 4(c)(2)* properly could serve process to a Central Authority. Id. at *7. The court stated,

> A party is "competent" to forward process for purpose of the Hague Convention if it is "competent" to serve such documents in the country where the documents originate. Because Mr. Crowe was authorized to serve process in the United States, he was competent to forward documents originating in the United States to the French Ministry of Justice.

Id.

In *Marschhauser v. Travelers Indemnity Co., 145 F.R.D. 605, 608-09 (S.D. Fla. 1992),* the defendants challenged service of process to the Israeli Central Authority. The court stated a private attorney qualifies to serve process on a Central Authority. *Id. at 608.* The **[*25]** court stated, "Article 3, expressly states that the authority or judicial officer must be competent in the state in which the documents originate, not the recipient state." Id.

Anyone who qualifies to serve process in the United States under *Fed. R. Civ. P. 4(c)*, therefore, qualifies to serve process on the German Central Authority. Counsel for plaintiff served the request on the German Central Authority and could serve process under Rule 4(c). Doc. 35 at 15. Service of process thus was not insufficient as to Taifun.

**B. Gudemann**

Defendants again argue service of process was insufficient as to Gudemann because plaintiff failed to make a proper request for service through a competent officer required by Article 3.

Plaintiff again contends that a private attorney is competent under the Hague Convention to accept service of process. Plaintiff further argues that only the German Central Authority may object to a Request for Service.

Defendants' argument that service of process was insufficient because plaintiff failed to make a proper request for service through a competent officer again is not well taken for the same reasons discuss supra. Anyone who qualifies to serve **[*26]** process in the United States under *Fed. R. Civ. P. 4(c)* qualifies to serve process on the German Central Authority. Counsel for plaintiff served the request on the German Central Authority and could serve process under Rule 4(c). Doc. 35 at 15. Service of process thus was not insufficient as to Gudemann because plaintiff's counsel served the request to the Central Authority.

Defendants further argue that process was insufficient as to Gudemann because the documents were not translated into German. Defendants argue that service of process was insufficient because the process was insufficient.

Plaintiff argues that translation of all documents whose service is requested is not necessary when service is obtained by voluntary acceptance of the recipient.

In *Pennsylvania Orthopedic Assoc. v. Mercedes-Benz, 160 F.R.D. 58, 60 (E.D. Pa. 1995),* the plaintiffs submitted their request for service and did not translate the summons into German. The court found that the plaintiffs did not comply with the German requirements and the Hague Convention. Id. The court stated,

> Upon receipt of the request and attached documents, the German Central Authority checked the box **[*27]** on the request titled "the document has not been served, by reason of the following facts," and wrote (translated from German) "because of missing translations, only informal delivery [Hague Convention art. 5, P 2] through acceptance of service by addressee was a possibility. The addressee was not willing to accept service."

Id.

The court held, "Because Plaintiffs did not comply with the Hague Convention and Defendant did not voluntarily accept service, we conclude that service of process has not been effected upon the Defendant." Id.(emphasis added). The translation requirement, therefore, effectively could be waived if the defendant had accepted service voluntarily.

If Gudemann accepted service of process voluntarily, the translation requirement, and plaintiff's failure to comply with it, would not render process insufficient.

Defendants contend that service of process was insufficient as to Gudemann because nothing in the record establishes that Gudemann was served voluntarily. Plaintiff points out that the process server states Gudemann accepted service voluntarily.

The only support for defendants' argument that Gudemann was not served voluntarily is **[*28]** the fact that the acknowledgment of service only is signed by the process server and not by Gudemann. This bald conclusion does not establish involuntariness, especially in light of the process server's form which states that Gudemann was served and accepted service voluntarily. Doc. 35 at Ex. Because Gudemann accepted service voluntarily, the translation was not required.

Both process and service of process were not insufficient as to Gudemann.

**III. Adequacy of Pleadings**

No complaint shall be dismissed unless the plaintiff has failed to allege facts in support of plaintiff's claim that, construed in plaintiff's favor, would entitle the plaintiff to relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* When deciding a motion brought pursuant to *Fed. R. Civ. P. 12(b)(6)*, the inquiry is essentially limited to the content of the complaint, although matters of public record, orders, items appearing in the record, and attached exhibits also may be taken into account. See *Yanacos v. Lake County, 953 F. Supp. 187, 191 (N.D. Ohio 1996).* The court must accept all the allegations stated in the complaint as true, *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984),* **[*29]** while viewing the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).* A court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986).*

**A. Count I: Fraud**

Plaintiff claims defendants engaged in common law fraud because they represented that Taifun would and did supply plaintiff with reclaimed bromotrifluoromethane when they knew Taifun would not do so. Plaintiff claims defendants fraudulently failed to disclose that they could not supply plaintiff with reclaimed bromotrifluoromethane and would substitute virgin bromotrifluoromethane.

Defendants contend that Count I must be dismissed because it fails to comply with the pleading requirements of *Fed. R. Civ. P. 9(b).* Defendants contend, "Plaintiff cannot boldly allege conduct 'upon information and belief,' or based simply on conjecture or by making conclusory statements, offer no factual basis for such belief or statements, yet fulfill its pleading obligations under *Fed.Civ.R. 9(b).*" Doc. 26 at 27 (citations **[*30]** omitted). Under *Fed. R. Civ. P. 9(b)*, fraud claims must be pleaded with particularity; general allegations of fraud are insufficient. *VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 701 (6th Cir. 2000).* To satisfy this requirement, a "plaintiff must allege specifically times, places, [and] contents . . . of the underlying fraud." *Vild v. Visconsi, 956 F.2d 560, 567 (6th Cir. 1992).* The Sixth Circuit has stated that Rule 9(b) must be read in conjunction with Rule 8, which calls for short, concise statements. American Town Ctr. v. Hall 83 Assoc., 912 F.2d 104, 109, 113 (6th Cir. 1990).

Failure to plead an essential element of a fraud claim, however, warrants dismissal under Rule 9(b). *Craighead v. E.F. Hutton & Co., 899 F.2d 485, 491 (6th Cir. 1990).* A plaintiff must "at a minimum, . . . allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 322 (6th Cir. 1999)* (quoting *Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).* **[*31]**

Defendants argue that plaintiff's fraud claim does not meet *Fed. R. Civ. P. 9(b)* for several reasons: 1) the complaint contains conclusory allegations of misrepresentations and concealment, intent, and level of knowledge; 2) failure to allege detrimental reliance; 3) the damages are speculative and time-barred; and 4) the claim is barred by the economic loss doctrine because the fraud claim does not contain damages in addition to damages attributable to plaintiff's breach of contract claim.

Plaintiff's second amended complaint sufficiently pleads fraud under *Fed. R. Civ. P. 9(b).* The second amended complaint alleges the time, place, and content of the alleged misrepresentations on which plaintiff relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.

Attached to plaintiff's first amended complaint were several exhibits containing the alleged misrepresentations. Doc. 19 at Exs. C-1, C-2, F-1, F-2, F-3. These exhibits contain dates, statements of intent to ship, and statements of actual shipment of reclaimed bromotrifluoromethane. The attachment of these exhibits is sufficient to plead the time, place, and content of the alleged **[*32]** misrepresentations on which plaintiff relied.

Plaintiff's second amended complaint also alleges a fraudulent scheme and defendants' fraudulent intent. The second amended complaint states:

> In connection with the Agreement, defendants transmitted to plaintiff in Holland, Ohio via United States mail and facsimile transmission over interstate telecommunications lines a series of correspondence and other writings which, directly or indirectly, constituted written representations from defendants to plaintiff that defendants could supply, would supply or did supply to plaintiff reclaimed bromotrifluoromethane, when in fact defendants knew each of those representations to be false. Defendants fraudulently or recklessly failed to disclose to plaintiff that: (1) defendants had no ability, or alternatively no intention, to supply plaintiff with reclaimed bromotrifluoromethane; and (2) defendant would substitute virgin Halon for reclaimed bromotrifluoromethane for shipment to plaintiff. Copies of all such written correspondence and facsimile transmissions as are in plaintiff's possession or control were attached to the First Amended Complaint as Composite Exhibit G. Collectively, such **[*33]** written correspondence, facsimile or wire transmissions evidence that defendants intended to and did commit fraudulent acts in Ohio on an ongoing, repetitive and continuous basis over a substantial period of time, and did transact business in this judicial district in Ohio.

Doc. 22 at P 37.

These allegations sufficiently plead that defendants engaged in a scheme to substitute virgin bromotrifluoromethane for the reclaimed bromotrifluoromethane that plaintiff believed it was purchasing. These allegations also sufficiently plead defendants' requisite intent.

Plaintiff's second amended complaint sufficiently pleads justifiable reliance. The second amended complaint states, "Plaintiff justifiably and actually did rely upon defendants' misrepresentations of fact, and defendants' concealment and omissions of fact, as aforesaid." Doc. 22 at P 40.

Plaintiff's second amended complaint sufficiently alleges injury and damages in the fraud claim. Defendants argue that the fraud claim is barred by the economic loss doctrine. Defendants argue that, because the fraud claim does not contain damages in addition to damages attributable to plaintiff's breach of contract claim, the fraud **[*34]** claim must be dismissed. Defendants rely on *Raymac Leasing Corp. v. U.S. Brands Corp., 1991 U.S. App. LEXIS 19417, No. 9-4043, 1991 U.S. App. LEXIS 19417,* at *10 (6th Cir. Aug. 14, 1991) (quoting *Bowman v. Goldsmith Bros. Co., 63 Ohio L. Abs. 428, 109 N.E.2d 556 (Ohio Ct. App. 1953)),* for the proposition that "the tort liability of parties to a contract arises from the breach of some positive legal duty imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contract obligation."

While defendants are correct in that plaintiff needs to prove more than economic loss to recover on its fraud claim, the court in Raymac decided the issue on a motion for summary judgment. Because this issue comes to the court on a motion to dismiss, I must read the second amended complaint liberally in plaintiff's favor. The second amended complaint sufficiently alleges more than economic loss:

> As a direct and proximate result of the fraudulent substitution of smuggled virgin Chinese bromotrifluoromethane for the reclaimed German agent required under the contract, defendants have caused plaintiff to be threatened with both criminal and civil **[*35]** charges by the United States of America, as a result of which plaintiff has incurred substantial legal fees and expenses, well in excess of One Hundred Thousand Dollars ($ 100,000.00) to date in responding to such investigations and claims.

Doc. 22 at P 42.

Count I cannot, therefore, be dismissed for failure to comply with the pleading requirements of *Fed. R. Civ. P. 9(b).* Defendants' motion to dismiss Count I shall be denied.

**B. RICO**

Plaintiff asserts two claims under RICO and Ohio's Pattern of Corrupt Activities Law ("PCA"), *O.R.C. § § 2923.32* and 2923.34. n2 In Count II, plaintiff claims that both defendants devised a scheme to defraud plaintiff and the EPA or to obtain money from plaintiff by fraudulent representations and executed that scheme through mail and wire fraud. In Count III, plaintiff claims that Gudemann devised a scheme to defraud plaintiff and the EPA by representing to plaintiff and the EPA that Taifun would deliver reclaimed bromotrifluoromethane. Plaintiff claims Gudemann executed that scheme through mail and wire fraud.

> n2 Because Ohio courts applying the PCA look to federal case law applying RICO, my analysis applies equally to both plaintiff's RICO and PCA claims. *U.S. Demolition and Contracting, Inc. v. O'Rourke Constr. Co., 94 Ohio App. 3d 75, 83, 640 N.E.2d 235 (1994)* ("PCA is patterned after the Racketeering Influenced and Corrupt Organizations Act ('RICO'), Section 1961 et seq., Title 18, U.S.Code. . . . In applying PCA, Ohio courts look to federal case law applying RICO.") (citations omitted).

**[*36]**

RICO provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. § 1962*(c).

To establish a violation of § 1962(c), plaintiff must prove injury caused by a person who conducts the affairs of an enterprise through a pattern of racketeering activity. *18 U.S.C. § 1962*(c). The elements of a RICO claim are: 1) two or more predicate offenses; 2) the existence of an enterprise; 3) a nexus between the pattern of racketeering activity and the enterprise; and 4) resulting injury to business or property. *VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 699 (6th Cir. 2000)* (citing *Frank v. D'Ambrosi, 4 F.3d 1378, 1385 (6th Cir. 1993)).* In addition, the Sixth Circuit stated in VanDenBroeck, "the Supreme Court has held that in order to be held responsible under the Act, a defendant must have not only **[*37]** participated in the scheme, but must have also participated in the operation or management of the enterprise itself." Id. (citing *Reves v. Ernst & Young, 507 U.S. 170, 183, 122 L. Ed. 2d 525, 113 S. Ct. 1163 (1993)).*

Defendants argue that both counts must be dismissed under *Fed. R. Civ. P. 12(b)(6)* for two reasons: 1) plaintiff failed to allege a pattern of racketeering activity; and 2) while plaintiff alleges common law fraud as the basis for the RICO claims, plaintiff does not meet the fraud pleading requirements of *Fed. R. Civ. P. 9(b)*. Defendants argue that Count II must be dismissed for an additional two reasons: 1) plaintiff failed to allege an enterprise; and 2) plaintiff failed to join an indispensable party under *Fed. R. Civ. P. 12(b)(7)*.

**1. Count II: RICO Violations Alleged Against Both Defendants**

Under RICO, an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961*(4). The Supreme Court has defined an enterprise as a "group of persons associated together for a common purpose of **[*38]** engaging in a course of conduct." *United States v. Turkette, 452 U.S. 576, 583, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981).*

An association-in-fact enterprise is established by showing three factors: "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." *VanDenBroeck, 210 F.3d at 699* (citing *Frank, 4 F.3d at 1386);* see also *Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 995 (8th Cir. 1989)* ("These characteristics are mandated in order to avoid the danger of guilt by association that arises because RICO does not require a proof of a single agreement as in a conspiracy case, and in order to ensure that criminal enterprises, which are RICO's target, are distinguished from individuals who associate for the commission of sporadic crime.") (internal quotations omitted).

There must be somewhat of an organizational structure amongst the entities forming an association-in-fact. *VanDenBroeck, 210 F.3d at 699.* "Simply conspiring **[*39]** to commit a fraud is not enough to trigger the Act if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes." Id. "'The command system of a Mafia family is an example of the type of structure' that is distinct from the pattern of racketeering activity." *United States v. Tocco, 200 F.3d 401, 425 (6th Cir. 2000)* (quoting *United States v.*

*Bledsoe, 674 F.2d 647, 665 (8th Cir. 1982)).* Continuity occurs "'where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than ad hoc, basis.'" *Tocco, 200 F.3d at 425* (quoting *United States v. Kragness, 830 F.2d 842, 856 (8th Cir. 1987)).*

Plaintiff alleges:

> The defendants and T.T. Intertrade, who assisted the defendants in smuggling the virgin bromotrifluoromethane from China to Germany for its eventual delivery to plaintiff and WESCO [a New Jersey company who entered into a similar purchase agreement with Taifun] in the United States in violation of German and federal law, formed an association-in-fact and **[*40]** are, therefore, an enterprise as defined under *18 U.S.C. 1961*(4).

Doc. 22 at P 53.

Plaintiff's second amended complaint fails to allege the factors necessary to establish an association-in-fact. Plaintiff never alleges any sort of organizational structure between Taifun and T.T. Intertrade. See, e.g. 800537 *Ontario Inc. v. Auto Enter., Inc., 113 F. Supp. 2d 1116, 1123 (E.D. Mich. 2000)* ("None of the allegations in the amended complaint support a conclusion that the World Imports Defendants and the Auto Enterprises Defendants participated in any type of joint-decisionmaking regarding the alleged enterprise, nor any type of hierarchy beyond their contractual relationship."). Plaintiff never alleges that Taifun and T.T. Intertrade and associated for anything other than the fraud alleged in the second amended complaint. Plaintiff's second amended complaint only alleges that Taifun and T.T. Intertrade "simply conspired to commit a fraud . . . [and were] not organized in a fashion that would enable them to function as a racketeering organization for other purposes." *VanDenBroeck, 210 F.3d at 699.*

Because I agree that plaintiff **[*41]** has failed to allege an enterprise in Count II, I decline to address defendants' remaining arguments regarding Count II.

Count II shall, therefore, be dismissed.

**2. Count III: RICO Violation Alleged Against Gudemann**

**a. Pattern of Racketeering Activity**

Defendants contend that plaintiff failed to allege a pattern of racketeering activity. Plaintiff argues that the second amended complaint alleges that defendants engaged in mail and wire fraud as the regular manner in which they conducted their business of sale of the virgin bromotrifluoromethane instead of reclaimed bromotrifluoromethane.

A plaintiff must plead facts sufficient to establish a pattern of racketeering activity. *Vemco, Inc. v. Camardella, 23 F.3d 129, 133 (6th Cir. 1994)* (citing *Sedima S.P.R.L. v. Imrex Corp., 473 U.S. 479, 496, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)).* A pattern consists of at least two predicate acts of racketeering activity within ten years of each other. Id. (citing *H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 237-38, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)).* The acts must demonstrate "relatedness," a relationship **[*42]** between the predicate acts, and "continuity," a threat of continuing criminal activity. Id. (citing *H.J., Inc., 492 U.S. at 238).* "Relatedness" is established if the acts have "'the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events.'" Id. (citing *Vild, 956 F.2d at 566).*

"Continuity" is established by three different methods: 1) "the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit;" 2)"the predicate acts or offenses are part of an ongoing entity's regular way of doing business;" or 3)"the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J., Inc., 492 U.S. at 242-43.* Several factors may be used to determine whether plaintiff can meet the continuity requirement: "(1) the number and variety of predicate acts; (2) the length of time over which the acts were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries." *Griffin v. NBD Bank, 43 F. Supp. 2d 780, 787 (W.D. Mich. 1999)* **[*43]** (citing *Olive Can Co., Inc. v. Martin, 906 F.2d 1147, 1151 (7th Cir. 1990)* (quoting *Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir. 1986)); Barticheck v. Fidelity Union Bank, 832 F.2d 36, 39 (3d Cir. 1987)).*

Plaintiff's second amended complaint alleges:

> 59. Defendant Gudemann personally and repeatedly represented to plaintiff and to EPA through the United States mail and interstate wire transmissions that the product being delivered by Taifun to plaintiff was reclaimed bromotrifluoromethane as specified in the Agreement and the application to the EPA.
>
> 60. Defendant Gudemann personally and repeatedly represented to WESCO and to EPA through the United States mail and wire transmissions that the produce being

> delivered by Taifun was reclaimed bromotrifluoromethane as specified in their contract and the application to the EPA.
>
> . . . .
>
> 68. Gudemann's mail and wire fraud continued for a number of months, included numerous individual correspondence, and victimized plaintiff, EPA, and WESCO.

Doc. 22. at PP 59, 60, 68.

Plaintiff's second amended complaint sufficiently alleges the relatedness and continuity **[*44]** of the mail and wire fraud. As to relatedness, plaintiff alleges the acts of mail and wire fraud had the same purpose of defrauding plaintiff and WESCO, had the same result of defrauding plaintiff and WESCO, involved Gudemann, victimized both plaintiff and WESCO, and were committed in the same manner.

As to continuity, plaintiff alleges numerous acts of mail and wire fraud over a span of approximately six months. Plaintiff alleges two different victims requiring two different schemes to defraud. Plaintiff alleges two distinct injuries--one to plaintiff, and one to WESCO. While the time period indeed is limited, I find that the acts were sufficient to establish continuity because the second amended complaint alleges two different fraudulent schemes. Unlike the facts in Vemco, where the court did not find a pattern, there are "allegations that [Gudemann] engaged in similar practices on other contracts involving other parties." *23 F.3d at 135* ("We do not find that a defendant who engages in several different forms of fraud for a single purpose, to defraud a single victim through activities surrounding one construction project, without more, has engaged in more than **[*45]** one criminal scheme."). Plaintiff alleges that Gudemann engaged in different forms of fraud to defraud two different victims through activities surrounding two different contracts.

Count III cannot be dismissed for failure to plead a pattern of racketeering activity.

**b. Implications of *Fed. R. Civ. P. 9(b)***

"Because Plaintiff is alleging fraud to establish racketeering activity, the allegations regarding those predicate acts must be 'stated with particularity.'" *Paycom Billing Servs., Inc. v. Payment Res. Int'l, 212 F. Supp. 2d 732, 2002 U.S. Dist. LEXIS 10437,* at *9 (W.D. Mich. 2002) (citation omitted). "Courts have repeatedly held in RICO cases alleging mail fraud and wire fraud as the 'predicate acts,' the underlying fraudulent activities must be pled with particularity." *Eby v. Producers Co-op, Inc., 959 F. Supp. 428, 431 (W.D. Mich. 1997)* (quoting *Berent v. Kemper Corp., 780 F. Supp. 431, 448 (E.D. Mich. 1991)).* In *Gotham Print, Inc. v. American Speedy Printing Centers, Inc., 863 F. Supp. 447, 458 (E.D. Mich. 1994)* (emphasis in original), the court stated:

> Courts have been particularly sensitive **[*46]** to *FED. R. CIV. P. 9(b)*'s pleading requirements in RICO cases in which the "predicate acts" are mail fraud and wire fraud, and have further required specific allegations as to which defendant caused what to be mailed (or made which telephone calls), and when and how each mailing (or telephone call) furthered the fraudulent scheme.
>
> Plaintiff's second amended complaint alleges:
>
> 59. Defendant Gudemann personally and repeatedly represented to plaintiff and to EPA through the United States mail and interstate wire transmission that the product being delivered by Taifun to plaintiff was reclaimed bromotrifluoromethane as specified in the Agreement and the application to the EPA.
>
> . . . .
>
> 61. At the times of some or all of the aforesaid representations, Gudemann knew the representations to be false, in that he knew that smuggled virgin bromotrifluoromethane would be, and ultimately was, illegally substituted for the permitted reclaimed bromotrifluoromethane.

Doc. 22.

Plaintiff's first amended complaint also attached exhibits which support the RICO claim. Exhibit F-1 is a letter dated February 28, 1997, states that Taifun will ship reclaimed bromotrifluoromethane **[*47]** to Detroit, Michigan, and is signed by Gudemann. Exhibit F-2 is an invoice dated May 22, 1997, states that Taifun will ship recycled bromotrifluoromethane to Detroit, Michigan, and is signed by Gudemann. Doc. 19 at Exs. F-1, F-2.

The second amended complaint, along with the exhibits, therefore pleads the facts of mail and/or wire fraud with particularity. Count III alleges that Gudemann caused statements or invoices to be transmitted to plaintiff and alleges when and how the mailing or faxing furthered the fraudulent scheme.

Count III cannot, therefore, be dismissed for failure to plead fraud with particularity. Defendants' motion to dismiss Count III shall be denied.

**C. Count IV: Breach of Contract**

Plaintiff claims Taifun breached its contract with plaintiff when it allegedly substituted virgin bromotrifluoromethane for the reclaimed bromotrifluoromethane agreed to by the parties.

Defendants argue that this claim must be dismissed under *Fed. R. Civ. P. 12(b)(6)* because plaintiff has not incurred any damages. In response, plaintiff asserts, "The possibility exists that under some set of facts, plaintiff may be entitled to recover something for breach of contract. That is **[*48]** all that is required to be determined, in order to deny defendants' renewed motion for dismissal for failure to state a claim." Doc. 35 at 34-35.

Plaintiff's second amended complaint states:

> 76. By its conduct aforesaid, including the fraudulent substitution of smuggled Chinese bromotrifluoromethane for reclaimed material, and surreptitiously causing the same to be shipped form Germany into the United States to plaintiff, defendant Taifun has materially breached the terms of the Agreement with plaintiff, or fraudulently induced plaintiff to enter into the Agreement, or both. By virtue of the failure of consideration represented by this substitution, plaintiff's acceptance of the bromotrifluoromethane was obtained by fraud and was and is legally and contractually without effect.
>
> 77. As a direct result of defendant Taifun's breach of contract, defendant Taifun is liable to plaintiff for the contract amount of Five Hundred Twenty-Five Thousand One Hundred Twenty Dollars ($ 525,120.00), plus all consequential and incidental damages, plus pre-judgment and post-judgment interest at the statutory rate, plus attorneys' fees, costs of suit and such other further relief as may **[*49]** be just and equitable.

Doc. 22.

The breach of contract claim cannot be dismissed based on insufficient pleading of damages because plaintiff alleges facts in support of the breach of contract claim that, construed in plaintiff's favor, would entitle plaintiff to relief. Plaintiff adequately alleges that it incurred damages as a result of Taifun's alleged breach of contract.

Defendants' motion to dismiss Count IV shall be, therefore, denied.

**IV. Standing**

Defendants argue that plaintiff's complaint must be dismissed for lack of standing because plaintiff has not alleged a case and controversy. Defendants argue that plaintiff has yet to incur monetary damages.

Plaintiff asserts that defendants' standing argument is frivolous. Plaintiff contends, "What is important, in the context of a Rule 12(b)(6) motion, is that plaintiff has alleged damages flowing from the challenged conduct." Doc. 35 at 15.

The jurisdiction of federal courts is limited to actual "Cases" and "Controversies" by Article III of the United States Constitution. U.S. Const. art. III, § 2, cl. 1. To satisfy this "case-or-controversy" requirement, "a plaintiff must establish three elements: (1) an injury **[*50]** in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue--the injury must be fairly traceable to the defendant's action; and (3) [a] likelihood that the injury would be redressed by a favorable decision of the Court." *Blachy v. Butcher, 221 F.3d 896, 909 (6th Cir. 2000)* (internal quotation marks omitted); *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992).*

Under Count I, plaintiff alleges:

> As a direct and proximate result of defendants' fraudulent misrepresentations, omissions and concealment, plaintiff has sustained damages in an amount in excess of One Million One Hundred Forty-Seven Thousand Three Hundred and Six Dollars ($ 1,147,306.00), plus interest, costs, taxes, penalties, attorneys' fees, and may also suffer additional damages in the future, including without limitation, the costs of re-procurement under the contract with the DLA.

Doc. 22 at P 41.

Under Count III, plaintiff alleges:

> Defendant Gudemann has violated *18 U.S.C. 1961*, et seq. As a direct and proximate result of the corrupt activity of **[*51]** defendant Gudemann, plaintiff has been injured monetarily, has been placed in positions of substantial financial peril, has had to expend substantial sums and to divert substantial resources to respond to pending investigations and claims triggered by defendant Gudemann's corrupt activities, and has been threatened with civil and criminal liability, all as a result of the deliberate, intentional, and malicious acts of defendant Gudemann, all to plaintiff's damage in an amount not less than Five Million Dollars ($ 5,000,000.00).

Doc. 22 at P 74.

Under Count IV, plaintiff alleges:

> As a direct result of defendant Taifun's breach of contract, defendant Taifun is liable to plaintiff to the contract amount of Five Hundred Twenty-Five Thousand One Hundred Twenty Dollars ($ 525,120.00), plus all consequential and incidental damages, plus pre-judgment and post-judgment interest at the statutory rate, plus attorneys' fees, costs of suit and such other further relief as may be just and equitable.

Doc. 22 at P 77.

In these portions of plaintiff's second amended complaint, plaintiff alleges an injury in fact regarding its claims and a connection between the injury **[*52]** and the conduct at issue. n3 It furthermore is likely that any injury could be redressed by a favorable decision.

> n3 Because Count II shall be dismissed under *Fed. R. Civ. P. 12(b)(6)*, I decline to address plaintiff's standing to assert the claim in Count II.

Defendants' motion to dismiss for lack of standing shall be, therefore, denied.

**CONCLUSION**

It is, therefore,

**ORDERED THAT**

1. Defendants' motion to dismiss Counts I, III, and IV be, and hereby is, denied; and

2. Defendants' motion to dismiss Count II be, and hereby is, granted.

**So ordered.**

9/4/02

/s/ James G. Carr

James G. Carr

United States District Judge

# EXHIBIT F

**UNITED STATES OF AMERICA, ex rel. DOROTHY BRANHAN, Plaintiff-Appellant, v. MERCY HEALTH SYSTEM OF SOUTHWEST OHIO, et al., Defendants-Appellees.**

**No. 98-3127**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

***1999 U.S. App. LEXIS 18509***

**August 5, 1999, Filed**

**NOTICE: [*1]** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 206 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 206 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:**

Reported in Table Case Format at: *1999 U.S. App. LEXIS 28267*.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO. 96-00396. Weber. 1-12-98.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee challenged the order of the United States District Court for the Southern District of Ohio which granted defendant hospitals' motion to dismiss plaintiff's qui tam action under the False Claims Act, *31 U.S.C.S. § 3729*(1)(a) for alleged improper Medicare billing procedures.

**OVERVIEW:** Plaintiff employee was an admissions clerk for defendant hospitals. She brought suit under the False Claims Act, *31 U.S.C.S. § 3729*(1)(a), alleging a general billing scheme whereby defendants assigned Medicare patients who were undergoing preadmission testing two billing numbers so they could double bill the government for preadmission testing. The complaint failed to allege a single specific incident in which the improper billing occurred. Plaintiff's amended complaint only added a report listing reimbursements to defendants for preadmission testing. Defendants filed a motion to dismiss for lack of subject matter jurisdiction, lack of specificity, and failure to state a claim under *Fed. R. Civ. P. 9(b)*. The magistrate denied plaintiff's motion to amend and recommended dismissal for lack of subject matter jurisdiction and failure to state a claim. Plaintiff appealed. The court affirmed because plaintiff based her amended complaint on a publicly disclosed report and thus failed to meet the requirements of the original source exception to the limitation on jurisdiction contained in *31 U.S.C.S. § 3730*(e)(4)(A). Moreover, plaintiff's fraud claims were not pled with specificity.

**OUTCOME:** The judgment dismissing plaintiff employee's qui tam action for alleged improper Medicare billing was affirmed; the court did not have jurisdiction over plaintiff's claim since she did not have first hand knowledge of the allegations and was not an original source. Further, plaintiff's allegations of fraud were generalized and not pled with particularity.

**LexisNexis(R) Headnotes**

**COUNSEL:** For UNITED STATES OF AMERICA, DOROTHY F. BRANHAN, Plaintiffs - Appellants: Robert A. Perez, Cincinnati, OH.

For MERCY HEALTH SYSTEM OF SOUTHWEST OHIO, et al., Defendants - Appellees: Scott D. Phillips, Frost & Jacobs, Cincinnati, OH.

**JUDGES:** BEFORE: BOGGS, CLAY & GODBOLD *, Circuit Judges. CLAY, Circuit Judge, concurring in part and dissenting in part.

