UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THE UNENCUMBERED ASSETS TRUST; and ERWIN I. KATZ, LTD., Trustee of The Unencumbered Assets Trust,<br><br>Plaintiffs,<br><br>v.<br><br>JP MORGAN CHASE BANK; BANK ONE, N.A.; CREDIT SUISSE FIRST BOSTON CORP.; CREDIT SUISSE FIRST BOSTON (USA), INC.; CREDIT SUISSE FIRST BOSTON LLC; CSFB USA; DELOITTE & TOUCHE, LLP; KAYE SCHOLER, LLP; PRICEWATERHOUSECOOPERS,LLP; PURCELL & SCOTT, L.P.A.; THE BEACON GROUP III-FOCUS VALUE FUND, L.P.; INTERCONTINENTAL INVESTMENT ASSOCIATES; HEALTHCARE CAPITAL L.L.C.; FLOHAZ PARTNERS L.L.C.; SOUTH ATLANTIC INVESTMENTS, L.L.C.; THOR CAPITAL HOLDINGS L.L.C.; KACHINA INC; LANCE K. POULSEN; BARBARA L. POULSEN; DONALD H. AYERS; REBECCA S. PARRETT; and TASK HOLDINGS LTD.,<br><br>Defendants. | Civil Action No.: C2-04-1090<br><br>Judge James L. Graham<br><br>Magistrate Judge Abel |

**THIRD AMENDED COMPLAINT***

* The sole purpose of this amendment is to add the allegations contained in Exhibit A to The Unencumbered Assets Trust's Motion for Leave to Amend Complaint, filed May 31, 2005. The Court granted the UAT leave to file this Third Amended Complaint on December 23, 2005 [Docket No. 151]. The allegations contained herein do not vary from those permitted by the Court's December 23, 2005 Order. Although the Third Amended Complaint contains allegations against Deloitte & Touche, LLP ("Deloitte"), the UAT no longer seeks relief against Deloitte because of the settlement between the UAT and Deloitte.

## TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . i

I. INTRODUCTION . . . . . 1

II. JURISDICTION AND VENUE . . . . . 5

III. PARTIES . . . . . 6

A. Plaintiff . . . . . 6

B. Defendants . . . . . 7

IV. THE NATURE AND OPERATION OF NPF VI AND NPF XII . . . . . 12

A. The Limited Purposes of the NPF VI and NPF XII Special Purpose Companies . . . . . 12

B. The Limited Role of NPF VI and NPF XII in the National Century Financial Enterprises Group of Affiliated Companies . . . . . 13

1. NPF VI and NPF XII Maintained a Corporate Existence Independent from Other NCFE Affiliates . . . . . 13

2. The NPF VI and NPF XII Securitization Programs . . . . . 14

3. NPF VI and NPF XII Contracted for Certain of Their Functions to Be Performed by the Servicer . . . . . 16

C. Prohibitions and Controls Placed on the Programs Under the Master Indentures . . . . . 16

1. Restrictions on the Purchase of Eligible Receivables from Non-Affiliated Sellers . . . . . 17

2. Credit Enhancements . . . . . 20

a. Equity Account . . . . . 22

b. Seller Credit Reserve Account . . . . . 24

c. Offset Reserve Account . . . . . . . . . . 26

3. Other Controls on Withdrawals and Deposits from Accounts . . . . . . . . . 28

4. Reporting of Account Balances and Other Test Results to Rating Agencies . . . . . . . . . . 30

a. Specified Equity Account Balance Test . . . . . . . . . . 30

b. Specified Seller Credit Reserve Report . . . . . . . . . . 31

c. Specified Offset Reserve Balance Report . . . . . . . . . . 31

d. Collateral Coverage Test . . . . . . . . . . 32

e. Receivables Default Test . . . . . . . . . . 32

f. Concentration Test . . . . . . . . . . 33

5. Audit in Conformity with General Accepted Auditing Principles . . . . . 33

6. Trustee Duties in Event that Certain Controls Being Violated . . . . . . . . 34

a. Principal Amortization Events . . . . . . . . . . 34

b. Rights to Pursue Legal Redress . . . . . . . . . . 35

c. Right to Remove the Servicer . . . . . . . . . . 36

d. Indenture Trustees' Duty to Act as They Would in the Conduct of Their Own Affairs . . . . . . . . . . 37

V. THE SCHEME TO DEFRAUD, AND THEREBY MISAPPROPRIATE THE ASSETS OF, NPF VI AND NPF XII . . . . . . . . . . 37

A. Factual Allegations Regarding Chase . . . . . . . . . . 39

1. Chase Joins the Scheme to Defraud by Agreeing to Disregard Its Obligations Under the NPF VI Indenture . . . . . . . . . . 51

B. Chase Operates as Indenture Trustee in Accordance with Its Unlawful Agreement, in Violation of the NPF VI Indenture . . . . . . . . . . 59

1. Chase Carries Out Transfers and Withdrawals that It Had Actual Knowledge Were Not Permitted Under the Indenture . . . . . . . . . . . . . . . 59

a. Unauthorized Transfers from the NPF VI Equity Account Not on a Monthly Payment Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

b. Unauthorized Transfers from the NPF VI Equity Account to the NPF VI Purchase Account, Seller Credit Reserve Account, and Offset Reserve Account . . . . . . . . . . . . . . . . . . . . . 62

c. Unauthorized Transfers from the NPF VI Seller Credit Reserve Account to the NPF VI Equity Account and Offset Reserve Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

d. Unauthorized Transfers from the NPF VI Offset Reserve Account to the NPF VI Seller Credit Reserve Account . . . . . . . 64

2. Chase Fails to Take Required Action in Response to Repeated Events of Default Resulting from the Failure to Maintain the NPF VI Reserve Accounts at the Minimum Balances Required by the Indenture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

a. The NPF VI Reserve Accounts Were Continuously in Default Throughout the Term of Chase's Service as Indenture Trustee68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

b. Chase Had Actual Knowledge that the NPF VI Reserve Accounts Were Not Maintained at their Required Minimum Levels Throughout Its Term of Service as NPF VI Indenture Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

3. Chase Actively and Knowingly Participates in the Interstate Kiting of Funds Between the NPF VI Trust Account Held at Chase and the NPF XII Trust Accounts Held at Bank One . . . . . . . . . . . . . . . . . . . . . . . 80

4. Chase Accepts Invalid and Improper Investor Reports in Violation of the Terms of the NPF VI Indenture in Order to Facilitate the Kiting Scheme and to Conceal the Conspiracy to Loot the NPF VI Assets . . . . 86

5. Chase Transfers or Withdrawn Funds From the NPF VI Accounts for Purposes that It Knows Are Not Permitted Under the NPF VI Indenture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

a. Ineligible Receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

i. Defaulted and Rejected Receivables . . . . . . . . . . . . . . . . 90

ii. "Pro Forma"Receivables . . . . . . . . . . . . . . . . . . . . . . . . . 91

b. Affiliated Sellers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

6. Chase's Monetary Reward for Participating in the Scheme to Defraud NPF VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

7. Alternative Pleading of Gross Negligence, Negligence and Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

C. Factual Allegations Regarding Bank One . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

1. Bank One's Long History with NCFE . . . . . . . . . . . . . . . . . . . . . . . . . 96

2. Bank One Joins the Scheme to Defraud by Agreeing to Disregard Its Obligations Under the NPF XII Indenture . . . . . . . . . . . . . . . . . . . . . . . 97

3. The Mechanics of Bank One's Active Participation in the NPF XII Misappropriation Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

4. Bank One's Unauthorized Withdrawals from the NPF XII Reserve Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

a. Banks One's Improper Withdrawals from the NPF XII Equity Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

b. Bank One's Improper Withdrawals from NPF XII Seller Credit Reserve Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

c. Bank One's Improper Withdrawals from NPF XII Offset Reserve Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

5. Bank One's Active Participation in Routinely Draining NPF XII's Reserve Accounts, Allowing Those Accounts to Remain Consistently at Levels Dramatically Below Those Required by the Indenture, and Its Failure to Take Required Action in Response to These Defaults . . . 116

6. Bank One Actively and Knowingly Participates in the Kiting of Trust Funds Between NPF XII Trust Accounts, Held at Bank One, and NPF VI Trust Accounts, Held at Chase . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

7. Bank One's Improper Transfers out of the Purchase Account for Ineligible Receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

8. Bank One's Improper Transactions With NCFE Affiliates . . . . . . . . . . 137

9. Bank One's Failure to Monitor the Servicer's Compliance with the Indenture's Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 140

10. Bank One Had Much to Lose If NPF XII Wound Down . . . . . . . . . . . . 143

11. NPF XII and NPF VI?s Discovery of the Fraud . . . . . . . . . . . . . . . . . . 145

D. Factual Allegations Regarding the Founders . . . . . . . . . . . . . . . . . . . . . . . . . . 146

E. Counts Regarding the Scheme to Defraud and Thereby Misappropriate the Assets of NPF VI and NPF XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Count I
Federal RICO Enterprise: 18 U.S.C. § 1962(c)
The Operation and Management of NPF VI Enterprise
*Against Poulsen, Ayers, Parrett, and Chase* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Count II
Federal RICO Conspiracy: 18 U.S.C. § 1962(d)
Conspiring to Violate § 1962(c)—The Operation and Management of NPF VI Enterprise
*Against Poulsen, Ayers, Parrett, Chase and Bank One* . . . . . . . . . . . . . . . . . . . . . . . . 164

Count III
Federal RICO Enterprise: 18 U.S.C. § 1962(c)
The Operation and Management of NPF XII Enterprise
*Against Poulsen, Ayers, Parrett, and Bank One* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Count IV
Federal RICO Conspiracy: 18 U.S.C. § 1962(d)
Conspiring to Violate § 1962(c)—The Operation and Management of NPF XII Enterprise
*Against Poulsen, Ayers, Parrett, Chase and Bank One* . . . . . . . . . . . . . . . . . . . . . . . . 180

