UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE UNENCUMBERED ASSETS TRUST; and ERWIN I. KATZ, LTD., Trustee of The Unencumbered Assets Trust,

Plaintiffs,

v.

JP MORGAN CHASE BANK; BANK ONE, N.A.; CREDIT SUISSE FIRST BOSTON CORP.; CREDIT SUISSE FIRST BOSTON (USA), INC.; CREDIT SUISSE FIRST BOSTON LLC; CSFB USA; DELOITTE & TOUCHE, LLP; KAYE SCHOLER, LLP; PRICEWATERHOUSECOOPERS, LLP; PURCELL & SCOTT, L.P.A.; THE BEACON GROUP III-FOCUS VALUE FUND, L.P.; INTERCONTINENTAL INVESTMENT ASSOCIATES; HEALTHCARE CAPITAL L.L.C.; FLOHAZ PARTNERS L.L.C.; SOUTH ATLANTIC INVESTMENTS, L.L.C. THOR CAPITAL HOLDINGS L.L.C.; KACHINA INC; LANCE K. POULSEN; BARBARA L. POULSEN; DONALD H. AYERS; REBECCA S. PARRETT; and TASK HOLDINGS LTD.,

Defendants.

Civil Action No.: C2-04-1090

Judge James L. Graham

Magistrate Judge Abel

**ANSWER AND AFFIRMATIVE DEFENSES OF CREDIT SUISSE (USA), INC., CREDIT SUISSE, NEW YORK BRANCH AND CREDIT SUISSE SECURITIES (USA) LLC TO THE UAT'S THIRD AMENDED COMPLAINT**

Defendants Credit Suisse Securities (USA) LLC (formerly Credit Suisse First Boston LLC),[1] Credit Suisse, New York Branch (formerly Credit Suisse First Boston, New York Branch) ("CSNYB"), and Credit Suisse (USA), Inc. (formerly Credit Suisse First Boston (USA),

[1] Credit Suisse First Boston LLC was successor by merger to Credit Suisse First Boston Corp, another named defendant.

Inc.) (collectively, "Credit Suisse"), by their undersigned attorneys, hereby answer the averments made by plaintiffs The Unencumbered Assets Trust and Erwin I. Katz, Ltd., Trustee of the Unencumbered Assets Trust ("Plaintiff" or the "UAT") in the Third Amended Complaint (the "Complaint") in the action The Unencumbered Assets Trust v. JP Morgan Chase Bank, No. C2-04-1090 (D. Ohio).

Pursuant to Federal Rule of Civil Procedure 8(b), any averment in the Complaint as to which Credit Suisse denies knowledge or information sufficient to form a belief as to its truth shall have the effect of a denial. Credit Suisse hereby denies any averment in the Complaint that it does not specifically admit.

Credit Suisse's answer is set forth in numbered paragraphs that correspond to the numbered paragraphs set forth in the Complaint. Unless otherwise specified, an answer to a numbered paragraph is inclusive of any subparagraphs or footnotes to such paragraph in the Complaint, and unless otherwise specified Credit Suisse's answers reflect the knowledge that Credit Suisse had as of the date of this Answer. Credit Suisse need not answer any averment that is or may be contained in the headings or sub-headings in the Complaint, and Credit Suisse shall not be deemed to have admitted the truth or accuracy of any of the information, allegations or characterizations set forth in such headings or sub-headings. Pursuant to Federal Rule of Civil Procedure 8(b), Credit Suisse need not answer any allegation that is not directed against it. As and for their answer, and subject to the foregoing, Credit Suisse hereby submits its answer to the Complaint and states as follows:

## PREFACE

The UAT is the successor entity to NPF VI and NPF XII, which were special purpose entities with no employees of their own. The Founders of their parent company, National Century Financial Enterprises, Inc. ("NCFE"), were the directors and officers of NPF

VI and NPF XII. NPF VI and NPF XII, through their officers and directors, issued notes by making false misrepresentations to Credit Suisse and others. When the Founders' scheme unraveled, NCFE and its subsidiaries, NPF VI and NPF XII, filed for bankruptcy protection. Although Credit Suisse was itself a victim of the Founders' fraud, and lost more money than any other investor that has brought suit against it, the UAT nevertheless decided to sue Credit Suisse, claiming that Credit Suisse conspired with the Founders to commit fraud, even though there is no evidence of any involvement by Credit Suisse in any such conspiracy, or any other misconduct by Credit Suisse. Indeed, the federal government brought criminal charges against the Founders, all of whom have been convicted of having orchestrated a fraud that they concealed from those outside NCFE, including Credit Suisse. In contrast, the government did not bring any charges against Credit Suisse or its employees, nor did any regulatory agency. It is nonsensical for the UAT to maintain Credit Suisse knew about the fraud when the record evidence clearly shows that Credit Suisse substantially increased its financial exposure to NCFE after it supposedly learned of the wrongdoing by NCFE's employees. Equally contrived is the UAT's assertion that NPF VI and NPF XII relied upon Credit Suisse when making their decisions to issue notes and that they relied on information Credit Suisse gave them. The truth is that it was NPF VI and NPF XII, through their officers and directors, that provided all relevant information to Credit Suisse and represented to Credit Suisse that the information was accurate and complete in all material respects. Credit Suisse performed specific professional services for NPF VI and NPF XII pursuant to written contracts that set forth the parties' contractual duties to each other. These contracts clearly and expressly state that it was Credit Suisse that was relying and entitled to rely on representations and information that NPF VI and NPF XII provided to it, and that Credit Suisse owed no duties to NPF VI or NPF XII beyond marketing the notes NPF VI and NPF XII

issued. NPF VI and NPF XII did not rely (and under the terms of the written contracts could not have relied) upon Credit Suisse to do anything other than market the notes, which Credit Suisse did and which the UAT does not dispute. The Complaint against Credit Suisse lacks merit and should be dismissed.

