**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No. 2:03-MD-1565-JLG-MRA |
| | : | |
| National Century Financial Enterprises, Inc. | : | |
| | : | Judge Graham |
| Debtors. | : | Magistrate Judge Abel |
| | : | |

| | | |
|---|---|---|
| The Unencumbered Assets Trust, *et al*., | : | |
| | : | Case No. C2-04-1090 |
| Plaintiffs, | : | |
| vs. | : | Judge Graham |
| | : | Magistrate Judge Abel |
| JP Morgan Chase Bank, *et al.* | : | |
| | : | |
| Defendants | | |

**DEFENDANT AYERS' ANSWER AND AFFIRMATIVE DEFENSES TO THE UNENCUMBERED ASSETS TRUST'S THIRD AMENDED COMPLAINT**

Defendant Donald H. Ayers' ("Defendant Ayers") by his undersigned attorneys, hereby answer the averments made by Plaintiffs, The Unencumbered Assets Trust (hereinafter the "UAT") in the Third Amended Complaint (the "Complaint") in the action of *The Unencumbered Assets Trust, et al. v, JP Morgan Chase Bank, et al.*, Case No. C2-04-1090 (S.D. Ohio).

Pursuant to the Federal Rules of Civil Procedure 8(b), any averment in the Complaint as to which Defendant Ayers denies knowledge or information sufficient to form a belief as its truth shall have the effect of a denial. Defendant Ayers hereby denies any averment in the Complaint that he does not specifically admit.

Defendant Ayers' answers are set forth in numbered paragraphs that correspond to the numbered paragraphs of the Complaint. Unless otherwise specified, an answer to a numbered

paragraph is inclusive of any subparagraphs or footnotes to such paragraph in the Complaint, and unless so specified, Defendant Ayers' answers reflect the knowledge that he had at the date his Answer was filed. Defendant Ayers need not answer any averment that is or may be contained in the headings or subheadings in the Complaint, and Defendant Ayers shall not be deemed to have admitted the truth or accuracy of any of the information, allegations or characterizations set forth in such headings or subheadings. Furthermore, pursuant to the Federal Rules of Civil Procedure 8(b), Defendant Ayers need not answer any allegations in the Complaint that is not directed against him. As and for his answer, and subject to the foregoing, Defendant Ayers hereby submits his answer to the Complaint and states the following:

**I. INTRODUCTION**

1. When they began, NPF VI and NPF XII were healthy, solvent, limited purpose companies. They existed for one purpose: to boy bona fide, health care accounts receivable with the proceeds of notes secured by those receivables. To do that, NPF VI and NPF XII appointed agents and trustees to act on their behalf, and they imposed strict limitations on what those agents could, and *could not*, do in carrying out their business affairs. On the strength of what appeared to be strict controls and a lawful, legitimate business, NPF VI and NPF XII became industry leaders. They issued triple-A rated, money market equivalent, asset backed notes and were hailed in the financial press as the nation's leading securitzers of health care receivables. NPF VI and NPF XII had more than $3 billion in notes outstanding when they suddenly imploded and collapsed into bankruptcy in November of 2002.

Defendant Ayers denies the allegations of Paragraph 1.

2. How did this happen? It happened because the strict controls that NPF VI and NPF XII had imposed in order to protect themselves were deliberately and continuously

subverted by the faithful agents they had appointed to act on their behalf. This complaint seeks to remedy that wrongdoing.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in Paragraph 2.

3. The Indenture Trustees for NPF VI and NPF XII, JP Morgan Chase and Bank One, each conspired with one another, and with the individual agents of the Servicer whom NPF VI and NPF XII had appointed to act for them, Defendants Lance Poulsen, Donald Ayers and Rebecca Parrett, in a concerted effort to loot these innocent, lawful businesses out of virtually their entire worth. As described below, through a concerted pattern of racketeering activity and interstate kiting, comprised of literally thousands of acts of mail and wire fraud, and through deliberate acts of fraud and breaches of the duties imposed on them, the Indenture Trustees and the Founders foisted upon NPF VI an NPF XII wrongful transfers of their funds totaling over $16 billion, including:

- $728,153,384 in wrongful withdrawals from the NPF VI Equity Account, effected through at least 494 wire transfers;
- $6,619,546,454 in wrongful withdrawals from the NPF XII Equity Account, effected through at least 2,439 wire transfers
- $4,250,000,000 in funds kited via hundreds of fraudulent, interstate wire transfers from NPF VI at Bank One in Ohio to NPF XII at Chase in New York;
- $4,180,000,000 in funds kited via hundreds of fraudulent, interstate wire transfers from NPF XII in New York to NPF VI in Ohio.
- Billions of dollars of wrongful transfers to purported healthcare providers for fictitious receivables "purchases" much of which was to affiliates of Poulsen and NCFE's Founders

Paragraph 3 contains conclusions of law as to which no answer is required. To the extent an answer is required, Defendant Ayers denies the allegations of paragraph 3 as to Defendant

Ayers, and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

4. In the end, NPF VI and NPF XII were in debt nearly $3 billion with nothing to show for it, through the willful and wrongful acts of Chase, Bank One, Poulsen, Ayers and Parrett. As a result of this wrongful pattern of racketeering activity, NPF VI and NPF XII were completely destroyed, rendered hopelessly insolvent and ruined.

Defendant Ayers denies the allegations of paragraph 4 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

5. Credit Suisse First Boston independently and deliberately injured NPF VI and NPF XII, as well. CSFB is one of the leading investment banks in the world. It describes itself as the gatekeeper to the financial markets, and touts the fact that it is the world's second leading underwriter of asset backed notes. In NPF VI and NPF XII, CSFB saw two clients it could use to elevate its stature, and from whom it could reap enormous investment banking fees. But CSFB was facing intense business competition, and even the fees it stood to earn from legitimate note issuances were not enough to satisfy its greed. CSFB therefore entered into a corrupt conspiracy with Poulsen and Ayers, whom it knew were fiduciaries to NPF VI and NPF XII, in order to profit them and itself by illegitimate means. In complete disregard of its own fiduciary obligations to NPF VI and NPF XII, and those it knew were owed by Poulsen and Ayers, CSFB first paid a series of unlawful bribes to Ayers, and offered to bribe Poulsen, in exchange for the right to serve as the exclusive investment banker for NPF VI and NPF XII. As a quid pro quo, Poulsen and Ayers then awarded CSFB the exclusive ability to dictate the terms, timing and frequency of note issuances by NPF VI and NPF XII. Having agreed to exploit and subvert NPF

VI and NPF XII for their own benefit, CSFB, Poulsen, Ayers and Parrett then forced NPF VI and NPF XII to issue nineteen separate offerings of notes that they (but not NPF VI and NPF XII) knew to be worthless. They caused these notes to be issued in a consistent pattern, through largely identical offering documents, in deliberate and intentional violation of the Ohio securities laws. CSFB and the Founders did this with the full knowledge that these issuances would not further the legitimate business of NPF VI and NPF XII. Instead, CSFB and the Founders knowingly and wrongfully forced the issuance of these notes simply to load even more debt onto NPF VI and NPF XII, so that there would be even more money for these conspirators to steal, embezzle and loot through illicit fees and unlawful related party transactions.

Paragraph 5 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies the allegations of paragraph 5 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

6. It has been said that, “One deceit needs many others, and so the whole house is built in the air and must soon come to the ground.” As we demonstrate below, each of the acts of fraud and deceit perpetrated on NPF VI and NPF XII could not have been accomplished without the willful, knowing agreement of Chase, Bank One, CSFB, Poulsen, Ayers and Parrett.

Paragraph 6 contains conclusions of law as to which no answer is required. To the extent any answer may be required. Defendant Ayers denies the allegations of paragraph 6 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

7. NPF VI and NPF XII were also injured because their auditors, who owed them duties of care, failed to discharge their obligations to prevent-or at a minimum, to report so that it

could be remedied--the fraud that was being perpetrated on NPF VI and NPF XII. The conscious indifference of Price Waterhouse Coopers and Deloitte & Touche, and their woeful negligence, thus enabled the scheme to defraud NPF VI and NPF XII to continue long past the point from which NPF VI and NPF XII could survive it.

Paragraph 7 contains conclusions of law as to which no answer is required. To the extent any answer may be required. Defendant Ayers denies the allegations of paragraph 7 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

8. The Unencumbered Assets Trust is a post-confirmation trust endowed with the power to pursue claims on behalf of a number of entities. Erwin Katz, Ltd., is its trustee. On behalf of NPF VI and NPF XII, the Unencumbered Assets Trust and Katz seek to recover in damages what the Defendants' wrongful acts destroyed: the value of two lawful businesses, the $3 billion of worthless debt they were forced to incur, the billions of dollars of assets that were looted from them, and the fraudulent transfers and preferences that were made-not for the benefit of NPF VI and NPF XII or their affiliates-but, rather, for the benefit of their faithless agents or for creditors who had no legal right to receive them.

Paragraph 8 contains conclusions of law as to which no answer is required. To the extent any answer may be required. Defendant Ayers denies the allegations of paragraph 8 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, except admits that paragraph 8 purports to describe the UAT and the relief it seeks, but denies that the UAT is entitled to receive any relief as to Defendant Ayers.

9. This is what happened, and it must be remedied. We explain why in greater

detail, below.

Defendant Ayers denies the allegations of Paragraph 9 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

## II. JURISDICTION AND VENUE

10. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331; the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c) & (d) & 1964; 11 U.S.C. § 548 *et seq.;* and 11 U.S.C. § 1334 *et seq*.

Paragraph 10 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies allegations or information sufficient to form a belief as to the allegation of Paragraph 10, except admits that the UAT purports to rely on the above-mentioned statutory provisions to establish the original jurisdiction of this Court.

10A. This Court has original subject matter jurisdiction over this action pursuant to the statutes cited in Paragraph 10 above and 28 U.S.C. 1334 et seq.

Paragraph 10A contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies allegations or information sufficient to form a belief as to the allegation of Paragraph 10A, except admits that the UAT purports to rely on the above-mentioned statutory provisions to establish the original jurisdiction of this Court.

11. To the extent Plaintiff pleads causes of action arising under state law, this Court has supplemental subject matter jurisdiction over these causes of action pursuant to 28 U.S.C. § 1367. Supplemental subject matter jurisdiction is conferred under 28 U.S.C. § 1367 because (i) this Court has original jurisdiction over this action; and (ii) Plaintiffs state law claims are so

related to claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Paragraph 11 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies allegations or information sufficient to form a belief as to the allegation of Paragraph 11, except admits that the UAT purports to rely on the Constitution and the above-mentioned statutory provisions to establish the original jurisdiction of this Court.

12. Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1391(b) for several reasons. First, venue is proper pursuant to 28 U.S.C. § 1391 (b)(2) because this is a district and division in which a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred. Second, venue is proper pursuant to 28 U.S. C. § 1391 (b)(2) because this is a district and division in which a substantial part of the property that is the subject of this action is situated. Third, venue is proper pursuant to 18 U.S.C. § 1965(a) because this is a civil action under 18 V.S.C. § 1965(a) against defendants that reside, are found, have an agent, or transact affairs in this division and district.

Paragraph 12 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies allegations or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except admits that venue is proper in this district and divisions pursuant to 28 U.S.C. §§ 1409 and 1391(b)(2) in that a substantial part of the events giving rise to the UAT's claims against Defendants Ayers and other parties occurred in this district and division.

## III. PARTIES

### A. Plaintiff

13. On or about November 18, 2002, National Century Financial Enterprises, Inc. ("NCFE Inc."); NPF VI, Inc. ("NPF VI"); NPF X, Inc. ("NPF X"); NPF XII, Inc. ("NPF XII"); and other related entities filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of Ohio, Eastern Division, in a Chapter 11 case jointly administered as Case No. 02-65235. On April 16, 2004, the Court entered its Order Confirming the Fourth Amended Joint Plan of Liquidation of NCFE and Its Debtor Subsidiaries, as Modified (D.1. 2789) (the "Confirmation Order), by which the Court confirmed the Fourth Amended Joint Plan of Liquidation of NCFE and its Debtor Subsidiaries (including NPF VI and NPF XII), as modified (the "Plan"). On April 30, 2004, the Plan became effective by its terms. Pursuant to Section IV .D.4.a of the Plan, substantially all of the unencumbered assets of the Debtors, including their legal claims or causes of action, were transferred to The Unencumbered Assets Trust (the "UAT" or "Trust") free and clear of liens, claims and encumbrances. Erwin I. Katz ("Katz") serves as trustee of the UAT, with authority to act on its behalf, including the assertion of the claims herein. Except for certain of the avoidance actions below or as otherwise expressly stated herein, the claims brought herein are the claims that belonged to NPF VI and/or NPF XII prior to the bankruptcy. Together, Katz and the UAT are referred to as the "Plaintiff."

Paragraph 13 contains conclusions of law as to which no answer is required. To the extent any answer may be required Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 13, except states that to the extent the UAT relies on the public record, Defendant Ayers refers to that public record for the true and complete information relating to Case No. 02-65235.

13A. The order for relief, as that phrase is defined in 11 U.S.C. ¶108(a)(2), was entered on November 18, 2002.

Paragraph 13A contains conclusions of law as to which no answer is required. To the extent any answer may be required Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 13A, and refers to that public record for the true and complete information relating to Case No. 02-65235.

**B. Defendants**

14. Defendant JP Morgan Chase Bank ("Chase") is a national bank with its principal office in New York City, New York. Defendant Chase continuously and systematically does business in this state. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts carried out in its capacity as an Indenture Trustee of the NPF VI securitization program.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 14.

15. Defendant Bank One, N.A. ("Bank One") is a national bank with its principal office in Chicago, Illinois. Defendant Bank One continuously and systematically does business in this state. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts carried out in its capacity as an Indenture Trustee of the NPF XII securitization program.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 15.

16. Defendant Credit Suisse First Boston is a Swiss bank. It is organized as a joint stock corporation established under Swiss law. Its head office is in Zurich, Switzerland, and its

principal office in New York, New York. It is a wholly owned subsidiary of Credit Suisse Group, one of the world's leading global financial services companies. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 16.

17. Defendant Credit Suisse First Boston (USA), Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a wholly owned subsidiary of Credit Suisse First Boston, and an indirect, wholly owned subsidiary of Credit Suisse Group. It has committed acts in this state from which Plaintiff s claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 17.

18. Defendant Credit Suisse First Boston LLC is a Delaware limited liability corporation, which is wholly and indirectly owned by Credit Suisse Group. Credit Suisse First Boston LLC and Credit Suisse First Boston (USA), Inc. operate in the United States under the trade name "Credit Suisse First Boston" and are the entities through which the Credit Suisse Group and Credit Suisse First Boston conduct their investment banking business in the United States. They have committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 18.

19. CSFB USA is the successor in interest to Credit Suisse First Boston Corporation,

which served as placement agent for over $3 billion dollars worth of note issuances by NPF VI and NPF XII during the time periods at issue in this Complaint. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 19.

20. Defendants Credit Suisse First Boston, Credit Suisse First Boston LLC, Credit Suisse First Boston Corporation and Defendant Credit Suisse First Boston (USA), Inc. will be referred to collectively as "CSFB" throughout this Complaint.

Paragraph 20 contains no allegations requiring an answer, to the extent that paragraph 20 is construed to contain allegations requiring an answer, Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 20.

21. Defendant Deloitte & Touche, LLP ("Deloitte") is a Delaware limited liability partnership with its principal place of business in New York. Deloitte continuously and systematically does business in this state and has partners in this state. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 21.

22. Defendant PriceWaterhouseCoopers, LLP ("PWC") is a Delaware limited liability partnership with its principal place of business in New York. Defendant PWC continuously and systematically does business in this state and has partners in this state. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 22.

22A. Defendant Kaye Scholer LLP ("Kaye Scholer") is a New York limited liability partnership with its principal place of business in New York. Kaye Scholer continuously and systematically does business in this state. It has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 22A.

22B. Defendant Purcell & Scott, Co., LPA ("Purcell & Scott") is an Ohio legal professional association with its principal place of business in Dublin, Ohio. Its members and/or partners are residents of Ohio, including those attorneys involved in the conduct made the basis of the Plaintiff s claims below. Purcell & Scott continuously and systematically does business in this state. It has committed acts in this state from which Plaintiffs claims arise, including the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 22B, excepts admits that during the relevant time period Purcell & Scott was an Ohio legal professional association with its principal place of business in Dublin, Ohio.

23. Defendant The Beacon Group III Focus Value Fund, L.P. ("Beacon Fund") is a New York limited partnership with its principal place of business in New York. Beacon Fund continuously and systematically does business in this state. It has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 23.

24. Defendant Intercontinental Investment Associates ("IIA") is a Nevada limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. IIA has committed acts in this state from which Plaintiff s claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies allegations or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except admits that Defendants Ayers, Poulsen and Parrett were members of IIA.

25. Defendant Healthcare Capital L.L.C. ("HCC") is a Nevada limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. HCC has committed acts in this state from which Plaintiff s claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies allegations or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except admits that Defendants Ayers, Poulsen and Parrett were members of HHC.

26. Defendant Flohaz Partners L.L.C. ("Flohaz") is a Delaware limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Flohaz has committed acts in this state from which Plaintiff's claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies allegations or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except admits that Defendants Ayers, Poulsen and

Parrett were members of Flohaz.

27. Defendant South Atlantic Investments, L.L.C. ("South Atlantic") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. South Atlantic has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies allegations or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except admits that Defendants Ayers, Poulsen and Parrett were members of South Atlantic.

28. Defendant Thor Capital Holdings L.L.C. ("Thor") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Thor has committed acts in this state from which Plaintiffs claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies allegations or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except admits that Defendants Ayers, Poulsen and Parrett were members of Thor.

29. Defendant Kachina Inc. ("Kachina") is an Ohio limited liability company with its principal place of business in Ohio. Its members include Defendants Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett, several of whom are Ohio residents. Kachina has committed acts in this state from which Plaintiff s claims arise, including a substantial portion of the acts alleged below.

Defendant Ayers denies allegations or information sufficient to form a belief as to the

allegations not directed at Defendant Ayers, except admits that Defendants Ayers, Poulsen and Parrett were members of Kachina.

30. Defendants Lance K. Poulsen ("Poulsen") and Barbara L. Poulsen ("Barbara Poulsen") are husband and wife and currently reside in Ohio and/or Florida. Poulsen at all relevant times served as an officer, director and shareholder of NCFE Inc. and certain other affiliates of NCFE Inc. Barbara Poulsen at all relevant times served as secretary, treasurer, and a director of NCFE Inc. Poulsen and Barbara Poulsen regularly do business in this state and have committed acts within this state from which Plaintiff s claims arise.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 30, except admits that Lance Poulsen and Barbara Poulsen are husband and wife, that Lance Poulsen served as an officer, director and shareholder of NCFE and certain of its affiliates, that Barbara Poulsen served at times as the secretary, treasurer or a director of NCFE.

31. Defendant Donald H. Ayers ("Ayers") is an individual currently residing in Ohio and/or Florida. Ayers at all relevant times served as an officer, director, and shareholder of NCFE Inc. and certain affiliates of NCFE Inc. Ayers regularly does business in this state and has committed acts within this state from which Plaintiffs claims arise.

Defendant Ayers denies the allegations of paragraph 31, except admits that Defendant Ayers is an individual currently residing in Florida, served until 2000 as an officer, director, but not as a shareholder of NCFE, Inc. and certain affiliates of NCFE Inc., and regularly conducted business in this state.

32. Defendant Rebecca S. Parrett ("Parrett") is an individual who resides in Maricopa County, Arizona. At all relevant times, Parrett served as an officer, director, and shareholder of

NCFE. Parrett regularly does business in this state and has committed acts within this state from which Plaintiffs claims arise.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 32, except admits that Rebecca Parrett served as an officer, director and shareholder of NCFE and certain of its affiliates.

33. Defendant Task Holdings Ltd. ("Task Holdings") is a British Virgin Islands corporation with its principal place of business in New York, New York. Plaintiff's claims against Task Holdings arise from Task Holdings's activities in this state and the state of New York, and from payments made from this state.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 33.

## IV. THE NATURE AND OPERATION OF NPF VI AND NPF XII

### A. The Limited Purposes of the NPF VI and NPF XII Special Purpose Companies

34. NPF VI and NPF XII were special purpose corporations formed under the laws of Ohio.

Defendant Ayers admits paragraph 34.

35. As special purpose corporations, NPF VI and NPF XII were formed for certain limited purposes and with limited authority to take certain actions. In general, as described in greater detail below, NPF VI and NPF XII were formed for the limited purpose of purchasing certain well-defined, high quality health care accounts receivable and funding those purchases with the proceeds of the issuances of Notes to investors.

Defendant Ayers denies paragraph 35.

36. In particular, according to their Articles of Organization, NPF VI and NPF XII

were specifically formed for the limited purposes of:

a. acquiring or disposing certain eligible healthcare accounts receivable related to the provision of health care services;

b. providing (or arranging for the provision of) services necessary for the collection of those accounts receivable;

c. providing (or arranging for the provision of) services necessary for the maintenance of the ownership of those accounts receivable;

d. issuing and selling notes to investors; and

e. engaging in activities necessary to accomplish the purchase of receivables and the issuance of notes to investors.

Defendant Ayers denies the allegations of paragraph 36 and states the Articles of Incorporation speaks for itself.

**B. The Limited Role of NPF VI and NPF XII in the National Century Financial Enterprises Group of Affiliated Companies**

**1. NPF VI and NPF XII Maintained a Corporate Existence Independent from Other NCFE Affiliates**

37. NPF VI's and NPF XII's capital stock was owned by National Century Financial Enterprises, Inc. ("NCFE").

Defendant Ayers admits paragraph 37.

38. NCFE was a company that owned NPF VI, NPF XII, and a number of other affiliated companies. NPF VI and NPF XII were operated independently of NCFE and NCFE's other affiliates. NPF VI and NPF XII maintained their own separate corporate existence apart from NCFE and NCFE's other affiliates.

Defendant Ayers admits paragraph 38.

39. NPF VI and NPF XII were formed as bankruptcy-remote entities such that, if NCFE or any of its affiliates entered bankruptcy, the assets of NPF VI and NPF XII would not be consolidated with the assets of any other bankruptcy estate.

Defendant Ayers admits paragraph 39.

40. To facilitate their independence and bankruptcy-remote status, and in addition to other restrictions placed on them in other agreements as discussed below, NPF VI and NPF XII were:

a. prohibited from becoming involved in the day to day management of any other entity;

b. required to maintain separate corporate records and books of account;

c. required to maintain their assets separately from the assets of any other entity;

d. required to maintain corporate records and books of account separate from any other entity;

e. required to maintain financial statements, books, and records separate from any other entity;

f. prohibited from guaranteeing any other entity's obligations; and

g. prohibited from acting as an agents of any other entity in any capacity.

Defendant Ayers denies the allegations of paragraph 40 and states the Governing Documents of NCFE speaks for itself.

41. In addition, NPF VI and NPF XII were required to have at least one director that was not a shareholder, director, officer, employee, or affiliate of any shareholder of the Corporation (the “Independent Director”).

Defendant Ayers denies paragraph 41.

42. In the absence of the affirmative vote of 100% of the members of the respective Boards of Directors of NPF VI and NPF XII, including the vote of the Independent Director for each company, NPF VI and NPF XII were legally prohibited from engaging in any transaction other than ones stated above. As such, certain of NPF VI's and NPF XII's agents, while having been delegated certain responsibilities, did not have the authority to exercise unfettered discretion over NPF VI and NPF XII.

Paragraph 42 contains conclusions of law as to which no answer is required. To the extent any answer may be required Defendant Ayers denies the allegations of paragraph 42 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**2. The NPF VI and NPF XII Securitization Programs**

43. NPF VI and NPF XII were created as components of programs that would purchase certain well-defined, high quality health care account receivables and fund those purchases with the proceeds of the issuances of Notes to investors.

Defendant Ayers denies the allegations in paragraph 43, except states that NPF VI and NPF XII purchased Eligible Receivables and highly rated-investments and the issuance of the notes to fund Providers with the proceeds of the healthcare receivable securitization program notes.

44. The structure of the NPF VI and NPF XII programs (the "Programs") was created and governed by each of their respective Health Care Receivables Securitization Program Notes Master Indentures, along with periodic supplements thereto (the "Master Indentures").[1]

---

[1] The capitalized terms in the Complaint incorporate by reference the definitions given to those terms in NPF VI's and NPF XII's respective Master Indentures. The provisions of the NPF VI and NPF XII Master Indentures are

Defendant Ayers admits paragraph 44, and further states that the Programs were governed by the Sales and Subservicing Agreements, Private Placement Memorandums, and UCC filings, and to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents.

45. Pursuant to the Master Indentures, NPF VI and NPF XII periodically issued Notes to investors.

Defendant Ayers denies the allegations in paragraph 45.

46. Those Note proceeds, according to the Master Indentures, were to be used for the purpose of financing the Programs' purchases of certain types of high quality health care receivables.

Defendant Ayers denies the allegations paragraph 46 and states the Master Indentures speaks for itself.

47. Under the Master Indentures, the Programs were to purchase those receivables from certain healthcare providers, called Sellers.

Defendant Ayers denies the allegations in paragraph 47 and states the Master Indentures speaks for itself.

48. Under the Master Indentures, the Programs were to purchase the receivables of each Seller pursuant to the terms of a Sale & Subservicing Agreement, which was an attachment to the Master Indentures.[2]

Defendant Ayers denies the allegations in paragraph 48 and states the Master Indentures

---

substantially similar. References to the Master Indentures include both the NPF VI and NPF XII Master Indentures, unless otherwise expressly noted. The NPF VI Master Indenture is attached here to as Exhibit "A". The NPF XII Master Indenture is attached hereto as Exhibit "B." All descriptions and explanations herein of the Indentures and their exhibits are hereby qualified in their entirety to the extent that they are inconsistent with the terms of the Indentures and their exhibits.

[2] An example of a Sale & Subservicing Agreement is attached hereto as Exhibit "C."

speaks for itself.

49. There were three parties to each Program's Master Indenture: (i) the special purpose vehicle itself; (ii) a servicer of the Program, to which the special purpose vehicles delegated certain functions; and (iii) an Indenture Trustee, which worked in conjunction with the servicer and performed numerous other oversight functions.

Defendant Ayers admits paragraph 49 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

50. The Servicer for both the NPF VI and NPF XII Programs was National Premier Financial Services, Inc. ("Servicer").

Defendant Ayers admits paragraph 50.

51. Chase acted as the Indenture Trustee for the NPF VI Program. Bank One served as the Indenture Trustee for the NPF XII Program.[3]

Defendant Ayers admits paragraph 51.

### 3. NPF VI and NPF XII Contracted for Certain of Their Functions to Be Performed by the Servicer

52. Under the Master Indentures, NPF VI and NPF XII contractually engaged the Servicer to carry out numerous defined functions. *See* Master Indentures Art. V. For instance, NPF VI and NPF XII engaged the Servicer for the functions of purchasing receivables, servicing and tracking the receivables, and administering the Programs in conjunction with the Indenture Trustees.

Defendant Ayers denies the allegations in paragraph 52 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for

[3] Chase and Bank One are referred to collectively herein as the "Indenture Trustees." As a result of the merger, The Chase Manhattan Bank is now part of Defendant JP Morgan Chase Bank.

the complete and actual description of its contents as the document speaks for itself.

53. Thus, as the Programs actually operated, the Servicer and the Indenture Trustees together facilitated the transfer of funds to and from various accounts both inside and outside the Programs, purportedly pursuant to the requirements of the Master Indentures.

Defendant Ayers denies paragraph 53 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the document speaks for itself.

**C. Prohibitions and Controls Placed on the Programs Under the Master Indentures**

54. The Programs were created to operate in a manner that would allow for little risk that the principal and interest on the Notes would not be repaid.

Defendant Ayers denies the allegations in paragraph 54 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents as the document speaks for itself.

55. The low-risk nature of the NPF VI and NPF XII Programs was derived from and dependent upon compliance with the numerous controls placed upon the Programs and those operating the Programs in the Master Indentures.

Defendant Ayers denies paragraph 55 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the document speaks for itself.

56. Because of the tightly controlled structure provided for under the Master Indentures, the Notes relating to the Programs were rated by several national Rating Agencies as "AAA" and "investment grade."

Defendant Ayers denies paragraph 56 and further states to the extent the UAT relies on

the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the document speaks for itself.

57. The key component of the low-risk structure provided for by the Master Indentures was a series of controls, in the form of prohibitions, covenants, and tests, concerning the operations of the Programs.

Defendant Ayers denies paragraph 57 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the document speaks for itself.

58. These controls, if violated, would signal to the Indenture Trustees, the Rating Agencies, and ultimately the Programs' investors that the Programs were being operated outside the provisions of the Master Indentures and, accordingly, outside the contemplated low-risk tolerance level set forth therein.

Defendant Ayers denies paragraph 58 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the document speaks for itself.

59. In the event one of the Master Indenture's controls was violated, a duty was placed upon the Indenture Trustees to take certain actions with regard to the violations so that the Programs would not be able to operate outside compliance with the Master Indentures. These controls included the following:

Defendant Ayers denies paragraph 59 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the document speaks for itself.

### 1. Restrictions on the Purchase of Eligible Receivables from Non-Affiliated Sellers

60. The Master Indentures tightly regulated the expenditure of the proceeds derived from the issuance of the investor Notes.

Defendant Ayers denies paragraph 60 and further states that the Master Indentures, the Sales and Subservicing Agreements and the Private Placement Memorandum tightly regulated the expenditure of the proceeds and to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents.

61. Aside from certain highly rated Permitted Investments not at issue here and the issuance of the Notes to the investors, the Master Indentures limited the Programs' business to the purchase of a specific type of collateral, called Eligible Receivables. *See, e.g.*, Master Indentures § 4.06.

Defendant Ayers denies paragraph 61 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents.

62. Generally speaking, an Eligible Receivable consisted of the third-party reimbursable portion of a payment due to a Seller for a health-care service that had been provided to a patient.

Defendant Ayers denies paragraph 62 and further states to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the document speaks for itself.

63. Pursuant to the Master Indenture, to be classified as an Eligible Receivable, a Seller's health care Receivable (as defined in Master Indentures Art. I) would have to meet

several specific criteria that were set forth in Section 4.2 of the Sale and Subservicing Agreements, which were the contracts between the Servicer and the Sellers under which the Servicer purchased the Seller's receivables on behalf of the Programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 63, except states to the extent the UAT relies on the Master Indentures and Sale and Subservicing Agreements, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the documents speaks for itself.

64. For example, as provided in Section 4.2 of the Sale and Subservicing Agreements, to qualify as an Eligible Receivable, each Receivable:

a. was required to arise from the Seller having provided a health care service to a patient in the ordinary course of the Seller's business at a price that was usual, customary, and reasonable in the Seller's community for the service that had been provided;

b. was required to have been billed by the Seller to an Eligible Payor, which included only highly rated payors such as certain government-funded programs *(e.g.,* Medicare, Medicaid), commercial insurers, managed health care organizations, and the like;

c. was required to be supported by certain required documentary information, such as the name of the Eligible Payor, the billing date, and the patient's account number;

d. could not have any outstanding portion unpaid for more than 180 days;

e. was required to be owned outright by the Seller; and

f. had to meet various other criteria set forth in the Master Indentures and

Section 4.2 of the Sale & Subservicing Agreement

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 64, subparagraph a-f, except to the extent the UAT relies on the Master Indentures and Sale and Subservicing Agreements, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the documents speaks for itself.

65. Because of the various restrictions placed on the purchase of Receivables, and the limited authority given to the Servicer and the Trustees to purchase Eligible Receivables, the Master Indentures prohibited the Programs, as administered by the Servicer and the Trustees, from making advances to any Seller apart from or in excess of the discounted value of the Eligible Receivables sold in return for the money the Programs had advanced.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 65, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the documents speaks for itself.

66. In addition, except for certain limited transactions not applicable here, the Master Indentures prohibited the Programs from entering into any transaction with NCFE or any of its Affiliates. *See* Master Indentures § 4.1l(c).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 66, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents and the documents speak for itself.

67. Craig Kantor, the "team leader" for Chase that had responsibility for the NPF VI

relationship for Chase from 1999 to 2002, testified that the Master Indentures and related documents prohibited the purchase of receivables generated by affiliates of NCFE:

"Q: It's your understanding that ... receivables generated by affiliates of NCFE are or are not eligible?

A: I think under the documents they are not eligible.

Q: Whether or not disclosed?

A: Well, that's correct."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 67, except states that to the extent the UAT relies on the Master Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents, and to the extent the UAT relies on the testimony of Craig Kantor referenced in paragraph 67, Defendant Ayers refers to the transcript of that testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

68. Thus, the Programs were not permitted to purchase receivables from any healthcare provider affiliated by ownership or common control to NCFE, NPF VI, or NPF XII. The affiliated party prohibition served to protect the Programs by, for instance, ruling out the risk that the Programs would engage in transactions with its own affiliates that were not arms length or that were fraudulent in nature.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 68, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents documents speak for itself.

69. Absent the permission of the Rating Agencies, the Master Indentures prohibited any Seller from entering the Programs unless that Seller was listed on Exhibit 3 to the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 69, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents documents speak for itself.

70. These criteria, among others discussed below, served to ensure that the health care receivables purchased by the Programs were high quality and presented a low risk of uncollectibility.

Defendant Ayers denies knowledge or information sufficient to form belief as to the allegations of paragraph 70.

**2. Credit Enhancements**

71. To further offset the low risk associated with the Programs and to provide an additional set of controls that would indicate whether the Programs were functioning within the bounds of the Master Indentures, the Master Indentures required the creation and maintenance of several segregated trust accounts that held funds that were contractually withheld from the payment made to the Sellers in return for the purchase of the Sellers' Eligible Receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 71, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents documents speak for itself.

72. With regard to each Eligible Receivable that was purchased, the contractually withheld funds amounted to 17% of the outstanding balance of each Eligible Receivable, at a

minimum. 8.5% of these held back funds were deposited in program reserves, and the remaining 8.5% was paid to the servicer to insure collections by the seller of the receivable. In other words, if the Programs were functioning in compliance with the Master Indentures, each Eligible Receivable purchased would have an associated total 8.5% seller reserve and on 8.5% service-old-back was still controlled by the Servicer and the Trustee.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 72, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents documents speak for itself.

73. Although each segregated, credit enhancement trust account had its own specific function, as described in detail in the Master Indentures and set forth below, these accounts collectively served at least two purposes. First, they provided a financial buffer that could offset a significant shortfall in collections on Eligible Receivables. Second, because certain of these reserves could be drawn on in the event that the purchased receivables did not collect at the expected rates these accounts would act as an early warning that the program was not functioning as expected or was not being operated as promised if they were not being maintained at or above their proper minimum balances. This, in turn, placed an obligation upon certain entities to take certain actions so that the Programs were protected and not operated outside of the low-risk parameters of the Master Indentures upon which the Rating Agencies had based their investment grade ratings of the Programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 73, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of

its contents documents speak for itself.

74. Furthermore, the role of the Indenture Trustees, which were only authorized to take such actions permitted by the Master Indentures and prohibited from taking any other actions, was intended to safeguard the credit enhancement accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 74, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents documents speak for itself.

75. Each of these reserve accounts was a segregated trust account held by the Program's respective Indenture Trustee. The NPF VI segregated trust accounts were held by Chase. The NPF XII trust accounts were held by Bank One.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 75, except to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text or those documents for the complete and actual description of its contents documents speak for itself.

76. As Bank One has testified, funds could not be moved into or out of any of the NPF XII segregated trust accounts without Bank One's approval. Similarly, funds could not be moved into or out of the NPF VI segregated trust accounts without Chase's approval.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 76, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents, and to the extent the UAT relies on the testimony of Bank One referenced in Paragraph 76, Defendant Ayers refers to the transcript testimony for the complete

and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

77. As Chase has testified, the Indenture Trustees had no power to take any action that was not authorized by the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 77, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents, and to the extent the UAT relies on the testimony of Chase referenced in Paragraph 77, Defendant Ayers refers to the transcript testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

78. As Bank One has testified, the Indenture Trustees were not legally permitted to accept an instruction from anyone, including the Servicer, if that instruction would violate the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 78, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents, and to the extent the UAT relies on the testimony of Bank One referenced in Paragraph 78, Defendant Ayers refers to the transcript testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

79. The Indenture Trustees had no authority to make any transfer into or out of any account unless authorized by the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 79, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

80. Furthermore, as Chase has testified, the Indenture Trustees were expected to know what instructions they could and could not carry out under the Master Indentures. As Chase further testified, the Indenture Trustees were expected to review each transaction to ensure that the transaction was consistent with and permitted under the governing Master Indentures. NPF VI and NPF XII relied on the Trustees to perform these functions, as compliance with the Master Indentures were critical to their financial health.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 80, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents, and to the extent the UAT relies on the testimony of Chase referenced in Paragraph 80, Defendant Ayers refers to the transcript testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

**a. Equity Account**

81. Pursuant to the Master Indentures, each Program included a segregated trust account held by that Program's respective Indenture Trustee called the Equity Account. *See* Master Indentures § 6.03.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 81, except states that to the extent the UAT relies on the Master

Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

82. Each Program's Equity Account had a specified minimum balance that was required to be maintained at all times. *See, e.g.,* Master Indentures § 6.06. This balance, called the Specified Equity Account Balance, required that, at a minimum, the Equity Account at all times have in it at least 8.5% of greater of the Notes outstanding or the net value of the Eligible Receivables that NPF VI and NPF XII had purchased.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 82, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

83. Withdrawals against the Specified Equity Account Balance were highly constrained under Section 6.06 of the Master Indentures. As Defendant CSFB and INO (an institutional investor), stated in identical letters to the Indenture Trustees in fall 2002, "no amount may be withdrawn [from the Equity Account] except as required and/or permitted under Section 6.06 of the Master Indenture." As an internal ING e-mail sent a few hours after the INO and CSFB letters also confirms, "Chase and their attorney, Seward & Kissell, agree with our view on the case collateral accounts.[4]

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 83 and states that to the extent the UAT relies on the Master Indenture, the Fall 2002 Letters and an internal ING email referenced in paragraph 83, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

[4] The law firm of Kaye Scholer drafted the October 1, 2002 letter on behalf of Defendant CSFB and ING. Kaye Scholer knew this was true because, in connection with a prior representation, Kaye Scholer also acted as the principal drafter of the Master Indentures.

84. The Indenture Trustees, along with the Servicer, controlled the withdrawals from the Equity Account. The Trustees were prohibited from disbursing any funds from the Equity Account except on the first business day of each month, called the Monthly Payment Date. *See* Master Indentures § 6.06. As Defendant CSFB and non-defendant INO stated in their fall 2002 letters to the Indenture Trustees, "Under Section 6.06 of the Master Indenture, amounts may be withdrawn from the Equity Account only on a Monday Payment Date." (Emphasis in original.) As the internal ING e-mail sent a few hours after the October I letter confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 84 and states that to the extent the UAT relies on the Master Indenture, the Fall 2002 Letters and an internal ING email referenced in paragraph 84, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

85. Except for the Indenture Trustees' fees and the interest payments on the investors' Notes, the Indenture Trustees were prohibited from making any disbursements from the Equity Account that would cause the balance of the Equity Account to drop below the Specified Equity Account Balance. *See* Master Indenture § 6.06. As Defendant CSFB and non-defendant INO stated in their fall 2002 letters to the Indenture Trustees, "[N]o withdrawal of any amount for purposes of payment thereof to the Servicer or NPF VI and NPF XII may be made from the Equity Account to the extent it would cause amounts remaining on deposit therein to be less than the required Specified Aggregate Equity Account Balance." (Emphasis in original.) As the internal INO e-mail sent a few hours after the October 1 letter confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 85 and states that to the extent the UAT relies on the Master Indenture, the Fall 2002 Letters and an internal ING email referenced in paragraph 85, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

86. In the event that the balance of the Equity Account exceeded the Specified Equity Account Balance after the payment of the Indenture Trustees' fees and the interest payment on the investors' Notes, the Master Indenture contained a specific waterfall provision governing to whom, at what time, and under what circumstances the excess balance could be paid. *See* Master Indenture § 6.06.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 86 and states that to the extent the UAT relies on the Master Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

87. Pursuant to Section 6.06 of the Master Indentures, the Indenture Trustees were prohibited from making any:

(a) transfer from the Equity Account on days other than a Monthly Payment Date in contravention of Section 6.06 of the Master Indentures;

(b) transfer from the Equity Account to the Purchase Account for further disbursement to sellers in the NPF VI program and for other purposes;

(c) transfer from the Equity Account to the Seller Credit Reserve Account; and

(d) transfer from the Equity Account to the Offset Reserve Account; and

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 87 and states that to the extent the UAT relies on the Master Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of

its contents.

**b. Seller Credit Reserve Account**

88. Pursuant to the Master Indentures, each Program included a segregated trust account held by that Program's respective Indenture Trustee called the Seller Credit Reserve Account. *See* Master Indentures § 6.01.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 88 and states that to the extent the UAT relies on the Master Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

89. Each Program's Seller Credit Reserve Account had a specified minimum balance that was required to be maintained at all times, called the Specified Credit Reserve Balance. *See* Master Indentures § 4.03(t). The Specified Credit Reserve Balance was 6.5% of the outstanding amount on the purchased Eligible Receivables. *See* Master Indentures Art. I.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 89 and states that to the extent the UAT relies on the Master Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

90. The Specified Credit Reserve Balance required that for each Eligible Receivable purchased by each Program, each Seller Credit Reserve Account would have in it at all times, on every day of the month, at least 6.5% of the outstanding amount owed on each Eligible Receivable. *See* Master Indentures § 4.03(t). As Chase has testified, it would violate the Master Indentures for the Specified Seller Credit Reserve Balance not to be maintained on any day of the month.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 90, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents, and to the extent the UAT relies on the testimony of Chase referenced in Paragraph 90, Defendant Ayers refers to the transcript testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

91. The 6.5% Specified Credit Reserve Balance was available for withdrawal in the event that an Eligible Receivable became a Defaulted Receivable. *See, e.g.*, Sale & Subservicing Agreement §§ 6.2, 6.3. A Defaulted Receivable included any receivable for which more than 180 days had passed since the date the receivable was billed. *See* Master Indentures Art. 1. In other words, the Programs treated these receivables as defaulted and provided for the draw down on the Seller Credit Reserve Account to make up for the shortfall in collections caused by the default. Such a shortfall was called a Credit Deficiency.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 91 and states that to the extent the UAT relies on the Master Indentures and Sale & Subservicing Agreements, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

92. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Amounts on deposit in the Seller Credit Reserve Account may only be withdrawn to cover a Credit Deficiency." (Emphasis in original.) As the internal ING e-mail sent a few hours after these letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 92 and states that to the extent the UAT relies on the Fall 2002 letters and an internal ING e-mail referenced in paragraph 92, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

93. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Amounts on deposit in the Seller Credit Reserve Account may only be withdrawn to cover a Credit Deficiency, and any amount so withdrawn must be deposited in the Purchase Account, all in the manner required under the Master Indenture and Sale Agreement." (Emphasis in original.) As the internal ING e-mail sent a few hours after the fall 2002 letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 93 and states that to the extent the UAT relies on the Fall 2002 letters and an internal ING e-mail referenced in paragraph 93, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

94. The Indenture Trustees had no authority to withdraw funds from the Seller Credit Reserve Account and transfer them to other reserve accounts within the Programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 94 and states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

95. Any significant balance below the Specified Credit Reserve Balances on any day would demonstrate that the Programs were not functioning properly. Such a deficiency would indicate the possible misuse of reserve funds, a Defaulted Receivables rate beyond that permitted

under the Master Indentures, or other abuses not permitted under the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 95 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 95, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**c. Offset Reserve Account**

96. Pursuant to the Master Indentures, each Program also included a segregated trust account held by that Program's respective Indenture Trustee called the Offset Reserve Account. *See* Master Indentures § 6.01(a).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 96 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 96, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

97. Each Program's Offset Reserve Account had a specified minimum balance that was required to be maintained at all times, called the Specified Offset Reserve. *See* Master Indentures § 4.03(t). The Specified Offset Reserve was 2% of the outstanding amount on the purchased Eligible Receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 97 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 97, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

98. The Specified Offset Reserve required that, for each Eligible Receivable purchased by each Program, the Offset Reserve Account would have in it at all times at least 2%

of each Eligible Receivable. *See* Master Indentures § 4.03(t). As Chase has testified, it would violate the Master Indentures for the Specified Offset Reserve Balance not to be maintained on any day of the month.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 98, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents, and to the extent the UAT relies on the testimony of Chase referenced in Paragraph 98, Defendant Ayers refers to the transcript testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

99. The 2% Specified Offset Reserve was available for withdrawal in the event a receivable purchased by a Program became a Rejected Receivable. *See* Master Indentures § 6.09; Sale & Subservicing Agreement §§ 2.7, 6.2, 6.3. A Rejected Receivable, which was a defined term of the Master Indentures, essentially included any receivable that was not an Eligible Receivable. That is, in the event that the Seller had breached any representation with regard to any receivable previously sold to the Programs (those representations purportedly making the receivable an Eligible Receivable), the Programs treated these receivables as "rejected." Each Seller was required to repurchase Rejected Receivables. *See* Sale & Subservicing Agreement § 4.3..

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 99 and states that to the extent the UAT relies on the Master Indentures and Sale & Subservicing Agreements referenced in paragraph 99, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

100. Except for the payment of certain program fees not at issue here, the amount in the Offset Reserve Account could only be withdrawn to compensate for the impact of a Rejected Receivable. *See, e.g.*, Master Indentures § 6.09; Sale & Subservicing Agreement §§ 2.7, 6.2, 6.3. As Defendant CSFB and non-defendant ING stated in their fall 2002 letters to the Indenture Trustees, "Amounts on deposit in the Offset Reserve Account may only be withdrawn to cover amounts due by a Seller in respect of Rejected Receivables and, under certain circumstances, to pay Program Fee." (Emphasis in original.) As the internal INO e-mail sent a few hours after the fall 2002 letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well. Put another way, for example, funds in the Seller Credit Reserve Account could not be withdrawn to purchase receivables (even Eligible Receivables).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 100 and states that to the extent the UAT relies on the Fall 2002 letters and an internal INO e-mail referenced in paragraph 100, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

101. In the event that the Indenture Trustee made a transfer out of the Offset Reserve Account, the Indenture Trustee was only authorized to withdraw the amount of the deficiency and deposit that amount into the Purchase Account. As Defendant CSFB and non-defendant INO stated in their fall 2002 letters to the Indenture Trustees, amounts withdrawn from the Offset Reserve Account to offset the effect of a Rejected Receivable "must be deposited in the Purchase Account." As the internal ING e-mail sent a few hours after the fall 2002 letters confirms, Chase, the Indenture Trustee for NPF VI, agreed with this point, as well. Put another way, except for limited exceptions not applicable here, the Indenture Trustees had no authority to withdraw funds from the Offset Reserve Account and transfer them to other reserve accounts within the

Programs or to accounts outside the Program.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 101 and states that to the extent the UAT relies on the Fall 2002 letters and an internal ING e-mail referenced in paragraph 101, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

102. Any significant balance below the Specified Offset Reserve Balance on any day would demonstrate that the Programs were not functioning properly. Such a deficiency would indicate the possible misuse of reserve funds, a Rejected Receivables rate beyond that which is permitted under the Master Indentures, or other abuses not permitted under the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 102 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 102, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**3. Other Controls on Withdrawals and Deposits from Accounts**

103. Under the Master Indentures, the Servicer and the Indenture Trustees acted in concert to transfer funds to and from the segregated trust accounts that they controlled. The Servicer was given limited authority to request the Indenture Trustee to make certain transfers for certain purposes. Coupled with this restraint on the Servicer, the Trustee was authorized to carry out only certain transfers from certain accounts to certain accounts. The Indenture Trustees were not authorized to, and were therefore prohibited from, making any other transfers other than those authorized by the Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 103 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 103, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

104. For instance, as discussed above, the Indenture Trustees were not authorized or permitted to withdraw funds from the Equity Account of the NPF VI or NPF XII Program except pursuant to Section 6.06. Pursuant to Section 6.06, the Indenture Trustee was prohibited from transferring funds from the Equity Account to the Purchase Account, the Seller Credit Reserve Account, the Seller Offset Reserve Account, the Collection Account, or any Seller.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 104 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 104, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

105. In addition, the Trustee was not permitted to withdraw funds from the Equity Account on any date other than the first business day of a month, except to the extent Section 6.06 permitted a transfer from the Equity Account to an investor for the purpose of making an early payment on an outstanding Note in certain circumstances. *See* Master Indenture § 6.06.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 105 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 105, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

106. Withdrawals from the Purchase Account were also tightly restricted. As discussed above, except for certain Permitted Investments, the Programs were only permitted to purchase Eligible Receivables. The Programs were only permitted to purchase Eligible Receivables by

means of the withdrawal of funds from the Purchase Account. *See* Master Indenture Art. I, §§ 3.01, 6.05. The Programs were only permitted to purchase the Eligible Receivables from healthcare providers that met the definition of the terms "Seller" in the Master Indentures and Sale and Subservicing Agreement.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 106 and states that to the extent the UAT relies on the Master Indentures and Sale & Subservicing Agreement referenced in paragraph 106, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

107. The Indentures did not authorize or permit the Indenture Trustees to transfer funds from the Purchase Account of either the NPF VI Program or the NPF XII Program to any account outside of its respective Program except for the account of a Seller.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 107 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 107, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

108. NCFE, NPF VI, and NPF XII, did not meet the Master Indentures' definition of a Seller because, among other things, they were not health care providers and, in addition, were not listed on Exhibit 3 to each Master Indenture.[5] *See* Master Indentures Art. 1. Accordingly, except in narrow circumstances not applicable here, the Indenture Trustees were not authorized or permitted to transfer funds from the Purchase Account to NCFE or to any affiliate of NCFE, including NPF VI and NPF XII. No Seller could be added to Exhibit 3 without the prior approval of the Rating Agencies.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

[5] No Seller could be added to Exhibit 3 without the prior approval of the Rating Agencies.

allegations of paragraph 108 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 108, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

109. Deposits to the Purchase Account were also limited pursuant to Section 6.02 of the Indentures. Section 6.02 permitted transfers only from certain accounts to the Purchase Account. The accounts from which money could be transferred to the Purchase Account, pursuant to Section 6.02, were the Collection Account, the Seller Credit Reserve Account (in narrowly limited circumstances), the Offset Reserve Account (in narrowly limited circumstances), or the account holding the funds received by means of the Note issuances to investors. The Indentures did not authorize or permit the Trustees to make transfers from any other account to the Purchase Account, including the Equity Account or the account of any other outside entity.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 109 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 109, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

110. In addition, pursuant to Section 4.11 (e), NPF VI and NPF XII were obligated to maintain their assets separately from the assets of NCFE and all of its Affiliates. For example, NPF VI and NPF XII were not permitted to commingle their assets for any purpose whatsoever.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 110 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 110, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

### 4. Reporting of Account Balances and Other Test Results to Rating Agencies

111. The Master Indentures required a monthly report to be delivered to, among others, Indenture Trustees and the Rating Agencies that had rated the Programs. These reports, although not required by the Master Indentures to be delivered to the Programs' investors, were called the "Investor Reports."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 111, excepts admits that the monthly reports were called Investor Reports and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 111, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

112. In part, the purpose of the Investor Reports was to assist the Trustees in carrying out their oversight functions and to advise the Rating Agencies whether (i) the requisite specified account balances were being maintained and (ii) other specified tests concerning the Programs' operations were being met, pursuant to the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 112 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 112, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

#### a. Specified Equity Account Balance Test

113. As discussed above, the Master Indentures required the minimum Specified Equity Account Balance to be maintained at all times in the Equity Account. The failure to maintain the Specified Equity Account Balance on any day constituted an Event of Default under Section 7.01 of the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 113 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 113, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

114. As a periodic check on this requirement, the Master Indentures called for the disclosure on a monthly Investor Report of whether, on the first business day of each month, the balance in the Equity Account was at or above the Specified Equity Account Balance.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 114 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 114, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**b. Specified Seller Credit Reserve Report**

115. Section 4.03(t) of the Master Indentures required the minimum Specified Seller Credit Reserve Balance to be maintained at all times in the Seller Credit Reserve Account. The failure to maintain the Specified Credit Reserve Balance on any day constituted an Event of Default under Section 7.01 of the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 115 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 115, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

116. As a periodic check on this maintenance requirement, the Master Indentures called for the disclosure on a monthly Investor Report of whether, on the first business day of each month, the balance in the Seller Credit Reserve Account was at or above the Specified

Seller Credit Reserve Balance. In addition, weekly Collateral Coverage Reports were required by the Indentures to be delivered to the Trustee listing, among other things, the balances in the trust reserve accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 116 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 116, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**c. Specified Offset Reserve Balance Report**

117. Section 4.03(t) of the Master Indentures required the minimum Specified Offset Reserve Balance to be maintained at all times. The failure to maintain the Specified Offset Reserve Balance on any day constituted an Event of Default under Section 7.01 of the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 117 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 117, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

118. As a periodic check on this maintenance requirement, the Master Indentures called for the disclosure on a monthly Investor Report of whether, on the first business day of each month, the balance in the Offset Reserve Account was at or above the Specified Offset Reserve Balance. The Collateral Coverage Reports also reported on this balance on a weekly basis.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 118 and states that to the extent the UAT relies on the Master Indentures

referenced in paragraph 118, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**d. Collateral Coverage Test**

119. Section 7.01 (k) of the Master Indentures required a calculation that compared, among other things, the total Eligible Receivables in each Program to the outstanding balance on the Notes purchased by the investors. This test served as a means of ensuring that the collateral that was supposed to exist in each Program actually existed and that the Programs were appropriately collateralized, as required by the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 119 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 119, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

120. Through a calculation provided for under Section 7.01 (k), the collateral was supposed to be sustained, at a minimum, at 111% of the value of the receivables that had been purchased.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 120 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 120, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

121. The failure to meet the Collateral Coverage Test constituted an Event of Default under Section 7.01(g) of the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 121 and states that to the extent the UAT relies on the Master Indentures

referenced in paragraph 121, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**e. Receivables Default Test**

122. Section 7.01(h) of the Master Indentures required a calculation that measured the sum of the total Defaulted Receivables and Rejected Receivables compared to the total amount of Eligible Receivables. This test served as a means of ensuring that the Programs were not purchasing underperforming receivables (in the case of Defaulted Receivables) or ineligible receivables (tn the case of Rejected Receivables).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 122 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 122, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

123. Through the calculation provided for under Section 7.01(h), the sum of Defaulted and Rejected Receivables was not to exceed 10% of the Eligible Receivables that had been purchased.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 123 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 123, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

124. The failure to meet the Receivables Default Test constituted an Event of Default under Section 7.01(h) of the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 124 and states that to the extent the UAT relies on the Master Indentures

referenced in paragraph 124, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**f. Concentration Test**

125. Section 4.13 of the Master Indentures required a calculation that measured, for example, the reliance of each Program on receivables purchased from anyone Seller and that Seller's Affiliates. This test served as a means of ensuring that the Programs were not impermissibly dependent upon any single Seller.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 125 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 125, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

126. Pursuant to Section 4.13(xiii), the receivables purchased from anyone Seller, including any Affiliates or Subsidiaries of that Seller, were limited to 20% absent approval from the Rating Agencies that had rated each of the Programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 126 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 126, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**5. Audit in Conformity with General Accepted Auditing Principles**

127. Section 4. 12 of the Master Indentures required that NPF VI and NPF XII provide the Trustee a consolidated, audited financial statement of NCFE, including NPF VI, NPF XII, and the Servicer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 127 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 127, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

128. The audited financial statements were to include a report on those companies' statements of income, retained earnings, and cash flow. *See* Master Indenture § 4.12.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 128 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 128, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

129. The Master Indentures required these reports and audits to be performed by a firm of nationally recognized independent public accountants. The Master Indentures required the auditing firm to be pre-approved by the Rating Agencies. *See* Master Indenture § 4.12.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 129 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 129, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

130. Upon receipt of the audit report, the Trustee was then obligated under Section 4.12 to forward the report to the Rating Agencies.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 130 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 130, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

131. The failure to deliver such an audit report within 180 days after the end of each

fiscal year constituted an Event of Default under Section 7.01 of the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 131 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 131, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

132. As with other various controls put in place by the Master Indentures, the audit report requirement constituted another control that would tell the Trustees and Rating Agencies, among others, whether the NPF VI and NPF XII Programs were operating properly pursuant to the terms of the Master Indentures, under which the Rating Agencies had provided their AAA, investment grade ratings.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 132 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 132, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**6. Trustee Duties in Event that Certain Controls Being Violated**

133. In addition to the protection provided to the Programs by limiting the Indenture Trustees' authority to make transfers except in specific circumstances, as discussed above, the Master Indentures also required the Indentures Trustees, in certain circumstances, to take affirmative action to protect the Programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 133 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 133, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**a. Principal Amortization Events**

134. Pursuant to Section 7.02 of the Indentures, the Indenture Trustees were required, in certain circumstances, to declare a Principal Amortization Event. Under the Master Indentures, a Principal Amortization Event was an event that, in essence, shut down the operations of the Programs because they were not operating in accordance with the Master Indentures. In the event the Indenture Trustees declared a Principal Amortization Event, the Programs' receivables purchasing operations were suspended, the Programs' Permitted Investment operations were halted, and the principal and interest owed on the investors' Notes was to be repaid. Notice of a Principal Amortization Event was to be given to the Servicer, the Rating Agencies, and the Programs' investors. *See* Master Indentures § 7.02.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 134 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 134, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

135. In sum, as detailed below, once the Trustee learned of certain facts that constituted Events of Default under Section 7.01 of the Master Indentures, and once certain other conditions were satisfied in some circumstances, then the Master Indentures placed affirmative obligations upon the Indenture Trustees to take certain actions to protect the Programs, including the issuance of notices of Events of Default and, ultimately, the declaration of Principal Amortization Events.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 135 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 135, Defendant Ayers refers to the text of those documents for the

complete and actual description of its contents.

136. Chase has testified that the Indenture Trustees had an obligation to know what facts would constitute an Event of Default under Section 7.01 so that the Indenture Trustees could take the actions required of them in a manner consistent with their obligations under Section 7.02.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 136, except states that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents, and to the extent the UAT relies on the testimony of Chase referenced in Paragraph 136, Defendant Ayers refers to the transcript testimony for the complete and actual description of its contents without admitting that the testimony is accurate based on personal knowledge.

137. If one of the Trustees knew of facts constituting certain Events of Default, and if that event was continuing, then the Trustee was required to deliver a notice of an Event of Default to the Servicer. *See* Master Indentures § 7.02. Unless the Servicer reasonably demonstrated to the Indenture Trustee that no such Event of Default had occurred, then the Indenture Trustee was required to declare a Principal Amortization Event. *See* Master Indentures § 7.02.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 137 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 137, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**b. Rights to Pursue Legal Redress**

138. The Master Indentures provided the Indenture Trustees rights and obligations, in certain circumstances, to pursue legal and extra-judicial redress to protect the Programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 138 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 138, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

139. Pursuant to Section 3.03(a)(i), upon the occurrence of any Event of Default other than one occurring under 7.01(a), (b), (c), (h), or (j), and in addition to the rights afforded to and the obligations placed upon the Indentures Trustees under Article VII of the Master Indentures, the Indenture Trustees had the right to: (i) pursue any legal remedy available to collect any sum of money supposedly secured under the Programs; (ii) to enforce their title in an right to possession of the receivables purchased by the Programs, wherever they could be found; (iii) to pursue any remedies they may have against any Seller or Subservicer under any Sale Agreement; (iv) to enforce any and all other rights or remedies available to them; and (v) without further notice or demand and without legal process, take possession of the receivables purchased by the Programs, wherever found.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 139 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 139, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

140. Pursuant to Section 7.03 of the Master Indentures, if an Event of Default occurred and continued with respect to all Series of the Notes, the Indenture Trustees were given the right

to proceed to protect and enforce their rights and the rights of the investors by appropriate judicial proceedings.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 140 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 140, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**c. Right to Remove the Servicer**

141. Under the Master Indentures, the Indenture Trustees had the right, in certain circumstances, to terminate the servicing responsibilities of the Servicer in order to protect the Programs and their investors.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 141 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 141, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

142. Section 5.09 of the Master Indentures listed several specific events that, when they occurred and continued, would constitute Events of Servicer Default. Master Indentures § 5.09.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 142 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 142, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

143. An Event of Servicer Default could be triggered by, for example, the Servicer's failure to perform or observe any material term, covenant, or agreement contained in the Master

Indentures; the Servicer's failure to deliver an Investor Report; or a material breach of any Servicer representation or warranty in Section 5.03. Master Indentures § 5.09.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 143 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 143, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

144. If an Event of Servicer Default occurred, the Indenture Trustees were given the authority to notify the Servicer of the occurrence of such an event of Servicer Event of Default.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 144 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 144, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

145. If an Indenture Trustee gave the Servicer notice of an Event of Servicer Default and the default was not remedied after thirty days, then the Indenture Trustee was authorized to terminate the servicing responsibilities of the Servicer, without demand, protest or further notice of any kind. Master Indentures § 5.09.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 145 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 145, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

#### d. Indenture Trustees' Duty to Act as They Would in the Conduct of Their Own Affairs

146. Under the Master Indentures, if <u>any</u> Event of Default occurred and was continuing, the Indenture Trustees were obligated to exercise all of their rights and powers-

including the declaration of a Principal Amortization Event, the removal of the Servicer, and all other rights-"as a prudent person would exercise or use under the circumstances in the conduct" of the Trustees' own affairs. *See* Master Indentures § 8.01(d).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 146 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 146, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

147. When acting under this standard after a continuing Event of Default, the Trustees were required to investigate and ascertain the pertinent facts relating to the pertinent Event of Default. *See* Master Indentures § 8.0l(d).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 147 and states that to the extent the UAT relies on the Master Indentures referenced in paragraph 147, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

## V. THE SCHEME TO DEFRAUD, AND THEREBY MISAPPROPRIATE THE ASSETS OF, NPF VI AND NPF XII

148. Defendants, Chase, Bank One, the Servicer, Poulsen, Parrett, and Ayers joined together in concerted, well defined, organized, and long-running racketeering enterprises, conspiracies, and schemes to defraud NPF VI and NPF XII by misappropriating the assets of these entities. Each of these defendants, and non-defendant the Servicer, played a crucial role in this scheme to defraud. Because the object of the schemes-the substantial cash assets of NPF VI and XII-were held in trust accounts at Chase (for NPF VI) and Bank One (for NPF XII), it was impossible for the scheme to succeed without the active participation and assistance of Bank One and Chase. These trustee banks held the keys to the targeted assets and they were charged

with responsibility to safeguard the assets that belonged to NPF VI and NPF XII (including their reserve accounts), and to disburse them only for those purposes expressly set forth in the governing NPF VI and NPF XII Indentures. Accordingly, in order for the scheme to misappropriate these assets to succeed, it was necessary and essential that Chase and Bank One each have knowledge of the scheme, agree to participate in it, and intend that NPF VI and NPF XII be injured by it. As detailed below, both Chase and Bank One had such knowledge, did so agree, and had such an intention.

Defendant Ayers denies the allegations of paragraph 148 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except states that to the extent the UAT relies on the Indentures, Defendant Ayers refers to the test of those documents for complete and actual description of its contents.

149. Chase and Bank One were gatekeepers charged with protecting the assets of NPF VI and NPF XII. Rather than faithfully execute that charge, Chase and Bank One joined a scheme to loot those assets. They did so by first fraudulently agreeing to undertake the protection of NPF VI and NPF XII's assets according to the terms of the NPF VI and NPF XII Indentures, when in fact neither Chase nor Bank One had any intention to perform their obligations under the Indentures when they executed them and their related supplements. To the contrary, both had already joined in conspiracies to defraud and loot NPF VI and XII prior to executing the Indentures and, in furtherance thereof, had agreed to disregard their obligations under the Indentures in order to permit the assets of VI and XII to be misappropriated for their benefit and for the benefit of their coconspirators. Chase and Bank One played their part in this criminal conspiracy by throwing open the gates they had agreed to man and by personally delivering the assets they had promised to safeguard into the hands of those who, along with Chase and Bank

One, intended to and did loot them.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 149, except states that to the extent the UAT relies on the Indentures, Defendant Ayers refers to the test of those documents for complete and actual description of its contents.

150. Chase and Bank One participated in the fraud on, and theft of, the assets of NPF VI and XII not only by their actions but also by their failures to act. In their roles as guardians of the assets of NPF VI and XII, Chase and Bank One each agreed to be vigilant, to act prudently, and to take action and sound the alarms if they learned that the NPF VI and XII trust assets were being misused or misappropriated. Not surprisingly, despite being inundated with a continuous and unceasing barrage of plain, unmistakable knowledge and proof that the assets under their protection were being looted, Chase and Bank One sat silent, sounded no alarms, and took none of the actions they had committed to take when confronted with such facts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 150.

151. As a direct result of the faithlessness, frauds, defalcations and breaches of Chase and Bank One, the conspiracy to loot the assets of NPF VI and XII was a resounding success. NPF VI and NPF XII suffered catastrophic and debilitating multi-billion-dollar losses. Chase and Bank One, acting together and in concert with the Servicer, Poulsen, Parrett, and Ayers, caused these losses and are now responsible to NPF VI and NPF XII to replace the funds lost as a result of their frauds and theft.

Defendant Ayers denies the allegations of paragraph 151 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at

Defendant Ayers.

**A. Factual Allegations Regarding Chase**

152. On June 1, 1998, Chase executed the NPF VI Master Indenture. Although Chase was already serving in an indenture trustee capacity with respect to NPF VI at this time, the execution of the NPF VI Indenture began Chase's service under this new "Master" indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 152, except states that on June 1, 1998, Chase executed the NPF VI Master Indenture.

153. Poulsen, Parrett, and Ayers selected Chase to serve as Indenture Trustee for NPF VI because of their prior dealings with Chase vice president Joseph Giordano. Mr. Giordano had served as a trust officer for the NPF VI program, as well as other NPF programs, at Bankers Trust, the predecessor trustee to Chase. Although the Bankers Trust NPF VI indenture was not identical to the Chase NPF VI Master Indenture, there were substantial similarities.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 153 and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except admits that Chase served as Indenture Trustee for NPF VI.

153A. Marie Merritt, a Chase officer who would later supervise the NPF VI trusteeship at Chase, was also employed by Bankers Trust and worked closely with Giordano in connection with the administration of the NPF programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 153A.

153B. Poulsen, Parrett, and Ayers likewise selected Bank One to serve as Indenture

Trustee for NPF XII because of their prior dealings with John Rothrock, who had served as a trust officer for the NPF IV and other NPF programs at Bankers Trust, Bank One's predecessor trustee.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 153B and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers, except admits that Bank One served as Indenture Trustee for NPF XII.

153C. As a result of their work at Bankers Trust acting as trust officers for the NPF programs, Giordano, Merritt, and Rothrock became intimately aware of the manner in which the Founders misused their roles with the Servicer and the NPF entities to routinely violate the then-existing indentures and loot the programs entrusted to the care of Bankers Trust. Giordano, Merritt, and Rothrock not only learned of the Founders' and the Servicer's systematic defalcations at Bankers Trust (which would continue unabated at Chase and Bank One), they actively participated in carrying out and covering up these breaches and frauds. Indeed, Giordano himself *originated* the idea of breaching the indentures by commingling funds of the NPF programs and their affiliates to cover up the misuse of funds and create the fraudulent impression that the reserve accounts were maintained at the levels required by the then-extant indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 153C and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

153D. Thus, as set forth in more detail below, long before they accepted their roles as trustees, and throughout their service as trustees, Chase and Bank One (through Giordano,

Merritt, and Rothrock) were intimately familiar with the fraudulent character of the Founders, the misuse and misappropriation of funds by the Servicer, the persistent failure of the NPF programs to operation in accordance with their indentures including, and the persistent looting of reserve accounts and the resulting insufficient balances in those accounts. Chase and Bank One were not, therefore, innocent trustees who were hoodwinked by the Founders or the Servicer. To the contrary, they were complicit co-conspirators who, well before they ever executed the NPF VI and XII Indentures, were intimately familiar with and knew: (i) the disreputable character and fraudulent predilections of the individuals who they were to do business with; (ii) the fact that the Founders, acting through the Servicer, intended to operate the NPF VI and XII programs in total disregard of the Indentures and the rights of NPF VI and XII; and (iii) that they were expected to actively participate in, facilitate, and turn a blind eye to the Founders and the Servicer's defaults, frauds, and breaches of the Indentures. With this full knowledge, with the intent to ignore their future Indenture obligations, and with the intent to misrepresent that they intended to abide by the Indentures in order to serve as Trustees and earn lucrative trustee fees and compensation, Chase and Bank One executed the Indentures and Supplemental Indentures. By doing so, they placed Giordano, Merritt, and Rothrock in positions of authority to continue where they had left off at Bankers Trust, facilitating the Servicer's and the Founders' disregard of the indentures and looting of NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 153D.

153E. The relationship between Bankers Trust and the Founders, the Servicer and the NPF programs began no later than November 1992 with the execution by Bankers Trust of the indenture for the NPF IV program. At that time, Giordano was employed by Bankers Trust and

was responsible for administering the NPF programs until late 1996, when he joined Chase and began to solicit the Founders to move their business there. Rothrock served as the day-to-day administrator of the NPF programs for Bankers Trust beginning no later than March 1993 and continuing through July 1994, when he joined Bank One and began to solicit the Founders to move their business there. Merritt served as an administrator of the NPF programs for Bankers Trust from no later than November 1994 until November 1997. After Giordano and Rothrock left Bankers Trust, Bankers Trust's new NCFE account team was unwilling to continue to ignore the indentures. As a result, Bankers Trust promptly resigned as trustee for all NPF programs in November 1997, citing among other reasons the Founders and the Servicer's "disdain" for the indentures' requirements. As detailed herein, throughout the terms of their service as Bankers Trust trust officers for the NPF programs, Giordano, Merritt, and Rothrock learned of and actively facilitated the Founders' and the Servicer's fraud and breaches of trust.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 153E.

153F. For example, by October 1994, it was clear that the Founders and the Servicer were disregarding their indenture obligations and that Bankers Trust, under the supervision of Giordano and Rothrock, were doing nothing about it. On October 20, 1994, an investor in the NPF IV and V programs wrote to complain about recently discovered defaults and breaches in the preceding year under the indentures that Bankers Trust, under Giordano and Rothrock, had ignored. Among other things, the letter (copied to Giordano) complained that: (i) Bankers Trust had ignored the fact that "the *Seller Reserves in aggregate have been below the* 6.5% *required* for each Seller pursuant to the Sales and Subservicing Agreement;" (ii) the explanations given for these shortfalls were *not verifiable;* (iii) Bankers Trust had ignored that "the Program

Defaulted Receivables Test for NPF IV *was breached;"* and (iv) Bankers Trust had accepted certificates from the Servicer and the Founders "suggesting that the programs were in compliance *when infact the reported data indicated non-compliance."*

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153F.

153G. In the October 20, 1994 correspondence, the investor faulted Bankers Trust for ignoring its obligations in the face of these defaults:

> *We place a great deal of reliance on the Trustee to properly monitor the programs* and suggest or take appropriate action to ensure compliance. Based on past discussions, *we are not convinced they are properly discharging their responsibilities.*

Bankers Trust (under Giordano and Rothrock) was not discharging its responsibilities, just as Chase and Bank One (also under Giordano and Rothrock) would later not discharge theirs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153G.

153H. The October 1994 investor complaints about Giordano and Rothrock's disregard over the prior year of the trustee's indenture obligations demonstrate that by this early date the Founders and the Servicer were already operated the NPF programs well outside the boundaries ofthe relevant indentures, that Giordano and Rothrock were well aware of these breaches and defaults, and that Giordano and Rothrock (on behalf of Bankers Trust) were doing nothing about it despite their obligation to do so.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153H.

153I. After October 1994, the Founders and the Servicer continued to operate the programs outside the limitations of the Indenture by failing to provide required audits,

certificates, and reports to Bankers Trust, and by misusing reserve funds for purposes not permitted by the NPF indentures, such as using Equity Account proceeds to purchase receivables. The Bankers Trust team had continued awareness of these breaches but made no effort to take the actions required by the indentures to stop them. To the contrary, they actively facilitated the concealment of these breaches.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153I.

153J. The knowledge and active participation of Giordano and Merritt in the Founders' fraud in the Bankers Trust era is exemplified by the December 1994 events concerning the Equity Account for the NPF-PW program. In November 1994, the Servicer provided Merritt and Giordano with a "Lender Report" for the NPF -PW program indicating that the Equity account held the required minimum balance of $1,688,129 as of month-end October 1994. This report was false and Giordano and Merritt knew it. In fact, the actual balance in the Equity Account at month-end October 1994 was only $727,069, less than half of the required amount.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153J.

153K. Rather than take the actions required in the NPF-PW indenture as a result of this Event of Default, on December 20, 1994, Merritt wrote to Lance Poulsen, with a copy to Giordano, to inform him of this discrepancy and ask for an explanation. The letter noted that the Equity Account was deficient at month-end November 1994, although no Lender Report for this period had yet been received for this time period. On December 21, 1994, Poulsen responded in a memorandum to Merritt, copied on Giordano. Poulsen claimed that the Equity Account, when combined with the Sub-servicing Reserve Account, totaled the necessary minimum and that

Bankers Trust should find those circumstances sufficient.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153K.

153L. The Sub-servicing Reserve Account was a Bankers Trust account into which the Servicer deposited the 8.5% servicing fee subtracted from the amounts paid to receivable sellers and paid to the Servicer to cover the cost of collecting the receivables. Under the terms of the programs, the Servicer would then sub-contract its collection duties back to the seller who would be repaid the withheld 8.5% upon collection of the receivable in question (this same procedure was also followed with respect to the NPF VI and XII programs at issue in this lawsuit). Thus, at Bankers Trust, each time the Servicer was paid a servicing fee it was deposited into the Sub-servicing Reserve account to be held until such time as it was needed to pay the Servicer's obligation to the seller of the receivable upon collection thereof. Thus, what Poulsen suggesting in his December 20, 1994 letter was that the assets of the Servicer, which were already fully committed to pay sellers upon collection of their receivables, should fraudulently be counted as assets of the NPF program as though they had been deposited in the Equity Account.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153L.

153M. On December 22, 1994, Giordano responded to Poulsen’s letter with a memorandum of his own, copied on Merritt. In it, Giordano correctly noted that the Servicer's funds on deposit in the Sub-servicing Reserve account could not be used to bolster the NPF-PW Equity Account balance reserve calculation. By rejecting Poulsen's frivolous attempt to explain away the Equity Account shortfall in the last two months, Giordano confirmed that an Event of Default had occurred in October, had continued into November, and was continuing to that day

as a result of insufficient funds in the NPF-PW Equity Account.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153M.

153N. Giordano's next response illustrates how the Founders and the Servicer were able, in the years to come, to openly loot billions of dollars from trustee-supervised reserve accounts. The NPF-PW indenture provided that Bankers Trust "shall promptly declare" a Principal Amortization Event shutting down the program upon the occurrence of defaults like the Equity Account's insufficient balances in October, November, and December 1994. Ignoring these obligations, as Chase and Bank One would later ignore countless such defaults, Giordano did not declare a Principal Amortization Event, as he was required to do. Rather, Giordano hatched a plan to help the Founders and the Servicer cover up the default and conceal similar defaults in the future.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153N.

153O. To Giordano, the problem was not that the Equity Account did not have the funds required by the indenture; the problem was that the Servicer was not able to find a way, *whether accurate or not,* to report that it did. Thus, in a December 22, 1994 letter to the Servicer, Giordano suggested a solution:

> *we would recommend* you consider giving authorization to transfer the balance in the Sub-servicing Reserve Account to the Equity Account *so this reserve test can be met.*

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153O.

153P. Giordano thus suggested commingling the Servicer's funds with those ofNPF-PW

in clear violation of the indenture to create the false impression that the Equity Account was properly maintained. The Servicer could not possibly "give" the amounts in the Sub-servicing Reserve account to NPF -PW without rendering itself insolvent because, as discussed above, the Servicer was simply holding these funds for repayment to sellers. Giordano (and Merritt) knew this and knew what Giordano was proposing was improper. Notwithstanding their obligations to enforce the indentures, Giordano and Merritt offered to actively participate in subverting them. So began the kiting and reserve account chicanery that would continue unabated, in increasingly complex forms and increasingly larger dollars, over the next eight years. The brainchild not of Poulsen or Ayers or Parrett, but of JP Morgan Chase Bank's own Joseph Giordano, the kiting scheme would ultimately end in catastrophe, with NPF VI and XII losing billions of dollars.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153P.

153Q. Not to be outdone, Poulsen quickly agreed with Giordano's suggestion and the Sub-servicing Reserve account was raided to fill the Equity Account and wrongfully simulate compliance with its minimum balance requirements. By March 1995, the Sub-servicing account closed, as it had become the routine practice, pursuant to Giordano's scheme, to simply place the funds held by the Servicer for repayment to sellers (formerly deposited in the Sub-servicing Reserve Account) straight into the Equity Account, in clear violation of the indenture. Not surprisingly, this shell game meant that the Equity Account was routinely raided throughout each month, again in violation of the indenture, to repay sellers who had successfully collected their receivables. Bankers Trust, at the direction of Giordano and Merritt, permitted these withdrawals, entrenching the practice of routine looting and misuse of the Equity Account that was to become a fixed feature of the fraud perpetrated on NPF VI and XII under the tutelage of

Giordano, Merritt, and Rothrock.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153Q.

153R. After December 1994, the Founders and the Servicer continued to ignore the requirements of the indenture by making unauthorized transfers and by defaulting on their obligations to provide required reports. Indeed, a September 1995 Bankers Trust memo, copied to Giordano, noted that required investor reports had been missing for seven of the last eleven months.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153R.

153S. In a June 1995 letter to Bankers Trust, an NPF IV and V investor again criticized the trustee's performance under Giordano and Merritt. The investor complained that Bankers Trust had taken no action despite the fact that: (i) monthly compliance reports were not being provided in a timely manner, (ii) unexplained discrepancies and errors in the calculation of compliance ratios existed, and (iii) "both NPF V and VI have *breached certain reserve tests."* The investor complained:

> [we] are concerned that to our knowledge, we were the ones discovering the errors, as we rely heavily on Banker's Trust as Trustee to monitor these issues and to ensure compliance. Additionally, if Bankers was aware of any instances of noncompliance, we would expect to have been advised .... We are relying on the Trustee to properly monitor the programs and suggest or take action ifthere is any non-compliance.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153S.

153T. Of course, the author did not know that Bankers Trust, through Giordano and Merritt, was well aware of the cited defaults, as well as many others, but had made the

determination (as Chase, Bank One, the Servicer and the Founders did) to ignore the indenture and assist the Servicer and the Founders in their concealment.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153T.

153U. In the fall of 1995, storm clouds began to gather over the NPF programs. In a series of memos between NCFE and Prudential Securities, which had underwritten NPF notes, Prudential began to ask a number of uncomfortable questions. Prudential questioned the accuracy of the Investor Reports prepared by the Servicer, particularly with respect to defaulted receivables, and questioned what percentage of receivables were actually collected as opposed to being rolled over into another securitization vehicle, ponzi scheme style. Prudential questioned the accuracy of materials provided to Standard & Poors in October 1995 that explained away June, July, and August 1995 indenture defaults that otherwise would have led to an amortization and downgrade of the NPF programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153U.

153V. As these questions highlighted that Bankers Trust was doing nothing in the face of these defaults, Giordano took action. On November 16, 1995, Giordano and Poulsen agreed in writing to coordinate all their communications with Prudential to ensure that damaging information was not accidentally revealed to Prudential or to others at Bankers Trust who might spoil the scheme. As Poulsen explained to Giordano:

> As a follow up to our earlier conversation, I am writing to you to confirm our understanding that a representative of National Century Financial Enterprises, Inc. ("NCFE") *be a part of any conversations by and between Bankers Trust Company and Prudential Securities Incorporated and/or its counsel.* As we discussed, this approach will avoid any misunderstandings and misconceptions. Please contact me directly regard any such communications.

Shortly thereafter, Prudential stopped underwriting securities for NCFE. Credit Suisse First Boston took their place.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153V.

153W. From late 1995 until Giordano's departure in mid-1996, the Servicer and the Founders continued to operate the NPF programs in blatant disregard of the indentures. Numerous reports, evaluations, and reconciliations received and/or generated by Bankers Trust during this time demonstrated numerous defaults and breaches, including the purchase of ineligible receivables, unauthorized transfers from the trust accounts, and reserve account deficiencies. Still, Bankers Trust, under Giordano and Merritt, did nothing.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153W.

153X. Following Giordano's departure, the Founders and the Servicer continued to operate the NPF programs irresponsibly. However, at Bankers Trust, a new team took over that did not know the drill, and went about performing the trustee's job, enforcing the indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153X.

153Y. On March 13, 1997, Bankers Trust sent the Servicer notices of default and notices of events of servicer defaults, something it had never done in Giordano's three year tenure administering NPF V, NPF VI, NPF IX, and NPF-WL. These notices cited, among other things, defaults in NCFE' s financial statements, failure to provide required reports and certificates, purchase of receivables from unapproved sellers and non-compliance with reserve requirements. Of course, none of this misconduct was new, just the trust officers at Bankers Trust. Giordano

and Rothrock had left for Chase and Bank One, and the Founders would soon follow them.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153Y.

153Z. By March 27, 1997, Poulsen was huddled in meetings with Bankers Trust senior management and their counsel. Poulsen described the post-Giordano/Rothrock relationship with Bankers Trust as "the war that had erupted between the Trustee and National Century." By May 1997, Bankers Trust had demanding a comprehensive review of NCFE, with particular focus on cash and collateral reporting. At this same time, Bankers Trust began a historical review to determine if past defaults had been improperly ignored or concealed. In addition, Bankers Trust demanded that the Servicer reconcile its investor reports monthly with the Servicer's computer database to verify their accuracy. A May 23, 2997 internal Bankers Trust memorandum to Merritt concluded that although NPF V was approaching an amortization date requiring $90 million to retire notes, there was currently only $22 million in the NPF V accounts. In short, after Giordano's departure in late 1996, Bankers Trust realized they had a fraud of alarming proportions on their hands.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153Z.

153AA. Obviously, the Founders were not pleased by the night-and-day change in attitude at Bankers Trust, which Poulsen described as "a recent renovation of their policies." Although Bankers Trust was doing nothing more than, finally, enforcing the indentures, Poulsen complained bitterly that Bankers Trust was "not acting rationally."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153AA.

153BB. On June 30, 1997, Bankers Trust pulled the rip cord, giving notice of its resignation as the NPF-WL trustee. By August 4, 1997, Poulsen indicated that the Founders had already settled on a "plan of moving our business from Bankers Trust." Of course, Rothrock and Giordano had already been soliciting the Founders for some time to move to Chase and Bank One, where they promised the same level of service, and willingness to ignore the indentures, that the Founders had enjoyed at Bankers Trust in the Rothrock/Giordano era there.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153BB.

153CC. Until Bankers Trust's complete resignation from all NPF trusteeships in November 1997, Bankers Trust continued to insist on indenture compliance. On September 19, 1997, Bankers Trust gave notice of its resignation as NPF IX's program. On September 25, 1997, Bankers Trust delivered to the Servicer a notice of event of default and intention to declare a principal amortization event for NPF VI. On November 19, 1997, Bankers Trust resigned from all remaining NPF trustee positions, including NPF VI.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 153CC.

153DD. The events at Bankers Trust demonstrate that by the time the Founders and the Servicer brought NPF VI and NPF XII to Chase and Bank One, these banks, through Giordano and Rothrock, were intimately familiar with Poulsen, Parrett, and Ayers' propensity for fraud. These events likewise illustrate that the Founders abandoned Bankers Trust for Chase and Bank One because they wanted and needed trustees who would agree not to enforce the indentures and assist them in concealing their breaches, as Rothrock and Giordano had done at Bankers Trust. Chase and Bank One made precisely that agreement, as set forth in this Complaint.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 153DD and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

154. The Founders had been pleased with high level of cooperation and low level of scrutiny they had received from Bankers Trust when Giordano was the responsible trust officer for the NPF VI trust. Indeed, an internal Chase memo from December 1998 notes that "NCFE loved Joe G. and John Rothrock (Bank One) when they were at BT." However, Giordano left Bankers Trust in 1996 and troubles ensued shortly thereafter. For instance, in March 1997 Bankers Trust declared an event of default for the NPF VI program (operating under a 1995 indenture) for among other things, improper assignments of receivables, failing to deliver required compliance reports and certificates, and failing to notify the trustee of defaults admitted in the company's financial statements. On March 27, 1997, in an internal memorandum, Poulsen described the difficulties as "a war that had erupted as between the Trustee [Bankers Trust] and National Century." Giordano and other Chase officers were aware of these disputes. In a November 3, 1997 email, Chase trust officer Marcus Gustafson wrote to Chase vice presidents Giordano and Laura Yeffeth passing along a concern expressed by the Duff & Phelps rating agency that "NPF may be repeating with Chase its prior history with BT regarding its compliance requirements." Marie Merritt, a Chase officer who supervised the NPF VI trusteeship at Chase, had also been previously employed by Bankers Trust and was also aware of Poulsen and the Servicer's troubled past.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 154.

155. Shortly after the events of March 1997, Poulsen, Parrett, and Ayers became

dissatisfied with Bankers Trust's level of insistence on enforcement with the NPF VI indenture and began to look for a more pliant replacement. They found one in Chase, where Giordano had moved. Anticipating a more lenient approach to indenture enforcement as a result of their past history with Giordano, the Founders selected Chase to accede to the trusteeship of NPF VI. As set forth in detail hereinafter, the Founders were not disappointed. Chase proved to be an active and willing participant in their fraudulent misconduct.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 155.

**1. Chase Joins the Scheme to Defraud by Agreeing to Disregard Its Obligations Under the NPF VI Indenture**

156. Prior to the execution of the NPF VI Indenture, on June 1, 1998, Poulsen, acting on behalf of the Servicer, together with Parrett and Ayers, had multiple communications with responsible officers of Chase, including without limitation Joseph Giordano, Tara Sweeny, Marcus Gustafson, Laura Bertolino, and Robert Snyder, to discuss the manner in which the Servicer and Chase would exercise the rights and responsibilities to be granted them under the as-yet unsigned NPF VI Indenture. These communications were carried out in face-to-face meetings as well as by means of the telephone, the U. S. mails, electronic mail, and facsimile. The Founders originated their mail and wire communications from the state of Ohio and directed them to the state of New York. Chase originated its mail and wire communications from New York and directed them to Ohio.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 156.

157. In the course of these communications, the Founders, the Servicer, and Chase agreed to disregard crucial material terms of the Indenture and operate the NPF VI program

according to their own plan and design, in order to further their own purposes. These agreements were not a modification of the NPF VI Indenture. Rather, they were an agreement to disregard and breach the NPF VI Indenture. NPF VI did not agree or consent to these intended violations of the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 157.

158. In the context of the communications and agreements discussed here (and in the subsections below) as well as all other agreements, arrangements, and discussions with Chase regarding operation of the NPF VI Program referenced in this Complaint (except where expressly noted), the Founders were speaking and acting for themselves and the Servicer only, and not on behalf of or as agents for NPF VI. Chase knew and understood that the Founders were speaking and acting for themselves and the Servicer only, and not on behalf of or as agents for NPF VI in the context of these communications. Chase knew and understood that neither the Servicer nor the Founders had actual or implied authority, on behalf of NPF VI, to modify the Indenture, waive any of requirement of the Indenture, or ratify any prior breach or violation of the Indenture. The NPF VI Noteholders, express and intended third party beneficiaries of the NPF VI Indenture, likewise did not agree or consent to these intended violations of the NPF VI Indenture. Nor did the Rating Agencies so consent. The NPF VI Indenture could only be modified by the execution of a Supplemental Indenture, made and executed in accordance with the express provisions of the NPF VI Indenture. No Supplemental Indenture was ever executed for the NPF VI Indenture permitting or authorizing any of the violations agreed to by the Founders, the Servicer, and Chase in the discussions and agreements described in this paragraph (including the subsections below). Nevertheless, without authorization and in disregard of the

limits placed on them, the Servicer, the Founders, and Chase agreed to the following, in exhaustive list of Indenture violations:

(a) The Servicer, the Founders, and Chase agreed that Chase would execute and carry out improper and unauthorized instructions from the Servicer to make unauthorized withdrawals from the NPF VI Equity Account, Seller Credit Reserve Account, and Offset Reserve Account (collectively, the "NPF VI Reserve Accounts") such that the balances in these reserve accounts would routinely, and as a matter of ordinary course, be kept and maintained well below the minimum levels specified for these accounts in the NPF VI Indenture. The Servicer, Founders, and Chase likewise agreed that Chase would disregard its obligations under the NPF VI Indenture and take no action (such as giving notice of Events of Default, giving notice of incipient Events of Default, declaring Principal Amortization Events, and other actions) if the balance in one or more of the NPF VI Reserve Accounts drop below the minimum balances specified in the Indenture. The Servicer, Founders, and Chase likewise agreed that no effort would be made to maintain the NPF VI Reserve Accounts at or above the minimum balances specified in the NPF VI Indenture, other than on the last day of each month, in order to permit the Servicer to prepare a misleading Investor Report, which Chase would then forward to the Rating Agencies, falsely indicating compliance with the minimum reserve balance requirements to the NPF VI Indenture.

b) The Servicer, the Founders, and Chase agreed that Chase would execute and carry out improper and unauthorized instructions from the Servicer to withdraw funds on a routine and near daily basis from the NPF VI Equity Account including:

(i) transferring funds from the NPF VI Equity Account to Sellers in

the NPF VI program as payment of the Subservicing Fee owed by the Servicer to such Sellers (the Subservicing Fee was an amount equal to 8.5% of the collections in the last week on receivables that had been sold by a Seller to NPF VI; the obligation to pay the Subservicing Fee was that of the Servicer, not NPF VI, and the Servicer was expressly required to pay the Subservicing Fee from its own funds);

(ii) transferring funds from the NPF VI Equity Account on days other than the first day of any month, which is expressly prohibited by the terms of the NPF VI Indenture;

(iii) transferring funds from the NPF VI Equity Account to the NPF VI Purchase Account for further distribution to Sellers or for other purposes (no transfers from Equity to Purchase are permitted for any purpose under the NPF VI Indenture);

(iii) transferring funds from the NPF VI Equity Account to the NPF VI Seller Credit Reserve Account for purposes of creating the false impression in Investor Reports, as well as in other contexts, that the Seller Credit Reserve Account was being maintained at all times at or above the required minimum balance set forth in the Indentures or other purposes (no transfers from the Equity Account to the Seller Credit Reserve Account are permitted for any purpose under the NPF VI Indenture); and

(iv) transferring funds from the NPF VI Equity Account to the NPF VI Offset Reserve Account for purposes of creating the false impression in Investor Reports, as well as in other contexts, that the Offset Reserve Account was being

maintained at all times at or above the required minimum balance set forth in the Indenture, or for other purposes (no transfers from the Equity Account to the Offset Reserve Account are permitted for any purpose under the NPF VI Indenture).

(c) The Servicer, the Founders, and Chase also agreed that Chase would execute and carry out improper and unauthorized instructions from the Servicer to withdraw funds on a routine basis from the NPF VI Seller Credit Account including:

(i) transferring funds from the NPF VI Seller Credit Reserve Account to the NPF VI Offset Reserve Account for purposes of creating the false impression in Investor Reports, as well as in other contexts, that the Offset Reserve Account was being maintained at all times at or above the required minimum balance set forth in the Indenture" or for other purposes (no transfers from the NPF VI Seller Credit Reserve Account to the Offset Reserve Account are permitted for any purpose under the NPF VI Indenture);

(ii) transferring funds from the NPF VI Seller Credit Reserve Account to the NPF VI Equity Account for purposes of creating the false impression in Investor Reports, as well as in other contexts, that the Equity Account was being maintained at all times at or above the required minimum balance set forth in the Indenture, or for other purposes (no transfers from NPF VI Seller Credit to Offset Reserve are permitted for any purpose under the NPF VI Indenture).

(d) The Servicer, the Founders, and Chase also agreed that Chase would execute and carry out improper and unauthorized instructions from the Servicer to withdraw funds on a routine basis from the NPF VI Offset Reserve Account including:

(i) transferring funds from the NPF VI Offset Reserve Account to the NPF VI Seller Credit Reserve Account for purposes of creating the false impression in Investor Reports, as well as in other contexts, that the Seller Credit Reserve Account was being maintained at all times at or above the required minimum balance set forth in the Indenture, or for other purposes (no transfers from the NPF VI Seller Credit Reserve Account to the Offset Reserve Account are permitted for any purpose under the NPF VI Indenture); and

(ii) transferring funds from the NPF VI Offset Reserve Account to the NPF VI Equity Account for purposes of creating the false impression in Investor Reports, as well as in other contexts, that the Equity Account was being maintained at all times at or above the required minimum balance set forth in the Indenture, or for other purposes (transfers from NPF VI Offset Reserve to Equity are permitted only for one very narrow, rarely occurring, purpose under the NPF VI Indenture which, on information and belief, did not occur or occurred only rarely during the terms of the NPF VI Indenture).

(e) The Servicer, the Founders, and Chase also agreed that Chase would execute and carry out improper and unauthorized instructions from the Servicer to withdraw funds on a routine basis from the NPF VI Purchase Account and transfer such funds to Sellers that were owned in whole or in part by Poulsen, Parrett, Ayers, and NCFE, Inc. Such affiliate transactions are prohibited by the express terms of the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 158, except that to the extent the UAT relies on the Master Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of

their contents.

159. The arrangements and agreements between the Servicer, the Founders, and Chase described in paragraphs above were repeated and reconfirmed by and between the Founders, the Servicer, and Chase (by and through its officers Joseph Giordano, Marcus Gustafson, Laura Bertolino, Marie Merritt, Robert Snyder, and the Trust Officers) prior to the execution of each ofthe NPF VI Supplemental Indentures dated June 1, 1998; August 14, 1998; November 4, 1998; March 26, 1999; June 20,2001; and February 28,2002. These communications were carried out as part of an ongoing pattern of corrupt, racketeering activity by means of the U.S. mails, the telephone, electronic mail, and facsimile.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 159, except that to the extent the UAT relies on the NPF VI Supplemental Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

160. Chase demonstrated its planning for, and intention to carry out, its agreement to ignore the terms of the NPF VI Indenture and carry out unauthorized transfers by preparing standardized forms for use in connection with the NPF VI transaction that facilitated these improper transfers. For example, Chase prepared, prior to June 1, 1998, and thereafter used throughout the term of the NPF VI program, an account transfer form, titled "Daily DDA Account Transactions" (the "Daily DDA Form"), that was created for use in the NPF VI Program. For each combination of NPF VI trust accounts that Chase intended to transfer funds between, the Daily DDA Form contained a pre-prepared entry (including account numbers, account names, and other internal tracking and processing entries), leaving only the transfer amount to be filled in. This allowed a Chase employee who received an instruction from the

Servicer to move funds between NPF VI accounts to prepare the necessary paper work by simply entering the requested dollar amount of the instruction on the appropriate line-without regard to whether the transfers ordered conformed to the Indenture. The Daily DDA Form includes pre-prepared entries to facilitate transfers: (a) from the Equity Account to Purchase Account; (b) from the Equity Account to Seller Credit Reserve Account; (c) from Equity Account to Offset Reserve Account; (d) from Seller Credit Reserve Account to the Equity Account; (e) from the Seller Credit Reserve Account to the Offset Reserve Account; and (f) from Offset Reserve Account to the Seller Credit Reserve Account. None of these transfers was permitted under the NPF VI Indenture *under any circumstance.* It should be noted that the Daily DDA Form does not simply recite all of the possible combinations of accounts between which funds could theoretically be transferred. Several impermissible transfer combinations are not listed making clear that Chase intended to comply with these, highly specific Indenture requirements. Instead, always intended to make these specific types of prohibited transfers, in violation of the Indenture and in deliberate breach of its obligations to NPF VI, which establishes that Chase never intended to comply with the NPF VI Indenture with respect to such transfers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 160, except that to the extent the UAT relies on the NPF VI Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

161. Chase had no present intention to perform its obligations under the NPF VI Master Indenture when it entered into and executed this agreement. The same is true with respect to each Supplemental Indenture executed by Chase in connection with the NPF VI Indenture. Chase executed the NPF VI Indenture and Supplements solely to induce NPF VI into allowing it

to serve as Indenture trustee so that it could participate in and carry out the scheme to defraud and loot the assets of NPF VI that it had previously entered into with the Servicer, Poulsen, Parrett, and Ayers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 161, except that to the extent the UAT relies on the NPF VI Indentures and Supplements, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

**B. Chase Operates as Indenture Trustee in Accordance with Its Unlawful Agreement, in Violation of the NPF VI Indenture**

**1. Chase Carries Out Transfers and Withdrawals that It Had Actual Knowledge Were Not Permitted Under the Indenture**

162. As Indenture Trustee, Chase had a duty and obligation to know-and it actually knew- what instructions it was, and was not, authorized to carry out under the Indenture. Chase has acknowledged this obligation under oath. Throughout its term of service as trustee under the NPF VI Indenture, each of its responsible trust officers, known as Relationship Managers, including without limitation, Tara Sweeny, Jennifer Cupo, Patricia Russo, and Jennifer Baran (collectively the "Trust Officers") knew this as well. Because the NPF VI Indenture does not authorize the improper withdrawals discussed, prior to executing each such transfer or withdrawal, Chase was informed and had actual knowledge, from the face of the transfer request provided by the Servicer, that each such transfer or withdrawal was not permitted under the Indenture. Moreover, the NPF VI Indenture expressly provides that Chase was not entitled to rely on any transfer or withdrawal instruction from the Servicer where the requested transfer was not authorized under the Indenture. Nonetheless, Chase carried out literally thousands of such facially improper and unauthorized transfers and withdrawals from the NPF VI Accounts

throughout its term of service as trustee under the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 162, except that to the extent the UAT relies on the NPF VI Indentures, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

163. During the term of the NPF VI Indenture, Chase carried out the facially improper and unauthorized transfers from the NPF VI Equity Account, the NPF VI Seller Credit Reserve Account, and the NPF VI Offset Reserve Account described above. Each of the unauthorized transfers and withdrawals listed above was specifically reviewed and authorized by a Chase Trust Officer who was charged with having, and actually had, actual knowledge that the transfers were not authorized under the NPF VI Indenture. Indeed, Chase has testified that its standing policy required that a responsible officer verify, by reviewing the terms of the NPF VI Indenture, that any transfer request submitted by the Servicer was permitted and authorized under the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 163, except that to the extent the UAT relies on the NPF VI Indentures and Chase's testimony regarding that Indenture, Defendant Ayers refers to the text of that Indenture and the transcript of that testimony for the complete and actual description of their contents without admitting that the testimony is accurate based on personal knowledge.

164. These transfers were facilitated internally at Chase through the use of the Daily DDA Form discussed above. Each of the Daily DDA Forms directing the unauthorized transfers discussed herein stated on its face the transferring account and the receiving account. As a result, the responsible Chase Trust Officers, and their supervisors, each of whom was

required to execute the Daily DDA Form in order for the transfers to take place, would be on notice, and have actual knowledge, upon review of the Daily DDA Form that it was requesting transfers that Chase had no authority to carry out.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 164.

165. The following is a non-exclusive list of the Trust Officers and other Chase officers and responsible persons who executed and approved Daily DDA Forms authorizing transfers that Chase had no authority to carry out: (a) Tara Sweeny, trust officer, (b) Laura Yeffeth, assistant vice president, (c) Erick U. Bautista, trust officer, (d) Jennifer Cupo, assistant vice president (e) Patricia Russo, trust officer (f) Jennifer Baron, trust officer (g) Torn Mackay, vice president, (h) Vada Haight, vice president, (i) JoAnn Manieri, trust officer, (j) Jennifer Richardson, trust officer, (k) Marcus Gustafson, vice president, and (1) Craig Kantor, vice president The following is a non-exclusive list of the unauthorized transfers carried out by Chase with actual knowledge that they were not authorized under the NPF VI Indenture:

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 165.

**a. Unauthorized Transfers from the NPF VI Equity Account Not on a Monthly Payment Date**

166. Pursuant to Section 6.06 of the NPF VI Indenture, withdrawals may be made from the NPF VI Equity Account only on a Monthly Payment Date, which is defined as the first business day of each month. Both Chase and its attorneys at Seward & Kissell acknowledged this fact on October 1, 2002 when the issue was raised by an NPF VI Noteholder. As illustrated below, in just the twenty two (22) months between June 1999 and April 200 1, for which clear information has been provided, Chase carried out 494 facially invalid and unauthorized transfers

from the NPF VI Equity Account on days other than a Monthly Payment Date, totaling $501,153,384. Each of these transfers was an improper and unlawful misappropriation of the assets of NPF VI and was effected by bank wire transfers:

| Month | No. of Transfers | Total Dollar Amounts of Transfers |
|---|---|---|
| June 1999 | 21 | $21,811,497.98 |
| July 1999 | 27 | $12,987,844.85 |
| August 1999 | 21 | $16,745,952.24 |
| September 1999 | 24 | $20,154,716.48 |
| October 1999 | 27 | $29,227,389.98 |
| November 1999 | 20 | $26,834,231.15 |
| December 1999 | 17 | $14,275,376.12 |
| January 2000 | 14 | $ 8,660,993.45 |
| February 2000 | 20 | $15,577,119.56 |
| March 2000 | 25 | $17,199,142.89 |
| April 2000 | 17 | $12,681,486.83 |
| May 2000 | 22 | $25,934,683.75 |
| June 2000 | 31 | $11,722,801.61 |
| July 2000 | 18 | $ 9,168,355.38 |
| August 2000 | 25 | $12,908,660.06 |
| September 2000 | 30 | $24,490,338.88 |
| October 2000 | 21 | $19,079,482.45 |
| November 2000 | 24 | $29,048,927.59 |
| December 2000 | 21 | $29,209,938.25 |
| January 2001 | 16 | $24,015,799.52 |
| February 2001 | 18 | $19,921,128.56 |
| March 2001 | 18 | $35,833,052.07 |
| April 2001 | 17 | $63,664,464.76 |
| **TOTALS** | **494** | **$501,153,384.41** |

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 166, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

167. Though a revised statement format makes similar summary information more difficult for subsequent months, Chase carried out approximately $227 million of similar

improper transfers from May 2001 through October 2002.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 167.

**b. Unauthorized Transfers from the NPF VI Equity Account to the NPF VI Purchase Account, Seller Credit Reserve Account, and Offset Reserve Account**

168. Section 6.06 of the NPF VI Indenture sets forth all permissible withdrawals from the NPF VI Equity Account. No other provision of the Indenture authorizes withdrawals from the Equity Account. Both Chase and its attorneys at Seward & Kissell acknowledged this fact on October 1, 2002 when the issue was raised by an NPF VI Noteholder. Nowhere in Section 6.06, or elsewhere in the NPF VI Indenture, is Chase authorized to transfer funds from the NPF VI Equity Account to either the NPF VI Purchase Account, The NPF VI Seller Credit Reserve Account, or the NPF VI Offset Reserve Account. Notwithstanding this prohibition, Chase executed and carried out thousands of such transfers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 168, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

169. Chase did so primarily to assist and participate in the Founders' and the Servicers' efforts to loot the NPF VI Reserve Accounts by improperly and without authorization transferring their contents to healthcare providers in the NPF VI Program or to other NPF VI Reserve Accounts to conceal the Founders, the Servicer's, and Chase's abuse of the NPF VI Reserve Accounts and failure to maintain such accounts at the minimum balances required by the NPF VI Trust Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 169, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

170. For example, from June to September 1999, Chase carried out 58 facially invalid and unauthorized transfers from the NPF VI Equity Account to the NPF VI Purchase Account, Seller Credit Reserve Account, and Offset Reserve Account, totaling $50.8 million. Transfers ofthe same kind occurred continuously until November 2002. Each of these transfers was an improper and unlawful misappropriation of the assets of NPF VI. Each of these unauthorized transfers and withdrawals was specifically reviewed and authorized by a Chase Trust Officer who was charged with having, and did actually have, actual knowledge that the transfers were not authorized under the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 170, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

c.**Unauthorized Transfers from the NPF VI Seller Credit Reserve Account to the NPF VI Equity Account and Offset**

171. Nowhere in the NPF VI Indenture is Chase authorized to transfer funds from the NPF VI Seller Credit Reserve Account to the either the NPF VI Equity Account of the NPF VI Offset Reserve Account. The corporate representative of Chase designated to testify concerning the meaning of the NPF VI Indenture has acknowledged that Chase had no power to take any action, whether to transfer NPF VI trust funds or otherwise, not specifically set forth in the NPF VI Indenture. Indeed, in October 2002, when questioned on the matter by an NPF VI Noteholder,

Chase and its attorneys at Seward & Kissell acknowledged that amounts on deposit in the NPF VI Seller Credit Reserve Account could only be withdrawn to cover a Credit Deficiency (as defined in the Indenture), and that any amounts so withdrawn were required to be deposited in the NPF VI Purchase Account. Notwithstanding this clear prohibition, acknowledged by Chase in real-time, Chase executed and carried out hundreds of such transfers during the term of the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 171, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

172. Chase did so primarily to assist and participate in the Founders' and the Servicers' efforts to loot the NPF VI Reserve accounts by improperly and without authorization transferring their contents to healthcare providers in the NPF VI Program or to other NPF VI Reserve Accounts to conceal the Founders', the Servicer's and Chase's abuse of the NPF VI Reserve Accounts and failure to maintain such accounts at the minimum balances required by the NPF VI Trust Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 172, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

173. Each of these transfers was an improper and unlawful misappropriation of the assets of NPF VI. Each of the following unauthorized transfers and withdrawals was specifically reviewed and authorized by a Chase Trust Officer who was charged with having, and did

actually have, actual knowledge that the transfers were not authorized under the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 173, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

#### d. Unauthorized Transfers from the NPF VI Offset Reserve Account to the NPF VI Seller Credit Reserve Account

174. Nowhere in the NPF VI Indenture is Chase authorized to transfer funds from the NPF VI Offset Reserve Account to the NPF VI Seller Credit Reserve Account. The corporate representative of Chase designated to testify concerning the meaning of the NPF VI Indenture has acknowledged that Chase had no power to take any action, whether to transfer NPF VI trust funds or otherwise, not specifically set forth in the NPF VI Indenture. Indeed, in October 2002, when questioned on the matter by an NPF VI Noteholder, Chase and its attorney's at Seward & Kissell acknowledged that amounts on deposit in the NPF VI Offset Reserve Account could only be withdrawn to cover amounts due by a Seller in respect of Rejected Receivables and, under certain circumstances, to pay Program Fees, and any amount so withdrawn to cover amounts due by a Seller in respect of Rejected Receivables must be deposited in the Purchase Account and any amount so withdrawn to pay Program Fees must be deposited in the Equity Account. Notwithstanding this clear prohibition, acknowledged by Chase in real-time, Chase executed and carried out hundreds of transfers from the NPF VI Offset Reserve Account to the NPF VI Seller Credit Reserve Account during the term of the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 174, except states that to the extent the UAT relies on the NPF VI

Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

175. Chase did so primarily to assist and participate in the Founders' and the Servicers' efforts to loot the NPF VI Reserve accounts by improperly and without authorization transferring their contents to healthcare providers in the NPF VI program or to other NPF VI Reserve Accounts to conceal the Founders', the Servicer's, and Chase's abuse of the NPF VI Reserve Accounts and failure to maintain such accounts at the minimum balances required by the NPF VI Trust Indenture. In just the twenty two (22) months between June 1999 and April 2001, Chase carried out dozens upon dozens of facially invalid and unauthorized transfers from the NPF VI Seller Credit Reserve Account to the NPF VI Equity and Offset Reserve Accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 175.

176. Each of these transfers was an improper and unlawful misappropriation of the assets of NPF VI. Each of the following unauthorized transfers and withdrawals was specifically reviewed and authorized by a Chase Trust Officer who was charged with having, and did have, actual knowledge that the transfers were not authorized under the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 176, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

177. These improper transfers continued into 2002.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 177.

### 2. Chase Fails to Take Required Action in Response to Repeated Events of Default Resulting from the Failure to Maintain the NPF VI Reserve Accounts at the Minimum Balances Required by the Indenture

178. A failure to maintain, at any time, the minimum specified balances in the NPF VI Reserve Accounts constituted an Event of Default under the NPF VI Indenture. The corporate representative of Chase designated to testify concerning the meaning of the NPF VI Indenture has acknowledged under oath that, under the Indenture, the Seller Credit Reserve Account and the Offset Reserve Account were required to be maintained at all times at or above the minimum balances specified in the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 178, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

179. This interpretation is consistent with the position that Chase adopted in November 2002, when the NPF VI Noteholders were carefully scrutinizing its actions. In November 2002, Chase acknowledged that the Servicer was not permitted to request transfers from the NPF VI Reserve Accounts that would cause the balance in such accounts to fall below the minimums specified in the NPF VI Indenture. Unfortunately, Chase took no action to enforce this requirement during its service as NPF VI Indenture Trustee.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 179, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

180. Upon the occurrence of any failure of the NPF VI Reserve Accounts to be

maintained at or above their required levels, which would constitute an Event of Default, Chase would be required to declare a Principal Amortization Event, or alternatively make a determination whether to declare a Principal Amortization Event, which would result in the termination of the programs and would cause a halt to all future withdrawals from the trust accounts other than those directed to NPF VI or its creditors. Pursuant to the terms of the NPF VI Indenture, in making any discretionary determination during the continuance of an Event of Default, Chase was obligated to use the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. Chase was also obligated to exercise reasonable care in ascertaining the pertinent facts necessary to make an informed judgment with respect to any discretionary determination as to whether to declare a Principal Amortization Event. Despite these obligations, Chase agreed with the Servicer, in the communications described above, that Chase would abrogate and ignore its obligations under the NPF VI Indenture, regardless of the circumstances and regardless of the nature and magnitude of the breach, and would take no action to prevent or to respond to the repeated, and near continuous, Events of Default caused by the failure of the NPF VI Reserve Accounts to be maintained at the minimum levels required in the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 180, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the test of that document for the complete and actual description of its contents.

180A. Chase understood its obligation to monitor the NPF VI reserve accounts to ensure that they were maintained at the levels required by the Indenture. Chase also knew that it was failing to discharge this obligation. In May 1999, Marc Daly, an employee of Chase's Capital

Markets Fiduciary Services department, prepared a "Business Review" of the NPF VI Indenture and the management processes in place at Chase to administer NPF VI (and NPF XI). Daly's report was reviewed by the Chase trust officers responsible for the NPF VI relationship and Chase prepared a final report dated June 2, 1999 (the "Daly Report").

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 180A.

180B. The Daly Report stated the following conclusions and recommendations:

- "The NCFE program requires *monitoring* of the following five Cash Accounts (NPF VI and NPF XI): [listing Collection, Equity Reserve, Seller Credit, Offset, and Purchase accounts];"
- "In addition to its duties as Trustee, Chase CMFS Deal Administration *is contractually obligated to perform additional tasks which include* ***cash reconciliation****. One of the primary purposes of cash reconciliation is timely identification of early amortization events."* (italics added, bold type in original)
- "All five accounts are required to be adequately funded to prevent Amortization Triggers…*The task of not performing complete and frequent account reconciliations is that early amortization events will not be identified timely. WE ARE THE ONLY ONES REALLY WATCHING THE DEAL. IF WE DON'T IDENTIFY THE AMORT EVENTS THEN THEY WILL PASS UNNOTICED*." (italics added, all caps in the original).
- "At present, Deal Administration Performs reconciliations on only two of the five cash accounts – the Purchase and Collection Accounts"
- "A weekly reconciliation should be performed for all program accounts against NCF's books *to ensure account balances are at or above expected program requirements*."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 180B.

180C. Notwithstanding Chase's own recognition that it was obligated to monitor compliance of NPF VI Reserve Accounts but that as of June 1999 it was not doing so, Chase changed nothing made no effort to heed the warnings in the Daly Report. Rather, Chase continued to assist the Founders and the other Defendants in their scheme to loot NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 180C.

**a. The NPF VI Reserve Accounts Were Continuously in Default Throughout the Term of Chase's Service as Indenture Trustee**

181. The NPF VI program was in a near-continuous state of default *(t. e.* Events of Default had occurred and were continuing) throughout the time that Chase served as trustee under the NPF VI Indenture. First among the reasons for these pervasive defaults was the failure of the NPF VI Reserve Accounts to be maintained at the specified minimum balances required by the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 181, except to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of the document for the complete and actual description of its contents.

182. For example, from November 1999 to April 2001, the NPF VI Equity Account fell below its required minimum balance on over 400 separate occasions. In each instance, the cause of the shortfalls in the Equity Account was the unauthorized and improper withdrawals carried

out by Chase at the direction of the Servicer. Thereafter, the balance in the Equity Account continued to be routinely and improperly drained of funds by Chase such that its balance was rarely in compliance with the minimum requirements of the Indenture. In each instance, these shortfalls were caused by Chase executing improper transfers from this account -- transfers it knew it had no authority to carry out.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 182, except states that to the extent the UAT relies on NPF VI's bank statements, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

183. These deficiencies were not minor or immaterial. For instance, in March 2000, the required minimum balance in the Equity Account was $68.7 million, yet the average daily balance in the account in this month was only $36 million, with the balance dropping as low as $20.3 million. Similarly, in December 2000, the required minimum balance in the Seller Credit Reserve was $67.8 million, yet the average daily balance in the account in this month was only $5.8 million **--** and at one point dropped to a mere $63,905.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 183, except states that to the extent the UAT relies on NPF VI's bank statements, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

184. The looting of the Equity Account reached such a chronic point that on September 13, 2000, at a time when the minimum required balance for the Equity Account was over $67.8 million, the balance in this account fell to <u>a negative $185,671</u>. This pattern continued throughout the term of Chase's service as NPF VI Indenture Trustee, yet it took no action, gave

no notices, and declared no defaults or amortization events.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 184, except states that to the extent the UAT relies on NPF VI's bank statements, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

185. The NPF VI Seller Credit Reserve Account was likewise routinely and improperly drained of funds causing it to remain below the minimum balance specified in the NPF VI Indenture for most times between June 1998 and November 2002. For example, in the first six (6) months following the execution of the NPF VI Indenture, the NPF VI Seller Credit Reserve Account fell below its required minimum balance on 69 separate occasions. In the first six (6) months of 1999, the NPF VI Seller Credit Reserve Account fell below its required minimum balance on 101 separate occasions. From December 1999 to April 2001, the NPF Seller Credit Reserve Account fell below the required minimum balance on 500 days. Thereafter, the balance in the Seller Credit Account continued to be routinely, and improperly, drained of funds by Chase such that its balance was rarely in compliance with the minimum requirements of the Indenture. In each instance, these shortfalls were caused by Chase executing improper transfers from this account -- transfers that it knew it had no authority to carry out.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 185, except states that to the extent the UAT relies on NPF VI's bank statements, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

186. These deficiencies were not minor or immaterial. For instance, in August 2000, the required minimum balance in the Seller Credit Reserve was $49.9 million, yet the average daily

balance in the account in this month was only $6.4 million, with at one point the balance dropping as low as $137,271. Similarly, in March 2001, the required minimum balance in the Seller Credit Reserve was $50 million, yet the average daily balance in the account in this month was only $11 million, with at one point the balance dropping as low as $66,496.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 186, except states that to the extent the UAT relies on NPF VI's bank statements, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

187. As with the Equity Account, the looting of the Seller Credit Reserve was so pervasive that on February 24, 1999, at a time when the minimum specified balance for the Seller Credit Account was over $38 million, the balance in this account fell to a negative $334.654. At no time, in the entire month of February 1999, did the balance in the NPF VI Seller Credit Reserve Account meet or exceed the minimum balance specified in the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 187, except states that to the extent the UAT relies on NPF VI's bank statements, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

188. The NPF VI Offset Reserve Account was also routinely, and improperly drained of funds causing it to remain below the minimum balance specified in the NPF VI Indenture for most times between June 1998 and November 2002. For example, in the first seven months following the execution of the NPF VI Indenture, from June 1998 to December 1998, the NPF VI Offset Reserve Account fell below its required minimum balance on 64 separate occasions.

In the first six (6) months of 1999, the NPF VI Offset Reserve Account fell below its required minimum balance on 101 separate occasions. From December 1999 to April 200 1, the NPF Seller Credit Reserve Account fell below the required minimum balance on 446 days. Thereafter, the balance in the Offset Reserve Account continued to be routinely, and improperly, drained of funds by Chase such that its balance was rarely in compliance with the minimum requirements of the Indenture. In each instance, these shortfalls were caused by Chase executing improper transfers from this account, that it had no authority to carry out. This pattern continued throughout the term of Chase's service as NPF VI Indenture Trustee, yet it took no action, gave no notices, and declared no defaults or amortization events.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 188, except states that to the extent the UAT relies on NPF VI's bank statements, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**b. Chase Had Actual Knowledge that the NPF VI Reserve Accounts Were Not Maintained at their Required Minimum Levels Throughout Its Term of Service as NPF VI Indenture Trustee**

189. Throughout the term of its service as Trustee under the NPF VI Indenture, from June 1, 1998 to November 18, 2002, Chase had actual knowledge, from a number of sources, of the near continuous state of non-compliance of the NPF VI Reserve Accounts. For instance, the Servicer was required to deliver weekly Collateral Coverage Reports to Chase stating the balances in the NPF VI Reserve Accounts. Because the NPF VI Reserve Accounts were rarely maintained at levels at or above the minimum balances specified in the NPF VI Indenture, these Collateral Coverage Reports routinely reported and disclosed to Chase that each of the NPF VI Reserve Accounts were out of compliance with the Indenture. Pursuant to the terms of the

Indenture, Chase was required to review and recalculate the Collateral Coverage Reports. Accordingly, Chase repeatedly had and obtained actual knowledge that the NPF Reserve Accounts were routinely maintained at levels below the specified minimum balances in the NPF VI Indenture from the Collateral Coverage reports.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 189, except states that to the extent the UAT relies on the NPF Indenture, NPF VI's bank account statements and collateral coverage reports referenced in paragraph 189, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

190. For example, from May 1999 to October 1999, Chase received twenty two (22) weekly Collateral Coverage Reports from the Servicer reporting that the NPF VI Seller Credit Reserve Account was below the minimum balance specified in the NPF VI Indenture. In October 1999 alone, Chase received, reviewed, and recalculated four consecutive weekly Collateral Coverage Reports, each of which reported that the Seller Credit Reserve Account balance was only 40% of the required minimum balance, a $30 million shortfall for each report.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 190, except states that to the extent the UAT relies on the NPF Indenture, NPF VI's bank account statements and collateral coverage reports referenced in paragraph 190, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

191. The graph below plots the balances in the NPF VI Seller Credit Reserve Account from April 16, 1999 to October 22, 1999 as reflected in the Collateral Coverage Reports and Investor Reports provided to Chase by the Servicer against the required minimum balance. The

graph -- prepared from information in Chase's records -- clearly demonstrates both that Chase was well aware that the NPF VI Reserve Accounts were routinely maintained below the specified minimum balances, and that they were only brought into momentary apparent compliance on the last day of the month for the purpose of preparing a misleading Investor Report.




Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 191, except states that to the extent the UAT relies on the Investor Reports, NPF VI's bank account statements and collateral coverage reports referenced in paragraph 191, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

192. The same pattern held true throughout the period from June 1, 1998 to November 18, 2002 with the weekly collateral coverage reports routinely reporting non-compliance in all of the NPF VI Reserve Accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 192, except states that to the extent the UAT relies on the collateral coverage reports referenced in paragraph 192, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

193. At various times, the Investor Reports provided by the Servicer to Chase also reported that the NPF VI Reserve Accounts were below the minimum balances specified in the Indenture. For example, as discussed in more detail, *infra*, the "Revised" Investor Report for February 1999 reported that both the NPF VI Seller Credit Reserve Account and the Equity Account were well below their minimum permitted balances as of the reporting date. Similarly, the September and October 1999 Investor Reports each reported that the NPF VI Seller Credit Reserve Account was below the minimum permitted balances as of the reporting date.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 193, except states that to the extent the UAT relies on the Investor Reports referenced in paragraph 193, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

194. Chase's actual knowledge that the NPF VI Reserve Accounts were routinely maintained at levels well below the required minimum balances was not limited to reports provided by the Servicer. Indeed, the accounts at issue were Chase accounts to which Chase had constant and ready access to balance information. The Chase Trust Officers, who were the individuals responsible for compliance with the Indenture within Chase, received constant and continuous reports on the NPF VI Reserve Accounts and their balances. For example, each day, Chase and the Servicer would communicate by phone or email to reconcile and balance their calculations of the balances in all of the NPF VI Trust Accounts, including the NPF VI Reserve Accounts. Thus, it was impossible to conceal the actual balances in these accounts from Chase, who was constantly reviewing and working with the NPF VI Reserve Account Balances.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 194.

195. In addition, Chase generated, as a routine matter, monthly reports that were circulated to the Trust Officers stating the average monthly balance for each of the NPF VI Reserve Accounts. These reports made abundantly clear that the NPF VI Reserve Accounts were routinely maintained below the minimum balances specified in the NPF VI Indenture. For example, the October 1999 report shows that the average balance in each of the NPF VI Reserve Accounts was below the specified minimum balance provided in the Indenture. With respect to the Seller Credit Reserve account, the October 1999 report indicates that the average balance was less than half of the specified minimum.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 195, except states that to the extent the UAT relies on internal Chase reports and NPF VI bank account statements referenced in paragraph 195, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

196. Similarly, on November 21, 2001, Jonathon Ravens, the Chase administrator for the NPF VI Program, sent an email to Robert Snyder, a Chase vice president, and Jennifer Baran, the Chase Trust Officer responsible for indenture compliance for NPF VI. The email reports the average balances for the months of August, September, and October 2001 with the note, "Hope this helps." The average balances reported, when compared with the required balances, dramatically illustrate the chronic and persistent deficiencies in the NPF VI Reserve Accounts, as well as Chase's clear knowledge of them, as illustrated below:

**Seller Credit Reserve Account**

| Month | Required Balance | Avg. Balance | Shortfall | % Shortfall |
|---|---|---|---|---|
| 08/01 | $50.5 million | $17.1 million | $33.4 million | 66.1% |
| 09/01 | $54.1 million | $39.6 million | $14.5 million | 26.8% |
| 10/01 | $56.4 million | $53.3 million | $1.4 million | 2.5% |

**Equity Account**

| Month | Required Balance | Avg. Balance | Shortfall | % Shortfall |
|---|---|---|---|---|
| 08/01 | $66.0 million | $65.5 million | $.5 million | 0.1% |
| 09/01 | $70.7 million | $50.4 million | $20.3 million | 28.7% |
| 10/01 | $73.3 million | $29.9 million | $43.4 million | 59.2% |

**Offset Reserve Account**

| Month | Required Balance | Avg. Balance | Shortfall | % Shortfall |
|---|---|---|---|---|
| 08/01 | $15.5 million | $8.3 million | $7.2 million | 46.5% |
| 09/01 | $16.6 million | $11.1 million | $5.5 million | 33.1% |
| 10/01 | $17.3 million | $15.6 million | $1.7 million | 9.9% |

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 196, except states that to the extent the UAT relies on internal Chase reports and NPF VI bank account statements referenced in paragraph 196, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

197. This email was sent and received on the morning of the day that the October 2001 Investor Report was delivered by the Servicer. On information and belief, this information was requested in order to review the present and recent compliance status of the NPF VI Reserve Accounts. As the above table illustrates, the information that Mr. Snyder and Ms. Baran received on this date made clear that the NPF VI Reserves were routinely being maintained below the minimum balances specified in the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 197, except states that to the extent the UAT relies on the NPF VI

Indenture, an internal Chase email and NPF VI bank account statements referenced in paragraph 197, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

198. Moreover, it was the pattern and practice of the Servicer, consistent with its agreements with Chase: (a) to transfer large sums of cash into the NPF VI Reserve Accounts on or just before the last day of the month, then (b) to prepare an Investor Report based on these transient balances, and then (c) to transfer most or all of the cash back out of the reserve accounts on or about the first day of the following month. Each of these transfers was carried out by Chase, like clockwork, on the instructions of the Servicer, virtually every month, under the watchful eye of the Chase Trust Officers. Bank One, which was dependent upon similar interstate kiting transfers from NPF VI to "meet" the reserve requirements under the NPF XII Indenture, actively facilitated and conspired with Chase and the Founders in this continuous -- and wholly fraudulent -- conduct. It is simply impossible that the Chase Trust Officers did not notice this painfully apparent pattern, making clear that the NPF VI Reserve Accounts were routinely maintained far below the specified minimum balances in the NPF VI Indenture but were only brought up to this level once a month -- through kited transfers from Bank One -- in order to prepare misleading Investor Reports. There was, of course, no need to conceal these reserve deficiencies from Chase given that it had already agreed, as discussed above, to ignore these Events of Default and take no action to address them regardless of its obligations under the Indenture.

Paragraph 198 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 198, except states that to the extent the UAT

relies on the Investor Reports and NPF Bank account statements referenced in paragraph 198, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

199. The extent to which Chase would go in order to participate and lend assistance to the looting of the NPF VI accounts is well illustrated by the events surrounding the February 1999 Investor Report. On March 29, 1999 Chase received the NPF VI Investor Report from the Servicer for the month of February 1999 (the "2/99 Report"). The account balances were stated in the 2/99 Report as of 02/28/99. When delivered, the 2/99 Report was 9 days past due, an Event of Servicer Default. As of the same date, the Servicer had failed to deliver, over the past four months, all of the required 18 weekly Collateral Coverage Reports. Each failure to do so was also a Servicer Event of Default.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 199, except states that to the extent the UAT relies on the February 1999 Investor Reports and collateral coverage reports referenced in paragraph 199, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

200. The 2/99 Report stated that the balances in the NPF VI Reserve Accounts were greater than or equal to the minimum balances specified in the NPF VI Indenture as of that date. The 2/99 Report also stated that the Collateral Coverage Test had been met as of that date. Each of these statements in the 2/99 Report was false. The balances in the NPF VI Reserve Accounts were not greater than or equal to the minimum balances specified in the NPF VI Indenture as of that date. Instead, two of these accounts-the two with the highest minimum balances-were woefully short. In addition, the Collateral Coverage Test had not been met as of that date.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 200, except states that to the extent the UAT relies on the NPF VI Indenture, the February 1999 Investor Report and NPF VI bank account statements referenced in paragraph 200, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

201. Chase recognized and knew, on March 29, 1999 when it received the 2/99 Report, that the account balances stated in it were false. A contemporaneous internal Chase memorandum notes that the report was identified as being inaccurate on the day it was received. On March 29, 1999, Chase compared the 2/99 Report to its own account balance records and learned, and thereby had actual knowledge, that contrary to the false 2/99 Report: (a) the Seller Credit Reserve Account balance was one quarter (1/4) of its required minimum as of the measurement date, a $28.5 million shortfall; (b) the Equity Account was 20% under its minimum required balance, a shortfall of $11 million; and (c) the Equity Account was below the specified minimum balance on each day between and including February 28, 1999 and March 29, 1999, and the Seller Credit Reserve Account was below the specified minimum balance on each day between and including February 28,1999 and March 28, 1999. Each of these reserve shortfalls was an Event of Default, triggering Chase's obligation to act under the "prudent man" standard in determining what action it should or was required to take.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 201, except states that to the extent the UAT relies on an internal Chase memorandum, the February 1999 Investor Report and NPF VI bank account statements referenced in paragraph 201, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

202. On the next day, March 30, 1999, Tara Sweeny (the Trust Officer responsible for ensuring Chase's compliance with its obligations under the NPF VI Indenture) verified with the Servicer that the Servicer's own internal accounting reflected that the 2/99 Report was false and that the reserve deficiencies described above were present.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 202.

203. Because Chase knew on 3/29/99 that the Equity Account balance was $28.5 million below the specified minimum as of the month end February Monthly Payment Date, as well as in the seven days thereafter, and remained below the minimum level as of 3/29/99, Chase was obligated under the NPF VI Indenture to give immediate notice of this Event of Default to the Servicer and declare a Principal Amortization Event on the next business day. Chase gave no such notice nor did it declare a Principal Amortization Event.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 203, except states that to the extent the UAT relies on the NPF VI Indenture and NPF VI bank account statements referenced in paragraph 203, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

204. Realizing that the 2/99 Report was false, Chase requested that the Servicer issue a "Revised" report for the month-end February 1999 time period (the "Revised Report"). The Revised Report accurately reported the account balances and accurately reported that the Seller Credit Reserve Account balance was a quarter (1/4) of its required minimum as of the measurement date, a $28.5 million shortfall, and the Equity Account was 20% under its minimum required balance, a shortfall of $11 million. The Revised Report also accurately reported that the Collateral Coverage test was not met as of 2/28/99. This was the second notice

to Chase in a single month, that it was required to declare an Event of Default. Consistent with its wrongful agreement, Chase again breached its duty and deliberately did not declare a default.

Paragraph 204 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 204, except states that to the extent the UAT relies on the Investor Reports referenced in paragraph 204, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

205. On April 6, 1999, the Servicer issued an Investor Report for the month-end March 1999 period, this one more than ten days *early.* Poulsen claimed that it demonstrated that the NPF VI Reserve Accounts were then compliant and that the Collateral Coverage test was now met. On April 7, 1999, Poulsen prepared and forwarded a letter to Chase and the Duff & Phelps rating agency purporting to explain the reason for the shortfalls and compliance failures reflected in the Revised Report. Poulsen sent this letter from Ohio to Duff & Phelps in Illinois by interstate facsimile transmission. Poulsen claimed that the reason for the shortfalls were "timing" issues dealing with "in-transit" receivables, supposedly purchased just prior to month-end February, that were not posted to the system such that the corresponding allocations of funds from the Purchase Account to the Equity Account and Seller Credit Reserve Account were not made until after month-end February. Poulsen stated in his letter that "the Trustee had found no event of default and we, the Servicer, concurred with that analysis," and that "at no time did we have an uncured event of default."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 205, except states that to the extent the UAT relies on the April 6, 1999 Investor Report and an April 7, 1999 letter referenced in paragraph 205, Defendant Ayers refers

to the text of those documents for the complete and actual description of its contents.

206. When Chase received the 4/7/99 letter from Poulsen it knew that the statements and explanation contained in it were false. Chase knew from its own account records that the sums on deposit in the NPF VI Seller Credit and Equity Accounts had in fact decreased throughout the month of March 1999. Chase knew that the Seller Credit and Equity accounts had not received funds necessary to meet their specified minimum balances until March 30, 1999, four days after a note issuance by NPF VI had made $180 million in additional cash available to the Servicer. Chase also knew and understood that, given the size of the shortfalls in the Seller Credit Reserve Account and the Equity Account, the explanation given by Poulsen could not possibly have explained the deficiencies in the reserves. Chase knew that Poulsen's statement that Chase had found no event of default, and that at no time was there an uncured event of default, were each false lulling letters because there had been such defaults. Chase made no effort to correct these statements or to attempt to determine the actual cause of the reserve shortfalls and the failure of the Collateral Coverage Test. Chase made no such effort because it knew that the actual reason for the shortfall was that Chase, acting on the unauthorized instructions of the Servicer, had improperly withdrawn funds from the Seller Credit Reserve Account and Equity Account and transferred those sums to Sellers. Likewise, Chase knew that the reserve deficiencies had not been cured by "in-transit" receivables being properly allocated after month-end February 1999, but rather that the deficiencies had only been cured by using funds from the March 26, 1999 $180 million note issuance. Chase knew that, without the $180 million in new funds, the reserve deficiencies and the failure of the Collateral Coverage Test could not have been remedied. Because these violations of the Indenture were consistent with the arrangement and agreement reached by Chase, the Servicer, and Poulsen prior to the execution of

the NPF VI Indenture, Chase took no further action, gave no notices, and declared no defaults or principal amortization events.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 206, except states that to the extent the UAT relies on the NPF VI bank account statements referenced in paragraph 206, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

206A. Chase did not just suspect that the explanations provided by Poulsen to the rating agencies about the February 1999 reserve shortfalls were false--Chase knew. On April 6, 1999, Tara Sweeney, the day-to-day NPF VI trust officer wrote to Chase officers Thomas Mackay, Robert Snyder, and Vada Haight responding to Poulsen's letter to rating agencies, "I don't think that letter from Lance is going to answer too many questions (which may be obvious not obvious)." On April 29, 1999, Sweeney again wrote to Mackay, Snyder, and Haight and made her views more clear:

> there is nothing wrong with the way that money is received from the lockbox banks or the way that it is reconciled. *Lance is just blowing smoke in an attempt to distract the rating agencies.* We need to discuss the fact that "money in transit" does not qualify as trust funds on hand to satisfy collateral coverage tests.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 206A.

206B. Notwithstanding Chase's knowledge that Poulsen's explanation to the rating agencies was a fraud meant only to "distract" them and that the Servicer was fraudulently covering up Events of Default, Chase did nothing. Worse, it muzzled its employees, instructing them to say nothing to the rating agencies lest the Defendants' fraud be revealed. Sweeney confirmed her marching orders from Chase officer Robert Snyder in an e-mail, "I will keep my mouth shut."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 206B.

### 3. Chase Actively and Knowingly Participates in the Interstate Kiting of Funds Between the NPF VI Trust Account Held at Chase and the NPF XII Trust Accounts Held at Bank One

207. By late 1999, the NPF VI Trust Accounts at Chase began to run even lower as a result of the continuous looting that had occurred in them since the NPF VI Indenture had been executed more than a year before. The balances were so low by this time that it was no longer possible, as had been done in the past, to scrape together enough cash in the NPF VI Reserve Accounts at the end of the month so that misleading Investor Reports could be prepared suggesting that the reserve accounts were being maintained at or above the minimum balances required by the NPF VI Indenture. Large amounts of additional cash were needed to continue to conceal the reserve defaults.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 207, except states that to the extent the UAT relies on the NPF VI Indenture and NPF bank account statements referenced in paragraph 207, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

208. To solve this problem, a scheme was hatched no later than late 1999 by Poulsen and the Servicer, and was then joined by Chase and Bank One, whereby huge sums of cash would be transferred by interstate bank wires from the NPF XII Trust accounts at Bank One in Ohio to the NPF VI accounts at Chase in New York on or before the last day of the month. These funds would then hurriedly be deposited into the NPF VI Reserve Accounts in amounts sufficient to allow the reserves to meet their specified minimum reserves, albeit for only a day and only by using funds that were not the property of NPF VI. Investor Reports were then

prepared, falsely reporting compliance, and the funds were then transferred back from Ohio to New York -- again via interstate bank wires -- to the NPF XII accounts at Bank One, usually on the first day of the month (so that the Servicer could report the same funds on the NPF XII investor report). From November 1999 to October 2002, Bank One kited and fraudulently transferred in interstate commerce no less than ***$4.25 billion*** from NPF XII to the NPF VI Trust Accounts at Chase, an average of $121.5 million each month. In the same time period, Chase kited and fraudulently transferred in interstate commerce ***$4.18 billion*** from the NPF VI Trust Accounts back to the NPF XII Trust Accounts at Bank One, an average of $119.4 million each month.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 208, except states that to the extent the UAT relies on the NPF bank account statements referenced in paragraph 208, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

209. At all times from November 1999 to October 2000, Chase had actual knowledge of this continuous pattern of fraudulent interstate transfers back and forth between the NPF VI and NPF XII accounts. Given their magnitude and regularity, it is apparent, as Chase's designated corporate representative has testified, that the responsible Chase officers "must have been aware" these transfers were occurring and had become a permanent monthly feature of the operation of the NPF VI program since October 1999. Bank One was similarly aware of and actively participated in this continuous pattern of wholly fraudulent, interstate transfers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 209, except states that to the extent the UAT relies on the NPF bank account statements referenced in paragraph 209, Defendant Ayers refers to the text of those

documents for the complete and actual description of its contents.

210. Contemporaneous documents confirm each of the Trustees knew about and conspired to make these fraudulent transfers. Each transfer from Bank One to the NPF VI accounts was recorded and reflected in the "Lockbox Receipts Report" prepared by the Servicer and delivered to Chase on a daily basis, as required by the NPF VI Indenture. The Lockbox Receipts Reports were intended to report the money being deposited on a daily basis in the NPF VI Collection Account from the collections on purchased receivables. Chase was required by the Indenture to review the daily Lockbox Receipts Reports and match it with Chase's own records to verify that the deposits it had received were consistent with those reported by the Servicer. Almost without exception, the Bank One transfers were by far the largest deposits on the Lockbox Receipts Reports. For instance, the Lockbox Receipts Report for October 29, 1999 reports 24 deposits for that day, totaling $61.8 million. Of this total $57.1 million, or 92%, is attributable to three deposits received by interstate wire from Bank One. The Lockbox Receipts Report for May 31, 2000 reports 40 deposits for that day, totaling $61.5 million. Of this total $60.4 million, or 98%, is attributable to one interstate wire deposit from Bank One. The Lockbox Receipts Report for August 31, 2000 reports 29 deposits for that day, totaling $82.2 million. Of this total $79.7 million, or 97%, is attributable to two interstate wire deposits from Bank One.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 210, except states that to the extent the UAT relies on the NPF VI Indenture and NPF bank account statements referenced in paragraph 210, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

211. The forgoing examples are not aberrations. Rather, they were part and parcel of a

consistent, continuous pattern of racketeering activity that continued literally for years. Each time Chase received the large interstate transfers from Bank One, they conspicuously dwarfed all other incoming deposits as reported on the Lockbox Receipts Report for that day. The Bank One deposits also stood out on the Lockbox Receipt Reports for another reason. With the exception of the Bank One deposits, for each deposit listed on the report, the seller of the receivable that had been collected is identified and an indication is made that the funds were transferred from Huntington Bank (the bank holding the "lockboxes" that receive collections on purchased receivables). Neither of these hold true for the oversized Bank One deposits, where no seller is identified, because there was none (the notation "Reconciliation" is substituted), and it is indicated that the funds have been received from Bank One -- whom Chase knew to be the NPF XII Trustee.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 211, except states that to the extent the UAT relies on the NPF VI Indenture and NPF bank account statements referenced in paragraph 211, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

212. Chase's contemporaneous email communications with the Servicer reflect that Chase was well aware of the large interstate wire transfers from Bank One. For example, the following are examples of representative emails between Chase in New York and the Servicer in Ohio regarding interstate wire fund transfers being sent to Chase in New York from Bank One in Ohio:

| To: | From | Date | Message |
|---|---|---|---|
| Chase | Servicer | 05/02/02 | "You'll receive a wire from Bank One for $115,199,394." |
| Chase | Servicer | 06/28/02 | "You'll be receiving more money from Bank One. A memo for $29,161.58. Also $210,461,152.86. |
| Chase | Servicer | 07/31/02 | "Assuming that you get the wire from Bank One for $35,500,590.86, I have put yet ANOTHER transfer for this exact amount on the Internet." |
| Servicer | Chase | 08/30/02 | "The 76mm is in" (with attachment showing funds received are from Bank One) |
| Chase | Servicer | 09/04/02 | "[Y]ou will be receiving a wire from Bank One for $55,544,725.12." |
| Chase | Servicer | 09/30/02 | "You will be receiving a wire from Bank One for $124,400.742.12." |

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 212.

213. The Chase recipients and senders of these emails include Jennifer Baran, Jonathon Ravens, Maria Inoa, and Randy Kahn.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 213.

214. Chase had actual knowledge that the purpose of the large, month-end, interstate transfers of cash from Bank One to the NPF VI accounts at Chase was to fill the NPF VI Reserve Accounts at the end of the month in order to permit the conspirators to create misleading investor reports that "demonstrate" compliance with the minimum specified balances in the NPF VI Indenture, when in fact Chase knew the reserves were routinely maintained below these mandatory minimums. Numerous Daily DDA Account Transaction Forms, executed and approved by Chase trust officers including the Trust Officers, demonstrate that upon receipt of the Bank One transfers, the funds were quickly parceled off to the NPF VI Reserve Accounts and

then transferred out again immediately, by interstate wire, on the first of the month.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 214.

215. Chase also knew that the funds it was receiving from and returning to Bank One were the proceeds of a fraud, because Chase knew they originated in NPF XII trust accounts. Contemporaneous documents reflect Chase's clear knowledge that the large transfers back to Bank One that it was sending, after having parked the cash in the NPF VI Reserve Funds for the last day of the month, were directed to the NPF XII trust accounts. Wire transfers at Chase were accomplished by preparing a form known as the "Corporate Trust Services Money Transfer Memorandum" (the "Money Transfer Memos"). Numerous of the Money Transfer Memos prepared for large transfers of cash to Bank One expressly note that they are being directed to "XII Collection." The following are representative examples: (a) 10/28/99 transfer for $12,305,859; (b) 11/01/99 transfer of $41,255,800; (c) 02/01/00 transfer of $56,000,000; (d) 03/01/00 transfer of $23,700,000; (e) 10/02/00 transfer of $27,111,351; (f) 01/31/01 transfer of $26,402,212; and (g) 04/02/01 transfers totaling (4) $95,139,630. These Money Transfer Memos were each executed and approved by two or more Chase trust officers, including Jeannie Chin, Mark McDermott; Vada Haight, Kristin Driscoll, Jennifer Baran, Wen Hao Wang, Michael A. Smith, vice president, Kevin Crombie, assistant vice president, and Patricia Russo, vice president.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 215.

216. Chase knew that the reason it was consistently instructed to return the NPF XII funds to Bank One was so that NPF XII could use the same fraudulent funds to prepare its own

Investor Reports, measuring reserve balances as of the first day of the month, in order to create the identical, misleading impression that the NPF XII Reserve Accounts were maintained at or above the minimum specified balances in the NPF XII Indenture, when in fact such reserves were routinely maintained below these mandatory minimums. Chase knew that the NPF XII Indenture was a virtual carbon copy of the NPF VI Indenture, with the same reserve requirements as NPF VI and similar monthly reporting requirements. Moreover, numerous communications between Chase and the Servicer reflect Chase's understanding that it was imperative that the funds transferred from Bank One be kited right back to NPF XII *before the close of business on the first business day of the month.* For example, a 03/01/00 email from the Servicer to Jeannie Chin at Chase inquires about a $75,000,000 kiting transfer from NPF VI to NPF XII at Bank One and states "I have a 2:00 investment deadline today. As of 1 :30 these wires have not been received by Bank One. Will you please call your wire room for the status of each?" Similarly, a September 1, 2000 email from the Servicer to Jeannie Chin and Maria Inoa at Chase states "[t]he wires that are going to Bank One XII Col need to be there by 2 pm. I hope this will not be a problem. (out of VI) Please see that these get out ASAP."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 216.

217. This fraudulent movement of funds between the NPF VI accounts at Chase and the NPF XII accounts at Bank One served a critical, shared, fraudulent purpose: it created the false impression that NPF VI Reserve Account balances existed, when they were in fact non-existent. This practice otherwise known as kiting was not only a fraud on NPF VI (and the users of its Investor Reports), it also violated numerous provisions of the NPF VI Indenture. The Indenture expressly prohibits transactions between NPF VI and affiliates of NCFE, such as NPF XII.

Chase knew that and willfully disregarded it in order to effectuate and assist the fraudulent scheme to loot NPF VI. Moreover, it is a breach of the Indenture and an Event of Default for the assets of NPF VI to be commingled with an affiliate of NCFE, such as NPF XII. There is no conceivable proper purpose under the indenture for tens of millions, and sometimes hundreds of millions, of dollars to be stripped from the NPF VI Reserve Accounts on the first day of the month, bundled together in the NPF VI Purchase Account, wired transferred in interstate commerce, in bulk, to NPF XII accounts at Bank One. Chase knew about the fraudulent kiting of funds between the NPF VI and NPF XII programs, and its own active participation and facilitation in the kiting scheme, through a consistent, continuous pattern of fraudulent interstate wires directly facilitated and allowed the looting of NPF VI assets. Chase intended this result, as is evident from its actions in furthering and facilitating the kiting scheme, as well as the other innumerable breaches and violations of the terms of the NPF VI Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 217, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

**4. Chase Accepts Invalid and Improper Investor Reports in Violation of the Terms of the NPF VI Indenture in Order to Facilitate the Kiting Scheme and to Conceal the Conspiracy to Loot the NPF VI Assets**

218. Many of the compliance tests in the NPF VI Indenture, as well as many of the Indenture Trustee's monitoring obligations, involve the "Monthly Payment Date." This term is defined in the Indenture as the first business day of each month.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 218, except states that to the extent the UAT relies on the NPF VI

Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

219. Pursuant to Section 7.01 G) of the NPF VI Indenture, Chase was required to determine, based on the Investor Report provided by the Servicer, whether the NPF VI Equity Account was being maintained at the specified minimum balance called for by the NPF VI Indenture as of the Monthly Payment Date. Although this was not the exclusive obligation of Chase with respect to monitoring the NPF VI Equity Account, it was an important function given that, pursuant to Section 6.06 of the Indenture, no funds were to be withdrawn from the Equity Account other than on a Monthly Payment Date. Thus, provided that the limitations of Section 6.06 were adhered to (and they were not), monitoring the Equity Account on the Monthly Payment Date would be an effective method for insuring compliance with the minimum balance requirements of the Equity Account.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 219, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

220. The Collateral Coverage Test of Section 7.01(k) of the NPF VI Indenture was also tied to the Monthly Payment Date. Likewise, the Defaulted and Rejected Receivables Ratio was tied to the first day of the month.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 220, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

221. Under the NPF VI Indenture, the Investor Report was one tool, of many, to be used by the Trustee in connection with certain of its monitoring obligations. The Investor Report was required to report, as of the Monthly Payment Date (the first business day of the month), on the balances in the NPF VI Reserve Accounts, on the Defaulted and Rejected receivables ratios, on the Seller Concentrations in the programs, and on compliance, or lack thereof, with the Collateral Coverage Test. If the Servicer failed to deliver an Investor Report, or delivered an inaccurate Investor Report, the Trustee would be significantly hampered in its ability to carry out its obligations under the NPF VI Indenture. For this reason, a failure by the Servicer to deliver an Investor Report by the 15th business day of the month constitutes an express Event of Servicer Default.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 221, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

222. Chase knew that the Servicer continuously and repeatedly breached its obligation to deliver an appropriate Investor Report, in that each and every Investor Report issued by the Servicer to Chase measured the NPF VI Reserve Balances, calculated the Collateral Coverage test, calculated the Defaulted and Rejected Ratios, and determined Concentration requirements by measuring each of these items as of the last day of the month, rather than on the required Monthly Payment Date, which was the first business day of the month (a fact that made possible the kiting with NPF XII, because its reports were actually due on the first day).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 222.

223. Despite this failure, Chase never questioned the Investor Reports submitted to it and never insisted that proper reports, measuring the relevant items as of the proper date, be issued. Thus, Chase breached each and every one of its obligations to monitor the performance of the NPF VI program and the maintenance of the NPF VI collateral, including the reserve requirements, all of which were tied to the Monthly Payment Date. Chase's unauthorized and continuous acceptance of Investor Reports that failed to reflect the status of the NPF VI program and accounts as of the required Monthly Payment Date facilitated the kiting scheme described above. Like the NPF VI Indenture, the NPF XII Indenture required the submission of an Investor Report that measures compliance as of the Monthly Payment Date, which was the first business day of the month. The requirement to test both programs on *the same day,* as was specified in both Indentures, would have prevented the kiting scheme, but the Trustees and the Founders willfully and continually breached that requirement. It was only by improperly and without authorization changing the measurement date for NPF VI to the last day of the month that the Servicer, the Founders, and Chase could create a false and misleading impression of compliance in NPF VI on one day, and then use the same dollars to simulate compliance in NPF XII on the next. That is precisely what they agreed to do and it is precisely what they did **--** regardless of the fact that it was illegal. Chase's acceptance of Investor Reports that were not tied to the Monthly Payment date is another obvious example of Chase's complete and utter disregard of its most straightforward obligations under the NPF VI Indenture and conclusively establishes its fraudulent intent to conspiracy. Chase had actual knowledge of the requirement in the Indenture that the Investor Reports be submitted as of the first day of the month. Chase also had knowledge that certain of its monitoring obligations were tied to the first day of the month. Nonetheless, in order to further the scheme to defraud NPF VI, Chase ignored those obligations.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 223, except states that to the extent the UAT relies on the NPF VI and NPF XII Indentures, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

**5. Chase Transfers or Withdrawn Funds From the NPF VI Accounts for Purposes that It Knows Are Not Permitted Under the NPF VI Indenture**

224. Throughout the term of the NPF VI Indenture, Chase repeatedly transferred funds to persons and entities that it had actual knowledge were not entitled to receive them, or for purposes that were expressly prohibited by the Indenture. In addition to the improper kiting and unauthorized transfers and withdrawals discussed elsewhere, Chase also knowingly transferred NPF VI trust funds: (a) for the purchase of ineligible receivables and (b) for the purchase of receivables from ineligible, affiliated sellers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 224.

**a. Ineligible Receivables**

225. The NPF VI Indenture expressly prohibits the transfer of NPF VI trust funds to any third person or entity (other than payment of Servicer and Trustee fees) for any purpose not directly connected with the purchase and collection of "Eligible Receivables." Throughout the time that Chase served as NPF VI Trustee, it knew about this restriction, which is expressly spelled out in the Indenture and is at the very heart of the operation of the NPF VI program.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 225, except states to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its

contents.

226. Chase knew that it was transferring funds from the NPF VI trust accounts for at least two types of receivables that it knew were not Eligible Receivables ("Ineligible Receivables"): (a) Defaulted and Rejected Receivables; and (b) "pro forma" receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 226.

**i. Defaulted and Rejected Receivables**

227. Under the NPF VI Indenture, generally speaking, a Defaulted Receivable is a receivable, purchased from a Seller, that has not been fully collected within 180 days of the date that it was originally billed. The unpaid portion of any Defaulted Receivable is charged against the Seller and is reported as a Defaulted Receivable on the Investor Report for each month. The rate by which purchased receivables default was an important indicator of the performance of the NPF VI program. If the level of Defaulted Receivables for any month exceeded the levels specified in the Indenture, an Event of Default would occur.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 227, except states to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

228. Generally speaking, a Rejected Receivable is a receivable, purchased from a Seller, that has been determined to be out of compliance with the representations and warranties necessary to qualify as an Eligible Receivable. Where a receivable is determined to be a Rejected Receivable, it is charged against the Seller. Rejected Receivables are reported on the Monthly Investor Reports and are subtracted from the net value of purchased receivables used to

determine collateral coverage requirements.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 228, except states to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

229. Neither Defaulted Receivables nor Rejected Receivables may be purchased by NPF VI pursuant to the clear terms of the NPF VI Indenture. By definition, neither a Defaulted Receivable nor Rejected Receivable can qualify as an Eligible Receivable. Throughout the time that Chase served as NPF VI Trustee, it knew that Rejected and Defaulted Receivables were not eligible for purchase by NPF VI by virtue of its knowledge of the terms of the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 229, except states to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

230. No later than March 8, 2000, Chase was advised by Roger Faulkenberry of NCFE that, at the direction of the Servicer, NPF VI was re-purchasing receivables that had become Defaulted or Rejected Receivables. This communication was directed to and received by Robert Snyder, Chase vice president and Vada Haight, Chase vice president. The same information with respect to Rejected Receivables was again communicated to Chase, and received by Jennifer Baran, trust officer, on September 13, 2002. As a result, no later than March 8, 2000, Chase knew that the Servicer was improperly directing the re-purchase of Rejected and Defaulted Receivables -- in express violation of the Indentures. Notwithstanding this knowledge, Chase took no action to prevent it, gave no notices, and declared no events of default or principal

amortization events. To the contrary, it continued to allow the Servicer to misuse NPF VI Trust proceeds in this way and continued to participate in and facilitate this fraud by transferring money from the NPF VI trust accounts for this purpose. Worse yet, on September 13, 2002, Chase executed and delivered a confirmation letter to NCFE, for distribution to NCFE's auditors and potential equity investors, falsely "confirming" that the purchase of ineligible Defaulted and Rejected receivables was *permitted* under the NPF VI Indenture. Chase had no authority to unilaterally "amend" the Indenture in this fashion, yet it purported to do so as yet another overt act in furtherance of the fraudulent scheme to loot NPF VI.

Paragraph 230 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 230, except states that to the extent the UAT relies on the NPF VI Indenture and the September 13, 2002 “confirmation letter” referenced in paragraph 230, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**ii "Pro Forma" Receivables**

231. Generally speaking, a "pro forma receivable" is one that arises out of a contract between a healthcare provider and an insurance company or other payor. The amount due on such a "receivable" is the amount that the healthcare provider *expects* to be able to collect from the payor at the end of the month for services rendered pursuant to a contract. For example, in the nursing home setting, an insurer may enter into a contract to pay a fixed rate, per month, to the nursing home for each covered patient residing therein. In this example, the nursing home's *anticipated* right to payment at the end of the month, based on the number of covered patients in residence, at the beginning of the month is its "pro forma receivable."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 231, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

232. A "pro forma receivable" is not really a receivable at all. It is a *prediction* by a healthcare provider of a receivable that it *expects* to generate at the end of the month. No bill has been issued, no services have been provided, and it may well be that some, most, or even all of the anticipated "pro forma" amount may never become due and owing by the insurer. For example, if a nursing home for some reason were unable to continue doing business, due to a bankruptcy or other business disruption, the actual amount owed by an insurer could be significantly less than the predicted "pro forma" amount. As noted above, an Eligible Receivable was defined in the Indenture as a receivable for services that had already been provided by a health care provider. For these reasons, "pro forma receivables" cannot qualify as Eligible Receivables under the NPF VI Indenture. Chase demonstrated its understanding of this fact in early November 2002 (a time when the NPF VI Noteholders were scrutinizing Chase's actions) when it barred the Servicer from directing the transfer of NPF VI Trust Funds for the purchase of proforma receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 232, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

233. Notwithstanding this fact, throughout the term of the NPF VI Indenture, Chase transferred NPF VI trust fund assets to healthcare providers in return for the purchase of "pro

forma" receivables. No later than March 8, 2000, Chase was advised by Roger Faulkenberry of NCFE that, at the direction of the Servicer, NPF VI was purchasing "pro forma receivables." This communication was directed to and received by Robert Snyder, Chase vice president and Vada Haight, Chase vice president. The same information was again communicated to Chase, and received by Jennifer Baran, trust officer, on September 13,2002. As a result, no later than March 8,2000, Chase knew that the Servicer was improperly directing Chase to transfer NPF VI trust funds for the purchase of Ineligible Receivables. Notwithstanding this knowledge, Chase took no action to prevent it, gave no notices, and declared no events of default or principal amortization events. To the contrary, it continued to allow the Servicer to misuse NPF VI Trust proceeds in this way and continued to participate and facilitate this fraud by transferring money from the NPF VI trust accounts for this purpose. Worse yet, on September 13, 2002, Chase, through Jennifer Baran, executed and delivered a confirmation letter to NCFE, for distribution to NCFE's auditors and potential equity investors, falsely "confirming" that the purchase of ineligible pro forma receivables was permitted under the NPF VI Indenture. Chase had no right to purport to unilaterally amend the Indenture in this fashion, and it knew this statement was false when it made it -- but this was just one more in the near constant stream of fraudulent acts Chase committed in furtherance of the scheme to loot NPF VI.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 233, except states that to the extent the UAT relies on the NPF VI Indenture and the September 13, 2002 “confirmation letter” referenced in paragraph 233, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**b. Affiliated Sellers**

234. As set forth in detail below, the Founders and NCFE owned substantial interests in many of the Sellers in the NPF VI program (the "Affiliated Sellers"). The Founders and NCFE had acquired the vast majority of these interests in return for making unauthorized uncollateralized "advances" of funds from the NPF VI and XII Programs to distressed healthcare providers, who then provided equity and other ownership positions in return for these improper fundings. Chase knew that NPF VI was advancing funds to the Affiliated Sellers as a result of a series of meetings between Chase and Poulsen prior to the execution of the NPF VI Indenture on June 1, 1998. In these meetings, Poulsen disclosed to Chase the extent of the Founders' and NCFE's holdings in the Affiliated Sellers. In 1998, prior to the execution of the Indenture, and in each subsequent year, Poulsen met with representatives of Chase and provided Chase with detailed schedules setting forth the Founders and NCFE's holdings in the Affiliated Sellers, prepared in connection with the NCFE' s annual audit. In addition, in May 2000, Chase received extensive detailed reports listing all of the Founders and NCFE's ownership positions in the Affiliated Sellers. Thus, at all times during the term of its service under the NPF VI Indenture, Chase had actual knowledge of the identity of the Affiliated Sellers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 234.

235. Craig Kantor, a vice president of Chase charged with responsibility for managing the day-to-day administration of the Asset Backed Securities Trust unit at Chase, and the team leader responsible for the NPF VI trust relationship from 1999 to 2002, testified under oath in May 2003 that advances of funds to the Affiliated Sellers was not permitted under the terms of the NPF VI Indenture. In giving this testimony, Mr. Kantor was testifying on behalf of and as the

designated representative of Chase as NPF VI trustee. In November 2002, after Chase was aware that its conduct was being closely monitored by the NPF VI Noteholders, Chase refused to allow the Servicer to advance funds to affiliated sellers, finally enforcing this requirement after it had knowingly and intentionally ignored it for over four years.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 235.

236. Throughout the entire term of its service as trustee under the NPF VI Indenture, Chase transferred NPF VI trust funds to the Affiliated Sellers on the instructions of the Servicer. In connection with each such transfer, Chase knew that such each such Affiliated Seller was an "Affiliate" of NPF VI, as that term is defined in the Indenture. Despite the fact that the NPF VI indenture prohibits affiliate transactions, and thereby prohibited transfers of funds to the Affiliated Sellers, Chase carried out and executed these transfers with actual knowledge that they were unauthorized and improper.[6] These transfers were substantial in size and continued throughout the life of the NPF VI program. After the NPF VI program collapsed in November 2002, and after efforts were made to recover on the sums advanced to the Affiliated Sellers, NPF VI held over $1billion in uncollectible debt owed by the Affiliated Sellers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 236, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

237. Although the transfer of funds to the Affiliated Sellers was a material breach of the Indenture and constituted an Event of Default, Chase took no action, gave no notices, and

[6] The Indentures' prohibitions on affiliate transactions is still another reason that both Chase and Bank One knew that the reserve kiting scheme described above was wholly fraudulent and wrongful.

declared no Event or Default or Principal Amortization Event in response to the transfers of funds to the Affiliated Sellers. Chase carried out such transfers intending to further the scheme to defraud NPF VI and with an intent to herm it.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 237.

**6. Chase's Monetary Reward for Participating in the Scheme to Defraud NPF VI**

238. NPF VI was an important and lucrative client for Chase. Chase identified NPF VI as a "Platinum" level client who was to receive "a level of service beyond their expectations." Although Plaintiff does not yet have access to information regarding the total compensation earned by Chase in connection with its service as NPF VI Trustee, it is clear that this sum is well in excess of $5 million and was likely substantially more.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 238.

**7. Alternative Pleading of Gross Negligence, Negligence and Breach of Fiduciary Duty**

239. Plaintiff hereby pleads, in the alternative to its allegations that Chase acted with actual knowledge of its breaches, frauds, and defalcations and with intent to injure NPF VI, as follows: Chase was, at a minimum, grossly negligent in the conduct of its duties as NPF VI Indenture Trustee. Chase's acts and omissions in carrying out its obligations under the NPF VI Indenture, and in obtaining the information necessary to exercise any discretion granted to it under the NPF VI Indenture, was a gross neglect of duty which amounts to willfulness and evinced a reckless disregard for the rights of NPF VI. In the alternative to this pleading of gross negligence, Chase was negligent and failed to exercise reasonable care under the circumstances

in carrying out its obligations under the NPF VI Indenture, at times when it was obliged to act as a prudent man, and in obtaining the information necessary to exercise any discretion granted to it under the NPF VI Indenture. Because Chase knew that NPF VI was in a continuous and uncured state of default, at all times relevant to this complaint Chase owed NPF VI a general fiduciary duty to act as a prudent man would. Chase, however, willfully and negligently breached the fiduciary obligations it owed to NPF VI.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 239.

**C. Factual Allegations Regarding Bank One**

**1. Bank One's Long History with NCFE**

240. Bank One served as the Indenture Trustee for NPF XII from its inception in March 1999 until after NPF XII collapsed in October 2002.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 240, except admits that Bank One served as a Trustee for NPF XII.

241.Bank One originally acquired NCFE's business when John Rothrock, a trust officer who handled early NCFE-related programs while at Bankers Trust, left Bankers Trust to work for Bank One. At that time, Bank One's trust department was small, but Rothrock promised Poulsen that Bank One would develop a trust department that NCFE "could be proud of."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 241.

242.Prior to signing on as NPF XII's indenture trustee, Bank One was intimately familiar with NCFE and the operations of its various funding programs. Since at least 1996, Bank One had served as indenture trustee for numerous other NCFE-related programs, including NPF XIII

(the predecessor to NPF XII), NPF IX, NPF - LP, and NPF - WL, NPF IX, and NPF KL. As a result of its close relationship with NCFE, Bank One, and in particular John Rothrock, specifically knew and understood that NPF VI was a securitization program with an indenture virtually identical to that of NPF XII. In all, NCFE and its various programs were one of the Bank One Trust Department's largest clients.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 242.

243.At the time Bank One began administration of NPF XII in March 1999, John Rothrock had been the day-to-day contact and worked closely with NCFE for almost ten years. Because NCFE was one of Bank One's self-styled "tier-one" clients, Bank One Trust department representatives, including Rothrock and others, frequently visited NCFE's offices in person, and met with Poulsen and other NCFE principals on a regular basis. In addition, through the Trust Department relationship, Bank One had been able to secure sustained business from NCFE for its Private Client Services Group, its Treasury Department, its underwriting affiliate, and several other departments at Bank One.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 243.

244.At all relevant times, John Rothrock was the account executive assigned by Bank One to administer NPF XII. Bank One officers Darlington Cummings (March 1999 through December 2001), and Jeff Kinney (from December 2001 through NPF XII's bankruptcy in November 2002), assisted Rothrock in the administration of NPF XII. At all relevant times, Rothrock, Cummings and Kinney were also "Responsible Officers" as that term was defined in the NPF XII Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 244, except states that to the extent the UAT relies on the NPF XII Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**2. Bank One Joins the Scheme to Defraud by Agreeing to Disregard Its Obligations Under the NPF XII Indenture**

245. Prior to the execution of the NPF XII Master Indenture on March 10, 1999, Poulsen, acting on behalf of the Servicer, had multiple communications with responsible officers of Bank One, including without limitation John Rothrock, to discuss the manner in which the Servicer and Bank One would exercise the rights and responsibilities to be granted them under the as yet unsigned NPF XII Indenture. These communications were carried out in face to face meetings as well as by means of the telephone, the U.S. mails, electronic mail, and facsimile. In the course of these communications, Poulsen, the Servicer, and Bank One agreed to disregard crucial material terms of the Indenture and operate the NPF XII program according to their own plan and design, in order to further their own unlawful purposes. These agreements were not a modification of the NPF XII Indenture. Rather, they were an agreement to disregard and breach the NPF XII Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 245.

246. NPF XII did not agree or consent to these intended violations of the NPF XII Indenture. In the context of the communications and agreements discussed in this paragraph (and in the paragraphs' below) as well as all other agreements, arrangements, and discussions with Bank One regarding operation of the NPF XII program, Poulsen was speaking and acting for himself and the Servicer only, and not on behalf of or as an agent for NPF XII. Bank One knew

and understood that Poulsen was acting and speaking in these capacities only, in the context of these communications. The NPF XII Noteholders, express and intended third party beneficiaries of the NPF XII Indenture, likewise did not agree or consent to these intended violations of the NPF XII Indenture. The Rating Agencies did not consent, either. The NPF XII Indenture could only be modified by the execution of a Supplemental Indenture, made and executed in accordance with the express provisions of the NPF XII Indenture. No Supplemental Indenture was ever executed for the NPF XII Indenture permitting or authorizing any of the violations agreed to by Poulsen, the Servicer, and Bank One in the discussions and agreements described in this paragraph and in the paragraphs below. In particular, and without limitation, the Servicer, Poulsen, and Bank One agreed to commit the following violations ofthe NPF XII Indenture as follows:

1. The Servicer, Poulsen and Bank One agreed that, contrary to the terms of the Indenture, Bank One would execute and carry out improper and unauthorized instructions from the Servicer to make unauthorized withdrawals from the NPF XII Reserve Accounts.

2. The Servicer, Poulsen and Bank One agreed that, contrary to the terms of the Indenture, Bank One would allow the balances in the NPF XII Reserve Accounts to routinely, and as a matter of ordinary course, be kept and maintained well below the minimum levels specified for these accounts in the Indenture.

3. The Servicer, Poulsen and Bank One agreed that, contrary to the terms of the Indenture, Bank One would follow the Servicer's instructions to make improper and unauthorized withdrawals from the NPF XII Purchase Account for the purpose of buying ineligible receivables.

4. The Servicer, Poulsen and Bank One agreed that, contrary to the terms of the Indenture, Bank One would follow the Servicer's instructions to make improper and unauthorized withdrawals from the NPF XII Purchase Account for the purpose of transacting unauthorized business with affiliates ofNCFE, including NPF VI.

5. The Servicer, Poulsen and Bank One agreed that, contrary to the terms of the Indenture, Bank One would not send a notice of default, declare an Event of Default, or declare a Principal Amortization Event, even when Bank One knew

> that it was obligated under the Indenture to do so in the event the Servicer and Bank One took the actions described above.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 246, except states that to the extent the UAT relies on the NPF XII Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

247. The arrangements and agreements between the Servicer, Poulsen and Bank One described here and in the paragraphs set out below were repeated and ratified by Bank One, the Servicer, and Poulsen prior to the execution of each of the NPF XII Supplemental Indentures, dated June 28, 1999; November 24, 1999; March 29, 2000; October 17, 2000; December 22, 2000; December 27, 2000; March 21,2001; June 26, 2001; November 2,2001; and May 29,2002. The communications surrounding the execution of these supplemental indentures were also carried out in personal, face-to-face meetings, as well as by means of the U.S. mails, the telephone, electronic mail, and facsimile.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 247.

248. At the same time it made these agreements with Poulsen and the Servicer, however, and on every occasion when Bank One confirmed those agreements, Bank One knew that the Indenture required that if Bank One received an instruction from the Servicer that was inconsistent with the terms of the Indenture, Bank One was obligated not to follow it. Nevertheless, Bank One repeatedly and knowingly violated the Indenture by following instructions consistent with the scheme it had laid with Poulsen and the Servicer-even though Bank One knew these instructions were unauthorized on their face.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 248, except states that to the extent the UAT relies on the NPF XII Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

249. Bank One had no present intention to perform its obligations under the NPF XII Master Indenture when it entered into and executed this agreement. The same is true with respect to each Supplemental Indenture executed by Bank One in connection with the NPF XII, to allow it to serve as Indenture Trustee, so that it could participate in and carry out the scheme to defraud and loot the assets of NPF XII that it had previously entered into with the Servicer, Poulsen, Parrett, and Ayers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 249.

250. In addition, as set out in more detail below, Bank One also violated the Indenture regularly by, among other things, (i) knowingly agreeing to allow, allowing, and facilitating the Servicer's purchase of receivables for NPF XII that Poulsen, the Servicer, and Bank One knew to be ineligible for the NPF XII program; (ii) knowingly agreeing to allow, allowing, and facilitating the Servicer's directing of NPF XII into countless improper transactions with affiliates of NCFE; (iii) knowingly agreeing to allow, allowing, and facilitating the kiting and commingling of NPF XII's assets with those of NCFE and other NCFE subsidiaries and affiliates; and (4) knowingly failing to take required action in the face of actual knowledge that Events of Default existed under the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 250.

### 3. The Mechanics of Bank One's Active Participation in the NPF XII Misappropriation Scheme

251. After the numerous meetings Bank One had held with Poulsen and the Servicer about NPF XII prior to the signing of the NPF XII Indenture on March 10, 1999, and due to Bank One's prior familiarity with other NCFE-related securitization programs, Bank One was prepared, mechanically, to begin an active administration of NPF XII the day after NPF XII came into existence.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 251.

252. Each business day beginning March 11, 1999, the Servicer sent Bank One written requests to wire funds out of the NPF XII Purchase Account to health care providers who had sold health care receivables to NPF XII. Also on each business day, the Servicer sent Bank One plain, written requests to transfer funds between various NPF XII accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 252.

253. Upon receiving the Servicer's requests each day, Bank One prepared a one-page spreadsheet setting out the amounts to be debited from and/or credited to the various NPF XII accounts. Bank One also completed a wire transfer form with instructions for each outgoing wire. The instructions for each wire were reviewed and approved by one and sometimes two Bank One officers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 253.

254. Similarly, as Bank One performed each requested transfer between NPF XII accounts, it would make a notation next to the written instruction from the Servicer that

requested the transfer, as well as on its own spreadsheet. Each of these transfers among NPF XII accounts was also approved by at least one officer of Bank One.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 254.

255. Each day, the Servicer also sent to Bank One a report (the Lockbox Receipts Report) detailing the receipts, by health care provider, that the Servicer expected to have been deposited in the NPF XII Collection account that day. Each day, Bank One would also review the NPF XII Lockbox Receipts Report, on a deposit by deposit basis, to ensure that the collections the Servicer expected to have been deposited in the Collection account had actually been received by Bank One. Bank One made written notations on the Collections report comparing the report to what it had received in the NPF XII Collection Account that day.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 255.

256. Bank One also sent a memorandum to the Servicer at least once a week setting out the cash balances in the NPF XII accounts, and asked the Servicer to compare what it believed the balances of those accounts should be, and to report any discrepancies between the two.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 256.

257. Bank One and the Servicer regularly communicated over the phone, by fax, and by email on a daily basis to discuss the balances in the NPF XII accounts. In connection with the funding instructions, account transfers, and lockbox receipt comparisons, and balance checks, Bank One and the Servicer communicated by phone, fax, or email constantly, often as many as 10-20 times each day.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 257.

258. Bank One also administered NPF XII in part through the use of a program called SEI. Using SEI, Bank One officers Rothrock, Cummings and Kinney tracked and made transfers of money out of NPF XII accounts, or between NPF XII accounts, on a daily basis. SEI allowed anyone at Bank One to view the transactions that occurred with any ofNPF XII's funds on deposit, including transfers in and out of NPF XII accounts, as well as transfers between NPF XII accounts. Bank One used the SEI program to administer NPF XII's accounts each business day during the course of its administration of the accounts, and checked and had actual knowledge of the balances on a daily basis.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 258.

**4. Bank One's Unauthorized Withdrawals from the NPF XII Reserve Accounts**

259. As NPF XII's indenture trustee, Bank One had an obligation to know-and it actually knew-what rights and obligations were bestowed on it by the NPF XII Indenture, including what instructions from the Servicer it was, and was not, authorized to carry out. Nevertheless, from within a few days of the inception of NPF XII until NPF XII collapsed in October 2002, and in gross violation of its obligations under the Indenture, Bank One repeatedly made unauthorized, fraudulent transfers out of the NPF XII Equity Account, Seller Credit Reserve Account, and Offset Reserve Account (the "NPF XII Reserve Accounts"). With respect to each of these transactions, because Bank One understood the Indenture's requirements, Bank One knew (or, alternatively, was grossly negligent in failing to know) both that the Servicer had no authority under the NPF XII Indenture to instruct Bank One to execute these withdrawals and that Bank

One had no authority under the NPF XII Indenture to carry them out.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 259.

260. Notwithstanding this knowledge and awareness, Bank One carried out the unauthorized transfers from the NPF XII Reserve Accounts with the intent of participating in the scheme to misappropriate the assets ofNPF XII from the Bank One Trust Accounts and the assets ofNPF VI from the Chase Trust Accounts. These unauthorized transfers carried out by Bank One took on at least the following forms:

(a) unauthorized transfers from the NPF XII Equity Account on days other than a Monthly Payment Date in violation of Section 6.06 of the NPF XII Indenture;

(b) unauthorized transfers from the NPF XII Equity Account to the NPF XII Purchase Account for further disbursement to sellers in the NPF XII program (including affiliates of the Founders) and for other purposes'

(c) unauthorized transfers from the NPF XII Equity Account to the NPF XII Purchase Account for further disbursements of CSFB, Bank One, and the Founders for the repayment short term loans made by these persons and entities for the purpose of concealing material reserve deficiencies and defaults in the NPF XII program;

(d) unauthorized transfers from the NPF XII Equity Account to the NPF XII Seller Credit Reserve Account for the purpose of concealing material reserve deficiencies and defaults in the NPF XII program;

(e) unauthorized transfers from the NPF XII Equity Account to the NPF XII Offset Reserve Account for the purpose of concealing material reserve deficiencies and defaults in the NPF XII program;

(f) unauthorized transfers from the NPF XII Equity Account to the NPF XII Purchase Account for further disbursement to the NPF VI trust accounts held at Chase as a part of the kiting scheme whereby large sums of cash were repeatedly and continuously transferred by interstate wire back and forth between the NPF XII trust accounts at Bank One in Ohio and the NPF VI trust accounts at Chase in New York for the purpose of concealing material reserve deficiencies and defaults in the NPF XII and VI Programs;

(g) unauthorized transfers from the NPF XII Seller Credit Reserve Account to the NPF XII Purchase Account for further disbursement to sellers (including affiliates

of the Founders) in the NPF XII program and for other purposes; and

(h) unauthorized transfers from the NPF XII Offset Reserve Account to the NPF XII Purchase Account for further disbursement to sellers in the NPF XII program (including affiliates of the Founders) and for other purposes.

Defendant Ayers denies the allegations of paragraph 260 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 260, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

261. Prior to executing each such transfer or withdrawal, Bank One understood and had actual knowledge, from the face of the transfer request instruction provided by the Servicer, that each such transfer or withdrawal was not permitted under the Indenture. Moreover, the NPF XII Indenture expressly provides that Bank One was not entitled to rely on any transfer or withdrawal instruction from the Servicer where the requested transfer was not authorized under the Indenture. Nonetheless, Bank One carried out literally thousands of such facially improper, fraudulent unauthorized transfers and withdrawals from the NPF XII Reserve Accounts throughout its term as trustee under the NPF XII Indenture. In fact, at no time did Bank One ever finally refuse an instruction from the Servicer to transfer funds out of any NPF XII reserve account or between NPF XII reserve accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 261, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 261, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

### a. Banks One's Improper Withdrawals from the NPF XII Equity Account

262. The Indenture expressly provides -- and Bank One knew -- that funds may only be transferred from the NPF XII Equity Account on a Monthly Payment Date *(i.e.,* the first business day of each month). Bank One routinely violated this provision, and Bank One's deliberate, unlawful transfers out of the Equity Account continued throughout its entire tenure as Indenture Trustee: during that time, Bank One knowingly made at least 2,439 unauthorized transfers from the NPF XII Equity Account on dates other than a Monthly Payment Date. These wrongful transfers totaled **$6,619,546,454.65**.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 262, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 262, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

263. Indeed, throughout its tenure as Indenture Trustee, Bank One routinely transferred large sums from the NPF XII Equity Account throughout the month and then hastily transferred funds, temporarily, into the NPF XII Equity Account on the first day of the month in order to create the false impression on Investor Reports that the balance in the NPF XII Equity Account was being maintained at or above the minimum levels required in the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 263, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 263, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

264. With respect to each of these improper and unauthorized withdrawals, Bank One knew (or, alternatively, was grossly negligent in failing to know) that these withdrawals were

unauthorized and that Bank One had no authority to carry them out. In each instance, the written requests from the Servicer explicitly indicated that Bank One was being requested to transfer funds out of the Equity Account. Bank One also prepared spreadsheet summaries of the transactions that moved funds out of the Equity Account and, once it had completed each of the improper transactions, made notations on its internal documentation that it had done so.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 264.

265. Notwithstanding this knowledge and awareness, Bank One deliberately carried out the unauthorized transfers from the Equity Account with the intent of participating in the scheme to misappropriate the assets of NPF XII. Indeed, as an example, prior to the signing of the NPF XII Indenture, Bank One and Poulsen, acting on behalf of the Servicer, discussed and agreed that at various times during each month, Bank One would, at the instruction of the Servicer, make withdrawals from the NPF XII Equity Account to pay sub-servicing fees that the Servicer (not NPF XII) owed to various health care providers pursuant to the terms of the Sale and Subservicing Agreements between the Servicer and the health care providers. These transactions and many others processed by Bank One out of the Equity Account are nowhere contemplated by the Indenture, and they are in complete violation of its provisions. Despite the complete lack of any justification or foundation for making such transactions, throughout the course of Bank One's administration of the indenture, Bank One continued to discuss this ongoing practice with the Servicer, and both agreed to continue to allow and to make such unauthorized withdrawals from the Equity Account. Every one of these unauthorized transfers from the Equity Account set out above and detailed below was documented in writing at Bank One, and every one was authorized by one or more officers at Bank One -- each of whom knew,

moreover, that they had absolutely no right or authority to do this.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 265, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 265, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

266. Consistent with its prior understanding with Poulsen and the Servicer that NPF XII would be administered contrary to the Indenture, Bank One's improper withdrawals from the NPF XII Equity Account began the same month NPF XII came into existence. For example, on March 3D, 1999, not three weeks after it began administering NPF XII, Bank One, pursuant to written instructions from Poulsen, acting on behalf of himself and the Servicer, improperly transferred approximately $831,000 out of the NPF XII Equity Account into the Purchase Account for further distribution. Although small compared to the later unauthorized transfers of hundreds of millions of dollars at a time, this and other early unauthorized transfers signaled Bank One's complete disregard for the provisions of the NPF XII indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 266, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 266, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

267. The size of the unauthorized transfers grew as time passed. On April 13, 19, 21, 23, and 27, on May 4, 18, 25 and 26, and on June 2, 1999, Bank One made unauthorized transfers out of the Equity Account for amounts less than a million dollars. On June 4, it made such a transfer for $1,000,000. On July 7, 1999, Bank One moved $7.6 million from the Equity Account to the Purchase Account, most of which (along with $10.6 million improperly transferred from

the Seller Credit Account to the Purchase Account) was then, also improperly, wired to NPF Capital, Inc., another NCFE subsidiary, in plain violation of the Indenture's provisions that prohibited transactions with affiliates. By late 1999, the size of the transfers had grown substantially. For example, on October 29, 1999, Bank One moved $26.2 million from the Equity Account to the Purchase Account (from which it could be and was easily dissipated), also in plain violation of the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 267, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 267, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

268. These unauthorized transfers out of the Equity Account continued virtually non-stop for the entire duration of Bank One's administration of NPF XII up until NPF XII collapsed under the weight of the continuous and systematic misappropriation from its accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 268, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 268, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

269. In the months leading up to NPF XII's implosion, from July 2002 until October 2002, Bank One made at least one withdrawal from the Equity Account on virtually every business day -despite its knowledge that withdrawals were permitted on only one day -- the Monthly Payment Date -- each month. These wrongful, fraudulent withdrawals amounts ranged up to $150,000,000, including transfers out of the account of $150 million on July 2, $120 million on August 2, $63 million on August 5, $50 million on August 12, $11 million on August

13, $20 million on August 30, and $150 million on September 4, 2002. None of these days were Monthly Payment Dates, and Bank One knew that each such transfer, along with countless others, violated the NPF XII Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 269, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 269, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

270. The following schedule reflects the number and amounts of the unauthorized transfers made by Bank One from the NPF XII Equity Account on days Bank One knew were not the Monthly Payment Date:

| Month | No. of Transfers | Total Amount of Transfers |
|---|---|---|
| Mar-99 | 14 | $1,140,133.74 |
| April-99 | 21 | $2,008,083.65 |
| May-99 | 18 | $2,016,713.35 |
| Jun-99 | 25 | $5,192,389.60 |
| Jul-99 | 29 | $14,813,875.23 |
| Aug-99 | 18 | $4,694,812.37 |
| Sept-99 | 25 | $8,742,519.54 |
| Oct-99 | 18 | $39,341,432.84 |
| Nov-99 | 35 | $70,038,493.95 |
| Dec-99 | 47 | $106,023,502.33 |
| Jan-00 | 39 | $35,832,973.74 |
| Feb-00 | 43 | $88,064,173.77 |
| Mar-00 | 48 | $86,520,348.65 |
| Apr-00 | 29 | $51,653,308.17 |
| May-00 | 46 | $95,721,729.17 |
| Jun-00 | 47 | $123,202,432.09 |
| Jul-00 | 37 | $135,652,741.45 |
| Aug-00 | 50 | $126,486,002.46 |
| Sep-00 | 43 | $102,744,446.46 |
| Oct-00 | 36 | $257,018,307.65 |
| Nov-00 | 46 | $125,166,216.58 |
| Dec-00 | 57 | $283,379,683.09 |
| Jan-01 | 60 | $155,069,727.97 |
| Feb-01 | 45 | $191,931,813.41 |
| Mar-01 | 86 | $378,547,581.38 |
| Apr-01 | 69 | $249,247,741.52 |
| May-01 | 70 | $176,089,851.88 |
| Jun-01 | 67 | $391,999,001.11 |

| | | |
|---|---|---|
| Jul-01 | 66 | $66,017,802.60 |
| Aug-01 | 81 | $146,670,163.17 |
| Sep-01 | 76 | $122,670,452.55 |
| Oct-01 | 88 | $193,815,878.98 |
| Nov-01 | 85 | $397,258,911.95 |
| Dec-01 | 76 | $217,175,311.63 |
| Jan-02 | 90 | $216,420,909.42 |
| Feb-02 | 68 | $198,036,964.96 |
| Mar-02 | 58 | $122,250,557.93 |
| Apr-02 | 82 | $242,287,138.61 |
| May-02 | 108 | $186,076,028.83 |
| Jun-02 | 98 | $511,056,813.36 |
| Jul-02 | 96 | $247,117,481.52 |
| Aug-02 | 97 | $186,749,109.98 |
| Sep-02 | 65 | $246,387,076.17 |
| Oct-02 | 37 | $11,215,815.84 |
| **TOTAL:** | **2439** | **$6,619,546,454.65** |

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations of paragraph 270, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 270, Defendant Ayers refers to the text of those documents for the complete and actual description of their contents.

271. These unauthorized withdrawals from the Equity Account were not only troublesome because they were made on an improper and prohibited date, they were also, virtually without exception, made for improper purposes to improper parties or accounts who were not entitled to receive them -- and to whom Bank One had no authority to make them. For instance, Bank One repeatedly made the following unauthorized withdrawals from the Equity Account that Bank One knew (or was grossly negligent in not knowing) that it had no authority to carry out under the Indenture: (i) transferring funds from the Equity Account to the Purchase Account (where the funds would then be used to purchase purported receivables to make loans or advances to affiliated Providers, or make other payments to program participants); (ii) transferring funds from the Equity Account to the Seller Credit Reserve Account (where the funds would be used to conceal the failure of this reserve account to be maintained at the levels required

by the Indenture); (iii) transferring funds from the Equity Account to the Offset Reserve Account (where the funds would be used to conceal the failure of this reserve account to be maintained at the levels required by the Indenture); and (iv) transferring funds to CSFB and the Founders to repay short terms loans made by these entities to conceal the failure of the Seller Credit Reserve, Offset Reserve, and Equity accounts to be maintained at the levels required by the Indenture.

Defendant Ayers denies the allegation of paragraph 271 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegation not directed at Defendant Ayers, except states that to the extent the UAT relies on the NPF XII Indenture and NPF bank account statements referenced in paragraph 271, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

272. As just one of many examples of transfers from the Equity Account to the Purchase Account that were further distributed to third parties, including program participants, on October 2, 2001 (not a Monthly Payment Date), the Servicer sent to Bank One, and Bank One received, reviewed, approved and processed, a transfer from the Equity Account to the Purchase Account in the amount of $121,617,012. That same day, indeed in the same fax, the Servicer requested, and Bank One received, reviewed, approved and processed wires to be sent -- using those funds -- from the Purchase Account to third parties, including NPF XII program participants, totaling $118,824,228.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegation in paragraph 272, except states that to the extent the UAT relies on the NPF XII bank account statements referenced in paragraph 272, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

273. Similarly, there were numerous instances of transfers of funds from the Equity Account to the Seller Credit Reserve Account where the funds were used to conceal the failure of the Seller Credit Reserve Account to be maintained at the levels required by the Indenture. For example, as set out more fully below, on October 2, 2001, and January 3, 2002, the Servicer requested, and Bank One received, reviewed, approved and processed transfers of$24.5 million and $20 million, respectively, from the NPF XII Equity Account. As set out fully below Bank One and the Servicer made these transfers to the Seller Credit Reserve Account to allow the Servicer to report fraudulently on its NPF XII Investor Report for those months purported compliance with certain reserve tests. Similarly, on December 3, 2001, the Servicer requested, and Bank One received, reviewed, approved and processed, a transfer of $7.5 million from the Equity Account to the Seller Credit Reserve Account which, along with a separate transfer from the Purchase Account, allowed the Servicer to footnote fraudulently on its December 3, 2001 Investor Report that the account was purportedly "compliant" on December 4, the day following the December Monthly Payment Date.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegation in paragraph 273, except states that to the extent the UAT relies on the NPF XII bank account statements referenced in paragraph 273, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

274. Bank One also had actual knowledge that transfers were made out of the Equity Account to CSFB and others who at the direction of the Servicer loaned NPF XII to meet monthly reserve tests on an ad hoc basis. In June, July, and August 2002, NPF XII had several issuances of Notes that were due to amortize and be paid off. Prior to the scheduled payments, the Servicer and Bank One calculated and discussed that if NPF XII made these scheduled

principal payments to noteholders, NPF XII would have insufficient funds to cover its reserve requirements, even with help from cash from NPF VI. The Servicer advised Bank One and CSFB at that time that it intended to "go soft" on the notes at issue, or make only partial principal payments, in order to be able to continue to have enough cash on hand to plug the reserve accounts once a month. CSFB was alarmed, and advised the Servicer that if NPF XII failed to repay the Notes on time, CSFB would have trouble selling the significant amount of Notes that CSFB owned in its own portfolio. Poulsen, acting on behalf of the Servicer, warned CSFB that if the Notes due to be repaid were actually repaid in full, the Servicer would be unable to prop up NPF XII's reserves, even at month-end.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegation in paragraph 274.

275. In a meeting in the Bahamas and in series of interstate phone calls that included the Servicer, CSFB, and Bank One, CSFB agreed to loan to NPF XII $75 million to cover NPF XII's reserves on the September 2002 Monthly Payment Date. CSFB and Bank One both independently advised the Servicer that it should not alert NPF XII's noteholders about CSFB's loan or its purpose.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegation in paragraph 275.

276. CSFB made the loan, and the funds were deposited into NPF XII's various reserve accounts to meet the September 3, 2002 Monthly Payment Date tests. With Bank One's full knowledge, the Servicer then caused NPF XII to repay CSFB's loan during September, in a series of small payments, the funds for which came in part from NPF XII's Equity Account.

Defendant Ayers denies knowledge or information sufficient to form a belief as to

allegation in paragraph 276.

277. With respect to each of these improper and unauthorized withdrawals, Bank One knew (or, alternatively, was grossly negligent in failing to know) that the withdrawals were unauthorized and that Bank One had no authority to carry them out. For example, Bank One knew from its review of the Indenture that there was no provision that contemplated a transfer from the NPF XII Equity Account to the NPF XII Purchase Account other than in instances in which the Equity Account exceeded its required balance on a Monthly Payment Date under Section 6.06 (a)(vii). Likewise, Bank One had actual knowledge from its review of the Indenture that there existed no provision whatsoever that authorized transfers from the Equity Account to the Seller Credit Reserve Account or Offset Reserve Account.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegation in paragraph 277.

278. Notwithstanding this knowledge and awareness, Bank One knowingly and unlawfully carried out the dizzying number of repeated, continuous and wholly fraudulent unauthorized transfers from the Equity Account with the intent of participating in the scheme to misappropriate the assets of NPF XII from the Bank One Trust Accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegation in paragraph 278.

**b. Bank One's Improper Withdrawals from NPF XII Seller Credit Reserve Account**

279. Bank One also knew under the NPF XII Indenture that transfers from the NPF XII Seller Credit Reserve Account to the Purchase Account were not permitted. Nevertheless, Bank One routinely made such transfers. For example, as early as March 18, 1999, eight days after the program began, the Servicer sent Bank One a written request to transfer $510,000 "from the

Seller Credit Reserve to the Purchase Account." As it had improperly agreed to do, Bank One transferred the funds.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 279, except states that to the extent the UAT relies on the NPF XII Indenture and NPF XII bank account statements referenced in paragraph 279, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

280. Bank One made almost daily transfers out of the Seller Credit Account and, as with the transfers out of the Equity Account, as NPF XII matured Bank One's improper transfers out of the Seller Credit Reserve Account increased in both number and amount.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 280, except states that to the extent the UAT relies on the NPF XII bank account statements referenced in paragraph 280, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

281. On April 28, 2000, Bank One received, reviewed, approved and processed requests from the Servicer to transfer:

- $15 million from the Seller Credit Reserve to the Purchase Account, and
- $20 million from the Equity Account to the Purchase Account

These requests total $35 million. In the same fax from the Servicer that included these transfers from the Reserve Accounts to the Purchase Account, the Servicer included a request that Bank One wire $32 million of the funds thereby accumulated from the NPF XII Purchase Account to NPF VI-- an interstate wire that Bank One knew was a prohibited affiliate transaction, but that it executed anyway in furtherance of the scheme to loot NPF XII. In violation of the Indenture, Bank One approved and processed the request.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 281, except states that to the extent the UAT relies on the NPF XII bank account statements and written requests from the Servicer referenced in paragraph 281, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

282. On August 30, 2002, Bank One received, reviewed, approved and processed requests from the Servicer to transfer:

- $5,983,616 from the Seller Credit Reserve to the Purchase Account, and
- $5,983,616 from the Purchase Account to NPF VI

On that same day, Bank One received, reviewed, approved and processed requests from the Servicer to transfer:

- $46.9 million from the Seller Credit Reserve to the Purchase Account
- $20 million from the Equity Account to the Purchase Account
- $10 million from the Offset Reserve to the Purchase Account.

These requests total $76.9 million. In the same fax from the Servicer that included these transfers from the Reserve Accounts to the Purchase Account, the Servicer included a request that Bank One wire $76.8 million from the NPF XII Purchase Account to NPF VI. In violation of the Indenture, Bank One knowingly and unlawfully approved and processed the request.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 282, except states that to the extent the UAT relies on the NPF XII bank account statements and written requests from the Servicer referenced in paragraph 282, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**c. Bank One's Improper Withdrawals from NPF XII Offset Reserve Account**

283. Bank One knew under the NPF XII Indenture that transfers from the NPF XII Offset

Reserve Account to the Purchase Account were impermissible. Nevertheless, Bank One routinely made such transfers. As with the unauthorized transfers it made from the Equity and Seller Credit Accounts, Bank One made the transfers after receiving instructions from the Servicer that were improper on their face and not authorized by the Indenture. For example, on July 7, 1999, the Servicer sent Bank One a written request to transfer $1,800,000 "from the Medicare/Medicaid Offset Reserve to the Purchase Account." As it had improperly agreed to do, Bank One knowingly and improperly transferred these funds at the direction of the Servicer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 283, except states that to the extent the UAT relies on the NPF XII bank account statements and written requests from the Servicer referenced in paragraph 283, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

284. Bank One also knew under the NPF XII Indenture that transfers from the NPF XII Offset Reserve Account to the Seller Reserve Account were impermissible. Nevertheless, Bank One made such transfers frequently. For example, on March 1, 2000, Bank One received from the Servicer, and reviewed, approved and processed a request to transfer $1,500,000 from the Medicare/Medicaid Offset Reserve to the Seller Credit Reserve. Bank One knew from the Investor Report for March 1,2000 that this transfer left just enough (2.01%, where 2% was required) in the Offset Reserve, while propping up the Seller Credit Reserve as much as possible.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 284, except states that to the extent the UAT relies on the NPF XII bank account statements and written requests from the Servicer referenced in paragraph 284, Defendant Ayers refers to the text of those documents for the complete and actual description of

its contents.

285. Bank One made frequent unauthorized and fraudulent transfers from the Offset Reserve Account and, as with the transfers out of the Equity Account, as NPF XII matured Bank One's improper transfers out of the Offset Reserve increased in both number and amount. For example, on May 2, 2002, Bank One received, and then knowingly reviewed, approved and processed, an instruction from the Servicer directing Bank One to transfer $10,000,000 "from the Medicare/Medicaid Offset Reserve to the Purchase Account."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 285, except states that to the extent the UAT relies on the NPF XII bank account statements and written requests from the Servicer referenced in paragraph 285, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

286. In this particular instance, as in many, many others, Bank One knew that the transfer from the Offset Reserve to the Purchase Account was not just impermissible on its face, but was further prohibited because the funds Bank One was being asked to move to the Purchase Account that day were to be immediately transferred from NPF XII to another affiliate of NCFE in a prohibited, affiliate transaction. That same day, after making the $10 million transfer, Bank One deliberately followed additional improper instructions from the Servicer to transfer an additional $113 million ($50 million from the Seller Credit Reserve and $63 million from the Equity Account) to the Purchase Account, for a total of $123 million for those transfers. Included in the same batch of instructions from the Servicer that day were further instructions to make wire transfers totaling $122,694,000 out of NPF XII entirely. One of those instructions, which Bank One knew was invalid and unauthorized on its face, directed Bank One to transfer

$115 million via interstate wire to NPF VI -- in furtherance of what Bank One knew was the wrongful kiting scheme. Despite having actual knowledge of the unauthorized and wholly fraudulent nature of the transaction, Bank One nevertheless knowingly made the unlawful wire transfer to NPF VI.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 286, except states that to the extent the UAT relies on the NPF XII Indenture, NPF XII bank account statements and written requests from the Servicer referenced in paragraph 286, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

287. Bank One knowingly made similar, unauthorized transfers from the Offset Reserve Account on a routine basis through its entire administration of NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 287.

288. Bank One knew that the Servicers' constant instructions to Bank One to violate the terms of the Indenture were an Event of Servicer Default and constituted an Event of Default under the Indenture. Nevertheless, despite its obligations to do so, Bank One failed to take appropriate action under the Indenture to remedy the defaults or declare a Principal Amortization Event.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 288.

### 5. Bank One's Active Participation in Routinely Draining NPF XII's Reserve Accounts, Allowing Those Accounts to Remain Consistently at Levels Dramatically Below Those Required by the Indenture, and Its Failure to Take Required Action in Response to These Defaults

289. Bank One understood that a failure to maintain, at any time, the minimum specified

balances in the NPF XII Reserve Accounts constituted an Event of Default under the NPF XII Indenture. Upon the occurrence of each and every such Event of Default, Bank One was required to declare a Principal Amortization Event or at a minimum required to determine whether to declare such an event, which would result in the termination of the NPF XII programs and would cause a halt to all future withdrawals from the trust accounts other than those directed to NPF XII or its creditors.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 289, except states that to the extent the UAT relies on the NPF XII Indenture Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

290. Pursuant to the terms of the NPF XII Indenture, in making this determination, Bank One was obligated to use the same degree of care and skill as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. Bank One was also obligated to exercise reasonable care in ascertaining the pertinent facts necessary to make an informed judgment with respect to the determination as to whether to declare a Principal Amortization Event. Despite these obligations, Bank One agreed with the Servicer, in the communications described above, that Bank One would abrogate and ignore its obligations under the NPF XII Indenture and would take no action, regardless of the circumstances and regardless of the nature and magnitude of the breach, to prevent or to respond to the repeated, and near continuous, Events of Default caused by the failure of the NPF XII Reserve Accounts to be maintained at the minimum levels required in the NPF XII Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 290, except states that to the extent the UAT relies on the NPF XII

Indenture Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

291. The NPF XII program was in a near-continuous state of default *(i.e.* Events of Default had occurred and were continuing) throughout the entire time that Bank One served as trustee under the NPF XII Indenture. As a result, Bank One owed NPF XII the general fiduciary duty to act as a prudent man would. This all-but-perpetual state of default stemmed largely from the Servicer and Bank One's failure to maintain the NPF XII Reserve Accounts at the specified minimum balances required by the Indenture. As set out in detail below, the balances in the Equity Account, Seller Credit Reserve Account, and Offset Reserve Accounts were routinely and improperly drained of funds by Bank One such that their balances were rarely in compliance with the minimum requirements of the Indenture, from March 1999 to November 2002. In each instance, the cause of the shortfalls in the accounts was the unauthorized and improper withdrawals carried out by Bank One at the direction of the Servicer.

Paragraph 291 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 291, except states that to the extent the UAT relies on NPF XII bank account statements referenced in paragraph 291, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

292. As set forth more fully below, throughout the term of its service as trustee under the NPF XII Indenture, Bank One had actual knowledge, from a number of sources, of the consistent and frequently precipitous inadequacy of the NPF XII Reserve Account balances. Moreover, Bank One also intentionally and wrongfully joined and participated in the kiting conspiracy, which it, the Servicer and Chase used to hide the constant state of default in NPF XII and in NPF

VI.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 292.

293. Bank One had actual knowledge of the amount of cash in NPF XII Reserve Accounts each and every day, because Bank One held those funds in trust for NPF XII every day. Moreover, Bank One accessed the accounts each and every day to disburse funds from them and between them. In fact, Bank One was the only entity capable of moving funds into or out of these NPF XII accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 293.

294. Bank One also had actual knowledge of the required balances of the reserve accounts because, in part, at least once a month Bank One received, reviewed, and recalculated an updated Investor Report from the Servicer stating the required balances of those accounts. Of course, Bank One also knew the balances required to be held in NPF XII's reserve accounts because the simple formulas for determining those amounts were contained in the Indenture itself.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 294.

295. Bank One also had actual knowledge of the ridiculously inadequate reserve balances by means of a memorandum Bank One prepared and sent at least once a week to the Servicer setting out the balances in each of the NPF XII accounts and asking the Servicer to confirm that the amounts matched the Servicer's records. For example, as early as June 7, 1999, Bank One's cash balance memorandum to the Servicer for June 4, 1999 noted a cash balance in the Seller

Credit Reserve Account that was $3.4 million instead of the required $6.5 million, and an equity reserve that was $1.2 million short of the required balance. The June 14, 21, and 28 memoranda authored by Bank One reflected equally large shortages.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 295, except states that to the extent the UAT relies on NPF XII bank account statements and a memoranda prepared by Bank One referenced in paragraph 295, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

296. By early 2000, Bank One, the Servicer, and Poulsen had actual knowledge that the continuing shortages had grown. Bank One's cash balance memorandum to the Servicer on March 1,2000 indicated that the reserves on February 29,2000, held $8.2 million (Seller Credit) and $15 million (Equity). The Investor Report Bank One received for the determination date of March 1, 2000 indicated, however, that those reserves should have been $42.2 million (Seller Credit) and $55.1 million (Equity).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 296, except states that to the extent the UAT relies on the March 1, 2000 Investor Report, NPF XII bank account statements and a memoranda prepared by Bank One referenced in paragraph 296, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

297. Bank One's cash balance memo to the Servicer dated July 3, 2000 reported reserves as of June 30, 2000 totaling $3.5 million, while the Investor Report it received for July 1 stated that NPF XII's total reserves should have been almost forty times larger, or $135.7 million.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 297, except states that to the extent the UAT relies on the July 1, 2000 and a memoranda prepared by Bank One referenced in paragraph 297, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

298. Bank One's cash balance memo to the Servicer dated August 1, 2000, reported that each of the three reserve accounts as of July 31, 2000 contained between $4-6 million, while the Investor Report Bank One received for August 1, 2000 stated that NPF XII's reserves should have been $69.2 million (Equity), $50.4 million (Seller Credit), and $15.5 million (Offset Reserve). In other words, the three reserve accounts were roughly $120.3 million short of their required $135.1 million.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 298, except states that to the extent the UAT relies on the August 1, 2000 and a memoranda prepared by Bank One referenced in paragraph 298, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

299. Bank One's cash balance memo to the Servicer dated September 1, 2000 reported that each of the three reserve accounts as of August 31, 2000 contained:

| | |
|---|---|
| Seller Credit: | $334,128 |
| Offset Reserve: | $175,717 |
| Equity: | $359,328 |
| **TOTAL:** | **$869,173** |

Bank One knew these reserves were inadequate. The investor report Bank One had received from the Servicer a few days before indicated the Equity, Seller Credit, and Offset reserves should have been:

| | |
|---|---|
| Seller Credit: | $50,395,625 |
| Offset Reserve: | $15,498,457 |
| Equity: | $69,200,316 |
| **TOTAL:** | **$135,094,398** |

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 299, except states that to the extent the UAT relies on the Investor Report and a memorandum prepared by Bank One referenced in paragraph 299, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

300. Bank One's cash balance memo to the Servicer dated September 11, 2000 reported that the three reserve accounts as of September 8, 2000 contained a total of $22.9 million, while Bank One knew that the total of the three reserve accounts should have been approximately $135 million. Bank One thus knew those reserves were roughly $112 million short of their required balances.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 300, except states that to the extent the UAT relies on a memorandum prepared by Bank One referenced in paragraph 300, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

301. Bank One's cash balance memo to the Servicer dated October 2, 2000 reported that each of the three reserve accounts as of September 29, 2000 contained:

| | |
|---|---|
| Seller Credit: | $293,661 |
| Offset Reserve: | $128,483 |
| Equity: | $98,738 |
| **TOTAL:** | **$520,882** |

Bank One knew these reserves were inadequate. The investor report Bank One had received from the Servicer a few days before indicated the Equity, Seller Credit, and Offset reserves should have been:

| | |
|---|---|
| Seller Credit: | $50,369,987 |
| Offset Reserve: | $15,498,457 |
| Equity: | $70,451,587 |
| **TOTAL:** | **$136,320,031** |

Bank One thus had actual knowledge that the NPF XII reserves were approximately $135.8 million short of their required balance.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 301, except states that to the extent the UAT relies on the Investor Report and a memorandum prepared by Bank One referenced in paragraph 301, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

302. These cash balance reports, prepared by Bank One and sent to the Servicer on at least a weekly basis, spanned the entire length of the Bank One's administration of the NPF XII trust, and are yet another manner in which Bank One had actual knowledge that the reserve accounts were below levels required by the indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 302, except states that to the extent the UAT relies on a memorandum prepared by Bank One referenced in paragraph 302, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

303. In addition, on December 31, 2001, Bank One signed a certification for NPF XII's accountants indicating that the cash balance in the Equity Account was $40.2 million, while Bank One had actual knowledge, from investor reports it received shortly before and after that certification, that the required balance in the Equity Account balance should have been approximately $183,000,000.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 303, except states that to the extent the UAT relies on a certification

signed by Bank One referenced in paragraph 303, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

304. After July 1, 2002, the Monthly Payment Date, Bank One on July 2 transferred over $150 million out of the NPF XII Equity Account. From its cash balance reports to the Servicer and the contemporaneous Investor Reports it received, among other things, Bank One knew the NPF XII Equity Account was approximately $120 million short of its required balance every day until August 1. After August 1, also the Monthly Payment Date, Bank One on August 2 and 5 respectively transferred $120 and $63 million out of the Equity Account, and by the same means knew that account was short of its required balance (by between $156 million and $182 million) dwindling on August 13,2002, to a balance of less than $600,000. After September 3, 2002, the Monthly Payment Date, Bank One on September 4, 2002 transferred $150 million out of the Equity Account, and knew by the same means that the Equity Account was short of its required balance by between $125 million and $190 million.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 304, except states that to the extent the UAT relies on NPF XII bank account statements and reports prepared by Bank One referenced in paragraph 304, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

305. Pursuant to the Indenture, Bank One also received certain NPF XII Investor Reports from the Servicer that highlighted to Bank One both its and the Servicer's failure to maintain the required balances in the NPF XII reserve accounts. Because Bank One had access to and reviewed each of the NPF XII accounts and the balances in those accounts every day, Bank One was in a unique position to understand-and did understand and had actual knowledge-that

these Investor Reports demonstrated a continuous failure by the Servicer and Bank One to maintain the NPF XII reserves. To Bank One, the footnotes on several of the following reports indicating that NPF XII was in purported "compliance" a few days after the effective date of the report were meaningless, because in numerous circumstances, as set forth below, Bank One knew that the purported late "compliance" was not merely a matter of a report being filed a few days late but, rather, was the result of deliberate, unlawful and unauthorized wire transfers between NPF VI and NPF XII, or, in some instances, prohibited transactions solely among NPF XII's reserve accounts within Bank One in express violation of the Indenture Bank One had agreed to enforce for the benefit of NPF XII and its note investors. These reports span almost the entire duration of Bank One's administration of NPF XII:

- The investor report Bank One received September 23, 1999 stated on its face that the Seller Credit Reserve Account was below the required balance on August 31, 1999 (6.4% instead of 6.5% of Net Eligible Receivables).

- The investor report Bank One received October 25, 1999 indicated on its face the Seller Credit and Offset Reserves were below the required balances on September 30, 1999. (3.7% instead of 6.5% in the Seller Credit Reserve Account; 1.7% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received March 22, 2000 stated on its face that the Seller Credit Reserve Account was below the required balance on March 1, 2000 (6.4% instead of 6.5% of Net Eligible Receivables).

- The investor report Bank One received September 25, 2000 indicated on its face the Seller Credit Reserve Account and Offset Reserve Account were below the required balances on September 1, 2000. (3.1 % instead of 6.5% in the Seller Credit Reserve Account; 1.3% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received October 24, 2000 indicated on its face the Seller Credit Reserve Account and Offset Reserve Account were below the required balances on October 2, 2000. (0.9% instead of 6.5% in the Seller Credit Reserve Account; 0.9% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received December 22, 2000 indicated on its face the Seller Credit Reserve Account and Offset Reserve Account were below the required balances on December 1, 2000. (6.2% instead of 6.5% in the Seller Credit Reserve

Account; 1.7% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received January 23, 2001 indicated on its face the Seller Credit Reserve Account and Offset Reserve Account were below the required balances on January 2, 2001. (5.9% instead of 6.5% in the Seller Credit Reserve Account; 1.8% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received March 22, 2001 indicated on its face the Seller Credit Reserve Account and Offset Reserve Account were below the required balances on March 1, 2001. (6.2% instead of 6.5% in the Seller Credit Reserve Account; 1.8% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received April 23, 2001 indicated on its face the Seller Credit Reserve Account and Offset Reserve Account were below the required balances on April 2, 2001. (5.0% instead of 6.5% in the Seller Credit Reserve Account; 1.5% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received May 22, 2001 indicated on its face the Seller Credit Reserve Account and Offset Reserve Account were below the required balances on May 1, 2001. (4.6% instead of 6.5% in the Seller Credit Reserve Account; 1.1% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received September 25, 2001, indicated on its face the Seller Credit Reserve Account and Offset Reserve Account were below the required balances on September 4, 2001. (6.1% instead of 6.5% in the Seller Credit Reserve Account; 1.9% instead of 2% in the Offset Reserve Account).

- The investor report Bank One received October 23, 2001, indicated on its face the Seller Credit Reserve was below the required balance on October 1, 2001. (5.3% instead of 6.5%).

- The investor report Bank One received December 23, 2001, indicated on its face the Seller Credit Reserve Account was below the required balance on December 3, 2001. (5.8% instead of 6.5%).

- The investor report Bank One received January 24, 2002 indicated on its face the Seller Credit Reserve Account was below the required balance on January 2, 2002. (5.4% instead of 6.5%).

- The investor report Bank One received February 25, 2002 indicated on its face the Seller Credit Reserve Account was below the required balance on February 1, 2002. (5.4% instead of 6.5%).

- The investor report Bank One received April 22, 2002 indicated on its face the Seller Credit Reserve Account was below the required balance on April 1, 2002. (6.0% instead of 6.5%).

- The investor report Bank One received July 23, 2002 indicated on its face the Seller Credit Reserve Account was below the required balance on July 1, 2002. (4.8% instead of 6.5%).

- The investor report Bank One received August 22, 2002 indicated on its face the Seller Credit Reserve Account was below the required balance on August 1, 2002. (5.4% instead of 6.5%).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 305, except states that to the extent the UAT relies on Investor Reports referenced in paragraph 305, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

306. In addition to receiving the Investor Reports, under Section 8.01 (j) and Exhibit 7 of the Indenture, Bank One was required to receive and re-calculate a weekly "collateral coverage report" from the Servicer that compared and calculated by how much NPF XII's total eligible receivables and cash exceeded NPF XII's outstanding indebtedness. As part of that calculation, these reports included the cash balances in each of NPF XII's reserve accounts. As set out in Section below, Bank One violated the indenture by repeatedly failing to insist on timely delivery of these reports, and after June 2000, failing to insist on their delivery at all. Nevertheless, the reports that Bank One did receive highlighted for Bank One the deficiencies in NPF XII's reserve accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 306, except states that to the extent the UAT relies on the NPF XII Indenture and the Servicer's collateral coverage reports referenced in paragraph 306, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

307. The second NPF XII collateral coverage report Bank One ever received, dated July 13, 1999 for the week ended July 9, 1999, indicated the cash balance of the Seller Credit Reserve Account at 84% of what it was required to be. The next one, dated July 19, 1999 for the week ended July 16, 1999, was worse, reporting the Seller Credit Reserve Account at 77% of its required balance. The Offset Reserve Account balance on that report was also below the required 2% of net eligible receivables. The next report, dated July 26 for the week ended July 23, 1999, was even worse, reporting the Seller Credit Reserve Account at 65% of its required balance. The Seller Credit Reserve Account balance was similarly deficient on August 6, August 13, August 20, August 27, September 3, September 10, September 17, and September 24, October 8, October 15, October 22, December 17, and December 24. In all, only on four (7/6, 10/1, 12/3, 12/10) weeks out of the 42 weeks Bank One administered the NPF XII program in 1999 did the weekly collateral coverage reports received by Bank One indicated adequate reserve levels.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 307 except states that to the extent the UAT relies on the collateral coverage reports referenced paragraph 307, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

308. The reports Bank One received in 2000 were dramatically worse. All but one indicated drastic deficiencies in the reserves. All four reports sent to Bank One in January, three of the four sent to Bank One in February, and every March, April, and May 2000 report highlighted for Bank One that the Seller Credit Reserve Account balances were less than half of their required balance, now $20-25 million short each time. The collateral coverage reports for June 2, 2000 and June 9, 2000—the last ones Bank One ever received—each showed the Equity

Account and Seller Credit Reserve Accounts short of their required levels by approximately $45 million and $6 million, respectively.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 308 except states that to the extent the UAT relies on the collateral coverage reports referenced paragraph 308, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

309. Despite Bank One's actual knowledge of the massive shortfalls of NPF XII's Reserve Accounts, Bank One failed to take required action to declare a Principal Amortization Event.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 309.

**6. Bank One Actively and Knowingly Participates in the Kiting of Trust Funds Between NPF XII Trust Accounts, Held at Bank One, and NPF VI Trust Accounts, Held at Chase**

310. Bank One knew that NPF XII and NPF VI were special purpose entities designed to be bankruptcy-remote, stand-alone entities that would be unaffected by any bankruptcy of NCFE or any of its affiliates, because their assets were to be strictly maintained separate and apart from NCFE or its affiliates. Bank One was also aware that the Indenture prohibited the commingling of the assets of NPF XII with those of any other corporate entity.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 310.

311. Even so, as set out in detail above, Bank One knew that almost from NPF XII's inception that NPF XII contained insufficient assets to satisfy the minimum specified balances

of its reserve accounts essentially at any given time during the course of its administration of the trust. Bank One also understood that unless Bank One and the Servicer could manage to present NPF XII as having sufficient cash in its reserves at least once a month, the NPF XII program would be unwound and dissolved.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 311.

312. To solve this dilemma, Bank One, Poulsen, and the Servicer agreed to a scheme set out above-- by which they would cause NPF XII and the NPF VI securitization program to cash between them for the improper purpose of allowing the Servicer to fraudulently report NPF XII and NPF VI as maintaining the reserve balances required under the Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 312.

313. To further that agreement, beginning in October and November 1999, Bank One, Poulsen and the Servicer discussed and planned that during the course of the administration of the Indentures, wire transfers would take place between NPF XII and NPF VI and/or other NCFE affiliates for the purpose of allowing each of NPF VI and NPF XII to make their month-end reserve and equity tests. These discussions occurred in numerous meetings designed to flesh out how as a practical matter Bank One intended to administer NPF XII going forward, and also in subsequent meetings as the programs matured. Bank One had particularly involved discussions with Poulsen and the Servicer, covering such topics as how the Servicer intended to account for the kiting transactions at NPF XII and NPF VI, and how and where these transactions would be recorded in each program's books and records and general ledger.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 313.

314. As set out above with respect to Chase's administration of NPF VI, Bank One's and the Servicer's agreement to kite cash between NPF XII's with NPF VI's accounts manifested itself in the form of large transfers of cash back and forth between NPF XII and NPF VI on a monthly basis. Bank One and Chase knowingly caused the transfers to occur on dates designed to allow NPF VI to possess the limited available cash when the Servicer tested NPF VI's accounts for outside consumption, and NPF XII to possess the cash on dates the Servicer reported NPF XII's reserve accounts for outside consumption. Bank One, the Servicer, and Poulsen entered into this agreement knowingly and with the express purpose of maintaining the operation of the NPF XII program for the continued purpose of misappropriating significant amounts of money from it.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 314.

315. Of course, not a single element of Bank One's, the Servicer's, and Poulsen's plan and agreement was permitted by the NPF XII indenture or the NPF VI Indenture. Bank One, the Servicer, and Poulsen were all aware—because they discussed together in detail the obligations set forth in the Master Indenture—that their plan constituted an impermissible series of affiliate transactions prohibited under the indenture. Each of them was also aware that their plan constituted commingling of NPF XII's assets with those of its affiliates, including NPF VI, also in express violation of the indenture. Moreover, each was aware that the plan was fraudulent, and each specifically intended their plan to allow each of them to misappropriate NPF XII's and NPF VI's assets for their own benefit.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 315.

316. With that knowledge, Bank One consciously began a series of kiting transactions between NPF XII and NPF VI that ultimately led to the Servicer and Bank One keeping NPF XII and NPF VI afloat by passing hundreds of millions of dollars back and forth each month between NPF VI and NPF XII, with Bank One all the while earning substantial fees for the fraudulent transactions it perpetrated on NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 316, except states that to the extent the UAT relies on NPF bank account statements referenced in paragraph 316, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

317. Throughout the course of its administration of NPF XII, Bank One transferred approximately $4.25 billion from NPF XII to NPF VI in these kiting transactions. Every month, Bank One sent huge amounts of NPF XII funds to NPF VI to allow the Servicer to fill up NPF VI's reserve accounts for the last day of the month. On the first business day of the month, Chase dutifully wired the funds back to Bank One to allow it to fill up NPF XII's reserves.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 317, except states that to the extent the UAT relies on NPF bank account statements referenced in paragraph 317, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

318. As one of many, many examples, on October 29, 1999, Bank One moved $26.2 million from the Equity Account to the Purchase Account. It also moved $15 million from the Seller Credit Reserve to the Purchase Account, for a total of$41.2 million. That same day, Bank

One wired $41,250,800 to NPF VI from the NPF XII Purchase Account. As it did for virtually every one of the kiting transactions, Bank One's internal outgoing wire transfer form indicated simply that the wire was the "Chase Manhattan Bank Wire." On November 1, 1999, after Chase had tested NPF VI's reserve account balances on October 29, Chase wired the exact same amount of money, $41,255,800, back to Bank One and NPF XII. Unlike virtually every other non-kiting deposit NPF XII received—which invariably listed the health care provider from which it came—Bank One's records listed the received kited funds each month as the Chase "reconciliation."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 318, except states that to the extent the UAT relies on NPF bank account statements referenced in paragraph 318, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

319. Bank One knew that the funds it received from Chase on the first day of each month were the kited funds and were of a different nature than the funds it regularly received for NPF XII from the lock-box banks. Each business day, the Servicer sent Bank One a list of lock-box receipts, identifying by Seller the funds it received that were to be credited to NPF XII. On the first day of the month, however, those daily reports treated the kited money differently. On each of those days, the report listed the kited funds as a “reconciliation” from "Chase." The "reconciliation," of course, dwarfed the lock-box receipts. For example, on March 1, 2000, the report sent to Bank One included approximately $2.4 million in Seller-identified lock-box receipts but a $75.5 million "reconciliation" from Chase. Of course, Bank One on that same day knowingly moved the "reconciliation" funds to the NPF XII reserve accounts, $31.7 million to the Seller Credit Reserve Account and $43.5 million to the Equity Account.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 319, except states that to the extent the UAT relies on NPF bank account statements referenced in paragraph 319, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

320. The kiting transfers became routine, but the amounts swapped back and forth increased as time went on. By the summer of 2000, Chase and Bank One swapped roughly $100,000,000 at the end of each month, but thereafter the amounts fluctuated between $100,000,000 and $300,000,000. Between November 30, 2001 and December 4, 2001, Bank One and Chase wired exactly $121,499,221 to each other. In every case, these transfers dwarfed NPF XII's and NPF VI's regular lockbox receipts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 320, except states that to the extent the UAT relies on NPF bank account statements referenced in paragraph 320, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

321. Bank One, of course, had actual knowledge that the money it received from Chase on the first day of every month was for the purpose of refilling NPF XII's reserve accounts. Bank One knew not only because it actually performed such transfers of the Chase money back and forth to NPF XII's reserve accounts every month, but because it expected to perform those transfers every month. For example, on May 2, 2002, the Servicer notified Bank One that on May 1, 2002, Chase had sent Bank One too much money, namely $170 million instead of $117 million. Later that day, without any explanation, Bank One wired $53 million of it back. That Bank One made no inquiry at all about a $53 million difference in NPF XII's deposits speaks volumes about its actual knowledge and monthly anticipation of receiving the huge wires from

Chase. However, this particular transaction caused Bank One to document and explain its usual kiting procedure for a different reason.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 321, except states that to the extent the UAT relies on NPF bank account statements referenced in paragraph 321, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

322. Chase's wire on May 1, 2002, arrived at Bank One after 3 p.m., the cut-off time for Bank One's balance calculations and Bank One's daily sweep of NPF XII's balances into Bank One's overnight money market funds. Bank One discussed the wire in greater detail because the interest earned by the accounts needed to be adjusted when the Chase wire did not make the overnight investment sweep cut-off. On June 12, 2002, Maria Ruiz at Bank One emailed the Servicer and John Rothrock at Bank One clarifying what had happened and why the various accounts' interest revenue was being adjusted. Bank One's explanation included a discussion of the purpose of the $170 million wire from Chase and the large monthly wires from Chase generally: "Once that wire was received by Bank One, we would then make the appropriate transfers to the reserve accounts per your instructions." Bank One knew exactly why it received wires each month from Chase: to fill up NPF XII's reserve accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 322, except states that to the extent the UAT relies on NPF bank account statements and Bank One emails referenced in paragraph 322, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

323. The lengths to which Bank One would go to facilitate the kiting scheme are demonstrated in part by its actions on July 1, 2002. Bank One went out of its way to assist the

Servicer when the monthly transfer of cash between NPF XII and NPF VI was delayed. On that day, Bank One made "transfers" from the NPF XII Purchase Account into NPF XII's reserve accounts totaling $275 million, even though the Purchase Account contained nowhere near enough money for those transfers. Bank One made these "transfers" based solely on Bank One's anticipation of receiving a wire from Chase. Bank One and the Servicer had to make those transfers, because the Equity Account had otherwise been virtually emptied that same day by a $105 million principal payment to NPF XII bondholders, and without them NPF XII would have failed its Equity reserve test on that day. To make the transfers, then, Bank One agreed to carry a substantial overdraft in the NPF XII Purchase Account. Bank One's officers in charge of the NPF XII accounts reported this overdraft to other officers at Bank One because of the significant amount of money involved. Specifically, Bank One officer Jeff Kinney reported in an e-mail to another officer at Bank One that due to the late receipt of money and various transfers, the NPF XII Purchase Account would be overdrawn by $104 million. Although NPF XII only had net $171 million in its accounts at Bank One that day, Bank One reported-and allowed the Servicer to report-the following cash balances that day:

| | |
|---|---|
| *Purchase:* | *$104 million* |
| *Offset Reserve:* | *$18 million* |
| *Seller Credit* | *$56 million* |
| *Equity Reserve* | *$201 million* |

Of course, although the amounts in the three reserve accounts were reported outside of Bank One on the first day of each month, the negative balance of the purchase account was not. This "overdraft" in the Purchase Account therefore allowed Bank One and the Servicer to falsely report higher balances in the NPF XII reserve accounts for the purpose of preparing a misleading Investor Report and maintaining the misappropriation scheme.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 323, except states that to the extent the UAT relies on NPF bank account statements and internal Bank One documents referenced in paragraph 323, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

324. Bank One and the Servicer's overdraft trick was, though, only one of several they had at the ready to facilitate the kiting scheme. Bank One was required to be more creative than Chase in its deception, in part because NPF XII was, at least in terms of the receivables it purportedly owned, twice as large as NPF VI. Correspondingly, in furtherance of its unlawful agreements, each month Bank One needed to herd almost twice as much cash into NPF XII's reserve accounts than Chase did into NPF VI's. When the funds Bank One and Chase were kiting back and forth were insufficient to fill up NPF XII's reserves, Bank One kited funds internally among the three reserve accounts it held for NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 324, except states that to the extent the UAT relies on NPF bank account statements referenced in paragraph 324, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

325. For example, NPF XII's October 1, 2001 Investor Report, which the Servicer issued October 23,2001, set forth NPF XII's purported compliance with the required balance in the NPF XII Equity Account as of the effective date of the report, October 1. The report indicated that NPF XII had failed to meet the minimum amounts required to be held in the Seller Credit Reserve Account (the account held cash equal to 5.3% of the Net Value of Purchased Receivables instead of the required 6.5%) on October 1, but stated in a footnote that NPF XII

was "compliant as of October 2, 2001." However, NPF XII was only purportedly "compliant" with the Seller Credit Reserve Account test on October 2, 2001 because Bank One, at the request of the Servicer, and in violation of the indenture, transferred $24.5 million from the NPF XII Equity Account (whose balance had been reported as of October 1) to the NPF XII Seller Credit Reserve Account on the morning of October 2, 2001.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 325, except states that to the extent the UAT relies on the October 1, 2001 Investor Report and NPF bank account statements referenced in paragraph 325, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

326. Bank One thus had actual knowledge that (l) NPF XII failed the Seller Credit reserve test on October 1, 2001; (2) the Servicer was only able to achieve the specified minimum balance in the NPF XII Seller Credit Reserve Account for purposes of the fraudulent "corrective" footnote by raiding NPF XII's own Equity Account; (3) if Bank One had transferred the $24.5 million from NPF XII's Equity Account to make the Seller Credit Reserve Account compliant as of the Monthly Payment Date, it would have resulted in NPF XII failing its Equity Account reserve test; and (4) the October 1, 2001 NPF XII Investor Report "used" the same funds to report compliance with the balance requirements for both the Equity and Seller Credit Accounts in the same report. Not only did Bank One have actual knowledge of this fraud, but it actively participated in perpetrating it by agreeing to make and making the transfers necessary for this deception, and by distributing the misleading Investor Reports.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 326.

327. This plain kiting within Bank One's own accounts was not a one-time event. Bank One orchestrated a similar set of transfers just three months later. NPF XII's January 2002 Investor Report, issued January 24, 2002, set forth NPF XII's compliance with the required balance in the NPF XII Equity Account as of the effective date of the report, January 2. That same Investor Report stated that although NPF XII had failed to meet the minimum amounts required to be held in the Seller Credit Reserve account (holding cash equal to 5.4% of the Net Value of Purchased Receivables instead of the required 6.5%) on January 2, the report footnoted that NPF XII was "compliant as of January 3, 2002." However, NPF XII was only purportedly "compliant" with the Seller Credit reserve test on January 3, 2002 because Bank One, at the request of the Servicer, and in violation of the indenture, transferred $20 million from the NPF XII Equity Account to the NPF XII Seller Credit Reserve account on the morning of January 3, 2002.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 327, except states that to the extent the UAT relies on the January 2002 Investor Report and NPF bank account statements referenced in paragraph 327, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

328. Bank One thus had actual knowledge that (1) NPF XII failed the Seller Credit Reserve Account test on January 2, 2002; (2) the Servicer was only able to achieve the required minimum balance in the NPF XII Seller Credit Reserve Account for purposes of the fraudulent "corrective" footnote by raiding NPF XII's own Equity Account; (3) if Bank One had transferred the $20 million from NPF XII's Equity account to make the Seller Credit Reserve Account compliant as of the determination date, it would have resulted in NPF XII failing its Equity

Account Reserve test; and (4) the January NPF XII Investor Report "used" the same funds to achieve compliance with the balance requirements for both the Equity and Seller Credit Accounts in the same report. These transfers are yet another example that not only did Bank One have actual knowledge of this fraud, but it actively participated in perpetrating it.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 328.

329. When both its interbank and its intra-bank kiting were insufficient to allow the Servicer to place sufficient funds in the right account on the right day, Bank One simply, but intentionally, failed to correct the Servicer when it prepared investor reports that Bank One knew to be fraudulent and misleading. For example, as set out above, Bank One was required to receive and recalculate NPF XII's Investor Reports as of the first business day of each month. The first business day of August 2000 was Tuesday, August 1, 2000. However, Bank One's cash balance memorandum to the Servicer on August I—which Bank One had revised at least once before sending to the Servicer—indicated that the total cash at NPF XII was $58.7 million. That balance was $76 million short of the $134.8 million required to be in the three NPF XII reserve accounts on that day. The Chase wire was a day late.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 329.

330. On this occasion, however, the Servicer and Bank One took a different tack. The Servicer authored, and Bank One received, re-calculated, and approved, an Investor Report that month <u>not</u> as of the first business day, as required, but as of Wednesday, August 2. On August 2, 2000, after receiving the usual "reconciliation" wire from Chase a day late (this time $118 million), the total balance of the accounts was reported as $135.7 million, just above the

minimum amounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 330, except states that to the extent the UAT relies on the August 2000 Investor Report and NPF bank account statements referenced in paragraph 330, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

331. Bank One knew the significance of its deception. Internal notes and reports at Bank One compared the balances on August 1, 2000 with what Bank One knew they should have been, and referenced the significance of NPF XII's "determination date," or the effective date for which NPF XII's Investor Reports should have been prepared and calculated and reviewed by Bank One. Moreover, an officer senior to John Rothrock and Rothrock's supervisor, Tom Hyland, was called in for a meeting on the matter. In that meeting on August 3, 2000, Hyland instructed those at Bank One administering NPF XII that Darlington Cummings, the officer at Bank One who handled the day-to-day work on NPF XII, would "fix" the spreadsheets Bank One kept regarding the required balances in the three NPF XII reserve accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 331.

332. The result, of course, was that Bank One knowingly allowed the Servicer to prepare—and Bank One knowingly and fraudulently accepted, approved and distributed—an Investor Report Bank One knew did not comply with the Indenture and knew was generated to allow the misappropriation scheme to continue undiscovered.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 332.

333. Internal Bank One correspondence revisited similar non-compliance with the Indenture early the next month. On August 31, 2000, Bank One's cash balance memorandum to the Servicer indicated that the NPF XII accounts contained the following balances:

| | |
|---|---|
| *Collection:* | *$0* |
| *Purchase:* | *$1,237,000* |
| *Seller Credit:* | *$334,128* |
| *Offset Reserve:* | *$175,717* |
| *Equity:* | *$359,328* |
| ***TOTAL:*** | ***$2,106,175*** |

On that date the three reserve accounts should have contained, together, approximately $136,000,000. On September 1, 2000, an asset-backed securities specialist at Bank One wrote Rothrock regarding NPF XII, complaining of the "large dollar amounts taken from the deals, in which the compliance standards are not up to par." Bank One refused to take any action, despite its duty to do so under the indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 333, except states that to the extent the UAT relies on the NPF bank account statements and internal Bank One documents referenced in paragraph 333, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

334. Bank One later received and calculated a second investor report not on the correct determination date. On July 24, 2001, Bank One received an investor report from the Servicer with a determination date of June 30, 2001. Bank One knew from the indenture that June 30, 2001 was not the correct effective date for the report, but nevertheless did not require any correction or take any action to request a correct report.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 334, except states that to the extent the UAT relies on the Investor

Report referenced in paragraph 334, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

335. To monitor ongoing success of the kiting scheme, John Rothrock regularly prepared and reviewed a computer report on Bank One's SEI system that included the daily cash balance for the NPF XII accounts. Conspicuously, Rothrock kept together in one file a paper copy of the cash balance reports only for the last business day of each month and the first and second business day of the following month.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 335.

**7. Bank One's Improper Transfers out of the Purchase Account for Ineligible Receivables**

336. Bank One knew that the Indenture prohibited the purchase of receivables unless those receivables had been generated by the actual prior provision of health care services.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 336.

337. Nevertheless, Bank One agreed and condoned the Servicer' s directions for Bank One to transfer money by wire to health care providers for purported "receivables" for health care services that had not even taken place. As early as January 2000, in connection with NCFE's annual audit, Bank One co-signed a confirmation letter in which it expressly agreed that Bank One would allow the Servicer to issue instructions—and Bank One would follow those instructions—for the purchase of so-called "receivables" for which health care services had yet to be provided. In that letter dated January 27, 2000, which the Servicer sent to Bank One and Bank One returned through the U. S. mail and about which Bank One and the Servicer exchanged several phone calls and faxes, Bank One confirmed, among other things, that it would

knowingly allow the Servicer to fraudulently boost the amount of eligible receivables NPF XII supposedly owned and reported. John Rothrock confirmed in that letter that it was Bank One's understanding and policy that in administering NPF XII, "The Receivables balances may include the purchase of proforma Receivables . . . ," or receivables for which the payment, or at least a portion of the payment, was not even contractually owed to the health care provider.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 337, except states that to the extent the UAT relies the January 27, 2000 “confirmation letter” referenced in paragraph 337, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

338. Bank One knew this was an express violation of the Indenture, which, as set out above, required receivables to be actual receivables, *i.e.*, invoices for which the program participant had the existing contractual right to collect payment for services rendered.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 338, except states that to the extent the UAT relies the NPF XII Indenture referenced in paragraph 338, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

339. Bank One also knew that both the Indenture and the Sale and Subservicing Agreements had specific requirements for handling Rejected Receivables and Defaulted Receivables. That is, Bank One knew that Rejected and Defaulted Receivables were required to be re-purchased from NPF XII by the selling health care provider from which NPF XII had purchased them in the first place.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 339, except states that to the extent the UAT relies the NPF XII

Indenture and the Sale and Subservicing Agreements referenced in paragraph 339, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

340. Nevertheless, Bank One agreed and confirmed for the Servicer that in order to falsely demonstrate that NPF XII was in better financial position that it actually was, Bank One would allow the Servicer to direct, and Bank One to fund, re-purchases by NPF XII of Defaulted and Rejected Receivables. In its January 27, 2000, confirmation letter to the Servicer, Bank One confirmed that a "Rejected Receivable may be repurchased" and a "Receivable which has become a Defaulted Receivable may be repurchased" by NPF XII. These agreements and understandings were in direct violation of the Indenture, yet Bank One agreed to allow, and repeatedly allowed, the Servicer to direct such fraudulent re-purchases.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 340, except states that to the extent the UAT relies the January 27, 2000 “confirmation letter” referenced in paragraph 340, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

**8. Bank One's Improper Transactions With NCFE Affiliates**

341. Bank One knew that except for very limited instances carefully circumscribed in the Indenture, NPF XII was prohibited from participating in transactions with NCFE or its affiliates.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 341.

342.Nevertheless, Prior to Bank One's signing the Master Indenture in March 1999, as well as during meetings relating to the signing of each NPF XII supplemental indenture,

Poulsen, acting on behalf of the Servicer, specifically discussed with Bank One representatives, including John Rothrock, that many of the health care providers from which NPF XII purchased receivables were affiliates of the Founders, NCFE or other of NCFE's subsidiaries.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 342.

343.Bank One agreed, contrary to the terms of the Indenture, to allow NPF XII funds to be transferred to such affiliates. Bank One also confirmed with the Servicer, in writing through the U.S. mails and by fax and telephone call, that Bank One would permit these improper transactions between affiliates. In its January 27, 2000 confirmation letter to the Servicer, Bank One agreed that, "Transfers of collateral from NPF XII to another subsidiary or affiliate of NCFE are anticipated in the normal course of business and such transfers should be adjusted within a monthly period." Bank One again confirmed this agreement with the Servicer, again in writing through the U.S. Mails and by telephone, on September 13, 2002.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 343, except states that to the extent the UAT relies the January 27, 2000 “confirmation letter” referenced in paragraph 343, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

344.As a result, throughout its administration of NPF XII, Bank One routinely and knowingly wired funds from the NPF XII Purchase Account to health care providers it knew to be affiliated with NFCE and the Servicer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 344.

345.Bank One was reminded each year about the significant amount of related party

transactions between NPF XII and NCFE and its affiliates in connection with NCFE's delivery of its audited financials to Bank One. Each year Poulsen and the Servicer met with Bank One representatives, including John Rothrock, and discussed the results of NCFE's audit. During each of these meetings, Poulsen, the Servicer, and Bank One discussed many of the NCFE affiliates regularly being advanced funds by NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 345.

346.In addition, in mid-2000, after NCFE and Bank One became aware of several anonymous letters to an analyst at Duff & Phelps, Jeff Orr, (who would later go to work for a Bank One affiliate, Banc One Capital Markets), criticizing NCFE as a Ponzi scheme, the Servicer provided Bank One a comprehensive list detailing the health care providers in the NPF XII and NPF VI programs that were affiliated with NCFE. That list included how each affiliated seller had been acquired in whole or in part by NCFE or the Founders, the timing of the acquisitions, and the principals involved, among other information. In the summer of 2000, the Servicer also had numerous discussions with Bank One regarding the information contained on this report.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 346.

347.Bank One also repeatedly processed wire transfer request from the Servicer that were on their face violative of the NPF XII Indenture because the recipients were NCFE affiliates who were not Sellers. For example, on March 11, 1999, <u>one day after Bank One had signed the NPF XII Indenture</u> and had established the NPF XII accounts with the funds received from the first NPF XII offering, Bank One, pursuant to written "Special Wire Instructions" from

the Servicer, wired $20.5 million from NPF XII's new Purchase Account to NPF VI. Bank One knew from its review of the Indenture that there was no instance in which such a transfer was permissible under the Indenture. Nevertheless, Bank One knowingly and deliberately followed the Servicer's unauthorized instruction. In addition, on May 18, 1999, Bank One received, reviewed, approved and processed a request from the Servicer to wire $1.5 million from the NPF XII Purchase Account to NPF X, Inc., in violation of the Indenture. Bank One continued to knowingly make such prohibited transfers of funds throughout the course of its administration of NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 347, except states that to the extent the UAT relies on the August 2000 Investor Report and written requests from the Servicer referenced in paragraph 347, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

348.Bank One also had knowledge of and regularly directed improper transactions between NPF XII and another NCFE subsidiary for which Bank One served as Indenture Trustee, NPF WL, Inc. In mid-July 2000, however, one of the significant NPF-WL creditors, Bank Hapoalim, discovered numerous questionable transactions taking place at NPF-WL, as well as NPF-WL's failure to deliver required weekly collateral coverage reports to Bank One. Bank Hapoalim immediately requested in writing that Bank One immediately notify all the NPF-WL lenders of the amounts in the NPF-WL Equity, Seller Credit, Offset Reserve and other accounts every day during the remainder of the NPF-WL program. Bank One did not do so. Instead, ten days later, Bank One and another bank took assignment of all of Bank Hapoalim' s investment in NPF-WL (Bank One took $10,000,000 of it), quickly ridding itself of the

meddlesome investor whose request would have forced Bank One to disclose widely information it knew would cause disruption of the misappropriation scheme.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 348.

349. Bank One's quick investment allowed the Servicer and Bank One and Chase to continue using NPF-WL as part of the kiting scheme. For example, on September 29, 2000, at the direction of the Servicer, Bank One, in violation of the NPF-WL loan agreement and the NPF VI indenture, transferred $29.6 million from NPF-WL to NPF VI, in time for the testing of NPF VI's reserve account balances. Likewise, two months later, on November 29, 2000, Bank One, in violation of both the NPF WL loan agreement and the NPF XII indenture, transferred approximately $47 million from NPF WL to NPF XII in time for inclusion on reports regarding NPF XII's December 1, 2000 Monthly Payment Date. Bank One also knowingly processed numerous similar requests from the Servicer to transfer funds from NPF XII back to NPF - WL.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 349, except states that to the extent the UAT relies on the NPF VI Indenture and written requests from the Servicer referenced in paragraph 349, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

### 9. Bank One's Failure to Monitor the Servicer's Compliance with the Indenture's Reporting Requirements

350. Bank One also failed in its express duties to monitor NPF XII's and the Servicer's compliance by failing to receive and review reports Bank One was required to receive and review under the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 350.

351. Under Section 8.01 (j) and Exhibit 7 of the Indenture, Bank One was required to receive a weekly "collateral coverage report" from the Servicer that compared and calculated by how much NPF XII's total eligible receivables and cash exceeded NPF XII's outstanding indebtedness. Under the Indenture, Bank One was also required to receive these reports on a weekly basis and recalculate the information contained in them to determine, among other things, that NPF XII's collateral coverage was in excess of the amount required by the Indenture. These reports included the current amount of NPF XII's Net Eligible Receivables, as well as the cash balances of the NPF XII reserve accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 351, except states that to the extent the UAT relies on the NPF VI Indenture, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

352. In violation of the Indenture, Bank One did not receive or recalculate any such weekly report from the inception of NPF XII in March 1999 until July 6, 1999. After that, Bank One allowed the Servicer to provide it collateral coverage reports essentially at the Servicer' s leisure. For example, on July 26, August 9, September 24, 1999, Bank One received late two prior "weekly" reports. On October 26, 1999 and January 7, 2000, Bank One received four and five late, prior period reports respectively. On June 13, 2000, Bank One was sent the purportedly "weekly" reports for the prior two months. Bank One never insisted on receiving the reports on a weekly basis, as required by the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 352, except states that to the extent the UAT relies on collateral coverage reports referenced in paragraph 352, Defendant Ayers refers to the text of those

documents for the complete and actual description of its contents.

353. In fact, after the reports for the weeks ended June 2 and June 9, 2000 (both of which showed the Equity Account and Seller Credit Reserve Account short of their required levels by approximately $45 million and $6 million, respectively), Bank One never requested or received another weekly collateral coverage report. The Servicer stopped sending them, and Bank One never raised the issue. Bank One failed to do so in plain violation of its requirement to receive, review, and re-calculate these reports on a weekly basis.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 353 except states that to the extent the UAT relies on collateral coverage reports referenced in paragraph 353, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

354. Bank One also had no "tickler" or computerized reminder to note this non-compliance with the indenture, which was itself a violation of Section V of Exhibit 7 of the indenture, which required Bank One to establish appropriate electronic "ticklers" to monitor compliance with NPF XII's reporting requirements.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 354, except states that to the extent the UAT relies on the NPF XII Indenture referenced in paragraph 354, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

355. As set out above in greater detail, the collateral coverage reports Bank One did receive almost uniformly demonstrated significant deficiencies in the NPF XII reserve account balances, with the last reports Bank One received in June 2000 showing routine shortages of $20-25 million in the Seller Credit and Offset Reserve Accounts. The Servicer continued to

generate weekly collateral coverage reports for NPF XII through the end of 2000, and all but a handful declared reserve deficiencies. In addition, after June 2000, the reports detailed the deterioration of NPF XII's collateral coverage well below the amount specified for collateral coverage tests in the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 355 except states that to the extent the UAT relies on collateral coverage reports referenced in paragraph 355, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

356. Bank One also failed to request and receive other reports required under the Indenture. For example, as set out in greater detail above, Bank One on several occasions allowed the Servicer to send Bank One Investor Reports that had effective dates that were not the required Monthly Payment Date. For example, for the months March through September 1999, December 1999, January 2000, and July 2001 Bank One received and accepted from the Servicer Investor Reports that set out the various tests required in those reports as of the last business day of the month, not the correct, first day of the month. Nevertheless, Bank One did not insist on correct reports, in violation of the Indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 364, except states that to the extent the UAT relies on the NPF XII Indenture and the Investor Reports referenced in paragraph 356, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

357. In addition, as set out above, Bank One was complicit in August 2000 in accepting from the Servicer an Investor Report with an effective date of August 2, 2000, the second business day of the month, where receipt and recalculation of a proper report would have shown

NPF XII's reserve accounts short by approximately $76 million.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 357, except states that to the extent the UAT relies on the August 2000 Investor Report and NPF bank account statements referenced in paragraph 357, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

358. Bank One also allowed the Servicer to report NPF XII's Equity Account Balance on at least one Investor Report more than a week after the Monthly Payment Date. In June 2002, the Servicer sent to Bank One the NPF XII Investor Report with a notation that the NPF XII Equity Account Balance was reported as June 11, 2002, in violation of the Indenture. Bank One sent the Investor Report back to the Servicer to be revised, not because of the effective date of the Equity Account analysis, but because, after checking its own information regarding NPF XII's balances, Bank One knew that the amounts reported to be in the NPF XII Equity account, namely $732 million, did not exist. The Servicer revised the report, dutifully reporting that the Equity Account reported just over the $210 million required to be in that account. Bank One did not insist on, and the Servicer did not change, the effective date of the Equity Account reporting.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 358, except states that to the extent the UAT relies on the NPF XII Indenture, the June 2002 Investor Report and NPF bank account statements referenced in paragraph 358, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

### 10. Bank One Had Much to Lose If NPF XII Wound Down

359. The misappropriation scheme was lucrative for Bank One. Of course, Bank One's

Corporate Trust Department earned substantial, continuous fees for its work in administering NPF XII, including acceptance fees, monthly maintenance fees, and annual administration fees for each NPF XII supplemental indenture.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 359.

360. In addition to Bank One's Corporate Trust Department, other departments of Bank One, as well as Bank One's subsidiaries and affiliates, also earned significant income from their relationship with NCFE, the Servicer, and NPF XII. For example, Bank One earned significant investment advisory fees each year for investing NPF XII's account balances on a regular basis. In addition, Bank One earned roughly $50,000 per year in "sweep fees" in connection with its overnight investments of NPF XII's accounts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 360.

361. Bank One earned a commitment fee for its $30,000,000 investment in the CSFB variable funding note, NPF XII Series 2000-4 Note. It also earned interest from NPF XII from that investment.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 361.

362. Bank One earned additional fees from the sale to NPF XII of interest rate cap agreements for several of the NPF XII note offerings, for amounts ranging from $75,000 to $660,000 per offering.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 362.

363. Bane One Capital Markets, a Bank One affiliate, served as co-underwriter and co-manager with CSFB on approximately $800,000,000 of NPF XII Notes, earning substantial underwriting and placement agent fees in the process.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 363.

364. Bank One also earned similar fees for its administration of the NPF WL, NPF LP, and other NPF programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 364.

365. Bank One's treasury department also earned fees for administering several accounts for the Servicer including certain of its accounts that served as lockboxes for several Chartwell entities. Banc One Leasing Corp., a Bank One affiliate, earned interest and fees from its loan to NCFE in June 2000 to purchase one of NCFE's corporate aircraft. Bank One's Private Client Services Group also earned interest and fees from its $2 million personal loan to Poulsen.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 365.

366. When NPF XII collapsed in October 2002, Bank One had designing and was discussing with NCFE a comprehensive banking system for NCFE that Bank One estimated internally would earn Bank One over $4 million in fees per year, not including Bank One's trust services.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 366.

367. Plaintiff hereby pleads, in the alternative to its allegations that Bank One acted

with actual knowledge of its breaches, frauds, and defalcations and with intent to injure NPF XlI, as follows: Bank One was, at a minimum, grossly negligent in the conduct of its duties as NPF XII Indenture Trustee. Bank One's acts and omissions in carrying out its obligations under the NPF XII Indenture, and in obtaining the information necessary to exercise any discretion granted to it under the NPF XII Indenture, was a gross neglect of duty which amounts to willfulness and evinced a reckless disregard for the rights of NPF XII. In the alternative to this pleading of gross negligence, Bank One was negligent and failed to exercise reasonable care under the circumstances in carrying out its obligations under the NPF XII Indenture, at times when it was obliged to act as a prudent man, and in obtaining the information necessary to exercise any discretion granted to it under the NPF XII Indenture. Because Bank One knew that NPF XII was in a continuous and uncured state of default, at all times relevant to this complaint Bank One owed NPF XII a general fiduciary duty to act as a prudent man would. Bank One, however, willfully and negligently breached the fiduciary obligations it owed to NPF XII.

Paragraph 367 contains conclusions of law as to which no answer is required. To the extent an answer is required, Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**11. NPF XII and NPF VI?s Discovery of the Fraud**

367A. In late October 2002, NPF XII and NPF VI discovered the scheme that had been foisted on them over the prior years. As Bank One alleged in its own lawsuit against Chase:

> On September 30, 2002, without prior notice to the NPF XII Noteholders of the NPF XII Trustee, JP Morgan Chase Bank suddenly halted all transfers from NPF VI accounts to NPF XII accounts. . . . When JP Morgan Chase Bank abruptly halted the kiting activity on September 30, 2002, the balance of payments ran conspicuously in favor of NPF VI (the program for which it served as indenture trustee and against NPF XII (the program for which Bank One served as Indenture

> trustee). . . . [By doing so,] JP Morgan Chase Bank "substantially assisted the fraud."

Bank One Lawsuit ¶¶ 151-55, 305.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 367A, and refers to the Complaint referenced therein for the complete and actual description of its contents.

367B. The next day, October 1, 2002, Bank One was expecting to receive its usual end-of-the month kiting wire from Chase. The Servicer e-mailed Bank One to advise it to the contrary: "I don't think we are going to get this money in today, but you might see something come in from Credit Suisse, just not that much."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 367B, except to the extent the UAT relies on e-mail communications from the Servicer, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

367C. Emails between CSFB and Bank One a few days later discussed the fact that NPF XII only had approximately $10,000,000 in its accounts. When it determined that Chase had finally decided not to continue the scheme and CSFB would no longer float short-term loans to prop up the program, Bank One sent a widespread notice of Event of Default to NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 367C, except to the extent the UAT relies on the notice of Event of Default or the email referenced in paragraph 367C, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

367D. That notice of Event of Default alerted NPF XII, and shortly later NPF VI, for the

first time of the program's non-compliance, and spawned an investigation into the extent of the Defendants' wrongdoing. By late October 2002, internal correspondence at Bank One had concluded that "we could have a lot of exposure here. . . ." The investigation led to the removal of the Founders from their positions in late October 2002, the hiring of workout specialists Alvarez Marset to run NCFE, the programs' bankruptcy in November 2002, and ultimately to the discovery that NPF XII and NPF VI had been pillaged by the Defendants.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 367D.

**D. Factual Allegations Regarding the Founders**

368. The Founders, NCFE Inc., and the Servicer had a history of performing securitizations along with indenture trustees that pre-dated the NPF VI and NPF XII Programs.

Defendant Ayers denies the allegations of paragraph 368 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

369. In these earlier securitizations, which began as far back as 1993, Bankers Trust Company ("Bankers Trust") served as the indenture trustee.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 369.

370. At the time, Joseph Giordano, John Rothrock, and Marie Merritt were employees of Bankers Trust. Joseph Giordano, John Rothrock, and Marie Merritt each performed services for Bankers Trust in its role as indenture trustee on NCFE-related securitizations pre-dating the NPF VI and NPF XII programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 370.

371. During the securitizations that pre-dated the NPF VI and NPF XII programs, Giordano, Rothrock, and Merritt, at that time acting on behalf of Bankers Trust, began their pattern and practice of operating NCFE securitizations in an unauthorized and illegal fashion.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 371.

372. These types of practices resulted in Bankers Trust, in March 1997, issuing a notice of default in connection with the NPF VI Program due to multiple events of default in that program. A few months later, in approximately November 1997, Chase (with regard to the NPF VI program) replaced Bankers Trust as an indenture trustee on the NPF VI Program.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 372.

373. Former Bankers Trust employees Giordano and Merritt joined Chase's trustee while Former Banker's Trustee employee Rothrock, joined Bank One's trust department. These individuals continued their pattern and practice of operating NCFE securitizations in an unauthorized and illegal fashion in their continued capacities as indenture trustees (with different employers).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 373.

374. Giordano and Merritt were among the employees of Chase that were responsible for Defendant Chase's role as the Indenture Trustee for NPF VI. Rothrock was among the employees of Defendant Bank One responsible for Defendant Bank One's role as the Indenture Trustee for NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 374.

375. As explained throughout this Complaint, several of the misdeeds carried out by the Indenture Trustees and others involved the Founders.

Defendant Ayers denies the allegations of paragraph 375 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

376. Until approximately November 8, 2002, Poulsen served as an officer of NCFE Inc., the Servicer, NPF VI, and NPF XII. Specifically, he served as President of NCFE Inc.; President and Treasurer of the Servicer; President and Treasurer of NPF VI; and President and Treasurer of NPF XII.

Defendant Ayers admits that for at least some period of time during the relevant period, Poulsen was President of NCFE, President and Treasurer of the Servicer, President and Treasurer of NPF VI and President and Treasurer of NPF XII.

377.Until approximately November 8, 2002, Poulsen served as a director of NCFE Inc., the Servicer, NPF VI, NPF X, and NPF XII.

Defendant Ayers admits that for at least some period of time during the relevant period, Poulsen was Director of NCFE, the Servicer, NPF VI, NPF X and NPF XII.

378. Defendant Barbara Poulsen served as an officer of the Servicer.

Defendant Ayers admits that for at least some period of time during the relevant period, Barbara Poulsen served as an officer of the Servicer.

379. Defendant Barbara Poulsen served as a director of NCFE Inc.

Defendant Ayers admits that for at least some period of time during the relevant period,

Barbara Poulsen served as a director of NCFE.

380.Until approximately June 30, 2001, Ayers served as an officer of NCFE Inc., the Servicer, NPF X, and NPF XII. Specifically, he served as the Chief Operating Officer of NCFE Inc.; Vice President of the Servicer; President of NPF X; and Vice President of NPF XII.

Defendant Ayers denies the allegations of paragraph 380.

381.Until approximately June 30, 2001, Ayers served as a director of NCFE Inc., NPF VI, NPF X, and NPF XII.

Defendant Ayers denies the allegations of paragraph 381.

382. Until approximately June 30, 2001, Defendant Rebecca Parrett served as an officer of NCFE Inc., the Servicer, NPF VI, and NPF X. Specifically, she served as Secretary and Treasurer of NCFE, Inc.; Vice President of the Servicer; Vice President of NPF VI; and Vice President of NPF X.

Defendant Ayers admits that for at least some period of time during the relevant period, Rebecca Parrett served as a Secretary and Treasurer of NCFE, Vice President of the Servicer, Vice President of NPF VI and Vice President of NPF X.

383.Until approximately June 30, 2001, Defendant Rebecca Parrett served as a director of NCFE Inc., NPF VI, NPF X, and NPF XII.

Defendant Ayers admits that for at least some period of time during the relevant period, Rebecca Parrett served as a director of NCFE, NPF VI, NPF X and NPF XII.

384. The Founders operated and managed the Servicer.

Defendant Ayers denies the allegations of paragraph 384 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

385. In that capacity and in their individual capacity, the Founders each participated in several aspects of the conduct described in this Complaint which gives rise to the claims made herein, including various of the actions taken in contravention of the Master Indentures governing the NPF VI and NPF XII Programs.

Defendant Ayers denies the allegations of paragraph 385 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

385A. Each Founder, Lance Poulsen, Barbara Poulsen, Rebecca Parrett, and Don Ayers, knew that the operations of NPF VI and NPF XII were governed and restricted by the Master Indentures. Each Founder had specific knowledge of the requirements contained in the Master Indentures. Notwithstanding that knowledge, each Founder participated in several aspects of the conduct described in this Complaint that give rise to certain of the causes of action stated herein.

Defendant Ayers denies the allegations of paragraph 385A as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

386. For example, the Founders knew of, authorized, and participated in various transactions with parties affiliated to NCFE Inc., NPF VI, and NPF XII that were prohibited by the Master Indentures.

Defendant Ayers denies the allegations of paragraph 386 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

387. As discussed elsewhere, numerous of the healthcare providers that participated in the NPF VI and NPF XII Programs were owned directly or indirectly by the Founders through

companies in which they held total or near-total ownership interests. For instance, Home Medical of America, Infusion Management Systems, Thera-Kinetics, Med Diversified, and Rx Medical were (purported) health care providers in which the Founders held substantial—in many cases complete—ownership interests.

Defendant Ayers denies the allegations of paragraph 387 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

388. The Founders owned these companies through other off-balance-sheet companies they owned and controlled, including (as to the companies used as examples immediately above) IIA, Thor, HCC, Flohaz, and South Atlantic.

Defendant Ayers denies the allegations of paragraph 388 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

389. As of November 2002, Home Medical of America, Infusion Management Systems, Thera-Kinetics, Med Diversified, and Rx Medical had been illegally advanced at least $665,000,000 in transactions that were expressly prohibited by the Master Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 389.

390. Along with other of the Defendants, the Founders each knew of, participated in, and authorized these transactions at two levels. First, the Founders each knew of, participated in, and directed the Servicer to make the illegal transfers from NPF VI and NPF XII to these companies owned by the Founders. Second, the Founders each knew of and received a benefit from these transfers to the companies they owned.

Defendant Ayers denies the allegations of paragraph 390 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

391. In addition to these unauthorized affiliate transactions, the Founders each knew of and participated in various other facets of the illegal conduct described herein.

Defendant Ayers denies the allegations of paragraph 391 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

392. The Founders, with the knowledge of other Defendants as stated herein, directed the Servicer to "purchase" hundreds of millions of dollars in purported accounts receivable that were not permitted to be purchased under the Master Indentures.

Defendant Ayers denies the allegations of paragraph 392 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

393. The Founders, with the knowledge of other Defendants as stated herein, directed the Servicer to engage in the practice of purchasing "future receivables" that were, in reality, nothing more than unsecured advances prohibited by the Master Indentures.

Defendant Ayers denies the allegations of paragraph 393 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

394. The Founders, with the knowledge of other Defendants as stated herein, directed the Servicer to engage in the practice of "pro forma funding" which, similarly, often consisted of nothing more than making unsecured advances that were prohibited by the Master Indentures.

Defendant Ayers denies the allegations of paragraph 394 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

395. Poulsen and Ayers, with the knowledge of other Defendants as stated herein, participated in the kiting scheme alleged throughout this Complaint in which huge sums of money were illegally transferred back and forth between the Indenture Trustee banks in an effort to disguise the pervasive non-compliance within the NPF VI and NPF XII Programs. Upon information and belief, Parrett knew of and authorized this conduct, as well.

Defendant Ayers denies the allegations of paragraph 395 as to Defendant Ayers, and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

396. None of this conduct was ever disclosed to the Independent Director of NPF VI and NPF XII, Vincent J. Margello, Jr.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 396.

397.Until approximately June 30, 2001, Margello acted as an independent director of NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 397.

398. Margello was never employed by any NCFE entity or affiliate.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 398.

399. Margello's only role within NPF VI and NPF XII was to serve as their independent director until approximately June 30, 2001.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 399.

400.As a director of NPF VI and NPF XII, Margello was in a position to bring an end to some or all of the illegal conduct described in this Complaint, had he been informed of this conduct

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 400.

401. None of the Defendants to this action ever informed Margello of any of the wrongdoing alleged herein.

Defendant Ayers denies the allegations of paragraph 401 to the extent that it asserts that Defendant Ayers acted unlawfully and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

402. Had Margello been informed of the wrongdoing alleged herein, Margello would have discharged his fiduciary duty to NPF VI and NPF XII by taking steps to ensure that the Defendants' manipulation of NPF VI and NPF XII was discontinued.

Defendant Ayers denies the allegations of paragraph 402 to the extent that it asserts that Defendant Ayers acted unlawfully and denies knowledge or information sufficient to form a belief as to the allegations not directed at Defendant Ayers.

**E. Counts Regarding the Scheme to Defraud and Thereby Misappropriate the Assets of NPF VI and NPF XII**

**COUNT I**
**FEDERAL RICO ENTERPRISE: 18 U.S.C. § 1962(c)**
**The Operation and Management of NPF VI Enterprise**
***Against Poulsen, Ayers, Parrett, and Chase***

As to Count I, including paragraphs 403 through 430, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Chase. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT II**
**FEDERAL RICO CONSPIRACY: 18 U.S.C. § 1962(d)**
**Conspiring to Violate § 1962(c)-The Operation and Management of NPF VI Enterprise**
***Against Poulsen, Ayers, Parrett, Chase and Bank One***

As to Count II, including paragraphs 431 through 445, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Chase and Bank One. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**Count III**
**Federal RICO Enterprise: 18 U.S.C. § 1962(c)**
**The Operation and Management of NPF XII Enterprise**
***Against Poulsen, Ayers, Parrett, and Bank One***

As to Count III, including paragraphs 446 through 474, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Bank One. To the extent an answer is required, Defendant Ayers denies the

allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**Count lV**
**Federal RICO Conspiracy: 18 U.S.C. § 1962(d)**
**Conspiring to Violate § 1962(c)—The Operation and Management of NPF XII Enterprise**
***Against Poulsen, Ayers, Parrett, Chase and Bank One***

As to Count IV, including paragraphs 475 through 489, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Chase and Bank One. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT V**
**OHIO CORRUPT PRACTICES ACT: OHIO REV. CODE §§ 2923.34(B); 2923.32(A)(1)**
**The Operation and Management of NPF VI Enterprise**
***Against Poulsen, Ayers, Parrett, and Chase***

As to Count V, including paragraphs 490 through 519, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Chase. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT VI**
**OHIO CORRUPT PRACTICES ACT: OHIO REV. CODE §§ 2923.34(B); 2923.32(A)(1) Conspiring to Violate § 2923.32(A)(l) - The Operation and Management of NPF VI Enterprise**
***Against Poulsen, Ayers, Parrett, Chase and Bank One***

As to Count VI, including paragraphs 520 through 531, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Chase and Bank One. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT VII**
**OHIO CORRUPT PRACTICES ACT: OHIO REV. CODE §§ 2923.34(B); 2923.32(A)(1)**
**The Operation and Management of NPF XII Enterprise**
***Against Poulsen, Ayers, Parrett, and Bank One***

As to Count VII, including paragraphs 532 through 562, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Bank One. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT VIII**
**OHIO CORRUPT PRACTICES ACT: OHIO REV. CODE §§ 2923.34(B); 2923.32(A)(1) Conspiring to Violate § 1962(c)—The Operation and Management of NPF XII Enterprise**
***Against Poulsen, Ayers, Parrett, Chase and Bank One***

As to Count VIII, including paragraphs 563 through 574, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Chase and Bank One. To the extent an answer is required, Defendant Ayers

denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT IX**
**COMMON LAW CONVERSION**
***Against Bank One and Chase***

No answer is requires as to Count IX, including paragraphs 575 through 581, because Count IX is not directed against Defendant Ayers and because the UAT has settled and dismissed its claims against Bank One and Chase. Further an answer is not requires to the extent the allegations in Count IX state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT X**
**COMMON LAW FRAUD**
***Against Poulsen, Ayers, Parrett, Bank One and Chase***

As to Count X, including paragraphs 582 through 592, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Bank One and Chase. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XI**
**CIVIL CONSPIRACY**
***Against Poulsen, Ayers, Parrett, Bank One and Chase***

As to Count XI, including paragraphs 593 through 602, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its

claims against Bank One and Chase. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XII**
**BREACH OF CONTRACT**
***Against Bank One and Chase***

No answer is requires as to Count IX, including paragraphs 603 through 608, because Count IX is not directed against Defendant Ayers and because the UAT has settled and dismissed its claims against Bank One and Chase. Further an answer is not requires to the extent the allegations in Count IX state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XIII**
**BREACH OF FIDUCIARY DUTY**
***Against Poulsen, Parrett, Ayers, Chase, and Bank One***

As to Count XIII, including paragraphs 609 through 613, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Chase and Bank One. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XIV**
**CONCERT OF ACTION/KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY**
***Against Poulsen, Parrett, Ayers, Bank One and Chase***

As to Count XIV, including paragraphs 614 through 618, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Bank One and Chase. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XV**
**AIDING AND ABETTING**
***Against Poulsen, Parrett, Ayers, Bank One and Chase***

As to Count XV, including paragraphs 619 through 624, no answer is required to the extent the allegations state conclusions of law and because the UAT has settled and dismissed its claims against Bank One and Chase. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XIV**
**IN THE ALTERNATIVE, NEGLIGENCE AND GROSS NEGLIGENCE**
***Against Bank One and Chase***

No answer is requires as to Count IX, including paragraphs 625 through 630, because Count IX is not directed against Defendant Ayers and because the UAT has settled and dismissed its claims against Bank One and Chase. Further an answer is not requires to the extent the allegations in Count IX state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or

information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XV-A**
**OHIO REV. CODE § 1303.37**
***Against Chase and Bank One***

No answer is requires as to Count XV-A, including paragraphs 630A through 630I, because Count XV-A is not directed against Defendant Ayers and because the UAT has settled and dismissed its claims against Bank One and Chase. Further an answer is not requires to the extent the allegations in Count IX state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XV-B**
**OHIO REV. CODE § 1304.59(A)**
***Against Defendants Chase and Bank One***

No answer is requires as to Count XV-B, including paragraphs 630J through 630P, because Count XV-B is not directed against Defendant Ayers and because the UAT has settled and dismissed its claims against Bank One and Chase. Further an answer is not requires to the extent the allegations in Count IX state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XV-C**
**McKinney's Uniform Commercial Code § 3-304(2)**
***Against Chase and Bank One***

No answer is requires as to Count XV-C, including paragraphs 630Q through 630X, because Count XV-C is not directed against Defendant Ayers and because the UAT has settled

and dismissed its claims against Bank One and Chase. Further an answer is not requires to the extent the allegations in Count IX state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XV-D**
**McKinney's Uniform Commercial Code § 4A-204**
***Against Chase and Bank One***

No answer is requires as to Count XV-D, including paragraphs 630Y through 630EE, because Count XV-D is not directed against Defendant Ayers and because the UAT has settled and dismissed its claims against Bank One and Chase. Further an answer is not requires to the extent the allegations in Count IX state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

## VI. CLAIMS FOR RECOVERY OF TRANSFERS TO FOUNDERS AND THEIR AFFILIATED COMPANIES

631. At all times relevant to this Complaint, NCFE Inc., NPF VI, NPF X, and NPF XII were insolvent.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 631.

### A. The March 1999 Fraudulent Transfer

632. On or about March 8, 1999, IIA was transferred $750,000 from NPF X.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 632.

633. NPF X made this transfer with the actual intent to hinder, delay, or defraud its creditors, including NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 633.

634. NPF X received less than reasonable equivalent value-nothing-in exchange for this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 634.

635. NPF X was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 635.

636. At the time of the transfer, NPF X was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 636.

637. At the time of the transfer, NPF X intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 637.

638. In addition to the benefit of IIA, the transfer described above was made for the benefit of Poulsen, Barbara Poulsen, Ayers, and Parrett, all of whom owned IIA at the time of the transfer.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 638 and

denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

639. On or about March 9, 1999, IIA wired the $750,000 it had been transferred to an outside company, Sanga, in exchange for the receipt by IIA of stock in Sanga.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 639.

**B. The April 1999 Fraudulent Transfers**

640. Poulsen, Barbara Poulsen, Ayers, and Parrett, through Thor, owned Home Medical of America, one of the health care providers within the NPF VI and/or NPF XII Programs.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 640 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

641. In the spring of 1999, Home Medical of America purchased certain assets of another health care provider, Nations.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 641.

642. To consummate this transaction, on or about April 8, 1999, NPF VI transferred $2,800,000 to NPF X. This transfer was made for the benefit of Thor, Poulsen, Barbara Poulsen, Ayers, and Rebecca Parrett.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 642 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

643.NPF VI received less than reasonable equivalent value—nothing—in exchange for

this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 643.

644. NPF VI was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 644.

645. At the time of the transfer, NPF VI was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 645.

646. On or about the same day, April 8, 1999, NPF X transferred $2,750,000 to Nations Healthcare for the benefit of Thor, Poulsen, Barbara Poulsen, Ayers, and Rebecca Parrett.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 646 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

647. NPF X made this transfer with the actual intent to hinder, delay, or defraud its creditors, including NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 647.

648. NPF X received less than reasonable equivalent value—nothing—in exchange for this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 648.

649. NPF X was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 649.

650. At the time of the transfer, NPF X was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 650.

651. At the time of the transfer, NPF X intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 651.

652. Approximately six months later, in October 1999, Thor, through its subsidiary Home Medical of America, sold certain assets acquired in through its April 1999 purchase of Nations. 653. On or about October 13, 1999, HMA sold certain of the Nations assets and received in return $2,158,350.20.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 652.

654. On October 22, 1999, that $2,158,350.20, derived from the April 1999 NPF transfer, went from Home Medical of America to IIA.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 654.

655. On October 26, 1999, each of the owners of IIA and Thor—*i.e.*, Poulsen,

Barbara Poulsen, Ayers, and Rebecca Parrett-received personal checks from IIA in the amount of $250,000 per person.

Defendant Ayers admits the allegations as to Defendant Ayers in paragraph 655 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

C. **The July 1999 Fraudulent Transfers**

656. On or about July 14, 1999, NPF VI transferred $1,000,000 to NPF X. This transfer was made for the benefit of IIA and its owners, Poulsen, Barbara Poulsen, Ayers, and Rebecca Parrett.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 656 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

657. NPF VI received less than reasonable equivalent value—nothing—in exchange for this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 657.

658. NPF VI was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 658.

659. At the time of the transfer, NPF VI was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 659.

660. Later that day, on or about July 14, 1999, NPF X transferred $1,000,000 to IIA.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 660.

661. NPF X made this transfer with the actual intent to hinder, delay, or defraud its creditors, including NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 661.

662. NPF X received less than reasonable equivalent value—nothing—in exchange for this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 662.

663. NPF X was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 663.

664. At the time of the transfer, NPF X was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 664.

665.At the time of the transfer, NPF X intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 665.

666. In addition to the benefit of IIA, the transfer described above was made for the

benefit of Defendants Lance Poulsen, Barbara Poulsen, Ayers, and Rebecca Parrett, all of whom owned IIA at the time of the transfer.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 666 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

667. Shortly after the transfer described above, IIA made a $1,000,000 stock option payment to an outside company in which it held an interest, Medi-Manager. In return, the shareholders of IIA-Poulsen, Barbara Poulsen, Ayers, and Parrett-personally received stock in Medi-Manager.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 667 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**D. February 2000 Fraudulent Transfers**

668. On or about February 22, 2000 and February 28, 2000, NPF X collectively transferred to IIA $1,240,000.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 668.

669. NPF X made this transfer with the actual intent to hinder, delay, or defraud its creditors, including NPF VI and NPF XI.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 669.

670. NPF X received less than reasonable equivalent value—nothing—in exchange for this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 670.

671. NPF X was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 671.

672. At the time of the transfer, NPF X was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 672.

673.At the time of the transfer, NPF X intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 673.

674.In addition to the benefit of IIA, the transfer described above was made for the benefit of Lance Poulsen, Barbara Poulsen, Ayers, and Rebecca Parrett, all of whom owned IIA at the time of the transfer.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 674 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

675. In March 2000, IIA transferred $400,000 of the amount derived from the February 2000 transfer to its owners, Poulsen, Barbara Poulsen, Ayers, and Rebecca Parrett.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 675 and denies knowledge or information sufficient to form a belief as to allegations not directed at

Defendant Ayers.

**E. December 22, 2000 and October 28, 2002 Fraudulent Transfers**

676. On or about December 22, 2000, NCFE Inc. and Parrett entered into a Loan, Stock Pledge, and Stock Purchase Agreement whereby Parrett borrowed from NCFE Inc. $5,000,000, secured by a stock pledge of 935 shares of NCFE common stock.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 676.

677. On the same day, December 22, 2000, Parrett executed a Promissory Note promising to repay the $5,000,000 loan, plus interest at a rate of 6% per year, on June 22, 2001.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 677.

678. NCFE Inc. made this transfer with the actual intent to hinder, delay, or defraud its creditors.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 678.

679. NCFE Inc. received less than reasonable equivalent value—nothing—in exchange for this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 679.

680. NCFE Inc. was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 680.

681. At the time of the transfer, NCFE Inc. was engaged in business for which any of

its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 681.

682. At the time of the transfer, NCFE Inc. intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 682.

683. Parrett never made a payment on the December 22, 2000 loan.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 683.

684. On October 28, 2002, Parrett signed a new promissory note-this time non-recourse as to her personally—giving Parrett until January 1, 2003 to repay the principal plus interest on the December 2000 transfer of $5,000,000. Under this non-recourse loan, Parrett purportedly has no personal liability for payment of the loan and NCFE must look solely and exclusively to the Pledged Stock for satisfaction of Defendant Parrett's obligations.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 684.

685.NCFE Inc. made this transfer of interest with the actual intent to hinder, delay, or defraud its creditors.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 685.

686. NCFE Inc. received less than reasonable equivalent value in exchange for this transfer of interest. NCFE Inc. received no value whatsoever in exchange for this new note

extending the time Parrett had to repay the loan under the original note and no value whatsoever for purportedly agreeing that the new note would be a non-recourse note (materially limiting Defendant Parrett's liability and NCFE's ability to recover its money in the event of a default).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 686.

687. NCFE Inc. was insolvent on the date of the transfer of interest.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 687.

688. At the time of the transfer, NCFE Inc. was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 688.

689. At the time of the transfer, NCFE Inc. intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 689.

690. Parrett has made no payment on the October 28, 2002 note.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 690.

**F. The March 1999, February 2000, and March 2001 Fraudulent Transfers of E-Medsoft/Med-Diversified Stock**

691. Through a series of transactions beginning in at least March 1999 and ending, at the earliest, in March 2001, Poulsen, Barbara Poulsen, Ayers, Parrett, IIA, HCC, Thor, Flohaz, South Atlantic, and others associated with them, received approximately 50,650,000 shares of

stock in E- Medsoft.com and Med Diversified.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 691 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

692. The total market value this stock at the time of the respective transfers was approximately $97,600,000.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 692.

693. Poulsen, Barbara Poulsen, Ayers, Parrett, IIA, HCC, Thor, Flohaz, South Atlantic, as either immediate or subsequent transferees of the E-Medsoft/Med Diversified stock, received this stock through fraudulent transfers from NCFE Inc. and/or certain of its subsidiaries.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 693 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

694. For example, on February 2, 2000, NCFE Inc. received 9,500,000 shares of stock in E-Medsoft.com, valued at a total of $113,000,000.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 694.

695. Thereafter, NCFE Inc. transferred the one-half of that stock, or one-half of its right to receive that stock, to IIA—a transfer valued at the time at approximately $56,500,000.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 695.

696. At the time of each such transfer, including (but not limited to) the February 2,

2000 transfer, NCFE Inc. and/or the pertinent subsidiary transferring the stock made the transfers at a time at which it was insolvent.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 696.

697. With regard to each such transfer, including (but not limited to) the February 2, 2000 transfer, NCFE Inc. and/or the pertinent subsidiary transferring the stock received less than reasonable equivalent value in exchange for the transfer of interest.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 697.

698. At the time of each such transfer, including (but not limited to) the February 2, 2000 transfer, NCFE Inc. and/or the pertinent subsidiary transferring the stock was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 698.

699. At the time of each such transfer, including (but not limited to) the February 2,2000 transfer, NCFE Inc. and/or the pertinent subsidiary transferring the stock intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 699.

**G. The April 2001, August 2001, and October 25, 2002 Fraudulent Transfers**

700. On information and belief, NCFE Inc. loaned Ayers funds in the amount of

$1,000,000 on or about April 1, 2001 and in the amount of $1,550,000 on or about August 1, 2001. On information and belief, these loans were secured by a Stock Pledge of 206 shares of NCFE capital stock.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 700.

701. NCFE Inc. made this transfer with the actual intent to hinder, delay, or defraud its creditors.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 701.

702.NCFE Inc. received less than reasonable equivalent value—nothing—in exchange for this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 702.

703. NCFE Inc. was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 703.

704. At the time of the transfer, NCFE Inc. was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 704.

705.At the time of the transfer, NCFE Inc. intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 705.

706. Ayers never made a payment on the December 22, 2000 loan.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 706.

707. On October 25, 2002, Ayers signed a new promissory note—this time non-recourse—totaling $2,550,000. Under the terms of this new note, the $2,550,000 of principal, along with interest, was to be repaid on January 1, 2003.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 707.

708. Under the terms of the new note, Ayers purportedly has no personal liability for payment of the loan and NCFE Inc. must look solely and exclusively to pledged stock for satisfaction of Defendant Ayers's obligations.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 708.

709. NCFE Inc. made this transfer with the actual intent to hinder, delay, or defraud its creditors.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 709.

710. NCFE Inc. received less than reasonable equivalent value—nothing—in exchange for this transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 710.

711. NCFE Inc. was insolvent on the date of the transfer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 711.

712. At the time of the transfer, NCFE Inc. was engaged in business for which any of its remaining property was unreasonably small in relation to its business.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 712.

713. At the time of the transfer, NCFE Inc. intended to incur and knew that it would incur debts that were beyond its ability to pay its debts as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 713.

714. Ayers has made no on the new note executed in October 2002. Ayers presently owes NCFE the entire loan principal plus interest.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 714.

715. The transfers of interest stated above, including the purported releases of personal liability and extension of maturity dates for payments on past-due transfers, are void *ab initio* as unauthorized and as fraudulent transfers and/or preferences.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 715.

716. Upon information and belief, Poulsen, Barbara Poulsen, Ayers, Parrett, IIA, HCC, Thor, Kachina, Flohaz, and South Atlantic engaged in numerous other avoidable transactions such as those described above.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 716 and

denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

717. Upon information and belief, Poulsen, Barbara Poulsen, Ayers, Parrett, IIA, HCC, Thor, Kachina, Flohaz, South Atlantic, and others acting in concert with him, her, or it were either initial or subsequent transferees of funds from NPF VI, NPF XII, NPF X, or other companies affiliated with NCFE in connection with other avoidable transactions such as those described above.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 717 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

718. Upon information and belief, the Founders received preferred dividend payments amounting to avoidable transfers of interests pursuant to the laws of the United States and Ohio.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 718 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**H. Counts**

**COUNT XVI**
**LIABILITY ON PROMISSORY NOTE**
***Against Rebecca Parrett and Ayers***

No answer is required to the extent the allegations in Count XVI, including paragraphs 719 through 722 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XVII**
**BREACH OF CONTRACT**
***Against Rebecca Parrett and Ayers***

No answer is required to the extent the allegations in Count XVII, including paragraphs 723 through 727 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XVIII**
**AVOIDABLE TRANSFERS UNDER BANKRUPTCY CODE SECTION 544 AND 550** ***Against Founders and Affiliated Entities***

No answer is required to the extent the allegations in Count XVIII, including paragraphs 728 through 734 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XIX**
**AVOIDABLE TRANSFERS UNDER OHIO REV. CODE §§ 1336.04 & 1336.07** ***Against Founders and Affiliated Entities***

No answer is required to the extent the allegations in Count XIX, including paragraphs 735 through 740 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XX**
**AVOIDABLE TRANSFERS UNDER OHIO REV. CODE §§ 1336.05 & 1336.07 *Against Founders and Affiliated Entities***

No answer is required to the extent the allegations in Count XX, including paragraphs 741 through 744 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXI**
**AVOIDABLE TRANSFERS RECOVERY OF UNLAWFUL DIVIDENDS: OHIO REV. CODE 1701.33(c) & 1701.95(n)**
***Against Founders***

No answer is required to the extent the allegations in Count XXI, including paragraphs 745 through 748 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXII**
**BREACH OF FIDUCIARY DUTY**
***Against Founders***

No answer is required to the extent the allegations in Count XXII, including paragraphs 749 through 757 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXIII**
**UNJUST ENRICHMENT**
***Against Founders***

No answer is required to the extent the allegations in Count XXIII, including paragraphs 758 through 762 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**VII. NOTE ISSUANCE ENTERPRISE**

763. CSFB is a self-described "leading global investment bank" that claims a place in the "top tier" of global financial firms. Among global investment banks, CSFB claims that it ranks second in dollar value of global asset-backed financing—with over a 9% market share. It is asset-backed financing that is at the heart of the allegations made here against CSFB.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 763.

764. CSFB has acknowledged "its commitment to its role as a gatekeeper in the financial markets," but as described below its role in this case was as lookout for a criminal enterprise whose aim was the wholesale looting and subversion of two legitimate businesses, NPF VI and NPF XII. CSFB knew of the fraud being perpetrated on NPF VI and NPF XII, and actively participated in it. When the Rating Agencies raised questions, CSFB misled and distracted them, so that the scheme could continue. When NPF VI and NPF XII experienced liquidity crises as a result of the wrongful actions of their fiduciaries, CSFB funneled money into their reserve accounts so that the scheme to loot them could continue. When NPF VI and NPF XII had been rendered insolvent, CSFB knowingly raised additional debt on their behalf by

means of false statements and material omissions, all so that the looting of their assets could continue and CSFB's role as investment banker could be further entrenched.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 764.

765. CSFB was uniquely expert in asset-backed securitizations. Stated briefly, an asset-backed securitization is the practice of assembling valuable assets into a pool, and then selling notes whose repayment is secured by those assets, and whose repayment is derived from the revenue stream attributed to those assets.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 765.

766. Before they collapsed into bankruptcy in 2002, NPF VI and NPF XII were marquee issuers of investment grade, asset-backed notes. These notes were assembled and sold by CSFB as lead placement agent for NPF VI and NPF XII, both of whom CSFB described as the nation's leading issuers of securitized health-care receivables notes. For its services in creating these "asset backed securitizations," and in selling the notes to institutional investors, CSFB was paid handsomely from NPF VI and NPF XII funds. During the time periods relevant to this Complaint, fully 5% of the fees CSFB earned in its United States asset-backed business were derived from issuances of notes by NPF VI and NPF XII. CSFB anticipated that this number would double—to fully ten percent—in year 2002.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 766.

767. Each of the note issuances in question was sold by means of false and misleading statements of fact, which were made in Ohio and elsewhere in interstate commerce, and were

procured in part by a continuous pattern of commercial bribery, pursuant to which CSFB bribed Ayers, and offered to or did bribe Poulsen, to direct investment banking business to CSFB. Commercial bribery and attempted commercial bribery are felony offenses punishable by more than one year of imprisonment under the New York penal law and are, therefore, predicate acts for purposes of proving a violation of the Ohio RICO statute. As a result of this pattern of racketeering activity, NPF VI and NPF XII suffered racketeering injury, in that they were forced to issue notes that they had no hope of repaying, for the purpose of procuring additional funds that could then be looted from them by Defendants CSFB, Poulsen, Parrett and Ayers. In the course of this pattern of racketeering conduct, each of these defendants committed numerous breaches of their fiduciary duty as agents of NPF VI and NPF XII, aided and abetted the breaches of fiduciary duty by other defendants, committed fraud on NPF VI and NPF XII, converted and stole their assets and subverted them to their unlawful scheme. Before this pattern of racketeering conduct, NPF VI and NPF XII were legitimate, lawful businesses-but their lawful operations were subverted to an unlawful purpose by the wrongful actions of their faithless agents and fiduciaries. As a result of this pattern of wrongful conduct, NPF VI and NPF XII, who were financially sound before CSFB came on the scene, were first rendered insolvent, and then had their insolvency hopelessly deepened, so that today these former investment grade issuers are defunct and ruined.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 767 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

768. From 1995 until their bitter end in bankruptcy, CSFB served as the primary financial adviser to NCFE, and to NPF VI and NPF XII. As the agent for NPF VI and NPF XII,

CSFB had complete and comprehensive control of the structuring of the securitization programs at NPF VI and NPF XII. CSFB and its counsel drafted the Indentures of Trust and organizational documents for NPF VI and NPF XII. These documents imposed on NPF VI and NPF XII's agents, the Servicer and the Trustees strict limitations concerning what they could—and what they could not—do with monies that belonged to NPF VI and NPF XII. CSFB drafted and dictated the content of every document used by NPF VI and NPF XII to issue notes, it communicated on their behalf with credit rating agencies and investors, and it issued analyst reports whose purpose was to conceal the true facts concerning NPF VI and NPF XII. When the need arose, CFSB even "loaned" tens of millions of dollars to NPF VI or NPF XII to prevent their securitization programs from terminating, which only served to inflict further injury on NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 768.

769. NPF VI and NPF XII, as CSFB well knew, were limited purpose corporations. They had no employees of their own, and were therefore dependent upon the integrity of those whom they had appointed to act on their behalf as their financial advisers, agents and trustees. NPF VI and NPF XII had each bound their agents to adhere strictly to limitations in their Indentures of Trust. As described above and pursuant to these Indentures, NPF VI and NPF XII the Programs were each required:

- To maintain three specific reserve accounts: The Seller Credit Reserve, the Offset Reserve and the Equity Account (collectively, unless otherwise indicated, the "Reserve Accounts");
- To maintain the Reserve Accounts, at all times, in an amount equal to

17% of their outstanding note issuances;

- To refrain from engaging in affiliate transactions and to avoid commingling their assets with one another;
- To purchase only bona fide receivables for health care services that had been provided ("Eligible Receivables") by a health care provider (a "Seller");
- To make withdrawals from the Equity Account only on a monthly payment date, only if the amount in the Equity Account was in excess of the required 8.5% of the outstanding note balance, and only for specified purposes—which purposes did not include the purchase of receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 769.

770. CSFB knew that the Servicer, Poulsen, Ayers and Parrett were fiduciaries to NPF VI and NPF XII. CSFB knew that the Servicer was the duly appointed agent for NPF VI and NPF XII, whose activities had been strictly limited and constrained by the terms of two critical agreements: the Indentures of Trust and the Sales and Sub-Servicing Agreement. CSFB knew, however, that the Servicer was continually submitting to the Trustees' "authorizations" to purchase "receivables" that were not eligible because they were for "future" receivables," for "aged" receivables, or for "receivables" purchased from affiliates of NCFE, who were not eligible sellers under the terms of the Indentures. CSFB also knew that NCFE was purporting to buy "defaulted" receivables, in violation of the prohibition on affiliate transactions, solely to permit CSFB to misrepresent that NPF VI and NPF XII had low default rates for their

receivables—a ratio that CSFB itself recognized was material to the health of these entities. As described in detail below, each of these activities was a breach of the fiduciary obligations that the Servicer, as agent, owed to NPF VI and NPF XII, as their principal. Yet CSFB, who was the sole financial adviser to NPF VI and NPF XII, did nothing to protect them from these wrongful acts. Instead, in active concert with the Servicer, CSFB actively concealed these wrongful acts and conspired to cause NPF VI and NPF XII to issue additional notes that deepened their insolvency—all for the purpose of generating additional money that the Servicer could then steal for the benefit of Poulsen, Parrett, Ayers and their affiliated health care providers.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 770 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

771. In addition to its knowledge of and active participation in the wrongful acts of the Servicer, CSFB actively participated in and conspired with other fiduciaries to defraud and injure NPF VI and NPF XII. Specifically, CSFB knew about and actively concealed the wrongful selfdealing of Poulsen, Ayers and Parrett by concealing from Rating Agencies the extensive and wrongful use of NPF VI and NPF XII Note proceeds to fund related health care providers owned by Poulsen, Ayers, Parrett and their affiliates. CSFB also knew about and concealed the fact that the NPF VI and NPF XII accounts were being looted for the purported purchase of eligible receivables, when in reality CSFB knew about an facilitated repeated, continuous and unlawful "purchase" of related party receivables in violation of the Indentures.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 771 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

772. Fundamentally, CSFB committed these wrongful actions and conspired to commit others because it was facing "intense competition from various types of firms in all aspects of its business throughout the world." CSFB was specifically concerned that if it did not cooperate in the wrongful actions of NPF VI and NPF XII's agents that it would be fired as their financial adviser and a "real" underwriter would be brought in to compete with them for this lucrative and critical business. Accordingly, beginning in 1999 CSFB not only actively concealed the wrongdoing of these agents-thus enabling and magnifying the harm done to NPF VI and NPF XII—it bought their "loyalty" through a pattern of commercial bribery that induced these agents to transfer NPF VI and NPF XII's investment banking business from Prudential (which had begun to ask troubling questions) to CSFB, who asked no questions and was willing to pay handsomely for access to this lucrative relationship. Thus, the scheme to loot NPF VI and NPF XII was perpetuated and actively assisted through a conspiracy among CSFB and the faithless fiduciaries for NPF VI and NPF XII, specifically, the Servicer, Poulsen Parrett and Ayers.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 772 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

773. In the end, although they were financially sound and solvent when CSFB came on the scene in January of 1995, NPF VI and NPF XII were first rendered insolvent and then suffered ever deepening insolvency, as a result of the wrongful and continuous racketeering acts of CSFB, the Servicer, Poulsen, Ayers and Parrett.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 773 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**A. CSFB Subverts the Fiduciaries of NPF VI and NPF XII**

774. CSFB knew that Ayers and Poulsen were directors of, and owed fiduciary duties to, NPF VI and NPF XII. As fiduciaries, Ayers and Poulsen owed NPF VI and NPF XII duties of loyalty, care and prudence. Foremost of these was their duty to act solely in the best interest of NPF VI and XII, and to avoid transactions that placed their own interests ahead of those of NPF VI and NPF XII. They also had duties to operate NPF VI and NPF XII lawfully and in accordance with their Indentures of Trust.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 774 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

775. CSFB had begun working with NCFE in 1995, and was well aware of both these duties and of the specific-and limited-activities in which NPF VI and NPF XII were permitted to engage. CSFB was also, however, facing an intensely competitive environment in which other investment banking firms constantly threatened to undercut both its status as a leading underwriter of securitizations and its specific, and highly profitable, relationship with NCFE. In order to protect itself from encroachment by what it would later term as "a real underwriter," CSFB therefore resorted to a tactic that had served it well in other, now discredited, aspects of its business: it simply bribed the fiduciaries for NPF VI and NPF XII in order to induce them to continue to their send investment banking business to CSFB.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 775.

776. Specifically, beginning in 1999 and continuing in a pattern through at least the middle of 2000, CSFB offered to pay to Poulsen, and actually paid compensation to Ayers, over

one hundred thousand dollars in consideration of his agreement to allow CSFB to be the lead placement agent for notes issued by NPF VI and NPF XII. These payments were in the form of guaranteed shares of "hot IPOs" that CSFB had ensured would immediately increase in value based upon agreements with others to "ladder" their purchases at ever-increasing prices, so as to drive up the value of the issuance as a whole.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 776 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

777. To effectuate their scheme to bribe Poulsen and Ayers, sometime before September of 1999, CSFB set up an account in their New York office in the name of Ayers. The purpose of this account was to receive bribes payable to Ayers in the form of shares in hot IPOs that CSFB was underwriting. Both CSFB and Ayers understood that the purpose of this account was to allow Ayers to buy shares in IPOs underwritten by CSFB at the discounted initial offering price. Both CSFB and Ayers understood that these IPO shares were significantly undervalued and would increase in value several times over during the course of the first day oftrading, based upon pre-arranged agreements with others to buy at ever-increasing prices through the IPO laddering described above. CSFB and Ayers knew and agreed that in return for allowing Ayers the lucrative opportunity to purchase the IPO shares, Ayers was expected to, and did, direct NPF VI's and NPF XII's underwriting business to CSFB. The specific amounts and means by which Ayers was bribed by CSFB, through allocations to his New York account, are set out below:

- 10/29/99: 1000 shares of World Wrestling Federation, held for 5 days, for a profit of $6,374 and a rate of return of 37.5%.

- 11/01/99: 300 shares of lntertrust Technologies Corp., flipped out within a single day, for a profit of $8,812 and a rate of return of 163.2%.
- 11/10/99: 300 shares of Wireless Facilities, Inc., flipped out within a single day, for a profit of $14,391 and a rate of return of 319.8%.
- 11/15/99: 500 shares of United Parcel Service, sold within 11 days for a profit of $5,461 and a rate of return of 21.9%.
- 11/22/99: 250 shares of Virata Corp., sold within a single day, for a profit of $3,500 and a rate of return of 100%.
- 11/23/99: 250 shares of Symyx Technologies, Inc., sold within 48 days for a profit of $8,843 and a rate of return of 252.7%.
- 12/14/99: 250 shares of VA Linux Systems, sold within a single day for a profit of $59,826 and a rate of return of 797.7%.
- 12/14/99: 250 shares of Fogdog, Inc., sold within a single day for a profit of $594 and a rate of return of 10.8%.
- 12/20/99: 250 shares of Caliper Technologies Corp., sold within fourteen days for a profit of $8,875 and a rate of return of 221.9%.
- 2/412000: 500 shares of Skillsoft Corp., sold in 72 days for a profit of $2,500 and a rate of return of 35.7%.
- 2/9/2000: 500 shares of Mediacom Communications, sold within 13 days at a loss of $1,790 for a negative return of 18.8%.
- 3/1/2000: 500 shares of Digitalthink, Inc., held for 47 days for a profit of $8,281 and a rate of return of 118.3%.
- 3/1/2000: 500 shares of Intersil Corporation, held for 47 days for a profit of

$6,249 and a rate of return of 50%.

- 5/23/00: 200 shares of New Focus, Inc., held for a period of 14 days, for a profit of $9,425 and a rate of return of 235.6%.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 777 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

778. CSFB also opened a similar account in its New York office for Poulsen in 1999, and CSFB told Poulsen that it planned to allocate shares in these IPOs to his account, as well. Based upon the promise that he, too, would be bribed with the receipt of these hot IPO shares, Poulsen conspired with CSFB and Ayers to direct NPF VI and NPF XII's underwriting business to CSFB.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 778.

779. Collectively, the bribes paid to Ayers in the form of hot IPO shares totaled $141,341. The average rate of return on these "investments" was over 167%. Having been promised these payments in consideration of directing business to CSFB, and having been well compensated by the payments he actually received from CSFB in performance of this unlawful bribe, Ayers—without whose consent no notes could have been issued by NPF VI and NPF XII—and Poulsen then directed the following Investment banking business to CSFB as performance of the quid pro quo:

**NPF XII**

| | Date Issued | Amount of Issuance | Underwriter |
|---|---|---|---|
| 1999-1 | 3/10/1999 | $100,000,000 | PW |
| 1999-2 | 6/28/1999 | $350,000,000 | PW+CSFB |
| 1999-3 | 11/24/1999 | $200,000,000 | PW |
| 2000-1 | 3/29/2000 | $125,000,000 | DB ALEX BROWN+CSFB |
| 2000-2 | 10/17/2000 | $275,000,000 | CSFB+BOCM |
| 2000-3 | 12/22/2000 | $150,000,000 | CSFB |
| 2000-4 | 12/27/2000 | $222,500,000 | CSFB |
| 2001-1 | 3/21/2001 | $300,000,000 | CSFB+BOCM |
| 2001-2 | 6/26/2001 | $250,000,000 | CSFB+BOCM |
| 2001-3 | 11/2/2001 | $150,000,000 | CSFB |
| 2001-4 | 11/1/2001 | $150,000,000 | CSFB |
| 2002-1 | 5/29/2002 | $250,000,000 | CSFB |
| Total NPF XII | | $2,522,500,000 | |

**NPF VI**

| | | | |
|---|---|---|---|
| 1998-1 | 6/1/1998 | $300,000,000 | PW |
| 1998-2 | 8/14/1998 | $125,000,000 | CSFB |
| 1998-3 | 11/4/1998 | $114,600,000 | CSFB |
| 1998-4 | 11/4/1998 | $50,000,000 | CSFB |
| 1999-1 | 3/25/1999 | $180,000,000 | CSFB |
| 2001-1 | 6/20/2001 | $500,000,000 | ING ONLY |
| 2002-1 | 2/27/2002 | $250,000,000 | CSFB+ING |
| Total NPF VI | | $1,519,600,000 | |
| Total CSFB | | $2,942,100,000 | |

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 779 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

780. As a result of CSFB's conscious subversion of the directors of NPF VI and NPF XII, an additional $3 billion in notes were issued by NPF VI and NPF XII. Those notes should not, and would not, have been issued but for the bribes CSFB paid to Ayers and those that it offered to Poulsen.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 780 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

781. Having offered and paid bribes to Poulsen and Ayers to secure their loyalty, and having paid them to direct business to CSFB, Defendant CSFB then exploited the advantage for which it had paid. Over the life of its relationship with NPF VI and NPF XII, CSFB received investment banking fees alone that totaled $17,000,000, a sum that does not include the interest and placement charges it made for the various loans it made to NPF VI and NPF XII, or the profits it made from trading NPF VI and NPF XII notes in a secondary market that was created and sustained by the concerted, pattern of racketeering activity and fraud undertaken by CSFB, the Servicer, Poulsen, Ayers and Parrett. In part based on the strength of its illicit relationship with Poulsen and Ayers, CSFB was able to climb into second place in the all important "league tables" for asset-backed investment banking. NPF VI and NPF XII accounted for fully 5% of the asset-backed investment banking fees earned by CSFB' s United States operations in the year 2000 and 2001, and they were expected to rise to 10% in the year 2002.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 781 and

denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**B. CSFB's Participation in and Concealment of the Receivables Fraud**

782. CSFB knew that there were strict limits on the types of receivables that the Servicer could purchase for NPF VI and NPF XII. These limitations existed so that NPF VI and NPF XII could be assured that the assets they purchased, and that they had pledged to secure their notes, were real receivables capable of generating the money needed to repay the NPF VI and NPF XII notes. CSFB, however, was actively aware of and facilitated the fraudulent purchase of receivables in violation of the Indenture prohibitions, through a pattern of wrongful transactions that looted NPF VI and NPF XII, for the benefit of Poulsen, Ayers, Parrett and for the benefit of CSFB and its own client, Fresenius.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 782 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

783. As described above, CSFB knew and understood that Poulsen, Ayers and Parrett were directors of NPF VI and NPF XII and, as such, owed them duties of undivided loyalty, good faith and candor. CSFB had near complete dominion and control over all aspects of NPF VI and NPF XII's securities issuances, which were their primary business activity. CSFB dictated the terms of the offerings, specified its own fee, dictated the terms of the Indentures, filtered what would—and what would not—be disclosed to rating agencies and investors, dictated (and limited) the content of the offering documents without the knowledge or input of NPF VI and NPF XII and knowingly caused NPF VI and NPF XII to issue, and to continue to issue, notes that rendered these two entities insolvent and then more deeply insolvent. As

placement agent for NPF VI and NPF XII, and as a party with near total control over the securities issuances by NPF VI and NPF XII, CSFB owed a legal duty to NPF VI and NPF XII to assist them in complying with the relevant securities laws and with the terms of their Indentures of Trust. In the words of CSFB itself, it was a "gatekeeper in the financial markets." CSFB has admitted that, if had knowledge that facts were being misrepresented to NPF VI and NPF XII, and to the securities markets as a whole, "the one that Credit Suisse First Boston could not properly have done would be to sit idly and do nothing and continue to offer notes on behalf of NPF VI and NPF XII if information came to its attention that the offering documents were materially misleading." Yet, as is demonstrated below, that is precisely what CSFB did: It did so for many years, through more than $3 billion dollars worth of loans and note issuances, none of which would have occurred had CSFB performed its obligation to ensure that NPF VI and NPF XII were not fraudulently induced to incur additional debt so that those monies could be looted for the benefit of CSFB, its clients, and the directors of NPF VI and NPF XII.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 783 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**C. CSFB Understood the Limitations on the Types of Receivables that Could Be Purchased**

784. CSFB has testified under oath concerning its understanding that the Indentures contained specific limitations on what types of receivables the Servicer was authorized to purchase for NPF VI and NPF XII. There were "specific" limitations on the types of receivables that could be purchased. CSFB recognized and understood that receivables could only be "purchased from sellers," which were "health care providers." CSFB also understood that a receivable was only eligible to be purchased if it was "for services that had been provided by the

healthcare provider in the ordinary course of business." CSFB also knew that neither NPF VI nor NPF XII was itself a health care provider and thus, neither was qualified to sell receivables to the other. More importantly, CSFB understood that the Indenture specifically prohibited NPF VI and NPF XII from engaging in affiliate transactions, or from commingling their assets by transferring them back and forth to one another. As CSFB admitted in a recent deposition, if NPF VI and NPF XII "had worked as intended, the separatedness (sic) of the two entities would have been maintained, the assets would have been specifically maintained, and collections flowing through to those trusts with those noteholders."

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 784 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

785. Despite this knowledge, CSFB knowingly prolonged the insolvency of NPF VI and NPF XII, for the following unlawful purposes: a) to generate additional monies that it knew and understood would be looted by Poulsen, Parrett and Ayers through wrongful transactions with related parties; b) to prolong the life of NPF VI and NPF XII in order to permit CSFB to "work down" its own exposure to NPF VI and NPF XII; and c) to generate unlawful funds by which CSFB could benefit itself, through unearned fees and interest charges, and its other clients who also benefitted from this pattern of wrongful misconduct.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 785 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**D. CSFB Understood the Limitations Concerning Withdrawals from the Equity Account**

786. In addition to the strict limitations on the type of receivables that could be

purchased for NPF VI and NPF XII, CSFB also understood that there were strict limitations on how monies belonging to NPF VI and NPF XII could be used in the first place. First, as described above, monies belonging to NPF VI and NPF XII could be used to purchase eligible receivables in conformity with the conditions of the Indenture. Second, CSFB understood that the reserve accounts held for NPF VI and NPF XII were required to be maintained, at all times, at specified levels. Third, CSFB understood that the Equity Account existed to provide credit enhancement for the notes and that its integrity was critical to the maintenance of the investment grade ratings that had been provided to NPF VI and NPF XII in connection with their note issuances.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 786.

787. CSFB understood that "withdrawals from the equity account were permitted only on a monthly determination date," and at no other time. CSFB also understood that, even on monthly determination dates, withdrawals had to comply with the following conditions:

- Withdrawals could be made <u>only</u> for the following specific purposes:
  - "To pay fees to the Indenture Trustees;"
  - "To pay interest on the notes;"
  - "To pay the servicers' fees;"
  - "To make principal payments on [the notes] on a prepayment date;"
  - "During principal amortization events, to make payments to the holders;" and
  - To pay dividends to NPF VI or NPF XII, provided "that the balance
  - in the equity account" was "in excess of the eight and a half percent
  - of the outstanding note issuance."

- CSFB also knew and understood that "funds from the equity account could not be used from the equity account to purchase receivables."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 787.

788. Yet, despite its clear understanding of these Indenture limitations, CSFB knowingly facilitated and concealed a pattern of withdrawals from the Equity Account in violation of these clear limitations.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 788.

**E. The Receivables Fraud and the Fraudulent Conduct of the Servicer, Poulsen, Ayers and CSFB in Causing NPF VI and NPF XII to Issue Additional Debt**

789. CSFB knew and understood that a primary purpose of prolonging the existence of NPF VI and NPF XII was to enable the Servicer, Poulsen, Parrett and Ayers to loot their assets for the benefit of Poulsen, Parrett, and Ayers' related health care providers.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 789 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

790. CSFB, the Servicer, Poulsen, Parrett and Ayers all specifically understood that the Indentures of Trust for NPF VI and NPF XII prohibited them from engaging in related party transactions, and from any transactions that did not involve the purchase of bona fide, eligible receivables. Each of these defendants also knew and understood that NPF VI and NPF XII were affiliates of one another, and of NCFE, such that under the Indentures of Trust there could be no valid or permitted transactions among or between them.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 790 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

791. As of January of 2001, CSFB knew that assets had been transferred between NPF VI and NPF XII—yet it has admitted that it cannot cite a single provision of the Indentures that permitted any such transfers between NPF VI and NPF XII to occur. CSFB admits that these transactions were highly unusual, yet it sat idly by and did nothing to prevent it; indeed, with knowledge that this had occurred, CSFB knowingly assisted in the issuance of $1.1 billion in additional notes by NPF XII and $750 million in additional notes by NPF VI, all without disclosing that the Indentures' prohibitions on affiliate transactions had been violated in the most fundamental way through the commingling of assets and their transfer between NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 791.

792. CSFB's knowledge of wrongful affiliate transactions did not begin or end with the wholesale transfer of assets between NPF VI and NPF XII. Instead, CSFB was aware throughout its involvement with NPF VI and NPF XII that, far from purchasing bona fide, third party receivables, the Servicer was causing NPF VI and NPF XII to purchase purported "receivables" from health care providers that were affiliates of NFCE, and thus were affiliates of NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 792.

793. When it first encountered NCFE in early 1995, CSFB reviewed audited financial

statements for NCFE that had been prepared by the accounting firm of Hausser Taylor. In those financial statements, the following language appears:

- "The Company was ***not in compliance with certain requirements of the Indenture Agreements, most importantly, the advancement of funds to certain Provider absent accounts receivable detail."***
- "The Company ***has advanced amounts in excess of receivables provided*** by certain Providers. In addition, ***purchased receivables for certain Providers include receivables that have aged.*** As a result, certain providers have ***an exposed position for advances and aged receivables in excess of such Providers' cash reserves."***
- "Purchased receivables ***and advances to (affiliated) Providers*** approximated $30,500,000 and $17,475,000, respectively."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 793.

794. CSFB knew that the term "advances" in this context was the term NCFE used to describe unsecured loans of money to a health care provider without any accompanying purchase of an account receivable. More important, however, are these facts: At the outset of its relationship, therefore, CSFB was informed by these financial statements that fully ***half*** of the provider base for the securitization programs was comprised of affiliates of NCFE. CSFB also knew that NCFE and its affiliates were not in compliance with the Indentures, knew the nature and scope of the noncompliance and that these events of non-compliance could cause "the declaration of a principal amortization event with respect to an Indenture Agreement [which] would require the Company to cease purchasing new eligible receivables." Yet, with full

knowledge of these clear violations of the Indentures, CSFB proceeded to draft offering documents, and to cause the issuance and sale of additional notes by NPF VI and NPF XII, without disclosing ***any*** of these highly material facts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 794.

795. There is also no question that CSFB understood that these facts were material facts that had to be disclosed. In 1999, in the context of a proposed initial public offering of equity securities for NCFE, CSFB was advised by Kaye Scholer—which was jointly representing both NCFE as issuers' counsel and CSFB as counsel for the placement of the NPF VI and NPF XII notes—that the related party activity and the events of Indenture non-compliance had increased and had become ***even more material.*** Specifically, in a series of draft registration statements that were prepared by Kaye Scholer, sent by interstate wire, and then reviewed by CSFB, Poulsen, Parrett and Ayers, each of them was advised that:

> •<u>NPF VI and NPF XII were not being operated in compliance with their Indentures</u>. CSFB was informed that "Some of our structured financing programs have not complied [and do not currently comply][7] with various documentary and reporting provisions contained in these Indentures. For example, some of our programs have not provided information to program trustees or investment rating agencies on a timely basis or have not obtained complete closing documentation, such as legal opinions, from customers."

[7] This bracketed language appears in the text of the document itself.

- NCFE, Poulsen, Ayers and Parrett were continuing to loot NPF VI and NPF XII through wrongful affiliate transactions. In a faxed draft of a proposed related party disclosure, entitled "Certain Transactions," which was sent to CSFB, Poulsen, Ayers and Parrett by means of an interstate wire transfer, CSFB was advised that as of 1998, over $445 million in NPF VI and NPF XII note proceeds had been advanced to related parties, out of a total outstanding note balance of $1.2 billion. This meant that nearly 40% of the receivables reportedly purchased for NPF VI and NPF XII had been Purchased from health care providers that were affiliated with NCFE, in violation of their Indentures of Trust. Collectively, these wrongful "purchases" accounted for over one-third of NCFE's gross revenues ($49.4 million).

- NCFE had sponsored one receivables purchase program that purchases ***almost all*** of its receivables from a group of affiliated health care facilities.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 790 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

796. CSFB knew that these issues were pervasive and persisted throughout their relationship with NCFE, NPF VI and NPF XII. Yet it was CSFB—and CSFB ***alone***—that decided not to disclose the existence of this related party activity in the offering documents used

to issue debt on behalf of NPF VI and NPF XII. Specifically, from and after 1999, it was CSFB (as pervasive controller of NPF VI and NPF XII's securities issuances) who, after having internal discussions in the asset-backed finance group regarding these related party transactions, decided ***not to*** disclose the existence of this pervasive related party activity and who worked hard to conceal these Indenture violations from NPF VI, NPF XII, the rating agencies and the outside investors who had purchased the notes.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 796.

797. CSFB knew this related party activity was highly material to the NPF VI and NPF XII note offerings. This is clear from CSFB's communications with the Rating Agencies on behalf of NPF VI and NPF XII, and is also apparent from the unlawful efforts CSFB undertook to conceal this information from the Rating Agencies, all in furtherance of its ongoing scheme to loot NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 797.

**F. The Anonymous Letters**

798. As was described above, the maintenance of an investment grade credit rating was critical to the survival of NPF VI and NPF XII. In order to maintain that credit rating, NPF VI and NPF XII had to provide significant credit support in the form of reserve accounts. By agreeing to maintain reserve accounts, and by committing themselves to operate in compliance with the strict limitations of their Indentures of Trust—including the restrictions on which receivables could be purchased and from whom—NPF VI and NPF XII were able to significantly lower their borrowing costs. Compliance with the Indentures was also, as CSFB has

admitted, required in order to maintain "a healthy securitization program [which would] maintain their access to the capital markets and that will result in a lower cost of funds."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 798.

799. The Rating Agencies' insistence on compliance, however, was an impediment to the ever-expanding scheme to subvert and loot NPF VI and NPF XII through wrongful transactions that violated the Indentures. In order to ensure that the Rating Agencies lacked sufficient facts to enable them to blow the whistle and call a halt to the fraud, CSFB, Poulsen, Parrett and Ayers undertook a lengthy campaign to deceive them. As a result of that successful campaign, these Defendants' fraud on NPF VI and NPF XII was left undiscovered by the Rating Agencies and other outsiders, and NPF VI and NPF XII were forced to issue an additional $2.5 billion in notes that would never have been issued had the Rating Agencies been told the truth because, without investment grade ratings, NPF VI and NPF XII would have been unable to issue additional debt.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 799 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

800. The Rating Agencies had long been deceived concerning the existence of Indenture violations and prohibited related party transactions, but the effort to deceive them became more pronounced after an anonymous writer sent a series of letters to the Fitch Rating Agency. The first letter was sent in April of 1999, and the second in July of 1999. In those letters, the writer advised the rating agency that NCFE was "a fraudulent organization which operates outside the scope of its Indentures and normal business practices," and that "it is

estimated that approximately 50% or more of the $2 billion portfolio is either worthless or non-existent."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 800, excepts states that to the extent the UAT relies on the April and July 1999 letters referenced therein, Defendant Ayers refers to the text of those documents for the complete and actual description of its contents.

801. These facts were already known to CSFB, and were being actively concealed by CSFB, Poulsen, Parrett and Ayers. In early March of 2000, however, CSFB issued an analyst report entitled "Healthcare ABS—A Clean Bill of Health." This report was distributed over interstate wires across the nation, and in Ohio. The report claimed to review several outstanding health care receivables financings, and was premised upon a purportedly objective analysis of the experience of NPF VI and NPF XII. This report contained the following statements of purported fact that CSFB knew to be false at the time they were made:

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 801, except states to the extent the UAT relies on the analyst report referenced therein, Defendant Ayers refers to the text of that documents for the complete and actual description of its contents.

802. **Purported Fact:**"The issuer . . . purchases receivables from healthcare providers on an ongoing basis."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 802, except states to the extent the UAT relies on the analyst report referenced in paragraph 801, Defendant Ayers refers to the text of that documents for the complete and actual description of its contents.

803. **REALITY:** CSFB, Poulsen, Parrett and Ayers knew that NPF VI and NPF XII were being caused, in violation of their Indentures, to make unsecured loans to affiliated health care providers, they knew of "advances" being made to providers, and they knew that counsel had raised questions concerning the recoverability and propriety of these affiliated transactions.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 803.

804. **Purported Fact:** "The program manager oversees the activities and ensures that receivables are eligible, that concentration limits with respect to obligors and providers are followed, and that credit enhancement and receivables valuations are appropriate."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 804, except states to the extent the UAT relies on the analyst report referenced in paragraph 801, Defendant Ayers refers to the text of that documents for the complete and actual description of its contents.

805. **REALITY:** CSFB, Poulsen, Parrett and Ayers knew that concentration limits were being violated constantly as a result of a concentration of ***prohibited*** related party transactions that exceeded 35% of the reported total purchased receivables on hand. In addition, CSFB knew about and participated in a decision in January of 1998 to force NPF VI to buy worthless, ineligible and aged receivables from Fresenius/NMC. This was a transaction in which CSFB assumed yet another, conflicting role and represented the interests of its major health care client, Fresenius, in selling its assets (including woefully aged receivables) to Healthcare Corporation of America and its parent, NCFE. NPF VI was forced to extend nearly $100 million in funding to complete that transaction, even though CSFB, Poulsen, Parrett and Ayers knew that the transaction violated at least the following prohibitions in the Indenture: a) the prohibition

on affiliate transactions; b) the prohibition on the purchase of aged receivables; and c) the requirement that receivables be purchased for their true value, when CSFB knew these were over-valued by nearly $50 million.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 805.

806. **Purported Fact:** "As stated earlier, defaulted and defaulted/rejected receivables are important indicators of the issuers' ability to effectively estimate contractual allowances, price receivables from seller and manage the program overall….Recall that every month defaulted and rejected receivables are charged back to the seller, out of proceeds from collections."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 806, except states to the extent the UAT relies on the analyst report referenced in paragraph 801, Defendant Ayers refers to the text of that documents for the complete and actual description of its contents.

807. **REALITY:** CSFB, Poulsen, Parrett and Ayers knew that defaulted and rejected receivables were ***not*** being charged back to the sellers. Instead, defaulted and rejected receivables were purportedly being "purchased" by NCFE from either NPF VI or NPF XII, in violation of the prohibition on affiliate transactions, and without regard to whether this was actually permitted by the Indentures. For example, in Apri127, 2001, e-mail to members of the CSFB investment adviser group, including among others, Oliver Sarkozy, reported that "AR lending which was out of compliance of the securitization program [was being] 'purchased' by NCFE corporate to avoid non-compliance with the securitization. . . ." The effect of these

"repurchases" was to conceal from NPF VI, NPF XII and from the Rating Agencies the build up of aged and defaulted receivables that CSFB itself had stated was an important, material indicator of the health of NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 807.

808. **Purported Fact:** "The collateral coverage test must always be met for the deal to be in compliance with early amortization triggers."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 808, except states to the extent the UAT relies on the analyst report referenced in paragraph 801, Defendant Ayers refers to the text of that documents for the complete and actual description of its contents.

809. **REALITY:** CSFB, Poulsen, Parrett and Ayers knew that NPF VI and NPF XII were repeatedly out of compliance with these tests. In fact, in April of 1999, CSFB received an Orwellian report from NCFE concerning "negative variances in various reserve accounts which led to problems in the Collateral Coverage Test and the Specified Equity Account Balance." In plain English, NCFE told CSFB that it had violated the Indentures by ***entirely failing to fund*** the required reserves when it purchased over one hundred million dollars of receivables. This led to a massive default and a massive shortfall in the reserves, which was literally papered over by the preparation of a "properly verified investor report." CSFB, however, knew that this was far from true.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 809.

810. The true facts concerning this 1999 Investor Report are even more chilling. They

demonstrate that CSFB, Poulsen, Parrett and Ayers were aware—as early as February of 1999—that NPF VI and NPF XII had been so badly damaged and were so thoroughly insolvent that each of them could only stay afloat through the issuance of additional notes. Issuance of additional notes was critical, however, because even as they deepened the insolvency of NPF VI and NPF XII, the notes generated handsome fees and additional assets to divert for the benefit of CSFB, Poulsen, Ayers and Parrett.

Paragraph 810 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 810 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

811. Specifically, in February of 1999, the reserve accounts at NPF VI had been drained—almost completely—for the purchase of receivables. The use of the reserve accounts to purchase receivables was itself a violation of the NPF VI Indenture. Had the Servicer timely submitted an accurate investor report for this period, it would have demonstrated that there was a massive monetary default that required the Trustee to immediately accelerate NPF VI's notes. This would have caused NPF VI to collapse. It would also have precipitated the collapse of NPF XII, because each was now fully dependent upon the other for their financial survival. Had this occurred, NPF VI and NPF XII could not have been forced to issue the additional $3.43 billion in debt that they actually issued in the ensuing years, and they might have survived and been able to pay the debts they actually owed. None of these faithless agents, however, had the best interests of NPF VI and NPF XII at heart—and so all of them conspired to ensure that the fraud being perpetrated on these companies was never revealed.

Paragraph 811 contains conclusions of law as to which no answer is required. To the

extent any answer may be required, Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 811 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

812. To that end, the Servicer—with the knowledge and approval of CSFB—did not submit the February Investor Report for NPF VI when it was due on March 19, 1999. Instead, the Servicer delivered a false report on March 29, 1999. This report purported to demonstrate that NPF VI was compliant with its reserve requirements—but the Trustee, Chase, recognized that the report was false. Inexplicably, Chase did not declare a default. Instead, it simply required the Servicer to re-submit the Investor Report with accurate data. The revised report showed that NPF VI had failed the Collateral Coverage Test. It also demonstrated the Specified Equity Account was 20% below its required minimum balance, and stated that the required level of the Seller Credit Reserve was a mere 25% of the specified minimum balance, with a $28.5 million shortfall. In total, the accurate report reflected that ***nearly $40 million was missing*** from the NPF VI reserve accounts. This created a crisis in its own right, and the conspirators scrambled to prevent a declaration of default. They succeeded in their effort, because the Servicer issued the March Investor Report nearly a week early. This report, a copy of which was sent to CSFB, purported to demonstrate that the reserves were now compliant. In fact, as CSFB, Poulsen, Parrett and Ayers knew, the only thing that had changed in the interval between the fictitious report and the real one was this: CSFB had caused the issuance of an additional $180 million of notes—which CSFB had promptly sold without disclosing the existence of these defaults—in order to raise the funds necessary to replenish the NPF VI reserve accounts.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 812 and denies knowledge or information sufficient to form a belief as to allegations not directed at

Defendant Ayers.

813. Having succeeded in replenishing the reserves through a wrongful note issuance, CSFB and Poulsen then turned their attention to the Rating Agencies, to ensure that they did not ask uncomfortable questions. In a long, false letter dated April 7, 1999, Poulsen—with the knowledge and approval of CSFB—assured the Rating Agencies that the "error" in the investor report was caused by the fact that "actual purchased receivables were more than $100 million higher than the amount shown in the February report because the purchased receivables data had not made it into the proper account and the resulting contribution to reserves and equity accounts for the similar period had also not been placed in the accounts." In fact, as described above, the "error" was that the reserves had been looted, and the "timing" issue was that the conspirators had to wait for a new note issuance by NPF VI in order to replenish them. This false letter was sent by interstate mail and wire from Ohio to the Duff & Phelps Rating Agency in Chicago, Illinois for the express purpose of lulling the Rating Agencies into a false belief that the programs were operating lawfully, when it fact they were hopelessly insolvent. CSFB and Poulsen took these wrongful actions because they knew that they could not afford to tell the Rating Agencies the truth; namely, that an Event of Default had occurred and had been cured only by another note issuance.

Paragraph 813 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 813 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

814. CSFB, Poulsen, Parrett and Ayers also knew that this default was not a one time occurrence; rather, it happened repeatedly over the course of CSFB' s involvement with NPF VI

and NPF XII. Yet, despite this knowledge, CSFB never revealed the constant defaults to the Rating Agencies and never disclosed them to anyone else. Instead, CSFB affirmatively ***misrepresented*** that the programs were in compliance with their reserve requirements.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 814 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

815. CSFB knew at the time it published this March 2000 "Clean Bill of Health" report that the statements made in it were materially false and misleading, but it published the report any way as part of its ongoing effort to create a false picture that NPF VI and NPF XII were financially healthy, sound and capable of issuing—and repaying—billions of dollars of notes. Indeed, on the strength of this "Clean Bill of Health," CSFB was able to place an additional $125,000,000 in debt on behalf of NPF XII, in an issuance that closed on March 29, 2000.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 815.

816. On the very day this $125 million issuance closed, however, the anonymous writer sent another letter to Duff & Phelps. In this letter, the writer specifically alleged fraud in connections with receivables purchased from Lincoln Hospital and suggested that this was "just the tip of the iceberg." It made specific allegations that the money should be followed, and that an investigation should be conducted concerning "how many valid receivables are available (valid does not mean an internal printout from the perpetrator) and is that reasonable for its size."

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 816, except to the extent the UAT relies on the anonymous letter,

Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

817. On May 12, 2000, representatives of Duff & Phelps in Chicago and New York spoke by interstate telephone with Poulsen in his New York hotel room. The purpose of this call was described in a fraudulent "confirming" letter that Poulsen sent to the Rating Agencies after the call was concluded. Poulsen dictated the letter to his secretary in Ohio over the interstate telephone wires, and the letter was then sent to the Rating Agency representatives by facsimile transmission, again over the interstate wires, at their offices in New York and in Chicago. While these letters are nearly entirely false, one statement stands out: "As you know, all of these securitizations are tightly regulated with extensive requirements for audit and agreed upon procedures. These tight reviews and audits have been compiled over the years and have been supplied to you on a timely basis. [In] not a single one of those reports has NCFE ***or its affiliates failed to perform within the limits of the Indenture.***" CSFB, which received its own copy of this letter by interstate fax, and Poulsen each knew that this statement was materially and categorically false.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 817, except to the extent the UAT relies on the Poulsen "confirming" letter, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

818. Fitch responded to this letter on May 17, 2000 with a detailed request for information from NCFE, NPF VI and NPF XII. In the letter, which NCFE received and forwarded to CSFB, Fitch stated: "We regard the relationships among NCFE and its officers …and the Providers in the NPF Program ***to be highly material.***" Fitch then asked for a detailed

description of all of the providers in the NPF VI and NPF XII programs who were affiliates of NCFE or any of its officers and directors. Poulsen promptly faxed a copy of this letter via interstate wire to CSFB in New York.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 818, except to the extent the UAT relies on the May 17, 2000 Fitch letter, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

819. First, an effort had to be made to deal with media inquiries that had been generated in the wake of the Fitch letter.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 819.

820. CSFB, Poulsen, Ayers and Parrett knew that this "highly material" information had been concealed from NPF VI, NPF XII, the Rating Agencies, and the purchasers of the NPF Notes. They also knew that if the facts concerning the related party transactions and the Indenture violations were revealed, NPF VI and NPF XII would collapse. Accordingly, they embarked on a concerted effort to persuade both the Rating Agencies and the market that NPF VI and NPF XII were financially sound—at a point in time when they knew that they were not.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 820 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

821. CSFB, Poulsen, Parrett and Ayers therefore agreed upon a course of action that would followed in order to prevent the discovery of their fraud. First, an effort had to be made to

deal with a press story that had been written in the wake of the revelation of the anonymous letters. CSFB, in furtherance of the existing conspiracy, complied with Poulsen's demands that it reassure the investors and the media that all was well. Accordingly, "a source at Credit Suisse First Boston" provided a quote to the Asset Sales Report stating that "The integrity of the company is heavily scrutinized by the agencies, and deals are refinanced all the time. Additionally, ***there is lots of due diligence in the course of underwriting.***" This quote was then repeated, verbatim, in the May 22, 2000 issue of Asset Sales Report.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 821 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

822. On May 19, 2000, Poulsen also used the interstate wires to fax a script to CSFB. In this fax, Poulsen insisted that CSFB follow the script in making interstate telephone calls to reassure investors in the NPF notes that all was well. The script contained "key messages" to convey and a "fact sheet that outlines NCFE's positioning on this situation as reference tools." CSFB, Poulsen, Parrett and Ayers each knew that the following facts contained in the script were false:

- "The letters make allegations against NCFE that are completely ***unfounded and untrue.***"
- "NCFE worked very closely with the editor of the publication to aggressively defend their position on these matters, and wants to assure you that ***there is no reason for alarm regarding any information in the article.***"
- "Our strong financial positioning (including our $2 billion

portfolio) speaks for itself and secures NCFE's position as the leading provider of health care receivable financing in the nation."

- “We ensure this through numerous annual audits performed through our rating agencies and outside independent auditors as well as our ongoing due diligence process."
- "NCFE has purchased and serviced more than $12 billion of healthcare receivables."

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 822.

823. On May 23, 2000, CSFB convened a meeting with Duff & Phelps, in its 10th floor conference room to "review the methods of investigation into the fraud allegations posed in the anonymous letter." As CSFB and Poulsen continued their efforts to reassure the Rating Agencies, however, the financial crisis in the NPF programs grew ever deeper.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 823.

824. First, the questions raised concerning the NPF programs had effectively locked them out of the market for new issuances-at least until the allegations could be "cleared up." Second, CSFB learned that Fitch had contacted PWC, the program's outside auditor, to request that PWC explain whether and how it confirmed with providers whether the receivables on the books of NPF VI and NPF XII were accurate. Third, CSFB, Poulsen, Ayers and Parrett recognized that they might not be able to satisfy Fitch's questions, and so they began making plans to obtain ratings from Moody's for any new issuances—because they could ill afford to lose the ratings from both agencies. CSFB and Poulsen agreed that they should not send Moody's

any documents for prior issuances or the old investor reports because "By sending the prior documents and the investor reports, we run the risk that Moody's might discover the error [in the credit enhancement methodology][8] which could affect our credibility."

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 824.

825. In the midst of this Crisis, a major customer of CSFB's—Blackrock Capital Management—called CSFB to insist that CSFB buy its very large position because it had become concerned about concentration issues in the programs. CSFB agreed to do so to appease Blackrock and avoid further discord, but this increased their own exposure to NPF VI and NPF XII, at a time when liquidity in the programs was rapidly vanishing. At a meeting on July 20, 2000, CSFB was warned by Poulsen and Roger Faulkenberry that they were looking at "alternate liquidity" and that they believed "six months should be enough time." Things had gotten so bad that Poulsen advised CSFB that they had "internally ***produced cash by moving Sellers between Programs***," in a kiting scheme that yielded approximately "$50 million cash." CSFB was also told that yet another NPF program, NPF XI, was now out of compliance with its own Indenture in its Equity Account.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 825.

826. CSFB was therefore enlisted to scour the marketplace to find any additional source of cash for NPF VI and NPF XII. GMAC, an experienced asset backed securities issuer, was contacted to determine whether it would be interested in making an equity investment in

[8] This is a euphemism for the reserve accounts, which were the sole "credit enhancement" in the NPF VI and NPF Xll note issuances

NCFE—but that transaction was moving too slowly to save NPF VI and NPF XII. The debt markets remained closed to NPF VI and NPF XII, so long as their ratings situation remained in limbo. In late September of 2000, the crisis became acute, as a new issuance was required in order to fund existing provider clients and to replenish—yet again—the looted reserve accounts. NCFE therefore enlisted the help of the Beacon Group, an affiliate of Chase, to provide it with the funding necessary to prevent a declaration of default. In September of 2000, Beacon scraped together $75 million that was "loaned" to NPF XII on a short term, unsecured basis. This money was funneled down into the reserve accounts on the understanding that it would be for "only a short period of time (approximately five days)" and would be "used to assist us during the Determination Date." In plain English, the conspirators came up with $75 million to momentarily plump up the reserve accounts just long enough for them to be measured, so that "all liquidity tests were met for that period," and then depleted once again.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 826 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

827. The crisis continued, however, even as the conspirators tried desperately to close an additional note issuance for NPF XII in order to "permanently" solve the liquidity crunch. On October 4, 2000, Kaye Scholer—which was then acting as counsel to both NPF VI, NPF XII and CSFB—ran into a problem with the disclosures on the 2000-2 NPF XII Note issuance. The completion of this issuance was critical to the survival of ***both*** NPF VI and NPF XII, but the issue raised by Kaye Scholer placed the entire issuance in jeopardy.

- In an electronic mail dated October 4, 2000, Ed O'Connell of Kaye Scholer advised Todd Fasanella of CSFB, and others, stating that

"Phy-America's 10K and 10Q indicate that 'future receivables' are accounted for as ***financed by long-term debt,*** which implies that 'billed receivables' are accounted for as sold. The future receivables appear to be the 'flat-rate' contracts, or amounts owed by hospitals under contracts for which Phy-America affiliates agree to provide services. ***These receivables would seem to be the ones we need excluded.*** My proposed solution would be: 1) Confirm with PhyAmerica's accountants, either orally or in writing, what the 'future receivables' are; 2) ***carve out/rom the 'Eligible Receivables' definition in the PhyAmerica Sale and Subservicing Agreements*** these type of receivables."

- The next day, NCFE responded to this email with a missive of its own, in which it stated that CSFB should "draft whatever certification language you were comfortable with that would then be attested to by NCFE. Lance has stated that the flat rate contracts are no longer a part of NPF XII… We do not see the necessity of amending all the PhyAmerica sale and subservicing agreements. Now that we know the scope was never more than $38 million, ***the issue is less material than we one thought.*** $38 million represents less than 4% of the total pool rather than the 18% we were discussing earlier."
- The very next morning, CSFB responded with its own email, accepting NCFE's demand that they be allowed to simply sign

"whatever certification language you were comfortable with," so as to convert these facts—concerning serious Indenture violations disclosed in a document filed with the Securities and Exchange Commission—into "non-facts" that could be ignored entirely.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 827 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

828. As a result of these frenzied efforts to keep NPF VI and NPF XII afloat, and to conceal the true facts from the Rating Agencies, Moody's was persuaded to issue a rating for NPF XII. It did so only because CSFB, Poulsen, Parrett and Ayers had successfully conspired to conceal from the Rating Agencies and from the purchasers of NPF VI and NPF XII notes, all of the following facts that each of the conspirators knew but chose to conceal:

- The fact that the reserves had been artificially inflated by a five-day cash infusion.
- The fact that assets had been kited between NPF VI and NPF XII to generate $50 million in cash.
- The fact that an affiliated provider—PhyAmerica—wasn't selling receivables at all, but instead was receiving unsecured loans or advances from NPF XII.

Paragraph 828 contains conclusion of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 828 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

829. With the Moody's rating in hand, the conspirators then forced NPF XII to sell $275 million in additional notes. None of these facts was disclosed in the offering memoranda that CSFB used to offer the notes, even though all of them were highly material facts. Once that issuance was completed, the conspirators then immediately withdrew ***everything*** they had contributed to falsely inflate the Equity Accounts, and then moved forward with the next phase of their continued conspiracy to breach their fiduciary duty and defraud NPF VI and NPF XII.

Paragraph 829 contains conclusion of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 829 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

830. Even after the NPF XII Note issuance closed in October of 2000, the issue of Indenture compliance could not be put to rest. It was raised again in October of 2000, by GMAC, in an outline of the "critical" agenda items it needed to cover in its due diligence. Among these items was the following:

- "Affiliate transactions—we need a general overview and understanding of all transactions between the company and certain other entities owned by the principals in terms of ***how and why assets have been transferred to and from those entities,*** the indebtedness of affiliated entities to the company and the prospects for repayment of that debt."
- We "need to reach a full understanding of the above ***key issues.***

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 830, except states that to the extent the UAAT relies on the agenda items, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

831. A meeting was arranged at the offices of NCFE on October 30, 2000 to respond to GMAC's questions. This meeting appears to have raised more issues than it resolved, because in a follow-up call on November 6, 2000, GMAC advised CSFB that one of its "due diligence concerns" was the "use of specified equity accounts to pay accounts receivables." The handwritten notes of this interstate telephone conversation reflect that Poulsen "represented that [they] were permitted to use Equity to buy accounts receivable intra-month….Lance said Investment Bankers and shareholders agree with this interpretation. This has been confirmed they attended the meeting." CSFB's own email confirms that it understood that GMAC was "focused most intently on the use of the cash in the equity account by NCFE to fund receivable purchases during this summer's liquidity crisis." CSFB, however, has admitted that it knew all along that NPF VI and NPF XII could ***not*** use proceeds from the Equity Account to purchase receivables. CSFB also knew that NPF VI and NPF XII could ***not*** access the Equity Account "intra month" because they were limited to a single withdrawal on the single, monthly payment date. That CSFB nonetheless "confirmed" to GMAC the opposite of what it believed was true serves only to demonstrate the extent to which it was willing to misstate facts in order to keep afloat the scheme to defraud NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 831.

832. Notably, when GMAC was informed that half of the business done by NPF VI

and NPF XII was with affiliated parties, it observed that this raised a disclosure issue. Shortly after it asked for the detail on the "unsecured loans made at the end of September [2000] for the purpose of depositing funds into the various securitization accounts, [including] a schedule showing the flow of funds into the equity accounts," GMAC simply declined to get involved further or to make any investment at all.

Defendant Ayers denies knowledge or information sufficient to form a belief as to allegations in paragraph 832.

833. Joining a conspiracy is not without hazard. CSFB itself became even more deeply ensnared in its own, tangled web, through a series of events that caused it to deepen its own exposure to NPF VI and NPF XII (which it remedied by causing them to issue even more, worthless notes), to misrepresent facts to the Rating Agencies and finally to its extortion of over $1 million from NPF VI and NPF XII as they were in their death throes.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 833 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

834. First, as placement agent for the NPF VI and NPF XII notes, it was expected that CSFB would maintain and support a secondary market for the notes. In essence, if a buyer of the notes wished to sell them, it was essential to CSFB's franchise that it maintain the appearance of an active, secondary trading market for the notes. CSFB therefore maintained a trading book, through which it would buy and sell NPF VI and NPF XII notes in the secondary market. In the middle of the Summer 2000 Liquidity Crisis, CSFB was compelled to purchase from Blackrock management a large tranche of bonds that increased its exposure to NPF VI and NPF XII at a time when their financial condition was becoming increasingly precarious.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 834 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

835. In December of 2000, CSFB was compelled to increase its exposure to NCFE when Poulsen demanded that it provide additional liquidity, in the form of a variable funding note, to NPF XII. At the point in time that it made this loan, CSFB knew that NPF XII was insolvent, it knew that NPF XII's assets were being looted through the pattern of wrongful activity described above, it knew the Indentures of Trust were being violated fundamentally and almost daily, and it knew that NPF XII and NPF VI were always one note issuance away from complete financial disaster. But the fees that CSFB earned from perpetuating this fraud—which it had now done successfully for at least five years—were critical to the bottom line of its Asset Backed Finance Group. Accordingly, rather than call a halt to the fraud, CSFB simply extended more credit to NPF XII—in the form of a variable funding note issued by NPF XII on December 27, 2000. This note was issued on the express understanding that this "liquidity" would permit NPF XII to issue still more notes—that would be purchased by innocent investors—whose proceeds could then be used to repay CSFB and further the continued looting of NPF VI and NPF XII. Faced with this increased exposure, and increasingly dependent upon the fees generated by NPF VI and NPF XII, CSFB had to take affirmative steps to ensure that the market for NPF VI and NPF XII notes did not collapse entirely. CSFB was determined to protect its golden goose—at almost any cost—and was equally determined to exploit the advantages it had gained. An important chink in its armor, however, opened up in June of 2001. At that time, NPF VI was performing poorly and was in desperate need of capital to stave off yet another liquidity crisis. NCFE therefore asked CSFB to provide additional conduit financing of $500 million to

tide it over. When CSFB refused to do so, NCFE was able to secure the funds from ING, based upon an agreement to allow ING to become a co-placement agent of NPF VI. This agreement began to drive down CSFB's margins on its relationship with NPF VI, and was met with dismay by the investment bankers at CSFB. As described by CSFB's Jonathan Clark in a memo prepared for senior CSFB management at the end of 2001, this is what occurred:

> We have gone back to NCFE and proposed the suggested modified fee split (15 bp for CSFB, 45 bp split between CSFB/ING). The company's response was that they did not have the flexibility to address our concerns. NCFE promised ING ½ of 60bp on every term transaction out of NPF VI. This was in return for $500 MM in conduit financing for the lesser performing of the two trusts[9] at a time when no one (including CSFB) was willing to increase their exposure. We now have less average exposure (conduit/bank balance sheet) to NCFE than we have had in the last 3-4 years. Our maximum exposure is now approximately $100 MM. ING was not promised anything for NPF XII, the larger and better performing of the two trusts.
>
> Here's what we expect for 2002: As much as $2.5 billion in total issuance ($1.7 billion in refinance alone). We expect VI to do $900 MM and XII to do $1.6 billion. If we make 50% of 60 bp on VI and 90% of 60 bp on XII (allowing 10% for a co-manager), we earn over $11 mm in 2002 on this client.
>
> None of us are happy that we have to give up so much of this fee to ING on NPF VI deals, but I'd rather do that than piss off the client and find us having ING or another "real" underwriter in on part, or all of the business.

Paragraph 835 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 835, excepts states that to the extent the UAT relies on the February 15, 2002 email, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

[9] This is a reference to NPF VI.

836. CSFB's email makes clear what is now obvious: CSFB actively participated in causing NPF VI and NPF XII to issue additional tranches of debt—even when the company was insolvent and when CSFB itself was unwilling to lend it additional funds—for two reasons. First, CSFB was causing additional debt to be issued in order to work down its own exposure to NPF VI and NPF XII. It had now largely succeeded in that effort, and had worked down its exposure to a "maximum of $100 million—which is less than we have had in 3-4 years." CSFB, notably, was consciously indifferent to the fact that it had "worked down" its own exposure by forcing NPF VI and NPF XII to issue additional notes (whose proceeds were used to repay CSFB and to pay it enormous fees). It was also indifferent to the fact that these notes had been offered on the basis of material misrepresentations and omissions. Having perpetuated the scheme long enough to get itself largely clear, CSFB was now anxious to keep for itself the investment banking fees that it had literally "bought and paid for" with its earlier bribes to the agents for NPF VI and NPF XII. Finally, and critically, CSFB didn't want a "real underwriter" to come on the scene, because a real underwriter might give NPF VI and NPF XII the unconflicted advice that they were entitled to receive. This advice, which any competent underwriter would have given, would have protected NPF VI and NPF XII from the continued scheme to force them to issue debt, so that the funds raised could be looted by their agents through self-dealing, unauthorized related party transactions, through violations of the Indentures of Trust, and through the "purchase" of receivables that were not valid or eligible. None of this was in the interest of NPF VI or NPF XII, and all of it served only to plunge them deeper into hopeless insolvency—insolvency that could and would have been avoided had CSFB honored its agency relationship and acted in the best interest of NPF VI and NPF XII.

Paragraph 836 contains conclusions of law as to which no answer is required. To the

extent any answer may be required, Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 836, excepts states that to the extent the UAT relies on the February 15, 2002 email, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

837. In July of 2002, however, the scheme began to unravel. Roughly a month after NPF XII issued its last, $250 million note issuance, Fitch issued a notice downgrading various NPF VI and NPF XII note issuances. CSFB, which then held a substantial trading portfolio of notes issued by NPF VI and NPF XII, was immediately placed in serious financial jeopardy. CSFB knew that if the market for the notes dried up, it might be left holding a bag full of notes it (and it alone) knew were worthless. Desperate to avoid the trading loss that would ensue if the programs collapsed, CSFB tried to stave off disaster by issuing its own analyst report.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 837.

838. In a "Market Tabs" report dated July 15, 2002, CSFB professed itself "a bit puzzled by Fitch's downgrade," and assured investors and the market as a whole that "there is really ***no material deterioration in collateral performance in NPF XII and improving collateral performance in NPF VI."*** This statement was literally true only if, by this statement, CSFB meant that the performance of the collateral was so ***poor*** that no material deterioration was even possible. CSFB claimed that "there have been only a few instances of minor concentration violations," and "these limits have never been breached in NPF XII since our data on the series began," even though it knew that literally ***half*** of the providers in the NPF program were affiliates of NCFE, or Poulsen, Ayers and Parrett. CSFB claimed that "aging of receivables has been progressing quite smoothly," but it knew that this was a result of NCFE "buying" the

defaulted receivables from NPF VI and NPF XII, through a series of prohibited affiliate transactions, so as to conceal the massively aged and largely defaulted nature of its receivables pool. CSFB claimed that "For the past year or so, NPF VI has…never [been] near the early amortization threshold," even as it concealed that CSFB, itself, had refused to lend additional funds to NPF VI to address its liquidity crisis in the Summer of 2001. There are many other overt misrepresentations in this report, but perhaps the worst one is this: "Any cheapening of these securities in the wake of the Fitch downgrade should, in our opinion, represent a good opportunity for investors to add or initiate exposure to NPF healthcare ABS." This invitation was included as part of a conscious effort by CSFB to generate fraudulent market interest so that it could reduce its own inventory of NPF VI and NPF XII Notes. CSFB's handwritten notes from August 15, 2002 confirm that CSFB was continuing to try to address "unsold NPF inventory on CSFB trading desk," and had tried to "create [an] environment where [it was] offering more spread to secondary ABS market investors. Have attracted interest ***but no sales.***"[10]

Paragraph 838 contains conclusions of law as to which no answer is required. To the extent any answer may be required, Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 838, excepts states that to the extent the UAT relies on the July 15, 2002 "Market Tabs" report and certain handwritten notes dated August 15, 2002, Defendant Ayers refers to the text of that document for the complete and actual description of its contents.

839. When its effort to prop up the market failed, CSFB began to discuss "next steps," including a "bridge until have 2 ratings," or "CSFB possible bridge (Can we get equity to close on 8/28)." On August 27, 2002, Poulsen placed a frantic call to CSFB asking "what is doable for NCFE. $100 million needed 5-10 days," Poulsen acknowledged that the Equity Account had

[10] This emphasis is in the original of the CSFB handwritten notes.

once again been invested in receivables. He begged CSFB to give him a $100 million loan, on 48 hours' notice, for a ten day period "to tide the company over until the next term deal." This was an explicit reference to the fact that CSFB and Poulsen had long understood; that NPF VI and NPF XII survived only by constantly issuing notes that deepened their insolvency.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 839.

840. CSFB knew and understood that this loan was highly unusual, and was being requested specifically in order to conceal the fact that the reserves were again empty, in violation of the Indentures of Trust. CSFB recognized that if the reserve tests were not met, the program would terminate. It also recognized that this gave it leverage to extract even more money from NPF VI and NPF XII, even as they were strangling to death. CSFB agreed to make the money available, but it demanded that it be paid a fee of $1 million dollars in consideration of its agreement to do so. CSFB made this extortionate loan for the express purpose of permitting NCFE to deposit money into the reserve accounts—to remain there only momentarily—in order to appear to "meet the test and keep the program afloat." These funds were transferred into NCFE by means of a federal bank wire for the express purpose of furthering the fraudulent scheme to defraud NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 840.

841. Less than a month later, NPF VI and NPF XII had literally choked to death on the notes they had been forced to issue through the years-long, concerted effort to defraud and subvert them. NPF VI and NPF XII were forced to issue notes as a result of the deliberately wrongful acts of their faithless agents, CSFB, the Servicer, Poulsen, Parrett and Ayers. These

agents, all of whom were fully aware of their own fiduciary duties and of the fiduciary duties of those with whom they conspired, engaged in massive self-dealing at the expense of NPF VI and NPF XII. Because these agents breached their fiduciary duties to them, converted their assets, defrauded them, committed racketeering acts that injured them and, fundamentally, conspired to subvert them, NPF VI and NPF XII—which were once healthy companies engaged in an entirely legitimate business—have been destroyed. They have no means to repay the billions in dollars of debt they were forced to issue in furtherance of their agents' scheme to defraud them, to defraud the Rating Agencies and to defraud their investors.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 841 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

## G. COUNTS

### COUNT XXIV
### OHIO CORRUPT PRACTICES ACT: OHIO REV. CODE §§ 2923.34(B); 2923.32(A)(1) *Against CSFB, Poulsen, Ayers and Rebecca Parrett*

No answer is required to the extent the allegations in Count XXIV, including paragraphs 842 through 866 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXV**
**BREACH OF AGENCY, BREACH OF FIDUCIARY DUTY, FRAUD, NEGLIGENT MISREPRESENTATION, AND DEEPENING INSOLVENCY**
***Against CSFB***

No answer is required to the extent the allegations in Count XXV, including paragraphs 867 through 879, because Count XXV is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXV, including paragraphs 867 through 879 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXVI**
**CONCERT OF ACTION**
***Against CSFB***

No answer is required to the extent the allegations in Count XXVI, including paragraphs 880 through 884, because Count XXVI is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXVI, including paragraphs 880 through 884 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXVII**
**CIVIL CONSPIRACY**
***Against CSFB***

No answer is required to the extent the allegations in Count XXVII, including paragraphs 885 through 896, because Count XXVII is not directed against Defendant Ayers. Further an

answer is not required to the extent the allegations in Count XXVII, including paragraphs 885 through 896 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXVIII**
**PROFESSIONAL**
**NEGLIGENCE *Against CSFB***

No answer is required to the extent the allegations in Count XXVIII, including paragraphs 897 through 902, because Count XXVIII is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXVIII, including paragraphs 897 through 902 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**VIII. CLAIMS AGAINST THE AUDITORS: PWC AND DELOITTE**

903. PWC (together with its predecessor firm Coopers & Lybrand, LLP) was the outside auditor for the consolidated NCFE entities' financial statements for the audit years 1995, 1996, 1997 and 1998. The 1995 audit report was finalized on or about December 20, 1996. The 1996 audit report was finalized on or about July 22, 1997. The 1997 audit report was finalized on or about May 19, 1998. The 1998 audit report was finalized on or about August 10, 1999. PWC's audit work encompassed NCFE's subsidiaries including NPF VI and other NPF entities. PWC was also engaged by the Servicer, by NCFE and the NPF Programs, the Indenture Trustees, CSFB and Poulsen to perform certain agreed-upon procedures related to specific NPF

programs, including NPF VI, NPF XII, and their predecessors.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 903.

904. Deloitte was the outside auditor for the consolidated NCFE entities' financial statements for the years 1999, 2000 and 2001, though Deloitte never finalized a report for the year 2001. The 1999 audit report was finalized on or about June 29, 2000. The 2000 audit report was finalized on or about May 18, 2001. Deloitte's audit work on the 2001 audit continued through November 2002. Deloitte's audit work included, NPF XII, its predecessor, NPF VI, and other NPF entities.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 904.

905. The audit opinions issued by PWC and Deloitte for the years 1995 through 2000 each reported that the firms had performed audits in accordance with generally accepted auditing standards (GAAS) and represented that the financial statements they were engaged to audit were in conformity with generally accepted accounting principles (GAAP). Each opinion was '"unqualified" (or "clean"), as neither firm ever reported that any account balances were misstated, any disclaimers or exceptions to GAAP, that there were "going concern" issues, that required disclosures were missing or inadequate, or that the '"clean" audited statements failed in any way to fully and fairly depict the financial condition and results of NCFE and its subsidiary entities.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 905.

906. Deloitte and PWC each knew, from the inception of their engagements and

during all their audit work, that the NCFE entities' need for an audit was primarily related to the debt indenture requirements of the NPF entities. Both have acknowledged that they reviewed the Indentures of the NPF entities and were familiar with the Indentures' requirements for audits. PWC and Deloitte both knew that the primary reason for the financial statement audits was so that they could be used to satisfy the Indenture requirements of the NPF entities (including transmission of the reports to the Indenture Trustees and to the rating agencies), that the NPF entities would rely on the audit reports, and that NPF VI, NPF XII and the other NPF entities were known, foreseen, key and primary beneficiaries of the audit work.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 906.

907. PWC and Deloitte knew that the NPF entities regularly issued more and more debt and that the outstanding balances of such debt rose each year and with each issuance. They knew their indenture obligations, and thus knew that their audits were necessary to keep the NPF entities active so that they could continue to be used to raise more funds, disburse more and more funds to the providers (including affiliated providers), and provide income to Poulsen and the Servicer. As discussed more fully below, Deloitte and PWC each knew that the NPF entities' funds were being misused and that those funds were being diverted and dissipated in violation of the Indentures and to the detriment of the NPF entities. Both knew that without the audit reports they provided, such diversion and dissipation would come to an end.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 907.

908. As discussed more fully below, PWC and Deloitte were aware of at least the following:

(a) significant, pervasive and repeated Indenture violations that jeopardized the programs;

(b) significant and material failures to obtain or maintain eligible receivables in exchange for the funds disbursed to providers and affiliated providers; and

(c) facts revealing misstatements and inadequacies in the audited financial statements, including overvalued receivables, statements based on a going-concern assumption, and inadequately-disclosed related party transactions, related party balances, and debt compliance violations.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 908.

909. As a result of these and other infirmities, the audited financial statements were not in conformity with GAAP and did not fairly present the consolidated results or financial position of the NCFE entities. Deloitte and PWC's failures—often in the face of extensive knowledge of the problems—to properly address and disclose these issues or to modify, withhold or withdraw their reports until and unless they were resolved appropriately constituted violations of GAAS.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 909.

910. Both knew that their audit reports on NCFE financial statements were transmitted to the rating agencies, the Indenture Trustees, CSFB, and the board and audit committee members of NCFE and its NPF affiliates. Each of these persons and entities had duties, obligations and/or practices to review the financial statements and to consider their contents in the performance of their own roles, duties and services with respect to the NCFE-related matters.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 910.

911. PWC and Deloitte were repeatedly made aware—by Poulsen and others—that

without obtaining clean audit opinions, the NPF entities would be unable to issue further notes and the programs would shut down. Had PWC or Deloitte either (a) refused to provide a clean audit report; (b) provided a report that identified the misstatements and nondisclosures that existed; or (c) compelled Poulsen, the Servicer or NCFE officers to make all necessary disclosures by refusing to provide a clean audit opinion until and unless those matter were resolved, the NPF entities' operations—including the dissipation of more and more of their funds and the burgeoning debt increases that permitted that dissipation to happen—would have ceased.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 911 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**A. PWC's Audits**

**1. PWC's Initial Audit**

912. During early 1996 when PWC began its initial work on the 1995 financial statement audits, PWC became aware, through inquiries of the prior auditor—Hauser Taylor, through review of the financial statements audited by the prior auditor and otherwise, that the NCFE engagement had a "heightened risk" of fraud, as well as heightened risks based upon prior audit results and financial reporting. PWC was aware of the company's history of failing to present its receivables at their fair collectible value and failing to adequately establish reserves to properly value the receivables. PWC also recognized that it had no basis upon which it could rely upon the integrity of management.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 912.

913. The Hauser Taylor audited statements clearly revealed to PWC, on the face of the

audit opinion and in the notes thereto, (i) that multiple indenture violations existed, including "most importantly," a practice of advancing funds to certain Providers in violation of the Indentures without receiving accounts receivable, (ii) that the Servicer included as purchased receivables certain receivables that were aged beyond the age permitted by the Indentures, (iii) that the consolidated entities had an "exposed position"—*i.e.*, reported receivables balances unsupported by eligible receivables—of nearly $20 million, nearly 8% of the then-reported receivables, (iv) that the majority of the advances made without obtaining receivables and the majority of the exposed position was related to two related-party providers owned or controlled in part by affiliates of the Founders of NCFE.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 913 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

914. Despite PWC's knowledge of these risks, facts, problems, and issues from the initiation of its audit work, PWC failed to develop audit procedures to address them, failed to perform audit tests to address them, failed to make appropriate disclosures of known similar facts and issues in its subsequent audits, failed to make similar necessary adjustments to receivables valuations, and inappropriately relied on the unsubstantiated representations of management.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 914.

**2. Accounts Receivable**

915. By July 5, 1997, in conjunction with the 1996 audit, PWC documented its knowledge that NPF VI was already significantly deficient in receivables. PWC's workpapers

reflect that PWC was aware of at least $31 million that had been "advanced" to providers for which the NPF VI program did not have or obtain receivables as collateral. PWC also had information demonstrating that even some of the recorded receivables were most likely uncollectible, a fact that would increase the $31 million shortfall (Recall that the NCFE entities' financial size was much smaller in 1995 and 1996 than it grew to be by late 2002, so these amounts were even more obviously and highly material.)

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 915.

916. Similarly, in connection with PWC's 1997 audit (in early 1998), PWC became aware of even greater shortfalls of receivables. PWC was aware that NPF VI had only $59 million it recorded as eligible receivables, despite an outstanding note payable balance of $123 million. Similarly, PWC's documentations showed that NPF IX had $210 million in outstanding notes but only $161 million in qualifying receivables. Again, PWC's knowledge of issues that cast doubt on the actual eligibility and collectibility of many of these receivables exacerbates these calculated shortfalls of eligible collateral.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 916.

917. Similar shortfalls existed in the audit year 1998. PWC's calculation for the 1998 audit showed, for example, that even the purportedly-eligible receivables balances maintained by the Servicer showed that NPF VI had over $150 million *less* in recorded eligible receivables than it had in notes payable outstanding, and that even if all the cash reserve funds were tapped to attempt to cover the shortfall and even if every penny of the reported eligible balance were collectible, the program would *still* have a shortfall of $22 million! Worse, NPF IX had $102

million less in purportedly-eligible receivables than it had in payables, and showed a shortfall of over $52 million even if reserve cash was fully depleted and utilized.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 917.

918. PWC was specifically aware that the shortfalls not only jeopardized the collectibility and valuation of the reported receivables and thus the entire financial stability of the NPF programs, but they also showed clear violations of the Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 918.

919. In its audit work, PWC quickly became aware that two of the biggest (purported) providers of receivables were two affiliates, Therakinetics and Rx Medical. Together these entities were responsible for well over $50 million of the receivables on NCFE financials in 1995. PWC's workpapers for those years make clear, however, that PWC knew that while the general ledger showed $21 million receivables related to Rx Medical in 1995 and $24 million by 1997, the Servicer's receivables tracking system, the AS400, revealed that the Servicer did not even purport to have but about $3 million of actual receivables to back up the figures that were included on the financial statements. The AS400 was the Servicer's computerized tracking system which maintained the only detailed listing of the accounts receivable that were purchased by the NPF Programs. If a receivables balance was not supported by detail in the AS400 system, it was highly unlikely that eligible receivables existed to support the balance, and an auditor would surely have no evidence upon which to conclude that the receivables did in fact exist.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 919.

920. Perhaps worse, to the extent PWC, Poulsen or the Servicer might suggest that the Rx Medical shortfall of over $15 million in reported "receivables" could be collected from Rx Medical itself, PWC was fully aware during the course of each of its audits and from its review of Rx Medical's SEC filings, that Rx Medical was deeply in debt with negative net worth, minimal assets and enormous operating losses, and that Rx Medical's own auditors had qualified their opinions. PWC was fully aware that the stated receivables balance for Rx Medical reported in NCFE's financial statements was materially overstated.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 920.

921. By 1997, for example, the Rx Medical Group represented about $45 million of the receivables balances reported on the financial statements. PWC's workpapers showed that the Servicer's internal systems revealed that the NCFE entities had only about half that amount in actual receivables on its system leaving over $21 million wholly unsupported, and that even the receivables that were shown on its system were substantially all "frozen," meaning that they were old, stale, and of highly doubtful collectibility. Rx Medical's financial condition was abysmal, as PWC's own workpapers reflected, with dramatically negative net worth and net losses, total assets of only around $6 million, and a swirl of litigation and regulatory scandal. Amazingly, PWC concluded that the reserve of only $4.5 million established by the Servicer was sufficient and that the company could thus report over $40 million as the net realizable value of the Rx Medical receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 921.

922. Substantially the same situation existed for Rx Medical in connection with the

1996 audit as well: PWC noted that of the approximately $20 million recorded balances reflected on the financial statements, only $2.6 million of actual receivables were even *purported* to be in the Servicer's internal systems, and those had been "rebilled with little or no payments received." Notwithstanding the almost completely unsupportable $20 million balance, PWC deemed a reserve of only $2.7 million to be sufficient, resulting in an overstatement of receivables for this provider alone of at least $16 million.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 922.

923. As early as 1995, the Therakinetics receivables were in similar shape: The financial statements included $34 million of receivables from Therakinetics, but PWC knew that the company had no more than about $12 million of actual eligible receivables, and that Therakinetics itself had determined that a valuation write down of about $19 million was necessary. NCFE had recorded a reserve of less than $2 million, resulting in a dramatic overvaluation of receivables that continued each year through PWC's tenure.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 923.

924. In its 1996 audit, PWC was aware that, of Therakinetics' reported receivables balance of approximately $29 million (net of cash reserves), over $6 million was unsupportable by any actual receivables, and the remainder was largely "rebilled" or aged receivables that were ineligible and that were not "collecting out very well." Indeed PWC obtained information during its audit in 1997 showing that even the Servicer's own information acknowledged that no more than about $8 million of the balance consisted of receivables less than 180 days.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegation of paragraph 924.

925. No later than its 1996 audit, PWC was aware that Capital America Healthcare was a related party, approximately 11.5% owned by NCFE affiliates, but PWC failed to disclose it as such and failed to include its transactions as related-party transactions, resulting in material deficiencies in the related party disclosures. Additionally, the approximately $43 million of net receivables NCFE reported related to Capital America in 1996 was materially overstated. PWC's own workpapers reveal that at least $11 million of the reported balance was supported by no patient receivables at all. They further revealed that over a $3 million reported category of receivables for Brea Hospital (a Capital America subsidiary) had experienced "minimal collections" and that agings and collections on the receivables that purported did exist for its Hadley Hospital subsidiary were "not collecting out very well" and "moving in a negative direction." Amazingly, PWC condoned booking *no* allowance for doubtful accounts at all, resulting in a material overvaluation of receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 925.

926. In its 1998 audit work, PWC received from the Servicer a schedule reflecting "exposure" in the reported receivables balances. The schedule compared the reported general ledger receivables balances to the underlying detailed listing showing the patient receivables balances that the Servicer purported to have for each provider. The schedule showed an exposure—a shortfall—of $345 million. This was *before even considering* that a material portion of the detailed receivables on the system were known to be aged beyond eligibility and to be slow in collecting or likely uncollectible at all, both facts that increased the true "exposure" and thus the true overstatement of receivables balances even above the $345 million. No later than

May 1999, PWC was aware of at least $200 million of receivables that were aged beyond 240 days and/or "frozen" so that they could no longer age at all.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 926.

927. For each year PWC had NCFE audit responsibility, it was aware that provider receivables were significantly overstated in the financial statements it audited. In addition to the facts above, no later than June 1997, prior to the issuance of its audit opinion on the 1996 financial statements, PWC knew of, at least, the following misstatements: (a) The NPF entities included in their receivables balances (and had funded) millions of dollars of outstanding receivables which consisted of overfunded pro-formas. These were, as PWC knew, ineligible receivables purchased without the patient specific receivables required by the Indentures, and were in fact fictitious and ineligible receivables, dramatically overstated provider receivables on the books of the NPF programs and NCFE's consolidated financial statements; (b) NCFE was not aging receivables with millions of dollars of outstanding receivables it had owned for longer than 180 days. This, too, resulted in a significant overstatement of provider receivables; and (c) NCFE was including in its "provider receivables detail" many items that were not "purchased receivables." PWC believed NCFE did this simply in order to falsely inflate the reported collateral base for the existing outstanding receivable balance.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 927.

928. At all times during PWC's audit tenure, the reported allowance for bad debts or doubtful accounts was materially insufficient, and each year PWC had more than ample information making clear to PWC that it was in fact insufficient.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 928.

929. The individual providers and individual audit years detailed herein are necessarily just examples. PWC's failures to properly value receivables, as described in the examples herein, were repeated and pervasive, and were so obvious and egregious that they were necessarily done knowingly and intentionally. PWC failed to obtain competent evidence supporting receivables balances and failed to analyze or report in a candid, careful or competent way on the information it was in fact provided. As a result, NCFE's receivables balances were dramatically overstated during each year of PWC's tenure as auditor, and PWC's assertion that the financial statements were fairly stated and in accordance with GAAP was false, and knowingly false or in the alternative at least recklessly and grossly negligently false.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 929.

930. PWC's audit partner has recently taken the position that PWC knew and believed during its entire tenure as auditor that the primary business of the NPF Programs was ***not*** the actual *purchase* of healthcare patient accounts receivable, but was instead the ***lending*** of money to providers, *sometimes* secured by accounts receivable. The representations and disclosures in the financial statements they audited are to the contrary, repeatedly describing the actual purchase of receivables. PWC's partner's position acknowledges that PWC thus knew that those statements were wholly false and misleading on this critical description of the very nature of NCFE's business and its principal assets.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 930.

931. Despite PWC's extensive knowledge of what were, at a bare minimum, enormous "red flags" concerning the receivables balances, PWC failed or declined to perform the most basic of audit procedures regarding the testing of accounts receivables. Never did PWC confirm or inquire of the obligors of purchased receivables—*i.e.*, insurance companies, medicare, etc.—a very basic audit procedure and one that surely would expose the falsely inflated receivables balances. Instead, PWC confined its inquiries to the persons and entities that had purportedly sold the receivables to the NPF Programs, "testing" the purported existence of hundreds of millions of accounts receivable by doing nothing but obtaining a verification from a representative of the seller that was in many instances a related party. PWC further failed to perform any meaningful or adequate alternative procedures, or to document any conceivable justification or rationale by which it chose to omit the testing.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 931.

**3. Indenture Violations**

932. In its 1995 audit, PWC specifically noted the violation of "several covenants, including . . . concentration limits, as well as advancing funds that are not collateralized by patient specific accounts receivable." NCFE's financial statement disclosures, however, said nothing about concentration limits or about advancing funds that were not supported by patient specific accounts receivable. PWC's audit workpapers prepared in 1996 also specifically noted that advances to providers without receiving purchased receivables appeared to violate Section 4.06 of the Indenture (limitations on types of business activity) as well. PWC's audit approach appeared to depend upon an alleged representation by management that both rating agencies and debt holders were "aware of these events and will not declare a principal amortization event."

GAAS and PWC's own audit policies and procedures required that any waiver of debt covenant violations be in writing, be specific as to each waiver being expressly waived, and be binding for at least the ensuing year. PWC's own workpapers recognize that it would be inappropriate for an auditor to rely upon the unverified word of management concerning a purported waiver of a debt covenant requirement. However, PWC obtained no written waivers or consents at all from debt holders, trustees or rating agencies, nor did PWC take any steps to verify the alleged statement by management that those parties had even been made aware of each of the violations PWC had knowledge of.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 932.

933. PWC was also aware that the Servicer had failed to give notice to the Trustees of these violations and Events of Default, a failure which itself constituted yet another Event of Default.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 933.

934. PWC's workpapers reflect substantially the same or similar knowledge by PWC each year of its audits with respect to the Indenture violations, and reflect similar actions and inaction by PWC each year. PWC was aware of Indenture violations so pervasive that at one point—for the 1996 audit—PWC acknowledged it would simply stop further audit work to determine, understand or quantify the full extent of such violations. As such, PWC was knowingly, recklessly and with conscious indifference looking aside while the Servicer and the Founders caused numerous material and repeated violations of the Indentures.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 934 and

denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

935. PWC knew that it was not true that the noteholders, Ratings Agencies and Trustees were aware of each of the Indenture violations, so the use of this purported knowledge to avoid qualifying its opinion was improper and fraudulent. Notably, PWC was aware that Poulsen regularly represented and indicated, in Investor Reports and otherwise, that there were no such violations.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 935.

936. Despite its knowledge of repeated, material and blatant Indenture violations—including violations regarding massive misuse of millions of dollars of funds—the PWC-audited financial statements never included a going concern qualification and never described the nature of any of the particular violations it had noted.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 936.

937. PWC's cavalier attitude toward violations of the indentures for the NPF programs appears to have been related, in part, to its assumptions regarding the "bankruptcy remoteness" of the NPF programs—*i. e.*, an indifferent belief that those NPF programs could simply fail and wind up without causing the failure NCFE itself or of the Servicer. During each year of its audit work, however, PWC, was aware of multiple and repeated violations of the very covenants designed to ensure bankruptcy remoteness. For example, in its 1998 audit work, PWC documented that NCFE's John Snoble acknowledged that the company actually "never" complied with covenants such as (1) the prohibition on overlapping management; (2)

intercompany transactions with NCFE and its affiliates; and (3) advancing funds from NCFE to the NPF programs. Snoble had made similar acknowledgments to PWC in connection with each of PWC's prior audits. The financial statements did not make any disclosures communicating that bankruptcy remoteness was jeopardized by known indenture violations.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 937.

938. PWC further appeared to base its cursory attitude toward the NPF programs' Indenture compliance and financial stability on an absurd purported view that the programs could never fail and their investors could never lose money. Each year of its audits, PWC's workpapers indicate, *e.g.*, its position that indenture violations can be substantially ignored because "even if [a violation of the Indenture caused] a principal amortization event . . . to be declared by the trustee, the book should be self-sustaining and the investors should not be at risk for their investment." PWC was aware that this bold premise depended upon the requirement that the "books" have sufficient value in their receivables and reserves, but as discussed above, PWC was aware of numerous and material shortfalls and overstatements in receivables balances. PWC further based its positions on a stated assertion that NCFE would "not allow the investors to lose any money and will make the book (and the investors) whole in case of a shortfall." PWC purported to rely upon this apparent logic to justify ignoring flagrant violations of the Indentures that jeopardized and victimized the NPF programs, but PWC knew there was no support, verification or audit testing of the premise that NCFE would somehow have both the willingness and financial wherewithal to "make whole" the NPF programs and investors. PWC in fact knew that NCFE could not, and was not obligated to, make whole such shortfalls. PWC knew that the purported rationale for glossing over known indenture violations—and for failing to provide

meaningful descriptions in disclosure of any of the known violations—were false and could not justify the lack of adequate disclosure or lack of any modification of the audit report.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 938.

**4. Related Party Disclosures**

939. Though PWC repeatedly certified their opinion that the financial statements for years 1995—1998 were fairly presented and in accordance with GAAP, in fact the financial statement disclosures with respect to related parties were glaringly in error and in violation of GAAP's clear requirements. PWC's workpapers acknowledge that GAAP (specifically the Statement on Financial Accounting Standards No. 57, a.k.a. "FASB 57") requires, very explicitly, for any material transactions or group of similar transactions, disclosure of (1) the nature of the relationship with the related party; (2) a description of the transactions; (3) the dollar volume of each type of transaction during the year; and (4) the year-end balance of any amounts due from the related parties, together with (5) the terms and manner of settlement of the amount due. PWC knew that the NPF books had two distinct types of transactions with the related parties – some purchases of eligible receivables and some prohibited unsecured or partly-secured loans to providers – and that no description of these two types of transactions was made (Requirement 2 above) in the financial statements. No disclosures were made of the dollar volume of receivables purchase transactions (Requirement 3 above). These disclosures would have made clear that the NPF programs were not functioning as outsiders had been led to believe. Instead of revealing the material amounts loaned to and thus "due from" the related parties (Requirement 4 above), the PWC-audited financials presented a dollar figure in which the receivables from these providers was lumped together with and buried within the balance of

valid, patient accounts receivables (due from third-party insurers and the like). Similarly, no disclosure was made of the "terms" (Requirement 5 above) of these loans to affiliates – indeed it is unclear that there even *were* any established terms. Had the amounts due from related parties and the fact that the money was being loaned without established or documented repayment terms or requirements been disclosed, the financial statements would have made apparent that material amounts of money was being transferred to related parties without receipt of corresponding purchased accounts receivable from third parties, a disclosure which would have revealed and quantified some of most crucial problems that ultimately destroyed the NPF programs. PWC had full knowledge of the GAAP requirements of FASB 57 and of the facts that made clear that FASB 57's requirements had not been met. PWC further knew that its assertions, in each of its audit reports, that the financial statements were fairly presented in this regard and in conformity with GAAP were false.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 939.

940.PWC also condoned a related-party disclosure that it knew to be false concerning a note receivable from IIA, an affiliate of the Founders. PWC knew, no later than May 1997, that the note was not being paid according to its terms, but the audited financial statement disclosures made the direct false representation (in, e.g., footnote 12 to the 1998 statements) that "All required principal and interest payments have been made according to the terms of [these] notes."

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 940 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

### 5. PWC's Agreed-Upon Procedures Reports

941. In addition to its financial statement audits, PWC performed "Agreed-Upon Procedures" testing from approximately June 1993 through at least early 2000, issuing numerous different reports each year. This testing was specifically done for each specific NPF program, including NPF VI, NPF XII (and its predecessor) and others. PWC's agreed-upon procedures work had implications on its financial statement audit work and vice versa. Through PWC's agreed-upon procedures work, PWC became aware of problems relating to lack of documentary support for purported receivables balances, misstatements in the amounts of certain receivables, indenture violations, and more. PWC's response was to cover up such exceptions by purposely eliminating from its testing universe those receivables that did not meet the indenture eligibility requirements, an approach designed to circumvent the very purpose of the agreed-upon procedures. PWC failed to appropriately consider the problems identified through its agreed-upon procedures work in conducting its financial statement audits.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 941.

942. By April 1998, PWC had concluded that the Servicer's "AS400" system, which it used to record and track individual accounts receivables balances, was unreliable and could not credibly support the balances in the Investor Reports or in the financial statements. Specifically, PWC noted that the AS400 reported balances included "odd items" and inaccurate agings. PWC also noted that the AS400 was not functioning properly and that erroneous information was being included on Investor Reports. PWC also noted inconsistencies between the books concerning the manner in which Investor Reports were being prepared. PWC knew that the Investor Reports were being used to mask Indenture violations and material infirmities in the

reported receivables balances.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 942.

943. Notwithstanding its knowledge of material problems in the AS400 system and in the Investor Reports and financial information taken from it, PWC continued to blindly issue agreed upon procedure reports with knowledge that those reports were substantially misleading because the underlying purpose was undermined. PWC further continued to knowingly place inappropriate and unjustified reliance on the figures reported by the AS400 system to purportedly support the financial statement's reported receivables balances.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 943.

**6. PWC Final Audit**

944. Perhaps PWC's most egregious acts relate to its work on the audit of the 1998 financial statements, performed during 1999. By May 1999, PWC acknowledged in its internal memoranda that NCFE had had "historical weaknesses" in internal controls, accounting processes and procedures. PWC had also concluded that the state of the NCFE financial statements was so bad that PWC was "not going to be a party to an Initial Public Offering" for NCFE that would expose PWC to additional potential liability.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 944.

945. In May 1999, PWC determined, and disclosed to Poulsen, that PWC needed to withdraw its opinions on the 1995, 1996 and 1997 financial statements. However, PWC never communicated its withdrawals of opinions to persons outside of NCFE management who were in

a position to take responsive action, nor did they follow any GAAS-required procedures with respect to the withdrawal of opinions.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 945.

946. In the same May 1999 memoranda, PWC acknowledged that a representative of one of NCFE's major customer-providers had contacted PWC directly to inform PWC that a member of the Servicer's (or NCFE's) management had attempted to interfere with the process of confirming accounts receivable in connection with the 1998 audit work. PWC acknowledged that, given this development, GAAS required "extensive additional [audit] procedures" related to the accounts receivables audit work, "including but not limited to" on-site procedures and visits to selected providers. PWC had a disagreement with Poulsen regarding PWC's possible contact with a provider, in which Poulsen accused the PWC auditors of a lack of professionalism. A later May 1999 list of needed audit procedures, and one in June 1999 each echoed the need to "visit each provider" to gain supporting information for the enormous reported receivables balances. These onsite procedures were never performed, and PWC never disclosed any limitations in the scope of its audit, nor did PWC disclose its disagreements with management or the concerns with management integrity that were raised by the interference with the confirmation process.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 946.

947. Later in May 1999, PWC determined that in performing its audit work, PWC needed to meet with the Trustees, noteholders and preferred stockholder to discuss certain matters related to the NPF entities Indentures. PWC specifically noted its responsibility as auditor: "We need to ensure that all parties are aware of the items noted below and do not

consider them to be material breaches....” This was never done. PWC's documentation reveals both (1) its knowledge of numerous highly-material issues concerning, among other things, Indenture compliance and the existence and valuation of receivables, and (2) its responsibility under GAAS to take action regarding these items. The listed issues include:

- "Not forcing providers to repurchase all receivables that have aged out past 180 days"
- "Commingling of assets between books, movement of collateral between providers/books (cross-collateralization) . . ."
- "Inaccurately aged receivables being included on the Investor Reports (Location 99)"[11]
- "Ineligible receivables brought on as collateral included in the Investor Reports (Location 99)"
- "The definition of 'purchased eligible receivables' under the terms of the Indentures"
- "Whether the proformas, advances and other items that are out of the norm meet the definition of a purchased receivable pursuant to the sales and sub servicing agreement."
- "Intercompany Balances/Advances between the books and NCFE. [Including] any balances for which an intercompany account was set up to replace transfer of exposure from one book to another."
- "Whether advances are considered unsecured lending that is prohibited by the [equity] agreement. "

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 947.

948. These issues—obviously known to PWC prior, at the very least, to PWC's issuance of its report on the 1998 financial statements, outline most of the acts constituting the

[11] Parenthetical in the original test of the PWC document.

wrongful dissipation of NPF entities' assets and the efforts to perpetuate and cover up that activity. Despite the facts and occurrences that were indisputably within PWC's knowledge by May and June 1999, PWC issued a clean audit opinion for the year 1998. PWC failed to disclose or alter its report to reflect the known material problems.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 948.

949. PWC knew that if it failed or refused to provide an audit report for 1998, the NPF programs would promptly go into default and would be shut down. This would have stopped the misappropriation and dissipation of the programs' assets, and would have halted the ever-deepening debt issuances than exacerbated the programs' insolvency. But PWC further knew that such a sequence of events would surely bring its prior audits under close scrutiny and immediately expose PWC to enormous liability. Accordingly, despite knowledge of multiple issues that made clear that the financial statements were misstated, the Indentures were being massively violated, the financial disclosures were inadequate, the financial statements did not comply with GAAP and the PWC audits did not conform with GAAS, PWC knowingly issued a false audit opinion for calendar year 1998, issued in or about August 10, 1999.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 949.

950. At the same time, PWC sought to minimize its known liability exposure by refusing to consent to use of the financial statements in connection with an IPO of NCFE equity. On or about May 18, 1999, PWC's Press Southworth expressly told Poulsen that PWC would not "be a party to" a planned IPO that would attempt to sell stock using the PWC-audited financial statements. PWC's refusal evidenced its knowledge that the financial statements were not in

accord with GAAP and its audits not in accordance with GAAS. PWC's compunction, however, was not so strong as to prevent it from issuing another clean audit report and permitting Poulsen, NCFE and the Servicer to continue issuing more debt and misappropriating the proceeds thereof.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 950.

951. In early 2000, well after its last financial statement audit opinion had been released, PWC and Poulsen solicited and obtained a document from Trustee Bank One constituting an agreement purporting to authorize or condone numerous actions not permitted by the Indenture. A few months later, a similar agreement was obtained from Chase. At PWC's request, Poulsen obtained an express written agreement from the trust officers at both Bank One and Chase. Though PWC knew of (and had repeatedly documented) many Indenture violations, the written confirmation falsely attempted to give the impression of a "confirmation" that no events of default existed. Critically, the letters expressly set out an agreement whereby Bank One and Chase would permit and condone at least the following:

(1) Purchases of ineligible receivables, including receivables already defaulted because they were over 180 days old, and "direct pay" receivables (those where the primary payor is the individual patient rather than, *e.g.*, an insurance company);

(2) NCFE's practice of secretly propping up the programs by injecting capital from other sources, a practice that betrayed the teetering, undisclosed financial condition of the programs, and was typified by the fraudulent five-day Beacon loan and also the CSFB VFN as discussed above.

(3) The kiting transfers—Bank One and Chase expressly condoned "transfers of collateral from NPF [VI and XII] to another subsidiary or affiliate of NCFE" (even

though such transfers were blatant violations of several indenture provisions, including at least § 4.11's clear prohibition of transactions with affiliates), and stated that such transfers should be considered the "normal course of business."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 951.

952. PWC claims that the agreement has nothing to do with either its financial statement audit work or its agreed-upon procedures work. This position leaves no conceivable justification for soliciting such agreements from the Trustees. Though PWC knew the statements were false, it agreed with Poulsen that if a written "confirmation" thereof could be obtained from the Trustees, PWC would issue certain agreed-upon-procedures reports that were necessary for the continued existences of the NPF VI and NPF XII programs. PWC, and the Trustees, knew that regardless of their purported agreement among themselves and Poulsen, the activities described were violations of the Indentures and that those violations would continue to result in injury to the NPF programs. According to PWC's own testimony, the difficulties and disagreement with Poulsen arising from PWC's request for and insistence upon documenting this agreement were the primary reason PWC ceased to be NCFE's financial statement auditor, though Deloitte's documentation and testimony indicate that PWC had—apparently falsely—represented to Deloitte that its engagement as auditor ended for other reasons.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 952.

**7. Transition from PWC to Deloitte**

953. When PWC was replaced by successor auditor Deloitte in early 2000 (for the 1999 audit), PWC apparently did not disclose to Deloitte matters about which Deloitte claims to

have inquired, and about which PWC was obligated under GAAS to disclose with professional candor. Notably, PWC did not disclose to Deloitte at least the following facts and issues known to PWC: (1) its disagreements with management concerning the scope of audit procedures with respect to direct contact with providers; (2) its disagreements with management concerning Indenture compliance issues and the need for PWC to be in direct contact with Trustees and noteholders concerning apparent violations of the Indentures; (3) its disagreement with management concerning the need for the Trustees to provide a written confirmation of matters the Trustees would permit under (or notwithstanding) the terms of the Indenture; (4) the actual reasons PWC ceased to serve as NCFE's auditor; (5) its information and experience bearing upon the integrity of management of NCFE and the Servicer, including the attempted interference with the accounts receivable confirmation process; (6) material financial, accounting and audit issues concerning Indenture violations, receivables valuation, and related-party transactions and disclosures; (7) historical material weaknesses in internal controls; and (8) massive and systematic Indenture violations not described in the financial statements. Had PWC candidly and honestly disclosed these and other issues it was required to disclose under GAAS standards (and assuming the potential successor auditor acted in good faith and in accordance with GAAS), NCFE would have been unable to find a replacement auditor who would provide clean audit opinions and the programs would have soon gone into default, resulting in a shutdown as soon as mid-2000 that would have stopped the dissipation of the assets of the NPF entities and stopped the additional incurrence of debt that financed and provided funds for the dissipation of funds by the Founders and the Servicer.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 953.

**B. Deloitte's Audits**

**1. Accounts Receivable**

954. During its 1999 and 2000 audits, Deloitte had ample information from the Servicer demonstrating enormous problems with the validity, existence, valuation and collectibility of accounts receivables, as well as their eligibility under the Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 954.

955. For example, the 1999 reconciliations in Deloitte's own audit workpapers showed enormous gaps between the receivables reported on financial statements and the amount of receivables reflected in the actual underlying detail listings kept on the Servicer's AS400 system. For example:

a. For provider Infusion Management, the reconciliations showed that over $143 million had been "overadvanced," so that the reported ledger balance incorporated into the financial statements was approximately $143 million higher than the balance the internal system revealed as the balance of actual patient receivables and the financial statements were misstated by that amount—for this one provider alone!

b. For provider Hadley Hospital, the reconciliations similarly showed that over $54 million had been "overadvanced," in the same manner.

c. For provider Brea Community Hospital, the reconciliations showed that over $18 million had been "overadvanced."

d. For provider Michael Reese Hospital, the reconciliations showed that over $20 million had been "overadvanced."

e. For provider PhyAmerica Physician Group-Government, the reconciliations showed

that over $12 million had been "overadvanced."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 955.

956. These "reconciliations" were given to Deloitte in early 2000 and reviewed by Deloitte in April and May 2000—they are merely examples of the dozens in Deloitte's files. The purported reconciliations did not reconcile the disparities at all—they simply acknowledged the enormous differences and showed the (plugged) difference as an amount that was, by definition, "overadvanced" by the Servicer to the providers in violation of the Indentures and without receipt of corresponding purchased accounts receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 956.

957. The "overadvanced" balances indicated highly questionable collectibility and valuation for the purported receivable balance not supported by actual patient accounts receivable, but just as importantly the balances indicated that the "overadvanced" balances had been "advanced" in violation of the Indentures, precisely because they did not represent the purchase of accounts receivable and were not supported by eligible collateral.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 957.

958. The year 2000 reconciliations in Deloitte's own audit workpapers again showed enormous gaps between the receivables reported on financial statements and the amount of receivables reflected in the actual underlying detail listings kept on the Servicer's AS400 system. This documentation, provided by the Servicer and obviously used, read and reviewed by Deloitte in early 2001 before they issued their opinion on the 2000 financial statements, was a horrific

revelation of the infirmities of the reported receivables balances in the 2000 financial statements. For example:

a. For provider Home Medical of America, the reconciliations showed that over $217 million had been "overadvanced," so that the reported ledger balance incorporated into the financial statements was approximately $217 million higher than the balance the internal system revealed as the balance of actual patient receivables. Thus the receivables balances in the financial statements included an overstatement of around $200 million—for this one provider alone!

b. For provider Michael Reese Hospital Management, the reconciliations showed that over $60 million had been similarly "overadvanced."

c. For provider National Rehab of Florida, the reconciliations showed that over $42 million had been "overadvanced." Essentially the entire $42 million balance reported on the general ledger and financial statements was wholly unsupported by *any* actual detailed receivables in the AS400 system.

d. For provider Nation's Healthcare, the reconciliations showed that over $10 million had been "overadvanced." Exacerbating the problem is that while the receivables detail system showed a purported $23 million in actual receivables, the same document (part of PWC's workpapers) revealed that the same $23 million had sat on the books a year prior, with no collections of even one penny of the supposed balance; this fact would make apparent to any auditor that the $23 million was fictitious and/or uncollectible, so that the financial statement reported balance for this provider alone was likely overstated by around the entire $33 million balance.

e. For provider PhyAmerica Physician Group-Government, the reconciliations showed that

over $47 million had been "overadvanced." Notably, general ledger balance included in the financial statements showed around $51 million, while the AS400 detail actually included only $4 million in receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 958.

959. These "reconciliations" were given to Deloitte in early 2001 and reviewed by Deloitte in February and March 2001—they are merely examples of the dozens in Deloitte's files. As with the prior year, the purported reconciliations did not reconcile the disparities at all—they simply acknowledged the enormous differences and showed the (plugged) difference as an amount that was, by definition reported as healthcare accounts receivable but unsupported by actual, existing receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 959.

960. Deloitte's knowledge concerning the NPF Programs' receivables made clear that the reported allowances for uncollectible receivables—the general ledger and financial statement accounts that should reduce overstated or uncollectible receivable account balances to their realizable and collectible values—were woefully insufficient.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 960.

961. Information provided by the Servicer and included in Deloitte's workpapers further made clear that even the balances that were purportedly supported by detailed receivables tracked in the AS400 system were either fictitious or uncollectible. As noted above regarding Nation's Healthcare, some of the reconciliations necessarily betrayed the fact that a purported

multi-million-dollar pool of receivables from certain providers had yielded little or no collections during the entire year—a fact that any auditor would have known to indicate an extremely high likelihood that the receivables did not exist or were not collectible. CRC Rx Medical (a related party), for example, supposedly had $37 to $50 million of valid patient receivables in the AS400 system during the year, but PWC's workpapers show that the Servicer had recorded less than $4,000 in collections on those purported balances during the entire year. Similarly, the reconciliation in Deloitte's workpapers for California Psychiatric Management Services showed *zero* collections despite a purported $25 million detail receivable balance and a $33 million general ledger balance.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 961.

962. Despite Deloitte's extensive knowledge of what were, at a bare minimum, enormous "red flags" concerning the receivables balances, Deloitte failed or declined to perform the most basic of audit procedures regarding the testing of accounts receivables. Never did Deloitte confirm or inquire of the obligors of purchased receivables—*i.e.*, insurance companies, medicare, etc.—a very basic audit procedure and one that surely would expose the falsely inflated receivables balances. Instead, Deloitte confined its inquiries to the persons and entities that had purportedly sold the receivables to the NPF Programs, "testing" the purported existence of hundreds of millions of accounts receivable by doing nothing but obtaining a verification from a representative of the seller that was in many instances a related party. Deloitte further failed to perform any meaningful or adequate alternative procedures, or to document any conceivable justification or rationale by which it chose to omit the testing.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegation of paragraph 962.

963. In connection with its 1999 audit work, Deloitte learned that NCFE's management had simply fabricated a $76 million receivable to cover up a $76 million cash shortfall in reserve accounts related to the NPF programs. Specifically, at year end 1999, Deloitte's workpapers indicate that the required cash reserves in trust accounts were short by $76 million. Deloitte knew that NCFE management covered up the shortfall by making a book-only entry to pump up the reported cash reserve figure. Deloitte further knew (and its workpapers prepared in 2000 show) that the Servicer's management "must have tapped into those reserves" for other program receivables, and thus fabricated and recorded an illusory $76 million receivable on the theory that because the money was not in the reserve accounts, the customers must surely owe it to the books "to replenish the reserves." No effort was made to confirm this purported receivables balance and indeed, Deloitte knew from its confirmations (which did not include this amount) that this balance was fictitiously recorded.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 963.

### 2. Indenture Compliance and Reserve Accounts

964. In addition, no later than May 2000, Deloitte was aware that NPF programs VI and XII (and perhaps others) had been used to fund ineligible receivables of the following types: (1) an unsecured loan by NPF VI to Health Care REIT on behalf of Hadley Hospital during 1999; (2) self-pay receivables *(i.e.*, those payable by individual patients rather than by third party insurers or government agencies); and (3) receivables greater than 180 days old. Deloitte knew that the NPF programs' Indentures mandated that receivables more than 180 days old be put back to the sellers to be repurchased; however, the NPF books had millions of dollars of receivables

well over 180 days old—indeed millions of dollars worth more than two years old—which were not repurchased by the sellers as required. No later than May 2000, Deloitte became aware that aged receivables over 180 days old were being manually added *back* to the receivables systems after the Servicer computer system automatically wrote them off as being beyond the age permitted under the Indentures. This practice blatantly violated the Indentures and caused a false inflation of receivables balances.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 964.

965.Deloitte's knowledge concerning the receivables constituted obvious knowledge of numerous Indenture provisions related to the use of funds, permissible collateral for the notes, required collateral for the notes, business lines permitted for the NPF programs, and more. Deloitte's corporate representative has acknowledged that the cursory financial statement disclosures mentioning unspecified Indenture violations were not intended to, and did not, inform the readers of the Indenture violations concerning prohibited uses of funds, failures to obtain required collateral, eligibility of receivables, repurchase of aged receivables, or reserve account shortfalls.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 965.

966.Deloitte's knowledge of Indenture violations did not end with these violations. Deloitte was also aware of violations of section 4.11 of the Indenture in most of the NPF programs, which was designed to ensure bankruptcy remoteness, separate integrity of management, and avoid commingling of assets. Deloitte was aware, during its 1999 audit work, that the concentration limits for NPF VI had been violated and that NPF XII had an insufficient

balance in its Seller Credit Reserve Account. Deloitte was aware, no later than February 2001, that NPF XI had purposely withheld its December 31, 2000 Investor Report because the report would have revealed significant covenant violations. Deloitte was also aware of the failure to report these events to the Trustees, a separate Indenture violation.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 966.

967.During each of its audits, Deloitte was also aware that the Servicer had falsely inflated the reported balances in the reserve accounts required by the Indentures by including in the reported reserve account balances amounts which were not in fact in the required Trustee bank trust reserve accounts but which were instead purportedly held in lockbox accounts or other banks. Deloitte knew that the Indenture required reserve account funds to be actually held in specific, segregated bank accounts at the Trustee banks.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 967.

**3. Related Party Disclosures**

968. Deloitte knew, during each of its audits, that related-party transactions and balances with affiliated providers were highly material. Deloitte knew that many of the prohibited "purchases" and fundings from the NPF Programs were made directly to entities owned in whole or in part by the Founders or their direct affiliates. Deloitte knew that many of the providers who had been "overadvanced" funds as reflected in the purported reconciliations above were providers that were related parties. The dollar figures associated with related party transactions and balances were highly material—in the hundreds of millions and even over a billion in 1999 and 2000 financials; this fact was well known to Deloitte at all times during its

audit work.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 968.

968.As discussed above with respect to PWC, GAAP requires very specific and detailed disclosures for related party transactions and balances. Just as in the prior years (as described with respect to PWC above), the financial statements audited by Deloitte failed almost entirely to comply with the specific requirements of FASB 57. Indeed, Deloitte's corporate representative has acknowledged that although Deloitte was clearly aware that the NPF books had two distinct types of transactions with the related parties—some purchases of eligible receivables and some prohibited unsecured or partly-secured loans to providers. However, no description of these two types of transactions was made as FASB 57 expressly requires. No disclosures were made of the dollar volume of receivables purchase transactions from related parties—another FASB 57 requirement. Instead of revealing the material amounts loaned to and thus "due from" the related parties (as FASB 57 required), the Deloitte-audited financials, like the PWC-audited financials before them—presented a dollar figure in which the receivables from these providers was deceptively lumped together with and buried within the balance of actual, eligible, patient accounts receivables (due from third-party insurers and the like). Similarly, no disclosure was made of the "terms" of these loans to affiliates. Had these mandatory disclosures been made, the financial statements would have exposed clearly many of the egregious abuses of NPF VI and NPF XII, as explained above with respect to the similarly-deficient related-party disclosures in the PWC-audited financial statement for earlier years. Deloitte also had full knowledge of the GAAP requirements of FASB 57 and of the facts that made clear that FASB 57's requirements had not been met. Deloitte knew that its assertions, in each of its audit reports, that the financial

statements were fairly presented in this regard and in conformity with GAAP were false.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 969.

970. During its 1999 and 2000 audit work Deloitte failed to provide adequate training, supervision and guidance to its field audit staff concerning the requirements of GAAP and GAAS for related party transactions. Specifically, Deloitte has testified that it first developed a comprehensive standardized audit procedure form for related party audit work in or about January 2002. Prior to that time, Deloitte's audit staff had insufficient guidance, planning, supervision or training to properly address related party transactions.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 970.

**4. Deloitte's 2002 Audit Work on NCFE's 2001 Financial Statements**

971. Deloitte began audit work for an audit of NCFE's 2001 financial statements, but never completed the audit. Before Deloitte issued any opinion, the FBI had raided NCFE's offices and the NCFE entities entered bankruptcy.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 971.

972. In early 2002, Deloitte's fieldwork began under a new Deloitte engagement manager, Doug Hart. Hart replaced the prior manager who had recently left Deloitte's employment. Hart was brought in from an out-of-town Deloitte office due to his experience with a similar client. Hart had had no responsibility for the two prior audit opinions issued by Deloitte.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegation of paragraph 972.

973. Hart was exposed almost immediately to the same sort of information concerning the NPF programs' receivables that the Deloitte auditors had known each year. Within the first days, Hart saw the type of collections information that had been callously ignored by the Deloitte personnel in each of the prior year. Just as prior years' workpapers had shown, some Providers—especially related-party providers—had purported receivables balances at year end 2000 and 2001 in the tens (or hundreds) of millions but had inordinately small amounts of collections, making apparently that the receivables reported were likely fictitious or uncollectible. Hart quickly noted that-for a selected group of accounts that had constituted over $1.2 billion of the NPF Programs' cumulative $2.5 billion of receivables at year end 2000—the <u>total collections during the year 2001 had been only about $58 million</u>! *(i.e.*, only about five percent of the balance had been collected a full year later, on receivables that, if valid, should "turn" or be collected substantially in full within about 90 days!). As noted above, the type of problem Hart was noting had been apparent to prior Deloitte auditors the past two years.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 973.

974. Within days (in early March), Hart asked for and was given (by the Servicer's John Snoble) information showing that at year end 2001, the NPF entities receivables had an "exposure" of $1.2 billion; "exposure" in this context meant that of the reported receivables balance of around $3 billion, <u>at least $1.2 billion</u> either had *no actual receivables at all to back it up*, or the receivables that did back it up were substantially aged (generally beyond 180 days) and most likely uncollectible. Much of the obvious problems were with purported receivables from affiliates of the Founders.

Defendant Ayers denies the allegations as to Defendant Ayers in paragraph 974 and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

975. In early May 2002, Hart and the audit senior had calculated that the year end 2001 receivables balances were overstated by at least $850 million dollars and thus needed to be written down by approximately that amount to be accurately valued. Even this valuation did not fully express the problem, because some of the purported value that Deloitte believed to exist in receivables was in receivables that Deloitte knew to be ineligible—*i. e.*, receivables not permitted by the NPF entities' Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 975.

976. By early May, Hart had exposed the problem to others within Deloitte who had not been associated with the prior years' audits. By May 14, an out-of-town partner with special expertise who was brought in to assist with the situation, Paul Drogosch, had concluded that Deloitte's prior year audit reports were inadequate and failed to properly disclose the enormously material practice of doling out money from the NPF Programs without receiving eligible receivables in return. Hart inquired of Drogosch on May 13 "what to do about our prior [years' audit] report," and Drogosch's May 14 response indicated, "Does not look like the advances are properly disclosed in the financials." Indeed, Drogosch was correct—Deloitte knew that its prior year audit report was false, and it knew that the prior financial statements were grossly misstated and lacked disclosures. Rather than take action, Deloitte sat quietly for *months*, permitting Poulsen and the Servicer to cause NPF XII to issue its 2002-1 Series of notes in the amount of $250 million, on or about May 31, 2002. This issuance provided one quarter of one billion

dollars that the Servicer could and did continue to misuse, misappropriate and dissipate in violation of the applicable Indentures, and further pushed NPF XII into debt and irreparable insolvency.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 976.

977. Had Deloitte taken action as required by GAAP to inform those who had used or relied on its prior opinions that it needed to withdraw those opinions, the May 2002 issuance of $250 million of notes would have been avoided, and the further misuse, misappropriation and dissipation of assets of the NPF Programs would have been curtailed. As noted above, as late as November 2002 when the FBI entered the premises, defaults had finally been declared and bankruptcy was filed, Deloitte still had not taken action with respect to its prior year reports, nor had it reported the egregious problems it had knowledge of during 2002 in conjunction with its audit of the 2001 financial statements.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 977.

**5. The Auditors' Acts Here Parallel -- But Are Far More Egregious Than -- Even Actions For Which Deloitte Has Been Recently Censured by the SEC**

977 A. Twice recently Deloitte has been publicly reprimanded by the SEC. On April 26, 2005, Deloitte was formally censured by the SEC in connection with its audits of Just for Feet, Inc.. The same day the SEC imposed a separate civil penalty of $50 million on Deloitte for its audits of Adelphia Communications. The underlying facts raise concerns quite similar to the allegations here, though the facts surrounding the NCFE audits are far more egregious, with respect to both Deloitte and PWC.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 977A.

977B. The SEC's reprimand of Deloitte concerning Adelphia parallels some of the problems at NCFE. There, Deloitte was reprimanded for failure to implement procedures designed to address illegal acts of management, and for failure to properly audit and report related party transactions. Deloitte agreed to pay $50 million, and committed to improve its procedures for addressing known high-risk clients, and its handling of the requirements for reporting related party transactions by its audit clients. Deloitte's pervasive failure to properly address related party auditing and reporting infected the NCFE audit, as discussed above in paragraph 970 (noting that Deloitte had no standardized procedure for related party auditing until 2002) and 969 (noting that of FASB 57's handful of simple, explicit and well-known requirements for related party disclosures, the majority were wholly unaddressed by Deloitte in the audited notes to NCFE's financial statements). Deloitte's reckless or grossly negligent approach to related-party auditing at a firm-wide level permitted its engagement team's knowing and intentional wrongdoing to occur.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 977B.

977C. The Just for Feet censure focused on the fact that Deloitte had recognized that the company posed a greater than normal risk of fraud, but nonetheless failed to address or report the discrepancies it encountered in its work. See, e.g., Order Instituting Public Admin. Proceedings, In the Matter of Deloitte & Touche LLP et al., File No. 3-11911 (April 26, 2005).

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 977C.

977D. As noted above, the auditors here similarly discerned at the beginning of their audits that NCFE presented a high risk of fraud. PWC's earliest workpapers show that it expressly came to this conclusion in the first days of its audits, yet inexplicably watched blatant fraudulent conduct occur, all the while unabashedly certifying as clean and "fairly stated" audit reports and investor reports it knew to be misstated. See, e.g., ¶912 above.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 977D.

977E. **DT's audit planning assessments concerning potential fraud at NCFE reveal an even darker story.** NCFE CFO, John Snoble, gave express, written warnings to Deloitte concerning the "Motivation for management to engage in fraudulent financial reporting." For example, in a document dated February 2001, Snoble indicated to Deloitte a heightened risk and motivation, based upon the fact that

(1) a "significant portion of management' s compensation [was] represented by bonuses, stock options or other incentives, the value of which [was] contingent upon the entity achieving **unduly aggressive targets for operating results, financial position or cash flow**," that

(2) there was "excessive interest by management to maintain or increase the entity's stock price or earnings trend through the use of **unusually aggressive accounting practices**," and that

(3) there was a "practice by management of committing to analysts, creditors and

> other third parties to achieve what appear to be unduly aggressive or **clearly unrealistic** forecasts."

These are among the very factors emphasized in the Just for Feet censure. But the story gets much worse.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 977E.

977F. The SEC censure indicates that such clearly-identified risk factors should have invoked additional reviews and procedures to address the known (and admitted) potential for fraud, including involvement by persons outside the Deloitte engagement team and even outside its Columbus office. Deloitte's audit team, however, sought to avoid such requirements. When Deloitte documented its "Understanding Regarding Ethics, Fraud and Illegal Acts," it falsely papered over what CFO Snoble had expressly told them. Though Snoble had told them **just the opposite** was true, Deloitte' s workpapers--prepared just days later--documented the following answers to the following questions:

- ❖ Is there excessive interest by management to maintain or increase the entity?s stock price or earnings trend, especially through the use of **unusually aggressive accounting practices?**
  **Deloitte's Answer: NO.**

- ❖ Is a significant portion of management's compensation represented by bonuses, stock options or other incentives, the value of which is contingent upon the entity achieving **targets for operating results, financial position or cash flow (especially if such targets are unduly aggressive)?**
  **Deloitte's Answer: NO.**

- ❖ Is there a practice by management of committing to analysts, creditors and other third parties to achieve what appear to be unduly aggressive or **clearly unrealistic** forecasts?
  **Deloitte's Answer: NO.**

Deloitte knew that its documentation was false. Deloitte's direct misrepresentation of what Snoble had told them was designed to avoid, and did avoid, invoking additional reviews,

procedures and disclosures that would have revealed the myriad problems with the financial statements and with management generally.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 977F.

977G. Deloitte's willingness to blatantly paper over known risk factors is further demonstrated by the following responses to questions, also contained in Deloitte's own risk assessment documentation for the 2001 audit (prepared in early 2002):

- Are **there significant affiliated entities** or other related parties that we will not audit and with whom significant transactions might have occurred?
**Deloitte's Answer: NO.**

- Are we aware of the existence of a significant number of **related-party transactions** that have arisen outside the normal course of business?
**Deloitte's Answer: NO.**

- Are there **violations, or apparent violations, of debt restrictions,** . . . or other terms of a trust deed?
**Deloitte's Answer: NO.**

- Is there an unusually **high dependence on debt**, or marginal ability to meet debt repayment requirements?
**Deloitte's Answer: NO.**

- Are **debt covenants difficult to maintain, or is compliance with debt covenants marginal** related to financial results?
**Deloitte's Answer: NO.**

- Has the entity undergone unusually rapid growth . . . ?
**Deloitte's Answer: NO.**

Though similar statements appear in the documentation for the 2000 audit, the answers above were made by Deloitte even after a full year's audit, in preparation for their second audit, by which time Deloitte had indisputable, specific knowledge indicating that these statements were false, as the allegations above make clear. Needless to say, it was beyond negligent, indeed it

was fraudulent, for Deloitte to misrepresent known audit risks at NCFE, and then to plan its audit and certify NCFE's financials in a way that ensured that these serious indications of fraud by NCFE were never audited, and never saw the light of day.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 977G.

**C. Additional Allegations as to Both Auditors**

978. During each year of their audits, PWC and Deloitte each had an economic interest and received economic benefits from their audit work and the continuation as auditors for NCFE. In every year, the auditors received substantial fees for their work and involvement. Except for the first year of each firm's audit work (prior to each auditor's issuance of its first report), each had a further economic interest in the concealment and nondisclosure of the errors, misstatements and infirmities of their prior year audit reports, as the revelation of these matters would have exposed each to substantial liability.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 978.

979. Deloitte and PWC failed to fulfill the following obligations and duties with respect to their audit work. Each of these duties was owed and assumed by PWC and by Deloitte due to their role as auditor and due to their issuance of audit reports claiming a "GAAS" audit and "GAAP" financial statements:

1. An obligation to obtain reasonable assurance that the financials were free of material misstatement;

2. An obligation to examine and evaluate evidence supporting the amounts and disclosures in the financial statements;

3. An obligation to make an objective and reasonable evaluation of estimates and valuations made by management or by the Servicer, including evaluation of the value and collectibility of receivables;

4. An obligation to assess the accounting principles applied by NCFE;

5. An obligation to ensure that disclosures required by GAAP were complete and valid and supported by audit evidence;

6. An obligation to assess the "going concern" assumption underlying the financial statements, given the information known to the auditors during each audit;

7. An obligation to adequately plan, supervise and conduct their audits in accordance with GAAS;

8. An obligation to provide reasonably adequate, informative disclosures in the financial statements, including those regarding (i) Indenture compliance and obligations, especially given the enormous materiality of the securitized notes; (2) the nature and valuation of the receivables (by far the largest asset on the books); (3) related party transactions, which were an unusually significant portion of the consolidated NCFE entities' business;

9. An obligation to correct errors or omissions in its prior reports, or to ensure that no persons continue to rely on such reports;

10. An obligation to ensure the existence of reported receivables balances;

11. An obligation to corroborate any material representations of management with independent evidence, particularly where related-party transactions or management's own interests are implicated; and

12. An obligation to evaluate internal controls.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 979.

980. Had PWC and Deloitte fulfilled these obligations, they would have (a) refused to provide a clean audit report; (b) provided a report that identified the misstatements and nondisclosures that existed; (c) taken appropriate steps to withdraw or curtail the use or reliance on their prior audit reports; (d) reported the material errors, irregularities and material misstatements and non-disclosures of which it was aware to the rating agencies, the Trustees, and board members and audit committees of NCFE and the NPF Programs, and/or (e) compelled Poulsen, the Servicer or NCFE officers to make all necessary disclosures by refusing to provide

a clean audit opinion until and unless those matter were resolved. The rating agencies, the Trustees, and the board and audit committee members were each under duties and obligations such that if Deloitte or PWC had made disclosures or taken action as set forth herein, they would have been obligated by their roles and duties to take appropriate corrective action.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 980.

981. Had PWC or Deloitte either (a) refused to provide a clean audit report; (b) provided a report that identified the misstatements and nondisclosures that existed; (c) taken appropriate steps to withdraw or curtail the use or reliance on their prior audit reports; (d) reported the material errors, irregularities and material misstatements and non-disclosures of which it was aware to the rating agencies, the Trustees, and board members and audit committees of NCFE and the NPF Programs, or (e) compelled Poulsen, the Servicer or NCFE officers to make all necessary disclosures by refusing to provide a clean audit opinion until and unless those matter were resolved, the NPF entities' operations—including the dissipation of more and more of their funds and the burgeoning debt increases that permitted that dissipation to happen—would have ceased. Without PWC' sand Deloitte's reports, or absent their breaches of duty as outlined herein, NPF VI and NPF XII would have ceased issuing further debt and the dissipation and misappropriation of its assets would have ceased.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 981.

982. PWC and Deloitte were aware that the matters they noted in their audits, including most notably the misappropriation of funds, misuse of collateral, violations of lndentures and failures to disclose, were breaches of fiduciary duties by Poulsen, the Trustees,

and the Servicer. PWC nonetheless continued to assist and participate in these breaches by issuing their reports and by the acts and omissions described herein.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 982.

983. PWC and Deloitte were aware at all relevant times of the financial condition and position of NPF VI and NPF XII. They knew these entities to be insolvent, incapable of paying their debts as they matured, and knew them to have liabilities in excess of their assets.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 983.

983A. In the course of its audit planning for 1999 and for 2000, Deloitte made numerous specific assessments about the management and control structure in place at NCFE. Specifically Deloitte concluded and documented

- that management was not dominated by a one strong personality or concentrated in a small group without compensating controls,
- that nonfinancial management [e.g., the CEO Poulsen] did not have excessive participation in the accounting process,
- that there was adequate monitoring of significant controls,
- that the company had established appropriate procedures relative to the prevention of illegal acts,
- that there was sufficient board oversight of critical processes,
- and that the structure of the board and audit committee was adequate

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 983A.

**D. COUNTS**

**COUNT XXIX**
**DEEPENING INSOLVENCY**
***Against Deloitte and PWC***

No answer is required to the extent the allegations in Count XXIX, including paragraphs 984 through 989, because Count XXIX is not directed against Defendant Ayers. Further an

answer is not required to the extent the allegations in Count XXIX, including paragraphs 984 through 989 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXX**
**COMMON LAW FRAUD *Against Deloitte and PWC***

No answer is required to the extent the allegations in Count XXX, including paragraphs 990 through 997, because Count XXX is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXX, including paragraphs 990 through 997 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXXI**
**AIDING AND ABETTING *Against Deloitte and PWC***

No answer is required to the extent the allegations in Count XXXI, including paragraphs 998 through 1002, because Count XXXI is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXXI, including paragraphs 998 through 1002 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXXII**
**CONCERT OF ACTION/ KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY *Against Deloitte and PWC***

No answer is required to the extent the allegations in Count XXXII, including paragraphs 1003 through 1007, because Count XXXII is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXXII, including paragraphs 1002 through 1007 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXXIII**
**PROFESSIONAL NEGLIGENCE AND NEGLIGENT MISREPRESENTATION *Against Deloitte and PWC***

No answer is required to the extent the allegations in Count XXXIII, including paragraphs 1008 through 1012, because Count XXXIII is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXXIII, including paragraphs 1008 through 1012 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXXIV**
**CIVIL CONSPIRACY**
***Against Deloitte & PWC***

No answer is required to the extent the allegations in Count XXXIV, including paragraphs 1013 through 1020, because Count XXXIV is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXXIV, including

paragraphs 1013 through 1020 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

## IX. ADDITIONAL AVOIDANCE CLAIMS

### A. Claims for Recovery of Transfers to Beacon Fund and Task Holdings

1021. Plaintiff, as successor to and transferee of National Century Financial Enterprises, Inc. ("NCFE") and its affiliates (collectively, the "Debtors"), brings these claims action against Beacon Fund and Task Holdings.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 1021, except admits that the UAT purports to bring this cause of action against defendant Beacon Fund and Task Holdings.

#### 1. Beacon Fund and Task Holdings's Involvement With NCFE

1022. In or about July 1998, Beacon Fund purchased approximately 20% of the equity in NCFE. Beacon Fund's purchase gave it approximately 4,865 shares.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1022.

1022A. On or about July 31, 1998, Beacon purchased 3,783.78 shares of stock in NCFE, representing 20.45% of the issued and outstanding stock in the company.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1022A.

1023. In connection with its purchase, Beacon Fund acquired (i) the right to elect two individuals to NCFE's six-member board of directors, and (ii) the right to appoint two of three

members on the boards of directors of certain NCFE subsidiaries, notably NPF VI and NPF XII. Beacon Fund immediately exercised its rights, placing two of its own principals—Hal Pote and Eric Wilkinson—onto the board of NCFE, and making Pote the chairman of NCFE's audit committee, and appointing the same two individuals to the NPF VI and NPF XII boards. When Wilkinson later stepped down from these positions, another principal of Beacon Fund—Tom Mendell—took over Wilkinson's seats.

Defendant Ayers admits paragraph 1023.

1023A. Pote, Mendell, and Wilkinson were at relevant times officers and directors of JP Morgan Chase Bank. At all relevant times, at least one of these individuals was also an officer and director of NPF VI and NPF XII.

Defendant Ayers admits paragraph 1023A.

1024. At all relevant times, Beacon Fund was managed and/or controlled, in whole or in part, by Messrs. Pote, Mendell, and/or Wilkinson or by entities they managed or controlled.

Defendant Ayers admits paragraph 1024.

1025. Beacon Fund subsequently transferred approximately 540 of its shares to Task Holdings, a Beacon Fund affiliate. On information and belief, Task Holdings has, at all relevant times, been managed and controlled by Beacon Fund or by the same entities or individuals who manage and control Beacon Fund.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1025.

1025A. As a result of Beacon's transferring a potion of its holdings in NCFE to one of its own affiliates, Task Holdings, the percentage of Beacon's ownership interest in NCFE decreased slightly after its initial acquisition.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1025A.

1026. Beacon Fund and Task Holdings are "insiders" of NCFE and its affiliates, as the term is used on connection with avoidance statutes and avoidance actions.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1026.

### 2. Cash Transfers

1027. Beginning on or about October 4, 1999 and continuing through approximately July 17, 2002, NCFE made multiple and repeated payments to Beacon Fund and to or for the benefit of Task Holdings (certain payments appear to have been made to the Internal Revenue Service on behalf of and at the request of Task Holdings). The payments were generally characterized as payments of preferred stock dividends. These transfers are set out below:

| Date paid | To Beacon Fund | To or for the benefit of[12] Task Holdings |
|---|---|---|
| October 4, 1999 | 400,000 | 49,992 |
| December 31, 1999 | 279,452 | 34,925 |
| April 3, 2000 | 397,814 | 49,718 |
| July 3, 2000 | 397,814 | 19,887 |
| October 4, 2000 | 673,223 | 113,970 |
| December 29, 2000 | 804,371 | 100,530 |
| April 4, 2001 | | |
| July 25, 2001 | 789,040 | 98,614 |
| October 9, 2001 | 797,807 | 99,709 |
| December 31, 2001 | 1,481,642[13] | 134,772 |
| | — | 151,208 |
| January 3, 2002 | 806,575 | — |
| April 4, 2002 | 1,183,560 | 147,920 |
| July 17, 2002 | 1,196,771 | 149,564 |
| **Total** | $9,208,010 | $1,150,809 |

[12] Approximately 30% of the transfers to or for Task Holdings appear to have been sent, at Task Holding's request, to pay tax liabilities of Task Holdings.

[13] The October 9, 2001 payment to Beacon Fund included an overpayment of approximately $403,287.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1027.

1028. NCFE received no goods, services, property or other value in exchange for these transfers, nor was the transfer intended to be a contemporaneous exchange for new value.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1028.

1029. As of the date of each transfer, (1) NCFE was insolvent and/or was made insolvent by the transfer, (2) NCFE was left with property constituting unreasonably small capital, and/or (3) NCFE intended or believed that it would incur debts beyond its ability to pay as such debts matured.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1029.

1030. The funds used by NCFE to make the payments to Beacon Fund and Task Holdings were funds inappropriately and wrongfully taken by NCFE or the Servicer from NPF VI, NPF XII or other NPF subsidiaries of NCFE. Pursuant to the bankruptcy plan, the Trust has standing to assert claims belonging to NCFE, NPF VI, NPF XII or the other Debtor subsidiaries.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1030.

1031. Through the counts and claims listed below, the Plaintiff here seeks recovery of each of the above-listed payments to Beacon Fund and Task Holdings.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1031, except admits that Paragraph 1031 purports to describe the relief the UAT seeks.

**3. COUNTS**

**COUNT XXXV**
**AVOIDABLE TRANSFERS RECOVERY OF UNLAWFUL DIVIDENDS: OHIO REV. CODE 1701.33(C) & 1701.95(D)**
***Against Beacon Fund and Task Holdings***

No answer is required to the extent the allegations in Count XXXV, including paragraphs 1032 through 1035, because Count XXXV is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXXV, including paragraphs 1032 through 1035 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXXVI**
**AVOIDABLE TRANSFERS UNDER BANKRUPTCY CODE SECTION 544 & APPLICABLE STATE AVOIDANCE LAW**
***Against Beacon Fund and Task Holdings***

No answer is required to the extent the allegations in Count XXXVI, including paragraphs 1036 through 1043, because Count XXXVI is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXXVI, including paragraphs 1036 through 1043 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXXVII**
**AVOIDABLE TRANSFERS UNDER BANKRUPTCY CODE SECTION 548** ***Against Beacon Fund and Task Holdings***

No answer is required to the extent the allegations in Count XXXVII, including paragraphs 1044 through 1045, because Count XXXVII is not directed against Defendant Ayers.

Further an answer is not required to the extent the allegations in Count XXXVII, including paragraphs 1044 through 1045 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXVIII**
**AVOIDABLE TRANSFERS UNDER BANKRUPTCY CODE**
**SECTION 547 *Against Beacon Fund and Task Holdings***

No answer is required to the extent the allegations in Count XXVIII, including paragraphs 1046 through 1049, because Count XXVIII is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXVIII, including paragraphs 1046 through 1049 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XXXIX**
**RECOVERY OF MONEY OR PROPERTY UNDER BANKRUPTCY CODE**
**SECTION 550 *Against Beacon Fund and Task Holdings***

No answer is required to the extent the allegations in Count XXXIX, including paragraphs 1050 through 1051, because Count XXXIX is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XXXIX, including paragraphs 1050 through 1051 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

### B. Claims Against CSFB Related to NPF XII Series 2000-4 Variable Funding Note

#### 1. Background

1052. On or about December 27, 2000, NPF XII sold a certain note, referred to as an NPF XII Healthcare Receivables Securitization Program Variable Funding Note Series 2000-4 (the "CSFB VFN"). CSFB was the Committed Purchaser, the Managing Agent and the Agent; CSFB's affiliate Alpine Securitization Corporation acted as Conduit Purchaser.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1052.

1053. On or about May 2002, the outstanding balance on the CSFB VFN was approximately $220 million. NPF XII was insolvent at the time; its assets at their fair values were less than its massive outstanding debts and it had insufficient assets to pay its debts as they matured. During early 2002, CSFB—with its extensive knowledge of NCFE's financial condition and operations as set forth herein-had made a decision that it desired to reduce its "exposure" to NCFE-related debt.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1053.

1054. On or about May 29, 2002, CSFB, Poulsen, the Servicer and NCFE caused NPF XII to issue an additional series of debt sold to third parties, raising $250 million and deepening NPF XII's total debt level by $250 million, but providing funds that could be used to pay down the CSFB VFN.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1054.

1055. Days later, on or about June 3, 2002, Poulsen, the Servicer and NCFE acting in

concert with and at the instance of CSFB, caused NPF XII to make a payment to CSFB on the CSFB VFN in the amount of $100 million.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1054.

1056. At all times relevant to this claim, CSFB was an insider of NCFE and the Servicer as that term is used in applicable avoidance statutes. CSFB, through its roles as underwriter, financial adviser, managing agent and placement agent, as well as initial note purchaser with respect to various NPF programs, had substantial ability to affect, influence and control, and did in fact affect, influence and control, the cash flows, financing, debt issuance and debt repayment of NCFE and its affiliates. Such influence and control was such that the dealings with CSFB ceased to be at arm's length, and far exceeded the control normally attendant to the usual debtor-creditor relationship.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1056.

1057. NCFE neither received goods, services, or other value in exchange for these transfers, nor was the transfer intended to be a contemporaneous exchange for new value.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1057.

1058. As of the date of the $100 million payment on the CSFB VFN, (1) NPF XII was insolvent and/or was made insolvent by the transfer, (2) NPF XII was left with property constituting unreasonably small capital, and/or (3) NPF XII was expected to have or incur debts beyond its ability to pay as such debts matured. CSFB did not take the payment in good faith, nor did Poulsen, the Servicer, CSFB or NCFE act in good faith in directing the transfer be made

to CSFB.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegation of paragraph 1058.

1059. Through the counts and claims listed below, the Plaintiff here seeks recovery from CSFB of the above-referenced $100 million payment to CSFB.

Paragraph 1059 contains no allegations that may require an answer. To the extent an answer may be required, Defendant Ayers admits that the UAT purports to seek recovery from CSFB.

**2. COUNTS**

**COUNT XL**
**AVOIDABLE TRANSFERS UNDER BANKRUPTCY CODE SECTION 544 & APPLICABLE STATE LAW**
***Against CSFB***

No answer is required to the extent the allegations in Count XL, including paragraphs 1060 through 1066, because Count XL is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XL, including paragraphs 1060 through 1066 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XLI**
**AVOIDABLE TRANSFERS UNDER BANKRUPTCY CODE SECTION 548 *Against CSFB***

No answer is required to the extent the allegations in Count XLI, including paragraphs 1067 through 1068, because Count XLI is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XLI, including paragraphs 1067

through 1068 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XLII**
**AVOIDANCE OF PREFERENTIAL TRANSFERS UNDER BANKRUPTCY CODE SECTION 547 *Against CSFB***

No answer is required to the extent the allegations in Count XLII, including paragraphs 1069 through 1071, because Count XLII is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XLII, including paragraphs 1069 through 1071 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XLIII**
**RECOVERY OF MONEY OR PROPERTY UNDER BANKRUPTCY CODE SECTION 550 *Against CSFB***

No answer is required to the extent the allegations in Count XLIII, including paragraphs 1072 through 1073, because Count XLIII is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XLIII, including paragraphs 1072 through 1073 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**A. Kaye Scholer's Role in Collapse of NPF VI and NPF XII**

1074. Kaye Scholer is a prestigious New York law firm. It is highly sophisticated and is

a self-proclaimed expert in securitization transactions. It advertises itself as being "widely recognized as a leader in asset securitization, with a team of lawyers that spans our offices in New York, Chicago, Los Angeles, London, Hong Kong and Frankfurt . . . ." Despite its claimed expertise and sophistication, however, Kaye Scholer neglected the most basic duties a law firm owes to its client: the duty of unfettered loyalty, and the duty to perform its work competently. Because Kaye Scholer continuously, and knowingly, breached these duties, its former clients, NPF VI, NPF XII and NCFE, suffered catastrophic damages. The purpose of this claim is to recover those losses.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 1074, except admits that Kaye Scholer is a New York law firm.

1075. Kaye Scholer's involvement with NCFE dates as far back as 1995. Kaye Scholer had a hand in nearly every legal aspect of NCFE's operations. It served as counsel to NCFE, NPF VI and NPF XII, drafted offering documents on their behalf, wrote opinion letters on their behalf and provided advice to them concerning what facts needed to be disclosed in the documents that were being used to offer notes on behalf of NPF VI and NPF XII, and potential equity securities on behalf of NCFE. This work extended over seven years. Because of Kaye Scholer's comprehensive involvement in their affairs, NCFE, NPF VI and NPF XII were led to believe that the advice Kaye Scholer gave them was both the firm's best advice, and that it was in their best interest. It was not—because Kaye Scholer labored under a number of serious, and undisclosed, conflicts of interest.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 1075.

1076. At the very same time it was representing NPF VI, NPF XII and NCFE, Kaye

Scholer was simultaneously serving as counsel to CSFB and other placement agents who were selling notes issued by NPF VI and NPF XII. Kaye Scholer also acted as lender's counsel to CSFB when it extended variable funding notes to NPF VI and NPF XII as borrowers. Competent lawyers know that it is an obvious conflict of interest to represent both an issuer and the placement agent at the same time, just as they know that one cannot simultaneously represent both borrower and lender. Yet Kaye Scholer never advised NCFE, NPF VI or NPF XII that these conflicts existed, nor did the firm tell its clients that they should not rely on its advice because the firm's loyalties were severely compromised by these conflicts. Kaye Scholer never sent an engagement letter to NCFE, NPF VI or NPF XII that attempted to limit or define its role—so these clients, who were not lawyers and did not understand these issues, were not aware that their interests were or could be compromised by these conflicts, and they certainly did not give their informed consent to Kaye Scholer's ongoing, hopelessly conflicted role.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations in paragraph 1076.

1077. Kaye Scholer's role was so entangled with conflicts that it was never fully able to account for it when NCFE, NPF VI and NPF XII declared bankruptcy. After NCFE collapsed, Kaye Scholer switched sides-yet again-and sought to represent the *creditors* of NPF VI against its former client, NPF VI. In order to be approved as counsel to the NPF VI Creditors' Committee, Kaye Scholer was required to disclose all potentially conflicting relationships. Its "disclosure" of these matters was woefully generic and deficient, but even the limited amount that was disclosed caused the U.S. Trustee to object to Kaye Scholer's service as a professional to the bankruptcy estate. What this generic disclosure left unstated, however, was far more extensive, and far more serious: Kaye Scholer did not disclose to the United States Bankruptcy

Court that it had provided ongoing and continuous disclosure advice and opinion letters to NCFE, NPF VI and NPF XII on matters that had led, directly, to their bankruptcy. It was only *after* the U.S. Trustee's objection was overruled, when it had entrenched itself as a professional to its clients' creditors, that Kaye Scholer circulated a Supplemental Declaration of some of these NCFE-related relationships. This "supplement" disclosed further, conflicting representations of NCFE-related parties, but it was *never filed with the bankruptcy court*, which remained in the dark about the full extent of Kaye Scholer's overlapping and conflicting representations. It is not clear why Kaye Scholer did not make full disclosure of these facts, but it is telling that it took Kaye Scholer *over a year to decide* how it and what it should disclose about them.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1077.

1078. As counsel for NCFE, NPF VI, NPF XII and CSFB, Kaye Scholer was responsible for a multitude of tasks, including, critically, the drafting of the following key documents: the NPF VI and NPF XII Master Indentures, the Sale & Subservicing Agreement, the NPF VI and NPF XII PPMs, the NPF VI and NPF XII Supplemental PPMs, and various note purchase agreements and loan amendments made by CSFB to NPF XII. Kaye Scholer thus had detailed knowledge of the key terms, limitations, and obligations under these governing documents. Kaye Scholer knew how the NPF VI and NPF XII programs were supposed to function and thus knew when they were failing to function properly.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1078.

1079. As the drafter of these governing documents, Kaye Scholer, like the other Defendants, understood that the NPF VI and NPF XII programs were each required:

- To refrain from engaging in affiliate transactions;
- To purchase only bona fide receivables from healthcare providers for healthcare services that had already been provided ("Eligible Receivables");
- To monitor rejected and defaulted receivables rates so that they do not exceed the maximum allowed under the Master Indentures; and
- To maintain the equity reserve accounts.

Defendant Ayers denies the allegations in paragraph 1079 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

1080. Throughout the course of its NCFE-related representations, however, Kaye Scholer obtained first-hand knowledge of the widespread violations in the Programs. Kaye Scholer knew of the existence and magnitude of related-party transactions between NCFE and various Founderaffiliated companies which directly violated the Indentures. It also knew about the massive, unsecured loans and advances for "future receivables" made to healthcare providers that were in direct violation of the Indentures which allowed for only the purchase of "eligible" receivables as strictly defined. Kaye Scholer knew of the ongoing purchases of "aged" or defaulted receivables and the re-purchase by NCFE of rejected receivables—none of which was authorized under the Indentures, and all of which manipulated the reporting of defaulted and rejected receivables and distorted the financial health of the Programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1080.

1081. Despite Kaye Scholer's knowledge of these and other critical violations of the

Indentures, Kaye Scholer actively assisted CSFB in its unlawful and pervasive efforts undertaken to conceal this information—all in the furtherance of CSFB's scheme to loot NPF VI and NPF XII, ultimately destroying them. For example, Kaye Scholer took no steps to protect NPF VI and NPF XII when CSFB—without the consent of these entities and *without even discussing it with them*—decided that the NPF VI and NPF XII note offering documents would not disclose the massive, illegitimate related party activities that were being used to loot the assets of NPF VI and NPF XII. Additional wrongful actions are detailed below that, individually and as a whole, establish that Kaye Scholer consciously disregarded its obligations to its clients in order to serve the interest of CSFB, its more favored and significant client.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1081.

1082. There is no question that, throughout its conflicting representations, Kaye Scholer continuously favored CSFB's interests (and Kaye Scholer's own interests in generating enormous fees from CSFB) over the interests of its clients, NPF VI and NPF XII. Kaye Scholer knew that, as securities issuers, NPF VI and NPF XII had a clear interest in the full and accurate disclosure of material facts in order to avoid violations of any applicable laws—and specifically, the securities laws, which require full and accurate disclosures of any and all material facts.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1082.

1083. As demonstrated below, Kaye Scholer was aware of the multitude of Indenture violations and other material facts that were required to have been and should have been disclosed. As fiduciary to NPF VI and NPF XII, Kaye Scholer had an obligation to disclose the multitude of these violations, anyone of which, if disclosed, would have been considered an

event of default under the Indentures, triggering a principal amortization event that would have prevented the further issuance of notes and prevented the further deepening of NPF VI and NPF XII's insolvency. Despite its knowledge and its obligation to give careful, competent and considered advice that NPF VI and NPF XII disclose these facts in any offering documents, Kaye Scholer instead failed to insist upon their disclosure, concealed these facts, said nothing when CSFB—desperate to cause the issuance of more notes for its own reasons—consciously decided that these facts would be concealed from the note purchasers. Far from turning a blind eye to its duty to adequately protect the interests of NPF VI and NPF XII, Kaye Scholer instead watched with gimlet eyes as the interests of these clients were sacrificed for the benefit of Kaye Scholer's other, preferred and more profitable client.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1083.

1084. Kaye Scholer's active participation with CSFB in the concealment of the wrongful acts and its breaches of duty to its clients, NPF VI and NPF XII, worked to transform once healthy entities, into non-viable entities that sunk deeper and deeper into insolvency, all to the gain of Kaye Scholer and the other Defendants. The firm, in short, knew precisely what it was doing, and it must now bear the consequences of its decision to favor one client over another.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1084.

### B. Kaye Scholer Knew About Extensive and Undisclosed Related Party Transactions

1085. Beginning in at least 1999, as a result of its work as counsel to NCFE on the proposed equity IPO, Kaye Scholer learned of the pervasive related-party transactions between affiliate companies of the Founders and NCFE and/or NPF VI and NPF XII. As issuer's counsel,

Kaye Scholer was primarily responsible for the drafting of the S-l Registration Statement, a task which required Kaye Scholer to perform due diligence on the Company and draft the requisite disclosures of material facts in the S-l. In the course of its initial due diligence, Kaye Scholer acquired first-hand knowledge that NCFE was purchasing a significant percentage of its receivables from Founder-affiliated companies such as Thor, Kachina, IIA, Rx Medical, and Home Medical.

Defendant Ayers denies the allegations in paragraph 1085 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

1086. Handwritten notes of a May 14, 1999 meeting between a Kaye Scholer attorney, Kathryn Beller, and Randy Speer of NCFE, confirm that Kaye Scholer had a detailed understanding of the nature and breadth of the related party transactions. These notes reflect Kaye Scholer's fulsome understanding of not only the ownership structure of these affiliated companies, but more critically, the enormous percentage of gross revenues these affiliated companies represented to the Programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1086.

1087. It is from these May 14, 1999 notes that Kaye Scholer drafts a proposed disclosure document of these related party transactions, entitled "Certain Transactions," which is circulated to the NCFE IPO working group, including Kaye Scholer and CSFB, three days later, on May 17, 1999. Mel Cherney, a partner at Kaye Scholer working on the IPO, confirmed in his deposition testimony that Kaye Scholer drafted this suggested proposal and had detailed knowledge of these related party transactions by at least this point in time—spring of 1999. As

further discussed in ¶¶ 795-797 above and incorporated herein, this Certain Transaction disclosure documents reveals the following:

- "Home Medical of America, Inc ... which during 1998 ***accounted for* $16.6 million *(12.2%) of the gross revenues of NCFE***, is wholly owned by Intercontinental Investment Associates, Ltd. Intercontinental is a holding company owned by Lance K. Poulsen, Donald H. Ayers, Rebecca S. Parrett and Barbara L. Poulsen."
- "Intercontinental also holds an unexercised option to acquire all of the ownership interests in a [hospital group] that during 1998 ***accounted for* $[12. 6] *million* ([9.3 ]%) *of the gross revenues of NCFE."***
- "In addition, Intercontinental owns an approximately 10% interest in a [hospital group] that during 1998 **accounted for $[11.6] *million* ([8.5]%) *of the gross revenues of NCFE."***
- "Intercontinental also own approximately 54% of [Rx Medical Services Corp.], a hospital group which, during 1998 ***accounted for* $[8. 6] *million* ([6.3]%) of *the gross revenues of NCFE. "***

Kaye Scholer then drafted a disclosure for the "Risk Factors" section of the S-l Registration Statement which disclosed the magnitude of the related-party transactions an their impact on NCFE's gross revenues: "Receivables purchases from healthcare providers (including Home Medical of America, Inc.) in which these persons [Lance K. Poulsen, Barbara L. Poulsen, Donald H. Ayers, and Rebecca S. Parrett] had ownership interests ***accounted for* $[49.4] *million* ([36%]) *of NCFE's gross revenues during 1998."***

Defendant Ayers denies the allegations in paragraph 1087 as to Defendant Ayers and

denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

1088. These documents establish that, no later than the Spring of 1999, Kaye Scholer knew in detail about both the fact and the sheer magnitude of related party transactions in the NPF programs. It knew or, in the exercise of reasonable care should have recognized, that this indicated that Poulsen, Parrett, and Ayers were continuing to loot NPF VI and NPF XII through wrongful affiliate transactions. Kaye Scholer also knew, or as a claimed competent securities firm should have known, that this information was material information that needed to be disclosed in any offering document used to issue or sell securities on behalf of NCFE, NPF VI and NPF XII. Indeed, it cannot be credibly argued by Kaye Scholer that Founder-affiliated transactions totaling nearly 40% of NCFE's gross revenues could be anything but highly material information that needed to be disclosed.

Defendant Ayers denies the allegations in paragraph 1088 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

1089. Ultimately, NCFE aborted its IPO attempt on two separate occasions and the S-1 registration statement was never filed. Kaye Scholer continued, however, to act as placement agent counsel for CSFB in connection with $2.7 billion of debt issuances by NPF VI and NPF XII after the equity IPO collapsed. These debt issuances were a substantially related matter to its representation of NPF VI and NPF XII. ***In not one of those offerings*** did Kaye Scholer, or CSFB, include disclosures of the material, related party facts that Kaye Scholer had learned about, at the latest, in the equity IPO offering. The debt offering memoranda, which were drafted with extensive assistance from Kaye Scholer, not only do not disclose the significance of related

party transactions to NCFE's overall financial health, but they affirmatively represent in the "Related Entities" section that the only related party transactions are as follows: "NPF XI, Inc., NPF VI, Inc. and NPF WL, Inc. which serve as funding conduits for the purchase of health care receivables. NPF-LP, Inc., NPF X, Inc., NPF LL, Inc. and NPF-SPL Inc. which serve as funding conduits for the making of loans to healthcare providers collateralized by receivables on equipment and other assets." The assertion that *these* are the related party transactions is a deliberate, half-truth—because it suggests that there are no other related party transactions, even though Kaye Scholer plainly knew that there *were* others and that they *were extensive and material.* A competent securities professional, who had unfettered loyalty to its client, would have advised its clients to disclose these relevant and material facts, but Kaye Scholer did not do so. Instead, in concert with CSFB, Kaye Scholer sought to conceal these transactions in the note offerings so that additional notes could be sold—even as its clients NPF VI and NPF XII were collapsing into hopeless insolvency. That this was negligent, and indeed grossly so, is evident from the stark contrast between Kaye Scholer's draft disclosure of the related party transactions for the equity offering and the misleading disclosure it helped draft, and that was used, to offer notes for NPF VI and NPF XII at the same time.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1089.

1090. There is no question, therefore, that Kaye Scholer knew about the related party transactions, knew they were material-representing almost 40% of NCFE's gross revenues—and yet failed to advise its client to disclose them in the subsequent $2.7 billion in note issuances. A competent securities professional would have given this advice and would have declined to allow its work to be used to perpetrate a fraud. Kaye Scholer, in contrast, not only failed to give

this advice to NPF VI and NPF XII, it consciously continued to draft documents that were used to perpetuate the scheme to loot and defraud NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1090.

1091. There is no question, moreover, that the related party transactions were material to the NPF VI and NPF XII note offerings. The Fitch Rating Agency, on the heels of the anonymous letters, faxed a letter to Lance Poulsen advising that it was imperative that any related party transactions be disclosed *in the note offerings.* Fitch explained that "[i]n particular, we regard the relationships among NCFE and its officers, directors and beneficial owners, on the one hand, and the Providers involved in the NPF Program, on the other, to ***be highly material.***" This is not surprising, because related party transactions are uniformly recognized as matters that must be disclosed. The fact that this was material is also evident from the fact that, when the music stopped in late 2002 and NCFE, NPF VI and NPF XII all declared bankruptcy, related party providers in whom NCFE and/or the principals had an ownership interest resulted in **$1.7 *billion in losses*** to NPF VI and NPF—losses which could have been prevented.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1091.

1092. Kaye Scholer knew that this highly material information had been concealed from NPF VI and NPF XII, the Rating Agencies, and the purchasers of NPF notes. It also knew, as CSFB knew, that if the facts concerning the related party transactions and Indenture violations were revealed, NPF VI and NPF XII would collapse. Accordingly, Kaye Scholer assisted CSFB in its efforts to persuade the Rating Agencies and the market that NPF VI and NPF XII were financially sound—at a point in time when they knew they were not.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1092.

### C. Kaye Scholer Knew of the Pervasive Indenture Violations in the Programs

#### *1. Kaye Scholer's Knowledge of Unsecured "Loans" and Wrongful Purchases of "Future Receivables"*

1093. Like CSFB, Kaye Scholer has also testified under oath that it understood that the Indentures placed specific limitations on what types of receivables the Servicer was authorized to purchase for NPF VI and NPF XII. Indeed, as the primary drafter of the Indentures, Kaye Scholer knew that only "eligible" receivables could be purchased under the Indentures and that "eligible" receivables were carefully defined in Section 4.2 of the Sale & Subservicing Agreements. This section clearly prohibits (i) the Programs from making advances to any Seller apart from or in excess of the discounted value of the eligible receivables sold, and (ii) the purchase of receivables for services which had yet to be provided or performed, i.e. "future" receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1093.

1094. Despite Kaye Scholer's understanding that unsecured advances and the purchase of future receivables were expressly and strictly prohibited under the Indentures, it nevertheless assisted CSFB in concealing the existence of what it knew to be massive purchases of non-existent, future receivables and the making of unsecured loans to healthcare providers.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1094.

1095. Kaye Scholer was aware, throughout its involvement with NPF VI and NPF XII

that the Servicer was causing the Programs to advance funds to healthcare providers. Kaye Scholer has testified that it was aware of these practices through the audited financial statements for NCFE. As discussed above in ¶ 793 above in the claims against CSFB, Hausser Taylor's 1995 audited financials for NCFE, which also appear in Kaye Scholer's files, contain the following language:

- "The Company was not in compliance with certain requirements of the Indenture Agreements, most importantly, ***the advancement of funds to certain Providers absent accounts receivable detail."***
- "The Company ***has advanced amounts in excess of receivables*** provided by certain Providers."
- "Purchased receivables and advances to Providers approximated $39,500,000 and $17,475,000, respectively."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1095.

1096. Kaye Scholer, like CSFB, knew that such "advances" were violative of the Indentures and could cause "the declaration of a principal amortization event." Kaye Scholer also knew that these unsecured loans made out of the Programs continued throughout its representation of NPF VI and NPF XII. For example, a March 1999 draft offering document of NCFE equity securities in Kaye Scholer's files—a document prepared by Kaye Scholer and CSFB—reveals that Kaye Scholer was aware of unsecured advances in violation of the Indentures. That document states that "[f]rom time to time, certain Programs ***advance funds in excess of the Net Value of the client's Purchased Receivables.***"

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 1096.

1097. Further, as discussed in detail in ¶¶ 827-828 above and incorporated herein, Kaye Scholer, like CSFB, also knew that NCFE was purchasing non-existent, "future receivables" from one of NCFE's top ten healthcare provider sellers-PhyAmerica. At that time, Kaye Scholer, who was representing NPF VI, NPF XII and CSFB, was attempting to finalize the disclosure documents for the 2000-2 NPF XII note issuance. In connection with that note issuance, Edward O'Connell, a partner at Kaye Scholer who headed the securitizations for NCFE, sent an e-mail on October 4, 2000 to Todd Fasanella at CSFB and also to Purcell and Scott that "PhyAmerica's 10K and lOQ ***indicate that 'future receivables' are accounted for as long-term debt*** . . . . the 12/31/99 10K indicates that about $38 million of these were being financed in NPF XII. My proposed solution would be: 1. ***Confirm with PhyAmerica's accountants what 'future receivables' are;*** **2.** ***Carve out these types of receivables from the eligible receivables definition.***"

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1097.

1098. Kaye Scholer clearly understood from looking at PhyAmerica's 10K that a substantial number of receivables being purchased by the NPF Programs were not eligible receivables for healthcare receivables rendered, but were, instead, for non-existent receivables which PhyAmerica hoped to generate in the future, but which clearly did not exist at the time.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1098.

1099. It is clear from this e-mail and the PhyAmerica 10K that Kaye Scholer not only knew about the purchase of these future receivables, but that it understood that these were

ineligible and in direct violation of the Indentures. Indeed, PhyAmerica's 10K could not make the distinction between eligible receivables and future receivables more clear. Its 1999 10K states that "The Company's primary financing source consists of three accounts receivables programs. Under these programs, NCFE [(1)] purchases qualified receivables generated by Company, acquired by the Company from independent contractor physicians, and [(2)] ***advances funds for the rights to <u>future</u> <u>receivables</u>*** . . . ." After explaining the difference between these two types of receivables (qualified vs. future), PhyAmerica goes on to disclose that "[a]s of December 31, 1999, the Company had outstanding advances of approximately $196 million of receivables financing, of which $79 million related to billed [i.e. eligible receivables] and approximately **$117 *million of which related to <u>future</u> <u>receivables</u>.*"** Thus Kaye Scholer knew that ***60%*** of PhyAmerica's receivables were "future receivables" that did not currently exist.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1099.

1100. "Future receivables" is a well-recognized industry term defining an after-acquired asset which "does not exist" at the present time. Kaye Scholer, as a self-proclaimed expert in the field of securitizations understood what "future receivables" were. Indeed, one of Kaye Scholer's own lawyers, Steven Schwarz, has written about "future receivables" in an article where he discusses whether "future receivables" can ever serve as adequate collateral for a securitization and whether "local law [even] permits the transfer of an asset ***not then in existence.***"

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1110.

1101. Kaye Scholer's October 4, 2000 e-mail reveals that it understood that these "future receivables" were something other than the legitimate, eligible receivables allowed under the

Indentures. Indeed, O'Connell suggests that they quickly contact PhyAmerica's accountants, KPMG, and confirm that these "future receivables" are, indeed, what Kaye Scholer recognizes them to be—ineligible receivables—and that they "carve out" those from the "'Eligible Receivables' definition. "

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1101.

1102. The next day, however, O'Connell received a return e-mail in response, proposing an alternative that is clearly at odds with what Kaye Scholer and CSFB know to be the truth about these large purchases of future receivables. It suggested that Kaye Scholer should simply "draft whatever certification language you were comfortable with that would be attested to by NCFE. Lance has stated that the flat rate contracts are no longer a part of NPF XII . . . . We do not see the necessity of amending all of the PhyAmerica sale and subservicng agreements. Now that we know the scope was never more than $38 million, the issue is ***less material than we once thought.***"[13] CSFB responded in its own e-mail, accepting NCFE's demand that it be allowed to simply sign "whatever certification language you were comfortable with," so as to further conceal the fact that over half of the receivables of one of NCFE's top ten healthcare providers were non-existent receivables being purchased by the NPF VI and NPF XII programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1102.

1103. Kaye Scholer now admits that NCFE' s purported "flat rate contracts" explanation

[13] Not only were these "future receivables" material in 1999, they were even more so as time progressed. PhyAmerica's 2000 10K, which one can safely presume Kaye Scholer read or certainly should have read, reveals that far from diminishing over time, the "purchase" of these future receivables had grown exponentially. The total amount of future receivables purchased by NCFE rose from $117 million to $167 million, and, critically, the amount of future receivables financed in the NPF XII Program nearly doubled—from $38 million in 1999 to $62 million in 2000.

of these "future receivables" is at odds with what is clearly stated in O'Connell's October 4, 2000 e-mail and in PhyAmerica's 10K. It also knew or should have recognized this at the time. Yet Kaye Scholer nevertheless drafted a purported certification that future receivables did *not* exist in the NPF receivables pools—when Kaye Scholer knew that they clearly did—so that this fraud could literally be papered over in a frenzied attempt to keep the scheme to loot NPF VI and NPF XII afloat. Incredibly, even this claimed "certification" may be a fiction—because Kaye Scholer has been unable to produce it despite repeated requests that it do so. In taking this approach, Kaye Scholer failed to follow its own advice and failed to do what any competent professional would have done; namely, to contact PhyAmerica's auditors to confirm and then act on the true facts. Instead, in derogation of its obligations of due care and loyalty to NPF VI and NPF XII, Kaye Scholer chose to actively assist CSFB in concealing acknowledged, "material" facts that it should have insisted be disclosed in order to protect NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1103.

1104. Also, the timing of these questions regarding PhyAmerica's future receivables is significant because they arose only five months after the anonymous letters which asserted that "it is estimated that approximately 50% or more of the $2 billion portfolio [of NCFE' s receivables] is either worthless or ***non-existent.***" CSFB has testified that Kaye Scholer received these letters and copies of these letters are in the firm's files. The PhyAmerica 10K actually *confirms* that this is true, because it establishes that well over half of PhyAmerica's receivables were non-existent or were entirely ineligible because they were not being collected. Yet despite the fact that Kaye Scholer knew that concerns had been raised regarding whether advances of funds were being made to healthcare providers for non-existent receivables—and knew that

these facts were true as it pertained to PhyAmerica—Kaye Scholer failed to take any steps, even ineffectual ones, to protect NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1104.

1105. In addition, as counsel to NPF VI and NPF XII, Kaye Scholer's obligation to act with reasonable care required it to advise its clients concerning the need to make full disclosure of areas in which they were not in compliance with the Indentures. Notwithstanding its knowledge and awareness, Kaye Scholer never disclosed these advances and improper unsecured loans in the subsequent PPMs it drafted for CSFB. Rather, it continued to assist CSFB in repeatedly drafting false and misleading offering documents that concealed these facts from the Rating Agencies, from NPF VI and NPF XII, and from the purchasers of NPF VI and NPF XII notes.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1105.

1106. These actions, at a minimum, exhibit a lack of reasonable care on the part of Kaye Scholer. Kaye Scholer disregarded its own advice to verify the issue with PhyAmerica's accountants and instead chose to unreasonably rely on a certification that is false on its face and at odds with what Kaye Scholer knows to be the truth about the non-eligibility of these receivables.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1106.

### *2. Kaye Scholer's Knowledge of Manipulation of Defaulted and Rejected Receivables*

1107. Kaye Scholer's knowledge of Indenture violations was not limited to unsecured

advances and purchase of future receivables. It also understood and helped conceal the fact that defaulted and rejected receivables rates were being manipulated and misreported. For example, a March 1999 equity offering document that it helped CSFB draft, and which appears in Kaye Scholer's file, discloses that "From time to time, certain Programs . . . purchase Receivables which have ***aged beyond the 150 days (i.e., which are not Eligible Receivables under the client's SSA)***, and for financial reporting purposes may include Purchased Receivables ***aged beyond 180 days.***"

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1107.

1108. Additionally, the same PhyAmerica 10K which disclosed the sale of "future receivables" to NPF entities also disclosed (in the very same section Kaye Scholer was discussing in its October 2000 e-mails to CSFB) that "[a]s of December 31, 1999, the Company [PhyAmerica] had received funds from NCFE totaling approximately $117.4 million ***for which repayment has been waived until June 30, 2001*** . . . ." Waiving the requirement of collection within 180 days rendered these receivables "aged" and ineligible for purchase. Also, this $117 million of receivables is the same $117 million of receivables that were also those "future receivables" which did not currently exist. Thus, Kaye Scholer not only knew and understood that the NPF VI and NPF XII programs were being forced to purchase non-existent receivables, Kaye Scholer also understood that repayment of these receivables had been waived for over a year—a clear violation of the receivables aging requirements under the Indentures. Despite this fact, Kaye Scholer failed to <u>ever</u> disclose these facts in any of the subsequent note issuance offering documents.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 1108.

### *3. Kaye Scholer's Knowledge of Equity Account Abuses*

1109. As discussed in ¶¶ 156-159 above, and incorporated herein, Kaye Scholer, like Defendants Chase, Bank One, CSFB and others, knew about unauthorized withdrawals from the Programs' equity accounts, in clear violation of the Indentures. In a meeting attended by Kaye Scholer prior to the execution of the Master Indentures for NPF VI and NPF XII, it was discussed that funds were being improperly withdrawn from the equity reserve accounts in order to pay Sellers in the Programs. As discussed, for example, in ¶¶ 81-87 and incorporated herein, such withdrawals out of the equity account were in direct contravention of the terms of the Indentures. As discussed more below, letters drafted by Kaye Scholer on behalf of ING and CSFB in the fall of 2002, reveal that Kaye Scholer was clearly aware of what withdraws could be made out of the equity account, and knew that such payments to sellers were in violation of the terms of the Indentures.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1109.

## D. Kaye Scholer Knew that the Indentures Were Routinely Breached

1110. There is no question that as of 1999, Kaye Scholer knew about the above-described Indenture violations and that these violations were pervasive and that they were required to be disclosed. Specifically, in a series of draft S-1 registration statements prepared by Kaye Scholer in connection with NCFE's attempted IPO, it disclosed that some NCFE Programs "have not complied ***[and currently do not comply,]***[14] with various documentary reporting provisions . . . ."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

[14] This bracketed language is included in the original Kaye Scholer document.

allegations of paragraph 1110.

1111. Kaye Scholer had a detailed understanding of what was allowed and what was not allowed under the Indentures. This is evident not only from the fact that Kaye Scholer was the drafter of the key governing documents to the NPF Programs, but also from a pair of identical letters that Kaye Scholer has testified under oath that it drafted on behalf of its clients ING and CSFB and sent to the Indenture Trustees on September 30, 2002 and October 1, 2002, respectively. These letters reflect a detailed understanding of the specific limitations and obligations under the Master Indentures, each offering a seven-point analysis of Kaye Scholer's independent understanding of the requirements of the Indentures and Sale & Subservicing Agreements.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1111.

1112. Kaye Scholer knew and understood that the above-described events of lndenture non-compliance were occurring and knew that these were not merely "technical" defaults, but were material defaults that could jeopardize the continued survival of NPF VI and NPF XII and lead to early principal amortization.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1112.

1113. Kaye Scholer, which was NPF VI and NPF XII's fiduciary, took no steps to protect NPF VI and NPF XII from disaster. It never disclosed or required the disclosure of these material facts in any subsequent NPF debt offering documents, it never disclosed these facts to someone at NPF VI or NPF XII, such as an independent director, and it never resigned its representation of NPF VI and NPF XII when it knew that its services were being used by CSFB to perpetrate a fraud on its clients, NPF VI and NPF XII. Instead, Kaye Scholer aided and abetted CSFB,

Poulsen, Parrett and Ayers in the breaches of the duties that they owed to NPF VI and NPF XII by concealing the massive Founder-affiliate transactions used to loot NPF VI and NPF XII, the purchase of ineligible receivables, and the manipulation of receivables reporting.

Defendant Ayers denies the allegations in paragraph 1113 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

### E. Kaye Scholer Actively Participated with CSFB and Others to Deepen the Insolvency of NPF VI and NPF XII

1114. Kaye Scholer understood that the NPF VI and NPF XII programs functioned strictly according to Indentures and governing documents because they were the primary drafters of these documents. They understood that specific controls were in place that safeguarded the health of both NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1114.

1115. As described above, there is no question that Kaye Scholer knew about the Indenture violations, anyone of which represented a material event of default and anyone of which, if properly disclosed, would have triggered a principal amortization event, preventing further note issuances and halting the further dissipation of NPF VI and NPF XII's assets.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1115.

1116. Despite this knowledge that the Programs were not functioning properly, Kaye Scholer knowingly and actively assisted CSFB in the concealment of these and other material facts in order to (i) generate fees from its continued work as placement agent counsel, and (ii) to benefit CSFB, a preferred client upon which Kaye Scholer's securitization department was

dependent for business, by prolonging the life of NPF VI and NPF XII so that CSFB could continue to reap its own massive fees and work down its own exposure to NCFE. As placement agent counsel, Kaye Scholer knew that CSFB was perpetuating the fraud in order to issue more notes, and Kaye Scholer assisted CSFB as described above in drafting misleading disclosure documents which allowed CSFB to continue to issue more and more NPF notes, ultimately destroying NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1116.

1117. Kaye Scholer knew and understood that its services were being used by CSFB to perpetuate a fraud, but Kaye Scholer never withdrew as counsel, and failed to disclose this matter to anyone at NCFE, such as one of its independent directors.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1117.

1118. As described above, Kaye Scholer not only actively worked to conceal these wrongful acts in order to maintain its direct relationship as CSFB' s counsel on the note issuances for the fees, but, as a self-touted securitization expert, Kaye Scholer understood that it needed to curry favor with CSFB, as the global leader in the securitization industry. Kaye Scholer was dependent on CSFB's continued business as its client, and as counsel to CSFB on every note issuance, Kaye Scholer reaped enormous fees for its own work on each of the note issuances

1119. Kaye Scholer also served as counsel to CSFB on the loans and credit enhancement deals that CSFB had with NPF XII, and has testified under oath that it was the drafter of all the loan and loan amendment documents for CSFB's variable funding note with NPF XII. As detailed in ¶¶ 834-840, and incorporated herein, CSFB was, itself, heavily exposed to NCFE when it was compelled to provide additional liquidity to NPF XII in the form a variable funding note. Kaye

Scholer being the party responsible for drafting the note purchase agreement for the variable funding note and also the amendments to the note, knew and understood that CSFB had significant exposure in holding a large position of NPF notes. Kaye Scholer's assistance in concealing the material Indenture violations and failing to require their disclosure made it possible for CSFB to continue to issue more note issuances and "work down its exposure" in NCFE.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1119.

1120. Additionally, as discussed above in ¶¶ 839-841 and incorporated herein, in order to keep the Programs from collapsing, CSFB agreed to loan NPF XII $100 million to be repaid in less than a month to tide it over until the next note offering could be accomplished. Kaye Scholer has testified that it was responsible for drafting CSFB's loan documents and thus it understood that this loan was highly unusual and was being requested specifically in order to conceal the fact that NPF XII was experiencing a liquidity crisis and that it needed a temporary infusion of cash in the equity account to tide it over until the next note issuance.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1120.

**F. Kaye Scholer's Dual Representation Resulted in a Breach of Loyalty and Breach of Due Care to NPF VI and NPF XII**

1121. From the outset, Kaye Scholer's overlapping representations between the NPF VI and NPF XII on the one hand and the placement agent, CSFB, on the other represented an inherent conflict of interest that was never disclosed to either party. Kaye Scholer has confirmed in its deposition testimony that no engagement letters or conflict waiver letters exist that explain—or waive—the conflicts inherent in Kaye Scholer's dual and conflicting roles as counsel

to CSFB and the NPF entities.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1121.

1122. Kaye Scholer acted in many different capacities for NPF VI and NPF XII, its clients. Simultaneously, it acted as counsel to CSFB in connection with the preparation of offering documents that were used to sell notes issued by NPF VI and NPF XII. The firm also acted as counsel to CSFB in making loans to NPF XII, via the variable funding note, whose purpose was to cure reserve defaults and "keep the programs afloat" until the next note issuance. These dual representations created a clear conflict of interest because CSFB stood to profit every time NPF VI and NPF XII were forced to sell notes—even if those notes deepened their insolvency, exposed them to liability or destroyed them.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1122.

1123. Kaye Scholer's intertwined representations relating to NCFE rendered Kaye Scholer for all practical purposes, counsel to the situation. It was hopelessly entangled in a multitude of conflicting relationships, which served to subvert the interests of its clients, NPF VI and NPF XII, to those of its other, more influential client, CSFB.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1123.

1124. Kaye Scholer had an obligation as a fiduciary to NPF VI and NPF XII and as a legal professional to advise its clients to disclose all of the information about (i) the material related party transactions, (ii) the wrongful advances offunds, (iii) the purchases of ineligible, future receivables, (iv) manipulation of the defaulted and rejected receivables, and (v) the continuing indenture violations. Kaye Scholer failed to do so. Instead, Kaye Scholer advised

Poulsen, Parrett, Ayers and CSFB to take steps to conceal the fraud that they were perpetrating on NPF VI and NPF XII and the investing public.

Defendant Ayers denies the allegations in paragraph 1124 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

1125. Kaye Scholer knowingly allowed its legal services to be used to perpetrate a fraud. That fraud was not in the interest of NPF VI and NPF XII; instead, it destroyed them. Kaye Scholer's willful indifference to the injury being done to its clients NPF VI and NPF XII and its choice to favor its more influential client CSFB at the expense of NPF VI and NPF XII, aided and abetted CSFB's fraud and deepened the insolvency of NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1125.

1126. Kaye Scholer as counsel to NPF VI and NPF XII had a duty to protect its clients from the liability resulting from promulgating false and misleading statements. As described above in detail, Kaye Scholer knew of highly relevant and material facts that were not disclosed to investors, and which caused NPF VI and NPF XII to continuously issue notes in violation of securities laws and in violation of the NPF VI and NPF XII Indentures. Rather than insist on the disclosure of these highly material facts, the law firm actively worked to conceal these facts, aiding and abetting CSFB' s fraud against NPF VI and NPF XII and further deepening the insolvency of the programs. As a result of Kaye Scholer's negligence and fraudulent concealment, NPF VI and NPF XII were effectively destroyed.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1126.

**COUNT XLIV**
**NEGLIGENCE/PROFESSIONAL MALPRACTICE**
***Against Kaye Scholer***

No answer is required to the extent the allegations in Count XLIV, including paragraphs 1127 through 1131, because Count XLIV is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XLIV, including paragraphs 1127 through 1131 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XLVI**
**BREACH OF FIDUCIARY**
**DUTY**
***Against Kaye Scholer***

No answer is required to the extent the allegations in Count XLVI, including paragraphs 1132 through 1135, because Count XLVI is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XLVI, including paragraphs 1132 through 1135 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XLVII**
**CONCERT OF ACTION/KNOWING PARTICIPATION IN BREACH OF FIDUCIARY DUTY**
***Against Kaye Scholer***

No answer is required to the extent the allegations in Count XLVII, including paragraphs 1136 through 1139, because Count XLVII is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XLVII, including paragraphs 1136 through 1139 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT XLVIII**
**AIDING AND ABETTING CSFB's FRAUD AND DEEPENING INSOLVENCY** ***Against Kaye Scholer***

No answer is required to the extent the allegations in Count XLVIII, including paragraphs 1140 through 1143, because Count XLVIII is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XLVIII, including paragraphs 1140 through 1143 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

## XI. CLAIMS AGAINST PURCELL & SCOTT

1144. Purcell & Scott is a law firm located in Dublin, Ohio that acted as legal counsel to NCFE and its affiliates, including NPF VI and NPF XII, in numerous capacities.

Defendant Ayers admits paragraph 1144.

1145. Purcell & Scott's involvement with NCFE and its affiliated entities spans from the time Purcell & Scott was formed in April 1995 through the time NCFE collapsed in November 2002.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1145, but admits that Purcell & Scott was involved with NCFE and its affiliated entities during the relevant period.

1146. NCFE and its affiliated entities were Purcell & Scott's largest clients from a revenue perspective throughout this time period. Purcell & Scott was paid several million dollars in connection with its representation of NCFE and its affiliates, including NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1146.

1147. Purcell & Scott rendered legal advice concerning nearly every aspect of the operations of NCFE and its affiliates. For instance, on behalf of NPF VI and NPF XII, Purcell & Scott participated in the drafting of key documents at the heart of the securitization programs, including: (i) documents creating NPF VI and NPF XII, and (ii) documents governing the operations of NPF VI and NPF XII, such as the NPF VI and NPF XII Master Indentures, the NPF VI and NPF XII Supplemental Indentures, the Sale and Subservicing Agreements used in the NPF VI and NPF XII programs, the NPF VI and NPF XII private placement memoranda, the NPF VI and NPF XII supplemental private placement memoranda, and numerous other agreements.

Defendant Ayers admits paragraph 1147.

1148. NCFE and its affiliates, including NPF VI and NPF XII, hired Purcell & Scott to

give them legal advice with regard to numerous aspects of NPF VI's and NPF XII's securitization programs, including the note-issuance and receivables-operation components of those programs, in addition to numerous others.

Defendant Ayers admits paragraph 1148.

1149. NCFE and its affiliated entities, including NPF VI and NPF XII, expected and were entitled to competent representation by counsel capable of representing them in highly complex asset-backed securitization transactions, among other things.

Defendant Ayers admits paragraph 1149.

1150. NCFE and its affiliated entities, including NPF VI and NPF XII, did not receive such representation by Purcell & Scott. Purcell & Scott was neither sufficiently experienced in these types of transactions nor qualified to provide competent representation in these types of transactions, as evidenced by the substandard advice that it gave.

Defendant Ayers admits the allegations of paragraph 1150.

1151. Purcell & Scott had clear and detailed knowledge of the key terms, limitations, and obligations placed upon NPF VI and NPF XII. For instance, Purcell & Scott knew that NPF VI's and NPF XII's conduct was highly constrained from a legal perspective by several key documents that Purcell & Scott had helped create and on which Purcell & Scott rendered legal advice to NPF VI and NPF XII, including (i) NPF VI's and NPF XII's articles of organization; (ii) the Master Indentures under which those companies operated; and (iii) the Private Placement Memoranda submitted to noteholders, under which NPF VI and NPF XII had issued billions of dollars in debt used to operate their programs purportedly pursuant to the Master Indentures. These constraints are set forth in greater detail above. In short, Purcell & Scott knew well how NPF VI and NPF XII were supposed to function and the rules placed upon those companies.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1151.

1152. At the same time, however, Purcell & Scott knew that the strict limitations imposed upon its clients, NPF VI and NPF XII, were not being observed. To name a few examples:

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1152.

**A. Equity Account Withdrawals on Dates Other Than the Monthly Payment Date**

1153. Purcell & Scott knew that, except in certain circumstances it knew to be inapplicable, the Servicer and the Indenture Trustees were prohibited by the Master Indentures from withdrawing funds from the NPF VI or NPF XII Equity Accounts on a date other than the first business day of the month. By at least November 2000, Purcell & Scott knew that this limitation was being violated.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1153.

1154. On November 29, 2000, representatives of Purcell & Scott, along with others, attended a meeting with GMAC, which was contemplating an investment in NCFE.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1154.

1155. According to handwritten notes from Purcell & Scott's files, the fact that the Servicer and the Trustees had been making withdrawals from the NPF VI and NPF XII Equity Accounts on days other than the first business day of the month *(i.e.*, "monthly payment dates")

was discussed openly. According to those notes, one "issue" that was discussed "was withdrawals from equity account between monthly payment dates."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1155.

1156. Purcell & Scott knew that this conduct was not properly disclosed by it or anyone else to those to whom NPF VI and NPF XII was indebted through the issuance of notes, among others. Indeed, Purcell & Scott participated in furthering the scheme by authoring or participating in the authorship of documents that materially misrepresented the true circumstances concerning the operation of the securitization vehicles at issue.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1156.

1157. Purcell & Scott knew that these withdrawals were prohibited by the documents restricting the actions of NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1157.

**B. Prohibited Advances Based Upon No or Ineligible Receivables**

1158. Purcell & Scott knew that NPF VI and NPF XII were only permitted to purchase Eligible Receivables sold by qualified health care providers within the NPF VI or NPF XII programs.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1158.

1159. Purcell & Scott knew that NPF VI and NPF XII were not permitted to be operated such that they were advancing funds to health care providers (or anyone else) in the

absence of the receipt in return of appropriate Eligible Receivables, and even then the advances were not to exceed the net outstanding value on the Eligible Receivables, as described more fully above.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1159.

1160. Purcell & Scott knew by 1998, however, that these limitations were being disregarded.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1160.

1161. For example, in 1998, the Beacon Group was contemplating an investment in NCFE. As part of that process, a disclosure memorandum to be given to Beacon Group (but not the investors who had purchased Notes) was created on behalf of NCFE. Purcell & Scott participated in reviewing and drafting that disclosure memorandum.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1161.

1162. Based upon its review of this disclosure memorandum and its comments in connection with that document, Purcell & Scott knew that the Servicer and the Trustees, on behalf of NPF VI and NPF XII, would "advance funds to clients in excess of the net value of the client's purchased receivables and purchase receivables which [had] aged beyond 150 days (i.e., which are not eligible receivables under the client's [Sale and Subservicing Agreement]), and for financial reporting purposes may include purchased receivables aged beyond 180 days."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1162.

1163. Similarly, by 1999, Purcell & Scott knew that PhyAmerica, one of the biggest participants in the NCFE securitization programs, was receiving tens of millions of dollars in funds from NPF VI and/or NPF XII in violation of the Master Indenture limitations. Specifically, Purcell & Scott knew that PhyAmerica was receiving tens of millions of dollars in unsecured lending, unsupported by Eligible Receivables. Rather, as the communications to which Purcell & Scott were parties state, these advances were given in return for "future receivables," which Purcell & Scott knew to be prohibited by the Master Indentures. Indeed, as described above, the entire concept of a "future receivable," as Purcell & Scott knew well, amounted to no receivable at all, since there was no currently existing right to receive payment.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1163.

1164. Purcell & Scott knew that this conduct was not properly disclosed by it or anyone else to those to whom NPF VI and NPF XII was indebted through the issuance of notes, among others. Indeed, Purcell & Scott participated in furthering the scheme by, for example, authoring or participating in the authorship of documents that materially misrepresented the true circumstances concerning the operation of the securitization vehicles at issue.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1164.

1165. Purcell & Scott knew that this conduct violated several of the limitations placed upon the operation of NPF VI and NPF XII.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1165.

**C. Related Party Transactions**

1166. Purcell & Scott knew that NPF VI and NPF XII were not permitted to participate in transactions with affiliated companies, including the purchase of receivables from health care providers affiliated with NCFE or advances of funds to companies affiliated with NCFE. Purcell & Scott knew that these limitations on the operations of NPF VI and NPF XII were being violated, as described more fully above.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1166.

1167. As described in detail above, numerous of the top health care providers participating in the NPF VI and NPF XII programs were owned by a maze of companies such as Thor, Kachina, and IIA. As described above, these companies were, in turn, owned and controlled by NCFE's Founders, Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett.

Defendant Ayers denies paragraph 1166.

1168. Purcell & Scott, along with others, knew of these companies, knew that they were owned by NCFE's Founders, and knew that they owned several of the top providers in the NPF VI and NPF XII Programs. In fact, Purcell & Scott also represented Thor, Kachina, IIA, Lance Poulsen, Barbara Poulsen, Donald Ayers, and Rebecca Parrett simultaneously. Purcell & Scott participated in the transactions in which NCFE's Founders used their privately owned companies to acquire ownership interests in certain major providers in the NPF VI and NPF XII Programs. Such ownership, as Purcell & Scott knew, was prohibited under the documents governing the operations of the NPF VI and NPF XII Programs, which Purcell & Scott had helped create and upon which they rendered legal advice.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1168.

1169. Purcell & Scott knew that this conduct was not properly disclosed by it or anyone else to those to whom NPF VI and NPF XII was indebted through the issuance of notes, among others. Indeed, Purcell & Scott participated in furthering the scheme by authoring or participating in the authorship of documents that materially misrepresented the true circumstances concerning the operation of the securitization vehicles at issue.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1169.

1170. In addition, Purcell & Scott knew that the funds of NPF VI and NPF XII were, in contravention of the Master Indentures and as described above, being illegally advanced to related parties. For example, Purcell & Scott knew that Rx Medical, Home Medical of America, and Home Care Concepts o f America, all three of which were among the top participants in the NPF VI and NPF XII programs, were owned in whole or in substantial part by NCFE's Founders.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1170.

1171. Purcell & Scott knew that this conduct was prohibited by the Master Indentures and various other documents that limited the manner in which NPF VI and NPF XII could be operated. Yet, Purcell & Scott assisted the Founders in illegally transferring funds for the Founders' own personal purposes, as described above.

Defendant Ayers denies the allegations in paragraph 1166 as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at

Defendant Ayers.

**D. Frozen Receivables**

1172. Purcell & Scott knew that, pursuant to the Master Indentures and Sale and Subservicing Agreements, receivables that aged beyond 180 days could not be purchased. Purcell & Scott also knew that formerly Eligible Receivables which had aged greater than 180 days became Rejected Receivables, which triggered a draw on the Offset Reserve Account. In no event was the aging of the purchased receivables allowed to be "frozen," and in no event was the collection of any receivable to be suspended.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1172.

1173. Purcell & Scott knew at least as of 1999, however, that receivables within the NPF VI and NPF XII Programs were being "frozen."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1173.

1174. On our about March 22, 1999, Purcell & Scott representatives met with NCFE's outside accountant's representatives and discussed, among other things, the subject of "frozen accounts vis-a-vis reported aging buckets."

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1174.

1175. Purcell & Scott, in addition to various others, knew that this practice of "freezing" the ages of receivables was not disclosed to those to whom NPF VI and NPF XII was indebted through the issuance of notes.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the

allegations of paragraph 1175.

1176. Purcell & Scott knew that this conduct was not permitted under Master Indentures and other documents limiting the manner in which NPF VI and NPF XII could be operated.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1176.

1177. Despite all of the knowledge of the manner in which NPF VI and NPF XII were being operated, notwithstanding its fiduciary obligations of loyalty and honesty to NPF VI and NPF XII, despite its obligation to render competent and unconflicted legal advice to NPF VI and NPF XII, and notwithstanding its knowledge that its legal services had been and were being used to perpetrate the fraud described above, Purcell & Scott: (i) failed to act as reasonable lawyers would act under the same or similar circumstances by rendering legal advice that perpetuated violations of the documents governing NCFE's operations and other violations of law, as stated herein; (ii) failed to render proper legal advice to NPF VI and NPF XII, including the failure to advise them to disclose the conduct described above of which Purcell & Scott had knowledge; (iii) failed to advise the proper representatives within NPF VI and NPF XII, including those companies' independent directors and Noteholders, of the illegal conduct about which it had knowledge; (iv) failed to advise NPF VI and NPF XII that Purcell & Scott was rendering conflicted advice that would not further NPF VI or NPF XII's best interests but, rather, the interests of NCFE's Founders and their own personal companies; (v) failed to withdraw from its representation of NPF VI and NPF XII which was, under the circumstances presented, required by the law governing Purcell & Scott's representation; and (vi) materially participating in breaches of fiduciary duty by authoring or assisting in the authorship of documents materially

misstating the true condition of the pertinent securitization vehicles and participating in transactions that illegally took NPF VI and NPF XII funds and improperly transferred them to others, including the Founders and the Founders' personal companies.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1177.

1178. NPF VI and NPF XII relied upon the advice of Purcell & Scott to their detriment by, among other things, hiring Purcell & Scott to render legal advice, continuing to hire Purcell & Scott to render such advice over a period of numerous years, and declining to employ other competent and unconflicted counsel.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1178.

1179. Purcell & Scott's conduct has damaged NPF VI and NPF XII by deepening the insolvency of NPF VI and NPF XII as described above and causing those companies to pay legal fees for services that breached the legal standard of care, which should be disgorged.

Defendant Ayers denies knowledge or information sufficient to form a belief as to the allegations of paragraph 1179.

**COUNT XLIX**
**NEGLIGENCE/PROFESSIONAL**
**MALPRACTICE *Against Purcell & Scott***

No answer is required to the extent the allegations in Count XLIX, including paragraphs 1180 through 1185, because Count XLIX is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count XLIX, including paragraphs 1180 through 1185 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to

form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT L**
**BREACH OF FIDUCIARY DUTY *Against Purcell & Scott***

No answer is required to the extent the allegations in Count L, including paragraphs 1186 through 1191, because Count L is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count L, including paragraphs 1186 through 1191 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

**COUNT LI**
**AIDING & ABETTING BREACH OF FIDUCIARY DUTY *Against Purcell & Scott***

No answer is required to the extent the allegations in Count LI, including paragraphs 1192 through 1198, because Count LI is not directed against Defendant Ayers. Further an answer is not required to the extent the allegations in Count LI, including paragraphs 1192 through 1198 state conclusions of law. To the extent an answer is required, Defendant Ayers denies the allegations as to Defendant Ayers and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers, and incorporates herein its answers to the other paragraphs of the Complaint.

## XII. PRAYER FOR RELIEF

1199. Plaintiff respectfully requests that the Court enter judgment in its favor, and against Defendants, as follows:

(a) awarding the Plaintiff compensatory damages on all claims;

(b) awarding the Plaintiff punitive damages and treble damages;

(c) awarding Plaintiff treble damages and attorneys' fees on all counts asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.;

(d) awarding Plaintiff the costs of bringing this action, including reasonable attorneys' fees; and

(e) grating such other and further relief as the Court deems just and proper.

Defendant Ayers denies the allegations contained in the UAT's Prayer for Relief in paragraph 1199 as to Defendant Ayers and denies that the UAT is entitled to a judgment in its favor against Defendant Ayers or to any relief or damages whatsoever as against Defendant Ayers, and denies knowledge or information sufficient to form a belief as to allegations not directed at Defendant Ayers.

**GENERAL DENIAL**

Pursuant to the Federal Rules of Civil Procedure 8(b), any averment in the Complaint as to which Defendant Ayers denies knowledge or information sufficient to form a belief as its truth shall have the effect of a denial. Defendant Ayers hereby denies any averment in the Complaint that he does not specifically admit.

**AFFIRMATIVE AND OTHER DEFENSES**

As and for their defenses, and without, as to any defense, assuming the burden of proof or persuasion as to any element of the UAT's claims, Defendant Ayers states as follows with respect to all conduct complained of:

**FIRST DEFENSE**

The Complaint fails to state any claims against Defendant Ayers upon which relief may be granted.

**SECOND DEFENSE**

The Complaint fails to plead its claims against Defendant Ayers with the requisite particularity.

**THIRD DEFENSE**

The UAT lacks standing to assert these claims against Defendant Ayers.

**FOURTH DEFENSE**

The claims asserted against Defendant Ayers are barred, in whole or in part, under the applicable statutes of limitations.

**FIFTH DEFENSE**

The Complaint must be dismissed for failure to join necessary and indispensable parties.

**SIXTH DEFENSE**

At all times, and with respect to all matters contained herein, Defendant Ayers acted in good faith, exercised reasonable care and due diligence, and did not know, and in the exercise of reasonable care and due diligence could not have known of the purported untruths, misstatements and/or omissions alleged in the Complaint.

**SEVENTH DEFENSE**

Defendant Ayers did not make any misstatements or omissions of material fact.

**EIGHTH DEFENSE**

The UAT's claims are barred, in whole or in part, under the doctrine of laches, estoppel, waiver, ratification, unclean hands, and *in pari delicto*.

**NINTH DEFENSE**

Any recovery is barred, or must be reduced, as a result of the UAT's failure to mitigate any alleged damages.

**TENTH DEFENSE**

Defendant Ayers is entitled to contribution from others for any liability that may be incurred by Defendant Ayers, and to any apportionment of liability (for purposes of contribution and/or liability) as between Defendant Ayers and any other persons whose contributory negligence or culpable conduct caused or contributed to any damages or injury that the UAT may have sustained including, without limitation, the UAT, all other parties to this action, and all settling defendants who have been or may be dismissed from this action.

**ELEVENTH DEFENSE**

The claims asserted against Defendant Ayers are based on alleged misrepresentations and omissions not attributable to Defendant Ayers.

**TWELFTH DEFENSE**

The UAT's claims for damages are barred, in whole or in part, because the losses or damages, if any, are speculative, uncertain, or otherwise not cognizable.

**THIRTEENTH DEFENSE**

The UAT's claims are barred, in whole or in part, because the UAT has incurred no damages as a result of Defendant Ayers' alleged conduct.

**FOURTEENTH DEFENSE**

The UAT did not reasonably or justifiably rely upon any alleged statement or omission by Defendant Ayers.

**FIFTEENTH DEFENSE**

The UAT does not adequately allege actual, direct or individual reliance upon alleged statements or omissions by Defendant Ayers.

**SIXTEENTH DEFENSE**

Any recovery is barred, or must be reduced, because of superseding or intervening acts not attributable to Defendant Ayers.

**SEVENTEENTH DEFENSE**

Defendant Ayers is not liable because the UAT knew or had reason to know the truth of the alleged misrepresentations or omissions on which its claims are based.

**EIGHTEENTH DEFENSE**

The alleged losses of the UAT were not proximately caused or caused in fact by any act, statement, omission or conduct of Defendant Ayers.

**NINETEENTH DEFENSE**

The UAT's alleged injury or damages resulted from the acts or omissions of others and not from any alleged acts or omissions of Defendant Ayers.

**TWENTIETH DEFENSE**

Defendant Ayers did not have or breach a fiduciary duty or other special relationship with the UAT.

**TWENTY-FIRST DEFENSE**

Defendant Ayers did not owe or breach a legal duty to the UAT.

**TWENTY-SECOND DEFENSE**

Defendant Ayers is not liable because any alleged misrepresentations or omissions by Defendant Ayers were based on good faith, and in reasonable reliance upon the work, opinions,

information, representations and advice of others upon whom Defendant Ayers was entitled to rely, including legal counsel, auditors, accountants, and consultants.

**TWENTY-THIRD DEFENSE**

Defendant Ayers did not act with scienter.

**TWENTY-FOURTH DEFENSE**

Defendant Ayers had no knowledge of, nor any reasonable ground to believe in, the existence of any facts relating to any fraud as, or similar to, that alleged in the Complaint.

**TWENTY-FIFTH DEFENSE**

The UAT's claims are barred by the doctrine of accord and satisfaction.

**TWENTY-SIXTH DEFENSE**

The Complaint fails to state a claim against Defendant Ayers for exemplary damages.

**TWENTY-SEVENTH DEFENSE**

The UAT's claims against Defendant Ayers are not sanctioned by the provisions, intent, legislative history or purpose of the statutes cited in the Complaint.

**TWENTY-EIGHTH DEFENSE**

The claims asserted by the UAT in Counts I-VIII, X-XI, and XIII-XV fail because Defendant Ayers did not partake in actions taken in contravention of the Master Indenture governing the NPF VI and NPF XII Programs.

**TWENTY-NINTH DEFENSE**

The claims asserted by the UAT in Counts I-VIII, X-XI, and XIII-XV fail because Defendant Ayers did not have specific knowledge of the requirements contained in the Master Indenture.

**THIRTEETH DEFENSE**

The claims asserted by the UAT in Counts I-VIII, X-XI, and XIII-XV fail because Defendant Ayers did not have knowledge of, authorized and/or participated in various transactions with parties affiliated with NCFE, NPF VI and NPF XII that were prohibited by the Master Indentures.

**THIRTY-FIRST DEFENSE**

The claims asserted by the UAT in Counts I-VIII, X-XI, and XIII-XV fail because Defendant Ayers did not direct the Servicer to make illegal transfers from NPF VI and NPF XII to companies which Defendant Ayers owned.

**THIRTY-SECOND DEFENSE**

The claims asserted by the UAT in Counts I-VIII, X-XI, and XIII-XV fail because Defendant Ayers did not direct the Servicer to 'purchase' hundreds of millions of dollars in accounts receivable that were in contravention of the Master Indentures.

**THIRTY-THIRD DEFENSE**

The claims asserted by the UAT in Counts I-VIII, X-XI, and XIII-XV fail because Defendant Ayers did not direct the Servicer to engage in the practice of purchasing future receivables.

**THIRTY-FOURTH DEFENSE**

The claims asserted by the UAT in Counts I-VIII, X-XI, and XIII-XV fail because Defendant Ayers did not direct the servicer to engage in the practice of pro forma funding.

**THIRTY-FIFTH DEFENSE**

The claims asserted by the UAT in Counts I-VIII, X-XI, and XIII-XV fail because Defendant Ayers did not participate in any alleged kitting scheme set forth in the Complaint

where purportedly large sums of money were illegally transferred back and forth between NPF VI and NPF XII.

**THIRTY-SIXTH DEFENSE**

The claims asserted by the UAT in Counts XVI-XXIII fail because the Complaint fails to establish that the alleged March 1999 transfer to IIA in the amount of $750,000 was a fraudulent transfer for the benefit for Defendant Ayers and in contravention of NCFE's Governing Documents.

**THIRTY-SEVENTH DEFENSE**

The claims asserted by the UAT in Counts XVI-XXIII fail because the Complaint fails to establish that the alleged April 8, 1999 NPF VI transfer of $2,800,000 to NPF X and the alleged April 8, 1999 NPF X transfer of $2,750,000 to Nations Healthcare was a fraudulent transfer for the benefit for Defendant Ayers and in contravention of NCFE's Governing Documents.

**THIRTY-EIGHTH DEFENSE**

The claims asserted by the UAT in Counts XVI-XXIII fail because the Complaint fails to establish that the alleged July 14, 1999 NPF VI transfer of $1,000,000 to NPX X and the NPF X transfer of $1,000,000 to IIA was a fraudulent transfer for the benefit for Defendant Ayers and in contravention of NCFE's Governing Documents.

**THIRTY-NINETH DEFENSE**

The claims asserted by the UAT in Counts XVI-XXIII fail because the Complaint fails to establish that the alleged the February 22, 2000 and February 28, 2000 NPX X transfer of $1,240,000 to IIA was a fraudulent transfer for the benefit of Defendant Ayers and in contravention of NCFE's Governing Documents.

**FOURTHIETH DEFENSE**

The claims asserted by the UAT in Counts XVI-XXIII fail because the Complaint fails to establish that the alleged series of transactions beginning March 1999 and ending March 2001 were fraudulent transfers for the benefit of Defendant Ayers and in contravention of NCFE's Governing Documents.

**FORTY-FIRST DEFENSE**

The claims asserted by the UAT in Counts XXIV fail because Defendant Ayers did not receive bribes from Credit Suisse, did not purchase related party receivables in violation of NCFE's Governing Documents; did not make unsecured advances to related parties in violation of NCFE's Governing Documents; and did not engage in unlawful transactions between NCFE.

**FORTY-SECOND DEFENSE**

The UAT's claims are barred, in whole or in part, by the UAT's failure to join a necessary party.

**FORTY-THIRD DEFENSE**

The UAT's claims are barred, in whole or in part, by the UAT contributing to the alleged loss and damages.

**FORTY-FOURTH DEFENSE**

The UAT's claims are barred, in whole or in part, because the UAT had specific knowledge of the allegations set forth in the Complaint as it pertained to Chase and Bank One negligent administration of NCFE's trust accounts, as evidence by the Order filed by the Securities and Exchange Commission, *In the Matter of JPMORGAN CHASE & CO.*, Administrative Proceeding File No. 3-13000.

**FORTY-FIFTH DEFENSE**

The UAT's claims are barred, in whole or in part, because the UAT failed to fulfill its duty to fully review the entire Master Indentures, Sales and Subservicing Agreements and Private Placement Memorandums.

**FORTY-SIXTH DEFENSE**

The UAT's claims are barred by the applicable statute of limitations.

**FORTY-SEVENTH DEFENSE**

The UAT's claims are duplicative of, and/or are based on the same conduct alleged in, other claims and proceedings brought against Defendant Ayers and/or related entities. The UAT, and the beneficiaries, claims and interests represented by the UAT, may not receive more than a single satisfaction or recovery against Defendant Ayers; nor may Defendant Ayers be held liable for duplicative recoveries or be required to provide more than a single satisfaction or recovery premised upon the same conduct; nor may any conduct giving rise to any equitable relief, including without limitation disallowance, disgorgement or equitable subordination in any other proceedings, serve as the basis for any monetary damages or similar relief.

**FORTY-EIGTH DEFENSE**

Defendant Ayers hereby adopts and incorporates by reference any and all other defenses asserted or to be asserted by any other defendant to the extent Defendant Ayers may share in such defense.

**FORTY-NINETH DEFENSE**

Defendant Ayers expressly reserves the right to assert additional defenses as this litigation progresses.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendant Ayers respectfully prays for judgment against the UAT and in favor of Defendant Ayers and entry of an Order:

1. Denying the UAT's demand for judgment against Defendant Ayers, denying each and every prayer and/or request for relief contained in the Complaint as against Defendant Ayers and dismissing the Complaint in its entirety with prejudice as against Defendant Ayers;
2. Awarding costs and attorneys' fees to Defendant Ayers; and
3. Granting such other and further relief in favor of and to Defendant Ayers as the Court may deem just and proper.

Respectfully submitted,

**THE DICKERSON LAW GROUP, P.A.**

/s/ Brian E. Dickerson
Brian E. Dickerson (0069227)
Sharlene I. Chance (0070999)
5003 Horizons Drive, Suite 101
Columbus, OH 43220
Telephone No.: (614) 339-5370
Facsimile No.: (614) 442-5942
*Counsel for Defendant Ayers*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a true copy of the foregoing Answer and Affirmative Defenses of Defendant Donald H. Ayers to the UAT's Third Amended Complaint was served via the Court's CM/ECF filing system this 26th day of June, 2009.

Respectfully submitted,

/s/ Brian E. Dickerson
Brian E. Dickerson (0069227)
*Counsel for Defendant Ayers*