> * The Honorable John C. Godbold, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

**OPINIONBY:** John C. Godbold

**OPINION:**

**GODBOLD, Senior Circuit Judge**. Plaintiff Dorothy Branhan filed this *qui tam* action against Mercy Health Systems of Southwestern Ohio and four of its subsidiary hospitals under the False Claims Act, *31 U.S.C. § 3729* **[*2]** (1)(a), for alleged improper Medicare billing procedures. According to the United States Medicare Reimbursement regulations, *42 C.F.R. § 412.2*, pre-admission testing occurring within 72 hours of in-hospital treatment is to be billed with in-hospital charges and submitted on one bill. A single reimbursement is then made based on the patient's diagnosis at the time of discharge. Plaintiff alleges defendants double billed for tests performed within 72 hours of admission by billing for the test when rendered and again with the in-patient charges upon the patient's discharge.

On April 15, 1996, plaintiff filed her original complaint under seal. The government declined to intervene and the complaint was unsealed. Defendants filed a motion to dismiss under Rule 9(b) or in the alternative a motion for more definite statement. The district court denied the motion to dismiss and granted the motion for more definite statement. Plaintiff filed an amended complaint. Defendants filed a motion to dismiss the amended complaint for lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, and lack of specificity under Rule 9(b). The case was referred to a magistrate **[*3]** judge. Plaintiff moved to file a second amended complaint. The magistrate judge issued an order denying the motion to amend and a report and recommendation to grant the motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. The district court adopted the magistrate judge's recommendation. Plaintiff appeals the granting of the motion to dismiss. We affirm.

***Subject Matter Jurisdiction***

The False Claims Act contains the following jurisdictional limitation: "No court shall have jurisdiction over an action . . . based upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative, or Government Accounting Office Report, hearing, audit, or investigation, or from the news media, unless the person bringing the action is the original source of the information." *31 U.S.C. § 3730*(e)(4)(A). Because plaintiff bases her amended complaint on a publicly disclosed report of billing transactions in an administrative investigation and she fails to meet the requirements of the "original source" exception the court lacks subject matter jurisdiction over the amended **[*4]** complaint. *See United States ex rel. Detrick v. Daniel F. Young, Inc., 909 F. Supp. 1010, 1022 (E.D. Va. 1995)* (False Claims Act prohibits putative relator from "riding piggyback on information subsequently developed by a government investigation.").

Plaintiff had been employed as an admissions clerk by one of the defendant hospitals since 1990. Her original complaint alleged a general billing scheme whereby "defendants assigned Medicare patients who were undergoing preadmission testing two unique billing numbers so they could bill the Government for both preadmission testing and the [comprehensive] reimbursement . . . ." Original Complaint at 8. The complaint failed to allege a single specific incident in which improper billing occurred and plaintiff never set forth the dates, times, or the names of individuals who engaged in the alleged improper billing. The district court found the complaint insufficient to meet the requirements of *Federal Rule of Civil Procedure 9(b)* and ordered plaintiff to file an amended complaint. The only change plaintiff made in the amended complaint was the attachment of a report by the Health Care Financing Agency listing the reimbursements **[*5]** to three of the four defendant hospitals for pre-admission testing occurring within 72 hours of in-hospital treatment.

The three elements of the jurisdictional limitation are present. First, plaintiff's amended complaint is "based upon" the report because the report contains the plaintiff's sole specific allegations regarding the patients, dates, and sums recovered by the defendants. *See McKenzie v. BellSouth Telecommunications, Inc., 123 F.3d 935, 939-40 (6th Cir. 1997), cert. denied, 522 U.S. 1077, 118 S. Ct. 855, 139 L. Ed. 2d 755 (1998)* (an action is "based upon" prior allegations if the action is supported by public disclosures, even if the action is only partly based upon the disclosure). Second, the billing transactions have been publicly disclosed because the HCFA report was available to anyone who requested it. *See 42 C.F.R. § 401.101*-404.152 (public availability of HCFA records); *United States ex rel. Doe v. John Doe*

*Corp., 960 F.2d 318, 322 (2nd Cir. 1992)* (transactions deemed publicly disclosed when placed in public domain); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. The Prudential Ins. Co., 944 F.2d 1149, 1155-56 (3rd Cir. 1991)* **[*6]** (jurisdictional bar is "designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator."). Third, the billing transactions were publicly disclosed in a manner set forth in the statute because it is undisputed that the report is the result of an administrative investigation. n1 *See Doe, 960 F.2d at 323-24* (public disclosure through agency investigation). Therefore, the court lacks subject matter jurisdiction unless plaintiff can prove she falls under the "original source" exception.

n1 The magistrate judge called the report submitted by plaintiff an "FBI report." Report and Recommendation and Order at 8. However, the report was actually generated by the Health Care Financing Administration. Although he was technically incorrect, the conclusion that the report was of the type mentioned in the jurisdictional limitation is correct.

Plaintiff fails to meet the first requirement **[*7]** of the "original source" exception to the jurisdictional bar. A plaintiff is an "original source" if (1) she has direct and independent knowledge of the information on which the allegations are based and (2) she has voluntarily provided the information to the government before filing her action. *31 U.S.C. § 3730*(e)(4)(B); *McKenzie, 123 F.3d at 943* ("direct" knowledge is first-hand knowledge and "independent" means that the information known by plaintiff does not depend or rely upon the public disclosures themselves). Although plaintiff did provide information to the FBI before filing her suit, she has failed to demonstrate that, aside from the HCFA report, she has first-hand knowledge of instances in which defendants knowingly presented false claims.

***Failure to Allege Fraud with Particularity***

Claims brought under the False Claims Act must comply with *Federal Rule of Civil Procedure 9(b). United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997); Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476 (2nd Cir. 1995); Cooper v. Blue Cross & Blue Shield, Inc., 19 F.3d 562, 568 (11th Cir. 1994).* **[*8]** As part of the Rule 9(b) requirements a person alleging fraud must identify the individuals who participated in the fraudulent scheme. *Coffey v. Foamex L.P., 2 F.3d 157, 161 (6th Cir. 1993); Hoover v. Langston, 958 F.2d 742, 745 (6th Cir. 1992).* Even if the court had jurisdiction over plaintiff's False Claims Act claim, the court was correct in dismissing the amended complaint because plaintiff's allegations are based on generalized accusations of wrongdoing attributed to "defendants" without any specificity as to which employees of the defendants were engaged in the alleged fraudulent scheme.

***Conclusion***

The judgment of the district court is AFFIRMED.

**CONCURBY:** CLAY (In Part)

**DISSENTBY:** CLAY (In Part)

**DISSENT:**

**CLAY, Circuit Judge, concurring in part and dissenting in part.** I agree with the majority that dismissal of this case against Mercy Hospital of Southwest Ohio, Clermont Mercy Physician-Hospital Organization, Mercy Hospital of Hamilton, and Mercy Hospital of Fairfield is appropriate because Plaintiff has failed to plead fraud with particularity as to these Defendants. However, because I believe this case does not lack subject matter jurisdiction **[*9]** and because Plaintiff pled fraud with sufficient particularity as to Mercy Hospital of Anderson ("Mercy-Anderson"), I dissent from the Court insofar as it affirms the dismissal of Plaintiff's claim against Mercy-Anderson.

**I. FACTUAL BACKGROUND**

A closer look at the facts will aid a later discussion of how the majority has reached the wrong conclusion in this case. n1 Plaintiff Dorothy Branhan began her employment with Mercy-Anderson in 1990 as an admissions clerk, processing patients for inpatient admissions and outpatient, pre-admission testing and functions as a liaison to Defendants' billing departments. During or around February 1992, administration at Mercy-Anderson gave Plaintiff a memorandum outlining certain procedures creating a process of separate outpatient billing for Medicare patients. Under this system, Medicare patients received duplicate patient identification numbers, which were color-coded differently, in order to produce duplicate accounts. The hospital directed outpatient admissions staff to create a "face sheet" upon admitting patients for outpatient testing, and to create two separate charts for every Medicare patient ultimately admitted on an inpatient **[*10]** basis. When seeking reimbursement, Mercy-Anderson would then submit the first of the two charts to billing to seek reimbursement for pre-admissions testing from the Health Care Financing Administration ("HCFA"), the division of the Department of Health and

Human Services ("HHS") which processes reimbursements under Medicare, before admitting that patient for inpatient treatment. The hospital would then activate the second chart and duplicate patient identification number, use the second chart to establish a medical record of the patient's inpatient treatment, and ultimately bill the Government for diagnostic related grouping ("DRG") reimbursement for inpatient treatment of the same patient.

n1 When reviewing a district court's dismissal of an action for lack of subject matter jurisdiction, this Court must accept as true allegations raised in the complaint, and must construe those facts in the light most favorable to the plaintiff. *See Ang v. Procter & Gamble Co., 932 F.2d 540, 544 (6th Cir. 1991).* Moreover, this Court may consider evidence beyond the four corners of the pleadings in determining whether federal subject matter jurisdiction exists. *See RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1135 (6th Cir. 1996).*

**[*11]**

Plaintiff questioned Mimi Krisling, Director of Admitting and Medical Records, and Chris Parks, Assistant Director of Medical Records, about these procedures and informed them that she thought they were illegal. They told her to shut up and do her job. During the fall of 1995, Plaintiff met with counsel and discovered that the billing activities about which she asked Krisling and Parks were unlawful. n2 Plaintiff met with the FBI on March 15, 1996. In a meeting that lasted several hours, she told Special Agents Stephen Kosky and Cindy Cronin of Defendants' activities.

n2 Defendants' practices allegedly violate the "three-day rule" set forth in *42 C.F.R. § 412.2(a)* (1994). This Medicare regulation precludes reimbursement for certain pre-admission diagnostic testing when such services are rendered within seventy-two hours of inpatient admission. Under the system Plaintiff alleges, Defendants illegally sought reimbursement for pre-admission services performed within three days of a Medicare patient's admission.

**[*12]**

Plaintiff filed a qui tam lawsuit on behalf of the United States on April 15, 1996 in the district court, alleging that Defendants violated the False Claims Act through its use of a false billing scheme and seeking recovery of payment to Defendants of unlawfully billed Medicare charges. On April 8, 1997, Defendants moved for a protective order, and moved to dismiss or for a more definitive statement. Plaintiff subpoenaed HCFA records from AdminaStar n3 and from HHS on March 26, 1997, and two months later provided the court with a Factual Appendix which included the HCFA records she obtained by subpoena. On July 1, 1997, the district court denied Defendants' motions for a protective order and to dismiss, granted Defendants' motion for a more definitive statement, and ordered Plaintiff to amend her complaint. After Plaintiff filed an amended complaint, Defendants again moved to dismiss. A magistrate judge held a hearing on the motions, and on November 11, 1997, issued a Report and Recommendation urging the district court to dismiss Plaintiff's complaint. Although Plaintiff filed objections and an affidavit with the district court, the court adopted the magistrate judge's report and **[*13]** dismissed the case on January 12, 1998.

n3 AdminaStar, under a contract with HCFA, processes claims and reimbursements for Medicare treatment submitted by Defendants.

### II. SUBJECT MATTER JURISDICTION

The False Claims Act ("FCA") permits private individuals to bring civil actions on behalf of the government, or qui tam actions, for violations of its substantive provisions, which prohibit the perpetration of fraud upon the United States. n4 *See 31 U.S.C. § 3730*(b)(1) (1994). In a qui tam action, an individual brings suit as a "relator" that may recover treble damages from a party that has committed fraud upon the United States. n5 *See 31 U.S.C. § 3730*(d)(2) (1994). A relator who prevails may receive up to thirty percent of the money she recovers. *See id.* As this Court has recognized, the FCA authorization of qui tam actions encourages "'whistleblowers' to act as 'private attorneys-general' . . . in pursuit of an important public policy." *United States ex rel. Taxpayers Against Fraud v. General Elec. Co., 41 F.3d 1032, 1042 (6th Cir. 1994).* **[*14]**

n4 The FCA holds liable any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." *31 U.S.C. § 3729*(a)(1) (1994). The FCA also deems liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a

false or fraudulent claim paid or approved by the Government." *31 U.S.C. § 3729*(a)(2) (1994).

n5 "Qui tam" is an abbreviation for the Latin phrase "*qui tam pro domino rege quam pro si ipso in hac parte sequitur*," which means "who sues on behalf of the King as well as for himself." Black's Law Dictionary 1251 (6th ed. 1990). A qui tam action is "one brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act . . ., part of the penalty to go to any person who brings such action and the remainder to the state or some other institution." *Id.* A relator is the "informer" plaintiff in a qui tam action. *Id.* at 1289.

**[*15]**

Although the FCA as originally enacted allowed anyone to bring a qui tam action and to thereby claim fifty percent of the recovery, Congress amended the FCA in 1943 to preclude qui tam actions based on information the government possessed when the relator brought the action. *See United States ex rel. Jones v. Horizon Healthcare Corp., 160 F.3d 326, 330 (6th Cir. 1998).* However, this version of the FCA barred even the claims of relators who provided the government with their information before filing suit. *See id.* Consequently, Congress again amended the FCA in 1986, this time to permit qui tam suits based on facts in the government's possession where the information was not publicly disclosed and where the suit was brought by an original source of the information. *See Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 944, 138 L. Ed. 2d 135, 117 S. Ct. 1871 (1997).*

Specifically, under the current version of the FCA:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative **[*16]** or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*31 U.S.C. § 3730*(e)(4)(A) (1994). The FCA goes on to define "original source" as:

> an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

*31 U.S.C. § 3730*(e)(4)(B) (1994). Together, these jurisdictional limitations serve to avoid the adjudication of suits that are essentially parasitic. *See McKenzie, 123 F.3d 935 at 938.* In adopting them, Congress sought to codify "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute on their own." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 304 U.S. App. D.C. 347, 14 F.3d 645, 649 (D.C. Cir. 1994).* **[*17]**

Although Plaintiff does not dispute that her complaint is "based upon" the HCFA records, she argues that the HCFA records in question did not constitute public disclosure of allegations and transactions under the FCA, and claims that her complaint is not based on the HCFA records alone. I agree, and dissent from the majority opinion insofar as it concludes that the HCFA records were publicly disclosed allegations or transactions in a government investigation, and that Plaintiff is not an "original source" in any event.

**A. "Public Disclosures"**

Under the FCA, "a public disclosure occurs when information has been disseminated through 'a criminal, civil, or administrative hearing, in a congressional, administrative, or Government General Accounting Office report, hearing, audit or investigation, or from the news media.'" *McKenzie, 123 F.3d at 939* (quoting *31 U.S.C. § 3730*(e)(4)(A) (1994)). While this Court has never before answered the question of how "public" information must be to activate the FCA's jurisdictional bar, the majority has today chosen to follow, in essence, the Third Circuit's interpretation of "public disclosure." The Third **[*18]** Circuit has read § 3730(e)(4) "to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1155-56 (3d Cir. 1991)* (holding that discovery materials not filed with the court are "public disclosures" under the FCA).

The majority errs in following Third Circuit precedent in this area because the Third Circuit's interpretation contravenes both the plain language and the purpose of the FCA. Other circuits have recognized

the problems inherent in the approach taken by the Third Circuit and by the majority today, and have expressly rejected that approach by instead holding that materials that are "only potentially in the public eye" do not constitute "public" disclosures under the FCA. *See United States v. Bank of Farmington, 166 F.3d 853, 860 (7th Cir. 1999)* (rejecting Third Circuit law because the plain language of the FCA bars material that constitutes "public disclosure" and not material that is "potentially accessible to the public"), **[*19]** *Springfield, 14 F.3d at 653* (finding that no purpose is served by preventing a qui tam plaintiff who utilizes "allegations or transactions that may not otherwise come to the attention of the authorities," as that interpretation would not deter parasitic lawsuits). The Tenth and Second Circuits have also articulated that "public disclosure" occurs when the information is somehow released. *See, e.g., United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1520-21 (10th Cir. 1996)* (noting that "public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided to others not previously informed thereof'); *United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 322 (2d Cir. 1992).* n6 In *McKenzie*, this Court signaled its implicit agreement with this interpretation by suggesting that a "public disclosure" occurs when information is "disseminated." *123 F.3d at 939.*

n6 Although the majority cites *Doe* to support its position, the case ostensibly cuts against the majority's position in that it holds that "allegations of fraud are publicly disclosed when they are placed in the 'public domain'" *Doc, 960 F.2d at 322.* Here, there is nothing to show that while HCFA records were "publicly available," they were "placed in the public domain" by the government.

**[*20]**

Accordingly, the HCFA records at issue in this case should not qualify as public disclosures. In interpreting the FCA, this Court must begin with the language of the statute itself. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 64 L. Ed. 2d 766, 100 S. Ct. 2051 (1980).* As the Seventh Circuit has observed, the term "disclosure" means "opening up to view, revelation, discovery, exposure." *Bank of Farmington, 166 F.3d at 860* (quoting 4 Oxford English Dictionary 738 (2d ed. 1989)). Moreover, the term "public" means "open to general observation, sight, or cognition, . . . manifest, not concealed." *Id.* (quoting 12 Oxford English Dictionary 780 (2d ed. 1989)). Under the plain meaning of the statute, information that is potentially accessible to the public is not in fact publicly disclosed. Here, the records were "only potentially in the public eye," as there is no evidence that the government disclosed them generally to the public or that some other individuals actually saw them.

Beyond the plain meaning of a statute, this Court must further consider "the design of a statute as a whole and . . . its object and policy." **[*21]** *Crandon v. United States, 494 U.S. 152, 158, 108 L. Ed. 2d 132, 110 S. Ct. 997 (1990).* To construe the FCA jurisdictional bar so as to include records that are "public" in the sense that any individual might have obtained them would defeat the purpose of the statute. Because the FCA prevents attempts to get the government to pay false or fraudulent claims, it is extremely likely that any FCA case will involve a consideration of records, made publicly available by the government, that detail the government's transactions. Without such records, it would be extremely difficult, if not impossible, to show that a defendant cheated the government. By treating such records as "public disclosures," the majority bars qui tam plaintiffs who, in accordance with the statute, set out to expose fraud by seeking records to make a case, instead of plaintiffs who let the government analyze its own records to discover fraud and who then feed off that analysis. Instead of discouraging parasitic behavior, the majority's interpretation "deter[s] diligence in uncovering fraud." *Bank of Farmington, 166 F.3d at 861.* I therefore disagree with the majority and would find that **[*22]** the HCFA records upon which Plaintiff has relied were not "public disclosures" barred by the FCA.

**B. "Allegations or Transactions" in a Hearing, Audit, or Investigation**

Although the majority asserts in passing that "it is undisputed that the report is the result of an administrative investigation," Plaintiff clearly disputes the fact when she challenges the existence of an FBI report reflecting an investigation into the fraud she alleged, and when she argues that the district court erroneously concluded she based her complaint upon an investigative report. n7 Although the majority assumes that the HCFA records constitute a report "that is the result of an administrative investigation," there is no evidence to support this, as the record is devoid of anything indicating that the HCFA conducted any kind of a hearing, audit or investigation before generating or printing out the records in question. Moreover, the record contains a copy of the subpoena that Plaintiff used to obtain the HCFA records, which makes clear that Plaintiff sought "documents, computer reports, [and] electronic data representing payments from 1989 to the present related to any Medicare payments for out **[*23]** patient testing or patient admission testing that were made to [Defendants] within 72 hours of admission," and

not the fruits of a government hearing, audit, or investigation.

n7 While the district court found that Plaintiff based her complaint on an FBI report that resulted from the investigation into the scheme she reported to Agents Kosky and Cronin, there is no evidence in the record to support the conclusion that the HCFA records upon which Plaintiff relies are the fruits of an FBI investigation. Contrary to the assumption of the district court, Plaintiff neither subpoenaed nor relied on a copy of any FBI report.

Moreover, it is important to keep in mind that "courts sometimes speak loosely of barring a qui tam suit because it is based on 'publicly disclosed information.' But the Act bars suits based on publicly disclosed 'allegations or transactions,' not information." *Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir. 1992).* In *Springfield,* the D.C. Circuit agreed with the Ninth Circuit **[*24]** that the FCA does warrant a distinction between mere information that is publicly disclosed, and "allegations or transactions" that are publicly disclosed *See Springfield, 14 F.3d at 653.* Recently, this Court adopted the reasoning of *Springfield,* observing that disclosed information that does not "create an inference of impropriety" does not allege fraud so as to constitute an "allegation or transaction" forming the basis of a relator's complaint. *Horizon Healthcare, 160 F.3d at 331-32.* As this Court recognized, the "allegations and transactions" requirement of the FCA jurisdictional bar does not apply in cases where the disclosed information does not "suggest an inference of wrongdoing or bad faith," or where the disclosed information presents a true state of facts but not a misrepresented state of facts. *Id.* While the HCFA records in this case certainly constitute information, they alone do not illustrate a fraud perpetrated by Defendants, and do not constitute "allegations and transactions."

By overlooking this Court's prior decisions, the majority erroneously concludes that the HCFA records in this case were allegations and transactions **[*25]** resulting from a government investigation. *Horizon Healthcare* followed *Springfield* in setting forth an equation in which X stands for a misrepresented state of facts, Y stands for a true state of facts, and their sum, Z, stands for an allegation of fraud. *See id.* Application of this equation accords with the fact that "the entire qui tam regime is premised on the idea that the government's knowledge of misrepresented claims against the federal fisc (without knowledge that they are misrepresented) does not in itself translate into effective enforcement of the laws against fraud." *Springfield, 14 F.3d at 656.* Thus, while the government possesses certain knowledge, a legitimate qui tam relator may come forward with information to show that the government's knowledge is based on misrepresentation and fraud or that the false claims were knowingly submitted to the government, information the government did not possess.

Here, the HCFA records set forth a true state of facts: bills actually submitted by Defendants to the Government for reimbursement under various federally funded healthcare programs. However, they lack information about the misrepresentations **[*26]** alleged by Plaintiff: the intentional creation of a fraudulent billing system under which Defendants assigned duplicate accounts to patients who received pre-admission services within three days of inpatient admission. The HCFA records, on their face, do not disclose any impropriety or bad faith; they merely set forth a list of billings by Defendants. Rather, it is Plaintiff that supplies the knowledge element of the fraud. n8 Indeed, the FCA prohibits the false presentation of claims or the making or use of false records in billing the United States when such actions are knowing. n9 *See 31 U.S.C. § § 3729*(a)(1)-(2) (1994). While Plaintiff borrowed the X of her complaint by relying on the HCFA records, she herself supplied the Y of the equation to allege Z, a fraud upon the Government.

n8 While Plaintiff only generally alleges that every one of the Defendants knowingly submitted bills to the government in violation of the "three-day rule," that should not determine whether Plaintiff can clear the jurisdictional hurdle of the FCA. Rather, deficiencies in the specificity of Plaintiff's allegations go to the sufficiency of her complaint under the Federal Rules of Civil Procedure. **[*27]**

n9 Under the FCA, a defendant "knowingly" presents a false claim to the government if he (1) has actual knowledge of the false or fraudulent information presented; (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information. *See 31 U.S.C. § 3729*(b) (1994).

Under the facts of the present case, even if the HCFA records qualify as a "public disclosure" under the

FCA, they do not constitute a "public disclosure of allegations and transactions" upon which Plaintiff bases her complaint because Plaintiff added to the HCFA records evidence of intent, an essential element of an FCA violation. Thus, this case differs from those in which "all of the material elements of the fraudulent transaction are already in the public domain and the qui tam relator comes forward with additional evidence incriminating the defendant." *Springfield, 14 F.3d at 655.* Consequently, even if the HCFA records could be characterized as "public disclosures," they were not allegations or transactions **[*28]** preventing Plaintiff from bringing her qui tam action.

**C. "Original Source"**

Although the FCA jurisdictional requirements should not bar Plaintiff because she did not base her complaint upon publicly disclosed allegations or transactions, the FCA would not bar Plaintiff's complaint in any event because she is an "original source" of the information she cites in her complaint. The Sixth Circuit has determined that an individual must possess "direct and independent knowledge" to qualify as an "original source." *See McKenzie, 123 F.3d at 943.* However, we have never stated whether a relator must posses a certain nature and quantity of information in order to have "direct and independent knowledge" of her allegations. In *McKenzie*, this Court simply noted that "direct" means "first-hand knowledge" and that "independent" means that "the information known by the relator does not depend or rely on the public disclosures." *Id. at 942* (citing *United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 690 (D.C. Cir. 1997)).*

Under a plain interpretation of the term, it seems that "direct" knowledge is that "gained by **[*29]** the relator's own efforts and not acquired from the labors of others." *United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1006-07 (10th Cir. 1996).* And, "independent" knowledge is that which is not "derivative of the information of others, even if those others may qualify as original sources." *Id. at 1007.* As the D.C. Circuit has noted, "Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the qui tam relator for suits to proceed." *Springfield*; *14 F.3d at 649.* Thus, under a fair reading of the provision, a qui tam relator need not have direct and independent knowledge of every ingredient of a fraudulent transaction--she need only possess "direct and independent knowledge of any essential element of the underlying fraud transaction (e.g., Y)." *Id.* at 656-57.

Plaintiff qualifies as an "original source" under the FCA as to her claim against Mercy-Anderson. To the extent that she alleges misrepresentation in her complaint, her knowledge is both direct and independent. Although the majority asserts in passing that Plaintiff "failed to demonstrate **[*30]** that, aside from the HCFA report, she has first-hand knowledge of instances in which defendants knowingly presented false claims," Plaintiff pled that she obtained her knowledge by witnessing admissions practices at Mercy-Anderson as they related to Defendants' billing procedures, and by being in a position to receive the memorandum detailing system of assigning duplicate patient numbers and creating duplicate patient accounts that she alleges she received. While evidence of particular accounts Defendants billed to the government decidedly comes from the HCFA records, Defendants point to no other source for Plaintiff's information about an intentional false billing scheme, and the record reveals no other source for this information. Thus, Plaintiff was an "original source" entitled to bring a qui tam action under the FCA.

**III. RULE 9(b)**

Consequently, the majority errs in holding that the present action lacked subject matter jurisdiction under the FCA. However, the majority also concludes that Plaintiff failed to plead fraud with particularity as required by *Rule 9(b) of the Federal Rules of Civil Procedure.* I agree that Plaintiff failed to plead fraud with particularity as **[*31]** to almost all Defendants, because Rule 9(b) does not permit a plaintiff to allege fraud "by indiscriminately grouping all of the individual defendants into one wrongdoing monolith." *Lubin v. Sybedon Corp., 688 F. Supp. 1425, 1443 (S.D. Cal. 1988).* Rather, a plaintiff alleging fraud must establish a connection between fraudulent acts or statements and each defendant, or must establish facts that inform each defendant of its participation in the fraud. *See Rohland v. Syn-Fuel Assocs., 879 F. Supp. 322 (S.D.N.Y. 1995); Kriendler v. Chemical Waste Management, 877 F. Supp. 1140 (N.D. Ill. 1995).* Although Plaintiff failed to meet Rule 9(b) requirements in her allegations against most of the named Defendants, she adequately pled fraud with particularity as to Mercy-Anderson. Thus, I dissent from the dismissal of this case against Mercy-Anderson.

When applying the Rule 9(b) requirement that a plaintiff plead fraud with particularity, "a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8. Rule 8 calls for a 'short and plain statement of the claim.'" n10 *Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674, 679 (6th Cir. 1988).* **[*32]** In *Ameritrust*, this Court observed that the purpose of the particularity requirement of Rule 9(b) is to provide fair notice to a defendant of the nature of a plaintiff's claim, and that placing exclusive emphasis on the "particularity" requirement of Rule 9(b) would constitute too narrow an approach. *See id.* As a general

rule, plaintiffs must allege the time, place, and content of the fraud, and must identify the parties who allegedly participated in the fraud. *See id.*

n10 Rule 8 provides, in relevant part, that a complaint should include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2).*

Plaintiff met the requirements of Rule 9(b) insofar as her pleading gave fair notice to Mercy-Anderson of her allegations of fraud. By incorporating into her amended complaint the specific facts that the HCFA records provided, Plaintiff set forth the years during which billing in violation of the "three-day rule" took place at Mercy-Anderson, and states, **[*33]** to the extent possible, which billings violated the rule. Plaintiff has also provided the names of individuals in the Mercy-Anderson billing department that were involved in the false billing. Although Plaintiff has not given the names of patients or their identification numbers, especially where there has been no discovery, courts should remain reluctant to dismiss "where the facts underlying the claims are within the defendant's control." *Id. at 680.* It appears that Defendants possess and control information on the identities of these patients, and can likely ascertain more on those patients with the information Plaintiff has provided.

**IV. CONCLUSION**

Consequently, I agree with the majority that the district court properly dismissed Plaintiff's claims as to all but one of the Defendants, because Plaintiff did not plead fraud with particularity as to those Defendants. However, because Plaintiff did establish subject matter jurisdiction for her qui tam action and did allege facts establishing that Mercy-Anderson knowingly created false records and submitted false bills to the government sufficient to meet the Rule 9(b) requirement of identifying the time, place **[*34]** and content of such billings and the individuals involved in the fraud, I dissent from the majority's decision to affirm the dismissal of Plaintiff's action against Mercy-Anderson.

# EXHIBIT G

**Bob Carr, et al., Plaintiffs, -v- Countrymark Cooperative, Inc., et al., Defendants.**

**Case No. C-2-96-1246**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

***1998 U.S. Dist. LEXIS 23000***

**January 29, 1998, Filed**

**DISPOSITION:** **[*1]** Defendants' motions to dismiss (Docs. 11 and 23) GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant cooperatives filed a motion to dismiss plaintiff farmers' action under the Racketeer Influenced and Corrupt Organizations Act that alleged that the cooperative's contracts with the farmers violated federal commodities and securities laws.

**OVERVIEW:** The farmers filed an action against the cooperatives under the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § § 1961*-1968, based on predicate acts of mail and wire fraud. The farmers alleged that the contracts that they entered with the cooperatives violated federal commodities and securities laws. The cooperatives filed a motion to dismiss. The court found that the farmers failed to satisfy the standards for pleading predicate acts of mail or wire fraud. The farmers referred to the cooperatives collectively, without making any differentiation among them. Furthermore, the allegations regarding the mailings were very general. Also, the farmers failed to allege the existence of an enterprise separate and distinct from the culpable person. Finally, the farmers' allegations regarding investment injury were entirely conclusory and did not satisfy *Fed. R. Civ. P. 12(b)(6)*. Therefore, the cooperatives' motion to dismiss was granted.