Count V
Ohio Corrupt Practices Act: Ohio Rev. Code §§ 2923.34(B); 2923.32(A)(1)

The Operation and Management of NPF VI Enterprise
*Against Poulsen, Ayers, Parrett, and Chase* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

COUNT VI
OHIO CORRUPT PRACTICES ACT: OHIO REV. CODE §§ 2923.34(B); 2923.32(A)(1) Conspiring to Violate § 2923.32(A)(1) - The Operation and Management of NPF VI Enterprise
*Against Poulsen, Ayers, Parrett, Chase and Bank One* . . . . . . . . . . . . . . . . . . . . . . . . . 199

Count VII
Ohio Corrupt Practices Act: Ohio Rev. Code §§ 2923.34(B); 2923.32(A)(1) The Operation and Management of NPF XII Enterprise
*Against Poulsen, Ayers, Parrett, and Bank One* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Count VIII
Ohio Corrupt Practices Act: Ohio Rev. Code §§ 2923.34(B);2923.32(A)(1) Conspiring to Violate § 1962(c)—The Operation and Management of NPF XII Enterprise
*Against Poulsen, Ayers, Parrett, Chase and Bank One* . . . . . . . . . . . . . . . . . . . . . . . . . 216

Count IX
Common Law Conversion
*Against Bank One and Chase* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

Count X
Common Law Fraud
*Against Poulsen, Ayers, Parrett, Bank One and Chase* . . . . . . . . . . . . . . . . . . . . . . . . . 221

Count XI
Civil Conspiracy
*Against Poulsen, Ayers, Parrett, Bank One and Chase* . . . . . . . . . . . . . . . . . . . . . . . . . 223

Count XII
Breach of Contract
*Against Bank One and Chase* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

Count XIII
Breach of Fiduciary Duty
*Against Poulsen, Parrett, Ayers, Chase, and Bank One* . . . . . . . . . . . . . . . . . . . . . . . . 226

Count XIV
Concert of Action/Knowing Participation in Breach of Fiduciary Duty
*Against Poulsen, Parrett, Ayers, Bank One and Chase* . . . . . . . . . . . . . . . . . . . . . . . . . 227

Count XV
Aiding and Abetting
*Against Poulsen, Parrett, Ayers, Bank One and Chase* . . . . . 228

Count XIV
In the Alternative, Negligence and Gross Negligence
*Against Bank One and Chase* . . . . . 229

COUNT XV-A
OHIO REV. CODE § 1303.37
*Against Chase and Bank One* . . . . . 230

COUNT XV-B
OHIO REV. CODE § 1304.59(A)
*Against Defendants Chase and Bank One* . . . . . 231

COUNT XV-C
McKinney's Uniform Commercial Code § 3-304(2)
*Against Chase and Bank One* . . . . . 233

COUNT XV-D
McKinney's Uniform Commercial Code § 4A-204
*Against Chase and Bank One* . . . . . 234

VI. CLAIMS FOR RECOVERY OF TRANSFERS TO FOUNDERS AND THEIR AFFILIATED COMPANIES . . . . . 236

A. The March 1999 Fraudulent Transfer . . . . . 236

B. The April 1999 Fraudulent Transfers . . . . . 237

C. The July 1999 Fraudulent Transfers . . . . . 238

D. February 2000 Fraudulent Transfers . . . . . 239

E. December 22, 2000 and October 28, 2002 Fraudulent Transfers . . . . . 240

F. The March 1999, February 2000, and March 2001 Fraudulent Transfers of E-Medsoft/Med-Diversified Stock . . . . . 242

G. The April 2001, August 2001, and October 25, 2002 Fraudulent Transfers . . . 243

H. Counts . . . . . 245

Count XVI
Liability on Promissory Note
*Against Rebecca Parrett and Ayers* . . . . . . . . . . 245

Count XVII
Breach of Contract
*Against Rebecca Parrett and Ayers* . . . . . . . . . . 246

Count XVIII
Avoidable Transfers Under Bankruptcy Code Section 544 and 550
*Against Founders and Affiliated Entities* . . . . . . . . . . 246

Count XIX
Avoidable Transfers Under Ohio Rev. Code §§ 1336.04 & 1336.07
*Against Founders and Affiliated Entities* . . . . . . . . . . 248

Count XX
Avoidable Transfers Under Ohio Rev. Code §§ 1336.05 & 1336.07
*Against Founders and Affiliated Entities* . . . . . . . . . . 249

Count XXI
Avoidable Transfers Recovery of Unlawful Dividends: Ohio Rev. Code 1701.33(c) & 1701.95(d)
*Against Founders* . . . . . . . . . . 249

Count XXII
Breach of Fiduciary Duty
*Against Founders* . . . . . . . . . . 250

Count XXIII
Unjust Enrichment
*Against Founders* . . . . . . . . . . 251

VII. NOTE ISSUANCE ENTERPRISE . . . . . . . . . . 252

A. CSFB Subverts the Fiduciaries of NPF VI and NPF XII . . . . . . . . . . 257

B. CSFB's Participation in and Concealment of the Receivables Fraud . . . . . . . 263

C. CSFB Understood the Limitations on the Types of Receivables that Could Be Purchased . . . . . . . . . . 264

D. CSFB Understood the Limitations Concerning Withdrawals from the Equity Account . . . . . 265

E. The Receivables Fraud and the Fraudulent Conduct of the Servicer, Poulsen, Ayers and CSFB in Causing NPF VI and NPF XII to Issue Additional Debt266 . . . . .

F. The Anonymous Letters . . . . . 271

G. COUNTS . . . . . 292

Count XXIV
Ohio Corrupt Practices Act: Ohio Rev. Code §§ 2923.34(B); 2923.32(A)(1)
*Against CSFB, Poulsen, Ayers and Rebecca Parrett* . . . . . 292

Count XXV
Breach of Agency, Breach of Fiduciary Duty, Fraud,
Negligent Misrepresentation, and Deepening Insolvency
*Against CSFB* . . . . . 306

Count XXVI
Concert of Action
*Against CSFB* . . . . . 311

Count XXVII
Civil Conspiracy
*Against CSFB* . . . . . 312

Count XXVIII
Professional Negligence
*Against CSFB* . . . . . 314

VIII. CLAIMS AGAINST THE AUDITORS: PWC AND DELOITTE . . . . . 315

A. PWC's Audits . . . . . 318

1. PWC's Initial Audit . . . . . 318

2. Accounts Receivable . . . . . 319

3. Indenture Violations . . . . . 326

4. Related Party Disclosures . . . . . 329

5. PWC's Agreed-Upon Procedures Reports . . . . . . . . . . . . . . . . . . . . . . 330

6. PWC Final Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 332

7. Transition from PWC to Deloitte . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

B. Deloitte's Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

1. Accounts Receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

2. Indenture Compliance and Reserve Accounts . . . . . . . . . . . . . . . . . . . 343

3. Related Party Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 344

4. Deloitte's 2002 Audit Work on NCFE's 2001 Financial Statements . . 346

5. The Auditors' Acts Here Parallel -- But Are Far More Egregious Than -- Even Actions For Which Deloitte Has Been Recently Censured by the SEC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

C. Additional Allegations as to Both Auditors . . . . . . . . . . . . . . . . . . . . . . . . . 352

D. COUNTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 355

Count XXIX
Deepening Insolvency
*Against Deloitte and PWC* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 355

Count XXX
Common Law Fraud
*Against Deloitte and PWC* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356

Count XXXI
Aiding and Abetting
*Against Deloitte and PWC* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Count XXXII
Concert of Action/ Knowing Participation in Breach of Fiduciary Duty
*Against Deloitte and PWC* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Count XXXIII
Professional Negligence and Negligent Misrepresentation
*Against Deloitte and PWC* . . . . . 359

Count XXXIV
Civil Conspiracy
*Against Deloitte & PWC* . . . . . 360

IX. ADDITIONAL AVOIDANCE CLAIMS . . . . . 361

A. Claims for Recovery of Transfers to Beacon Fund and Task Holdings . . . . . 361

1. Beacon Fund and Task Holdings's Involvement With NCFE . . . . . 361

2. Cash Transfers . . . . . 363

3. COUNTS . . . . . 365

Count XXXV
Avoidable Transfers Recovery of Unlawful Dividends: Ohio Rev. Code 1701.33(c) & 1701.95(d)
*Against Beacon Fund and Task Holdings* . . . . . 365

Count XXXVI
Avoidable Transfers Under Bankruptcy Code Section 544 & Applicable State Avoidance Law
*Against Beacon Fund and Task Holdings* . . . . . 366

Count XXXVII
Avoidable Transfers Under Bankruptcy Code Section 548
*Against Beacon Fund and Task Holdings* . . . . . 367

Count XXVIII
Avoidable Transfers Under Bankruptcy Code Section 547
*Against Beacon Fund and Task Holdings* . . . . . 368

Count XXXIX
Recovery of Money or Property Under Bankruptcy Code Section 550
*Against Beacon Fund and Task Holdings* . . . . . 369

B. Claims Against CSFB Related to NPF XII Series 2000-4 Variable Funding Note . . . . . 369

1. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369

2. COUNTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

Count XL
Avoidable Transfers Under Bankruptcy Code Section 544 & Applicable State Law
*Against CSFB* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

Count XLI
Avoidable Transfers Under Bankruptcy Code Section 548
*Against CSFB* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

Count XLII
Avoidance of Preferential Transfers Under Bankruptcy Code Section 547
*Against CSFB* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 373