## I. *INTRODUCTION*

1. *When they began, NPF VI and NPF XII were healthy, solvent, limited purpose companies. They existed for one purpose: to buy bona fide, health care accounts receivable with the proceeds of notes secured by those receivables. To do that, NPF VI and NPF XII appointed agents and trustees to act on their behalf, and they imposed strict limitations on what those agents could, and could not, do in carrying out their business affairs. On the strength of what appeared to be strict controls and a lawful, legitimate business, NPF VI and NPF XII became industry leaders. They issued triple-A rated, money market equivalent, asset backed notes and were hailed in the financial press as the nation's leading securitizers of health care receivables. NPF VI and NPF XII had more than $3 billion in notes outstanding when they suddenly imploded and collapsed into bankruptcy in November of 2002.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 1, except admits that NPF VI and NPF XII were special purpose corporations that were supposed to buy healthcare accounts receivable with the proceeds of the notes secured by these receivables, that NPF VI and NPF XII issued triple-A rated asset-backed notes and were the nation's leading securitizers of healthcare receivables during the relevant time period, and that NPF VI and NPF XII had approximately $3 billion in notes outstanding when they filed for bankruptcy in November 2002.[2]

2. *How did this happen? It happened because the strict controls that NPF VI and NPF XII had imposed in order to protect themselves were deliberately and continuously subverted by the faithless agents they had appointed to act on their behalf. This complaint seeks to remedy that wrongdoing.*

---

2 Unless otherwise defined herein, all capitalized terms herein bear the same meaning as they do in the Complaint.

Credit Suisse denies the allegations of paragraph 2 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse.

3. *The Indenture Trustees for NPF VI and NPF XII, JP Morgan Chase Bank and Bank One, each conspired with one another, and with the individual agents of the Servicer whom NPF VI and NPF XII had appointed to act for them, Defendants Lance Poulsen, Donald Ayers and Rebecca Parrett, in a concerted effort to loot these innocent, lawful businesses out of virtually their entire worth. As described below, through a concerted pattern of racketeering activity and interstate kiting, comprised of literally thousands of acts of mail and wire fraud, and through deliberate acts of fraud and breaches of the duties imposed on them, the Indenture Trustees and the Founders foisted upon NPF VI an NPF XII wrongful transfers of their funds totaling over $16 billion, including:*

- *$728,153,384 in wrongful withdrawals from the NPF VI Equity Account, effected through at least 494 wire transfers;*
- *$6,619,546,454 in wrongful withdrawals from the NPF XII Equity Account, effected through at least 2,439 wire transfers;*
- *$4,250,000,000 in funds kited via hundreds of fraudulent, interstate wire transfers from NPF VI at Bank One in Ohio to NPF XII at Chase in New York;*
- *$4,180,000,000 in funds kited via hundreds of fraudulent, interstate wire transfers from NPF XII in New York to NPF VI in Ohio.*
- *Billions of dollars of wrongful transfers to purported healthcare providers for fictitious receivables "purchases" much of which was to affiliates of Poulsen and NCFE's Founders.*

Paragraph 3 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies the allegations of paragraph 3 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse.

4. *In the end, NPF VI and NPF XII were in debt nearly $3 billion with nothing to show for it, through the willful and wrongful acts of Chase, Bank One, Poulsen, Ayers and Parrett. As a result of this wrongful pattern of racketeering activity, NPF VI and NPF XII were completely destroyed, rendered hopelessly insolvent and ruined.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 4.

5. *Credit Suisse First Boston independently and deliberately injured NPF VI and NPF XII, as well. CSFB is one of the leading investment banks in the world. It describes itself as the gatekeeper to the financial markets, and touts the fact that it is the world's second leading underwriter of asset backed notes. In NPF VI and NPF XII, CSFB saw two clients it could use to elevate its stature, and from whom it could reap enormous investment banking fees. But CSFB was facing intense business competition, and even the fees it stood to earn from legitimate note issuances were not enough to satisfy its greed. CSFB therefore entered into a corrupt conspiracy with Poulsen and Ayers, whom it knew were fiduciaries to NPF VI and NPF XII, in order to profit them and itself by illegitimate means. In complete disregard of its own fiduciary obligations to NPF VI and NPF XII, and those it knew were owed by Poulsen and Ayers, CSFB first paid a series of unlawful bribes to Ayers, and offered to bribe Poulsen, in exchange for the right to serve as the exclusive investment banker for NPF VI and NPF XII. As a quid pro quo, Poulsen and Ayers then awarded CSFB the exclusive ability to dictate the terms, timing and frequency of note issuances by NPF VI and NPF XII. Having agreed to exploit and subvert NPF VI and NPF XII for their own benefit, CSFB, Poulsen, Ayers and Parrett then forced NPF VI and NPF XII to issue nineteen separate offerings of notes that they (but not NPF VI and NPF XII) knew to be worthless. They caused these notes to be issued in a consistent pattern, through largely identical offering documents, in deliberate and intentional violation of the Ohio securities laws. CSFB and the Founders did this with the full knowledge that these issuances would not further the legitimate business of NPF VI and NPF XII. Instead, CSFB and the Founders knowingly and wrongfully forced the issuance of these notes simply to load even more debt onto NPF VI and NPF XII, so that there would be even more money for these conspirators to steal, embezzle and loot through illicit fees and unlawful related party transactions.*

Paragraph 5 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies the allegations of paragraph 5 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse, except admits that Credit Suisse is one of the leading investment banks in the world and was one of the leading underwriters of asset-backed notes during the relevant time period. Credit Suisse also states that no answer is required to paragraph 5 to the extent that the paragraph alleges a claim of commercial bribery because, as Plaintiff conceded in its Response to Credit Suisse's Motion to Dismiss, dated May 31, 2005, Credit Suisse has not been accused or convicted of commercial bribery and, absent such conviction, Credit Suisse's

conduct, as a matter of law, cannot and does not constitute a predicate act under Ohio's RICO statute.

6. *It has been said that, "One deceit needs many others, and so the whole house is built in the air and must soon come to the ground." As we demonstrate below, each of the acts of fraud and deceit perpetrated on NPF VI and NPF XII could not have been accomplished without the willful, knowing agreement of Chase, Bank One, CSFB, Poulsen, Ayers and Parrett.*

Paragraph 6 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies the allegations of paragraph 6 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse.