**OUTCOME:** The cooperatives' motion to dismiss the farmers' action under the Racketeer Influenced and Corrupt Organizations Act was granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For BOB CARR, MATTHEW JEFFERS, CARL NIESE AND SONS FARM INC, JIM GRAY, BACON N BAKIN FARMS INC, MARVIN BERSCHET, STEVE HUSS, WAGNER FARM & SAWMILL, JAMES SMITH, plaintiffs: John Anthony Logan, Wright & Logan Co., L.P.A., Dublin, OH.

For BOB CARR, MATTHEW JEFFERS, CARL NIESE AND SONS FARM INC, JIM GRAY, BACON N BAKIN FARMS INC, MARVIN BERSCHET, STEVE HUSS, WAGNER FARM & SAWMILL, plaintiffs: Barry G Reed, Zimmerman & Reed, Minneapolis, MN.

For COUNTRYMARK COOPERATIVE INC, defendant: Jack Frederick Fuchs, Thompson Hine & Flory, Cincinnati, OH.

For BUCKEYE COUNTRYMARK INC, defendant: William Haston Dulaney, III, Dulaney, Engel & Phillips, Centerville, OH.

For BLANCHARD VALLEY FARMERS COOPERATIVE INC, defendant: Robert B Hollister, Oxley Malone Fitzgerald & Hollister, Findlay, OH.

For BLANCHARD VALLEY FARMERS COOPERATIVE INC, defendant: Wayne C Dabb, Jr, Cleveland, OH.

For BLANCHARD VALLEY FARMERS COOPERATIVE INC, defendant: Julie A Davenport, Dublin, OH.

For BLANCHARD VALLEY FARMERS COOPERATIVE INC, defendant: Barry G Reed, Zimmerman & Reed, Minneapolis, MN.

For CHAMPAIGN LANDMARK INC, **[*2]** defendant: Ray Allen Cox, Cox, Ginger & Root, Dayton, OH.

For CLARK LANDMARK INC, GERALD GRAIN CENTER INC, CAIRO ELEVATOR CO, LUCKEY FARMERS INC, defendants: Michael G Sanderson, Toledo, OH.

**JUDGES:** GEORGE C. SMITH, JUDGE, UNITED STATES DISTRICT COURT. Magistrate Judge Abel.

**OPINIONBY:** GEORGE C. SMITH

**OPINION:**

**OPINION AND ORDER**

Plaintiffs in this putative class action are farmers who assert various claims arising from "hedge to arrive" contracts they entered into with defendants. Plaintiffs assert claims under the Racketeering Influenced and Corrupt Organizations Act, *18 U.S.C. § § 1961*-1968, and state common law. Plaintiffs seek damages, as well as declaratory relief under *28 U.S.C. § 2201.*

Defendants move to dismiss under *Fed. R. Civ. P. 12(b)(6).* For the reasons that follow the Court grants defendants motions. n1

n1 Defendants Clark landmark, Inc., Gerald Grain Center, Inc., Cairo Elevator Company, and Lucky Farmers, Inc. moved to dismiss on December 30, 1996 (Doc. 11). Defendant Countrymark Cooperative, Inc. moved to dismiss on January 16, 1997 (Doc. 23). The Complaint and Amended Complaint allege the same conduct by all defendants, and the motions raise essentially the same issues. The Court will therefore address the motions together.

**[*3]**

**I.**

Plaintiffs summarize their complaint as follows:

> Plaintiffs' claims, reduced to their simplest terms, are that the contracts with Defendants are in violation of federal commodities law, federal securities law, or both, and therefore are void and unenforceable. Plaintiffs contend that Defendants, through the actions of various employees, engaged in a pattern of conduct in marketing and administering these illegal contracts that violated federal RICO, wire and mail fraud statutes. Plaintiffs further contend that the contracts were unilaterally breached by the Defendants, and that Plaintiffs have suffered serious economic damages as a result.

Memo. in Opp. (Doc. 24) at 2 (footnote omitted).

Plaintiffs farm in Ohio. In 1994, defendants introduced "hedge to arrive" grain contract programs under various names, such as "Opportunity Plus," "Target Plus," "Premium Flex," and "Flex."

The hedge to arrive contracts were to allow farmers to market their crops and substantially reduce their risk from droughts, floods, blight, and the like. They did so by permitting farmers, at their sole discretion, to "roll" any crop year's obligations forward to another year for a **[*4]** small per bushel fee.

Plaintiffs assert that when grain prices began to rise, defendants, through various unilateral modifications of the contracts, effectively eliminated plaintiffs' right to roll their delivery periods. Plaintiffs contend that defendants' conduct transferred the risk of a short position in the futures market to plaintiffs.

**II.**

A motion to dismiss for failure to state a claim "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* All well-pleaded allegation must be taken as true and be construed most favorably toward the non-movant. *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).* A 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134, 155 (6th Cir. 1983).* The merits of the claims set forth in the complaint are not at issue on a motion to dismiss for failure to state a claim. Consequently, a complaint will **[*5]** be dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* if there is no law to support the claims made, or if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief. See *Rauch v. Day & Night Mfg. Corp., 576 F.2d 697, 700 (6th Cir. 1976).* Rule 12(b)(6) must be read in conjunction with *Fed. R. Civ. P. 8(a)* which provides that a pleading for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Wright & Miller, Federal Practice and Procedure § 1356 (1990). The

moving party is entitled to relief only when the complaint fails to meet this liberal standard. Id.

On the other hand, more than bare assertions of legal conclusions is required to satisfy the notice pleading standard. *Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988).* "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." Id. (emphasis in original, quotes omitted).

> "We are not holding the pleader to an **[*6]** impossibly high standard; we recognize the policies behind rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist."

Id. (quoting *O'Brien v. DiGrazia, 544 F.2d 543, 546 n.3 (1st Cir. 1976)*, cert. denied, *431 U.S. 914 (1977)).*

*Fed. R. Civ. P. 9(b)* provides in pertinent part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." General and conclusory allegations do not satisfy Rule 9(b). *Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489 (6th Cir. 1990).* Facts pleaded on "information and belief" do not fulfill the particularity requirement. Id.; Uni* *Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 924 (7th Cir. 1992).* Civil RICO claims based on alleged mail or wire fraud fall under Rule 9(b) and must be pleaded with particularity. *Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 390-91 (6th Cir. 1996);* **[*7]** *Eby v. Producers Co-op, Inc., 959 F. Supp. 428, 431 (E.D. Mich 1997).*

**III.**

The thrust of defendants motions to dismiss is that plaintiffs fail to state a viable RICO claim, that plaintiffs claim for declaratory relief does not establish a basis for federal jurisdiction, and that if the RICO claims are dismissed, the Court should decline to exercise supplemental jurisdiction over plaintiffs' remaining claims, which are brought under state law.

Plaintiffs purport to assert RICO claims under *18 U.S.C. § 1964*(c), § 1964(a), and § 1962(d).

**A. 1962(c)**

Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. § 1962*(c). The elements of a § 1962(c) claim are:

(1) conduct

(2) of an enterprise

(3) through a pattern

(4) of racketeering activity.

*Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 389 (6th Cir. 1996)* **[*8]** (citing *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)).* To establish racketeering, a plaintiff must allege a predicate act. Id. In the instant case, plaintiffs allege predicate acts of mail and wire fraud. (Amended Complaint, PP 74-79, 86).

Mail and wire fraud differ only in the medium used by the defendant. Both consist of "a scheme or artifice to defraud." *Kenty, 92 F.3d at 389.* In turn a scheme to defraud is "'intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender a right, and which accomplishes the designed end.'" *Id. at 389-90* (quoting *Bender v. Southland Corp., 749 F.2d 1205, 1216 (6th Cir. 1984).* Fraud in this context means misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension. *92 F.3d at 390.*

RICO claims based upon predicate acts of mail and wire fraud must be pleaded with particularity. *Id. at 390-91; Eby v. Producers Co-op, Inc., 959 F. Supp. 428, 431 (E.D. Mich 1997).* Loose references to mailing and telephone calls made **[*9]** in furtherance of a purportedly fraudulent scheme will not suffice. *Eby, 959 F. Supp. at 431* (citing *Jepson, Inc. v. Makita, 34 F.3d 1321, 1328 (7th Cir. 1994)).* Rather, to satisfy *Fed. R. Civ. P. 9(b)*, a plaintiff must make specific allegations as to which defendant made which telephone calls or mailings, and how each call or mailing furthered the fraudulent scheme. Id. A plaintiff must also plead with particularity the false statement the defendant made and upon which the plaintiff relied. *Kenty, 92 F.3d at 390.*

The Amended Complaint in the instant case fails to satisfy the above standards for pleading predicate acts of mail or wire fraud. First, plaintiffs refer to defendants collectively, without making any differentiation among them. Plaintiffs allegations as to the nature of the mailings and telephone calls is also in very general, undifferentiated terms.

Plaintiffs concede this, but urge the Court to grant leave to amend, suggesting that discovery would likely uncover facts to support a RICO claim:

> Plaintiffs have acknowledged that certain of their claims may require amendment. Specifically, amendment of the RICO, **[*10]** wire and mail fraud claims would be proper to allege additional specific facts. As Plaintiffs have indicated, the information necessary to permit accurate and detailed statements in the amended complaint is in the control of Defendants. Discovery on these issues is proper before Plaintiffs should be required to amend.

Pl. resp. (Doc. 44) at 20. The Court in Eby rejected the identical argument in a strikingly similar case, stating:

> Plaintiffs claim that they should not be required to plead with specificity because information is under the Defendant's control. In Berent v. Kemper *[Corp, 780 F. Supp. 431 (E.D. Mich. 1991),* aff'd, *973 F.2d 1291 (6th Cir. 1992)]* the court rejected a plaintiff's claim that they should be entitled to pursue discovery rather than comply with the requirements of Rule 9(b). The court quoted *NL Industries, Inc. v. Gulf & Western Industries, Inc., 650 F. Supp. 1115 (D. Kansas 1986)* : "[Rule 9(b)'s] requirement of greater specificity is intended to protect defendants from the harm that results from charges of serious wrongdoing, and to give defendants notice of the conduct complained of. Complaints alleging fraud should seek redress for a wrong, rather than attempt to uncover unknown wrongs." *Berent, 780 F. Supp. at 448-449,* quoting *NL Industries, Inc., 650 F. Supp. at 1129-30.*

*959 F. Supp. at 431.* The reasoning of Eby is sound, and the Court likewise rejects plaintiffs' argument in the instant case.

A RICO claim under § 1962(c) also requires proof of the existence of an enterprise separate and distinct from the culpable person. *Davis v. Mut. Life Ins. Co., 6 F.3d 367, 377 (6th Cir. 1993); Shonac Corp. v. AMKO Int'l, Inc., 763 F. Supp. 919, 939 (S.D. Ohio 1991).* Defendants contend that plaintiffs fail to allege a separate person and enterprise. n2 Plaintiffs do not attempt to refute this. Indeed, plaintiffs acknowledge that this aspect of their complaint is deficient (Pl. resp. (Doc. 44) at 12), but go on to suggest that the Court should allow amendment after discovery (Pl. resp. (Doc. 44) at 13). For reasons already stated, the Court will not allow discovery to proceed based on plaintiffs inability to plead their claims. *Eby, 959 F. Supp. at 431.*

n2 Although they do not rely upon it in their Memorandum Contra, in Count V plaintiffs also refer to the Chicago Board of Trade ("CBOT") as an enterprise. Plaintiffs do not, however, allege or explain how defendants "conducted" CBOT's affairs. Indeed, it is highly unlikely that the requirements of Rule 11 would permit plaintiff to allege that defendants managed or directed the affairs of CBOT. See *Stone v. Kirk, 8 F.3d 1079, 1091-92 (6th Cir. 1993).*

**B. 1962(a)**

Plaintiffs also purport to assert claims under *18 U.S.C. § 1962*(a). Defendants argue that plaintiffs fail to state such a claim because plaintiffs fail to allege "investment injury."

Section 1962(a) states in part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or **[*11]** the activities of which affect, interstate or foreign commerce.

*18 U.S.C. § 1962*(a). The essence of a § 1962(a) claim is injury directly related to the investment or use of tainted money in the enterprise. *Eby, 959 F. Supp. at 432.* Section 1962(a) does not apply to injuries from the racketeering activity itself. Id. That is, to state a claim under § 1962(a), a plaintiff must allege a specific injury caused by investment of income into the racketeering enterprise, and this injury must be distinct from any

injuries arising from the underlying racketeering activity. *Vemco, Inc. v. Camardella, 23 F.3d 129, 132 (6th Cir. 1994);* see also *Craighead v. E.F. Hutton & Co., 899 F.2d 485, 494 (6th Cir. 1990)*(1962(a) claim requires "separate and traceable injury" stemming from defendants' alleged use or investment of illegally obtained income).

Plaintiffs allegations concerning investment injury are entirely conclusory and do not satisfy even the liberal standard of Rule 12(b)(6) and Rule 8(a). See Amended Complaint, PP 90, 91. Plaintiffs do not even address defendants' argument that their § 1962(a) claims **[*12]** are deficient. The Court finds that plaintiffs' § 1962(a) claims are subject to dismissal for failure to state a claim upon which relief can be granted.

**C. 1962(d)**

Section 1962(d) prohibits conspiracies to violate § § 1962(a), (b), or (c). Inasmuch as plaintiffs fail to state a claim under § § 1962(a) or (c), it follows that they cannot assert a claim under § 1962(d).

Based on the above, the Court grants defendants' motions to dismiss plaintiffs' RICO claims, Counts V, VI, and VII of the Amended Complaint.

**IV.**

Having determined that plaintiffs fail to state a claim under RICO, the Court will next address whether plaintiffs' claim for declaratory relief provides a basis for federal jurisdiction. In Count I of their amended complaint, plaintiffs seek a judgment declaring that the HTA contracts are void or voidable because they violate the Commodity Exchange Act, *7 U.S.C. § § 1*-25 ("CEA"). n3 Defendants contend that plaintiffs' declaratory judgment claim cannot provide the basis for federal jurisdiction.

n3 Plaintiffs also make a passing and conclusory reference to federal securities law in P 50 of their amended complaint. The reference is so vague and conclusory that it cannot support a claim for relief.

**[*13]**

Although it is not entirely clear, plaintiffs appear to acknowledge that as currently pleaded Count I does not provide a basis for federal subject matter jurisdiction. Pl. resp. (Doc. 24) at 6-7 and Pl. resp (Doc. 44) at 8-9. It is well-established that the declaratory judgment statute does not confer federal jurisdiction. *Victor Foods v. Crossroads Economic Development, 977 F.2d 1224, 1227 (8th Cir. 1992).* A corollary principle is that a declaratory judgment claim does not "arise under" federal law where it presents only a federal "defense" to the defendant's impending or threatened state law action. *Franchise Tax Bd. v. Laborers Vacation Trust, 463 U.S. 1, 10, 16, 77 L. Ed. 2d 420, 103 S. Ct. 2841 (1983); City of Saginaw v. Ser. Emp. Intern. U., Loc. 446-M, 720 F.2d 459, 461 (6th Cir. 1983).*

Here, the reference to federal law in plaintiffs' declaratory judgment claim is no more than an anticipated defense to defendants' claims for breach of contract. n4 As such, plaintiffs' declaratory judgment claim does not provide a basis for federal jurisdiction.

n4 Plaintiffs aver that defendants have filed at least fifteen state court actions against plaintiffs and members of the putative class. Pl. mot. (Doc. 88) at 2.

**[*14]**

Once again, plaintiffs indicate that they will plead an affirmative claim for relief under the CEA if the Court grants them leave to file another amended complaint.

Though they have had ample time and opportunity to do so, plaintiffs have not attempted to provide the Court with a proposed amended complaint setting forth an affirmative claim under the CEA. n5

n5 Plaintiffs did, in fact, submit a proposed amended complaint, but later withdrew it. (Doc. 20, Doc. 67). As defendants correctly point out, the proposed amended complaint failed to plead any affirmative claims under the CEA.

Any CEA claim would be subject to the requirements of *Fed. R. Civ. P. 9(b).* See *Kolbeck v. LIT America, 923 F. Supp. 557, 568 (S.D.N.Y. 1996).* Absent any indication of what plaintiffs' proposed CEA claim would look like, the Court is not inclined to grant leave to amend.

More significantly, recent decisions in other federal courts show that allowing plaintiffs to amend to assert a CEA claim would be futile. See **[*15]** *In re Grain Land Coop Cases, 978 F. Supp. 1267, 1277 (D. Minn. 1997)*(thoroughly discussing CEA, and holding that hedge-to-arrive contracts are forward contracts excluded from regulation under the CEA); Bunker v. Farmers Elevator Co. of Hopkins, No. 97-0137-CV-W-SOW (W.D. Mo. Sept 18, 1997) at 14 (same);see also *Brown v. North Central, F.S., Inc., 987 F. Supp. 1150, 1997 WL 797762 (N.D. Iowa 1997)*(not addressing issue whether CEA governs hedge-to-arrive contracts, but holding that

after amendment plaintiffs still failed to plead CEA claim with requisite particularity).

For the above reasons, the Court holds that plaintiffs' declaratory judgment claim does not provide a basis for federal jurisdiction, and declines to allow plaintiffs leave to amend to assert an affirmative claim under the CEA.

**V.**

Plaintiffs' federal claims are subject to dismissal under *Fed. R. Civ. P. 12(b)(6)*. In the circumstances this case presents, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims. *28 U.S.C. § 1367*(c)(3); *United Mine Workers v. Gibbs, 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).* **[*16]**

**VI.**

Based on the above, the Court **GRANTS** defendants' motions to dismiss (Docs. 11 and 23).

The Clerk shall enter a final judgment in this case, in favor of defendants, and against plaintiffs, dismissing plaintiffs' RICO and declaratory judgment claims with prejudice, and dismissing plaintiffs' state law claims without prejudice.

The Clerk shall remove this case from the Court's pending cases and motions lists.

**IT IS SO ORDERED.**

**GEORGE C. SMITH, JUDGE**

**UNITED STATES DISTRICT COURT**

# EXHIBIT H

**AIG AVIATION, INC., Plaintiff-Appellee (96-1503), Cross-Appellant (96-1563/1582) v. BOOROM AIRCRAFT, INC., et al., Defendants/Cross-Appellees (96-1563/1582), RICHARD L. FARRELL, Defendant-Appellant (96-1503), Cross-Appellee (96-1563/1582).**

**Nos. 96-1503/96-1563/96-1582**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

***142 F.3d 431; 1998 U.S. App. LEXIS 2143***

**February 11, 1998, Filed**

**NOTICE: [*1]** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1998 U.S. App. LEXIS 16027*.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN. 92-76167. Hood. 4-2-96.

**DISPOSITION:** Verdict against Farrell AFFIRMED, case REMANDED for a new trial on the RICO damages, and for an amendment of the judgment to reflect the defendants' joint and several liability.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant individuals and corporations appealed from the United States District Court for the Eastern District of Michigan, which found them liable to plaintiff insurer under the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1961* et seq., and parallel state laws for certain peculations. The insurer also appealed from the district court's judgment to the extent that it only awarded damages on the state law claims.

**OVERVIEW:** An insurer brought claims against individuals and corporations under RICO, as well as parallel state laws, on charges that included conspiracy to falsify insurance claims, falsifying and approving inadequate bids, and inflating repair costs. A jury found for the insurer on all counts, but awarded damages only on the state law claims. The jury also awarded damages in different amounts as against the individuals. The individuals and corporations filed a motion for a new trial and for judgment notwithstanding the verdict, and the insurer filed a motion to amend or alter the judgment and for a new trial. The district court denied all motions. On appeal, the court affirmed the judgment against the individuals and corporations, but remanded for a new trial on damages and for an amendment of the judgment. Specifically, the court rejected the arguments raised on appeal by the individuals and corporations, held that the district court erred in not readjusting the judgment to reflect the defendants' joint and several liability, and concluded that because the jury had found injury to the insurer, a new trial on the issue of RICO damages was required.

**OUTCOME:** The court affirmed the judgment against the individuals and corporations, but remanded for a new trial on damages and for an amendment of the judgment. Specifically, the court held that the district court had erred in not readjusting the judgment to reflect the defendants' joint and several liability and concluded that because the jury had found injury to the insurer, a new trial on the issue of damages on the federal law claims was required.

**LexisNexis(R) Headnotes**

**COUNSEL:** For AIG AVIATION, INC., Plaintiff - Appellee, Cross-Appellant (96-1503): Patrick L. Rose, Lansing, MI.

For AIG AVIATION, INC., Plaintiff - Appellee, Cross-Appellant (96-1503): David W. Moore, Troy, MI.

For BOOROM AIRCRAFT, INC., et al, Defendants (96-1503): John D. Baker, Baker & Glaser, Adrian, MI.

For RICHARD L. FARRELL, Defendant - Appellant, Cross-Appellee (96-1503, 96-1563), Pro se, Skokie, IL.

For AIG AVIATION, INC. (96-1563, 96-1582): Patrick L. Rose, Lansing, MI.

For AIG AVIATION, INC. (96-1563, 96-1582): Mark Granzotto, Detroit, MI.

For **[*2]** AIG AVIATION, INC. (96-1563, 96-1582): David W. Moore, Troy, MI.

For BOOROM AIRCRAFT, INC., et al (96-1563, 96-1582): John D. Baker, Baker & Glaser, Adrian, MI.

RICHARD L. FARRELL (96-1582), Pro se, Skokie, IL.

**JUDGES:** Before: KEITH, BOGGS, and NORRIS, Circuit Judges.

**OPINION:**

PER CURIAM. Richard Farrell and his co-defendants were found liable to AIG for certain peculations after a jury trial in April 1995. Farrell filed a motion for a new trial and for a judgment notwithstanding the verdict, and AIG filed a motion for judgment as a matter of law, to amend or alter the judgment, and to have a new trial. The district court denied both parties' motions, and both parties have appealed. We affirm in part and remand.

**I**

AIG filed a complaint against Mikel Boorom, n1 Richard Farrell, and several corporations associated with the men. The complaint had six federal claims, under the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C. § 1961 et seq.*, and eleven parallel state-law claims. n2 The allegations arose out of a course of conduct by Boorom and Farrell in the late 1980s and early 1990s. Farrell became a claims manager for AIG in 1985, with responsibilities **[*3]** that included supervising the investigation of aircraft accidents, overseeing the bidding for damaged aircraft, and issuing settlement checks. He had a duty to seek out the best bids for damaged aircraft and to act in the interests of AIG. The complaint charged that Farrell conspired with Boorom and falsified insurance claims, falsified and approved inadequate bids, inflated repair costs, and converted the money and property of AIG.

n1 Boorom has not appealed, or participated in the cross appeal by AIG, apparently because he has filed for bankruptcy.

n2 The claims were labeled as: conversion, fraud, negligence, conspiracy, fraudulent concealment, "equitable relief," insurance fraud, "goods sold and delivered," "monies paid by mistake," negligent and innocent misrepresentation, and breach of fiduciary duty.

A jury found for AIG on all counts. On the state claims, the jury awarded damages of $ 285,100 against Farrell and $ 81,500 against Boorom (the latter to be reduced by a $ 60,000 counterclaim that Boorom **[*4]** won against AIG). On the RICO claims, the jury specifically found that the defendants were liable and that their actions had caused damages for AIG, but the jury set the amount of damages at $ 0. Farrell and AIG filed respective unsuccessful motions challenging the verdict, then filed timely appeals.

**II**

Farrell raises two issues on appeal First, he argues that a pre-trial temporary restraining order (TRO) and preliminary injunction entered against him was improper, and that it prevented him from presenting a full defense. Second, he challenges discovery decisions made by the magistrate judge and upheld by the district court. Farrell rests his appeal entirely on the claim of prejudice resulting from the injunction and the discovery decisions. He raises no other challenge to the sufficiency of the evidence supporting the jury verdict against him.

A

AIG included a request in the original complaint for an order preventing the defendants from transferring any of their assets without court approval. The district court granted a TRO forbidding the defendants from, among other things, using any of their then-current assets. The court also ordered the defendants to show cause why **[*5]** the TRO should not be converted into a preliminary injunction during the pendency of the suit. Boorom resolved this matter with AIG, but Farrell filed a motion for dissolution or modification of the TRO. The district court denied Farrell's motion, noting that: (1) Farrell's wife had a $ 30,000 bank account and $ 3,000 a month in

income; (2) Farrell himself had a new job that yielded $ 1,000 a month; and (3) the Farrells' ordinary living expenses were $ 2,000 per month. The court modified the preliminary injunction to allow Farrell access to $ 1,000 per month for living expenses. It had previously released $ 5,000 in a lump sum. Subsequently, during pre-trial proceedings, the district court allowed additional special disbursements to Farrell.

Farrell later filed another motion to modify the preliminary injunction, claiming that he needed more money per month and that he needed a lump sum to pay a tax liability. The court rejected his motion, because he did not raise his arguments at the earlier proceeding, because he provided no proof of his claims, and because allowing him to withdraw more money would defeat the purpose of the injunction (to make sure that if AIG won there would be **[*6]** money left to satisfy the judgment). At that point, Farrell stopped contesting the injunction. He did not file an interlocutory appeal.

Farrell argues strenuously that the preliminary injunction, by freezing his assets, prevented him from mounting an effective defense. He also complains that the TRO and injunction were based on insufficient evidence, and on a faulty application of the standards established by law.

As a preliminary matter, the evidence supporting the TRO and injunction, though somewhat thin, was not wholly inadequate. At the hearing on the preliminary injunction, Farrell did not contest the evidence with anything other than his own conclusory statements; although there was no verified evidence supporting AIG other than an affidavit, Farrell offered no verified evidence of his own to contradict it. The affidavit upon which Farrell alleges the TRO was based is relatively sparse, relying almost entirely "upon information and belief," but does state, not merely upon information and belief, that Farrell had gone to the Cayman Islands recently and that there was a pending criminal investigation of him.

The issuance of a preliminary injunction is reviewed for abuse of discretion. **[*7]** *CSX Transportation, Inc. v. Tennessee State Bd. of Equalization, 964 F.2d 548, 552 (6th Cir. 1992).* The district court applied the appropriate factors in deciding to grant the preliminary injunction. Those factors are: "(1) the likelihood of plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction." *In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985).* The analysis for a TRO is similar. *See Procter & Gamble v. Bankers Trust Co., 78 F.3d 219, 226 (6th Cir. 1996)* (citing *Mason County Medical Ass'n v. Knebel, 563 F.2d 256, 261 (6th Cir. 1977),* a preliminary injunction case, as applying to TROs).

First, on likelihood of success, the court noted that Farrell provided no reason to question the extensive and relatively detailed allegations made by AIG. Next, on irreparable harm, the court found that there was a risk that Farrell would dispose of all of the money that AIG sought to have placed in a constructive trust -- once Farrell spent all of the allegedly ill-gotten money, there would be no money **[*8]** left to vindicate AIG's claims. Third, on balancing of harms, the court noted that because Farrell's new job did not pay enough to cover his expenses, he should be allowed $ 1,000 per month. This adjustment covered all of Farrell's expenses that had been represented to the court. Finally, on the public interest, the court cited the two sides' arguments -- Farrell's that he needed the money to defend himself, and AIG's that Farrell was a known swindler -- and concluded that the factors weighed against Farrell.

The court acted reasonably here, and certainly not in abuse of its discretion. Although Farrell was harmed by the preliminary injunction, the purpose of it -- to allow a victory by AIG to be meaningful -- was sound, and the district court did not abuse its discretion in holding that any harm to Farrell was sufficiently outweighed.

B

Farrell's other claim on appeal concerns a pre-trial discovery dispute, beginning with the decision of a magistrate judge to deny one of Farrell's motions to compel discovery. Farrell sought a rehearing of the magistrate's decision, which the magistrate denied. Farrell filed objections to this denial, but the district court rejected the motion. **[*9]** It appears from the record, however, that Farrell obtained most or all of the materials that he sought. Indeed, this was one of the reasons his motions were denied. Farrell gives no specific explanation on appeal of what information he was unable to obtain, or how this prejudiced him. We will not reverse the judgment on these grounds.

**III**

AIG raises two issues on cross-appeal. First, it argues that both Boorom and Farrell should be held jointly and severally liable, not separately liable. Second, AIG argues that the district court should have awarded a judgment notwithstanding the verdict on the RICO counts, because the jury awarded no damages on those counts.

A

AIG is correct that, under Michigan law, "the liability of conspirators to civil damages is joint and several." *Brown v. Brown, 338 Mich. 492, 61 N.W.2d*

*656, 662 (Mich. 1953); see Warsop v. Cole, 292 Mich. 628, 291 N.W. 33, 35 (Mich. 1940). Cf. Donajkowski v. Alpena Power Co., 219 Mich. App. 441, 556 N.W.2d 876 (Mich. App. 1996)* (recently applying Michigan contribution statute to joint intentional tortfeasors). One of the counts on which the defendants were convicted was a state-law conspiracy count, and **[*10]** the other counts related back to the conspiracy, so it is appropriate to consider the defendants as co-conspirators and to impose joint and several liability.

The jury was instructed that conspirators are liable for all acts of the conspiracy, but returned judgments against both men for separate amounts of money. As this court has held in a similar case:

> It is well settled that the liability of conspirators is a joint and several liability. . . . Under Rule 49(a), Rules of Civil Procedure, the trial judge is authorized to submit to the jury special findings of fact which might properly be made under the pleadings and evidence, together with such explanation and instructions concerning the matter as may be necessary to enable the jury to make its findings upon each issue. The separate verdicts in this case are merely factual findings. They do not constitute the law of the case. The trial judge has the responsibility of applying appropriate legal principles to the facts found by the jury. . . . The manner in which those factual findings are used in formulating and entering the final judgment is a question of law for the Court.
>
> The trial judge was accordingly authorized to enter **[*11]** an appropriate judgment based upon these findings and the legal principles applicable thereto. Since as a matter of law the liability of conspirators is joint and several, and not separate, the joint and several judgments were properly entered.

*Solomon v. United States, 276 F.2d 669, 675-76 (6th Cir. 1960)* (emphasis added; citations omitted). The district court should have applied the proper law to the verdicts and converted the separate judgments into one judgment of joint and several liability. We remand the case so that the district court can do so now.