Count XLIII
Recovery of Money or Property Under Bankruptcy Code Section 550
*Against CSFB* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 373

X. CLAIMS AGAINST KAYE SCHOLER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 374

A. Kaye Scholer's Role in Collapse of NPF VI and NPF XII . . . . . . . . . . . . . . . . 374

B. Kaye Scholer Knew About Extensive and Undisclosed Related Party Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

C. Kaye Scholer Knew of the Pervasive Indenture Violations in the Programs . . . 383

1. Kaye Scholer's Knowledge of Unsecured "Loans" and Wrongful Purchases of "Future Receivables" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

2. Kaye Scholer's Knowledge of Manipulation of Defaulted and Rejected Receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 389

3. Kaye Scholer's Knowledge of Equity Account Abuses . . . . . . . . . . . . . 390

D. Kaye Scholer Knew that the Indentures Were Routinely Breached . . . . . . . . . 390

E. Kaye Scholer Actively Participated with CSFB and Others to Deepen the Insolvency of NPF VI and NPF XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391

F. Kaye Scholer's Dual Representation Resulted in a Breach of Loyalty and Breach of Due Care to NPF VI and NPF XII . . . . . . . . . . . . . . . . . . . . . . . . . . . 393

Count XLIV
Negligence/Professional Malpractice
*Against Kaye Scholer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

Count XLVI
Breach of Fiduciary Duty
*Against Kaye Scholer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 396

Count XLVII
Concert of Action/Knowing Participation in Breach of Fiduciary Duty
*Against Kaye Scholer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 397

Count XLVIII
Aiding and Abetting CSFB's Fraud and Deepening Insolvency
*Against Kaye Scholer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

XI. CLAIMS AGAINST PURCELL & SCOTT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

A. Equity Account Withdrawals on Dates Other Than the Monthly Payment Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 400

B. Prohibited Advances Based Upon No or Ineligible Receivables . . . . . . . . . . . . 401

C. Related Party Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

D. Frozen Receivables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 404

Count XLIX
Negligence/Professional Malpractice
*Against Purcell & Scott* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

Count L
Breach of Fiduciary Duty
*Against Purcell & Scott* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 406

Count LI
Aiding & Abetting Breach of Fiduciary Duty
*Against Purcell & Scott* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

XII. PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 408

CERTIFICATE OF SERVICE ........................................................ 409

UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THE UNENCUMBERED ASSETS TRUST; and ERWIN I. KATZ, LTD., Trustee of The Unencumbered Assets Trust,<br><br>Plaintiffs,<br><br>v.<br><br>JP MORGAN CHASE BANK; BANK ONE, N.A.; CREDIT SUISSE FIRST BOSTON CORP.; CREDIT SUISSE FIRST BOSTON (USA), INC.; CREDIT SUISSE FIRST BOSTON LLC; CSFB USA; DELOITTE & TOUCHE, LLP; KAYE SCHOLER, LLP; PRICEWATERHOUSECOOPERS,LLP; THE BEACON GROUP III-FOCUS VALUE FUND, L.P.; INTERCONTINENTAL INVESTMENT ASSOCIATES; HEALTHCARE CAPITAL L.L.C.; FLOHAZ PARTNERS L.L.C.; SOUTH ATLANTIC INVESTMENTS, L.L.C.; THOR CAPITAL HOLDINGS L.L.C.; KACHINA INC; LANCE K. POULSEN; BARBARA L. POULSEN; DONALD H. AYERS; REBECCA S. PARRETT; and TASK HOLDINGS LTD.,<br><br>Defendants. | Civil Action No. C2-04-1090<br><br>Judge James L. Graham<br><br>Magistrate Judge Abel |

**THIRD AMENDED COMPLAINT**

## I. INTRODUCTION

1. When they began, NPF VI and NPF XII were healthy, solvent, limited purpose companies. They existed for one purpose: to buy bona fide, health care accounts receivable with the proceeds of notes secured by those receivables. To do that, NPF VI and NPF XII appointed agents

and trustees to act on their behalf, and they imposed strict limitations on what those agents could, and *could not*, do in carrying out their business affairs. On the strength of what appeared to be strict controls and a lawful, legitimate business, NPF VI and NPF XII became industry leaders. They issued triple-A rated, money market equivalent, asset backed notes and were hailed in the financial press as the nation's leading securitzers of health care receivables. NPF VI and NPF XII had more than $3 billion in notes outstanding when they suddenly imploded and collapsed into bankruptcy in November of 2002.

2. How did this happen? It happened because the strict controls that NPF VI and NPF XII had imposed in order to protect themselves were deliberately and continuously subverted by the faithless agents they had appointed to act on their behalf. This complaint seeks to remedy that wrongdoing.

3. The Indenture Trustees for NPF VI and NPF XII, JP Morgan Chase Bank and Bank One, each conspired with one another, and with the individual agents of the Servicer whom NPF VI and NPF XII had appointed to act for them, Defendants Lance Poulsen, Donald Ayers and Rebecca Parrett, in a concerted effort to loot these innocent, lawful businesses out of virtually their entire worth. As described below, through a concerted pattern of racketeering activity and interstate kiting, comprised of literally thousands of acts of mail and wire fraud, and through deliberate acts of fraud and breaches of the duties imposed on them, the Indenture Trustees and the Founders foisted upon NPF VI an NPF XII wrongful transfers of their funds totaling over $16 billion, including:

- $728,153,384 in wrongful withdrawals from the NPF VI Equity Account, effected through at least 494 wire transfers;
- $6,619,546,454 in wrongful withdrawals from the NPF XII Equity Account, effected through at least 2,439 wire transfers;

- $4,250,000,000 in funds kited via hundreds of fraudulent, interstate wire transfers from NPF VI at Bank One in Ohio to NPF XII at Chase in New York;
- $4,180,000,000 in funds kited via hundreds of fraudulent, interstate wire transfers from NPF XII in New York to NPF VI in Ohio.
- Billions of dollars of wrongful transfers to purported healthcare providers for fictitious receivables "purchases" much of which was to affiliates of Poulsen and NCFE's Founders.

4. In the end, NPF VI and NPF XII were in debt nearly $3 billion with nothing to show for it, through the willful and wrongful acts of Chase, Bank One, Poulsen, Ayers and Parrett. As a result of this wrongful pattern of racketeering activity, NPF VI and NPF XII were completely destroyed, rendered hopelessly insolvent and ruined.

5. Credit Suisse First Boston independently and deliberately injured NPF VI and NPF XII, as well. CSFB is one of the leading investment banks in the world. It describes itself as the gatekeeper to the financial markets, and touts the fact that it is the world's second leading underwriter of asset backed notes. In NPF VI and NPF XII, CSFB saw two clients it could use to elevate its stature, and from whom it could reap enormous investment banking fees. But CSFB was facing intense business competition, and even the fees it stood to earn from legitimate note issuances were not enough to satisfy its greed. CSFB therefore entered into a corrupt conspiracy with Poulsen and Ayers, whom it knew were fiduciaries to NPF VI and NPF XII, in order to profit them and itself by illegitimate means. In complete disregard of its own fiduciary obligations to NPF VI and NPF XII, and those it knew were owed by Poulsen and Ayers, CSFB first paid a series of unlawful bribes to Ayers, and offered to bribe Poulsen, in exchange for the right to serve as the exclusive investment banker for NPF VI and NPF XII. As a quid pro quo, Poulsen and Ayers then awarded CSFB the

exclusive ability to dictate the terms, timing and frequency of note issuances by NPF VI and NPF XII. Having agreed to exploit and subvert NPF VI and NPF XII for their own benefit, CSFB, Poulsen, Ayers and Parrett then forced NPF VI and NPF XII to issue nineteen separate offerings of notes that they (but not NPF VI and NPF XII) knew to be worthless. They caused these notes to be issued in a consistent pattern, through largely identical offering documents, in deliberate and intentional violation of the Ohio securities laws. CSFB and the Founders did this with the full knowledge that these issuances would not further the legitimate business of NPF VI and NPF XII. Instead, CSFB and the Founders knowingly and wrongfully forced the issuance of these notes simply to load even more debt onto NPF VI and NPF XII, so that there would be even more money for these conspirators to steal, embezzle and loot through illicit fees and unlawful related party transactions.

6. It has been said that, "One deceit needs many others, and so the whole house is built in the air and must soon come to the ground." As we demonstrate below, each of the acts of fraud and deceit perpetrated on NPF VI and NPF XII could not have been accomplished without the willful, knowing agreement of Chase, Bank One, CSFB, Poulsen, Ayers and Parrett.

7. NPF VI and NPF XII were also injured because their auditors, who owed them duties of care, failed to discharge their obligations to prevent–or at a minimum, to report so that it could be remedied--the fraud that was being perpetrated on NPF VI and NPF XII. The conscious indifference of PriceWaterhouseCoopers and Deloitte & Touche, and their woeful negligence, thus enabled the scheme to defraud NPF VI and NPF XII to continue long past the point from which NPF VI and NPF XII could survive it.

8. The Unencumbered Assets Trust is a post-confirmation trust endowed with the power to pursue claims on behalf of a number of entities. Erwin Katz, Ltd., is its trustee. On behalf of NPF

VI and NPF XII, the Unencumbered Assets Trust and Katz seek to recover in damages what the Defendants' wrongful acts destroyed: the value of two lawful businesses, the $3 billion of worthless debt they were forced to incur, the billions of dollars of assets that were looted from them, and the fraudulent transfers and preferences that were made–not for the benefit of NPF VI and NPF XII or their affiliates–but, rather, for the benefit of their faithless agents or for creditors who had no legal right to receive them.