7. *NPF VI and NPF XII were also injured because their auditors, who owed them duties of care, failed to discharge their obligations to prevent-or at a minimum, to report so that it could be remedied--the fraud that was being perpetrated on NPF VI and NPF XII. The conscious indifference of PriceWaterhouseCoopers and Deloitte & Touche, and their woeful negligence, thus enabled the scheme to defraud NPF VI and NPF XII to continue long past the point from which NPF VI and NPF XII could survive it.*

Paragraph 7 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies the allegations of paragraph 7 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse.

8. *The Unencumbered Assets Trust is a post-confirmation trust endowed with the power to pursue claims on behalf of a number of entities. Erwin Katz, Ltd., is its trustee. On behalf of NPF VI and NPF XII, the Unencumbered Assets Trust and Katz seek to recover in damages what the Defendants' wrongful acts destroyed: the value of two lawful businesses, the $3 billion of worthless debt they were forced to incur, the billions of dollars of assets that were looted from them, and the fraudulent transfers and preferences that were made-not for the benefit of NPF VI and NPF XII or their affiliates-but, rather, for the benefit of their faithless agents or for creditors who had no legal right to receive them.*

Paragraph 8 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies the allegations of paragraph 8 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations

not directed at Credit Suisse, except admits that paragraph 8 purports to describe the Plaintiff and the relief it seeks, but denies that Plaintiff is entitled to receive any relief as to Credit Suisse.

9. *This is what happened, and it must be remedied. We explain why in greater detail, below.*

Credit Suisse denies the allegations of paragraph 9 as to Credit Suisse and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse.

## II. *JURISDICTION AND VENUE*

10. *This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331; the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c) & (d) & 1964; 11 U.S.C. § 548 et seq.; and 11 U.S.C. § 1334 et seq.*

Paragraph 10 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 10, except admits that Plaintiff purports to rely on the referenced statutory provisions to establish the original jurisdiction of this Court.

10A. *This Court has original subject matter jurisdiction over this action pursuant to the statutes cited in Paragraph 10 above and 28 U.S.C. 1334 et seq.*

Paragraph 10A contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 10A, except admits that Plaintiff purports to rely on the referenced statutory provisions to establish the original jurisdiction of this Court.

11. *To the extent Plaintiff pleads causes of action arising under state law, this Court has supplemental subject matter jurisdiction over these causes of action pursuant to 28 U.S.C. § 1367. Supplemental subject matter jurisdiction is conferred under 28 U.S.C. § 1367 because (i) this Court has original jurisdiction over this action; and (ii) Plaintiffs state law claims are so related to claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.*

Paragraph 11 contains conclusions of law as to which no answer is required. Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 11, except admits that Plaintiff purports to rely on the Constitution and referenced statutory provisions to establish the original jurisdiction of this Court.

12. *Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1391(b) for several reasons. First, venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because this is a district and division in which a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred. Second, venue is proper pursuant to 28 U.S.C. § 1391 (b)(2) because this is a district and division in which a substantial part of the property that is the subject of this action is situated. Third, venue is proper pursuant to 18 U.S.C. § 1965(a) because this is a civil action under 18 U.S.C. § 1965(a) against defendants that reside, are found, have an agent, or transact affairs in this division and district.*

Paragraph 12 contains conclusions of law as to which no answer is required. Credit Suisse denies the allegations of paragraph 12 as to Credit Suisse and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse, except admits that venue is proper in this district and divisions pursuant to 28 U.S.C. § 1409 and 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the Plaintiff's claims against the Founders and other parties occurred in this district and division.

13. *On or about November 18, 2002, National Century Financial Enterprises, Inc. ("NCFE Inc."); NPF VI, Inc. ("NPF VI"); NPF X, Inc. ("NPF X"); NPF XII, Inc. ("NPF XII"); and other related entities filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of Ohio, Eastern Division, in a Chapter 11 case jointly administered as Case No. 02-65235. On April 16, 2004, the Court entered its Order Confirming the Fourth Amended Joint Plan of Liquidation of NCFE and Its Debtor Subsidiaries, as Modified (D.E. 2789) (the "Confirmation Order"), by which the Court confirmed the Fourth Amended Joint Plan of Liquidation of NCFE and its Debtor Subsidiaries (including NPF VI and NPF XII), as modified (the "Plan"). On April 30, 2004, the Plan became effective by its terms. Pursuant to Section IV.D.4.a of the Plan, substantially all of the unencumbered assets of the Debtors, including their legal claims or causes of action, were transferred to The Unencumbered Assets Trust (the "UAT" or "Trust") free and clear of liens, claims and encumbrances. Erwin I. Katz ("Katz") serves as trustee of the UAT, with authority to act on its behalf, including the assertion of the claims herein. Except for certain of the avoidance actions below or as otherwise expressly stated herein, the claims brought herein are the claims that belonged to NPF VI and/or NPF XII prior to the bankruptcy. Together, Katz and the UAT are referred to as the "Plaintiff."*

Paragraph 13 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 13, except states that to the extent Plaintiff relies on the public record, Credit Suisse refers to that public record for the true and complete information relating to Case No. 02-65235.

13A. *The order for relief, as that phrase is defined in 11 U.S.C. ¶108(a)(2), was entered on November 18, 2002.*

Paragraph 13A contains conclusions of law as to which no answer is required. To the extent any answer may be required, Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 13A, and refers to the text of the public record for the true and complete information relating to Case No. 02-65235.

## III. *PARTIES*

14. *Defendant JP Morgan Chase Bank ("Chase") is a national bank with its principal office in New York City, New York. Defendant Chase continuously and systematically does business in this state. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts carried out in its capacity as an Indenture Trustee of the NPF VI securitization program.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 14.

15. *Defendant Bank One, N.A. ("Bank One") is a national bank with its principal office in Chicago, Illinois. Defendant Bank One continuously and systematically does business in this state. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts carried out in its capacity as an Indenture Trustee of the NPF XII securitization program.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 15.