B

Despite its finding that the defendants violated RICO, and that AIG was damaged by that violation, the jury awarded AIG no damages on the RICO counts. The district court concluded that "the jury apparently found that Plaintiff was not entitled to damages for its injury." However, since the jury found that AIG was damaged, and since it carefully calculated those damages on the parallel state claims, it seems more likely that the jury calculated the full amount of the damages it considered appropriate and awarded all the damages on the state claims, awarding nothing on the RICO claims so as to prevent a double recovery. **[*12]**

The Seventh Circuit has ruled on this very question:

> [A] plaintiff injured by RICO violations deserves complete recovery. A finding of liability for violations of RICO is conspicuously inconsistent with an assessment of zero damages for those violations since the jury was required to find that the class suffered an injury to business or property before finding [the defendant] liable. The jury's damage assessment is made more remarkable because the jury awarded the class over $ 600,000 in damages for the CFA [Consumer Fraud Act] claim. Both the RICO claims and the CFA claim were supported by identical facts; thus, it seems that the facts must support some actual damages award for the RICO claims. . . . We emphasize that we are not reversing the trial court's denial of the class' motion for new trial on damages simply because we believe the damages for the RICO counts were inadequate. The jury did not award even nominal damages on the RICO counts.

*Rosario v. Livaditis, 963 F.2d 1013, 1020-21 (7th Cir. 1993).*

The Fifth Circuit has made a similar holding, although not in the RICO context:

> . . . . We can find no view that reconciles the jury's damage awards **[*13]** under the section 1983 and contractual-interference tort claims with the zero damage award under the antitrust claim.
>
> VIP tried this case as one set of facts demonstrating a single injury for which the jury could find liability under any one or all of three theories. . . . Thus, one

> would expect the jury's respective damage awards to be virtually the same. The jury's lopsided apportionment of damages therefore makes us think it likely that the jury decided the total amount it wished to award and apportioned it among the theories, rather than awarding duplicative damages on each separate theory in approximately the same amount.

*Video Int'l Production, Inc. v. Warner-Amex Cable Communications, Inc., 858 F.2d 1075, 1085-86 (5th Cir. 1988).* The Fifth Circuit was particularly concerned that the jury had divided one total among the three claims, because the claim that represented the bulk of the damages awarded was reversed on appeal. *Id. at 1086.*

In cases like this, where parts of the verdict are inconsistent, "we look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case." *Tipton v. Michelin Tire Co.,* **[*14]** *101 F.3d 1145, 1148 (6th Cir. 1996)* (overturning jury verdict for plaintiff on negligence count, when jury had found for defendant on strict liability count). Accordingly, we have three choices. First, we can view the jury's intent here as the Fifth and Seventh Circuits did in their analogous cases, and assume that the jury meant to find liability but was attempting to avoid a double recovery -- this would lead us to remand for a trial on damages only. Second, we can affirm the district court and decide that the jury did not mean to hold that AIG had been damaged, so that the figure of $ 0 was correct. Third, we can determine that neither resolution is reasonable and remand for a new trial on both liability and damages.

The present case combines factual aspects of the two cases cited above. As in *Rosario*, the jury failed to award even nominal damages, even though it simultaneously awarded substantial damages on parallel claims stemming from identical facts. As in *VIP*, the jury made only one award and split it unevenly between alternative bases of recovery that rested on the same set of facts.

The jury found the defendants liable for both the RICO claims and the parallel state **[*15]** claims. It then calculated damages for the state claims. Were it not for this fact -- that the jury ably calculated the damages that resulted from the very same actions by the defendants -- we could agree with the district court that "the jury apparently found that Plaintiff was not entitled to damages for its injury." But the jury told us what it believed when it awarded precise damages on the state claims.

The most "reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case" is thus that the jury believed that the defendants were liable for their actions, on both state and federal theories, and that the damages from these actions totaled $ 366,600. The jury then declared specifically that there were damages from the RICO violation, but, incorrectly fearing a double recovery, it fixed the amount of damages at zero. Because the jury was inconsistent, and apparently said something different than what it meant, we remand for a new trial, limited to the determination of RICO damages.

We note that there is no reason for the jury or the district court to fear a double recovery. Just as these are alternative claims, the damages are alternative **[*16]** as well; AIG will recover the larger of either the state-claim damages or the RICO damages. *See, e.g., Interpool Ltd. v. Patterson, 1994 U.S. Dist. LEXIS 16897, No. 89 Civ. 8501, 1994 WL 665850*, at *3 (S.D.N.Y. Nov. 28, 1994) (maximizing recovery on alternative theories of liability, but avoiding double recovery); *Thompson v. Paasche, 1989 U.S. Dist. LEXIS 17754, No. G86-09-CA, 1989 WL 160623* (W.D. Mich. July 13, 1989) (determining that larger of alternative bases of recovery should be awarded), *rev'd in part on other grounds, 950 F.2d 306 (6th Cir. 1991); see also Bingham v. Zolt, 66 F.3d 553, 564 (2d Cir. 1995)* ("The amount of compensatory damages awarded is not dependent on the number of theories that plaintiff alleges and under which it may recover."), *cert. denied 517 U.S. 1134, 134 L. Ed. 2d 543, 116 S. Ct. 1418 (1996).*

Under the treble-damage provision of *RICO, 18* U.S.C. § 1964(c), the larger is likely to be the RICO damages, which we presume is the reason that AIG is pursuing this issue. If the new jury believes (as the district court held the old jury believed) that AIG is not entitled to damages for its injury, it should award nominal damages, not none. In that instance, AIG will recover its state-law damages.

**IV**

For the foregoing reasons, **[*17]** the verdict against Farrell is AFFIRMED, but the case is REMANDED for a new trial on the RICO damages, and for an amendment of the judgment to reflect the defendants' joint and several liability.

# EXHIBIT I

**KONRAD ERIC POTH; FEROL A. POTH, in her capacity as Trustee of the Konrad Forrest Poth 2000 Trust, Plaintiffs-Appellants, v. CRAIG A. RUSSEY; DOUGLAS J. BETLACH; ROY D. TARTAGLIA; BRUCE A. NASSAU; WILLIAM M. SPRAGUE; V. MICHAEL FITZGERALD; RANDALL R. LUNN; CREST COMMUNICATIONS HOLDINGS, LLC; CREST COMMUNICATIONS PARTNERS, LP, Defendants-Appellees, and LAWRENCE J. TOOLE, Defendant.**

**No. 03-1308**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

***99 Fed. Appx. 446; 2004 U.S. App. LEXIS 5861***

**January 22, 2004, Argued**
**March 30, 2004, Decided**

**NOTICE: [**1]** RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. (CA-02-770-A). Gerald Bruce Lee, District Judge. *Poth v. Russey, 281 F. Supp. 2d 814, 2003 U.S. Dist. LEXIS 15813* (E.D. Va., 2003)

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a former shareholder and a trustee, sued defendants, officers, directors, affiliates, and other shareholders, alleging fraud and breach of fiduciary duty claims. The United States District Court for the Eastern District of Virginia, at Alexandria, dismissed the breach of fiduciary duty claim for lack of standing and granted defendants summary judgment as to the fraud claims. Plaintiffs appealed.

**OVERVIEW:** Pursuant to a merger agreement, a corporation acquired all of the voting stock of the former shareholder's telecommunications firm. The purchasing corporation failed to perform certain obligations under the agreement and subsequently declared bankruptcy. The former shareholder alleged that defendants fraudulently induced him to sell his stock and breached a fiduciary duty owed to him as the creditor of an insolvent company. The appellate court determined that defendants were entitled to summary judgment as to the fraud claims. A jury could not infer that defendants fraudulently intended not to perform certain promises when they entered into the agreement. The former shareholder did not reasonably rely on certain oral representations that directly contradicted the terms of notes. The former shareholder failed to raise a material fact as to the falsity of two statements. The appellate court determined that the former shareholder lacked standing to assert the breach of fiduciary duty claim because the claim was similar in object and purpose to a potential fraudulent conveyance claim that the bankrupt corporation's trustee in bankruptcy could bring.

**OUTCOME:** The appellate court affirmed the judgment of the district court.

**LexisNexis(R) Headnotes**

***Civil Procedure > Summary Judgment > Standards of Review***

[HN1] In an appeal from summary judgment in favor of the defendants, the appellate court states the facts in the light most favorable to the plaintiff, drawing all reasonable inferences from the evidence in his favor.

***Civil Procedure > Summary Judgment > Standards of Review***
[HN2] The appellate court reviews the grant of summary judgment de novo.

***Civil Procedure > Summary Judgment > Summary Judgment Standard***
[HN3] Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

***Civil Procedure > Summary Judgment > Standards of Review***
[HN4] In reviewing the district court's grant of summary judgment, the appellate court must construe the facts in the light most favorable to the non-moving party. In reviewing the evidence, the appellate court makes all reasonable inferences in favor of the non-moving party. The appellate court makes no credibility determinations, and the appellate court does not weigh the evidence.

***Securities Law > Bases for Liability > Deceptive Devices***
***Torts > Business & Employment Torts > Deceit & Fraud***
***Securities Law > Blue Sky Laws > Blue Sky Fraud***
[HN5] To state a claim for federal securities fraud, Virginia state law securities fraud, Virginia common law actual fraud, or Virginia common law constructive fraud, a plaintiff must show, among other requirements, that the defendant made a false statement of material fact on which the plaintiff reasonably relied. 17 C.F.R. § 240.10b-5 (2003).

***Securities Law > Bases for Liability > Deceptive Devices***
***Torts > Business & Employment Torts > Deceit & Fraud***
[HN6] Courts properly resist attempts to transfer breach of contract cases into fraud, and therefore fraud cannot ordinarily be predicated on unfulfilled promises or statements of future events.

***Torts > Business & Employment Torts > Deceit & Fraud***
[HN7] Misstatements or omissions regarding actual past or present facts are far more likely to be actionable as fraud than statements regarding projections of future performance. When a person enters into a contract, however, he implicitly states, as a matter of present fact, that he intends to perform his obligations under the contract. Thus, when a party makes a contractual promise but secretly intends not to perform that promise, his promise is a misrepresentation of present fact that is actionable as fraud.

***Securities Law > Bases for Liability > Deceptive Devices***
***Torts > Business & Employment Torts > Deceit & Fraud***
[HN8] In financial and securities matters, when a plaintiff claims to have relied on oral misrepresentations that are contradicted by later-received written documentation, the court evaluates the following eight factors to determine whether the plaintiff's reliance on the oral statements was reasonable: (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

***Torts > Business & Employment Torts > Deceit & Fraud***
[HN9] The mere failure to perform contractual obligations is not enough evidence for a jury reasonably to infer fraudulent intent on the part of the breaching party.

***Securities Law > Additional Offerings, Disclosure & the Securities Exchange Act of 1934 > Definitions***
[HN10] The term accredited investor is defined to include, among others, any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $ 1,000,000 and any natural person who had an individual income in excess of $ 200,000 in each of the two most recent years. 17 C.F.R. § 230.501(a) (2003).

***Civil Procedure > Appeals > Standards of Review > De Novo Review***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action***
[HN11] The appellate court reviews de novo a district court's dismissal of a claim for lack of subject matter jurisdiction.

***Bankruptcy Law > Estate Property > Debtor Interests***
[HN12] If a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim. The *11 U.S.C.S. § 541* estate includes any right of action the debtor corporation may have to recover damages for misconduct, mismanagement, or neglect of duty by a corporate officer or director. Creditors

similarly lack standing to bring causes of action that are similar in object and purpose to claims that the trustee could bring in bankruptcy, regardless of whether such claims are technically part of the estate of the bankrupt.

***Civil Procedure > Justiciability > Standing***
***Bankruptcy Law > Examiners & Trustees > Fraudulent Transfers***
[HN13] *11 U.S.C.S. § 548*(a) of the Bankruptcy Code allows a bankruptcy trustee to avoid fraudulent conveyances. It provides that the trustee may avoid an obligation if the debtor voluntarily or involuntarily incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. *11 U.S.C.S. § 548*(a). When a creditor brings a state-law challenge to a transaction that a bankruptcy trustee could avoid as a fraudulent conveyance, the state-law cause of action is so similar in object and purpose to the fraudulent conveyance claim that the creditor lacks standing to assert it.

***Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities***
[HN14] Ordinarily knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation.

**COUNSEL:** ARGUED: John Martin Wood, REED SMITH, L.L.P., Falls Church, Virginia, for Appellants.

Kathryn Cox Ellsworth, DEWEY BALLANTINE L.L.P., New York, New York, for Appellees Russey, Betlach, Tartaglia, Nassau, Sprague, Fitzgerald, and Lunn; Edward Scott Rosenthal, Alexandria, Virginia, for Appellees Crest Communications Holdings, L.L.C., and Crest Communications Partners, L.P.

ON BRIEF: Paul J. Waters, REED SMITH L.L.P., Falls Church, Virginia, for Appellants.

John F. Collins, DEWEY BALLANTINE L.L.P., New York, New York, for Appellees Russey, Betlach, Tartaglia, Nassau, Sprague, Fitzgerald, and Lunn.

**JUDGES:** Before NIEMEYER, WILLIAMS, and GREGORY, Circuit Judges.

**OPINION:** **[*448]** PER CURIAM:

This case is part of the fallout from a merger between two telecommunications firms that took place shortly before the stock market bubble burst in 2001. n1 On June 1, 2000, Viasource **[**2]** Communications, Inc. acquired all of the voting stock of Excalibur Cable Communications, Ltd. from Konrad Eric Poth and the other Excalibur shareholders pursuant to a merger agreement. When Viasource failed to perform some of its contractual obligations, Poth filed a claim against Viasource for breach of the merger agreement. That action was automatically stayed when Viasource subsequently filed for bankruptcy protection from its creditors. Poth then filed this action, alleging that he had been fraudulently induced to sell his stock in Excalibur by several of Viasource's officers, directors, and shareholders. n2 He also alleged that the Viasource defendants breached a fiduciary duty owed to him as the creditor of an insolvent company. The district court granted summary judgment to the Viasource defendants on Poth's fraud claims and dismissed the breach of fiduciary duty claim for lack of standing. Poth now appeals, and finding no error, we affirm.

n1 The decline in the stock market during 2001 was especially devastating to the telecommunications sector. *See* Rebecca Blumenstein, *Lives on Hold: As It Deepens, Telecom Bust Is Taking a Heavy Human Toll*, Wall St. J., Aug. 19, 2002, at A1. **[**3]**

n2 In his complaint, Poth named several officers, directors, and shareholders of Viasource and its affiliates as defendants. We refer to the defendants collectively as "the Viasource defendants."

I.

[HN1] Because this is an appeal from summary judgment in favor of the Viasource defendants, we state the facts in the light most favorable to Poth, drawing all reasonable inferences from the evidence in his favor. *Edell & Assocs., P.C., v. Law Offices of Peter G. Angelos, 264 F.3d 424, 429 (4th Cir. 2001).*

Konrad Eric Poth is the founder and former majority owner of Excalibur, a small telecommunications firm. n3 In the **[*449]** fall of 1999, Craig Russey, then president of Viasource, approached Poth to discuss a potential acquisition of Excalibur by Viasource. On March 30, 2001, the parties signed a letter of understanding indicating that the structure of the transaction would be a merger and specifying the essential terms of the merger. During the merger agreement negotiations, each party was allowed access to the records of the other so that each could satisfy its obligation of due diligence. The

parties **[**4]** signed a merger agreement (the Agreement) on June 1, 2000.

n3 Ferol Poth, Konrad Poth's wife, is also a party to this action in her capacity as trustee of the Konrad Forrest Poth 2000 Trust, a trust established for the benefit of the Poths' son in connection with the sale of the Excalibur stock. Konrad Poth owned approximately 75 of Excalibur, and the Trust owned approximately 9. The owners of the remaining 16 of Excalibur are not parties to this action.

Mrs. Poth never had any direct contact with the Viasource defendants and instead relied entirely on representations allegedly made to her husband. Because Mrs. Poth's claims are entirely derivative of the representations underlying Konrad's claims, they require no separate analysis. We will use "Poth" to refer exclusively to Konrad Eric Poth.

**The Agreement**

The Agreement provided that Viasource would purchase 100% of the voting shares of Excalibur. The total purchase price was $ 16,000,000, payable in a combination of cash, subordinated notes (the Notes), **[**5]** and Viasource common stock. n4 The Agreement contained an integration clause, which Poth understood to mean that "everything agreed to was in that agreement." (J.A. at 578.)

n4 The Agreement provided that "the purchase price for all of the issued and outstanding shares of the capital stock of [Excalibur] shall be $ 16,000,000." (J.A. at 614.) The purchase price was to be satisfied with the following consideration:

> (a) 3,200,000 shares of Viasource Common Stock (the "Stock Consideration"); (b) the sum of Four Million and 00/100 Dollars ($ 4,000,000) (the "Cash Consideration") ...; and (c) the sum of Four Million and 00/100 Dollars ($ 4,000,000) in the form of a subordinated promissory note ...

(J.A. at 614.) Although the Agreement refers to only one promissory note, in fact, two promissory notes were issued to the Excalibur shareholders.

The Agreement also provided for a post-closing purchase price adjustment (PPA) to account for any change in the net worth of Excalibur between January 1, 2000, and **[**6]** the closing. Viasource was required to calculate the PPA by August 31, 2000, and pay Excalibur's shareholders for any increase in their company's net worth by September 30, 2000. If Poth disagreed with Viasource's calculation of the PPA, he could object and have the PPA dispute settled by one of the "'big five' "accounting firms. n5 (J.A. at 642.)

n5 At the time of the Agreement, the Big Five accounting firms were Arthur Andersen LLP, Deloitte & Touche LLP, Ernst & Young LLP, KPMG LLP, and Pricewaterhouse Coopers LLP. *See* Cassell Bryan-Low, *Who Are Winners at Andersen's Yard Sale?*, Wall St. J., May 30, 2002 at C1.

Excalibur's shareholders also agreed to indemnify Viasource against certain enumerated claims. As security for the indemnification obligations, Viasource was entitled to retain 10% of the purchase price for one year. In the event that an indemnifiable claim was filed, the Agreement required Viasource to give written notice to Excalibur's shareholders of the amount and basis of the claim. **[**7]**

The Agreement further required Viasource and Poth to enter into an employment agreement, which they did. Under the employment agreement, Poth was to be employed for three years at an annualized base salary of $ 208,000. In the event that Poth was terminated without cause during those three years, Poth was entitled to "an amount equal to one (1) year of base salary ...payable in equal semi-monthly installments." (J.A. at 1091.) The Agreement also required Poth and Viasource to "use their best efforts to cause Eric Poth to be released from all personal guarantees" of loans made to Excalibur. (J.A. at 643.) **[*450]**

**The Notes**

As discussed above, 25% of the purchase price was provided in the form of subordinated promissory notes. The Notes were subordinate to "all senior indebtedness," which included Viasource's indebtedness to General Electric Credit Corporation (GECC) "together with all amendments, modifications, increases, or refinancings thereof." (J.A. at 1101.) The entire principal and interest on the Notes was scheduled to become due eighteen

months after the date of the closing, which would have been December 1, 2001. The Notes also were subject to mandatory prepayment in the event **[**8]** that Viasource made an initial public offering (IPO) "pursuant to an effective registration statement on Form S-1 ..., which contemplates cash proceeds ... of at least $ 50,000,000." (J.A. at 1098.) Notwithstanding the maturity date of the Notes, the Excalibur shareholders were not entitled to payment at maturity unless the GECC debt had been paid in full. Poth, however, believed that the Notes were subordinate only to the GECC debt outstanding on the closing date of the merger and claims that he "was never advised until after the fact that the *increased* borrowing from GECC was to be considered senior to the Notes issued despite assurances to the contrary as to what constituted the senior debt to which [his] Notes were subordinate." (J.A. at 1965 (emphasis added).) In any event, Poth alleges that the Viasource defendants assured him that the Notes "would be paid no later than 18 months from the closing, regardless of the success of the IPO." (J.A. at 1961.)

**The Planned IPO**

At the time of the merger negotiations, Viasource was planning to make an IPO of its common stock set to occur shortly after the completion of the merger. The Viasource defendants represented to Poth **[**9]** that they anticipated that the IPO would be priced in the $ 14-$ 16 per share range and would raise more than $ 150,000,000. The Viasource defendants continually assured Poth that the IPO would easily satisfy the prepayment conditions of the Notes, *i.e.*, that the IPO would yield cash proceeds in excess of $ 50,000,000. Despite these representations, Poth knew that there was a chance that the IPO would raise less than $ 50,000,000. Indeed, Poth's attorney warned him of such a possibility. It is undisputed that neither the Agreement nor the Notes contain any promises or representations about the outcome of a Viasource IPO.

**Events After Closing**

The merger closed as planned on June 1, 2000, and Viasource's prospects deteriorated rapidly thereafter. On June 2, 2000, Viasource filed a registration statement on Form S-1 with the Securities and Exchange Commission indicating its intent to make an IPO on August 18, 2000. Viasource initially indicated an intent to offer 11,000,000 shares at $ 13-$ 15 per share. As August 18, 2000 approached, however, the market for telecom IPOs began to deteriorate. Viasource filed several amendments to its Form S-1; the last one, which was filed **[**10]** on August 18, 2000, reflected an offer of 5,750,000 shares at $ 8 per share, for contemplated cash proceeds of only $ 46,000,000. Accordingly, the prepayment threshold in the Notes was not satisfied.

In addition to the IPO failing to meet expectations, Viasource's performance of its merger agreement obligations disappointed Poth as well. First, Poth and Viasource could not reach agreement as to the amount of the PPA. On December 12, 2000, Viasource submitted its calculation of the PPA and offered to pay Excalibur's **[*451]** shareholders approximately $ 1,100,000. Poth did nothing with the calculation until March 30, 2001, at which time he submitted his own calculation of the PPA, which was substantially higher than Viasource's calculation. When the parties failed to reach an agreement by June 2001, Poth demanded that the dispute be submitted to an arbitrator, but it never was arbitrated. Second, although Viasource employed Poth pursuant to the three-year employment agreement until April 2001 when it terminated him without cause, it made full severance payments only until September 2001, at which time cash flow shortages forced Viasource to reduce the payments. Third, Viasource never paid Poth **[**11]** the 10% indemnification holdback, and it never notified him of any indemnifiable claims. Finally, Poth and Viasource disagreed over the payment of the Notes. On January 30, 2001, Viasource requested that Poth extend the due date on the Notes. Poth refused. Viasource then obtained an opinion letter from its counsel, which stated that, under the terms of the Notes, Viasource could not repay the Notes on the maturity date if GECC objected.

Poth filed suit against Viasource in June 2001, alleging that Viasource had breached the Agreement by failing to deliver the indemnification holdback after one year and by failing to obtain releases of Poth's personal guarantees. He later amended the complaint in that action to add an allegation that Viasource had failed to arbitrate the PPA dispute as required by the Agreement.

During 2001, Viasource's financial health continued to deteriorate. Several times it had to seek forbearances from GECC on the senior indebtedness. During the summer of 2001, Viasource and GECC amended the GECC credit agreement to provide for the infusion of $ 2,450,000 by GECC in exchange for certain promissory notes, titled the Term B Notes. Because they were part of the **[**12]** GECC credit agreement, the Term B Notes were senior to the Notes given to Poth. Several of the Viasource defendants then provided GECC $ 2,450,000 in exchange for the Term B Notes. Thus, at the end of the day, GECC had no net cash outlay related to the Term B Notes - the Viasource defendants held the debt and bore all of the risk associated therewith. n6

n6 As discussed below, Poth's contentions respecting the Term B Notes have evolved over time. Our discussion of the Term B Notes is

based on the appellate iteration of the argument, which appears at pages 19 and 33 of Poth's brief.

Despite GECC's forbearances and the cash infusion from the Term B Notes, on November 15, 2001, Viasource filed for bankruptcy protection from its creditors. The filing of the bankruptcy petition automatically stayed Poth's breach of contract action.

II.

In May 2002, Poth filed this action against the Viasource defendants, alleging that they fraudulently induced him to sell his stock in Excalibur. Relevant to this appeal, Poth alleged **[**13]** that the Viasource defendants made the following specific misrepresentations: (1) Poth would be paid the 10% holdback one year after the merger closed absent specifically enumerated circumstances; (2) the PPA would be timely calculated and paid as stated in the Agreement; (3) Poth would be employed for three years or paid one year's severance; (4) Poth would be relieved from his personal guarantees; (5) the Notes would be paid eighteen months from closing at the latest; (6) the Notes were subordinate only to GECC debt outstanding at the closing of the merger; (7) Viasource's IPO **[*452]** would result in proceeds of more than $ 150,000,000; (8) Viasource's IPO would be priced at $ 14-$ 16 per share; and (9) the $ 50,000,000 prepayment threshold in the Notes could not be reduced, because an identical term was included in notes given to other companies that Viasource had acquired, and Poth could not be given a "better deal" than the shareholders of those companies. Poth alleged that these misrepresentations amounted to fraud under federal and state securities laws and state common law.

Poth also claimed that the Viasource defendants breached their fiduciary duty to him by "delaying any payment **[**14]** to Poth while, at the same time, ensuring payments to themselves." (J.A. at 40.) In essence, Poth alleged that the defendants engaged in self-dealing to ensure that they would be repaid ahead of other Viasource creditors. Poth based this claim on what he calls "the Term B Notes scheme," (Appellant's Br. at 33), which we discuss further in Part IV.

The district court granted summary judgment to the Viasource defendants on the fraud counts and held that Poth lacked standing to bring the fiduciary duty claim because it fell within the exclusive jurisdiction of the bankruptcy court. Poth now appeals, and we affirm.

III.

A.

[HN2] We review the grant of summary judgment de novo. *Canal Ins. Co. v. Distrib. Servs., Inc., 320 F.3d 488, 491 (4th Cir. 2003).* [HN3] "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id. at 491-92*. [HN4] "In reviewing the district court's grant of summary judgment, we must construe the facts in the light most **[**15]** favorable to the non-moving party." *Id. at 492*. In reviewing the evidence, we make all reasonable inferences in favor of Poth, the non-moving party. *Thompson v. ALCOA, 276 F.3d 651, 656 (4th Cir. 2002).* "We make no credibility determinations, and we do not weigh the evidence." *Id*.

B.

Poth alleges four different causes of action for fraud: federal securities fraud; Virginia state law securities fraud; Virginia common law actual fraud; and Virginia common law constructive fraud. [HN5] To state a claim for any of these types of fraud, a plaintiff must show, among other requirements, that the defendant made a false statement of material fact on which the plaintiff reasonably relied. *See* 17 C.F.R. § 240.10b-5 (2003) (hereinafter "Rule 10b-5"); *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1027 (4th Cir. 1997)* (listing the elements for a federal securities fraud claim under § 10(b) and Rule 10b-5); *Evaluation Research Corp. v. Alequin, 247 Va. 143, 439 S.E. 2d 387, 390, 10 Va. Law Rep. 779 (Va. 1994)* (listing the elements of Virginia common law actual and constructive fraud claims); **[**16]** Va. Code Ann. § 13.1-502 (Michie 1999) (using language almost identical to that in Rule 10b-5).

[HN6] "Courts properly resist attempts to transfer breach of contract cases into fraud[,] and therefore ... fraud 'cannot ordinarily be predicated on unfulfilled promises or statements of future events.'" *Flip Mortgage Corp. v. McElhone, 841 F.2d 531, 537 (4th Cir. 1988)* (quoting *Soble v. Herman, 175 Va. 489, 9 S.E. 2d 459, 464 (Va. 1940))*. [HN7] "Misstatements or omissions regarding actual *past* or *present* facts are far more likely to be actionable **[*453]** [as fraud] than statements regarding projections of *future* performance." *Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 212 (4th Cir. 1994)* (quotation marks omitted) (applying federal securities law); *Patrick v. Summers, 235 Va. 452, 369 S.E. 2d 162, 164, 4 Va. Law Rep. 2949 (Va. 1988)* (" As a general rule, 'fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events.'") (applying Virginia law and quoting *Soble, 9 S.E.2d at 464*). When a person enters **[**17]** into a contract,

however, he implicitly states, as a matter of present fact, that he intends to perform his obligations under the contract. *Flip, 841 F.2d at 537*; *Patrick, 369 S.E. 2d at 164*. Thus, when a party makes a contractual promise but secretly intends not to perform that promise, "' his promise is a misrepresentation of *present* fact'" that is actionable as fraud. *Flip, 841 F.2d at 537* (quoting *Colonial Ford Truck Sales v. Schneider, 228 Va. 671, 325 S.E. 2d 91, 94 (Va. 1985)).*

[HN8] In financial and securities matters, when a plaintiff claims to have relied on oral misrepresentations that are contradicted by later-received written documentation, the court evaluates the following eight factors to determine whether the plaintiff's reliance on the oral statements was reasonable:

> (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the **[**18]** plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations

*Foremost Guar. Corp. v. Meritor Sav. Bank, 910 F.2d 118, 123-24 (4th Cir. 1990)* (quotation marks omitted).

The misrepresentations that Poth alleges can be categorized as follows: (1) statements directly incorporated into the Agreement; (2) statements contradicted by the Agreement; and (3) statements about which the Agreement is silent. We deal with each category in turn.

1.

Poth first challenges the Viasource defendants' assurances that Viasource would perform its various contractual obligations under the Agreement. Poth argues that he has presented sufficient evidence from which a jury could infer that the Viasource defendants secretly intended not to perform these promises when they entered into the Agreement. Specifically, Poth contends that the defendants never intended: (1) to pay the 10% holdback one year after the merger absent specifically enumerated circumstances; (2) to timely calculate and pay the PPA as stated in the Agreement; (3) to use their best efforts to have Poth released from his personal loan **[**19]** guarantees; or (4) to employ Poth for three years or pay him one year's severance.

The record contains no direct evidence of a fraudulent intent on the part of the Viasource defendants. Although Poth concedes the absence of a "smoking gun," he nonetheless asserts that a jury reasonably could infer "that because *none* of [the Viasource defendants'] representations came to fruition, the speakers never intended that Poth would receive the consideration represented." (Appellant's Br. at 28, 30.) Poth is mistaken both factually and legally.

Poth's blanket assertion that *none* of Viasource's promises came to fruition simply is inaccurate. First, Viasource entered into an employment agreement with Poth, **[*454]** in the form specified in the Agreement, and employed him pursuant to that contract for over ten months. Viasource eventually terminated Poth without cause, which was permissible under the employment agreement, and made severance payments thereunder until shortly before it filed for bankruptcy protection. Second, Viasource calculated the PPA and sent Poth a settlement agreement outlining the payment of the PPA as calculated. Although Poth eventually disputed the amount of the PPA **[**20]** and exercised his right to dispute resolution, this hardly negates Viasource's partial performance. Finally, Poth improperly focuses on only those provisions of the Agreement that Viasource breached, while ignoring the fact that Viasource performed the vast majority of its obligations under the Agreement. For example, Viasource performed its central obligations when it transferred cash, stock, and the Notes to Poth at closing. Viewing the Agreement as a whole, it is clear that *many*, if not most, of Viasource's promises came to fruition.