9. This is what happened, and it must be remedied. We explain why in greater detail, below.

## II. JURISDICTION AND VENUE

10. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331; the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c) & (d) & 1964; 11 U.S.C. § 548 *et seq.*; and 11 U.S.C. § 1334 *et seq.*

10A. This Court has original subject matter jurisdiction over this action pursuant to the statutes cited in Paragraph 10 above and 28 U.S.C. 1334 et seq.

11. To the extent Plaintiff pleads causes of action arising under state law, this Court has supplemental subject matter jurisdiction over these causes of action pursuant to 28 U.S.C. §1367. Supplemental subject matter jurisdiction is conferred under 28 U.S.C. § 1367 because (i) this Court has original jurisdiction over this action; and (ii) Plaintiff's state law claims are so related to claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12. Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1391(b) for several reasons. First, venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because this is a district

and division in which a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred. Second, venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because this is a district and division in which a substantial part of the property that is the subject of this action is situated. Third, venue is proper pursuant to 18 U.S.C. § 1965(a) because this is a civil action under 18 U.S.C. § 1965(a) against defendants that reside, are found, have an agent, or transact affairs in this division and district.

## III. PARTIES

### A. Plaintiff

13. On or about November 18, 2002, National Century Financial Enterprises, Inc. ("NCFE Inc."); NPF VI, Inc. ("NPF VI"); NPF X, Inc. ("NPF X"); NPF XII, Inc. ("NPF XII"); and other related entities filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of Ohio, Eastern Division, in a Chapter 11 case jointly administered as Case No. 02-65235. On April 16, 2004, the Court entered its Order Confirming the Fourth Amended Joint Plan of Liquidation of NCFE and Its Debtor Subsidiaries, as Modified (D.I. 2789) (the "Confirmation Order), by which the Court confirmed the Fourth Amended Joint Plan of Liquidation of NCFE and its Debtor Subsidiaries (including NPF VI and NPF XII), as modified (the "Plan"). On April 30, 2004, the Plan became effective by its terms. Pursuant to Section IV.D.4.a of the Plan, substantially all of the unencumbered assets of the Debtors, including their legal claims or causes of action, were transferred to The Unencumbered Assets Trust (the "UAT" or "Trust") free and clear of liens, claims and encumbrances. Erwin I. Katz ("Katz") serves as trustee of the UAT, with authority to act on its behalf, including the assertion of the claims herein. Except for certain of the avoidance actions below or as otherwise expressly stated herein, the claims brought herein are the claims that belonged

to NPF VI and/or NPF XII prior to the bankruptcy. Together, Katz and the UAT are referred to as the "Plaintiff."

13A. The order for relief, as that phrase is defined in 11 U.S.C. ¶108(a)(2), was entered on November 18, 2002.

**B. Defendants**

14. Defendant JP Morgan Chase Bank ("Chase") is a national bank with its principal office in New York City, New York. Defendant Chase continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts carried out in its capacity as an Indenture Trustee of the NPF VI securitization program.

15. Defendant Bank One, N.A. ("Bank One") is a national bank with its principal office in Chicago, Illinois. Defendant Bank One continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts carried out in its capacity as an Indenture Trustee of the NPF XII securitization program.

16. Defendant Credit Suisse First Boston is a Swiss bank. It is organized as a joint stock corporation established under Swiss law. Its head office is in Zurich, Switzerland, and its principal office in New York, New York. It is a wholly owned subsidiary of Credit Suisse Group, one of the world's leading global financial services companies. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

17. Defendant Credit Suisse First Boston (USA), Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a wholly owned subsidiary of Credit

Suisse First Boston, and an indirect, wholly owned subsidiary of Credit Suisse Group. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

18. Defendant Credit Suisse First Boston LLC is a Delaware limited liability corporation, which is wholly and indirectly owned by Credit Suisse Group. Credit Suisse First Boston LLC and Credit Suisse First Boston (USA), Inc. operate in the United States under the trade name "Credit Suisse First Boston" and are the entities through which the Credit Suisse Group and Credit Suisse First Boston conduct their investment banking business in the United States. They have committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

19. CSFB USA is the successor in interest to Credit Suisse First Boston Corporation, which served as placement agent for over $3 billion dollars worth of note issuances by NPF VI and NPF XII during the time periods at issue in this Complaint. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

20. Defendants Credit Suisse First Boston, Credit Suisse First Boston LLC, Credit Suisse First Boston Corporation and Defendant Credit Suisse First Boston (USA), Inc. will be referred to collectively as "CSFB" throughout this Complaint.

21. Defendant Deloitte & Touche, LLP ("Deloitte") is a Delaware limited liability partnership with its principal place of business in New York. Deloitte continuously and systematically does business in this state and has partners in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

22. Defendant PriceWaterhouseCoopers, LLP ("PWC") is a Delaware limited liability partnership with its principal place of business in New York. Defendant PWC continuously and systematically does business in this state and has partners in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

22A. Defendant Kaye Scholer LLP ("Kaye Scholer") is a New York limited liability partnership with its principal place of business in New York. Kaye Scholer continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

22B. Defendant Purcell & Scott, Co., LPA ("Purcell & Scott") is an Ohio legal professional association with its principal place of business in Dublin, Ohio. Its members and/or partners are residents of Ohio, including those attorneys involved in the conduct made the basis of the Plaintiff's claims below. Purcell & Scott continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including the acts alleged below.

23. Defendant The Beacon Group III Focus Value Fund, L.P. ("Beacon Fund") is a New York limited partnership with its principal place of business in New York. Beacon Fund continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

24. Defendant Intercontinental Investment Associates ("IIA") is a Nevada limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. IIA has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

25. Defendant Healthcare Capital L.L.C. ("HCC") is a Nevada limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. HCC has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

26. Defendant Flohaz Partners L.L.C. ("Flohaz") is a is a Delaware limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Flohaz has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

27. Defendant South Atlantic Investments, L.L.C. ("South Atlantic") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. South Atlantic has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

28. Defendant Thor Capital Holdings L.L.C. ("Thor") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Thor has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

29. Defendant Kachina Inc. ("Kachina") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara

Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Kachina has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

30. Defendants Lance K. Poulsen ("Poulsen") and Barbara L. Poulsen ("Barbara Poulsen") are husband and wife and currently reside in Ohio and/or Florida. Poulsen at all relevant times served as an officer, director and shareholder of NCFE Inc. and certain other affiliates of NCFE Inc. Barbara Poulsen at all relevant times served as secretary, treasurer, and a director of NCFE Inc. Poulsen and Barbara Poulsen regularly do business in this state and have committed acts within this state from which Plaintiff's claims arise.

31. Defendant Donald H. Ayers ("Ayers") is an individual currently residing in Ohio and/or Florida. Ayers at all relevant times served as an officer, director, and shareholder of NCFE Inc. and certain affiliates of NCFE Inc. Ayers regularly does business in this state and has committed acts within this state from which Plaintiff's claims arise.

32. Defendant Rebecca S. Parrett ("Parrett") is an individual who resides in Maricopa County, Arizona. At all relevant times, Parrett served as an officer, director, and shareholder of NCFE. Parrett regularly does business in this state and has committed acts within this state from which Plaintiff's claims arise.

33. Defendant Task Holdings Ltd. ("Task Holdings") is a British Virgin Islands corporation with its principal place of business in New York, New York. Plaintiff's claims against Task Holdings arise from Task Holdings's activities in this state and the state of New York, and from payments made from this state.

## IV. THE NATURE AND OPERATION OF NPF VI AND NPF XII

### A. The Limited Purposes of the NPF VI and NPF XII Special Purpose Companies

34. NPF VI and NPF XII were special purpose corporations formed under the laws of Ohio.

35. As special purpose corporations, NPF VI and NPF XII were formed for certain limited purposes and with limited authority to take certain actions. In general, as described in greater detail below, NPF VI and NPF XII were formed for the limited purpose of purchasing certain well-defined, high quality health care accounts receivable and funding those purchases with the proceeds of the issuances of Notes to investors.

36. In particular, according to their Articles of Organization, NPF VI and NPF XII were specifically formed for the limited purposes of:

a. acquiring or disposing certain eligible healthcare accounts receivable related to the provision of health care services;

b. providing (or arranging for the provision of) services necessary for the collection of those accounts receivable;

c. providing (or arranging for the provision of) services necessary for the maintenance of the ownership of those accounts receivable;

d. issuing and selling notes to investors; and

e. engaging in activities necessary to accomplish the purchase of receivables and the issuance of notes to investors.

### B. The Limited Role of NPF VI and NPF XII in the National Century Financial Enterprises Group of Affiliated Companies

#### 1. NPF VI and NPF XII Maintained a Corporate Existence Independent from Other NCFE Affiliates

37. NPF VI's and NPF XII's capital stock was owned by National Century Financial Enterprises, Inc. ("NCFE").

38. NCFE was a company that owned NPF VI, NPF XII, and a number of other affiliated companies. NPF VI and NPF XII were operated independently of NCFE and NCFE's other affiliates. NPF VI and NPF XII maintained their own separate corporate existence apart from NCFE and NCFE's other affiliates.

39. NPF VI and NPF XII were formed as bankruptcy-remote entities such that, if NCFE or any of its affiliates entered bankruptcy, the assets of NPF VI and NPF XII would not be consolidated with the assets of any other bankruptcy estate.

40. To facilitate their independence and bankruptcy-remote status, and in addition to other restrictions placed on them in other agreements as discussed below, NPF VI and NPF XII were:

a. prohibited from becoming involved in the day to day management of any other entity;

b. required to maintain separate corporate records and books of account;

c. required to maintain their assets separately from the assets of any other entity;

d. required to maintain corporate records and books of account separate from any other entity;

e. required to maintain financial statements, books, and records separate from any other entity;

f. prohibited from guaranteeing any other entity's obligations; and

g. prohibited from acting as an agents of any other entity in any capacity.