16. *Defendant Credit Suisse First Boston is a Swiss bank. It is organized as a joint stock corporation established under Swiss law. Its head office is in Zurich, Switzerland, and its principal office in New York, New York. It is a wholly owned subsidiary of Credit Suisse Group, one of the world's leading global financial services companies. It has committed acts in*

*this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies the allegations of paragraph 16, except admits that Credit Suisse First Boston, now known as Credit Suisse, is a Swiss bank organized under Swiss law, that its head office is in Zurich, Switzerland, and that it is a wholly-owned subsidiary of Credit Suisse Group, one of the world's leading global financial services companies. Credit Suisse operates in New York through its branch, CSNYB. CSNYB, acting from New York, and not Credit Suisse in Switzerland, had business dealings with NCFE or its subsidiaries. Credit Suisse notes that CSNYB is not a named defendant in the caption of the Complaint and it was not served in a timely manner in accordance with Rule 4(m) of the Federal Rules of Civil Procedure.

17. *Defendant Credit Suisse First Boston (USA), Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a wholly owned subsidiary of Credit Suisse First Boston, and an indirect, wholly owned subsidiary of Credit Suisse Group. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies the allegations of paragraph 17, except admits that Credit Suisse (USA), Inc. (formerly Credit Suisse First Boston (USA), Inc.), is a Delaware corporation with its principal place of business in New York, New York, and that it is a wholly-owned subsidiary of Credit Suisse Holdings (USA), Inc., and an indirect, wholly-owned subsidiary of Credit Suisse Group. Credit Suisse further states that Credit Suisse (USA), Inc. had no business dealings with NCFE and its subsidiaries and Credit Suisse (USA), Inc. is not properly a defendant in this action.

18. *Defendant Credit Suisse First Boston LLC is a Delaware limited liability corporation, which is wholly and indirectly owned by Credit Suisse Group. Credit Suisse First Boston LLC and Credit Suisse First Boston (USA), Inc. operate in the United States under the trade name "Credit Suisse First Boston" and are the entities through which the Credit Suisse Group and Credit Suisse First Boston conduct their investment banking business in the United States. They have committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies the allegations of paragraph 18, except admits that Credit Suisse Securities (USA) LLC (formerly Credit Suisse First Boston LLC), successor by merger to Credit Suisse First Boston Corporation, is a Delaware limited liability corporation, which is a wholly-owned subsidiary of Credit Suisse (USA), Inc., and an indirect, wholly-owned subsidiary of Credit Suisse Group, and further admits that Credit Suisse Securities (USA) LLC conducted investment banking business in the United States.

19. *CSFB USA is the successor in interest to Credit Suisse First Boston Corporation, which served as placement agent for over $3 billion dollars worth of note issuances by NPF VI and NPF XII during the time periods at issue in this Complaint. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies the allegations of paragraph 19.

20. *Defendants Credit Suisse First Boston, Credit Suisse First Boston LLC, Credit Suisse First Boston Corporation and Defendant Credit Suisse First Boston (USA), Inc. will be referred to collectively as "CSFB" throughout this Complaint.*

Paragraph 20 contains no allegations requiring an answer; to the extent that paragraph 20 is construed to contain allegations requiring an answer, Credit Suisse denies the allegations of paragraph 20 and states that some of the entities Plaintiff purports to name as defendants in paragraph 20 are not the same as the entities listed in the caption of this Complaint or in paragraphs 16-19 above. Credit Suisse treats the UAT's use of "CSFB" throughout the Complaint as a reference to defendants Credit Suisse Securities (USA) LLC, CSNYB, and Credit Suisse (USA), Inc. (collectively, "Credit Suisse"), but notes that it is improper for Plaintiff to assert the allegations against all Credit Suisse defendants as a group, particularly because Credit Suisse (USA) Inc. had no dealings with NCFE or its subsidiaries and CSNYB had only limited dealings with NCFE or its subsidiaries.

21. *Defendant Deloitte & Touche, LLP ("Deloitte") is a Delaware limited liability partnership with its principal place of business in New York. Deloitte continuously and systematically does business in this state and has partners in this state. It has committed acts in*

*this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 21.

22. *Defendant PriceWaterhouseCoopers, LLP ("PWC") is a Delaware limited liability partnership with its principal place of business in New York. Defendant PWC continuously and systematically does business in this state and has partners in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 22.

22A. *Defendant Kaye Scholer LLP ("Kaye Scholer") is a New York limited liability partnership with its principal place of business in New York. Kaye Scholer continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 22A.

22B. *Defendant Purcell & Scott, Co., LPA ("Purcell & Scott") is an Ohio legal professional association with its principal place of business in Dublin, Ohio. Its members and/or partners are residents of Ohio, including those attorneys involved in the conduct made the basis of the Plaintiff's claims below. Purcell & Scott continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 22B.

23. *Defendant The Beacon Group III Focus Value Fund, L.P. ("Beacon Fund") is a New York limited partnership with its principal place of business in New York. Beacon Fund continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 23.

24. *Defendant Intercontinental Investment Associates ("IIA") is a Nevada limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. IIA has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 24.

25. *Defendant Healthcare Capital L.L.C. ("HCC") is a Nevada limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. HCC has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 25.

26. *Defendant Flohaz Partners L.L.C. ("Flohaz") is a is a Delaware limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Flohaz has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 26.

27. *Defendant South Atlantic Investments, L.L.C. ("South Atlantic") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. South Atlantic has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 27.

28. *Defendant Thor Capital Holdings L.L.C. ("Thor") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Thor has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 28.

29. *Defendant Kachina Inc. ("Kachina") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Kachina has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 29.

30. *Defendants Lance K. Poulsen ("Poulsen") and Barbara L. Poulsen ("Barbara Poulsen") are husband and wife and currently reside in Ohio and/or Florida. Poulsen at all relevant times served as an officer, director and shareholder of NCFE Inc. and certain other affiliates of NCFE Inc. Barbara Poulsen at all relevant times served as secretary, treasurer, and a director of NCFE Inc. Poulsen and Barbara Poulsen regularly do business in this state and have committed acts within this state from which Plaintiff's claims arise.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 30, except admits that, for at least some period of time during the relevant period, Poulsen was an officer, director and shareholder of NCFE, and, for at least some period of time during the relevant period, Barbara Poulsen was secretary, treasurer, and director of NCFE.