Poth's evidence of fraudulent intent thus amounts to nothing more than Viasource's complete failure to perform two contractual obligations and its partial failure to perform two others. This evidence is insufficient to allow a reasonable jury to infer that the Viasource defendants never intended for Viasource to perform its obligations under the Agreement. Indeed, Viasource's partial performance of the Agreement makes such an inference unreasonable. *Cf. Powers v. British Vita, P.L.C., 57 F.3d 176, 185 (2d Cir. 1995)* ("Intent may be found when a defendant violates an agreement so maliciously and so soon after it is made that his **[**21]** desire to do so before he entered into the agreement is evident."). Moreover, even had there been no partial performance, [HN9] the mere failure to perform contractual obligations is not enough evidence for a jury reasonably to infer fraudulent intent on the part of the breaching party. *See Patrick, 369 S.E. 2d at 164* (holding that the evidence of mere failure to perform a contractual obligation "is insufficient as a matter of law

to show ...[an] intent to defraud at the time ...the promise [was made]"); *Powers, 57 F.3d at 185* ("The mere non-performance of promises is insufficient to create an inference of fraudulent intent." (quotation marks omitted)). Otherwise, plaintiffs could convert every breach of contract action into an action for fraud. Accordingly, we hold that Poth has not raised a material issue of fact as to whether the Viasource defendants secretly intended at the time they entered into the Agreement that Viasource would renege on its contractual obligations. Without a secret intent not to perform, the Viasource defendants did not make a misrepresentation of a material fact at the time they entered into the Agreement.

2.

Poth also alleges **[**22]** that he relied on the following oral representations, which directly contradict the terms of the Notes, which were incorporated by reference into the Agreement: (1) Viasource unconditionally would pay to Poth the principal and interest due on the Notes eighteen months after the closing of the merger at the latest; (2) the Notes would be subordinate only to GECC debt outstanding at the closing of the merger; and (3) Viasource's IPO would result in proceeds of more than $ 150,000,000.

The Notes state that "in the event of the maturity of this Note, Holder of this Note shall be entitled to payments hereunder only if, prior thereto, all Senior Indebtedness shall have been Paid In Full." (J.A. at 1101.) The Notes define Senior Indebtedness as "all obligations of [Viasource] under [the GECC credit agreement], **[*455]** together with all amendments, modifications, *increases* or *refinancings* thereof." (J.A. at 1101 (emphases added).) The Notes also state that they are subject to mandatory prepayment only if Viasource made an IPO pursuant to a registration statement that contemplated proceeds of more than $ 50,000,000. n7 By making mandatory prepayment conditional, the Notes clearly imply **[**23]** that there is a chance that the condition for prepayment might not be met, *i.e.*, Viasource might not have an IPO with proceeds of more than $ 50,000,000. Viasource's oral "guarantee" that the IPO would exceed $ 150,000,000 is thus belied by the prepayment condition in the Notes.

n7 The Notes were also subject to mandatory prepayment if Viasource sold all of its stock or assets, a condition not relevant here.

Because Poth received written documentation that contradicted the alleged oral misrepresentations, we must consider the eight *Foremost Guarantee* factors to determine whether Poth could reasonably rely on the prior oral misrepresentations. *See Foremost Guar., 910 F.2d at 123-24*. First, Poth is an accredited investor n8 under the Federal Securities laws. As such, he certainly has some "sophistication and expertise ...in financial and securities matters." *Id. at 123-24*. Second, this was the first securities transaction between these parties, and thus no "long standing **[**24]** business or personal relationships" existed among them. *Id*. Third, Poth undisputedly had "access to relevant information" when he performed his due diligence inquiry. *Id*. Fourth, when the parties negotiated the Agreement, the defendants owed Poth no fiduciary duty. Fifth, Poth has not alleged that the defendants took any actions to "conceal[]...the fraud." *Id*. Sixth, Poth had "the opportunity to detect the fraud" when he engaged in due diligence and when he reviewed the terms of the Agreement. Thus, the first six factors weigh heavily in favor of the Viasource defendants. The seventh and eighth factors weigh in Poth's favor, as the defendants initiated the transaction, and the alleged misrepresentations are fairly specific. *Id*. Considering all of the factors, we hold that the balance weighs heavily in the Viasource defendants' favor. Accordingly, Poth has failed to raise a material issue of fact as to whether he reasonably relied on the defendant's oral statements. n9

n8 [HN10] The term accredited investor is defined to include, among others, "any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $ 1,000,000" and "any natural person who had an individual income in excess of $ 200,000 in each of the two most recent years." 17 C.F.R. § 230.501(a) (2003). **[**25]**

n9 Given that Poth understood that the integration clause meant that "everything agreed to was in that agreement" and that he understood that the Agreement basically said that he "better not rely on what [he] had been told that's outside of the[] written documents," (J.A. at 578-79), we question whether Poth has even raised a material issue of fact as to whether he *actually*, let alone reasonably, relied on oral statements that were contradicted by the written terms of the Agreement and the Notes. Nonetheless, it is clear that even if Poth actually did rely on the statements, his reliance was unreasonable.

3.

Poth alleges that the defendants orally made two other false statements, both of which concern subject matters not discussed in the Agreement. Specifically, Poth contends that the defendants represented the following: (1) Viasource's IPO would be priced at $ 14-$ 16 per share; and (2) the $ 50,000,000 threshold in the Notes could not be reduced, because an identical term was included in notes given to other companies that Viasource had acquired, and Poth could not be given a "better **[**26]** **[*456]** deal" than the shareholders in those companies.

Poth has not raised a material issue of fact as to the falsity of either statement. Poth knew that the defendant's representations regarding the IPO were "predictions" about future events. (J.A. at 544-45.) The Viasource defendants' predictions regarding the IPO share price cannot serve as the basis for a fraud claim because they were not statements of present or pre-existing fact. *Hillson Partners Ltd., 42 F.3d at 212*; *Patrick, 369 S.E. 2d at 164*. To the extent that Poth's complaint could be construed as alleging that the defendants never intended to price the IPO at $ 14-$ 16, his claim has a defect similar to the ones discussed in Part III. B. 1 above. Poth has introduced no evidence, other than the fact that the IPO was eventually priced at $ 8 per share, that the defendants did not intend to price the IPO as they represented. Indeed, all of the other evidence indicates the contrary, especially Viasource's initial S-1 registration form and the early amendments thereto, filed with the SEC in the summer of 2000. In the S-1 amendment dated July 7, 2000, the first filing with an estimated offer price, **[**27]** Viasource anticipated an offering price of $ 13-$ 15 per share. Moreover, in January 2000, Viasource's investment bank advised Viasource that it believed that an IPO in the $ 100,000,000 to $ 150,000,000 range would "attract significant interest from investors." (J.A. at 137.) In the face of this evidence, no reasonable jury could infer that the defendants secretly intended to price Viasource's IPO below $ 14 per share at the time that they were negotiating the Agreement with Poth.

As to the second alleged misrepresentation, Poth points to no evidence in the record, and we have found no evidence, that Viasource gave any of the companies that it acquired notes with a lower prepayment threshold than Poth's Notes. In fact, all of the other promissory notes in the record contain the same prepayment threshold as Poth's Notes. Accordingly, Poth has not submitted sufficient evidence from which a reasonable factfinder could conclude that either of these two statements was false when made.

IV.

We next turn to Poth's breach of fiduciary duty claim. The district court held that Poth lacked standing to assert his breach of fiduciary duty claim and that the claim properly could be asserted only **[**28]** by Viasource's trustee in bankruptcy. [HN11] We review *de novo* a district court's dismissal of a claim for lack of subject matter jurisdiction. *Ahmed v. United States, 30 F.3d 514, 516 (4th Cir. 1994).*

As noted above, Poth has based his breach of fiduciary duty claim on what he calls "the Term B Notes scheme." n10 (Appellant's **[*457]** Br. at 33.) Poth asserts that the Viasource defendants "piggybacked" the Term B Notes onto the GECC debt so that the Term B Notes would be senior to Poth's Notes in bankruptcy. (Appellant's Br. at 33.) He alleges that this self-interested transaction was a breach of the fiduciary duty that the officers and directors of an insolvent company owe to the company's creditors.

n10 In the district court, Poth asserted two different theories of how the Term B Notes transaction was a breach of fiduciary duty. One theory that Poth asserted in the district court was that the Viasource defendants had provided an infusion of capital in exchange for the Term B Notes so that Viasource could "limp past the one year preferential transfer cutoff date" applicable to corporate insiders. (Pl. Mem. Opp. Sum. J. at 43-44.) In other words, Poth asserted that the defendants made a loan to Viasource to delay the filing of a bankruptcy petition. This delay was just long enough for the defendants to avoid having to repay funds that they had received from the proceeds of Viasource's IPO into the bankruptcy estate. *See 11 U.S.C.A. § 547*(b)(4)(B) (West 1993) (giving bankruptcy trustees the power to avoid any transfer made to a creditor "between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider"). The district court held that Poth lacked standing to bring this claim, and Poth has abandoned this theory on appeal. On appeal, Poth pursues only his other theory, namely that the defendants "intentionally attempted to make [their own loans to the company] superior to the debt already owed to Poth." (Pl. Mem. Opp. Sum. J. at 43.)

**[**29]**

[HN12] "If a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim" *Nat'l Am. Ins. Co. v. Ruppert Landscaping*

*Co., 187 F.3d 439, 441 (4th Cir. 1999)*. "The § 541 estate ...includes any right of action the debtor corporation may have to recover damages for misconduct, mismanagement, or neglect of duty by a corporate officer or director." *Delgado Oil Co. v. Torres, 785 F.2d 857 (10th Cir. 1986)* (holding that a state-law action to avoid a preferential transfer by a corporate director was property of the estate of the bankrupt). Creditors similarly lack standing to bring "causes of action [that] are ...similar in object and purpose to claims that the trustee could bring in bankruptcy," regardless of whether such claims are technically part of the estate of the bankrupt. *Nat'l Am. Ins. Co., 187 F.3d at 441* (affirming the dismissal of various state law claims that were "similar in object and purpose" to a bankruptcy trustee's potential fraudulent conveyance claim).

[HN13] Section 548(a) of the Bankruptcy Code allows a bankruptcy trustee to avoid fraudulent conveyances. It provides that the trustee **[**30]** may avoid an obligation "if the debtor voluntarily or involuntarily ... incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. ..." *11 U.S.C.A. § 548*(a) (West 1993). When a creditor brings a state-law challenge to a transaction that a bankruptcy trustee could avoid as a fraudulent conveyance, the state-law cause of action is "so similar in object and purpose" to the fraudulent conveyance claim that the creditor lacks standing to assert it. *Nat'l Am. Ins. Co., 187 F.3d at 441*.

In this case, it is clear that the facts alleged by Poth in support of his "piggybacking" theory would support an action by Viasource's trustee in bankruptcy to avoid the Term B Notes transaction as a fraudulent conveyance. The heart of Poth's theory is that the Term B Note transaction was entered into to thwart Viasource's ability to repay its creditors, specifically Poth's Notes. Thus, Poth has alleged that Viasource "incurred an obligation" to repay the Term B Notes, while it "was insolvent," and that the Viasource **[**31]** defendants had the "actual intent to hinder, delay, or defraud an[] entity [(Poth)] to which [Viasource] was ...indebted." *11 U.S.C.A. § 548*(a). Under familiar corporate law principles, the knowledge and intent of the Viasource defendants, who authorized the Term B Notes transaction, is imputed to Viasource. *See, e.g, Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 250 (4th Cir. 1967)* [HN14] (" Ordinarily knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation."). Therefore, even though Poth's breach of fiduciary duty claim and the "trustee's fraudulent conveyance claim do not contain identical elements, they ... share the same underlying focus." *Nat'l Am. Ins. Co.,* **[*458]** *187 F.3d at 441*. As such, Poth's breach of fiduciary duty claim is "so similar in object and purpose" to a potential fraudulent conveyance claim that Viasource's trustee in bankruptcy could bring that Poth lacks standing to assert it. *Id*. Accordingly, the district court properly dismissed Poth's breach of fiduciary duty claim for lack of subject matter jurisdiction.

V. **[**32]**

For the reasons stated above, we conclude that the district court properly granted summary judgment to the Viasource defendants on Poth's fraud claims and that Poth lacks standing to assert his breach of fiduciary duty claim. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*

# EXHIBIT J

**CITY OF MONROE EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, Plaintiff-Appellant, v. BRIDGESTONE CORPORATION; BRIDGESTONE/FIRESTONE, INC.; YOICHIRO KAIZAKI; MASATOSHI ONO, Defendants-Appellees.**

**No. 03-5505**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**05a0052a.06;**

***2005 U.S. App. LEXIS 1814; 2005 FED App. 0052P (6th Cir.); Fed. Sec. L. Rep. (CCH) P93,097***

**June 9, 2004, Argued**
**February 4, 2005, Decided**
**February 4, 2005, Filed**

**PRIOR HISTORY: [*1]** Appeal from the United States District Court for the Middle District of Tennessee at Nashville. No. 01-00017. Robert L. Echols, Chief District Judge. *City of Monroe Emples. Ret. Sys. v. Bridgestone Corp., 387 F.3d 468, 2004 U.S. App. LEXIS 22125 (6th Cir. Tenn., 2004)*

**DISPOSITION:** Affirmed in part, reversed in part and remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors appealed the U.S. District Court for the Middle District of Tennessee at Nashville's dismissal with prejudice of a securities fraud class action against defendants, a corporation, its subsidiary, its chief executive officer (CEO), and the corporation's executive vice president and CEO of the subsidiary. The complaint alleged, inter alia, violation of § 10(b) *(15 U.S.C.S. § 78j*(b)) of the Securities Exchange Act of 1934.

**OVERVIEW:** The complaint alleged a series of public, fraudulent statements by the corporation and its subsidiary, relying heavily on the company's annual reports for fiscal years 1996-2000. The appellate court held that: (1) the district court did not err in granting the motion of the corporation's CEO to dismiss for lack of personal jurisdiction; (2) because the complaint, for the subsidiary's August 1, 2000 statement, adequately alleged an actionable statement and scienter against it, the district court erred in dismissing the claim based on that statement; (3) the district court did not err in dismissing the claims against the subsidiary for its numerous other statements because those statements were not material; (4) the district court erred in dismissing the claims against the corporation based on two of its effective representations in the 1999 annual report; (5) the district court did not err in dismissing the claims based on the corporation's representations in the financial statements of the 1996-1998 annual reports because those statements were not misrepresentations; and (6) the district court did not err in dismissing the claims against the subsidiary's CEO.

**OUTCOME:** The court affirm in part, reversed in part, and remanded for the district court to consider whether the complaint adequately pleaded justifiable reliance and proximate cause with respect to the three actionable statements as against the corporation and its subsidiary, and for further proceedings not inconsistent with the court's opinion.

**LexisNexis(R) Headnotes**

**COUNSEL:** ARGUED: Pamela M. Parker, LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, San Diego, California, for Appellant.

Thomas S. Kilbane, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, James E. Gauch, JONES DAY, Washington, D.C., Erik L. Kitchen, STEPTOE & JOHNSON, Washington, D.C., for Appellees.

ON BRIEF: Pamela M. Parker, Michael J. Dowd, William S. Lerach, LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, San Diego, California, George E. Barrett, BARRETT, JOHNSTON & PARSLEY, Nashville, Tennessee, Edward M. Gergosian, BARRACK, RODOS & BACINE, San Diego, California, for Appellant.

Thomas S. Kilbane, George M. Von Mehren, Paul B. Ockene, Frances F. Goins, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, James E. Gauch, Stephen J. Brogan, Jacqueline M. Holmes, JONES DAY, Washington, D.C., Antonia B. Ianniello, Brian M. Heberlig, STEPTOE & JOHNSON, Washington, D.C., for Appellees.

**JUDGES:** Before: KEITH and CLAY, Circuit Judges; OBERDORFER, Senior District Judge. *

> * The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation. **[*2]**

**OPINIONBY:** Louis F. Oberdorfer

**OPINION:** **[**2]**

**AMENDED OPINION**

OBERDORFER, Senior District Judge. In this appeal, we review the district court's dismissal with prejudice of a securities fraud class action Consolidated Complaint ("Complaint") filed by investors in Bridgestone Corporation ("Bridgestone") against Bridgestone, its subsidiary Bridgestone/Firestone, Inc. ("Firestone"), Bridgestone Chief Executive Officer ("CEO") Yoichiro Kaizaki, and Bridgestone Executive Vice President and Firestone CEO Masatoshi Ono. The district court dismissed the claims against Kaizaki for lack of personal jurisdiction and dismissed the claims against Bridgestone, Firestone and Ono for failure to state a claim upon which relief could be granted. For the reasons stated below, we affirm in part, reverse in part, and remand.

**I. BACKGROUND**

We assume the truth of the following facts for the purpose of this appeal. Unless otherwise indicated, they are drawn from the Complaint.

Bridgestone, a multi-national corporation with its international headquarters in Japan, is the world's largest tire manufacturer. Bridgestone's stock trades in Japan on the Tokyo Stock Exchange. Bridgestone's stock does not **[*3]** trade on any American stock exchange. Accordingly, Bridgestone is not required to register its equity securities with the United States Securities & Exchange Commission ("SEC"). Bridgestone's stock trades in the United States on the over-the-counter, or "OTC," market. The OTC market is an American market for foreign-issued securities not traded on any domestic stock exchange. n1

> n1 *See* the National Association of Securities Dealers, Inc. ("NASD") website, <http://www.nasd.com/resources/glossary>. *See generally New England Health Care Employees Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003)* ("A court that is ruling on a *Rule 12(b)(6)* motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice."), *cert. denied, 540 U.S. 1183, 158 L. Ed. 2d 87, 124 S. Ct. 1424 (2004)*; *Fed. R. Evid. 201* (providing that "[a] court may take judicial notice, whether requested or not" of a "judicially noticed fact" which "must be one not subject to reasonable dispute," a requirement satisfied if the fact is "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

**[*4]**

Bridgestone operates in the United States through its regional corporate headquarters in Nashville, Tennessee, and through its wholly owned subsidiary Firestone. Firestone's corporate headquarters are in Nashville. Firestone's largest tire production facility is in Decatur, Illinois.

From 1993 to 2001, Yoichiro Kaizaki was Bridgestone's President and CEO. In January 2001, he resigned from both positions. Kaizaki is now retired and resides in Japan. From 1993 to October 2000, Appellee Masatoshi Ono was the Executive Vice-President of Bridgestone and CEO of Firestone. In October 2000, Ono resigned from both positions.

Lead Class Plaintiff City of Monroe Employees Retirement System ("the Retirement Fund") is, like all class members, a purchaser of Bridgestone common stock or American Depository **[**3]** Receipts n2 for Bridgestone common stock between March 31, 1998 to

August 31, 2000. The allegations in the Retirement Fund's Complaint relate to events dating back to 1978.

n2 An American Depository Receipt, or "ADR," represents ownership in a security issued by a foreign company in foreign markets. Typically, a United States depository bank has custody of the security corresponding to an ADR and issues the ADR certificate to a United States investor. *See generally* Edward F. Greene, et al., U.S. Regulation of the International Securities and Derivatives Markets, § 2.02 (2000); *Fed. R. Evid. 201* (authorizing, and providing standards for, taking judicial notice). Each Bridgestone ADR represents ten shares of Bridgestone common stock. *See* Joint Appendix ("App.") at 140.

**[*5]**

In that year, Firestone's "Firestone 500" tire was the leading steel-belted radial tire brand. In 1978 and 1979 combined, Firestone manufactured approximately 14,000 defective Firestone 500 tires, resulting in hundreds of passenger vehicle crashes and 41 fatalities. Initially, Firestone publicly attributed the known failures to consumers' failure to properly inflate or take care of their tires. Government investigators subsequently determined that Firestone had added too much of an adhesion-boosting compound to the rubber that held the steel belts together, resulting in rubber tire tread separating from underlying steel belts, eventually leading to the tires suddenly falling apart. As a result, in 1979, Firestone paid a $ 500,000 fine imposed by the National Highway Traffic Safety Administration ("NHTSA"), n3 the then-largest-ever fine imposed by the NHTSA, and instituted a recall from consumers of 13 million Firestone 500 tires. The recall injured Firestone's corporate image, brand, and financial performance. App. at 143 (Complaint).

n3 The NHTSA is an administration within the United States Department of Transportation. *See generally 49 U.S.C. § 105*.

**[*6]**

In 1988, n4 Bridgestone acquired Firestone for $ 2.6 billion. Upon acquiring Firestone, Bridgestone sought to increase Firestone's revenue by expanding its contractual relationship with Ford Motor Company ("Ford"), a leading American automobile manufacturer.

n4 The Complaint does not address the years 1980--1987.

In 1988 and 1989, Ford was developing the Explorer, a new sport-utility vehicle. Firestone sought to obtain the tire supply contract for the Explorer. Towards that end, Firestone, in 1989, submitted prototypes of its ATX tires to Ford for testing. n5 An outside company tested seventeen of the prototypes. In February 1989, the outside testing company reported that five of the seventeen prototypes had failed due to tread separation problems under heavy loads and strenuous conditions.

n5 The Firestone ATX brands included the ATX, ATX II, and Wilderness AT Tires. App. at 144, 150, 154. Unless otherwise specified, we refer to these brands collectively as the "ATX" tires.

**[*7]**

In March 1990, Ford introduced the new Explorer, equipped with Firestone ATX tires. Between 1990 and 1993, Ford sold over 300,000 Explorers per year. By 1993, Ford had become Firestone's leading customer as measured by sales volume and Firestone's financial health had improved markedly. Firestone had been losing approximately $ 1 million per day as of 1989-1990, prior to entering into the contract with Ford to outfit the Explorer with ATX tires; by 1993, Firestone was profitable.

Beginning in 1992, Firestone began receiving consumer complaints regarding tire tread defects, some of which led to "rollover" accidents in which the Explorer would flip over on to its side. Between 1992 and 1996, consumers filed 16 or more lawsuits against Bridgestone or Firestone for rollover accidents allegedly caused by ATX tire failures on the Explorer. Between 1993 and 1994, such suits based on problems with ATX tires increased from 13% of the claims filed against Firestone from problems in light truck tires to 43% of that category of claims. By 1999, at least 50 such suits had been filed. **[**4]**

The Complaint alleges that by 1994, under pressure to cut its costs and increase the productivity **[*8]** and production rates of its American manufacturing facilities, Firestone imposed longer hourly work shifts to permit around-the-clock, seven days-a-week operations. In July 1994, Firestone's labor force, which was unionized, responded by engaging in a massive production strike.

During the strike, Firestone continued production at its Decatur, Illinois manufacturing plant. To do so, Firestone staffed the manufacturing floor with "untrained

and inexperienced non-union replacement workers," along with management employees. App. at 146. During the strike, the number of defective tires increased sharply "as supervisors and under-trained or untrained replacement workers were called on to master highly skilled jobs to keep the Decatur plant running."*Id.* at 147.

In 1996, Firestone management, as part of the negotiations that ended the strike, extracted from the Firestone employees' union concessions under which production speed increased, including longer work shifts and retention of a seven-days-a-week production schedule. *Id.* at 147. In its 1996 Annual Report, Bridgestone proclaimed that "we reached an agreement in 1996 with the union that represents employees at several of our **[*9]** North American plants . . . The union has accepted already-implemented adjustments in working hours that permit our plants to operate 24 hours a day, seven days a week." *Id.* at 246. After the strike, the increased level of production errors persisted in tires made at Firestone's Decatur plant. The Complaint alleges that production and inspection shortcuts resulted in a sharp rise in the number of tires that were not properly manufactured, tested, or inspected.

In 1996, Firestone performed random quality control high-speed durability tests on various ATX tires. In one of the sample tests, Firestone examined 129 ATX tires made at the Decatur plant. Eighteen of those tires failed the test due to tire tread separation. In another random test of 229 ATX tires from the Decatur plant, 31 failed. In an additional random test of 18 ATX tires, eight failed, seven of which were from the Decatur plant. Internal Firestone documents show that the tires' tread separation rate was highest for tires produced at the Decatur plant from 1994 to 1996, during and just after the strike.

In addition to the alleged several thousand claims submitted by consumers directly to Firestone for compensation, **[*10]** between 1997 and 1999, United States consumers filed 34 suits against Bridgestone or Firestone based on deaths or injuries allegedly caused by rollovers of Explorers equipped with Firestone ATX tires. By no later than 1997, senior Firestone officials, including Firestone CEO and Bridgestone Executive Vice-President Ono, were tracking the claims and lawsuits. Robert Martin, who was Firestone's Vice President of Quality Assurance from 1997 or earlier until his retirement in April 2000, testified in a deposition that senior Firestone executives, Ono included, met at least quarterly from 1997 through 1999. The meetings consisted of Firestone's senior management group, the financial group, the quality group, and the public relations / marketing department. Martin testified that those meetings included discussion of tread-peeling claims and lawsuits lodged against Firestone and Bridgestone.

Internal Firestone documents regarding property damage, injury claims, and tire performance data, such as warranty adjustments and financial analysis of such claims, show that starting in 1996, the ATX tires began to fail at higher rates than they had before. Similarly, a Firestone chart reveals that **[*11]** from 1998 to 1999, tread separations for the Wilderness AT, one of Firestone's ATX tire models, increased by 194%. According to a 1999 internal Firestone report, in 1997 and 1998, another Firestone tire model, the ATX II, accounted for the majority of the tire claims against Firestone but for less than 10% of Firestone's total tire production. The Complaint alleges that Firestone "had knowledge of thousands of claims for and complaints concerning ATX tire failures, especially ATX tires manufactured at [its] Decatur, Illinois plant during and after a bitter 1994-1996 strike, due to design and manufacturing defects which resulted in over 2,200 rollover accidents, over **[**5]** 700 serious injuries and approximately 174 fatalities by 2000." App. at 131 (Complaint). In response to the lawsuits, Firestone and Bridgestone entered into settlement agreements under which the settlement agreements with plaintiffs were sealed, the parties entered into stipulated protective orders to conceal discovery, and Bridgestone or Firestone had returned to it "damaging documents." *Id.* at 151.

In 1996 and 1997, State Farm Insurance Company, the largest automobile insurer in the United States, demanded **[*12]** that Firestone pay the costs of automobile accidents attributable to ATX tire failures. Without conceding (or contesting) liability, Firestone reimbursed State Farm without public disclosure of the claims or the resulting payments. Having been paid, State Farm did not sue Firestone, lawsuits which the Complaint alleges "would have publicized the growing problem with the ATX tires." *Id.* at 150.

Firestone suppressed information pertaining to investigations by various governments, domestic and foreign. In 1996, Arizona state government agencies expressed concern about the Firestone ATX tires. Firestone sent a team of engineers to investigate and then replaced certain Explorer tires without any public disclosure of the investigation or the replacements.

In Venezuela, between 1990 and 1998, over forty people were killed in Explorer accidents allegedly due to ATX tire failures. Ford demanded that Firestone alter the design of its ATX tire being sold in Venezuela to include a nylon layer. Firestone initially did not do so. The Venezuelan government investigated and expressed concerns to Firestone about the ATX tires. According to

a Venezuelan government document, Firestone agreed to **[*13]** add a nylon layer to the tires in exchange for the Venezuelan government's promise that it would not publicly disclose this act by Firestone. According to the Venezuelan government document, Firestone expressed a belief that disclosure of the layer-adding "would put in jeopardy the Bridgestone brand in Venezuela." *Id.* at 152.

In Saudi Arabia, multiple people in Ford Explorers outfitted with Firestone ATX tires also died between 1990 and 1998 due, allegedly, to ATX tire failures. *Id.* at 152. Firestone's senior management team discussed the possibility of a formal recall of the ATX tires in the Persian Gulf region. Firestone ultimately decided not to initiate such a recall. *Id.* A March 1999 internal Ford memorandum stated, with respect to that decision, that "Firestone legal has some major reservations about the plan to notify customers and offer them an option . . . They feel that [the National Highway Traffic Safety Administration, or 'NHTSA'] will have to be notified of the program, since the product is sold in the U.S." *Id.* at 153.

Regarding the ATX-related accident data from the United States, Venezuela, and Saudi Arabia, the Complaint alleges that Bridgestone **[*14]** and Firestone executives "kept the accident rate data which they had and which showed these serious problems from safety regulators." *Id.* at 151. The Complaint alleges that their motive for doing so was "so they could report huge profits and their executives could retain their positions of power, prestige and profit and Bridgestone's stock and ADRs would continue to trade at inflated, higher prices, providing the executives with direct economic benefits based on their stock holdings and options and allowing them to personally pocket huge bonuses based on corporate profits." *Id.* at 151-52.

The Complaint alleges a series of public, fraudulent statements by Bridgestone and Firestone, beginning in March 1997 when Bridgestone issued its 1996 Annual Report. n6 (Bridgestone typically **[**6]** issued its annual reports for each fiscal year in March or April of the subsequent year). The 1996 Annual Report stated, in its introductory "Word from the President" section:

> We are staking our claim to global leadership on the tire industry. . . . I am especially satisfied with our ongoing business turnaround in the Americas, the biggest tire market in the world
>
> * * * *
>
> Our **[*15]** competitive edge in tire technology remains our highest asset. . . . Technology will continue to strengthen the appeal of our products and operations. This will include safety and improving performance.

App. at 245-47 (1996 Annual Report).

> n6 The Complaint relies heavily on Bridgestone's Annual Reports for fiscal years 1996--2000. Bridgestone attached to its motions to dismiss before the district court copies of those documents. *See* App. at 241--476. Accordingly, we, like the district court, consider the full text of the 1996--2000 Annual Reports. *See Weiner v. Klais & Co., 108 F.3d 86, 89 (6th Cir. 1997)* ("documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." (internal quotations omitted)).

In March 1998 came Bridgestone's 1997 Annual Report. The accompanying letter stated: "We are making steady progress towards leadership in the world tire **[*16]** industry . . . . Sales at our subsidiary for the Americas, [Firestone], surpassed our parent-company turnover for the first time." App. at 289 (1997 Annual Report). Similarly, Bridgestone's 1998 Annual Report, issued in April 1999, stated: "the Americas, the largest tire market in the world, are our biggest source of consolidated sales . . . Our global market share in original equipment tires increased further in 1998. That growth evidences high regard among automakers for our strengths in product quality." App. at 342 (1998 Annual Report).