41. In addition, NPF VI and NPF XII were required to have at least one director that was not a shareholder, director, officer, employee, or affiliate of any shareholder of the Corporation (the "Independent Director").

42. In the absence of the affirmative vote of 100% of the members of the respective Boards of Directors of NPF VI and NPF XII, including the vote of the Independent Director for each company, NPF VI and NPF XII were legally prohibited from engaging in any transaction other than ones stated above. As such, certain of NPF VI's and NPF XII's agents, while having been delegated certain responsibilities, did not have the authority to exercise unfettered discretion over NPF VI and NPF XII.

**2. The NPF VI and NPF XII Securitization Programs**

43. NPF VI and NPF XII were created as components of programs that would purchase certain well-defined, high quality health care account receivables and fund those purchases with the proceeds of the issuances of Notes to investors.

44. The structure of the NPF VI and NPF XII programs (the "Programs") was created and governed by each of their respective Health Care Receivables Securitization Program Notes Master Indentures, along with periodic supplements thereto (the "Master Indentures").[1]

---

[1] The capitalized terms in the Complaint incorporate by reference the definitions given to those terms in NPF VI's and NPF XII's respective Master Indentures. The provisions of the NPF VI and NPF XII Master Indentures are substantially similar. References to the Master Indentures include both the NPF VI and NPF XII Master Indentures, unless otherwise expressly noted. The NPF VI Master Indenture is attached here to as Exhibit "A". The NPF XII Master Indenture is attached hereto as Exhibit "B." All descriptions and explanations herein of the Indentures and their exhibits are hereby qualified in their entirety to the extent that they are inconsistent with the terms

45. Pursuant to the Master Indentures, NPF VI and NPF XII periodically issued Notes to investors.

46. Those Note proceeds, according to the Master Indentures, were to be used for the purpose of financing the Programs' purchases of certain types of high quality health care receivables.

47. Under the Master Indentures, the Programs were to purchase those receivables from certain healthcare providers, called Sellers.

48. Under the Master Indentures, the Programs were to purchase the receivables of each Seller pursuant to the terms of a Sale & Subservicing Agreement, which was an attachment to the Master Indentures.[2]

49. There were three parties to each Program's Master Indenture: (i) the special purpose vehicle itself; (ii) a servicer of the Program, to which the special purpose vehicles delegated certain functions; and (iii) an Indenture Trustee, which worked in conjunction with the servicer and performed numerous other oversight functions.

50. The Servicer for both the NPF VI and NPF XII Programs was National Premier Financial Services, Inc. ("Servicer").

51. Chase acted as the Indenture Trustee for the NPF VI Program. Bank One served as the Indenture Trustee for the NPF XII Program.[3]

---

of the Indentures and their exhibits.

[2]An example of a Sale & Subservicing Agreement is attached hereto as Exhibit "C."

[3] Chase and Bank One are referred to collectively herein as the "Indenture Trustees." As a result of a merger, The Chase Manhattan Bank is now part of Defendant JP Morgan Chase Bank.

### 3. NPF VI and NPF XII Contracted for Certain of Their Functions to Be Performed by the Servicer

52. Under the Master Indentures, NPF VI and NPF XII contractually engaged the Servicer to carry out numerous defined functions. *See* Master Indentures Art. V. For instance, NPF VI and NPF XII engaged the Servicer for the functions of purchasing receivables, servicing and tracking the receivables, and administering the Programs in conjunction with the Indenture Trustees.

53. Thus, as the Programs actually operated, the Servicer and the Indenture Trustees together facilitated the transfer of funds to and from various accounts both inside and outside the Programs, purportedly pursuant to the requirements of the Master Indentures.

## C. Prohibitions and Controls Placed on the Programs Under the Master Indentures

54. The Programs were created to operate in a manner that would allow for little risk that the principal and interest on the Notes would not be repaid.

55. The low-risk nature of the NPF VI and NPF XII Programs was derived from and dependent upon compliance with the numerous controls placed upon the Programs and those operating the Programs in the Master Indentures.

56. Because of the tightly controlled structure provided for under the Master Indentures, the Notes relating to the Programs were rated by several national Rating Agencies as "AAA" and "investment grade."

57. The key component of the low-risk structure provided for by the Master Indentures was a series of controls, in the form of prohibitions, covenants, and tests, concerning the operations of the Programs.

58. These controls, if violated, would signal to the Indenture Trustees, the Rating Agencies, and ultimately the Programs' investors that the Programs were being operated outside the provisions of the Master Indentures and, accordingly, outside the contemplated low-risk tolerance level set forth therein.

59. In the event one of the Master Indenture's controls was violated, a duty was placed upon the Indenture Trustees to take certain actions with regard to the violations so that the Programs would not be able to operate outside compliance with the Master Indentures. These controls included the following:

**1. Restrictions on the Purchase of Eligible Receivables from Non-Affiliated Sellers**

60. The Master Indentures tightly regulated the expenditure of the proceeds derived from the issuance of the investor Notes.

61. Aside from certain highly rated Permitted Investments not at issue here and the issuance of the Notes to the investors, the Master Indentures limited the Programs' business to the purchase of a specific type of collateral, called Eligible Receivables. *See, e.g.*, Master Indentures § 4.06.

62. Generally speaking, an Eligible Receivable consisted of the third-party reimbursable portion of a payment due to a Seller for a health-care service that had been provided to a patient.

63. Pursuant to the Master Indenture, to be classified as an Eligible Receivable, a Seller's health care Receivable (as defined in Master Indentures Art. I) would have to meet several specific criteria that were set forth in Section 4.2 of the Sale and Subservicing Agreements, which were the

contracts between the Servicer and the Sellers under which the Servicer purchased the Seller's receivables on behalf of the Programs.

64. For example, as provided in Section 4.2 of the Sale and Subservicing Agreements, to qualify as an Eligible Receivable, each Receivable:

a. was required to arise from the Seller having provided a health care service to a patient in the ordinary course of the Seller's business at a price that was usual, customary, and reasonable in the Seller's community for the service that had been provided;

b. was required to have been billed by the Seller to an Eligible Payor, which included only highly rated payors such as certain government-funded programs (*e.g.*, Medicare, Medicaid), commercial insurers, managed health care organizations, and the like;

c. was required to be supported by certain required documentary information, such as the name of the Eligible Payor, the billing date, and the patient's account number;

d. could not have any outstanding portion unpaid for more than 180 days;

e. was required to be owned outright by the Seller; and

f. had to meet various other criteria set forth in the Master Indentures and Section 4.2 of the Sale & Subservicing Agreement.

65. Because of the various restrictions placed on the purchase of Receivables, and the limited authority given to the Servicer and the Trustees to purchase Eligible Receivables, the Master Indentures prohibited the Programs, as administered by the Servicer and the Trustees, from making

advances to any Seller apart from or in excess of the discounted value of the Eligible Receivables sold in return for the money the Programs had advanced.

66. In addition, except for certain limited transactions not applicable here, the Master Indentures prohibited the Programs from entering into any transaction with NCFE or any of its Affiliates. *See* Master Indentures § 4.11(c).

67. Craig Kantor, the "team leader" for Chase that had responsibility for the NPF VI relationship for Chase from 1999 to 2002, testified that the Master Indentures and related documents prohibited the purchase of receivables generated by affiliates of NCFE:

> "Q: It's your understanding that . . . receivables generated by affiliates of NCFE are or are not eligible?
>
> A: <u>I think under the documents they are not eligible</u>.
>
> Q: Whether or not disclosed?
>
> A: Well, that's correct."

68. Thus, the Programs were not permitted to purchase receivables from any healthcare provider affiliated by ownership or common control to NCFE, NPF VI, or NPF XII. The affiliated-party prohibition served to protect the Programs by, for instance, ruling out the risk that the Programs would engage in transactions with its own affiliates that were not arms length or that were fraudulent in nature.

69. Absent the permission of the Rating Agencies, the Master Indentures prohibited any Seller from entering the Programs unless that Seller was listed on Exhibit 3 to the Master Indentures.

70. These criteria, among others discussed below, served to ensure that the health care receivables purchased by the Programs were high quality and presented a low risk of uncollectibility.

### 2. Credit Enhancements

71. To further offset the low risk associated with the Programs and to provide an additional set of controls that would indicate whether the Programs were functioning within the bounds of the Master Indentures, the Master Indentures required the creation and maintenance of several segregated trust accounts that held funds that were contractually withheld from the payment made to the Sellers in return for the purchase of the Sellers' Eligible Receivables.

72. With regard to each Eligible Receivable that was purchased, the contractually withheld funds amounted to 17% of the outstanding balance of each Eligible Receivable, at a minimum. 8.5% of these held back funds were deposited in program reserves, and the remaining 8.5% was paid to the servicer to insure collections by the seller of the receivable. In other words, if the Programs were functioning in compliance with the Master Indentures, each Eligible Receivable purchased would have an associated total 8.5% seller reserve and on 8.5% service-old-back was still controlled by the Servicer and the Trustee.

73. Although each segregated, credit enhancement trust account had its own specific function, as described in detail in the Master Indentures and set forth below, these accounts collectively served at least two purposes. First, they provided a financial buffer that could offset a significant shortfall in collections on Eligible Receivables. Second, because certain of these reserves could be drawn on in the event that the purchased receivables did not collect at the expected rates these accounts would act as an early warning that the program was not functioning as expected or was not being operated as promised if they were not being maintained at or above their proper minimum balances. This, in turn, placed an obligation upon certain entities to take certain actions so that the Programs were protected and not operated outside of the low-risk parameters of the

Master Indentures upon which the Rating Agencies had based their investment grade ratings of the Programs.