31. *Defendant Donald H. Ayers ("Ayers") is an individual currently residing in Ohio and/or Florida. Ayers at all relevant times served as an officer, director, and shareholder of NCFE Inc. and certain affiliates of NCFE Inc. Ayers regularly does business in this state and has committed acts within this state from which Plaintiffs claims arise.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 31, except admits that, for at least some period of time during the relevant period, Ayers was an officer, director and shareholder of NCFE.

32. *Defendant Rebecca S. Parrett ("Parrett") is an individual who resides in Maricopa County, Arizona. At all relevant times, Parrett served as an officer, director, and shareholder of NCFE. Parrett regularly does business in this state and has committed acts within this state from which Plaintiff's claims arise.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 32, except admits that, for at least some period of time during the relevant period, Parrett was an officer, director and shareholder of NCFE.

33. *Defendant Task Holdings Ltd. ("Task Holdings") is a British Virgin Islands corporation with its principal place of business in New York, New York. Plaintiffs claims against Task Holdings arise from Task Holding's activities in this state and the state of New York, and from payments made from this state.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 33.

## IV. *THE NATURE AND OPERATION OF NPF VI AND NPF XII*

34. *NPF VI and NPF XII were special purpose corporations formed under the laws of Ohio.*

Credit Suisse admits paragraph 34.

35. *As special purpose corporations, NPF VI and NPF XII were formed for certain limited purposes and with limited authority to take certain actions. In general, as described in greater detail below, NPF VI and NPF XII were formed for the limited purpose of purchasing certain well-defined, high quality health care accounts receivable and funding those purchases with the proceeds of the issuances of Notes to investors.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 35, except admits that NPF VI and NPF XII were special purpose corporations that were formed for certain purposes and with authority to take certain actions, including purchasing certain healthcare accounts receivable and funding those purchases with proceeds of Notes, and refers to the Indentures, which specify what NPF VI and NPF XII could purchase.

36. *In particular, according to their Articles of Organization, NPF VI and NPF XII were specifically formed for the limited purposes of:*

*a. acquiring or disposing certain eligible healthcare accounts receivable related to the provision of health care services;*

b. *providing (or arranging for the provision of) services necessary for the collection of those accounts receivable;*

c. *providing (or arranging for the provision of) services necessary for the maintenance of the ownership of those accounts receivable;*

d. *issuing and selling notes to investors; and*

e. *engaging in activities necessary to accomplish the purchase of receivables and the issuance of notes to investors.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 36, except admits that the Articles of Incorporation for NPF VI and NPF XII stated that those entities were formed for the purposes described in subparagraphs a-e of paragraph 36, and refers to the Articles of Incorporation for the complete and actual description of their contents.

37. *NPF VI's and NPF XII's capital stock was owned by National Century Financial Enterprises, Inc. ("NCFE").*

Credit Suisse admits the allegations of paragraph 37.

38. *NCFE was a company that owned NPF VI, NPF XII, and a number of other affiliated companies. NPF VI and NPF XII were operated independently of NCFE and NCFE's other affiliates. NPF VI and NPF XII maintained their own separate corporate existence apart from NCFE and NCFE's other affiliates.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 38, except admits that NCFE was a company that owned NPF VI and NPF XII, among others.

39. *NPF VI and NPF XII were formed as bankruptcy-remote entities such that, if NCFE or any of its affiliates entered bankruptcy, the assets of NPF VI and NPF XII would not be consolidated with the assets of any other bankruptcy estate.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 39.

40. *To facilitate their independence and bankruptcy-remote status, and in addition to other restrictions placed on them in other agreements as discussed below, NPF VI and NPF XII were:*

*a. prohibited from becoming involved in the day to day management of any other entity;*

*b. required to maintain separate corporate records and books of account;*

*c. required to maintain their assets separately from the assets of any other entity;*

*d. required to maintain corporate records and books of account separate from any other entity;*

*e. required to maintain financial statements, books, and records separate from any other entity;*

*f. prohibited from guaranteeing any other entity's obligations; and*

*g. prohibited from acting as an agents of any other entity in any capacity.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 40.

41. *In addition, NPF VI and NPF XII were required to have at least one director that was not a shareholder, director, officer, employee, or affiliate of any shareholder of the Corporation (the "Independent Director").*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 41.

42. *In the absence of the affirmative vote of 100% of the members of the respective Boards of Directors of NPF VI and NPF XII, including the vote of the Independent Director for each company, NPF VI and NPF XII were legally prohibited from engaging in any transaction other than ones stated above. As such, certain of NPF VI's and NPF XII's agents, while having been delegated certain responsibilities, did not have the authority to exercise unfettered discretion over NPF VI and NPF XII.*

Paragraph 42 contains conclusions of law as to which no answer is required. To the extent any answer may be required Credit Suisse denies the allegations of paragraph 42 as to Credit Suisse and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse.

43. *NPF VI and NPF XII were created as components of programs that would purchase certain well-defined, high quality health care account receivables and fund those purchases with the proceeds of the issuances of Notes to investors.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 43, except admits NPF VI and NPF XII were expected to purchase healthcare accounts receivable.

44. *The structure of the NPF VI and NPF XII programs (the "Programs") was created and governed by each of their respective Health Care Receivables Securitization Program Notes Master Indentures, along with periodic supplements thereto (the "Master Indentures").*[3]

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 44, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

45. *Pursuant to the Master Indentures, NPF VI and NPF XII periodically issued Notes to investors.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 45, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

46. *Those Note proceeds, according to the Master Indentures, were to be used for the purpose of financing the Programs' purchases of certain types of high quality health care receivables.*

---

[3] *The capitalized terms in the Complaint incorporate by reference the definitions given to those terms in NPF VI's and NPF XII's respective Master Indentures. The provisions of the NPF VI and NPF XII Master Indentures are substantially similar. References to the Master Indentures include both the NPF VI and NPF XII Master Indentures, unless otherwise expressly noted. The NPF VI Master Indenture is attached here to as Exhibit "A". The NPF XII Master Indenture is attached hereto as Exhibit "B." All descriptions and explanations herein of the Indentures and their exhibits are hereby qualified in their entirety to the extent that they are inconsistent with the terms of the Indentures and their exhibits.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 46, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

47. *Under the Master Indentures, the Programs were to purchase those receivables from certain healthcare providers, called Sellers.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 47, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

48. *Under the Master Indentures, the Programs were to purchase the receivables of each Seller pursuant to the terms of a Sale & Subservicing Agreement, which was an attachment to the Master Indentures.*[4]

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 48, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

49. *There were three parties to each Program's Master Indenture: (i) the special purpose vehicle itself; (ii) a servicer of the Program, to which the special purpose vehicles delegated certain functions; and (iii) an Indenture Trustee, which worked in conjunction with the servicer and performed numerous other oversight functions.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 49, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

---

4 *An example of a Sale & Subservicing Agreement is attached hereto as Exhibit "C."*

50. *The Servicer for both the NPF VI and NPF XII Programs was National Premier Financial Services, Inc. ("Servicer").*

Credit Suisse admits that the Indentures for NPF VI and NPF XII appointed National Premier Financial Services, Inc. as Servicer.