In early February 2000, a Houston, Texas television station reported that passengers in three Explorers equipped with ATX tires had died after suffering rollover accidents. On February 4, 2000, Firestone issued a release stating: "We monitor the performance of all of our tires and . . . we have full confidence in them." App. at 167 (Complaint).

In March 2000, Bridgestone issued its 1999 Annual Report. It stated: "We are determined to assert a singular advantage in product technology. . . . We increased our market share in North America in 1999 in . . . the original equipment market. Our North American operations are approaching a market share **[*17]** of 20%." App. at 384 (1999 Annual Report). The Report included in its "Analysis of Financial Position" section a chart indicating that as a percentage of Bridgestone's total international net sales, its net sales in the Americas were 41.5 %, n7 followed by Japan at 40.8%, Europe 10.6% and "Others" 7.1%. *See id.* at 403. In the

"Americas" section, under the bold, purple-colored, large font heading of "Trends And Topics," the Report stated that "we increased our market share in North America in 1999 . . . Demand for original equipment tires continued to grow in 1999 in the booming North American automobile market." *Id.* at 383-84. The Annual Report also stated that "our multi-brand strategy--centered on the Bridgestone, Firestone, and Dayton n8 brands--raised our market profile further in 1999," and that "aggressive product development and strategic marketing have re-established the Firestone name as a vigorous brand in premium-grade tires, as well as a large-volume, middle-market tires." *Id.* at 384. It continued: "Ford Motor Company is our oldest customer in North America . . . We also have become a major supplier to General Motors Corporation, which recently honored us with **[*18]** its Supplier of the Year **[**7]** Award for the fifth consecutive year. As a major supplier to leading European automakers, we have developed business with the North American operations of those automakers, too. We also supply tires to nearly all the Japanese-owned vehicle plants in North America." *Id.*

n7 Bridgestone's 1999 Annual Report did not break down the sales data between North and South America, nor as between dealers in individual countries in the Americas.

n8 Dayton was a Bridgestone brand marketed, in the words of the 1999 Annual Report, to consumers seeking "value-oriented tires." App. at 384.

Each of the Annual Reports covering fiscal years 1996 to 1999 included financial statements with a category labeled "Contingent Liabilities." *See* App. at 278, 322, 367, 417-18 (1996--1999 Annual Reports, respectively). None of those reports, though, made a mention or disclosure of any loss contingency related to any of Bridgestone or Firestone's tire products that had previously been sold or sent **[*19]** to dealers.

Each of the Annual Reports from 1996 to 1998 included a letter from Bridgestone's outside auditors Asahi and Company stating that the given Annual Report was prepared "in conformity with accounting principles generally accepted in Japan applied on a consistent basis." App. at 280, 324,370 (1996--1998 Annual Reports, respectively). The 1999 Annual Report contained similar language, stating that the consolidated financial statements accompanying it were prepared "inconformity with accounting principles and practices generally accepted in Japan . . . applied on a consistent basis, except for changes, with which we concur, in the method of accounting for retirement and severance benefits and pension costs . . . and for goodwill, consolidation differences, and income taxes." App. at 422 (1999 Annual Report). The Complaint alleges that under International Accounting Standard § 9010.08-.09, applicable in Japan pursuant to the International Accounting Standards Committee, "loss contingencies should be recorded if it is probable that an asset has been impaired or a liability incurred at the balance sheet date and a reasonable estimate of the amount of the resulting loss can be **[*20]** made." App. at 178 (Complaint). Section 9010.08-09 provides further that "if either of the conditions is met and the possibility of the loss is not remote, the existence of the contingent loss should be disclosed in the financial statements." *Id.* The Complaint alleges that under this standard, Bridgestone's lack of recordings of a loss contingency in the financial statements accompanying the Annual Reports for fiscal years 1996 through 1999 related to the safety and legal problems with the Firestone ATX tires--in particular a recall--were each separately an actionable misrepresentation in violation of federal securities laws.

Generally Accepted Accounting Principles, or "GAAP," are a series of general principles followed by accountants in a given country or geographic area. Bridgestone's 1999 Annual Report stated that "the Japanese consolidated financial statements have been prepared in accordance with the provisions set forth in the . . . accounting principles and practices generally accepted in Japan ('Japanese GAAP')." App. at 413 (1999 Annual Report). It represented that the "accompanying financial statements include the accounts of certain foreign subsidiaries, which are **[*21]** based upon U.S. GAAP, representing 45% of total consolidated assets and 51% of total consolidated revenues in 1999." *Id.* Bridgestone and Firestone do not dispute that this statement was a reference to, among other non-Japanese Bridgestone subsidiaries, Firestone. United States GAAP, as set forth in Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 5 ("FASB 5"), "requires that loss be accrued whenever it is probable a loss has been incurred or an asset impaired and the amount of the loss can be reasonably estimated" and that "if the loss is at least reasonably possible but no reasonable estimate can be made, the contingency at a minimum should be disclosed." App. at 178 (Complaint). The 1999 Annual Report stated that Japanese GAAP "are different in certain material respects (*e.g.* topics addressed, available alternatives, recognition criteria, measurement practices, presentation formats and disclosures, etc.), as compared to accounting and reporting standards generally accepted in the U.S. ('U.S. GAAP')." App. at 413(1999 Annual Report). At note 11, the Report included "a supplemental discussion of the accounting differences," *id.*, and **[*22]** listed a number of "differences between Japanese and

U.S. GAAP,"*id.* at 421. Note 11 did not include a reference to FASB 5 as one of the differences between U.S. and Japanese GAAP. *See id.* The Complaint alleges that under FASB 5, Bridgestone's failure to either accrue for a loss or disclose both the ongoing losses from claims due to settlement and the **[**8]** contingency of a recall or a major loss related to the impairment of the Firestone tires was an actionable misrepresentation.

In July 2000, after consumers filed two lawsuits against Firestone alleging that ATX tire tread separation caused Ford Explorers to roll over and cause fatalities, the Wall Street Journal asked Firestone to comment. A resulting July 26, 2000 Wall Street Journal article quoted a Firestone representative as stating that Firestone had "full confidence" in its tires. App. at 170-71 (Complaint). Also in July 2000, several safety groups urged Ford to recall all Explorers with Firestone ATX tires on them. On August 1, 2000, Firestone issued a written statement that "we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, **[*23]** safe tires." *Id.* In that release, Firestone further stated that "properly inflated and maintained Firestone ATX . . . tires are among the safest tires on the road today." *Id.* On August 3, 2000, the New York Times published an article about the Explorer and Firestone's ATX tires, suggesting problems with the tires. The article reported that "Firestone denied the charges. . . . 'These are safe tires,' said . . . a [Firestone] spokeswoman." *Id.* at 171. n9 The Complaint alleges that these public statements by Firestone in July 2000 and August 2000 were misrepresentations in violation of federal securities laws.

n9 The New York Times article identified the name of the Firestone spokesperson. Because that person is not a defendant in this case, and because neither the quotation's accuracy nor the spokesperson's job description are disputed, we need not repeat it here.

On August 9, 2000, Firestone announced that effective that day, it was beginning a formal, voluntary safety recall. The recall included **[*24]** 6.5 million Firestone ATX tires on Explorers already sold and an offer to replace all Firestone ATX tires on unsold Explorers in dealers' inventory at that time. The recall specifically designated ATX tires made at Firestone's Decatur plant.

In the months immediately following the recall, Firestone and Bridgestone suffered major upheaval. In October 2000, Ono resigned as Executive Vice President of Bridgestone and Chief Executive of Firestone. In January 2001, Kaizaki resigned as Bridgestone's President and Chief Executive Officer. Saudi Arabia banned the importation of ATX tires. The two companies' images were subjected to an array of public condemnation by regulators, n10 congressional representatives from both major American political parties, n11 and industry analysts. n12

n10 *See, e.g.*, Jennifer Hoyt, *Agency Seeks Broader Authority to Probe Vehicle Safety Breaches*, Houston Chronicle, Sept. 13, 2000, at 4, *available at 2000 WL 24511175* ("NHTSA Administrator Sue Bailey said she thought the problem was with tires, but that the agency was still investigating the vehicle-tire interaction."); Nedra Pickler,*Hearings Scheduled on Tire Case*, Associated Press, Sept. 14, 2000, available at *2000 WL 26675534* ("The National Highway Traffic Safety Administration has said it is investigating 88 deaths and more than 250 injuries over the past decade involving Firestone tires. The Wall Street Journal reported Thursday that five more deaths have occurred since the recall of 6.5 million ATX, ATX-II and Wilderness AT tires was announced"); App. at 136 (quoting a statement made August 30, 2000 by Samuel Ruh Rios, President of Indecu, the Venezuelan safety agency, that Bridgestone and Ford had "met to plan ways out of a situation that was affecting their commercial interests, at the price of causing damage, destruction, and death. . . . Both companies hid information and this caused many accidents"); *id.* at 172 (quoting an August 31, 2000 Reuters Report as stating that "Venezuela's consumer protection agency recommended . . . that criminal charges be filed against Bridgestone Corp . . . over defects linked to at least 46 deaths in Venezuelan road accidents"). We take judicial notice of the fact that the media articles cited above were published, without reaching any conclusions about their truth. *See generally Fed. R. Evid. 201.* **[*25]**

n11 *See, e.g.*, Hoyt, *Agency Seeks Broader Authority, 2000 WL 24511175* ("Sens. Dianne Feinstein . . . and Herb Kohl [] announced that they would introduce a bill to increase civil penalties for withholding information from NHTSA. Their bill also would set criminal penalties for companies that knowingly allow defective vehicles or parts to be distributed if death or injury results."); App. at 172-73

(Complaint, quoting statement by United States Representative Heather Wilson, in response to claims by senior Firestone executives of lack of knowledge of fatal defects of the ATX tires: "'That's rubbish . . . You knew a long time ago.'"); *id.* at 173 (quoting Representative Billy Tauzin as stating through his spokesman, after a congressional hearing on the rollover accidents: "'This latest information only confirms our suspicion that [Bridgestone and Firestone] knew a hell of a lot more than they're willing to admit.'").

n12 *See, e.g.*, App. at 9 (Complaint) (quoting David Meyers, Associate Professor of Management at Akron University, as stating "'I'm on record as saying that the Firestone brand name is toast. . . . That company's in trouble, and that's not news. I attended the congressional hearings at which company executives testified, and those people aren't believable. I wouldn't trust them with my kids['] piggy bank'") (internal parentheses omitted); *id.* (quoting Columbia University Law School Dean and Professor David Leebron as stating, on January 21, 2001: "'This is Firestone's Pinto.'").

**[*26]** **[**9]**

Most significant was the apparent financial impact of the recall. Firestone experienced a net $ 510 million loss for the 2000 fiscal year and Bridgestone' total profits decreased from about $ 764 million in 1999 to about $ 153 million in 2000. Between August 8, the day before the recall, and September 21, 2000, Bridgestone's common stock share price on the Tokyo stock exchange dropped from over $ 2,200.00 to less than $ 1,400.00. Between those same dates, its ADR share price dropped from over $ 202.00 to less than $ 122.00. Bridgestone's earnings for fiscal year 2000 were its lowest in a decade. In the 2000 Annual Report, then-newly installed Bridgestone CEO Shigeo Watanabe stated that "net earnings declined 80% in the past year . . . That decline is attributable mainly to a special charge in connection with the tire recall in the United States. We have recorded a charge at [Firestone] of $ 754 million [] for costs already incurred in replacing the recalled tires and for potential liabilities and other legal costs in connection with the problems that led to the tire recall. . . . Fallout from the recall will remain a marketing issue for us in North America and elsewhere **[*27]** in 2001." *Id.* at 432 (2000 Annual Report). n13

n13 The recall's public policy impact has been evident as well. The public controversy surrounding the safety issues that led to the recall has in important ways influenced the policy debate in the four years since the recall. *See, e.g.*, Danny Hakim, *U.S. Regulators Release Vehicle Rollover Data*, N.Y. Times, Aug. 10, 2004, at C1, available at 2004 WLNR 5561590 ("The government rollover tests began this year at the direction of Congress, which ordered the agency to develop a track test in the wake of a series of fatal rollover crashes in the late 1990's involving Ford Explorers equipped with Firestone tires.").

In the wake of the recall, Firestone immediately launched a four-month internal investigation culminating in a report released publicly in December 2000. *See* App. at 174 (Complaint). The report found that two problems were central to the ATX tires' repeated failures. First was a problem with the tires "'shoulder pocket," an area from the sidewall **[*28]** to the tread designed to give traction in snow and off-road driving conditions. In many of the ATX tires, the shoulder pocket was made with an angle steeper than is proper such that the pocket cracked on the inside. Particularly in those tires produced at the Decatur plant, the cracking was prone to spread from the pocket to the point where two belts of rubber-coated steel fibers form the tires' core. *Id.* Second, noted the report, the materials used at the Decatur plant produced tires less likely to stay intact. To make a tire, the various layers are heated and squeezed together by fusion. The Decatur plant produced rubber pellets while the other plants used rubber sheets. In each case, the pellets or sheets were sprayed with lubricant to keep the rubber from sticking together in large globules. Lubricant makes tires stick together less. Because the pellets had a larger surface area than the sheets, the pellets in the Decatur plant were exposed to two or three times more lubricant than the sheets from other plants. After Firestone's internal report was issued, Firestone began shipping rubber sheets from other plants to the Decatur plant to avoid this problem. *Id.*

On May 11, 2001, the **[*29]** Retirement Fund (as lead named plaintiff for the Class) filed the instant Consolidated Class Action Complaint in the United States District Court for the Middle District of Tennessee alleging violations of *§ § 10(b)* and *20(a)* of the *Securities Exchange Act of 1934*, codified at *15 U.S.C. § 78j(b)*, and Securities Exchange Commission *Rule 10b-5*, codified at **[**10]** 17 C.F.R. § 240. n14 *See* App. at 130-186. The four defendants--Bridgestone, Firestone, Kaizaki, and Ono--moved to dismiss the Complaint on a variety of grounds. *See* App. at 191-526.

n14 On January 4, 2001, the Retirement Fund filed a class action against the now defendant-appellees in the United States District Court for the Middle District of Tennessee, alleging securities fraud. On January 22, 2001, plaintiff Patricia Ziemer filed a similar Complaint in that same court against the same defendants. On April 11, 2001, the district court consolidated the two actions into the instant case.

On September 30, 2002, the district **[*30]** court issued a lengthy memorandum opinion and accompanying order dismissing the Complaint. *See* App. at 975-1038. Two of the district court's rulings are relevant in this appeal, each of which we describe in further detail within our analysis in Part II. First, the district court granted Kaizaki's motion to dismiss for lack of jurisdiction. Second, the district court granted--as to the remaining three defendants, Bridgestone, Firestone, and Ono--their motions to dismiss with prejudice all counts for failure to state a claim upon which relief can be granted under *Federal Rule of Civil Procedure 12(b)(6).*

The Retirement Fund appeals.

## II. DISCUSSION

On appeal, our analysis proceeds in three parts. Part II(A) articulates the applicable standards of review. Part II(B) assesses whether the district court erred in granting Kaizaki's motion to dismiss for lack of personal jurisdiction and concludes that it did not. Part II(C) addresses the merits and divides into two sections. Part II(C)(1) discusses whether the Complaint adequately pleaded any actionable statements and concludes, contrary to the district court, that one statement by Firestone **[*31]** and two statements by Bridgestone were actionable but, like the district court, that the remaining alleged statements in the Complaint were not actionable. Part II(C)(2) analyzes whether, for those three actionable statements, the Complaint adequately pled scienter as against Bridgestone, Firestone and Ono. It concludes that the Complaint did so for at least one statement with respect to each of the two corporate defendants, but did not do so with respect to Ono.

### A. Standards of Review

We review de novo the district court's dismissal of the counts against Kaizaki for lack of personal jurisdiction. *See Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., 91 F.3d 790, 793 (6th Cir. 1996).* We also review de novo the district court's dismissal of the securities fraud complaint against Bridgestone, Firestone, and Ono for failure to state a claim upon which relief can be granted.*PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 680, 91 Fed. Appx. 418 (6th Cir. 2004).* In performing that review, we, like the district court, "must accept as true 'well-pleaded facts' set forth in the complaint." *Id.* (quoting *Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)).* **[*32]** The Retirement Fund "need only give a 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Lawler v. Marshall, 898 F.2d 1196, 1199 (6th Cir. 1990)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). Rule 12(b)(6)* allows a dismissal for failure to state a claim only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Id.* "What *Rule 12(b)(6)* does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations." *Lawler, 898 F.2d at 1199* (quoting *Neitzke v. Williams, 490 U.S. 319, 328, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989)).* Construing the Complaint in a light most favorable to the Retirement Fund, we must determine whether it "undoubtedly can prove no set of facts in support of [its] claims that would entitle [it] to relief." *PR Diamonds, 364 F.3d at 680.* That said, we do not accept as true "the bare assertion of legal conclusions," *In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997)* (internal quotation omitted), **[*33]** nor do we "accept as true legal conclusions or unwarranted factual inferences," *id.* (quoting *Morgan, 829 F.2d at 12*). Further, we may affirm **[**11]** the district court on any ground supported by the record. *Hoffman v. Comshare, Inc. (In re Comshare Inc. Sec. Litig.), 183 F.3d 542, 547-48 (6th Cir. 1999).*

### B. Personal Jurisdiction

The *Due Process Clause of the United States Constitution* "permits the exercise of both general and specific jurisdiction." *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators, Ltd., 138 F.3d 624, 627 (6th Cir. 1998).* "General jurisdiction exists when a defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims." *Id.* (internal quotation omitted). Kaizaki lives today in Japan and at all relevant times lived and worked in Japan. The Retirement Fund does not argue that the district court could assert general jurisdiction over him. Rather, it argues that the district court should have exercised specific jurisdiction over him, which, in contrast, "subjects the defendant to 'suit in the forum state only on claims that **[*34]** arise out of or relate to a defendant's contacts with the forum.'" *Id. at 627-28* (quoting *Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414, 80 L. Ed. 2d 404, 104 S. Ct. 1868 & n. 8 (1984)* (internal quotations in original omitted)).

Whether specific jurisdiction exists over Kaizaki depends on three criteria. *Id. at 628*. First, he must have purposefully availed himself of the privilege of acting in the United States or have purposefully caused a consequence in the United States. *Id.* Second, the cause of action must arise from his actions in the United States. *Id.* Finally, the exercise of jurisdiction by a court within the United States n15 over Kaizaki must be reasonable under the circumstances of this case. *Id.* The district court held that the Retirement Fund's Complaint failed all three prongs. *See* App. at 997-1002. We must affirm the district court's holding if we conclude that any one of the three prongs are not satisfied. *See, e.g., LAK, Inc. v. Deer Creek Enters., 885 F.2d 1293, 1303 (6th Cir. 1989)* ("Each criterion represents an independent requirement, and failure to meet *any* of the three means that **[*35]** personal jurisdiction *may not* be invoked.") (emphasis added).

n15 The Securities Exchange Act includes a nationwide service-of-process provision. *See 15 U.S.C. § 78aa*. Therefore, the "forum" for the purposes of personal jurisdiction analysis in the Kazaiki's context is the United States, rather than any particular federal judicial district within the United States. *See United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1330 (6th Cir. 1993)* (holding that *15 U.S.C. § 78aa* "confers personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States").

Upon review, we conclude, under the circumstances of this case, that the third, "reasonableness" prong tips against exercising jurisdiction against Kaizaki. Whether the exercise of jurisdiction over a foreign defendant is reasonable is a function of balancing three factors: "the burden on the defendant, the interests of the forum State, and the **[*36]** plaintiff's interest in obtaining relief." *Asahi Metal Indus. v. Superior Ct. of Cal., 480 U.S. 102, 113, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).*

Applying that balancing test to this case, there is clearly potential, should this suit go forward, for some substantial burden on Kaizaki. The Supreme Court has cautioned that "*great care and reserve* should be exercised when extending our notions of personal jurisdiction into the international field,'" *id. at 115* (internal quotations omitted) (emphasis added), and that "the unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders," *id. at 114*. In performing this balancing of interests, we keep an eye towards "the interstate judicial system's interest" in judicial economy and "the shared interest of the several States in furthering fundamental substantive social policies." *Id. at 113*. In *Aristech*, decided in 1998, this Court upheld the reasonableness of exercising jurisdiction over a Canadian executive by reasoning, in part, **[*37]** that "a Canadian defendant . . . bears a substantially lighter burden than does a *Japanese* defendant - or for that matter, most other foreign defendants," since "only a short plane flight separates Ontario from Kentucky." *138 F.3d at 628* (emphasis added). "This is not a case," the **[**12]** court in *Aristech*, "where the exercise of jurisdiction requires a company to travel from the other side of the world or even across the Atlantic [ocean]." *Id.* (internal citations omitted). In contrast, of course, Kaizaki is living in Japan, and is a retired senior citizen at that. Though, presumably, a deposition or other proceedings involving Kaizaki's participation could be conducted by telephone or by counsel in Japan, circumstances might necessitate his traveling to the United States for a trial or other litigation-related purpose.

Turning to the other side of the scale, the countervailing interests of the United States as the forum and the class plaintiffs in the instant suit being prosecuted against Kaizaki are relatively light. The key defendants, we think, are Bridgestone and Firestone, the two corporate entities with substantial ongoing business affairs in the **[*38]** United States. The court's personal jurisdiction over the corporate defendants, and indeed over defendant Ono, is conceded. n16 Thus, the marginal addition of Kaizaki would add little or nothing to the potential recovery should the plaintiffs ultimately prevail on the merits and be awarded damages, for which Kaizaki would be at most "liable jointly and severally," but not separately liable. *15 U.S.C. § 78t(a).* We thus agree with the district court's conclusion that "because Bridgestone, Firestone and Ono are subject to jurisdiction, no actual violation of securities laws would go unpunished, and any [recovery] is highly unlikely to be affected by Kaizaki's dismissal." App. at 1001. Though the United States and the class plaintiffs of course have an interest in the enforcement of federal securities laws, those interests as against Kaizaki are tempered in the circumstances of this case. We find no error in the district court's conclusion that exercise of jurisdiction over Kaizaki in the circumstances of this case was not reasonable. Thus, even assuming, without deciding, that the first two prongs of the three-part specific jurisdiction test are satisfied, the **[*39]** district court did not err in granting Kaizaki's motion to dismiss for want of personal jurisdiction on the grounds that the third "reasonableness" prong was not satisfied.

n16 Bridgestone did not cross-appeal the denial of its motion to dismiss for lack of personal jurisdiction. Neither Ono or Firestone have contested personal jurisdiction.

The Retirement Fund suggests that even if we conclude that the circumstances of this case do not satisfy the test for personal jurisdiction over foreign defendants, its "allegations of control person liability" nonetheless "provide personal jurisdiction over Kaizaki." Appellant's Br. at 53. The notion of a control person derives from *§ 20(a) of the Securities Exchange Act*, which attaches liability to "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the **[*40]** violation or cause of action." *15 U.S.C. § 78t(a)*. The term "control" in this context is defined by the code of federal regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *17 C.F.R. § 230.405*.

There is a division of judicial authority as to whether showing that a defendant is a controlling person within the meaning of these provisions (and thereby potentially liable under the securities law to the same extent as the controlled entity) is automatically sufficient to bring that defendant within the personal jurisdiction of the court merely because the controlled entity itself has the requisite jurisdictional contacts. *See, e.g.*, *In re Baan Co. Sec. Litig., 245 F. Supp. 2d 117, 128-29 (D.D.C. 2003)* (collecting cases). This court has not apparently addressed the issue.

The Retirement Fund's theory is supported most prominently by *San Mateo County Transit Dist. v. Dearman, Fitzgerald, & Roberts, Inc., 979 F.2d 1356 (9th Cir. 1992)*. **[*41]** That decision held that jurisdiction is appropriate if the plaintiff makes only "a non-frivolous allegation that the defendant controlled a person liable for the fraud." *Id. at 1358*; *see also McNamara v. Bre-X* **[**13]** *Minerals Ltd., 46 F. Supp. 2d 628, 636-37 (E. D. Tex. 1999)* (adopting a rule that "the Court has personal jurisdiction over any Defendant as to which the Plaintiffs make a *prima facie* showing of control person liability."). Kaizaki responds that "[a] claim of statutory liability . . . is no substitute for establishing personal jurisdiction." Appellees Bridgestone and Kaizaki's Br. at 46 n.18 & accompanying text. We agree. "Liability is not to be conflated with amenability to suit in a particular forum. Personal jurisdiction has constitutional dimensions, and regardless of policy goals, Congress cannot override the due process clause, the source of protection for non-resident defendants." *AT&T Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 590-591 (9th Cir. 1996)* (internal citations omitted). The broad understanding of control person liability adopted by the securities laws cannot on its own support personal **[*42]** jurisdiction. This approach would, as one persuasive opinion stated, "impermissibly conflate[] statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair." *In re Baan, 245 F. Supp. 2d at 129 (Huvelle, J.)*. Though they may involve a similar contact-based analysis, ultimately, the two inquiries must be distinct: "control person liability under the securities laws is not germane to the issue of personal jurisdiction . . . ." *FDIC v. Milken, 781 F. Supp. 226, 234 (S.D.N.Y. 1991)* (Pollak, J.).

We thus reject the Retirement Fund's invitation to substitute our analysis of the securities laws' substantive bases for liability for the required, due-process based personal jurisdiction analysis, and therefore decline to address Kaizaki's potential liability as a control person. For the foregoing reasons, we hold that the district court did not err in granting Kaizaki's motion to dismiss for want of personal jurisdiction. We turn then to the merits of the Complaint and analyze whether the district court erred in granting the motion to dismiss as against the other three defendants on the grounds that **[*43]** it failed to state a claim upon which relief could be granted.

**C. Merits**

Since their enactment in response to the stock market crash of 1929, the "basic policies underlying securities regulation" have been that "'there cannot be honest markets without honest publicity'" because "'manipulation and dishonest practices of the market place thrive upon mystery and secrecy.'" *Helwig, 251 F.3d at 556* (quoting *Basic Inc. v. Levinson, 485 U.S. 224, 230, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)* (quoting H.R. Rep. No. 1383, at 11 (1934))). The Supreme Court "'repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure,'" *Helwig, 251 F.3d at 556* (quoting *Basic, 485 U.S. at 230*)), "to substitute a philosophy of full disclosure for the philosophy of caveat emptor," *Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 31 L. Ed. 2d 741, 92 S. Ct. 1456 (1972)* (quoting *SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, 11 L. Ed. 2d 237, 84 S. Ct. 275 (1963))*. Generally, federal securities law prohibits "fraudulent, material misstatements or omissions in connection with the **[*44]** sale or purchase of a security." *Morse v. McWhorter, 290 F.3d 795, 798 (6th Cir. 2002)*. Specifically, in order to state a claim under *Section 10(b)*

*of the Securities Exchange Act of 1934*, or under SEC *Rule 10b-5*, a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury. *Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001)* (en banc) (citing *Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir. 1991))*; *see also Sofamor Danek, 123 F.3d at 400*. n17 A statement is said to be "actionable" when it satisfies the first two of these requirements, i.e., it is a misrepresentation or omission of a material fact that the defendant had a duty to disclose. *See, e.g., Nathenson v. Zonagen Inc., 267 F.3d 400, 415 (5th Cir. 2001)*; *Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir. 2001)*.

N17 The Complaint also alleges liability against Kaizaki and Ono under § 20(a) of the Securities Exchange Act of 1934, *15 U.S.C. § 78t(a)*, which provides for liability of controlling persons. As discussed above, we need not analyze the merits of the *§ 20(a)* claim against Kaizaki because we resolve those claims on the jurisdictional issue. And, as discussed below, we need not resolve the "merits" of the control person liability theory against Ono beyond our conclusion that the Complaint does not adequately plead scienter against him.

**[*45] [**14]**

The district court held that the Retirement Fund's Complaint failed to plead adequately any actionable statements for any allegedly fraudulent statements. It held, in the alternative, that the Retirement Fund failed to plead scienter adequately. The district court did not address the remaining two elements of the claim: reliance and proximate cause. As detailed in the discussion that follows, the district court's merits holdings were in part erroneous.

**1. Actionable Statements**

In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant had a duty to disclose, two significant limitations to the general policy of disclosure. *See, e.g., Basic, 485 U.S. at 238* ("In order to prevail on a *Rule 10b-5* claim, a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.") (emphasis in original omitted); *In Re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997)* ("There is no general duty on the part of a company to provide the **[*46]** public with all material information."). As this Court has recognized, this set of requirements preserves the healthy limits on a public corporation's "duty to disclose all information[,] even colorably material," because corporations might otherwise "face potential second-guessing in a subsequent disclosure suit," a regime that would threaten to "deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public." *Sofamor Danek, 123 F.3d at 403* (internal quotations and citations omitted). A duty to affirmatively disclose "may arise when there is insider trading, a statute requiring disclosure," or, as relevant to this case, "an inaccurate, incomplete or misleading prior disclosure." *In re Digital Island Sec. Litig., 357 F.3d 322, 329 n.10 (3d Cir. 2004)* (internal quotations omitted).

As for materiality, whether or not a statement is material turns on "a fact-intensive test." *Helwig, 251 F.3d at 555*. n18 "'Materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.'" *Id.* (quoting *Basic, 485 U.S. at 240*). **[*47]** That is, would the information, had it been presented accurately, have "'significantly altered the 'total mix' of information made available?'" *Id. at 563* (quoting *Basic, 485 U.S. at 231-32*).

n18 *Cf.* R. Gregory Roussel, *Securities Fraud or Mere Puffery: Refinement of the Corporate Puffery Defense, 51 Vand. L. Rev. 1049, 1064-66 (1998)* (discussing the virtues of the "contextual standard," as distinguished from rigid, bright-line rules, in assessing whether a statement should be classified as puffery).

In this vein, this Court has distinguished between "hard" and "soft" information." *Sofamor Danek, 123 F.3d at 401-02*. "Hard information is typically historical information or other factual information that is objectively verifiable." *Id. at 401* (internal quotations omitted). Publicly disclosed, hard information is actionable if false and material.

"Soft information," on the other hand, includes "predictions and matter of opinions." *Id. at 402*. **[*48]** The failure to disclose soft information is actionable "'only if [it is] . . . virtually as certain as hard facts.'" *Starkman v. Marathon Oil Co., 772 F.2d 231, 241 (6th Cir. 1985))*. Thus, federal courts "everywhere 'have demonstrated a willingness to find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace--loosely optimistic statements that are so

vague, [and] so lacking in specificity, . . . that no reasonable investor could find them important to the total mix of information available.'" *In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570-71 (6th Cir. 2004)* (quoting *Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996))*.