74. Furthermore, the role of the Indenture Trustees, which were only authorized to take such actions permitted by the Master Indentures and prohibited from taking any other actions, was intended to safeguard the credit enhancement accounts.

75. Each of these reserve accounts was a segregated trust account held by the Program's respective Indenture Trustee. The NPF VI segregated trust accounts were held by Chase. The NPF XII trust accounts were held by Bank One.

76. As Bank One has testified, funds could not be moved into or out of any of the NPF XII segregated trust accounts without Bank One's approval. Similarly, funds could not be moved into or out of the NPF VI segregated trust accounts without Chase's approval.

77. As Chase has testified, the Indenture Trustees had no power to take any action that was not authorized by the Master Indentures.

78. As Bank One has testified, the Indenture Trustees were not legally permitted to accept an instruction from anyone, including the Servicer, if that instruction would violate the Master Indentures.

79. The Indenture Trustees had no authority to make any transfer into or out of any account unless authorized by the Master Indentures.

80. Furthermore, as Chase has testified, the Indenture Trustees were expected to know what instructions they could and could not carry out under the Master Indentures. As Chase further testified, the Indenture Trustees were expected to review each transaction to ensure that the transaction was consistent with and permitted under the governing Master Indentures. NPF VI and

NPF XII relied on the Trustees to perform these functions, as compliance with the Master Indentures were critical to their financial health.

**a. Equity Account**

81. Pursuant to the Master Indentures, each Program included a segregated trust account held by that Program's respective Indenture Trustee called the Equity Account. *See* Master Indentures § 6.03.

82. Each Program's Equity Account had a specified minimum balance that was required to be maintained at all times. *See, e.g.*, Master Indentures § 6.06. This balance, called the Specified Equity Account Balance, required that, at a minimum, the Equity Account at all times have in it at least 8.5% of greater of the Notes outstanding or the net value of the Eligible Receivables that NPF VI and NPF XII had purchased.

83. Withdrawals against the Specified Equity Account Balance were highly constrained under Section 6.06 of the Master Indentures. As Defendant CSFB and ING (an institutional investor), stated in identical letters to the Indenture Trustees in fall 2002, "no amount may be withdrawn [from the Equity Account] except as required and/or permitted under Section 6.06 of the Master Indenture." As an internal ING e-mail sent a few hours after the ING and CSFB letters also confirms, "Chase and their attorney, Seward & Kissell, agree with our view on the case collateral accounts."[4]

84. The Indenture Trustees, along with the Servicer, controlled the withdrawals from the Equity Account. The Trustees were prohibited from disbursing any funds from the Equity Account

[4]The law firm of Kaye Scholer drafted the October 1, 2002 letter on behalf of Defendant CSFB and ING. Kaye Scholer knew this was true because, in connection with a prior representation, Kaye Scholer also acted as the principal drafter of the Master Indentures.

except on the first business day of each month, called the Monthly Payment Date. *See* Master Indentures § 6.06. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Under Section 6.06 of the Master Indenture, amounts may be withdrawn from the Equity Account only on a Monday Payment Date." (Emphasis in original.) As the internal ING e-mail sent a few hours after the October 1 letter confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.

85. Except for the Indenture Trustees' fees and the interest payments on the investors' Notes, the Indenture Trustees were prohibited from making any disbursements from the Equity Account that would cause the balance of the Equity Account to drop below the Specified Equity Account Balance. *See* Master Indenture § 6.06. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "[N]o withdrawal of any amount for purposes of payment thereof to the Servicer or [NPF VI and NPF XII] may be made from the Equity Account to the extent it would cause amounts remaining on deposit therein to be less than the required Specified Aggregate Equity Account Balance." (Emphasis in original.) As the internal ING e-mail sent a few hours after the October 1 letter confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.

86. In the event that the balance of the Equity Account exceeded the Specified Equity Account Balance after the payment of the Indenture Trustees' fees and the interest payment on the investors' Notes, the Master Indenture contained a specific waterfall provision governing to whom, at what time, and under what circumstances the excess balance could be paid. *See* Master Indenture § 6.06.

87. Pursuant to Section 6.06 of the Master Indentures, the Indenture Trustees were prohibited from making any:

(a) transfer from the Equity Account on days other than a Monthly Payment Date in contravention of Section 6.06 of the Master Indentures;

(b) transfer from the Equity Account to the Purchase Account for further disbursement to sellers in the NPF VI program and for other purposes;

(c) transfer from the Equity Account to the Seller Credit Reserve Account; and

(d) transfer from the Equity Account to the Offset Reserve Account; and

**b. Seller Credit Reserve Account**

88. Pursuant to the Master Indentures, each Program included a segregated trust account held by that Program's respective Indenture Trustee called the Seller Credit Reserve Account. *See* Master Indentures § 6.01.

89. Each Program's Seller Credit Reserve Account had a specified minimum balance that was required to be maintained at all times, called the Specified Credit Reserve Balance. *See* Master Indentures § 4.03(t). The Specified Credit Reserve Balance was 6.5% of the outstanding amount on the purchased Eligible Receivables. *See* Master Indentures Art. I.

90. The Specified Credit Reserve Balance required that for each Eligible Receivable purchased by each Program, each Seller Credit Reserve Account would have in it at all times, on every day of the month, at least 6.5% of the outstanding amount owed on each Eligible Receivable. *See* Master Indentures § 4.03(t). As Chase has testified, it would violate the Master Indentures for the Specified Seller Credit Reserve Balance not to be maintained on any day of the month.

91. The 6.5% Specified Credit Reserve Balance was available for withdrawal in the event that an Eligible Receivable became a Defaulted Receivable. *See, e.g.*, Sale & Subservicing Agreement §§ 6.2, 6.3. A Defaulted Receivable included any receivable for which more than 180 days had passed since the date the receivable was billed. *See* Master Indentures Art. I. In other words, the Programs treated these receivables as defaulted and provided for the draw down on the Seller Credit Reserve Account to make up for the shortfall in collections caused by the default. Such a shortfall was called a Credit Deficiency.

92. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Amounts on deposit in the Seller Credit Reserve Account may only be withdrawn to cover a Credit Deficiency." (Emphasis in original.) As the internal ING e-mail sent a few hours after these letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.

93. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Amounts on deposit in the Seller Credit Reserve Account may only be withdrawn to cover a Credit Deficiency, and any amount so withdrawn must be deposited in the Purchase Account, all in the manner required under the Master Indenture and Sale Agreement." (Emphasis in original.) As the internal ING e-mail sent a few hours after the fall 2002 letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.

94. The Indenture Trustees had no authority to withdraw funds from the Seller Credit Reserve Account and transfer them to other reserve accounts within the Programs.

95. Any significant balance below the Specified Credit Reserve Balances on any day would demonstrate that the Programs were not functioning properly. Such a deficiency would

indicate the possible misuse of reserve funds, a Defaulted Receivables rate beyond that permitted under the Master Indentures, or other abuses not permitted under the Master Indentures.

**c. Offset Reserve Account**

96. Pursuant to the Master Indentures, each Program also included a segregated trust account held by that Program's respective Indenture Trustee called the Offset Reserve Account. *See* Master Indentures § 6.01(a).

97. Each Program's Offset Reserve Account had a specified minimum balance that was required to be maintained at all times, called the Specified Offset Reserve. *See* Master Indentures § 4.03(t). The Specified Offset Reserve was 2% of the outstanding amount on the purchased Eligible Receivables.

98. The Specified Offset Reserve required that, for each Eligible Receivable purchased by each Program, the Offset Reserve Account would have in it at all times at least 2% of each Eligible Receivable. *See* Master Indentures § 4.03(t). As Chase has testified, it would violate the Master Indentures for the Specified Offset Reserve Balance not to be maintained on any day of the month.

99. The 2% Specified Offset Reserve was available for withdrawal in the event a receivable purchased by a Program became a Rejected Receivable. *See* Master Indentures § 6.09; Sale & Subservicing Agreement §§ 2.7, 6.2, 6.3. A Rejected Receivable, which was a defined term of the Master Indentures, essentially included any receivable that was not an Eligible Receivable. That is, in the event that the Seller had breached any representation with regard to any receivable previously sold to the Programs (those representations purportedly making the receivable an Eligible

Receivable), the Programs treated these receivables as "rejected." Each Seller was required to repurchase Rejected Receivables. *See* Sale & Subservicing Agreement § 4.3..

100. Except for the payment of certain program fees not at issue here, the amount in the Offset Reserve Account could only be withdrawn to compensate for the impact of a Rejected Receivable. *See, e.g.*, Master Indentures § 6.09; Sale & Subservicing Agreement §§ 2.7, 6.2, 6.3. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Amounts on deposit in the Offset Reserve Account may only be withdrawn to cover amounts due by a Seller in respect of Rejected Receivables and, under certain circumstances, to pay Program Fee." (Emphasis in original.) As the internal ING e-mail sent a few hours after the fall 2002 letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well. Put another way, for example, funds in the Seller Credit Reserve Account could not be withdrawn to purchase receivables (even Eligible Receivables).

101. In the event that the Indenture Trustee made a transfer out of the Offset Reserve Account, the Indenture Trustee was only authorized to withdraw the amount of the deficiency and deposit that amount into the Purchase Account. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, amounts withdrawn from the Offset Reserve Account to offset the effect of a Rejected Receivable "must be deposited in the Purchase Account." As the internal ING e-mail sent a few hours after the fall 2002 letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well. Put another way, except for limited exceptions not applicable here, the Indenture Trustees had no authority to withdraw funds from the Offset Reserve Account and transfer them to other reserve accounts within the Programs or to accounts outside the Program.