51. *Chase acted as the Indenture Trustee for the NPF VI Program. Bank One served as the Indenture Trustee for the NPF XII Program.*[5]

Credit Suisse admits that the Indenture for NPF VI appointed Chase as the Indenture Trustee and the Indenture for NPF XII appointed Bank One as the Indenture Trustee.

52. *Under the Master Indentures, NPF VI and NPF XII contractually engaged the Servicer to carry out numerous defined functions. See Master Indentures Art. V. For instance, NPF VI and NPF XII engaged the Servicer for the functions of purchasing receivables, servicing and tracking the receivables, and administering the Programs in conjunction with the Indenture Trustees.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 52, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

53. *Thus, as the Programs actually operated, the Servicer and the Indenture Trustees together facilitated the transfer of funds to and from various accounts both inside and outside the Programs, purportedly pursuant to the requirements of the Master Indentures.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 53, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

54. *The Programs were created to operate in a manner that would allow for little risk that the principal and interest on the Notes would not be repaid.*

---

[5] *Chase and Bank One are referred to collectively herein as the "Indenture Trustees." As a result of a merger, The Chase Manhattan Bank is now part of Defendant JP Morgan Chase Bank.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 54.

55. *The low-risk nature of the NPF VI and NPF XII Programs was derived from and dependent upon compliance with the numerous controls placed upon the Programs and those operating the Programs in the Master Indentures.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 55, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

56. *Because of the tightly controlled structure provided for under the Master Indentures, the Notes relating to the Programs were rated by several national Rating Agencies as "AAA" and "investment grade."*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 56, except admits that the Class A Notes issued by NPF VI and NPF XII were rated AAA by one or more national Rating Agencies, and states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

57. *The key component of the low-risk structure provided for by the Master Indentures was a series of controls, in the form of prohibitions, covenants, and tests, concerning the operations of the Programs.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 57, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

58. *These controls, if violated, would signal to the Indenture Trustees, the Rating Agencies, and ultimately the Programs' investors that the Programs were being operated outside the provisions of the Master Indentures and, accordingly, outside the contemplated low-risk tolerance level set forth therein.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 58, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

59. *In the event one of the Master Indenture's controls was violated, a duty was placed upon the Indenture Trustees to take certain actions with regard to the violations so that the Programs would not be able to operate outside compliance with the Master Indentures. These controls included the following:*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 59, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

60. *The Master Indentures tightly regulated the expenditure of the proceeds derived from the issuance of the investor Notes.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 60, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

61. *Aside from certain highly rated Permitted Investments not at issue here and the issuance of the Notes to the investors, the Master Indentures limited the Programs' business to the purchase of a specific type of collateral, called Eligible Receivables. See, e.g., Master Indentures § 4.06.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 61, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

62. *Generally speaking, an Eligible Receivable consisted of the third-party reimbursable portion of a payment due to a Seller for a health-care service that had been provided to a patient.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 62, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

63. *Pursuant to the Master Indenture, to be classified as an Eligible Receivable, a Seller's health care Receivable (as defined in Master Indentures Art. 1) would have to meet several specific criteria that were set forth in Section 4.2 of the Sale and Subservicing Agreements, which were the contracts between the Servicer and the Sellers under which the Servicer purchased the Seller's receivables on behalf of the Programs.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 63, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

64. *For example, as provided in Section 4.2 of the Sale and Subservicing Agreements, to qualify as an Eligible Receivable, each Receivable:*

*a. was required to arise from the Seller having provided a health care service to a patient in the ordinary course of the Seller's business at a price that was usual, customary, and reasonable in the Seller's community for the service that had been provided;*

*b. was required to have been billed by the Seller to an Eligible Payor, which included only highly rated payors such as certain government-funded programs (e.g., Medicare, Medicaid), commercial insurers, managed health care organizations, and the like;*

*c. was required to be supported by certain required documentary information, such as the name of the Eligible Payor, the billing date, and the patient's account number;*

*d. could not have any outstanding portion unpaid for more than 180 days;*

*e. was required to be owned outright by the Seller; and*

> *f.* *had to meet various other criteria set forth in the Master Indentures and Section 4.2 of the Sale & Subservicing Agreement.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 64, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

65. *Because of the various restrictions placed on the purchase of Receivables, and the limited authority given to the Servicer and the Trustees to purchase Eligible Receivables, the Master Indentures prohibited the Programs, as administered by the Servicer and the Trustees, from making advances to any Seller apart from or in excess of the discounted value of the Eligible Receivables sold in return for the money the Programs had advanced.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 65, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

66. *In addition, except for certain limited transactions not applicable here, the Master Indentures prohibited the Programs from entering into any transaction with NCFE or any of its Affiliates. See Master Indentures § 4.11(c).*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 66, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

67. *Craig Kantor, the "team leader" for Chase that had responsibility for the NPF VI relationship for Chase from 1999 to 2002, testified that the Master Indentures and related documents prohibited the purchase of receivables generated by affiliates of NCFE:*

> *"Q: It's your understanding that ... receivables generated by affiliates of NCFE are or are not eligible?*
> *A: I think under the documents they are not eligible.*
> *Q: Whether or not disclosed?*
> *A: Well, that's correct."*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 67, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents, and to the extent Plaintiff relies on the testimony of Craig Kantor referenced in paragraph 67, Credit Suisse refers to the transcript of that testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

68. *Thus, the Programs were not permitted to purchase receivables from any healthcare provider affiliated by ownership or common control to NCFE, NPF VI, or NPF XII. The affiliated party prohibition served to protect the Programs by, for instance, ruling out the risk that the Programs would engage in transactions with its own affiliates that were not arms length or that were fraudulent in nature.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 68, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

69. *Absent the permission of the Rating Agencies, the Master Indentures prohibited any Seller from entering the Programs unless that Seller was listed on Exhibit 3 to the Master Indentures.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 69, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

70. *These criteria, among others discussed below, served to ensure that the health care receivables purchased by the Programs were high quality and presented a low risk of uncollectibility.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 70.