However, opinions may be deemed false or misleading under the securities laws if proof of their falsity can be established "through the orthodox evidentiary process." *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090, 1091-93, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991)*. For such statements, "'a company is **[**15]** generally under no obligation to disclose its expectations for the future to the investing **[*49]** public.'"*Helwig, 251 F.3d at 564* (quoting, with approval, *Kowal v. MCI Communications Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 1277 (D. C. Cir. 1994))*. If a company "chooses to volunteer such information," though, "its disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts . . . to the extent that the volunteered disclosure was misleading . . . ." *Id.* (internal quotations omitted). Our securities laws therefore "require an actor to 'provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'"*Helwig, 251 F.3d at 561* (quoting *Rubin v. Schottenstein, 143 F.3d 263, 268 (6th Cir. 1998)* (en banc)).

> The question thus is not whether a [defendant's] silence can give rise to liability, but whether liability may flow from his decision to speak . . . concerning material details . . . ., without revealing certain additional known facts necessary to make his statements not misleading. This question is answered by the text of [SEC] *Rule 10b-5(b)* itself: it is unlawful for any person to "omit to **[*50]** state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."

*Rubin, 143 F.3d at 267* (quoting *17 C.F.R. § 240.10b-5(b)*).

With these standards in mind, we consider whether the plaintiffs have alleged any actionable statements. The alleged statements fall into two categories: (1) public statements by Bridgestone and Firestone affirming the safety or quality of Firestone's tires; and (2) allegedly false representations made by Bridgestone in the financial statements accompanying its Annual Reports.

**a. Statements about the Quality or Safety of Firestone's ATX Tires**

The Retirement Fund argues that a number of public statements by Bridgestone and Firestone about the quality or safety of Firestone's ATX times (summarized in Part I) are actionable because they were made "while in possession of specific, adverse information undermining the truth of those statements," Appellant's Br. at 40, thereby engendering a duty to disclose known adverse information about the safety of Firestone's tires. These statements include: (1) Bridgestone's 1996 **[*51]** Annual Report statement that it sold "the best tires in the world," its publicly distributed written statement in "late 1996" that it had "no reason to believe there is anything wrong with [its ATX tires]"; (2) Bridgestone's 1997 Annual Report statement that its products demonstrated "global consistent quality"; (3) Bridgestone's 1997 Annual Report statement that "rigorous testing under diverse conditions at our proving grounds around the world helps ensure reliable quality for original equipment customers"; (4) Bridgestone's 1998 Annual Report statement that sales success in North American was due to "high regard among automakers for our strengths in product quality;" (5) Bridgestone's 1999 Annual Report statement that "we have built a premium-quality for . . . Firestone tires" and that "aggressive product development" had "re-established the Firestone name as a vigorous brand in premium-grade tires;" (6) Firestone's statements in February 2000 that it had "full confidence" in the ATX tires and that "our experience with Radial ATX indicates high consumer satisfaction with the quality and reliability of these tires"; (7) Firestone's statement in July 2000 that it had "full confidence" **[*52]** in its tires; and (8) Firestone's statement on August 1, 2000 that "we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires" and that "these are safe tires."

As to Bridgestone's statements, the district court concluded that they were "statements of self-praise and confidence in its future," which "constituted immaterial opinions." App. at 1019. Similarly, as to Firestone's statements, the district court held that they were "of general optimism and in defense of its products . . . [and] immaterial as a matter of law." *Id.* at 1029. Accordingly, the district court held that all of these statements were non-actionable. **[**16]**

On appeal, Bridgestone and Firestone likewise argue that these statements were immaterial puffery. With one important exception - the statement in Firestone's August 1, 2000 concerning "objective data" - we agree that the

statements recited above are best characterized as loosely optimistic statements insufficiently specific for a reasonable investor to "find them important to the total mix of information available." *In re Ford, 381 F.3d at 570-71* **[*53]** (quoting *Shaw, 82 F.3d at 1217*)). These statements, both on their own terms and in context, lacked a standard against which a reasonable investor could expect them to be pegged; such statements describing a product in terms of "quality" or "best" or benefitting from "aggressive marketing" are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision. The statements are analogous to those deemed immaterial by abroad spectrum of federal courts. *See, e.g., Longman v. Food Lion, Inc., 197 F.3d 675, 684 & n.2 (4th Cir. 1999)* (concluding that the statements that "Food Lion is one of the best-managed high growth operators in the food retailing industry" and that it provided its employees with "some of the best benefits in the supermarket industry" were "immaterial puffery"); *Grossman v. Novell, Inc., 120 F.3d 1112, 1121 (10th Cir. 1997)* (holding that a company's statement that it had achieved "substantial success" in integrating the sales force of two merged companies was "an immaterial statement[] of corporate optimism"); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996)* **[*54]** (holding that a company's statements that it was "optimistic" about its earnings and "should deliver income growth consistent with its historically superior performance" was non-actionable "puffery"); *In re Cybershop.com Sec. Litig., 189 F. Supp. 2d 214, 229 & 232 (D.N.J. 2002)* (holding that the statement that "we are well prepared for the holiday season and believe it will clearly differentiate us as the leader in our segment of online retail" was not material); *In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 220 (D. Mass. 1999)* (holding that the statement that company's product was enjoying "unprecedented market demand" was non-actionable puffery). We conclude that the district court did not err in dismissing the claims based on these statements.

**Firestone's August 1, 2000 Press Release: "Objective Data" Statement**. We reach a different conclusion, however, with respect to the statement in Firestone's August 1, 2000 press release. In that press release, Firestone stated: "we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires. **[*55]** " The context of statements is often telling. *See, e.g., Casella v. Webb, 883 F.2d 805, 808 (9th Cir. 1989)* ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."); *Scritchfield v. Paolo, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003)* (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery")). So it is with Firestone's August 1, 2000 statement. In July 2000, consumers filed multiple lawsuits against Firestone alleging that ATX tire tread separation caused Ford Explorers to roll over and caused fatalities. That same month, several safety groups urged Ford to recall the Explorers with Firestone ATX tires on them. On August 1, 2000, Firestone issued the statement concerning the "objective data." A reasonable juror could infer that the "objective data" representation **[*56]** was a direct response to the lawsuits, or to the public challenges to the safety of Firestone's tires, or to both.

A reasonable juror could also conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation. In 1996, Firestone had performed random quality control high-speed durability tests on ATX tires. In one of the sample tests, Firestone examined 129 ATX tires made at the Decatur plant. Eighteen of those tires failed the test due to tire tread separation. In another random test of 229 ATX tires from Decatur, thirty-one failed. In an additional random test of 18 ATX tires, eight failed, seven of which were from the Decatur plant. Internal Firestone documents show that Firestone knew since 1996-1997 from property damage and injury claims and tire performance data, **[**17]** such as warranty adjustments and financial analysis of such claims, that its ATX tires were failing at unprecedented rates. Similarly, a Firestone chart reveals that from 1998 to 1999, tread separations for the Wilderness ATX tires--one of the ATX models--increased by 194%. According to a 1999 internal **[*57]** Firestone report, in 1997 and 1998, another of the ATX models--the ATX II tires--accounted for the majority of Firestone's claims but less than 10% of its total production. Further, in Venezuela, between 1990 and 1998, over forty people were killed in Explorer accidents due to ATX tire failures and Ford had demanded that Firestone alter the design of its ATX tire being sold in Venezuela to include a nylon layer.

Firestone does not point to any record evidence showing its statement regarding the "objective data" was supported with respect to the ATX tires. It may be the case that at the summary judgment or trial stages of this dispute, Firestone will identify evidence that persuades the finder of fact that, as of the date of its statement on August 1, 2000 that "properly inflated and maintained Firestone ATX . . . tires are among the safest tires on the

road today," *id. at 171*, the available objective data supported that claim. Or perhaps Firestone will introduce some other evidence showing that its statement about the objective data was in fact not misleading or false. However, at this stage in the lawsuit, construing the Complaint in a light most favorable to the **[*58]** Retirement Fund, *see PR Diamonds, 364 F.3d at 680*, we conclude that Firestone's representation concerning "objective data" could be deemed a material misrepresentation by a reasonable fact-finder. *See, e.g., Hanon v. Dataproducts Corp., 976 F.2d 497, 502 (9th Cir. 1992)* (holding that the defendants' statements emphasizing superior quality were material because "a reasonable jury could conclude that [the company] publicly released optimistic statements . . . when it knew [its product] could not be built reliably"); *In re ValuJet, Inc. Sec. Litig., 984 F. Supp. 1472, 1477-78 (N.D. Ga. 1997)* (statement that airline's safety record was "certifiably among the very best in the airline industry" was material and actionable); *In re F & M Distribs. Inc. Sec. Litig., 937 F. Supp. 647, 653 (E. D. Mich. 1996)* (holding that the defendant chain store's failure to disclose an adverse industry trend that made the "deal buying" strategy touted in its prospectus less viable than otherwise known could be actionable); *In re Medimmune, Inc. Sec. Litig., 873 F. Supp. 953, 967 (D. Md. 1995)* (holding that a drug company's **[*59]** statements that "the results of treatment with [its product] were highly statistically significant along all of the efficacy parameters," and "the data are overwhelmingly good" were material and actionable); *Cohen v. Prudential-Bache Sec., Inc., 713 F. Supp. 653, 658 (S.D.N.Y. 1989)* (holding that a broker's statement to a client that she "would receive a very strong cash flow without risk to her initial investment" could not be dismissed as immaterial puffery).

In holding that Firestone's August 1, 2000 statement was actionable, we express no opinion as to whether Firestone necessarily had an obligation to disclose the various safety and looming regulatory issues surrounding the ATX tires regardless of whether it affirmatively spoke on the subject. The Retirement Fund does not rely on that allegation and, indeed, has waived such an argument. *See* App. at 558 (the Retirement Fund stating in a brief to the district court that "plaintiffs do not contend that in the face of defendants' silence they should have disclosed the defects in the ATX tires."). We merely hold that once Firestone elected to make statements such as the statement regarding the "objective data, **[*60]** " it was required to qualify that representation with known information undermining (or seemingly undermining) the claim. *See Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir. 1993)* ("Corporate officers are not required to speak, but once they do, they must be truthful if their comments are material to investors' decisionmaking."); *In re K-tel Intern, Inc. Sec. Litig., 300 F.3d 881, 896, 898 (8th Cir. 2002)* ("The requirement is not to dump all known information with every public announcement, but the law requires 'an actor to provide complete and **[**18]** non-misleading information with respect to the subjects *on which he undertakes to speak*.'" (quoting*Helwig, 251 F.3d at 561*) (emphasis added by Eighth Circuit). n19

n19 Contrary to Bridgestone and Firestone's assertions, such a conclusion is consistent, or not inconsistent, with this court's decision in *Sofamor Danek, 123 F.3d at 401-02*. In that case, the defendant corporation was silent as to the alleged product defects and likely regulatory problems and this court held there was no actionable omission. In contrast, Firestone (and Bridgestone) chose to speak, implicating, through that choice, the duty to speak truthfully as to the topics on which it spoke.

**[*61]**

Firestone also argues that the August 1, 2000 statement is non-actionable because it was "immaterial as a matter of law." Appellee Firestone's Br. at 40. Echoing the district court, Firestone argues that the statement was one of '"of general optimism and in its defense of its products,'" *id.* (quoting App. at 1018), and one that "reflected the market's understanding that others had suggested the products were not as safe as Firestone believed." Appellee Firestone's Br. at 47. As such, Firestone argues, the statement does '"not come within the duty of disclosure,'" *id.* at 44 (quoting *Sofamor Danek, 123 F.3d at 402*), because such opinions are '"routinely discounted by reasonable investors," *id.*

We reject this argument also, for several reasons. First, we do not agree that the statement that "the objective data clearly reinforces our belief that these are high-quality, safe tires" was a statement of general optimism or purely opinion. Rather, the statement was an assertion of a relationship between data and a conclusion, one that a finder of fact could test against record evidence.

Second, even if the statement regarding "objective data" was best classified **[*62]** as an opinion, it was still specific enough to form the basis of an actionable securities fraud claim. Federal courts have drawn the line on whether a statement may be actionable based, not on whether in the abstract a statement was best characterized as fact or opinion but, rather, if it was an opinion, on the nature of the statement. The key is whether the proposition at issue can be proven or disproven using standard tools of evidence. Thus, as

alluded to above, vague statements not subject to verification by proof are generally deemed non-actionable puffery. But "opinion or puffery . . . in particular contexts when it is both *factual and material* . . . *may* be actionable." *Longman, 197 F.3d at 683* (emphasis added).

For example, in *Virginia Bankshares*, the Supreme Court held that an opinion expressed by a corporation's board members to its minority stockholders that the stock price of $ 42.00 for the purchase of the company's shares was a "high value" and represented a "fair" transaction could be both factual and material. *501 U.S. at 1093*. In so holding, the Court expressly rejected the petitioner's argument, similar to that offered by Firestone **[*63]** here, that the Court "would invite . . . amorphous issues outside the readily provable realm of fact if [it] were to recognize liability . . . on proof that the directors did not recommend the merger for the stated reason." *Id. at 1091*. "It is no answer to argue," the Court stated, "that the quoted statement on which liability was predicated did not express a reason in dollars and cents, but focused instead on the 'indefinite and unverifiable' term, 'high' value, much like the similar claim that the merger's terms were 'fair' to shareholders." *Id. at 1093*. "The objection ignores the fact," observed the Court, "that such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* Rather, "provable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more **[**19]** definite statements, and defended or attacked through the orthodox evidentiary process that either substantiates their underlying **[*64]** justifications or tends to disprove their existence." *Id.* n20

n20 This court has recognized that "*Virginia Bankshares* is instructive for" materiality analysis in *§ 10(b)* cases because although the Court in *Virginia Bankshares* was concerned with *§ 14(a)*, not *§ 10(b) of the Securities Exchange Act*, "the [SEC] has promulgated the same rule for each section: violations occur under each section whenever a statement is false or a material omission makes the statements which are made misleading." *Mayer v. Mylod, 988 F.2d 635, 639 n.2 (6th Cir. 1993)* (citing *17 C.F.R. § § 240.10b-5* and *240.14a-9 (1991)*).

This court's en banc decision in *Helwig* also reflected these insights. In that case, the defendant corporation stated that it was "comfortable" with favorable earnings per shares estimates made before the passage of a piece of legislation even though in secret, internal communications, the corporation was making negative predictions **[*65]** about the impact of the statute on earnings. *Helwig*recognized that such opinions about a verifiable assertion "contain 'at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement.'" *Helwig, 251 F.3d at 557* (quoting *Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d 1109, 1113 (9th Cir. 1989))*. Reversing the district court's dismissal of the securities fraud claim, *Helwig* noted that unlike the facts underlying this court's decisions in"*Sofamor Danek*, [in which] the information claimed as adverse to the company had already been disclosed and was publicly available to permit an independent assessment by investors and analysts," or "*Starkman*, [which] was a case about non-disclosure," *id.*, the complaint in *Helwig*"was about *selective* disclosure of information . . . essential to complete a picture [the defendants] had only partially revealed." *Helwig, 251 F.3d at 560* (emphasis added). **[*66]** "The protections for soft information," *Helwig* stated, "end where speech begins." *Id.*

As in *Helwig*, the Retirement Fund's Complaint pleads a theory of liability for selective, incomplete disclosure. Following *Helwig*, we conclude that a reasonable juror in this case could conclude that Firestone's statement that "the objective data clearly reinforces our belief that these are high-quality, safe tires" carried with it the representation that there was a reasonable basis for that belief, and that Firestone was not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement, and that both those representations were misleading. That juror could thus find that the statement concerning objective data was actionable. *Accord Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996)* (holding that a company's statements regarding the safety of its new products were actionable where the reassuring statements "were designed to prevent shareholder flight in the aftermath of a damaging report regarding the possible hazards of [the product]").

Finally, as to Firestone's contention that the statement about the "objective data" is non-actionable **[*67]** because it "reflected the market's understanding that others had suggested the products were not as safe as Firestone believed," Appellee Firestone's Br. at 47, this argument mischaracterizes the facts as pled in the Complaint. A number of courts have indeed suggested that misrepresentations about a fact already known to the marketplace are not actionable. n21 And, although this

Court has not directly addressed this theory, it voiced the logical complement in *Helwig*, which, in reaching its conclusion that the statement at issue was material, relied in part on the fact that the information at issue was "known *exclusively*" to the defendants. *251 F.3d at 560* (emphasis added). It makes logical sense that a claim based on the alleged withholding from the **[**20]** public of information that contradicts information publicly stated is defeated by a demonstration that the allegedly withheld information was in fact disclosed to the public; however, that rule is not apposite here. Contrary to the implications of Firestone's argument, that "others" had "suggested the products were not as safe as Firestone believed" does not demonstrate that the market had received the adverse **[*68]** information--about the tires' test data, the claims for liability based on tire failure, and the deaths in the United States and abroad--that form the basis of the information the Retirement Fund alleges was withheld from the public. Rather, in an open and efficient securities market "information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices." *In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1425* (internal citation omitted). And, indeed, not until after Firestone's August 9, 2000 recall did the share value for both the Bridgestone common stock and Bridgestone ADRs each plummet by over one third of their value in approximately six weeks: between August 8, the day before the recall, and September 21, 2000, Bridgestone's common stock share price on the Tokyo stock exchange dropped from over $ 2,200.00 to less than $ 1,400.00, and its ADR share price from over $ 202.00 to less than $ 122.00. Accordingly, a reasonable juror could conclude that the revelations that accompanied the announcement of the August 2000 recall were in part reflected in this substantial share price change, which would suggest strongly **[*69]** that the market had not--prior to the public disclosures encapsulated in the recall--received the full extent of information related to the safety-related problems associated with Firestone's tires, and that such information was quite important to investors.

n21 *See, e.g., Longman, 197 F.3d at 684* ("Plaintiffs' securities fraud claim cannot succeed because, despite the fact that Food Lion denied the charges, the nature of the off-the-clock claims and the claims' risk to earnings were in fact well known to the market before the Prime Time Live broadcast, and therefore Food Lion's omissions were not material."); *In re Apple Computer Sec. Litig., 886 F.2d 1109, 1115 (9th Cir. 1989)* ("We conclude that in a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources.").

For the foregoing reasons, we hold that while most of the statements alleged by the **[*70]** Retirement Fund were insufficiently specific to be actionable, the August 1, 2001 statement regarding "objective data" is actionable. We turn now to Bridgestone's alleged misrepresentations in the Annual Reports' financial statements.

**b. Financial Statements in Bridgestone's Annual Reports**

The district court held that none of the claims based on financial statements in Bridgestone's Annual Reports for fiscal years 1996 through 1999 were actionable. The district court reasoned that the Complaint "failed to plead a single fact that would have caused a reasonable investor to believe that Bridgestone's financial statements were prepared according to United States GAAP, or that a reasonable investor would have relied on this belief," failed to "plead any particular fact that could establish any inference that Bridgestone violated Japanese GAAP," and that "even if Bridgestone was subject to United States GAAP," the Complaint "failed to plead with particularity any facts establishing a strong inference that Bridgestone should have 'considered probable' a Firestone recall and thus established a huge contingent liabilities fund." App. at 1016 (quoting FASB 5). Bridgestone argues that **[*71]** we should affirm on essentially the district court's rationales. As discussed below, we disagree with that conclusion with respect to the statement in Bridgestone's 1999 Annual Report, but agree with the result reached by the district court concerning the claims based on the financial statements in Bridgestone's 1996-1998 Annual Reports.

**i. Bridgestone's 1999 Annual Report**

Issued in March 2000, Bridgestone's 1999 Annual Report included at least two representations that a reasonable juror might conclude were material misrepresentations: (1) that no impairment of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions (the "No Impairment" representation); and (2) that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires (the "No Loss" representation). **[**21]**

**(a) The "No Impairment" Representation**

The 1999 Annual Report included several groups of statements that, taken together, constituted a representation to the investing public that no impairment of Bridgestone's corporate assets was substantially

certain to occur through **[*72]** problems arising from customers or regulators' actions. The below comparison of the Annual Report's accounting policy statements, the actual disclosures under those statements, and the alleged "on the ground" facts at Bridgestone and Firestone, reveals why a reasonable juror could conclude that this statement was a misrepresentation.

The accounting policy statements communicated to the investing public that if a loss or asset impairment was probable, the Annual Report would disclose that contingency in some form. The 1999 Report included a letter from Bridgestone's outside auditors stating that it was prepared "inconformity with accounting principles generally accepted in Japan applied on a consistent basis." Under International Accounting Standard § 9010.08-.09, applicable in Japan pursuant to the International Accounting Standards Committee, "loss contingencies should be recorded if it is probable that an asset has been impaired or a liability incurred at the balance sheet date and a reasonable estimate of the amount of the resulting loss can be made." Section 9010.08-09 provides further that "if either of the conditions is met and the possibility of the loss is not remote, the **[*73]** existence of the contingent loss should be disclosed in the financial statements." The 1999 Report also stated that "the Japanese consolidated financial statements have been prepared in accordance with the provisions set forth in the . . . accounting principles and practices generally accepted in Japan ('Japanese GAAP')." It further represented that Bridgestone's "accompanying financial statements include the accounts of certain foreign subsidiaries, which are based upon U.S. GAAP," a reference to Firestone, its largest foreign subsidiary. We thus disagree with the district court's observation that no investor could have reasonably concluded that a representation was being made under United States GAAP.

United States GAAP, via FASB 5, n22 "requires that loss be accrued whenever it is probable a loss has been incurred or an asset impaired and the amount of the loss can be reasonably estimated. If the loss is at least reasonably possible, but no reasonable estimate can be made, the contingency at a minimum should be disclosed." The unmistakable representation, under both the Japanese and American GAAP policies, n23 was that if a loss or asset impairment was probable, the Annual Report **[*74]** reader would see a discussion of it in some form in the report. A fortiori then, the Report included the representation that if there were a substantial certainty of such an impairment, that contingency or risk would be disclosed. *Cf. United States v. Lamartina, 584 F.2d 764, 766 (6th Cir. 1978)* (embracing this greater-includes-the-lesser logic in the criminal context and noting that "a defendant may be found guilty of an offense necessarily included in the offense charged.").

n22 In the United States, GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the 'FASB')." *Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 n.4 (2d Cir. 2000).* "The SEC treats the FASB's standards as authoritative." *Id.*

n23 The policies articulated in FASB 5 and § 910.08-09 are very similar if not identical in substance. The absence on Note 11's list of differences between U.S. and Japanese GAAP of any reference to the two provisions reinforces that notion.

**[*75]**

The disclosures under the Annual Report's stated policies included no reference to the impairment or likelihood of impairment to the asset of the Firestone Brand. The notes to the Consolidated Financial Statements did include a category labeled "Contingent Liabilities," which disclosed deferred income tax assets, deferred tax liabilities, discounted export bills, and lease commitments, note regarding "Market Value Information," which provided a disclaimer that **[**22]** Bridgestone was "exposed to the currency fluctuation risks in relation" to certain "forward contracts and to the interest rate fluctuation in relation to interest rate swaps," as well as statements cautioning that "those derivatives do not exceed corresponding financial instruments," and that Bridgestone" believes that the risk that the counterparts will not be able to fully satisfy their obligations under contracts is minimum." However, neither the Contingent Liability section nor the Market Value Information section, nor any other portion of the 1999 Annual Report, disclosed the contingency of any loss or asset impairment related to any of the Firestone tire products due to the lawsuits, regulatory scrutiny, or **[*76]** safety-related reasons. Nor did they disclose the potential risk of such an event.

The 1999 Annual Report's simultaneous inclusion of the accounting policies, the listed contingencies, and the absence of any mention of a contingency concerning Firestone tires constituted a representation that no loss or asset impairment arising from Firestone tire products due to the lawsuits, regulatory scrutiny, or safety-related reasons was "probable" or "reasonably possible." The

question then is whether a reasonable juror could find that the facts belied that representation.

Bridgestone suggests that it is only in hindsight evident that there was a probability or reasonable possibility of a substantially adverse event as of March 2000. We disagree. By March 2000, Bridgestone and Firestone, according to the allegations of the Complaint, had received thousands of claims for and complaints concerning ATX tire failures, covering hundreds of serious injuries and 174 fatalities by 2000 allegedly resulting from problems with the tires. Firestone had paid off State Farm for the costs of automobile accidents attributable to ATX tire failures. The investigations and scrutiny by the Arizona and Venezuelan **[*77]** governments reinforces the impression that evidence was present of serious risks of adverse consequences for the ATX brand. From 1998 to 1999, tread separations for one ATX model increased by 194%. In 1997 and 1998, another of Firestone's ATX model's tires accounted for the majority of the company's claims but during those same years, that model accounted for less than 10% of Firestone's total production. These claims, suits and payments were discussed at least quarterly from 1997 to 1999 in meetings that consisted of Firestone's senior management group, including Bridgestone Executive Vice-president Ono, and Firestone's financial group, quality group, and public relations / marketing department. A major decision such as a recall by a Fortune 500 corporation is unlikely to simply materialize out of the blue. As the Complaint alleges, the various increasing problems at Firestone crescendoed in 1998 and 1999. From the facts pleaded, assumed to be true, and construing the complaint in the light most favorable to the plaintiffs, it was, under all these circumstances, at least "reasonably possible" if not "probable" that, as of March 2000, the Firestone flagship brand ATX tires would experience **[*78]** a serious, adverse, financial event--an impairment of the asset. Bridgestone's effective representation that no loss or asset impairment arising from Firestone tire products due to the lawsuits, regulatory scrutiny, or safety-related reasons was "probable" or "reasonably possible" could thus be deemed by a reasonable juror to have been a misrepresentation based on the facts available at that time.

The question, then, is whether the "No Impairment" representation was material. Put another way, was it "'*so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance?*'" *Helwig, 251 F.3d at 563* (quoting *Ganino, 228 F.3d at 162*) (emphasis added by *Helwig*). We conclude that it was not. The 1999 Annual Report included at least six statements that stressed to shareholders or potential shareholders the significance of the Firestone brand or the American and North American market, of which Firestone was Bridgestone's major brand: (1) "We are determined to assert a singular advantage in product technology. . . . We increased our market share in North America in 1999 in . . . the original **[*79]** equipment market. Our North American operations are approaching a market share of 20%."; (2) are presentation that as a percentage of Bridgestone's net sales, its sales in the Americas were 41.5 %, the largest of any geographic sector; (3) "we increased our market share in North America in 1999 . . . Demand for original equipment tires continued to grow in 1999 in the booming North **[**23]** American automobile market"; (4) a statement under the bold, purple-colored, large font label of "Trends And Topics" that "our multibrand strategy--centered on . . . Firestone . . . raised our market profile further in 1999;" (5) "aggressive product development and strategic marketing have re-established the Firestone name as a vigorous brand in premium-grade tires, as well as in large-volume, middle-market tires;" and that (6) "as a major supplier to leading European automakers, we have developed business with the North American operations of those automakers, too. We also supply tires to nearly all the Japanese-owned vehicle plants in North America." Firestone's financial and brand name health was of obvious importance to the overall state of Bridgestone's financial health. That relationship **[*80]** was evident both from its portrayal in the Annual Reports and in the severely adverse results that resulted immediately after the asset impairment occurred: in addition to the stock and ADR share price drops, recall that Firestone and Bridgestone each experienced a net $ 510 million loss for the 2000 fiscal year and that Bridgeport's net earnings in 2000 were 80% less than in fiscal year 1999. We conclude--at a minimum--that the probability or reasonably possibility of Firestone's brand name experiencing a significant asset impairment was not information "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance." *Id.* (internal quotations omitted and emphasis omitted) This information was therefore not "immaterial" within the meaning of the federal securities laws. *15 U.S.C. § 78u-5(c)(1)(A)(ii).* A reasonable juror could conclude that Bridgestone's "no impairment" representation in the 1999 Annual Report was actionable.

**(b) The "No Loss" Representation**

The second representation from Bridgestone's 1999 Annual Report that a reasonable jury could conclude was actionable was its **[*81]** effective representation that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires. FASB 5 "requires accrual by a charge to income (and disclosure) for an estimated loss from a loss

contingency if two conditions are met: (a) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements, and (b) the amount of loss can be reasonably estimated." The Retirement Fund asserts that both FASB 5 and its Japanese analogue gave rise to a duty to disclose because Bridgestone "had specific knowledge throughout the Class Period that [it was] already incurring substantial loses through the replacement of tires, settlements of lawsuits and payment of claims." Appellant's Br. at 47.

Bridgestone responds on this point with two arguments. First, it argues that the Complaint's claims based on problems related to the tires' safety record are an impermissible attempt to plead fraud by hindsight. Bridgestone asserts that "the Retirement Fund has simply seized upon disclosures made in later annual **[*82]** reports and alleged that they should have been in earlier ones." Appellees Bridgestone and Kaizaki's Br. at 30 (internal quotations omitted). This is literally true but does not mean that the Complaint advances an impermissible theory of liability: the losses already sustained as of March 2000 were clearly facts reasonably (and actually) available to Bridgestone in an amount calculable with precision or near-precision as of March 2000; if they were material and subject to disclosure under the stated accounting policies, it is no answer to say they were eventually disclosed later in time.

Bridgestone's second and more forceful argument is that these losses were not material. Bridgestone asserts that "the complaint contains no pleaded fact indicating Bridgestone knew about any substantial losses or that those amounts . . . actually were substantial for an $ 18 billion company." Appellees Bridgestone and Kaizaki's Br. at 29 (internal quotations omitted). "Indeed," Bridgestone argues, "every manufacturer replaces its products, settles lawsuits, and pays claims as part of its day-to-day business; yet, no one would contend these activities alone require reserves." *Id.* **[**24]** **[*83]**

This argument is ultimately unpersuasive for three reasons. First, assuming the truth of the facts set forth in the Complaint, by March 2000--when the Bridgestone 1999 annual Report was issued--over 2000 rollover accidents, 700 serious injuries and 170 fatalities had occurred yielding thousands of claims for and complaints concerning ATX tire failures and Bridgestone (via Firestone) incurred numerous categories of financial losses, including those affiliated with entering into numerous settlement agreements with the injured parties involving compensation, reimbursing State Farm, absorbing the cost of replacing the tires in Arizona, and absorbing the cost of adding a nylon layer to its tires in Venezuela. A reasonable juror could infer from this category-based evidence (as opposed to dollar-amount-based evidence not included in the Complaint) that the related losses were substantial. That the Retirement Fund has not through disclosure at this pre-discovery stage identified the precise amount of the payments as of March 2000, or amounts corresponding to agreements reached by Bridgestone or Firestone by March 2000 for sums not as of then yet paid out, is no bar to the claim. The precise **[*84]** information as to dollar amount is presumably available thus far only to Bridgestone and may well emerge in discovery. It is enough at this motion to dismiss stage that the Complaint alleges specific losses via seemingly out of the ordinary payments on this wide array of issues, each of which, as stated, was a definite amount that had already been paid out by the time of the release of the subsequent annual report. *See* FASB 5 (requiring the disclosure of "information available prior to issuance of the financial statements indicating that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements" the amount of which can "be reasonably estimated").