102. Any significant balance below the Specified Offset Reserve Balance on any day would demonstrate that the Programs were not functioning properly. Such a deficiency would indicate the possible misuse of reserve funds, a Rejected Receivables rate beyond that which is permitted under the Master Indentures, or other abuses not permitted under the Master Indentures.

### 3. Other Controls on Withdrawals and Deposits from Accounts

103. Under the Master Indentures, the Servicer and the Indenture Trustees acted in concert to transfer funds to and from the segregated trust accounts that they controlled. The Servicer was given limited authority to request the Indenture Trustee to make certain transfers for certain purposes. Coupled with this restraint on the Servicer, the Trustee was authorized to carry out only certain transfers from certain accounts to certain accounts. The Indenture Trustees were not authorized to, and were therefore prohibited from, making any other transfers other than those authorized by the Indentures.

104. For instance, as discussed above, the Indenture Trustees were not authorized or permitted to withdraw funds from the Equity Account of the NPF VI or NPF XII Program except pursuant to Section 6.06. Pursuant to Section 6.06, the Indenture Trustee was prohibited from transferring funds from the Equity Account to the Purchase Account, the Seller Credit Reserve Account, the Seller Offset Reserve Account, the Collection Account, or any Seller.

105. In addition, the Trustee was not permitted to withdraw funds from the Equity Account on any date other than the first business day of a month, except to the extent Section 6.06 permitted a transfer from the Equity Account to an investor for the purpose of making an early payment on an outstanding Note in certain circumstances. *See* Master Indenture § 6.06.

106. Withdrawals from the Purchase Account were also tightly restricted. As discussed above, except for certain Permitted Investments, the Programs were only permitted to purchase Eligible Receivables. The Programs were only permitted to purchase Eligible Receivables by means of the withdrawal of funds from the Purchase Account. *See* Master Indenture Art. I, §§ 3.01, 6.05. The Programs were only permitted to purchase the Eligible Receivables from healthcare providers that met the definition of the terms "Seller" in the Master Indentures and Sale and Subservicing Agreement.

107. The Indentures did not authorize or permit the Indenture Trustees to transfer funds from the Purchase Account of either the NPF VI Program or the NPF XII Program to any account outside of its respective Program except for the account of a Seller.

108. NCFE, NPF VI, and NPF XII, did not meet the Master Indentures' definition of a Seller because, among other things, they were not health care providers and, in addition, were not listed on Exhibit 3 to each Master Indenture.[5] *See* Master Indentures Art. I. Accordingly, except in narrow circumstances not applicable here, the Indenture Trustees were not authorized or permitted to transfer funds from the Purchase Account to NCFE or to any affiliate of NCFE, including NPF VI and NPF XII.

109. Deposits to the Purchase Account were also limited pursuant to Section 6.02 of the Indentures. Section 6.02 permitted transfers only from certain accounts to the Purchase Account. The accounts from which money could be transferred to the Purchase Account, pursuant to Section 6.02, were the Collection Account, the Seller Credit Reserve Account (in narrowly limited circumstances), the Offset Reserve Account (in narrowly limited circumstances), or the account

---

[5] No Seller could be added to Exhibit 3 without the prior approval of the Rating Agencies.

holding the funds received by means of the Note issuances to investors. The Indentures did not authorize or permit the Trustees to make transfers from any other account to the Purchase Account, including the Equity Account or the account of any other outside entity.

110. In addition, pursuant to Section 4.11(e), NPF VI and NPF XII were obligated to maintain their assets separately from the assets of NCFE and all of its Affiliates. For example, NPF VI and NPF XII were not permitted to commingle their assets for any purpose whatsoever.

#### 4. Reporting of Account Balances and Other Test Results to Rating Agencies

111. The Master Indentures required a monthly report to be delivered to, among others, Indenture Trustees and the Rating Agencies that had rated the Programs. These reports, although not required by the Master Indentures to be delivered to the Programs' investors, were called the "Investor Reports."

112. In part, the purpose of the Investor Reports was to assist the Trustees in carrying out their oversight functions and to advise the Rating Agencies whether (i) the requisite specified account balances were being maintained and (ii) other specified tests concerning the Programs' operations were being met, pursuant to the Master Indentures.

##### a. Specified Equity Account Balance Test

113. As discussed above, the Master Indentures required the minimum Specified Equity Account Balance to be maintained at all times in the Equity Account. The failure to maintain the Specified Equity Account Balance on any day constituted an Event of Default under Section 7.01 of the Master Indentures.

114. As a periodic check on this requirement, the Master Indentures called for the disclosure on a monthly Investor Report of whether, on the first business day of each month, the balance in the Equity Account was at or above the Specified Equity Account Balance.

**b. Specified Seller Credit Reserve Report**

115. Section 4.03(t) of the Master Indentures required the minimum Specified Seller Credit Reserve Balance to be maintained at all times in the Seller Credit Reserve Account. The failure to maintain the Specified Credit Reserve Balance on any day constituted an Event of Default under Section 7.01 of the Master Indentures.

116. As a periodic check on this maintenance requirement, the Master Indentures called for the disclosure on a monthly Investor Report of whether, on the first business day of each month, the balance in the Seller Credit Reserve Account was at or above the Specified Seller Credit Reserve Balance. In addition, weekly Collateral Coverage Reports were required by the Indentures to be delivered to the Trustee listing, among other things, the balances in the trust reserve accounts.

**c. Specified Offset Reserve Balance Report**

117. Section 4.03(t) of the Master Indentures required the minimum Specified Offset Reserve Balance to be maintained at all times. The failure to maintain the Specified Offset Reserve Balance on any day constituted an Event of Default under Section 7.01 of the Master Indentures.

118. As a periodic check on this maintenance requirement, the Master Indentures called for the disclosure on a monthly Investor Report of whether, on the first business day of each month, the balance in the Offset Reserve Account was at or above the Specified Offset Reserve Balance. The Collateral Coverage Reports also reported on this balance on a weekly basis.

**d. Collateral Coverage Test**

119. Section 7.01(k) of the Master Indentures required a calculation that compared, among other things, the total Eligible Receivables in each Program to the outstanding balance on the Notes purchased by the investors. This test served as a means of ensuring that the collateral that was supposed to exist in each Program actually existed and that the Programs were appropriately collateralized, as required by the Master Indentures.

120. Through a calculation provided for under Section 7.01(k), the collateral was supposed to be sustained, at a minimum, at 111% of the value of the receivables that had been purchased.

121. The failure to meet the Collateral Coverage Test constituted an Event of Default under Section 7.01(g) of the Master Indentures.

**e. Receivables Default Test**

122. Section 7.01(h) of the Master Indentures required a calculation that measured the sum of the total Defaulted Receivables and Rejected Receivables compared to the total amount of Eligible Receivables. This test served as a means of ensuring that the Programs were not purchasing underperforming receivables (in the case of Defaulted Receivables) or ineligible receivables (in the case of Rejected Receivables).

123. Through the calculation provided for under Section 7.01(h), the sum of Defaulted and Rejected Receivables was not to exceed 10% of the Eligible Receivables that had been purchased.

124. The failure to meet the Receivables Default Test constituted an Event of Default under Section 7.01(h) of the Master Indentures.

**f. Concentration Test**

125. Section 4.13 of the Master Indentures required a calculation that measured, for example, the reliance of each Program on receivables purchased from any one Seller and that Seller's Affiliates. This test served as a means of ensuring that the Programs were not impermissibly dependent upon any single Seller.

126. Pursuant to Section 4.13(xiii), the receivables purchased from any one Seller, including any Affiliates or Subsidiaries of that Seller, were limited to 20% absent approval from the Rating Agencies that had rated each of the Programs.

**5. Audit in Conformity with General Accepted Auditing Principles**

127. Section 4.12 of the Master Indentures required that NPF VI and NPF XII provide the Trustee a consolidated, audited financial statement of NCFE, including NPF VI, NPF XII, and the Servicer.

128. The audited financial statements were to include a report on those companies' statements of income, retained earnings, and cash flow. *See* Master Indenture § 4.12.

129. The Master Indentures required these reports and audits to be performed by a firm of nationally recognized independent public accountants. The Master Indentures required the auditing firm to be pre-approved by the Rating Agencies. *See* Master Indenture § 4.12.

130. Upon receipt of the audit report, the Trustee was then obligated under Section 4.12 to forward the report to the Rating Agencies.

131. The failure to deliver such an audit report within 180 days after the end of each fiscal year constituted an Event of Default under Section 7.01 of the Master Indentures.

132. As with other various controls put in place by the Master Indentures, the audit report requirement constituted another control that would tell the Trustees and Rating Agencies, among others, whether the NPF VI and NPF XII Programs were operating properly pursuant to the terms of the Master Indentures, under which the Rating Agencies had provided their AAA, investment grade ratings.

**6. Trustee Duties in Event that Certain Controls Being Violated**

133. In addition to the protection provided to the Programs by limiting the Indenture Trustees' authority to make transfers except in specific circumstances, as discussed above, the Master Indentures also required the Indentures Trustees, in certain circumstances, to take affirmative action to protect the Programs.

**a. Principal Amortization Events**

134. Pursuant to Section 7.02 of the Indentures, the Indenture Trustees were required, in certain circumstances, to declare a Principal Amortization Event. Under the Master Indentures, a Principal Amortization Event was an event that, in essence, shut down the operations of the Programs because they were not operating in accordance with the Master Indentures. In the event the Indenture Trustees declared a Principal Amortization Event, the Programs' receivables purchasing operations were suspended, the Programs' Permitted Investment operations were halted, and the principal and interest owed on the investors' Notes was to be repaid. Notice of a Principal Amortization Event was to be given to the Servicer, the Rating Agencies, and the Programs' investors. *See* Master Indentures § 7.02.