71. *To further offset the low risk associated with the Programs and to provide an additional set of controls that would indicate whether the Programs were functioning within the bounds of the Master Indentures, the Master Indentures required the creation and maintenance of several segregated trust accounts that held funds that were contractually withheld from the payment made to the Sellers in return for the purchase of the Sellers' Eligible Receivables.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 71, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

72. *With regard to each Eligible Receivable that was purchased, the contractually withheld funds amounted to 17% of the outstanding balance of each Eligible Receivable, at a minimum. 8.5% of these held back funds were deposited in program reserves, and the remaining 8.5% was paid to the servicer to insure collections by the seller of the receivable. In other words, if the Programs were functioning in compliance with the Master Indentures, each Eligible Receivable purchased would have an associated total 8.5% seller reserve and on 8.5% service-old-back was still controlled by the Servicer and the Trustee.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 72, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

73. *Although each segregated, credit enhancement trust account had its own specific function, as described in detail in the Master Indentures and set forth below, these accounts collectively served at least two purposes. First, they provided a financial buffer that could offset a significant shortfall in collections on Eligible Receivables. Second, because certain of these reserves could be drawn on in the event that the purchased receivables did not collect at the expected rates these accounts would act as an early warning that the program was not functioning as expected or was not being operated as promised if they were not being maintained at or above their proper minimum balances. This, in turn, placed an obligation upon certain entities to take certain actions so that the Programs were protected and not operated outside of the low-risk parameters of the Master Indentures upon which the Rating Agencies had based their investment grade ratings of the Programs.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 73, except states that to the extent Plaintiff relies on the Master

Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

74. *Furthermore, the role of the Indenture Trustees, which were only authorized to take such actions permitted by the Master Indentures and prohibited from taking any other actions, was intended to safeguard the credit enhancement accounts.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 74, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

75. *Each of these reserve accounts was a segregated trust account held by the Program's respective Indenture Trustee. The NPF VI segregated trust accounts were held by Chase. The NPF XII trust accounts were held by Bank One.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 75, except admits that the reserve accounts were represented to Credit Suisse to be segregated trust accounts held by the Program's respective Indenture Trustee, and that Chase was the Trustee for NPF VI and Bank One was the Trustee for NPF XII.

76. *As Bank One has testified, funds could not be moved into or out of any of the NPF XII segregated trust accounts without Bank One's approval. Similarly, funds could not be moved into or out of the NPF VI segregated trust accounts without Chase's approval.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 76, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents, and to the extent Plaintiff relies on the testimony of Bank One referenced in paragraph 76, Credit Suisse refers to the transcript of that testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

77. *As Chase has testified, the Indenture Trustees had no power to take any action that was not authorized by the Master Indentures.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 77, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents, and to the extent Plaintiff relies on the testimony of Chase referenced in paragraph 77, Credit Suisse refers to the transcript of that testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

78. *As Bank One has testified, the Indenture Trustees were not legally permitted to accept an instruction from anyone, including the Servicer, if that instruction would violate the Master Indentures.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 78, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents, and to the extent Plaintiff relies on the testimony of Bank One referenced in paragraph 78, Credit Suisse refers to the transcript of that testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

79. *The Indenture Trustees had no authority to make any transfer into or out of any account unless authorized by the Master Indentures.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 79, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

80. *Furthermore, as Chase has testified, the Indenture Trustees were expected to know what instructions they could and could not carry out under the Master Indentures. As Chase further testified, the Indenture Trustees were expected to review each transaction to ensure that the transaction was consistent with and permitted under the governing Master Indentures. NPF VI and NPF XII relied on the Trustees to perform these functions, as compliance with the Master Indentures were critical to their financial health.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 80, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents, and to the extent Plaintiff relies on the testimony of Chase referenced in paragraph 80, Credit Suisse refers to the transcript of that testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

81. *Pursuant to the Master Indentures, each Program included a segregated trust account held by that Program's respective Indenture Trustee called the Equity Account. See Master Indentures § 6.03.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 81, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

82. *Each Program's Equity Account had a specified minimum balance that was required to be maintained at all times. See, e.g., Master Indentures § 6.06. This balance, called the Specified Equity Account Balance, required that, at a minimum, the Equity Account at all times have in it at least 8.5% of greater of the Notes outstanding or the net value of the Eligible Receivables that NPF VI and NPF XII had purchased.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 82, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

83. *Withdrawals against the Specified Equity Account Balance were highly constrained under Section 6.06 of the Master Indentures. As Defendant CSFB and ING (an institutional investor), stated in identical letters to the Indenture Trustees in fall 2002, "no amount may be withdrawn [from the Equity Account] except as required and/or permitted under Section 6.06 of the Master Indenture." As an internal ING e-mail sent a few hours after the ING and CSFB letters also confirms, "Chase and their attorney, Seward & Kissell, agree with our view on the case collateral accounts."*[6]

Credit Suisse denies the allegations of paragraph 83 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse, except admits that ING sent the NPF VI Trustee and CSNYB sent the NPF XII Trustee letters on or about October 1, 2002 ("Fall 2002 Letters") and states that to the extent Plaintiff relies on the Master Indentures, the Fall 2002 Letters and an internal ING email referenced in paragraph 83, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