Second, while it is likely the case that not every settlement or claim requires a reserve, that is besides the point here. These payments were not as a group routine or minor; they covered thousands of claims that alleged a common problem with a major product of Bridgestone's largest subsidiary in its highest volume sales market, the Americas. Because the 1999 Annual Report represented that there were no actual losses connected to the lawsuits and responses to the regulatory **[*85]** scrutiny of the ATX tires' failures, there was a duty to disclose any material information to the contrary, be it in the form of a reserve, notice of a contingency, or some other form of disclosure.

Third, to the extent the materiality question is close, the general rule for securities fraud cases is that "at [the motion to dismiss] stage in the proceedings, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Helwig, 251 F.3d at 563* (internal citations, quotations, ellipses and emphasis omitted). Courts "generally reserve such questions for the trier of fact." *Id.* (collecting cases). We think this approach is appropriate here, both because a reasonable juror could find this claim actionable and because we are reversing on independent grounds with respect to a separate statement in the 1999 Annual Report.

**ii. 1996-1998 Annual Reports**

With respect to the financial statements for the Annual Reports for fiscal years 1996 to 1998, we

conclude that the **[*86]** district court did not err in dismissing the claims based on those statements. Unlike the 1999 Annual Report, these reports contained no representation to the effect that United States GAAP standards applied. Any claim, if at all, based on these Annual Reports would have to be based solely on the implied statement (to American investors at that) that International Accounting Standard § 9010.08-.09 applied. Most significantly, much of the evidence that the Complaint relies on as establishing that the asset was impaired or likely to suffer impairment became fully available after March of 1999, when the last of these three reports was issued, particularly the data summary on the 34 suits against Bridgestone based on deaths or injuries by consumers of Firestone-equipped Ford Explorers from rollovers allegedly caused by Firestone tires, the tread separations increases from 1998 to 1999, and the dramatic rise in problems in 1998 and 1999. The facts tending to undermine the truth of the Annual Reports' representations regarding impairment **[**25]** and loss were thus not known at all or not known to their full extent as of the dates that the Annual Reports for the 1996--1998 fiscal years **[*87]** were issued.

For the foregoing reasons, we conclude that the Complaint pleaded three actionable claims: (1) Firestone's August 1, 2000 "objective data" representation; (2) Bridgestone's "No Impairment" representation; and (3) Bridgestone's "No Loss" representation.

**2. Scienter**

Mindful that to survive a motion to dismiss, a federal securities fraud claim must "withstand an exacting statement-by-statement analysis," *In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 886 (W.D.N.C. 2001)*, the question then is whether the Complaint adequately pled scienter for these particular statements as against Bridgestone, Firestone, or Ono. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375*. "As with all fraud claims, *Federal Rule of Civil Procedure 9(b)* applies to pleading a defendant's state of mind, allowing that 'malice, intent, knowledge, and other condition of mind of a person may be averred generally.'" *PR Diamonds, 364 F.3d at 682* (quoting *Fed. R. Civ. P.9(b)* **[*88]** ).

However, in 1995, Congress having "concluded that *Rule 9(b)* had 'not prevented abuse of the securities laws by private litigants,'" n24 enacted the *Private Securities Litigation Reform Act* ("Reform Act"). The Reform Act grafted on "special requirements for pleading scienter in federal securities fraud cases." *PR Diamonds, 364 F.3d at 682*. As amended by the Reform Act, the securities laws provide:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state *with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*.

*15 U.S.C. § 78u-4(b)(2)* (emphasis added). Under the Reform Act, if a plaintiff does not meet this requirement, the reviewing district court "shall, on the motion of any defendant, dismiss the complaint." *15 U.S.C. § 78u-4(b)(3)*. n25 In enacting the Reform Act's scienter-related provisions, Congress sought simultaneously to **[*89]** curb frivolous securities fraud litigation, which "'unnecessarily increases the cost of raising capital and chills corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news, not evidence of fraud,'" *Comshare, 183 F.3d at 548* (quoting S. Rep. No. 104-98 (1995), 1995 U.S.C.C.A.N. 679, 690), and "to protect investors and to maintain confidence in the securities markets." H.R. Conf. Rep. No. 104-369, at 31 (1995), 1995 U.S.C.C.A.N. 730. Reflecting this balance, this court has noted that after the **[**26]** Reform Act, for those complaints advancing non-frivolous, well-pled allegations of scienter, "our willingness to draw inferences in favor of the plaintiff remains unchanged." *Helwig, 251 F.3d at 553*; *see also id.* (rejecting an interpretation of the Reform Act under which "it [would] become a choke-point for meritorious claims").

n24 *Comshare, 183 F.3d at 548* (quoting H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 818).

n25 We take no position as to the constitutionality of the Reform Act's heightened scienter pleading requirements. The *Seventh Amendment to the Constitution* provides that "the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." *U.S. Const. Am. VII*. Traditionally, there has been a right to jury

trial for securities fraud claims. *See, e.g., SEC v. Infinity Group Co., 212 F.3d 180, 196 (3d Cir. 2000)*. The Reform Act compels dismissal unless the facts pleaded in the Complaint produce a "strong inference that the defendant acted" with scienter. *15 U.S.C. § 78u-4(b)(2)*. One might argue that for cases where a juror could conclude that the facts pleaded showed scienter, but that conclusion would not be the most plausible of competing inferences, a *Seventh Amendment* Problem is presented. However, the Retirement Fund has not advanced any such argument and we decline to address the merits of this constitutional question sua sponte.

**[*90]**

In elaborating on the meaning of the statute's term "strong inference," *Helwig* explained that "inferences must be reasonable and strong--but not [necessarily] irrefutable." *Id.* The Complaint "need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder." *Id.* Rather, under the "strong inference" requirement, the Retirement Fund is "entitled only to the most plausible of competing inferences." *Id.* "'Strong inferences'. . . involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact." *Id.* (quoted with approval in *In re Ford, 381 F.3d at 568*). Our task is thus to determine whether the Complaint alleges facts that, if true, would, by forming the basis for a strong inference, "convince a reasonable person that the defendant knew a statement was false or misleading." *Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1105 (10th Cir. 2003)*. Ultimately, in our scienter analysis, we "employ[] a totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong **[*91]** inference of at least recklessness."*PR Diamonds, 364 F.3d at 683*. "'This necessarily involves a sifting of allegations in the complaint.'" *PR Diamonds, 364 F.3d at 684* (quoting *Helwig, 251 F.3d at 551*). Towards that end, *Helwig* identified nine factors that, while "not exhaustive," are "helpful" in determining whether the facts as pled are "probative" of scienter in securities fraud actions:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing **[*92]** disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*251 F.3d at 552* (citing *Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999))* (in turn, collecting cases). With these standards in mind, n26 we turn to analyze scienter as to each of the three **[**27]** relevant defendants, the two corporate legal persons--Firestone and Bridgestone--and the one individual, Firestone CEO and Bridgestone Executive Vice-President Ono. *Id.*

n26 We note that, contrary to Bridgestone's and Firestone's arguments, which rely heavily on *In re Carter-Wallace Inc. Sec. Litig., 220 F.3d 36 (2d Cir. 2000)*, and *Oran v. Stafford, 226 F.3d 275 (3d Cir. 2000)*, the precedent of this circuit frames our scienter inquiry in this claim for securities fraud based on partial or incomplete disclosure.

**a. Scienter as to Firestone**

On August 1, 2000, Firestone **[*93]** released its statement that "we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires." With respect to Firestone's scienter concerning this statement, at least five of the nine non-exclusive *Helwig* factors are apparent in the Complaint's alleged facts. First, there was a clear "divergence between internal

reports and external statements on the same subject,"*Helwig, 251 F.3d at 552*; witness the contrast between the data known or available to Firestone as of August 2000--concerning the evidence of defective tires from Decatur and three years of a marked rise in the rates of deaths, injuries and claims and lawsuits based on several thousand rollover accidents, hundreds of injuries, and nearly 200 fatalities in the United States, over forty deaths in Venezuela, the multiple deaths in Saudi Arabia--versus the unqualified positive comments on the "objective data." Firestone's awareness of the circumstances at the Decatur plant, including in particular the strike, the untrained replacement workers, the production schedule time increase imposed by Bridgestone and Firestone **[*94]** in the labor negotiations with the union, and the test results pointing to higher rates of problems in the Decatur-produced ATX tires, make the imputation of scienter reasonable. n27

> n27 Arguably, the known background of the 1979 recall based on a faulty adhesion compound discovered after Firestone's public disavowals of such a problem and the strikingly similar pattern to the problems identified in Firestone's 2000 investigative report makes it that much more reasonable to impute scienter to Firestone.

Other factors reinforce this conclusion. There was a "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information," *id.*; the August 1 statement about "objective data" was followed one week later by the recall of 6.5 million tires and four months later by the admission that many of the tires from the Decatur plant were made with a shoulder pocket more likely to crack than normal due to an improper angle and were more likely to fail to stick together **[*95]** properly. There was also a "disregard," or at least a seeming disregard, of "the most current factual information before making statements." *Id.* Further, to the extent Firestone disclosed its data to Bridgestone in a form substantially similar to that presented in Bridgestone's Annual Reports, Firestone's "disclosure of accounting information [was made] in such a way that its negative implications could only be understood by someone with a high degree of sophistication." *Id.* Finally, assuming, as the Complaint alleges, that Bridgestone executives "kept the accident rate data which they had and which showed these serious problems from safety regulators . . . so they could report huge profits and their executives could retain their positions of power, prestige and profit and Bridgestone's stock and ADRs would continue to trade at inflated, higher prices, providing the executives with direct economic benefits based on their stock holdings and options and allowing them to personally pocket huge bonuses based on corporate profits," there was thus a "self-interested motivation of defendants in the form of saving their salaries or jobs."*Helwig, 251 F.3d at 552.* **[*96]** n28

> n28 We reject Firestone's suggestion that the withholding of information by senior corporate executives to effectuate an inflation of the executives' bonuses, stock prices, and job security is an "ordinary corporate event." Appellee Firestone's Br. at 45. Even if a regular occurrence, it is not an event this court sanctions as being legitimately ordinary.

Three of the nine *Helwig* factors are clearly absent as pertains to Firestone, although in a sense these factors all go to the same question: conflict of interest. That is, there is no evidence of alleged insider trading at a suspicious time or in an unusual amount, no evidence of bribery by a top **[**28]** company official, and no evidence of personal interest of certain directors in not informing disinterested directors of an impending sale of stock.

That covers eight of the nine *Helwig* factors. A word is in order on whether the remaining factor is present, i.e. whether there is the "existence of an ancillary lawsuit charging fraud by a company **[*97]** and the company's quick settlement of that suit." *Id.* There is not, strictly speaking, such evidence because the claims in question were not based on fraud per se. However, the presence of closely related evidence carries some weight, particularly given that the list of factors is "non-exhaustive." *Id.* Firestone entered into multiple settlement agreements in response to product liability suits under which the settlement agreements with plaintiffs were sealed, the parties entered into stipulated protective orders to conceal discovery, and Firestone would have returned to it "damaging documents." The gravamen of these claims and lawsuits, though framed as pre-litigation claims or lawsuits in tort, was closely parallel to that of this suit: the tires were not safe and Firestone should be held accountable for that fact. Moreover, Firestone secretly settled with State Farm all claims for insurance in exchange for lack of disclosure by State Farm and avoided through a secrecy agreement with the Venezuelan government any disclosure of its having added nylon layers to ATX tires in Venezuela. The evidence of these secret settlements gets at the same notion as does the *Helwig* factor **[*98]** instructing courts to analyze whether there have been ancillary lawsuits filed charging fraud followed by quick settlement of such

suits. The apparent animating idea is that a company engaging in such practices is, all things being equal, more likely than not aware of the improper nature of the practice being alleged, or at least of the perception of the given problem, which puts it on notice and, is fair to say, generates a duty to inquire. These settlements are thus appropriate to weigh in our scienter analysis, since "this court has made clear that 'the label which a plaintiff applies to a pleading does not determine the nature of the cause of action which he states.'" *Minger v. Green, 239 F.3d 793, 799 (6th Cir. 2001)* (quoting *United States v. Louisville & Nashville R. Co., 221 F.2d 698, 701 (6th Cir. 1955))*. Thus, in substance, if not form, we think a sixth of the nine factors is also present.

Given all this, we conclude under the totality of the circumstances that "the facts argued collectively . . . give rise to a strong inference of at least recklessness." *PR Diamonds, 364 F.3d at 683*. The Retirement Fund has therefore adequately **[*99]** pleaded scienter with respect to its claim against Firestone for the Firestone's August 1, 2000 statement. n29

n29 We do not foreclose the possibility that, going forward, Firestone may be held liable for Bridgestone's misrepresentations to the extent the Retirement Fund can prove Firestone communicated misleading results to Bridgestone. The requirement that the plaintiff allege that the defendant made a misrepresentation does not mean that the plaintiff must allege that the defendant communicated that misrepresentation directly to the plaintiff. *In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998)*; *see, e.g., Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997)* (defendant '"cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties'") (quoting *Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996))*; *Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226 (10th Cir. 1996)* ("There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach."). If the Retirement Fund can show that Firestone was the originator of Bridgestone's misrepresentations regarding Firestone and that Firestone knew or should have known that its misrepresentation would be communicated to investors, primary liability should attach. *See Anixter, 77 F.3d at 1226*. We need not assess here the factual question of whether Firestone was the original of Bridgestone's misrepresentations regarding Firestone and that Firestone knew or should have known that the misrepresentation would be communicated to investors.

**[*100]**

**b. Scienter as to Bridgestone**

We next analyze whether the Complaint adequately pled scienter against Bridgestone for the two actionable representations in the 1999 Annual Report discussed above in Part II(C)(i)(a): (1) the "No Impairment" representation--that no impairment of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions and **[**29]** (2) the "No Loss" representation--that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires. A brief word is in order, though, on the nature of these claims. Contrary to Bridgestone's characterizations, the Retirement Fund's theory is not that the Complaint relies on the violation of GAAP to prove scienter. As Bridgestone correctly points, that allegation, without more, would not be sufficient to plead scienter adequately.*See, e.g., Adams v. Standard Knitting Mills, Inc., 623 F.2d 422, 432 (6th Cir. 1980)* (concluding that although "there is sufficient evidence to support the Court's finding that [the defendant] inadequately tested . . . financial figures in certain **[*101]** respects, [] the evidence falls far short of proving that [the defendant] intended to deceive the stockholders."). Rather, GAAP is only part of the Complaint's explanation of the falsity of the claim: as discussed below, the Complaint alleges a wide range of facts above and beyond the violation of GAAP on which a reasonable juror could conclude scienter was proven. That brief detour aside, we turn to the two statements.

**i. Bridgestone's Scienter as to Its "No Impairment" Representation**

As to Bridgestone's scienter with respect to the "No Impairment" representation, we conclude that "the most plausible of competing inferences" arising from the evidence is that Bridgestone was at least reckless as to the falsity of that representation. *Helwig, 251 F.3d at 553*. The analysis on this claim breaks down similarly to that for Firestone: four--arguably five--of the*Helwig* factors are present.

First, and in this case most significantly, the Complaint pleads facts that, if proven, could show a divergence between internal reports and external statements on the same subject. By the end of 1999, consumers had filed fifty lawsuits based on alleged problems with the **[*102]** ATX tires against Bridgestone or Firestone or both, thirty-four of them filed between 1997 and 1999. As former Firestone Vice-President of Quality Assurance Robert Martin testified in his

deposition, Ono, who was Bridgestone's Executive Vice-President in addition to his role as Firestone CEO, was a member of the working group that from 1997 to 1999 tracked the lawsuits' status. An 1999 internal Firestone document included data that one of the ATX tire models--the ATX II--was the basis of the majority of the claims against Firestone but only ten percent of its production. A reasonable juror could conclude that this was a red flag as to problems with the tire model. Similarly, the ATX Wilderness model experienced in 1999 a rise in claims for tire tread separations of 194% over the previous year, another potential red flag. Thus, the facts known or available to Bridgestone were seemingly in tension with the representation that no impairment risk of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions and that there was no contingency risk of such a loss. Consider also Firestone's previous tire tread problems, **[*103]** fine, and massive recall, with which it is reasonable to assume, given due diligence standards, that Bridgestone, as its suitor in a multi-billion dollar purchase the previous decade, was aware. This history was in the known corporate background and should have made Bridgestone more attuned to the likelihood, or at least non-trivial, contingent possibility, of a major financial hit to Firestone as the lawsuits, settlements, and regulatory and public scrutiny surrounding the Firestone ATX tires, as used on the Explorer, intensified from 1996 to 1999. This is particularly so given that the Americas were Bridgestone's largest sales market, that the North American market was, according to Bridgestone's Annual Reports, a major source of past and presumed future growth, that Firestone was the primary engine fueling that growth, and that the Explorer contract in particular was - by all appearances - a key to Firestone's return to profitability.

Three, arguably four, other factors are further probative of Bridgestone's scienter, albeit with less force than the first one. First, for the reasons just outlined, we conclude that the facts could show that Bridgestone disregarded "the most current **[*104]** factual information before making statements." *Helwig, 251 F.3d at 552*. Second, the 1999 Annual Report, by combining its statement of accounting policy with its silence, can be viewed as "disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of **[**30]** sophistication." *Id.* Third, for the reasons discussed above with respect to Firestone, the evidence supports a finding of "self-interested motivation of defendants in the form of saving their salaries or jobs." *Id.* Fourth, for the reasons discussed in the context of Firestone but also applicable to Bridgestone, the existence of ancillary claims by consumers and State Farm Insurance, lawsuits, and settlements based on claims alleging harm from unsafe ATX tires, and Firestone's quick and secret settlements of such claims, arguably is also probative of Bridgestone's recklessness as to the truth of its "No Impairment" representation.

The four other *Helwig* factors admittedly are not probative of scienter. As to the "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information, **[*105]** " Bridgestone's statement in March 2000 occurred over four months before the information accompanying the safety recall was disclosed, too distant in time to draw an adverse inference. And, as discussed in the Firestone context, the Complaint does not allege insider trading at a suspicious time or in an unusual amount, evidence of bribery by a top company official, or the personal interest of certain directors in not informing disinterested directors of an impending sale of stock.

Nonetheless, considering the totality of the circumstances, in particular the divergence of internal and external statements with respect to clearly material information going to one of Bridgestone's major flagship brands, "the facts argued collectively . . . give rise to a strong inference of at least recklessness" as to the truth of its "No Impairment" representation. *PR Diamonds, 364 F.3d at 691*. n30 The Retirement Fund has therefore adequately pleaded scienter with respect to its claim against Bridgestone for that representation.

n30 *Cf. In re Ford, 381 F.3d at 572* (noting, in affirming the dismissal of securities fraud claims against Ford arising out of facts common to this case, that "it would be reasonable to expect the cost of replacing any tires would be on Bridgestone").

**[*106]**

**ii. Bridgestone's Scienter as to Its "No Loss" Representation**

We turn now to analyze whether the facts as pleaded give rise to a strong inference of recklessness by Bridgestone as to its representation in the 1999 Annual Report that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires. Again, we think the key factor here is the "divergence between internal reports and external statements on the same subject." *Helwig, 251 F.3d at 552*. As discussed, Ono, Bridgestone's Executive Vice-President, met at least quarterly with Firestone's senior management group from 1997 to 1999, the financial group, the quality group, and the public relations / marketing department and in those meetings

discussed the tread-peeling claims lodged against Bridgestone (as well as against Firestone). Assuming the truth of the Complaint's allegations, these discussions addressed the lawsuits, claim settlements, and informal complaints that led to investigations by governmental authorities in Arizona, Venezuela, and Saudi Arabia, as well as the secret settlements with State Farm under which Firestone reimbursed State **[*107]** Farm for accidents allegedly caused by ATX tire failures. Ono's awareness of the claims as gleaned from these meetings is directly attributable to Bridgestone n31 because "knowledge of a corporate officer or agent acting within the scope of his authority is attributable to the corporation." 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.8[4], at 444 (4th ed. 2002); *cf. Adams v. Kinder-Morgan, 340 F.3d at 1106* ("the scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of *§ 10(b)* and *Rule 10b-5* when those senior officials were acting within the scope of their apparent authority.").

n31 The Retirement Fund makes no serious argument that Bridgestone can be held liable for Firestone's August 1, 2000 statement; we therefore do not address that argument. We note though that generally a subsidiary's fraud cannot be automatically imputed to its corporate parent. *See In re Comshare, 183 F.3d at 554*.

**[*108] [**31]**

Two facts reinforce the notion that Bridgestone knew or should have known that it was taking heavy losses via claims settlement resulting from alleged problems with the ATX tires. First, Bridgestone should have been particularly attuned to the possibility of defect-caused problems from ATX tires manufactured at the Decatur plant in light of its awareness of the strike and the round-the-clock production schedule and the "implemented adjustments in working hours that permit our plants to operate 24 hours a day, seven days a week" that Bridgestone's 1996 Annual Report trumpeted, showing that it was clearly aware of the situation. Second, a 1999 internal Firestone report shows that the ATX II model was accounting for a quite disproportionate percentage of claims alleging tire failure relative to its production quantity as a Firestone's total tire output: over 50% versus 10%.

There is, as with the other two actionable statements and for the reasons previously stated, evidence of the existence of ancillary lawsuits and Firestone's quick settlement of those suits, of disregard of the most current factual information before making statements, of disclosure of accounting information **[*109]** in such a way that its negative implications could only be understood by someone with a high degree of sophistication, and of the self-interested motivation of defendants in the form of saving their salaries or jobs. Also like the analysis of the "No Impairment" representation, there is a lack of probative evidence as to the remaining *Helwig* factors.

Again, given this totality of circumstances, "the facts argued collectively . . . give rise to a strong inference of at least recklessness" by Bridgestone as to the truth of its "no loss" representation. *PR Diamonds, 364 F.3d at 683*. The Retirement Fund has therefore also adequately pled scienter with respect to its claim against Bridgestone for this representation.

**c. Scienter as to Ono**

The Complaint attributes to Ono, as an individual corporate officer of Firestone and Bridgestone, all of the alleged misrepresentations of those two corporate defendants. The Retirement Fund seeks to attach liability to Ono based on his status as Firestone CEO and Bridgestone Executive Vice-President when those two companies issued the alleged misrepresentations. The Retirement Fund argues that "Ono is Liable for Firestone's **[*110]** and Bridgestone's statements under the group-published doctrine and inference," also known as the "group-pleading" doctrine. Appellant's Br. at 48. The district court dismissed the claim against Ono for failure to plead scienter. Albeit for different reasons, we agree that the claim against Ono should have been dismissed.

At least two circuits have specifically recognized a "group pleading" exception to the pleading-with-particularity requirements of *Federal Rule Civil Procedure 9(b)*. *See Wool v. Tandem Computers Inc., 818 F.2d 1433, 1440 (9th Cir. 1987)*; *Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1254 (10th Cir. 1997)*. That exception is premised on the assumption that "in cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." *Wool, 818 F.2d at 1440*.

Firestone argues that this doctrine runs afoul of the amended pleading requirements embodied in the Reform Act, which **[*111]** requires, for adequate pleading of scienter, that a federal securities fraud complaint state the relevant facts "with particularity." *15 U.S.C. § 78u-4(b)*. The United States Court of Appeals for the Fifth Circuit and a number of district courts have held that the group-pleading doctrine is foreclosed by the Reform Act. n32 Generally without discussion of the effect of the Reform

Act, the several circuits that embraced the group-pleading doctrine prior to the **[**32]** passage of the Reform Act have continued to apply that doctrine since the Reform Act's enactment. *See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061-63 (9th Cir. 2000)*; *Schwartz, 124 F.3d at 1254*. This court has not taken a position on whether such an exception exists. Courts are divided on this issue. n33

n32 *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 364 (5th Cir. 2004)* (collecting cases).

n33 *Compare, e.g., In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000)*; *In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 152-53 (D. Mass. 2001)*; *In re Baan, 103 F. Supp. 2d 1, 17 (D.D.C. 2000)*;*In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1340-41 (S.D. Fla. 1999)*; *In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998)* (holding that the group pleading doctrine survived the enactment of the Reform Act), *with In re Miller Indus., Inc. Sec. Litig., 12 F. Supp. 2d 1323, 1329 (N.D. Ga. 1998)*; *Allison v. Brooktree Corp., 999 F. Supp. 1342, 1350 (S.D. Cal. 1998)* (holding that the Reform Act abolished the group pleading doctrine).

**[*112]**

We need not decide here the current viability of the group-published doctrine because resolution of that question is not required to decide this case. The Complaint pleads, regarding Ono, little more than his corporate titles, dates of employment and resignation, and attendance at the quarterly meetings. The Retirement Fund does not allege by direct allegation or even upon information and belief that Ono played any role in drafting, reviewing, or approving the Firestone's "objective data" representation or the Bridgestone annual reports, 1999 or any other years. Nor does it allege that he was, as a matter of practice, or by job description, typically involved in the creation of such documents. Even if we permit the group-pleading inference, these alleged facts, without more, are not enough to attribute the alleged misstatements to Ono. *See, e.g., Johnson v. Tellabs, Inc., 262 F. Supp. 2d 937, 946-47 (N.D. Ill. 2003)* ( "Even if the group pleading doctrine survives the [Reform Act], . . . . [a] plaintiff is . . . required at least to include allegations . . . relating to an individual defendant's duties . . . that create a presumption that the company's statement **[*113]** was somehow . . . attributable to an individual defendant. Simply alleging an individual defendant's title is not enough."); *In re Baan Co., 103 F. Supp. 2d at 18* (noting that to satisfy the group-pleading doctrine, a complaint "must identify the roles of the individual defendants, and describe their involvement, if any, in preparing the misleading statements"). Accordingly, we conclude that the district court did not err in dismissing the claims in the Complaint against Ono. n34

n34 At first glance, it might seem incongruous to reach this conclusion after relying in part on Ono's knowledge of the claims settlements as a basis for Bridgestone's scienter on that claim. However, while an individual officer's knowledge may be attributed to the corporation, liability for the corporation's act does not, absent independent evidence, generally flow from the corporation to the corporate officer.

**III. CONCLUSION**

To summarize, we hold that: (1) the district court did not err in granting Kaizaki's **[*114]** motion to dismiss for lack of personal jurisdiction; (2) because the Complaint, for Firestone's August 1,2000 statement that "we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires," adequately alleges an actionable statement and scienter against Firestone, the district court erred in dismissing the claim based on that statement; (3) the district court did not err in dismissing the claims against Firestone for its numerous other statements because those statements were not material; (4) the district court erred in dismissing the claims against Bridgestone based on two of its effective representations in the 1999 Annual Report--(i) that no impairment of Bridgestone's corporate assets was substantially certain to occur through problems arising from customers or regulators' actions, and (ii) that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires--because for those representations, the Complaint adequately pled an actionable statement and scienter against Bridgestone; (5) the district court did not err in dismissing **[*115]** the claims based on Bridgestone's representations in the financial statements of the 1996-1998 Annual Reports because those statements were not misrepresentations; and (6) the district court did not err in **[**33]** dismissing the claims against Ono. We therefore need not reach any of the district court's additional rulings. n35

n35 In connection with the defendants' motions to dismiss, the district court issued two rulings in addition to those discussed in the opinion, neither of which we need to analyze. First, the district court denied Bridgestone's motion to dismiss for lack of personal jurisdiction. *See* App. at 987-97 (Dist. Ct. Mem.). Because Bridgestone does not cross-appeal, we do not address this aspect of the district court's ruling. *See Spann v. Colonial Village, Inc., 283 U.S. App. D.C. 216, 899 F.2d 24, 35 (D.C. Cir. 1990)* (Ginsburg, R.B., J.) (noting that objections to "personal jurisdiction . . . can be waived at any stage of a proceeding and ordinarily are waived by failure to take a cross-appeal") (citing *United States v. American Ry. Express Co., 265 U.S. 425, 435-36 n.11, 68 L. Ed. 1087, 44 S. Ct. 560 (1924))*. Second, although the district court did not enter a Judgment in concert with its September 30, 2002 Order granting the several motions to dismiss, the Retirement Fund treated the district court's dismissal Order as a Judgment and, accordingly, on October 16, 2002, timely filed a motion pursuant to *Federal Rule of Civil Procedure 59(e)* to alter or amend the Judgment or in the alternative for leave to file a Proposed Amended Consolidated Complaint, which the Retirement Fund attached to its *Rule 59(e)* motion, along with numerous proposed exhibits. *See* App. at 1039-1319. On February 25, 2003, the district court denied that motion on the grounds of undue delay and futility. *See id.* at 1446-58. Because we have resolved the appeal on the question of whether the district court's initial dismissal was correct, the question of whether the district court also erred in its denial of the motion for leave to amend is moot. We therefore do not address it.

**[*116]**

To withstand the *12(b)(6)* motions by Bridgestone and Firestone, the Retirement Fund must for each alleged misrepresentation have adequately alleged five elements: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury. In addition to dismissing the claim against Kaizaki for lack of personal jurisdiction, the district court in its *12(b)(6)* analysis held that the Complaint did not satisfy the first three elements as against Bridgestone, Firestone, and Ono, holdings as to which, as just summarized, we reverse with respect to Bridgestone and Firestone and affirm as to Ono. The district court did not address the final two of the five requisite elements: justifiable reliance and proximate cause. The parties' briefs did not address these elements on appeal. As a "'general rule . . . a federal appellate court does not consider an issue not passed upon below.'" *Pinney Dock & Transport Co., 838 F.2d 1445, 1461 (6th Cir. 1988)* (quoting *Singleton v. Wulff, 428 U.S. 106, 120, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976))*. We see **[*117]** no special reason to do so here. Consequently, we remand to the district court to consider whether the Complaint adequately pleads justifiable reliance and proximate cause with respect to the three actionable statements as against Bridgestone and Firestone, and for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.