135. In sum, as detailed below, once the Trustee learned of certain facts that constituted Events of Default under Section 7.01 of the Master Indentures, and once certain other conditions

were satisfied in some circumstances, then the Master Indentures placed affirmative obligations upon the Indenture Trustees to take certain actions to protect the Programs, including the issuance of notices of Events of Default and, ultimately, the declaration of Principal Amortization Events.

136. Chase has testified that the Indenture Trustees had an obligation to know what facts would constitute an Event of Default under Section 7.01 so that the Indenture Trustees could take the actions required of them in a manner consistent with their obligations under Section 7.02.

137. If one of the Trustees knew of facts constituting certain Events of Default, and if that event was continuing, then the Trustee was required to deliver a notice of an Event of Default to the Servicer. *See* Master Indentures § 7.02. Unless the Servicer reasonably demonstrated to the Indenture Trustee that no such Event of Default had occurred, then the Indenture Trustee was required to declare a Principal Amortization Event. *See* Master Indentures § 7.02.

**b. Rights to Pursue Legal Redress**

138. The Master Indentures provided the Indenture Trustees rights and obligations, in certain circumstances, to pursue legal and extra-judicial redress to protect the Programs.

139. Pursuant to Section 3.03(a)(i), upon the occurrence of any Event of Default other than one occurring under 7.01(a), (b), (c), (h), or (j), and in addition to the rights afforded to and the obligations placed upon the Indentures Trustees under Article VII of the Master Indentures, the Indenture Trustees had the right to: (i) pursue any legal remedy available to collect any sum of money supposedly secured under the Programs; (ii) to enforce their title in an right to possession of the receivables purchased by the Programs, wherever they could be found; (iii) to pursue any remedies they may have against any Seller or Subservicer under any Sale Agreement; (iv) to enforce any and all other rights or remedies available to them; and (v) without further notice or demand and

without legal process, take possession of the receivables purchased by the Programs, wherever found.

140. Pursuant to Section 7.03 of the Master Indentures, if an Event of Default occurred and continued with respect to all Series of the Notes, the Indenture Trustees were given the right to proceed to protect and enforce their rights and the rights of the investors by appropriate judicial proceedings.

**c. Right to Remove the Servicer**

141. Under the Master Indentures, the Indenture Trustees had the right, in certain circumstances, to terminate the servicing responsibilities of the Servicer in order to protect the Programs and their investors.

142. Section 5.09 of the Master Indentures listed several specific events that, when they occurred and continued, would constitute Events of Servicer Default. Master Indentures § 5.09.

143. An Event of Servicer Default could be triggered by, for example, the Servicer's failure to perform or observe any material term, covenant, or agreement contained in the Master Indentures; the Servicer's failure to deliver an Investor Report; or a material breach of any Servicer representation or warranty in Section 5.03. Master Indentures § 5.09.

144. If an Event of Servicer Default occurred, the Indenture Trustees were given the authority to notify the Servicer of the occurrence of such an event of Servicer Event of Default.

145. If an Indenture Trustee gave the Servicer notice of an Event of Servicer Default and the default was not remedied after thirty days, then the Indenture Trustee was authorized to terminate the servicing responsibilities of the Servicer, without demand, protest or further notice of any kind. Master Indentures § 5.09.

#### d. Indenture Trustees' Duty to Act as They Would in the Conduct of Their Own Affairs

146. Under the Master Indentures, if any Event of Default occurred and was continuing, the Indenture Trustees were obligated to exercise all of their rights and powers—including the declaration of a Principal Amortization Event, the removal of the Servicer, and all other rights—"as a prudent person would exercise or use under the circumstances in the conduct" of the Trustees' own affairs. *See* Master Indentures § 8.01(d).

147. When acting under this standard after a continuing Event of Default, the Trustees were required to investigate and ascertain the pertinent facts relating to the pertinent Event of Default. *See* Master Indentures § 8.01(d).

## V. THE SCHEME TO DEFRAUD, AND THEREBY MISAPPROPRIATE THE ASSETS OF, NPF VI AND NPF XII

148. Defendants, Chase, Bank One, the Servicer, Poulsen, Parrett, and Ayers joined together in concerted, well defined, organized, and long–running racketeering enterprises, conspiracies, and schemes to defraud NPF VI and NPF XII by misappropriating the assets of these entities. Each of these defendants, and non-defendant the Servicer, played a crucial role in this scheme to defraud. Because the object of the schemes—the substantial cash assets of NPF VI and XII—were held in trust accounts at Chase (for NPF VI) and Bank One (for NPF XII), it was impossible for the scheme to succeed without the active participation and assistance of Bank One and Chase. These trustee banks held the keys to the targeted assets and they were charged with responsibility to safeguard the assets that belonged to NPF VI and NPF XII (including their reserve accounts), and to disburse them only for those purposes expressly set forth in the governing NPF VI and NPF XII Indentures. Accordingly, in order for the scheme to misappropriate these assets to

succeed, it was necessary and essential that Chase and Bank One each have knowledge of the scheme, agree to participate in it, and intend that NPF VI and NPF XII be injured by it. As detailed below, both Chase and Bank One had such knowledge, did so agree, and had such an intention.

149. Chase and Bank One were gatekeepers charged with protecting the assets of NPF VI and NPF XII. Rather than faithfully execute that charge, Chase and Bank One joined a scheme to loot those assets. They did so by first fraudulently agreeing to undertake the protection of NPF VI and NPF XII's assets according to the terms of the NPF VI and NPF XII Indentures, when in fact neither Chase nor Bank One had any intention to perform their obligations under the Indentures when they executed them and their related supplements. To the contrary, both had already joined in conspiracies to defraud and loot NPF VI and XII prior to executing the Indentures and, in furtherance thereof, had agreed to disregard their obligations under the Indentures in order to permit the assets of VI and XII to be misappropriated for their benefit and for the benefit of their co-conspirators. Chase and Bank One played their part in this criminal conspiracy by throwing open the gates they had agreed to man and by personally delivering the assets they had promised to safeguard into the hands of those who, along with Chase and Bank One, intended to and did loot them.

150. Chase and Bank One participated in the fraud on, and theft of, the assets of NPF VI and XII not only by their actions but also by their failures to act. In their roles as guardians of the assets of NPF VI and XII, Chase and Bank One each agreed to be vigilant, to act prudently, and to take action and sound the alarms if they learned that the NPF VI and XII trust assets were being misused or misappropriated. Not surprisingly, despite being inundated with a continuous and unceasing barrage of plain, unmistakable knowledge and proof that the assets under their protection

were being looted, Chase and Bank One sat silent, sounded no alarms, and took none of the actions they had committed to take when confronted with such facts.

151. As a direct result of the faithlessness, frauds, defalcations and breaches of Chase and Bank One, the conspiracy to loot the assets of NPF VI and XII was a resounding success. NPF VI and NPF XII suffered catastrophic and debilitating multi-billion-dollar losses. Chase and Bank One, acting together and in concert with the Servicer, Poulsen, Parrett, and Ayers, caused these losses and are now responsible to NPF VI and NPF XII to replace the funds lost as a result of their frauds and theft.

**A. Factual Allegations Regarding Chase**

152. On June 1, 1998, Chase executed the NPF VI Master Indenture. Although Chase was already serving in an indenture trustee capacity with respect to NPF VI at this time, the execution of the NPF VI Indenture began Chase's service under this new "Master" indenture.

153. Poulsen, Parrett, and Ayers selected Chase to serve as Indenture Trustee for NPF VI because of their prior dealings with Chase vice president Joseph Giordano. Mr. Giordano had served as a trust officer for the NPF VI program, as well as other NPF programs, at Bankers Trust, the predecessor trustee to Chase. Although the Bankers Trust NPF VI indenture was not identical to the Chase NPF VI Master Indenture, there were substantial similarities.

153A. Marie Merritt, a Chase officer who would later supervise the NPF VI trusteeship at Chase, was also employed by Bankers Trust and worked closely with Giordano in connection with the administration of the NPF programs.

153B. Poulsen, Parrett, and Ayers likewise selected Bank One to serve as Indenture Trustee for NPF XII because of their prior dealings with John Rothrock, who had served as a trust officer for the NPF IV and other NPF programs at Bankers Trust, Bank One's predecessor trustee.

153C. As a result of their work at Bankers Trust acting as trust officers for the NPF programs, Giordano, Merritt, and Rothrock became intimately aware of the manner in which the Founders misused their roles with the Servicer and the NPF entities to routinely violate the then-existing indentures and loot the programs entrusted to the care of Bankers Trust. Giordano, Merritt, and Rothrock not only learned of the Founders' and the Servicer's systematic defalcations at Bankers Trust (which would continue unabated at Chase and Bank One), they actively participated in carrying out and covering up these breaches and frauds. Indeed, Giordano himself *originated* the idea of breaching the indentures by commingling funds of the NPF programs and their affiliates to cover up the misuse of funds and create the fraudulent impression that the reserve accounts were maintained at the levels required by the then-extant indentures.

153D. Thus, as set forth in more detail below, long before they accepted their roles as trustees, and throughout their service as trustees, Chase and Bank One (through Giordano, Merritt, and Rothrock) were intimately familiar with the fraudulent character of the Founders, the misuse and misappropriation of funds by the Servicer, the persistent failure of the NPF programs to operation in accordance with their indentures including, and the persistent looting of reserve accounts and the resulting insufficient balances in those accounts. Chase and Bank One were not, therefore, innocent trustees who were hoodwinked by the Founders or the Servicer. To the contrary, they were complicit co-conspirators who, well before they ever executed the NPF VI and XII Indentures, were intimately familiar with and knew: (i) the disreputable character and fraudulent predilections of the individuals