84. *The Indenture Trustees, along with the Servicer, controlled the withdrawals from the Equity Account. The Trustees were prohibited from disbursing any funds from the Equity Account except on the first business day of each month, called the Monthly Payment Date. See Master Indentures § 6.06. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Under Section 6.06 of the Master Indenture, amounts may be withdrawn from the Equity Account <u>only on a Monday Payment Date</u>." (Emphasis in original.) As the internal ING e-mail sent a few hours after the October 1 letter confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.*

Credit Suisse denies the allegations of paragraph 84 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse, except states that to the extent Plaintiff relies on the Master Indentures, the Fall 2002 Letters and an internal ING email referenced in paragraph 84, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

---

[6] *The law firm of Kaye Scholer drafted the October 1, 2002 letter on behalf of Credit Suisse and ING. Kaye Scholer knew this was true because, in connection with a prior representation, Kaye Scholer also acted as the principal drafter of the Master Indentures.*

85. *Except for the Indenture Trustees' fees and the interest payments on the investors' Notes, the Indenture Trustees were prohibited from making any disbursements from the Equity Account that would cause the balance of the Equity Account to drop below the Specified Equity Account Balance. See Master Indenture § 6.06. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "[N]o withdrawal of ANY amount for purposes of payment thereof to the Servicer or NPF VI and NPF XII may be made from the Equity Account to the extent it would cause amounts remaining on deposit therein to be less than the required Specified Aggregate Equity Account Balance." (Emphasis in original.) As the internal ING e-mail sent a few hours after the October 1 letter confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.*

Credit Suisse denies the allegations of paragraph 85 as to Credit Suisse and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse, except states that to the extent Plaintiff relies on the Master Indentures, the Fall 2002 Letters and an internal ING email referenced in paragraph 85, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

86. *In the event that the balance of the Equity Account exceeded the Specified Equity Account Balance after the payment of the Indenture Trustees' fees and the interest payment on the investors' Notes, the Master Indenture contained a specific waterfall provision governing to whom, at what time, and under what circumstances the excess balance could be paid. See Master Indenture § 6.06.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 86, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

87. *Pursuant to Section 6.06 of the Master Indentures, the Indenture Trustees were prohibited from making any:*

*(a) transfer from the Equity Account on days other than a Monthly Payment Date in contravention of Section 6.06 of the Master Indentures;*

*(b) transfer from the Equity Account to the Purchase Account for further disbursement to sellers in the NPF VI program and for other purposes;*

*(c) transfer from the Equity Account to the Seller Credit Reserve Account; and*

*(d) transfer from the Equity Account to the Offset Reserve Account; and*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 87, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

88. *Pursuant to the Master Indentures, each Program included a segregated trust account held by that Program's respective Indenture Trustee called the Seller Credit Reserve Account. See Master Indentures § 6.01.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 88, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

89. *Each Program's Seller Credit Reserve Account had a specified minimum balance that was required to be maintained at all times, called the Specified Credit Reserve Balance. See Master Indentures § 4.03(t). The Specified Credit Reserve Balance was 6.5% of the outstanding amount on the purchased Eligible Receivables. See Master Indentures Art. I.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 89, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

90. *The Specified Credit Reserve Balance required that for each Eligible Receivable purchased by each Program, each Seller Credit Reserve Account would have in it at all times, on every day of the month, at least 6.5% of the outstanding amount owed on each Eligible Receivable. See Master Indentures § 4.03(t). As Chase has testified, it would violate the Master Indentures for the Specified Seller Credit Reserve Balance not to be maintained on any day of the month.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 90, except states that to the extent Plaintiff relies on the Master

Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

91. *The 6.5% Specified Credit Reserve Balance was available for withdrawal in the event that an Eligible Receivable became a Defaulted Receivable. See, e.g., Sale & Subservicing Agreement §§ 6.2, 6.3. A Defaulted Receivable included any receivable for which more than 180 days had passed since the date the receivable was billed. See Master Indentures Art. I. In other words, the Programs treated these receivables as defaulted and provided for the draw down on the Seller Credit Reserve Account to makeup for the shortfall in collections caused by the default. Such a shortfall was called a Credit Deficiency.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 91, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

92. *As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Amounts on deposit in the Seller Credit Reserve Account may only be withdrawn to cover a Credit Deficiency." (Emphasis in original.) As the internal ING e-mail sent a few hours after these letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.*

Credit Suisse denies the allegations of paragraph 92 as to Credit Suisse and denies knowledge or information sufficient to form a belief as to allegations not directed at Credit Suisse, except states that to the extent Plaintiff relies on the Fall 2002 Letters and an internal ING email referenced in paragraph 92, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

93. *As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Amounts on deposit in the Seller Credit Reserve Account may only be withdrawn to cover a Credit Deficiency, and any amount so withdrawn must be deposited in the Purchase Account, all in the manner required under the Master Indenture and Sale Agreement." (Emphasis in original.) As the internal ING e-mail sent a few hours after the fall 2002 letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.*

Credit Suisse denies the allegations of paragraph 93 as to Credit Suisse, and denies knowledge or information sufficient to form a belief as to allegations not directed at

Credit Suisse, except states that to the extent Plaintiff relies on the Fall 2002 Letters and an internal ING email referenced in paragraph 93, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

94. *The Indenture Trustees had no authority to withdraw funds from the Seller Credit Reserve Account and transfer them to other reserve accounts within the Programs.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 94, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

95. *Any significant balance below the Specified Credit Reserve Balances on any day would demonstrate that the Programs were not functioning properly. Such a deficiency would indicate the possible misuse of reserve funds, a Defaulted Receivables rate beyond that permitted under the Master Indentures, or other abuses not permitted under the Master Indentures.*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 95, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

96. *Pursuant to the Master Indentures, each Program also included a segregated trust account held by that Program's respective Indenture Trustee called the Offset Reserve Account. See Master Indentures § 6.01(a).*

Credit Suisse denies knowledge or information sufficient to form a belief as to the allegations of paragraph 96, except states that to the extent Plaintiff relies on the Master Indentures, Credit Suisse refers to the text of those documents for the complete and actual description of their contents.

97. *Each Program's Offset Reserve Account had a specified minimum balance that was required to be maintained at all times, called the Specified Offset Reserve. See Master Indentures §4.03(t). The Specified Offset Reserve was 2% of the outstanding amount on the purchased Eligible Receivables.*