**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| In re National Century Financial Enterprises, Inc., Investment Litigation. | : | Case No. 2:03-md-1565 |
| | : | Judge Graham |

| | | |
|---|---|---|
| The Unencumbered Assets, Trust, et al., | : | |
| | | Case No. 2:04-cv-1090 |
| Plaintiffs, | : | |
| | | Judge Graham |
| v. | : | |
| JP Morgan Chase Bank, et al., | : | |
| Defendants. | : | |

OPINION AND ORDER ON CREDIT SUISSE'S MOTION FOR SUMMARY JUDGMENT
IN THE UNENCUMBERED ASSETS TRUST CASE

This matter is before the court on defendant Credit Suisse's motion for summary judgment on the claims brought by the Unencumbered Assets Trust ("UAT"). The UAT was created in bankruptcy court to pursue legal causes of action belonging to debtor National Century Financial Enterprises, Inc. and its subsidiaries. In this action, the UAT brings various claims against Credit Suisse for its alleged role in assisting National Century's principals (the "Founders") in looting funds from two National Century subsidiaries, NPF VI and NPF XII.

Credit Suisse argues that it is entitled to summary judgment under the equitable defense of *in pari delicto*, whereby a plaintiff cannot recover for injuries caused by his own wrongdoing. Credit Suisse contends that the UAT, standing in the shoes of the debtors, may not recover for the debtors' injuries because the Founders controlled the debtors and caused their injuries. The UAT responds that the Founders' wrongdoing should not be imputed to the debtors and that equitable considerations – namely, Credit Suisse's alleged knowing participation in the wrongdoing – should cause this court to refrain from applying *in pari delicto*.

Also at issue are the UAT's claims under the Bankruptcy Code to avoid and recover a $100

million payment made by NPF XII to Credit Suisse about 5 months before the debtors went bankrupt. Credit Suisse argues that the transfer is protected from avoidance because, among other things, it was payment on a secured loan.

For the reasons set forth below, the court grants the motion for summary as to the UAT's civil claims because they are barred by the *in pari delicto* defense. The court also grants the motion as to the bankruptcy claims because a transfer to a creditor on a fully secured debt is not avoidable either as a preferential transfer or a fraudulent transfer.

## I.     BACKGROUND

The parties to the National Century multidistrict litigation have conducted exhaustive discovery. The facts material to the *in pari delicto* inquiry are not genuinely disputed, unless noted.

### A.     National Century

The Founders – Lance Poulsen, Donald Ayers, and Rebecca Parrett – formed National Century as an Ohio corporation in 1990. At all times, the Founders owned a controlling stake in National Century and occupied the positions of executive authority.[1] Poulsen served as president, chairman, and director. Ayers was vice chairman, chief operating officer, and director. Parrett served as vice chairman and director, as well as secretary and treasurer. Lance Poulsen's wife, Barbara Poulsen, served as secretary, treasurer, and director. The Founders owned 100% of National Century until July 1998, when the Beacon Group III - Focus Value Fund, L.P. purchased a 19% equity position in the company. This purchase gave the Focus Value Fund the right to appoint two outside directors to National Century's six-member board.

---

[1] There are many evidentiary sources, including corporate filings and documents, showing the various corporate positions that the Founders occupied. Officer's certificates for National Century and its subsidiaries can be found at Credit Suisse's Mot. for Sum. J. (hereinafter "CS Ex. __"), Exs. 103, 128, 219, 220. Other good reference points can be found CS Ex. 203 at NCFE-0271-1126 (National Century's management as of March 31, 1999), and the UAT's Mem. in Opp'n to Credit Suisse's Mot. for Summ. J. (hereinafter "UAT Ex. __"), Ex. 232 at CSFB-2004 0035002 (table showing all current and former officers and directors of National Century and its subsidiaries as of May 18, 2000).

National Century's business was to purchase accounts receivable at a discount from healthcare providers. Several corporate subsidiaries were established to carry out this task. NPF VI, Inc. and NPF XII, Inc. were wholly-owned subsidiaries formed in Ohio in 1995 and 1999 respectively. They functioned as special purpose corporations through which National Century purchased accounts receivable and raised capital by issuing investment-grade notes. See UAT Ex. Exs. 468 and 469, Articles of Incorporation at §3. National Premier Financial Services, Inc. was also a wholly-owned subsidiary formed in Ohio, and it performed the role of "Servicer." It made purchasing decisions on behalf of NPF VI and NPF XII, monitored and collected payments on purchased receivables, kept records, and maintained reserve accounts for NPF VI and NPF XII. See CS Exs. 5 and 6, Master Indenture Agreements at §5.04(b).

As they did with National Century, the Founders occupied the officer and director positions of NPF VI, NPF XII, and the Servicer. Poulsen was the president, treasurer, and director of NPF VI and NPF XII, while Ayers and Parrett filled the positions of chairman, vice president, secretary and director. See CS Ex. 2 at CSFB-2004 0028595; CS Ex. 3 at CSFB-2004 0057932; CS Ex. 103; CS Ex. 128. Poulsen served as president, treasurer, and sole director of the Servicer, while Ayers, Parrett, and Barbara Poulsen served as vice presidents. See CS Exs. 219, 220. Though NPF VI and NPF XII technically had an independent director, the individual who filled that position testified that he was a close friend of Donald Ayers, had no knowledge about NPF VI or NPF XII, and signed documents given to him by Ayers and Parrett without asking questions. See CS Reply Ex. 59, April 3, 2008 Dep. of Vincent Margello at 30, 42, 50-52, 58.[2]

It is undisputed that the Founders used their authority at National Century to commit a multi-billion dollar fraud. The mechanics of the fraud have been thoroughly detailed in orders of this court

_____

[2] The Margello deposition is attached as an exhibit to Credit Suisse's reply brief in support of its motion for summary judgment. The UAT has filed a motion to strike all of the exhibits attached to the reply brief on the grounds that these exhibits should have been filed with the original motion for summary judgment. Margello's testimony, however, did not break any new ground. There is overwhelming evidence that the Founders controlled and dominated NPF VI and NPF XII. Even though the UAT initially alleged in its complaint that Margello could have brought an end to the fraud (had he known of it), the UAT has abandoned that position.

(in the multidistrict litigation, in the criminal proceedings against National Century's executives, in civil enforcement actions brought by the Securities and Exchange Commission, and in numerous bankruptcy matters appealed to this court), as well as in orders of the Sixth Circuit in the appeals of the criminal convictions, and in orders of the bankruptcy court overseeing the Chapter 11 liquidation of National Century and its subsidiaries.  See, e.g., U.S. v. Faulkenberry, 614 F.3d 573, 577-79 (6th Cir. 2010); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., 617 F.Supp.2d 700, 705-07 (S.D. Ohio 2009); U.S. v. Poulsen, 568 F.Supp.2d 885, 890-912 (S.D. Ohio 2008); In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig., No. 2:03-md-1565, 2006 WL469468 at **1-6 (S.D. Ohio Feb. 27, 2006); In re Nat'l Century Fin. Enterprises, Inc., 341 B.R. 198, 209-10 (Bankr. S.D. Ohio 2006).

Briefly stated, National Century used NPF VI and NPF XII to issue investment-grade notes, representing them to be secured by healthcare receivables National Century obtained in the regular course of its business.  The Master Indentures governing the NPF note programs required NPF VI and NPF XII to purchase "eligible" receivables, those that satisfied certain criteria designed to ensure that the receivables were of high quality.  See CS Exs. 5 and 6, Master Indentures at §5.04 and at Ex. 2 (Sale and Subservicing Agreement at §4.2).

In reality a great deal of the accounts receivable that NPF VI and NPF XII "purchased" were worthless or non-existent.  Many of the advances of funds went to healthcare companies in which the Founders held undisclosed ownership interests.  What appeared on paper to be legitimate transactions in fact amounted to little more than transfers of corporate funds into companies in which the Founders had financial interests.  In testimony given in the criminal proceedings against the Founders, a government witness provided a four-year snapshot of the fraud at National Century.  He found that National Century had made $1.3 billion in unsecured advances in that time window to eight healthcare providers, seven of which the Founders held an ownership stake.  See Poulsen, 568 F.Supp.2d at 900. By the time National Century went bankrupt in November 2002, investors suffered losses of well over $2 billion.

The Sixth Circuit summarized the fraud as follows:

The record before us makes unmistakably clear that NCFE's representations were false. NCFE executives lied to investors in sales presentations; they lied to them in the

4

> governing documents for bond sales; and they lied to them in monthly investor reports that showed NCFE in full compliance with the obligations recited above. This practice of deception was continuous from approximately 1995 to October 2002, when NCFE ceased operations.
>
> The deception centered on the practice of "advancing." Contrary to what it told investors, NCFE routinely advanced funds to healthcare providers without obtaining any receivables, much less eligible ones, in return. NCFE apparently just fronted these monies – investor monies – with the hope that someday the provider would pay them back. Indeed, some providers were already so buried in debt that even the hope must have been absent. Moreover, the advances were large and focused on only a handful of providers, which meant that NCFE blew past its concentration limits as well.

Faulkenberry, 614 F.3d at 578.

Following a jury trial, Lance Poulsen was found guilty of multiple counts of securities fraud, wire fraud, and conspiracy to commit securities and wire fraud. See U.S. v. Poulsen, 2:06-cr-129 (S.D. Ohio) at doc. 857. He was sentenced to 30 years in prison. Id. at doc. 1009. Parrett was found guilty by a jury of multiple counts of securities fraud, wire fraud, and conspiracy to commit securities and wire fraud. Id. at doc. 531. Parrett, who fled the country after her conviction, received a sentence of 25 years in prison. Id. at doc. 982. Ayers was found guilty by a jury of multiple counts of securities fraud and conspiracy to commit securities and wire fraud. Id. at doc. 531. Ayers was sentenced to 15 years in prison. Id. at doc. 1100.

National Century had a handful of other executive management positions not filled by the Founders: chief financial officer, vice president of securitization, and vice president of administration. The individuals who served in those roles have either pleaded guilty to fraud-related criminal charges or have been found guilty by a jury of such charges. See U.S. v. Gibson, 2:03-cr-119 (S.D. Ohio), U.S. v. Snoble, 2:04-cr-193 (S.D. Ohio), U.S. v. Faulkenberry, 2:06-cr-129-4 (S.D. Ohio), U.S. v. Speer, 2:06-cr-129-5 (S.D. Ohio).

**B.      Credit Suisse**

Credit Suisse marketed and sold NPF notes, and its relationship with National Century and the subsidiaries was defined by written agreements. In late 1995, Credit Suisse agreed to be National Century's "agent and financial advisor in connection with the marketing" of certain note offerings by

NPF VI.  See UAT Ex. 245 at §1.  The agreement called on Credit Suisse to "structure, market and place the [note] Offerings."  Id.  Shortly thereafter, in early 1996, Credit Suisse entered into a Placement Agency Agreement with National Century, NPF VI, and the Servicer.  See CS Ex. 55.  The agreement appointed Credit Suisse as NPF VI's placement agent for a $50 million offering of Series 1995-2 notes, and it required Credit Suisse to use its "best efforts" to privately place the notes with qualified institutional buyers.  Id. at §2.  NPF VI promised to supply Credit Suisse with offering materials to distribute to potential investors and to pay Credit Suisse a placement fee of 1% of the principal amount of notes sold.  Id. at §3.

From 1996 to 2002, Credit Suisse entered into a series of agreements with National Century, NPF VI or NPF VII, and the Servicer.  For note issuances in 1996, 1998, June 1999, and March 2000, the parties entered into Placement Agency Agreements, as described above.  See CS Exs. 43, 44, 47, 48, 55.  For issuances in March 1999, October and December 2000, and all of 2001 and 2002, Credit Suisse entered into Purchase and Agency Agreements with National Century, NPF VI or NPF XII, and the Servicer.  See CS Exs. 14, 45, 46, 49-54.  These agreements defined Credit Suisse as an "initial purchaser" who would purchase the notes from the issuer at a slight discount, and would then work with a placement agent (Banc One Capital Markets, for example) to place the notes with qualified institutional buyers.

Credit Suisse was not the only financial institution who underwrote NPF notes, but it became the primary one beginning in 2000.  See UAT Ex. 73 (chart listing of all NPF asset-backed securities issuances); UAT Ex. 199 (Aug. 30, 2000 agreement in which National Century appointed Credit Suisse as "sole lead-manage" for future note issuances until Credit Suisse received $15 million in fees).  Credit Suisse placed nearly $2.8 billion in NPF VI and NPF XII notes from 1996 to 2002.  See UAT Ex. 73.  Five of the note issuances placed by Credit Suisse, with a value of $820 million, were paid in full to investors at maturity.  Id.  The remaining $2 billion of notes placed by Credit Suisse were not paid.  Id.

In allegations that are strongly disputed, the UAT alleges that Credit Suisse enjoyed such a lucrative relationship with National Century that it willingly disregarded knowledge it obtained about the fraud.  The evidence concerning Credit Suisse's knowledge is carefully documented in Appendix A

to the UAT's memorandum in opposition to the motion for summary judgment.[3] The UAT has

presented evidence in support of its position that Credit Suisse knew or should have known of the

following:

> (1) the Servicer paid funds out of NPF VI and NPF XII accounts to healthcare providers without receiving eligible receivables in return;
> (2) NPF VI and NPF XII reserve accounts were not maintained at levels required by the Master Indentures;
> (3) reserve funds were impermissibly advanced to healthcare providers;
> (4) shortfalls in the reserve accounts were concealed by shifting funds between NPF VI and NPF XII to give temporary cash infusions on the dates the accounts were tested for meeting their required minimum balances;
> (5) transfers were made from NPF VI and NPF XII to related parties (those in which the Founders held an ownership interest); and
> (6) the reported rate of defaulted receivables was manipulated by removing certain receivables before they defaulted.

The UAT further alleges that Credit Suisse helped keep the fraud concealed at several key points in time

by: opposing a forensic audit when a May 2000 industry publication reported anonymous allegations

that National Century had improperly advanced funds; deflecting concerns that rating agency Fitch had

in June 2001 about reserve shortages; and making short term loans in August 2000 and September 2002

to help National Century avoid liquidity crises.

### C. Procedural History

The complaint asserts numerous claims against Credit Suisse.[4] It asserts a claim under the Ohio

Corrupt Activities Act, Ohio Rev. Code §§2923.32(A)(1), 2923.34(B), alleging that the Founders and

Credit Suisse formed an organization known as the "NPF Note Issuance Enterprise." This enterprise

allegedly subverted the otherwise lawful operation of NPF VI and NPF XII by causing them to issue

---

[3] Credit Suisse has offered in rebuttal its own thorough examination of the facts and why Credit Suisse believes they do not support a finding that it knew or should have known of National Century's fraud. See CS Reply Statement of Facts (filed on main MDL docket at doc. 1657).

[4] There are two Credit Suisse defendants in this action. The UAT's non-bankruptcy claims are against Credit Suisse Securities (USA) LLC, an investment bank and broker-dealer that is a subsidiary of the Swiss bank Credit Suisse Group AG. The UAT's bankruptcy claims are against Credit Suisse, New York Branch, which is a branch of the Swiss bank. For ease of reference, the court refers to both defendants as Credit Suisse.

billions of dollars of worthless notes, misappropriating their assets, and forcing them into insolvency. Third Am. Compl., ¶847.  The complaint describes Credit Suisse's role in the enterprise as having "near-exclusive control over the content of the offering documents used to issue notes on behalf of NPF VI and NPF XII" and as "falsely creat[ing] a market" for the notes.  Id., ¶848.  Credit Suisse also allegedly acted "as the primary liaison for the purpose of deceiving the Rating Agencies concerning the health and solvency of NPF VI and NPF XII."  Id.

The complaint also asserts claims for breach of agency, breach of fiduciary duty, fraud, negligent misrepresentation, and deepening insolvency.  These claims largely rest on the alleged existence of a fiduciary duty owed by Credit Suisse to NPF VI and NPF XII.  The UAT alleges that Credit Suisse, as "placement agent and financial adviser for, and fiduciary to, NPF VI and NPF XII," owed "duties of care, fidelity, candor and good faith."  Third Am. Compl., ¶869.  Credit Suisse allegedly breached those duties because it failed to take any action to protect NPF VI and NPF XII, even though it knew of the Founders' wrongful conduct.  According to the complaint, Credit Suisse should have disclosed what it knew of the Founder's wrongdoing to NPF VI and NPF XII and should have refused to assist in any further note issuances.

The UAT next brings claims for concert of action and civil conspiracy.  The complaint alleges that Credit Suisse is liable for concert of action because it "knowingly participat[ed] in the breaches of fiduciary duties owed to NPF VI and NPF XII" by the Founders, the Servicer, and the Trustees of the note programs (Bank One and JPMorgan).  Third Am. Compl., ¶882.  The complaint alleges that Credit Suisse is liable for conspiracy because it agreed with the Founders, the Servicer and the Trustees to misappropriate the assets of NPF VI and NPF XII.

In its claim for professional negligence, the UAT alleges that Credit Suisse owed a duty to the note programs to act with reasonable care as a professional underwriter.  The UAT alleges that Credit Suisse breached this duty by "causing NPF VI and NPF XII to issue worthless notes, on the basis of materially misleading offering documents, and by knowingly disseminating financial statements, representations and reports to the Rating Agencies that it knew were materially false and misleading."  Third Am. Compl., ¶899.

Finally, the UAT brings avoidable transfer claims under the Bankruptcy Code. The complaint alleges that on June 3, 2002, NPF XII made a $100 million payment to Credit Suisse on a debt of $220 million owed by NPF XII to Credit Suisse. The UAT alleges that NPF XII was insolvent at the time of the payment and that Credit Suisse and the Founders did not act in good faith in directing the payment. The complaint alleges that the payment is avoidable by the trustee as a preferential transfer under §547 of the Bankruptcy Code and as a fraudulent transfer under §§544 and 548. The complaint further alleges that the payment may be recovered under §550.

Credit Suisse filed a motion to dismiss the complaint, which the court denied in all respects except for the deepening insolvency claim. See March 18, 2009 Opinion and Order. The issues of standing and *in pari delicto* received close attention. The court found that the UAT has standing to assert claims arising from the embezzlement stage of the fraudulent scheme. See Knauer v. Jonathon Roberts Fin. Grp. Inc., 348 F.3d 230, 233-34 (7th Cir. 2003) (distinguishing the sales stage of a Ponzi scheme from the embezzlement stage, and finding that investors have standing to bring claims arising from the sales stage and that the looted company has standing to bring claims arising from the embezzlement stage). The court thus held that the UAT could bring its claims that Credit Suisse breached a duty by assisting the Founders or otherwise failing to prevent them from looting corporate assets.

As for the *in pari delicto* defense, the court agreed with Credit Suisse that the complaint put the Founders at the heart of the fraud, thereby at least implicating the defense. Even so, the court found that the complaint contained sufficient factual allegations to support the UAT's position that the Founders' conduct should not be imputed to the note programs and to raise equitable concerns about Credit Suisse's alleged involvement in the wrongdoing. The court found that factual discovery would help illuminate these issues.

The parties filed an agreed order in which the UAT dismissed its claim for negligent misrepresentation and certain of its claims under the Bankruptcy Code requiring proof that the debtor received less than reasonably equivalent value in exchange for the transfer. See doc. 372 in Case No. 04-cv-1090.

The matter is now before the court on Credit Suisse's motion for summary judgment. The

parties have presented oral argument and have also filed supplemental briefs, as there have been numerous recent decisions relevant to this litigation.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most

favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.    *IN PARI DELICTO*

### A.    Elements of the Defense

Credit Suisse argues that UAT's non-bankruptcy claims are defeated by the equitable defense of *in pari delicto*, which "refers to the plaintiff's participation in the same wrongdoing as the defendant." Bubis v. Blanton, 885 F.2d 317, 321 n. 1 (6th Cir. 1989) (citing Memorex Corp. v. Int'l Bus. Machines Corp., 555 F.2d 1379, 1382 (9th Cir. 1977)).  This common law defense derives from the maxim: "'In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one.'"  Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985) (quoting Black's Law Dictionary 711 (5th ed. 1979)).  Courts apply the defense to protect judicial integrity and to deter wrongdoing.  "The defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality."  Bateman Eichler, 472 U.S. at 306 (footnotes omitted); see also In re Dublin Securities, Inc., 133 F.3d 377, 380 (6th Cir. 1997) ("'No Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.'") (quoting In re Dow, 132 B.R. 853, 860 (Bankr. S.D. Ohio 1991)); In re Amcast Indus. Corp., 365 B.R. 91, 123 (Bankr. S.D. Ohio 2007) (noting that the doctrine "prevents one wrongdoer from recovering from another because each should bear the consequences of their wrongdoing without legal recourse against the other").

The *in pari delicto* defense is available only when: (1) the plaintiff bears "at least substantially equal responsibility" for the wrongs he seeks to redress, and (2) preclusion of suit would not "significantly interfere" with the purposes of the law or harm the public interest.  Bateman Eichler, 472 U.S. at 310-11; Pinter v. Dahl, 486 U.S. 622, 633 (1988).  The Court in Bateman Eichler rejected a broader standard

whereby the defense would apply "where plaintiffs simply have been involved generally in the same sort of wrongdoing as defendants." 472 U.S. at 307 (internal quotation marks omitted).  In Pinter, the Court held that to satisfy the "substantially equal responsibility" prong, the "plaintiff must be an active, voluntary participant in the unlawful activity that is the subject of the suit. . . . Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated."  Pinter, 486 U.S. at 636.  See also Dublin Securities, 133 F.3d at 380 (first prong satisfied in suit brought by bankruptcy trustee where "debtors were *at least as* culpable as the defendants") (emphasis in original).

In the bankruptcy context, "it is well established that *in pari delicto* may bar an action by a bankruptcy trustee against third parties who participated in or facilitated wrongful conduct of the debtor."  Mosier v. Callister, Nebeker & McCullough, 546 F.3d 1271, 1276 (10th Cir. 2008) (citing cases).  The Sixth Circuit likewise has held that the *in pari delicto* defense can be raised against a bankruptcy trustee to the same extent that the defense could have been raised against the debtor. Dublin Securities, 133 F.3d at 380-81.  The UAT, which stands in the shoes of the debtors, see In re Cannon, 277 F.3d 838, 852-53 (6th Cir. 2002), thus is subject to any defenses that could have been asserted against the debtors at the moment before they filed for bankruptcy.  See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 356 (3d Cir. 2001); In re Motorwerks, Inc., 371 B.R. 281, 288 (Bankr. S.D. Ohio 2007).

Credit Suisse does not argue that *in pari delicto* applies to the UAT's bankruptcy claims.  See Terlecky v. Abels, 260 B.R. 446, 453 (S.D. Ohio 2001) (explaining that avoidance claims are not subject to the *in pari delicto* defense because those claims are brought under the trustee's statutory avoiding powers, not under the trustee's status as a successor in interest to the debtor).

**B.      Substantially Equal Responsibility**

There is no genuine issue of fact concerning the Founders' culpability for the National Century fraud.  The Sixth Circuit described the evidence against those convicted of the fraud as amounting to "several pallet-loads."  Faulkenberry, 614 F.3d at 580.  The UAT's complaint names the Founders as defendants, sets forth extensive allegations of their wrongdoing, and identifies Poulsen as the "leader"

12

and "principal architect" of the fraudulent scheme to loot NPF VI and NPF XII.  See Third Am. Compl., ¶848.  Credit Suisse agrees that the Founders orchestrated the fraud.

The real question here is one of imputation – should the Founders' wrongful conduct be imputed to NPF VI and NPF XII, in whose name the UAT brings this suit.  On that question, the court looks to state law.[5]  See O'Melveny & Myers v. F.D.I.C., 512 U.S. 79, 83-84 (1994); In re NM Holdings Co., LLC, 622 F.3d 613, 620 (6th Cir. 2010).

A principal is generally liable for the knowledge received and the conduct committed by an agent within the scope of employment.  Losito v. Kruse, 136 Ohio St. 183, 187-88, 24 N.E.2d 705, 707 (Ohio 1940); Clark v. Southview Hosp. & Family Health Ctr., 68 Ohio St.3d 435, 438, 628 N.E.2d 46, 48 (Ohio 1994); Leak v. Lexington Ins. Co., 641 F.Supp.2d 671, 678 (S.D. Ohio 2009).  An exception exists if the agent acts adversely to the principal and entirely for his own, or another's, purpose.  First Nat'l Bank of New Bremen v. Burns, 88 Ohio St. 434, 438, 103 N.E. 93, 94 (Ohio 1913); Burger v. Board of Liquor Control, 135 N.E.2d 786, 787 (Ohio Ct. App. 1955); Motorwerks, 371 B.R. at 291 n. 6; see also Collins v. Pioneer Title Ins. Co., 629 F.2d 429, 436 (6th Cir. 1980) ("The principal is not ordinarily charged with the knowledge of the agent in a matter where the agent's interests are adverse to those of the principal.").  Under this exception, the independent fraud of an agent acting "'on his own account'" will not ordinarily be imputed to the principal.  Aetna Cas. and Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 541-42 (6th Cir. 2000) (quoting Am. Export & Inland Coal Corp. v. Matthew Addy Co., 112 Ohio St. 186, 198, 147 N.E. 89, 92-93 (Ohio 1925)).  This adverse interest exception is widely acknowledged.  See, e.g., Nisselson v. Lernout, 469 F.3d 143, 156 (1st Cir. 2006); Official Comm. of Unsecured

_____

[5]  Credit Suisse argues in its motion that New York law should apply to the UAT's claims because the agency agreements between the parties were governed by New York law.  See, e.g., CS Ex. 48 at §14.  The UAT counters that those contractual choice of law provisions do not extend to tort claims and that Ohio law should apply because Ohio was the location of the injuries to NPF VI and NPF XII.  See Restatement (Second) of Conflict of Laws §145.

The court agrees that Ohio has the most significant relationship to the claims and parties in this action.  See Morgan v. Biro Mfg. Co., Inc., 15 Ohio St.3d 339, 342, 474 N.E.2d 286, 289 (Ohio 1984) (adopting the Restatement's "most significant relationship" test).  Even so, applying the law of New York would yield the same result on the *in pari delicto* issue.  And because New York case law is more developed than Ohio's case law on *in pari delicto*, the court will refer to New York cases when appropriate.

Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 164-65 (2d Cir. 2003); Askanase v. Fatjo, 130 F.3d 657, 666 (5th Cir. 1997); Mosier, 546 F.3d at 1276.

At the motion to dismiss stage, the court found that the complaint contained sufficient allegations to support applying the adverse interest exception. Courts have typically found that an agent who uses his office to loot corporate assets has acted adversely to his principal. See, e.g., Baena v. KPMG LLP, 453 F.3d 1, 8 (1st Cir. 2006); Beck v. Deloitte & Touche, 144 F.3d 732, 737 (11th Cir. 1998); In re Fuzion Technologies Grp., Inc., 332 B.R. 225, 237 (Bankr. S.D. Fla. 2005). The UAT's complaint alleged at length that the Founders intentionally misappropriated corporate assets by directing unauthorized advances out of NPF VI and NPF XII accounts. This conduct harmed NPF VI and NPF XII because they received receivables of little or no value in exchange for the advances to healthcare providers. Thus, the Founders' alleged actions fit within the rationale for applying the adverse interest exception – "'it cannot be presumed that an agent will communicate to his principal acts of fraud which he has committed on his own account in transacting the business of his principal, . . . the doctrine of imputed knowledge rests upon a presumption that an agent will communicate to his principal whatever he knows concerning the business.'" Aetna, 219 F.3d at 541 (quoting Am. Export, 112 Ohio St. at 198, 147 N.E. at 92-93); see also First Nat'l Bank, 88 Ohio St. at 438-39, 103 N.E. at 94.

In its motion for summary judgment, Credit Suisse does not raise any opposition to applying the adverse interest exception. The court pauses here only to note that New York law is more defined, and perhaps more stringent, in applying the exception. In a recent decision, the Court of Appeals of New York reiterated prior holdings that an "agent must have *totally abandoned* his principal's interests and be acting *entirely* for his own or another's purposes. . . . This rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed against a corporation rather than on its behalf." Kirschner v. KPMG LLP, 938 N.E.2d 941, 952 (N.Y. 2010) (internal quotation marks omitted) (emphasis in original); see also In re Bernard Madoff Inv. Securities, LLC, 440 B.R. 243, 260 (Bankr. S.D.N.Y. 2010).

Credit Suisse instead targets the sole actor rule as its grounds for summary judgment.  Under the sole actor rule, an agent's wrongdoing is directly attributed to the principal if he "so dominated and controlled" the principal that it "had no separate mind, will, or existence of its own." Dublin Securities, 133 F.3d at 380 (applying Ohio law).  Courts have characterized the sole actor rule as an inquiry into whether "the principal and agent are one and the same," Color Tile, 322 F.3d at 165, or are "alter egos," First Nat'l Bank, 88 Ohio St. at 443-44, 103 N.E. at 95.  See also NM Holdings, 622 F.3d at 620-21 ("The sole actor rule comes into play where the wrongdoer is, in essence, the corporation.") (internal quotation marks omitted); Fine v. Sovereign Bank, 634 F.Supp.2d 126, 139 (D. Mass. 2008) ("Where a corporation's agent effectively is himself the corporation – where the actor and the corporation are alter egos – even acts that harm the corporation cannot be considered 'adverse.'").

The sole actor rule has been described as an exception to the adverse interest exception, see Motorwerks, 371 B.R. at 291 n. 6 and In re Magnesium Corp. of Am., 399 B.R. 722, 767 (Bankr. S.D.N.Y. 2009), and alternatively as a doctrine that makes the adverse interest exception inapplicable in the first instance, see NM Holdings, 622 F.3d at 621 (applying Michigan law); Color Tile, 322 F.3d at 165.  However viewed, the rule " imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal." In re Mediators, 105 F.3d 822, 827 (2d Cir. 1997).  "The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability." Lafferty, 267 F.3d at 359; accord First Nat'l Bank, 88 Ohio St. at 443-44, 103 N.E. at 95 (holding that when agent is the alter ego of the principal, "the principal's liability does not depend on the agent's duty to communicate").

The evidence demonstrates that the Founders – and Poulsen in particular – dominated and controlled NPF VI and NPF XII, using the note programs to commit a massive fraud.  The corporate structure and governance of NPF VI and NPF XII placed controlling power in the Founders' hands.  The Founders created NPF VI and NPF XII as wholly-owned subsidiaries through which National Century purchased and collected receivables, issued notes, and held assets for the benefit of investors.

Poulsen executed the Master Indentures and authorized note issuances, signing documents multiple times in his various capacities as president of each of NPF VI, NPF XII, the Servicer, and National Century.  See, e.g., CS Exs. 5, 6, 214, 218.  The Founders filled all of NPF VI's and NPF XII's management positions, except for vice president and assistant secretary positions held by Randolph Speer and Roger Faulkenberry.  See CS Ex. 3 at CSFB-2004 0057932; CS Ex. 216 at CSFB-2004 0006840.  Speer and Faulkenberry belonged to the core group of inside wrongdoers, and the UAT does not argue that their presence in management changes the in pari delicto analysis.  Speer and Faulkenberry were convicted along with the Founders for their roles in the National Century fraud and received respective sentences of 12 and 10 years in prison.  See U.S. v. Speer, 2:06-cr-129-5 (S.D. Ohio) at doc. 844; U.S. v. Faulkenberry, 2:06-cr-129-4 (S.D. Ohio) at doc. 1076.  NPF VI and NPF XII had no other employees or decision-makers besides the individuals who committed the wrongdoing.

The Master Indentures put the Servicer in charge of NPF VI's and NPF XII's daily operations.  See CS Exs. 5 and 6, Master Indentures at §5.04(b).  The Servicer too was a wholly-owned subsidiary of National Century, and the wrongdoers likewise held all of its executive offices.  See CS Exs. 217, 219, 220.  The Servicer determined which receivables to purchase on behalf of NPF VI and NPF XII, oversaw collection of purchased receivables, monitored reserve accounts, and prepared reports to investors.

The Founders used their positions of control to loot the note programs' assets.  Indeed, they began their fraud even before they created NPF VI and NPF XII.[6]  Sherry Gibson, a director of administration and vice president of compliance at National Century, testified that the practice of improper advancing began at National Century as early as 1992.  See UAT Ex. 64, May 8, 2008 Dep. of Sherry Gibson at 99-100, 224; CS Ex. 172.  This practice continued when the Founders formed NPF VI and NPF XII.  They, as well as Speer and Faulkenberry, personally directed improper advances to be made to healthcare providers.  See UAT Ex. 64, Gibson Dep. at 88-93; CS Ex. 157, July 29, 2008 Dep. of Jessica Bily at 85-86; CS Exs. 158-64 (wire instructions signed by Poulsen); accord Poulsen, 568 F.Supp.2d at 895 (identifying which individuals directed the improper advances).  The UAT's own

_____

[6]  Other NPF note programs existed before NPF VI and NPF XII came into being.

expert estimates the looting of out of NPF VI and NPF XII accounts to have totaled $2.27 billion.  See UAT Ex. 516.A, Preliminary Expert Rep. of Richard W. Hoban at 7.

The Founders exerted such dominance over the note programs that they successfully concealed their wrongdoing.  Poulsen, with the approval of Ayers and Parrett, directed that funds in reserve accounts be transferred between note programs on certain monthly determination dates in order to hide the vast shortfalls in reserves.  See UAT Ex. 64, Gibson Dep. at 137-38, 220-21.  Poulsen also ordered that investor reports be manipulated through the inclusion of false data concerning the receivables, so that the reports never gave any hint of the programs' non-compliance with the Indentures.  See id. at 114-15, 193; CS Exs. 170, 171 (documents evidencing the manipulation of data).  From the note programs' beginnings, every single investor report contained false information, and every report was signed by Poulsen.  See UAT Ex. 64, Gibson Dep. at 115, 146.

This evidence strongly supports a finding that the Founders so dominated and controlled the note programs that neither NPF VI nor NPF XII had a separate corporate existence.  The Founders formed the note programs as the means through which they carried out their fraud.  See Nisselson, 469 F.3d at 154 ("[T]he fraudulent conduct of persons or entities who exercise complete control over a corporation may be imputed to the corporation when those actors have used the corporation as a vehicle for facilitation of the fraud."); In re Advanced RISC Corp., 324 B.R. 10, 14-16 (D. Mass. 2005) (dismissing trustee's action on in pari delicto grounds because debtor corporation was formed by the defrauders for the express purpose of carrying out their fraudulent plan).  On these facts, the identities of the agent wrongdoers and of the corporate principals are the same, and the agents' knowledge and conduct must be imputed to the principals.  See First Nat'l Bank, 88 Ohio St. at 444, 103 N.E. at 95 (where an agent is the alter ego of the principal, "his acts and knowledge ipso facto become the knowledge and acts of the principal").

Application of the sole actor rule is not negated because multiple wrongdoers committed the fraud.  See Dublin Securities, 133 F.3d at 380 (applying in pari delicto where wrongdoing officers and directors, as a group, dominated and controlled the corporation); Baena, 453 F.3d at 6-7 (applying in pari delicto where company's managers used the company to commit wrongdoing).  The rule applies to a

17

corporation controlled by multiple individuals so long as all relevant decision-makers "were involved together in the fraud against the corporation." In re CBI Holding Co., Inc., 311 B.R. 350, 373 (Bankr. S.D.N.Y. 2004), *aff'd in part, rev'd on other grounds*, 529 F.3d 432 (2d Cir. 2008); Magnesium Corp., 399 B.R. at 767. The evidence here establishes that the small group of individuals who were the executives, officers, and owners of NPF VI and NPF XII all worked together to commit the fraud.

The UAT's argument against applying the sole actor rule focuses on the internal controls built into the Master Indentures governing the note programs. The Indentures put the assets of NPF VI and NPF XII into various bank accounts, including ones designated as collection, purchase, and reserve accounts. See CS Exs. 5 and 6, Master Indentures at Art. VI. The Indentures appointed Chase Manhattan Bank (later JPMorgan) and Bank One to serve as Trustees over the accounts. The Trustees had authority to declare an "event of default" if they had actual knowledge that either the Servicer or an NPF entity had materially breached the Indentures. See id. at §§5.09, 7.01, 8.01. In the case of a Servicer default that went uncured after notice, the Trustee could terminate the Servicer and appoint a replacement. See id. at §5.09. In the case of a default by an NPF entity, the Trustee could declare a "principal amortization event" that would put noteholders and rating agencies on notice of the breach and would prevent the note program from purchasing receivables. See id. at §7.02. The UAT also stresses that while the Indentures delegated day-to-day responsibilities to the Servicer, they also imposed limits on the Servicer's power. In particular, the Servicer could purchase only "eligible" receivables (i.e., those meeting certain criteria designed to lower the risk of default), and the Servicer was required to submit monthly reports to the Trustees and rating agencies. See id. at §5.04. Finally, the UAT points out that the Indentures required independent audits of National Century's annual consolidated financial statements. See id. at §4.12.

The UAT argues that the very purpose of those controls was to provide meaningful supervision over the note programs and prevent NPF agents from dominating the programs. This argument tracks language found in cases from the Southern District of New York, which has described the sole actor rule as follows: "where a principal is 'completely dominated by [the agent] and habitually [does] whatever he request[s],' such that the agent has been permitted to act without meaningful oversight or

18

control, the principal is deemed to have abdicated its control of its agents and will be held accountable for the agents' actions." In re Parmalat Securities Litig., 477 F.Supp.2d 602, 610 (S.D.N.Y. 2007) (quoting Munroe v. Harriman, 85 F.2d 493, 494 (2d Cir. 1936)). In Breeden v. Kirkpatrick & Lockhart, LLP, the court similarly stated that the rule "applies where the corporate principal and its agent are indistinguishable, such as where the agent is a corporation's sole shareholder, . . . or where the corporation bestows upon its agent unfettered control and allows the agent to operate without meaningful supervision with respect to a particular type of transaction." 268 B.R. 704, 709 (S.D.N.Y. 2001) (internal case citations omitted).

Credit Suisse discounts the Indentures' safeguards as "paper controls," but there is potential merit to the UAT's position. With special-purpose entities like the NPF note programs, the checks and balances implemented to safeguard funds could be as important as who is put into corporate management. The UAT observes that the controls were sufficiently strong to garner the highest ratings from credit rating agencies, who based their ratings in part on the "structural integrity" of the securitization programs.

The court finds, however, that the evidence demonstrates as a matter of law that the controls did not provide meaningful supervision of the agents' actions because the scope of the Founders' fraud was sufficient to vitiate the effectiveness of the controls. The UAT speaks in broad strokes about the "multiple layers of controls" and the structural integrity of the note programs, but many of those safeguards were designed to enhance the quality of the receivables purchased, not to provide supervision of NPF VI's and NPF XII's agents. See CS Exs. 5 and 6, Master Indentures at §4.13 (setting concentration limits on purchased receivables); id. at Ex. 2 (Sale and Subservicing Agreement at §4.2) (defining "eligible" receivable in terms of source, age, type). Indeed, the credit rating agencies focused almost exclusively on various aspects relating to the quality of the receivables – diversification, aging, dilution, etc. – and on the credit reserves created to offset defaulted receivables. See, e.g., UAT Ex. 553 (Moody's rating of NPF XII 2000-2 notes). These controls did not aim to stop wrongdoing by corporate agents; they were meant to protect investors in the asset-backed notes from the risk of undercollateralization.

The Indentures placed many of the remaining controls into the Servicer's hands.  The Servicer was the party assigned to keep the various accounts at required levels, determine whether receivables were eligible for purchase, and ensure that concentration limits (on the type and source of receivables) were observed.  See CS Exs. 5 and 6, Master Indentures at §5.04(b)(i),(iii),(xii).  These controls proved ineffective because the same small group of wrongdoers who ran NPF VI and NPF XII also had full control over the Servicer.

For purposes of the sole actor rule, the installation of the Trustees represents the most important component of the note programs' checks and balances.  These outside parties possessed the authority to declare an event of default if they knew of a material breach of the Indentures.  This feature served as a selling point to investors, who might have imagined the Trustees standing guard to watch over their investments.  Even so, the facts do not bear out that the Trustees exercised meaningful supervision.

The Indentures relegated the Trustees to a passive role in knowing when an event of default had occurred.  The Trustees received their information from the Servicer and relied on the Servicer to truthfully report data.  The Indentures let the Servicer perform a great deal of its own "monitoring" and "maintaining," while requiring it to do relatively little "providing" of information to the Trustees.  See CS Exs. 5 and 6, Master Indentures at §5.04(b)(i)-(xxii).  And the Servicer had the authority to remove the Trustees without cause.  See id. at §8.08(c)(ii).

The Servicer's primary point of accountability to the Trustees rested in the monthly reports it furnished to the Trustees and rating agencies.  See id. at §5.04(b)(xiii).  The reports listed the cash balances of all of the reserve accounts, as of the monthly determination dates.  Because the accounts had different determination dates, the Servicer could manipulate the reports and hide shortages by shifting funds around to satisfy a particular account's cash balance requirement on its determination date.  The Servicer possessed authority to direct the wire transfers, which the Trustees were required to execute.  See id. at §6.01(a).  Thus, the control that the UAT calls a critical early warning system was routinely circumvented by the Founders with alarming ease, so much so that not a single investor report generated for NPF VI and NPF XII was accurate.  See, e.g., UAT Ex. 64, Gibson Dep. at 225-28

20

(testifying that National Century deceived the Trustees with false investor reports in order to avoid triggering an event of default); U.S. v. Speer, Nos. 08-4215, 4564, 2011 WL 1211097 at *1 (6th Cir. Apr. 1, 2011) (noting how the actual practices of National Century's principals "varied drastically" from the supposed business model).

Other points of accountability proved equally flawed. The Indentures required the Servicer to deliver to the Trustees weekly reports regarding the receivables purchased, collateral coverages, and lock-box receipts. See CS Exs. 5 and 6, Master Indentures at §8.01(j) and at Ex. 7 (Servicer/Trustee Verification Procedures at Part III). As with the monthly reports, the Trustees had no duty to conduct due diligence or verify the truth of the underlying data; they simply had to check the Servicer's math. See id. (requiring the Trustees to recalculate the numbers). Again, the Servicer manipulated data at the Founders' behest, to the point of entering ineligible and non-existent receivables into its computer system. See UAT Ex. 64, Gibson Dep. at 58-71, 87-103, 108-09, 193, 280-81; see also Faulkenberry, 614 F.3d at 578-79 ("Per the bonds' master indentures, the Trustees could wire funds to providers only to the extent that NCFE documented that it was obtaining eligible receivables in return. But NCFE evaded this limitation by submitting a phony Receivables Purchase Report to the Trustees for every advance."). These problems with the source of the data and the lack of independent verification also plagued the purported control of the outside audits. See e.g., UAT Ex. 64, Gibson Dep. at 203 (testifying that National Century "created" data whenever a random audit took place).

The UAT insists that the controls did work. See Tr. of Nov. 16, 2009 Hearing on Summ. J. Mots. at 194. The fraud ended when Bank One declared an event of default on October 25, 2002. See CS Ex. 193. Under different facts, the UAT might have a valid point; however, the fraud carried on for at least 7 years and the note programs were looted of more than $2 billion by the time a Trustee finally stepped in. See UAT Ex. 516.A, Hoban Preliminary Expert Rep. at 7 (calculating the total looting of NPF VI and NPF XII to be $2.27 billion). That the fraud ended when it did says far more about the Founders' ability to completely dominate the note programs than it says about the event-of-default mechanism working properly.

The same can be said for the UAT's next point, which is that a control is not objectively

inadequate merely because an agent circumvents it. Again, this argument could have merit under different facts, but the manner in which the Founders circumvented and manipulated the controls underscores just how much unchecked power they had. This is not a case of an agent managing to pull off some isolated acts of wrongdoing. This was a systematic, prolonged, and massive fraud.

Finally, the UAT attempts to assign blame for the failings of the internal controls. It argues that fault rests not in the controls' design or even with the Founders so much as it rests with the Trustees, auditors, and Credit Suisse. The UAT contends that the Trustees and auditors failed in their respective duties and that Credit Suisse helped defeat the controls by twice making loans to cover shortages in the reserve accounts and by not disclosing what it allegedly knew of the wrongdoing. See UAT Exs. 145, 179 (loans of August 2000 and September 2002).

One could argue about whether the Trustees and accounting firms were innocent victims, negligent enablers, or knowing participants in the Founders' deception.[7] And Credit Suisse's level of knowledge is highly disputed in this multidistrict litigation. Regardless, the argument that the *in pari delicto* defense should not be allowed because the Trustees, auditors, and Credit Suisse failed to keep the Founders in check is not well-taken. See Color Tile, 322 F.3d at 165-66 (rejecting as "flawed" the plaintiff's argument that an underwriter was to blame for not rescuing the primary wrongdoers from their own knowing misconduct). For one, Credit Suisse was not a party to the Indentures and had no contractual duty to enforce the controls. But more to the point, the question is not whether Credit Suisse is innocent. The critical issue is whether Credit Suisse is at least equally responsible for the injuries suffered by the debtors, and plainly it is not. The Founders bear primary responsibility for the overall fraud, as well as for defeating the controls established by the Indentures. The chief means through which the controls were circumvented – the wire transfers, falsified reports, and manipulated data – all occurred at the Founders' command and careful orchestration. Moreover, there is no evidence

---

[7] The Trustees and auditors were named as defendants in the UAT's complaint and in most of the other complaints in the National Century multidistrict litigation. They settled the claims against them before the cases reached the summary judgment stage. The SEC's investigation found that the Trustees and the accounting firms were negligent. See CS Exs. 57, 76, 77.

that Credit Suisse engaged in any looting or directed the Founders to do so. Simply put, the fraud originated with the Founders. See In re Parmalat Securities Litig., 659 F.Supp.2d 504, 530-31 (S.D.N.Y. 2009) (applying *in pari delicto* even though defendant auditors and bank allegedly worked with corporate insiders to facilitate and conceal the wrongdoing), *aff'd in part, vacated in part on other grounds*, 2011 WL 135825 (2d Cir. Jan. 18, 2011).

Having established that the Founders are primarily responsible, the court is excused under the *in pari delicto* doctrine from further parsing out fault. See Bateman Eichler, 472 U.S. at 306 (stating that courts should not "mediat[e] disputes among wrongdoers"); Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 326 (1st Cir. 2008) (stating that the court would not entertain primary wrongdoer's attempt to "shift[] blame to its hired professionals"). Accordingly, the court finds as a matter of law that the Founders are primarily responsible for the fraud, that they were the note programs' sole actors, and that their wrongdoing must be imputed to NPF VI and NPF XII.

### C.    Equitable Considerations

The court must also examine whether preclusion of the suit would "significantly interfere" with the purposes of the law or harm the public interest. Bateman Eichler, 472 U.S. at 310-11; Pinter, 486 U.S. at 633. As an initial matter, allowing Credit Suisse to prevail here on the *in pari delicto* defense does not mean that it will escape liability if the allegations of its wrongdoing are true. See Bateman Eichler, 472 U.S. at 315 (examining whether allowing *in pari delicto* defense would let wrongdoing go unpunished and resulting injury go unremedied). Credit Suisse's main role was to sell notes, and in doing so Credit Suisse generated income for National Century and the note programs. If Credit Suisse truly knew of the Founders' fraud, then the real harm done by Credit Suisse was to the investors to whom it knowingly sold worthless notes. Those investors have brought civil suits against Credit Suisse in the multidistrict litigation. For the investors who have settled their claims with Credit Suisse and for those who still have claims remaining at the summary judgment stage, all have had a fair and adequate opportunity to pursue recourse. See Nisselson, 469 F.3d at 157 n.6 (noting that applying *in pari delicto* would not allow the defendants to "escape unscathed" because they faced "a myriad of other civil suits relating to their respective roles in the alleged fraud").

23

The UAT nonetheless raises two proposed equitable exceptions to the *in pari delicto* defense.  The first is a co-conspirator exception.  The UAT argues that it would be inequitable to allow Credit Suisse to be shielded by the *in pari delicto* defense when Credit Suisse knew of the relevant aspects of the Founders' wrongdoing and contributed to the fraudulent scheme's success.  Credit Suisse's contributions allegedly included attracting money to the note programs through the marketing and private placement of NPF notes.  They also allegedly included helping to conceal the fraud at four points in time by: opposing a forensic audit amid anonymous allegations that National Century had improperly advanced funds, deflecting Fitch's concerns about reserve shortages, and making two short term loans to cover reserve account shortages.  The UAT stresses that the Founders could not have committed so massive of a fraud without Credit Suisse's help.

The second proposed exception is styled as a fiduciary exception.  According to the UAT, a fiduciary duty existed between Credit Suisse and the note programs.  It traces the source of that duty to two written agreements in which Credit Suisse agreed to act as National Century's "agent and financial advisor" in connection with note offerings.  See UAT Ex. 199 at §1 (Aug. 30, 2000 agreement); UAT Ex. 245 at §1 (Dec. 11, 1995 letter agreement).  The UAT argues that it would be inequitable for Credit Suisse to find refuge in the *in pari delicto* defense when it occupied a position of trust and had a duty to act in the note programs' best interests, yet failed to disclose or stop the Founders' looting.

Both proposed exceptions reflect discussion in the court's order on Credit Suisse's motion to dismiss.  Because of allegations in the complaint that cast Credit Suisse as an potential insider to the fraud and that suggested the Founders did not control the note programs, the court was unwilling to dismiss the complaint without affording the parties an opportunity to conduct discovery.  See March 18, 2009 Opinion and Order at 19-21.  The court noted cases in which other courts had struggled with applying *in pari delicto* in favor of a hired third party professional (an auditor, typically) who allegedly colluded with an agent to commit wrongs against a principal.  See, e.g., Baker O'Neal Holdings, Inc. v. Ernst & Young LLP, No. 1:03-cv-132, 2004 WL 771230 at *8 (S.D. Ind. March 24, 2004); NCP Litig. Trust v. KPMG, LLP, 901 A.2d 871, 882 (N.J. 2006).  As the Third Circuit wrote, "Extending *in pari delicto* to a breach-of-fiduciary-duty action . . . gives us pause."  Official Comm. of Unsecured Creditors

24

of Allegheny Health, Educ. and Research Found. v. PricewaterhouseCoopers, LLP, ("Allegheny I"),
No. 07-1397, 2008 WL 3895559 at *6 (3d Cir. July 1, 2008).

The evidence now before the court establishes that the Founders dominated NPF VI and NPF
XII and that they were the ones who looted the note programs' assets.  There is no evidence that Credit
Suisse misappropriated funds.  Much of Credit Suisse's contributions to the alleged conspiracy relate
to its role as the marketer and seller of notes, but those activities benefitted NPF VI and NPF XII by
bringing cash to the note programs.  See Knauer, 348 F.3d at 234 ("As we see it, Ponzi entities
themselves are not injured by the sales of securities. . . . [T]his misuse, at the sales stage, resulted only
in the fattening of the companies' coffers.  Any claim relating to the fraudulent sales rightfully belongs
to the wronged investors . . . .") (footnote omitted); Marioni v. TDI Inc., 591 F.3d 137 (3d. Cir. 2010)
("[T]here cannot be liability to a corporation for increasing its short-term liquidity."); Parmalat, 659
F.Supp.2d at 521(raising capital is to the company's benefit, even if it "ultimately provides the money
to buy the pencil that the employee then steals").

Credit Suisse's participation in the harm against NPF VI and NPF XII, for which the UAT does
have standing, thus can be narrowed down to the four instances in which Credit Suisse allegedly helped
conceal the fraud and to Credit Suisse's alleged failure to act, assuming a duty to act or speak existed.
According to the UAT, Credit Suisse had a pecuniary interest in keeping the fraud concealed because
it earned fees by selling notes and extending the short term loans.  See, e.g., UAT Exs. 146, 199.  It also
faced exposure on any unsold notes.

In Allegheny I, the defendant auditor allegedly issued a clean opinion of the principal
corporation's finances despite knowing that certain of the corporation's agents, including its financial
officer, had misstated those finances and thereby hid substantial operating losses.  The clean opinions
allegedly gave a false impression to the board of directors that the company was in good financial
condition.  The board had no knowledge of the operating losses and the company went bankrupt.  The
Third Circuit certified to the Supreme Court of Pennsylvania the question whether the agents'
wrongdoing should be imputed to the corporation when the party seeking to invoke the *in pari delicto*
defense was a non-innocent, colluding auditor.  The Pennsylvania Supreme Court held that an agent's

misconduct is not imputed to the principal when the third party secretly acts in bad faith with the agent.[8]
Official Comm. of Unsecured Creditors of Allegheny Health, Educ. and Research Found. v.
PricewaterhouseCoopers, LLP, ("Allegheny II"), 989 A.2d 313, 339 (Pa. 2010).

    The facts of this case do not match the facts of Allegheny II or the other cases in which courts
have refused to allow the *in pari delicto* defense to a colluding auditor. What distinguishes this case is that
the principals and wrongdoing agents are one and the same. There is no innocent principal here, as the
Founders commanded NPF VI and NPF XII to carry out their unlawful purposes. In Allegheny II, the
principal corporation had a board of directors who did not participate in the fraud. See 989 A.2d at 317
(noting that the board had been deceived); see also NCP, 901 A.2d at 890 (holding that innocent
shareholders were not automatically barred by *in pari delicto* from bringing suit against auditor for secretly
colluding with two rogue agents of a publicly traded corporation). The court in Allegheny II used risk
allocation as its rationale for granting an exception, holding that secretly collusive agents and auditors
should bear the risk of liability as against innocent principals and innocent third parties who transact
business with the principal. See 989 A.2d at 335; see also Restatement (Third) of Agency §5.03 cmt. b
(2006). The court, however, prefaced its analysis by stating that in situations of "full corporate
complicity" there would be "a good case" for applying *in pari delicto* to defeat claims arising out of
intentional auditor misconduct. Allegheny II, 989 A.2d at 331. When a principal fully participates in

---

[8] The Third Circuit and Pennsylvania Supreme Court treated the collusion issue as part of
their imputation analysis. The UAT presents both of its proposed exceptions as equitable
considerations. See Gray, 544 F.3d at 326-27 (treating alleged breach of professional duty as a
public policy consideration); Baker O'Neal Holdings, 2004 WL 771230 at *9 (treating auditor's
alleged collusion as a separate consideration from imputation); In re Am. Int'l Group, Inc., Consol.
Derivative Litig., ("AIG"), 976 A.2d 872, 888-89 (Del. Ch. 2009) (treating collusion issue and
"faithless fiduciary" allegation as public policy considerations).
    There are no Ohio cases adopting either a co-conspirator exception or faithless fiduciary
exception to imputation. In Allegheny II, the court found support for its holding in comments to
the Restatement (Third) of Agency §§5.03, 5.04, which discuss the policy goal of protecting innocent
principals. See Allegheny II, 989 A.2d at 319, 338. To the extent Ohio courts generally follow the
Restatement of Agency, see State v. Lucas Cnty. Ct. of C.P., 126 Ohio St.3d 198, 201, 931 N.E.2d
1082, 1087 (Ohio 2010), one could argue that Ohio courts might also follow the comments in
finding grounds to recognize an exception. Even so, whether viewing the co-conspirator and
faithless fiduciary exceptions as part of the imputation analysis or as equitable considerations, the
court finds, for the reasons that follow, that neither exception should apply.

the wrongdoing, it has "exposed itself" to a "just, judicial determination" that it should be left in the condition in which the court finds it.  Id.

In cases of full corporate complicity, courts agree that *in pari delicto* prohibits suits by the corporate wrongdoer against its co-conspirators for injuries caused by the wrongful conduct.  The Sixth Circuit indeed has held that in a situation of corporate wrongdoing where "the officers and directors were the 'alter egos' of the debtors corporations," "the equitable principles of the doctrine of *in pari delicto* . . . prevent recovery by debtors who conspired with the defendants." Dublin Securities, 133 F.3d at 380-81.  This reasoning holds true even if the co-conspirator has knowledge of the wrongdoing.  In Baena, supra, the defendant accounting firm allegedly violated state statutory law when it knowingly permitted the client company to engage in improper accounting practices.  The First Circuit applied *in pari delicto* in the defendant's favor because the members of the company's management were the "primary wrongdoers." 453 F.3d at 7.  See also Lafferty, 267 F.3d at 360 (applying *in pari delicto* in favor of third parties who allegedly conspired with company's management to engineer Ponzi scheme because company was controlled by sole actors); Mosier, 546 F.3d at 1276-77 (same); In re Oakwood Homes Corp., 389 B.R. 357 (D. Del. 2008) (applying *in pari delicto* in favor of a hired financial adviser, who allegedly knew of corporation's misconduct, because corporation's management and directors were primarily responsible for the wrongdoing).

The court finds that equity is best served by rejecting application of the UAT's proposed co-conspirator exception.  The UAT essentially stands in the shoes once filled by the Founders.  To allow the exception on these facts would swallow the *in pari delicto* rule by protecting primary wrongdoers at the expense of an alleged co-conspirator who is plainly less at fault.  See AIG, 976 A.2d at 889 (holding that to allow a co-conspirator exception would "would eviscerate the *in pari delicto* doctrine and contravene the policy judgments upon which that doctrine rests. . . . [P]ublic policy is not served by allowing corporations to sue their own co-conspirators").

New York law is in accord.  In Kirschner v. KPMG LLP, 938 N.E.2d 941 (N.Y. 2010), the state's highest court expressly rejected the opportunity to create public policy exceptions along the lines of those adopted in Allegheny II and NCP.  Substantial responsibility for the financial wrongdoing in

that case was imputed to the corporate principal.  The plaintiff, a litigation trustee standing in the corporation's shoes, urged the court to allow a suit against collusive outside professionals to go forward under Allegheny II and NCP .  The court, however, found those holdings to be unpersuasive on the facts before it and concluded that to allow the suit to go forward would enable the principal "to enjoy the benefit of [its] misconduct without suffering the harm."  Kirschner, 938 N.E.2d at 959.

Extending a faithless fiduciary exception to the UAT is equally problematic under these facts. The policy rationale for the proposed fiduciary exception again focuses on risk allocation.  Because a rogue agent cannot be presumed to communicate material information to his principal, a third party fiduciary (who knows or should have known of the agent's wrongdoing) occupies the best position to communicate the information to the innocent principal and thereby spare greater injury to the principal and innocent third parties with whom the principal transacts.  See Allegheny II, 989 A.2d at 338 (citing Restatement (Third) of Agency §5.04 cmt. b).  But to whom in NPF VI's and NPF XII's management should Credit Suisse have disclosed the fraud or sounded the alarm?  Management was composed entirely of the individuals committing the fraud.  Liability in Allegheny II hinged on the "secretive, collusive conduct of agent and auditor," but conduct is not "secret" when the principal fully participates in the fraud.  See also Gray, 544 F.3d at 327 (rejecting proposed exception to in pari delicto defense for breach of fiduciary duty by a hired professional, where the company's management directed the wrongdoing).

The UAT advocates imposing on Credit Suisse some broader duty to have actively taken corrective measures that would have saved the note programs from the Founders' misdeeds.  See, e.g., UAT's Mem. in Opp'n at 78 (arguing that Credit Suisse had a duty to "assume effective control and responsibility over the vital aspects of the business of NPF VI and NPF XII").  This position is not supported by the parties' formal agreements.  Those agreements appointed Credit Suisse as National Century's "agent and financial advisor in connection with the marketing of the Offerings" and thus confined Credit Suisse's duties to the marketing and sale of notes.  See UAT Ex. 199 at §1 and UAT Ex. 245 at §1.  Cf. NCP, 901 A.2d at 890 (allowing exception to in pari delicto defense, but limiting it to auditor's failure to perform duties "within the scope of its engagement").

According to the UAT, support for a broader, extra-contractual duty can be found in the parties' informal dealings and course of conduct.  Yet the court's examination finds that even those informal understandings cited by the UAT related to Credit Suisse's involvement in the various marketing and sales aspects of the note programs.  See, e.g., UAT Ex. 11, June 27, 2008 Dep. of Joseph Donovan at 475-76 (testifying that Credit Suisse had some input in the offering materials provided to investors); UAT Ex. 239 at ¶2 (Credit Suisse letter noting that it had aided National Century in a variety of capacities, including as an underwriter, trader of National Century bonds, and informal adviser); UAT Ex. 488 (Credit Suisse presentation materials detailing how its experience in asset-backed financing would benefit National Century); UAT Ex. 515 at CSFB-2004-0088263 (Credit Suisse materials touting its ability to bring asset-backed securities to market and noting its ability to provide "numerous services beyond the placement of the securities, including structuring the transactions and facilitating the rating agency process").

The UAT places great emphasis on what it perceives as Credit Suisse's assumption of a duty to "structure" the note programs.  The UAT contends that if the controls of the Indentures were flawed, then Credit Suisse bears the blame because it breached its fiduciary duty to structure the controls adequately.  See Tr. of Nov. 16, 2009 Hearing on Summ. J. Mots. at 201-202.  This goes too far.  The UAT's frequent reference to the word "structure" is misplaced.  The evidentiary context demonstrates that "structure" referred to the arrangement of the note issuances and sale transactions, not to the internal controls established by the Indentures, to which Credit Suisse was not a party.  See, e.g., UAT Ex. 199 at CSFB-2004 0071986 (written agreement referring to the structuring of future note issuances); UAT Ex. 249 at CSFB-2004 0046681 (Credit Suisse materials referring to structure – i.e., pricing, timing, marketing – of note offerings); UAT Ex. 512 at CSFB-2004 0065358 (referring to structuring the sale of asset-backed securities); UAT Ex. 515 at CSFB-2004-0088263 (same).

In the final analysis, the court finds no support for imposing on Credit Suisse a catch-all duty to have saved the note programs or to have stopped the Founders from themselves.  Cf. F.D.I.C. v. Ernst & Young, 967 F.2d 166 (5th Cir. 1992) ("Western cannot claim it should recover from EY for not being rescued by a third party for something Western was already aware of and chose to ignore.");

Color Tile, 322 F.3d at 165-66 (same).  More importantly, the UAT's attempt to shift blame to Credit Suisse, this time under a fiduciary duty theory, again contradicts fundamental *in pari delicto* precepts.  The Founders dominated the note programs and used them to accomplish their fraud.  With the Founders' share of the responsibility determined and their wrongdoing imputed to NPF VI and NPF XII, the analysis of fault ends.  As the court in Parmalat found, "[T]he primary purpose of the *in pari delicto* defense is to prevent courts from getting involved in suits among co-conspirators and others who are jointly at fault.  Holding that it does not bar aiding and abetting and conspiracy claims would defeat that purpose entirely."  659 F.Supp.2d at 532 (footnote omitted) (also rejecting an exception for breach of fiduciary duty).  See also Gray, 544 F.3d at 327 ("HVE's public policy argument lacks force.  Although HVE contends that dismissing the case will effectively pardon the professionals, in seeking to proceed with this lawsuit HVE asks for a pardon of its own. . . . For the court to entertain this dispute between equally culpable wrongdoers would waste valuable resources and would itself offend the public interest."); Kirschner, 938 N.E.2d at 950 (stating that when a plaintiff is the primary wrongdoer, *in pari delicto* "should not be weakened by exceptions," even if the outside professional's actions were willful) (internal quotations marks omitted); AIG, 976 A.2d at 884, 889 (criticizing the "squishy manner" in which some courts have expanded exceptions to *in pari delicto* defense and finding that co-conspirator exception "would not be socially useful" because it "would force courts to engage in inefficient accounting inquiries between wrongdoers").

### D.  Ohio RICO Claim

The UAT argues that even if the court allows the *in pari delicto* defense to defeat its common law claims, its claim under the Ohio Corrupt Activities Act should survive.  It contends that public policy is best served if RICO statutes are always available as a tool to "cope with the infiltration of legitimate businesses."  U.S. v. Turkette, 452 U.S. 576, 591 (1981).  The UAT recognizes that neither the Sixth Circuit nor Ohio courts have spoken on this issue, but it does acknowledge that other courts have squarely rejected its argument.  See Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1152-56 (11th Cir. 2006) (holding that *in pari delicto* barred a federal RICO claim); Rogers v. McDorman, 521 F.3d 381, 387-89 (5th Cir. 2008) (adopting the holding in Edwards).

Ordinarily *in pari delicto* will operate as a defense against all causes of action, or, in this case, all causes of action for which the UAT stands in the debtors' shoes. See Nisselson, 469 F.3d at 152 (noting that *in pari delicto* is a "binary paradigm" that "ordinarily will be the same across a spectrum of different causes of action"); Parmalat, 659 F.Supp.2d at 530 ("[P]laintiffs offer no support for the proposition that the defense is not a categorical bar."). Even so, the UAT's argument should be given due attention because the Supreme Court has held that "public policy implications [must] be carefully considered before the defense is allowed." Pinter, 486 U.S. at 633 (citing Bateman Eichler, 472 U.S. at 307); see also Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 138 (1968) (declining to apply *in pari delicto* to defeat a federal antitrust claim and cautioning courts against "invoking broad common-law barriers to relief where a private suit serves important public purposes").

The Eleventh Circuit in Edwards noted that the Perma Life Mufflers holding depended on the "passive characteristics of antitrust participants." Edwards, 437 F.3d at 1156. The court distinguished this from a RICO case: "Because federal RICO violations, as a matter of law, require affirmative wrongdoing rather than passive acquiescence, Perma Life Mufflers does not preclude the defense of *in pari delicto* in the RICO context." Id. at 1155-56. The plaintiff in Edwards stood in the shoes of the primary wrongdoer who was at "the hub of the Ponzi scheme to defraud investors"; thus, allowing recovery would not have accomplished the RICO goal of "divest[ing] RICO violators of their ill-gotten gains," but would have resulted in a "wealth transfer" among the RICO conspirators. Id. at 1155. The court concluded that *in pari delicto* barred the RICO claim because the debtor "was an active participant in the Ponzi scheme and the application of the defense of *in pari delicto* further[ed] the policy of the federal RICO statute." Id. at 1156.

Courts considering the issue have followed the Edwards holding. See, e.g., Rogers, 521 F.3d at 387-89; Smithfield Foods Inc. v. United Food and Commercial Workers Int'l Union, 254 F.R.D. 274, 280 (E.D. Va. 2008); Leasure v. AA Advantage Forwarders, No. 5:03-cv-181, 2007 WL 925829 at *15 n.7 (W.D. Ky. Mar. 23, 2007). Its reasoning applies with equal force here too. As alleged in the complaint and established as a matter of law by the evidence, the Founders were the masterminds of the fraudulent scheme. Making recovery available to the UAT under the Ohio RICO statute, which

authorizes treble damages, see O.R.C. §2923.32(B)(2)(a), would reward wrongdoing and pervert the goal of the statute.  See Bergeron v. Perrilloux, No. 08-4380, 2009 WL 2447843 at *4 (E.D. La. Aug. 6, 2009) ("Plaintiffs actively participated in the wrongdoing they now ask a remedy from; plaintiffs are co-conspirators.  With regard to the policy goals of RICO, precluded use of *in pari delicto* in this case would do a disservice to the goals of RICO.").

### E. Summary

The court therefore finds as a matter of law that the UAT's common law and Ohio RICO claims are barred by the defense of *in pari delicto*.

## IV. BANKRUPTCY CLAIMS

The facts are not in dispute concerning the transfer that is the subject of the UAT's bankruptcy claims.  In December 2000, NPF XII sought financing and it entered into a note purchase agreement with Credit Suisse and a conduit purchaser known as Alpine Securitization Corporation.  See CS Ex. 138 at LL_000003, Note Purchase Agreement.  NPF XII agreed to issue a variable funding note ("VFN") that was secured by receivables and cash accounts owned by NPF XII.  See CS Ex. 138 at LL_000082, Variable Funding Note at p.3 (pledging as security the collateral described in the Master Indenture and Seventh Supplemental Indenture); CS. Ex. 6, Master Indenture at §3.01; UAT Ex. 63F, Seventh Supplemental Indenture at §6.  The VFN had a maximum principal balance of $222 million, and NPF XII sold the note to Credit Suisse, New York Branch, who acted as a managing agent on behalf of conduit purchaser Alpine.  See CS Ex. 138 at LL_000013, Note Purchase Agreement at §2.01. Credit Suisse "sponsored" Alpine, meaning that Credit Suisse functioned as Alpine's administrative agent, controlled its daily operations, and made the decision to enter into the VFN purchase agreement. See UAT Ex. 54, May 8, 2008 Dep. of Mark Lengel at 14-17, 235-36.  Credit Suisse also bore the risk of loss on the VFN because it guaranteed to provide liquidity to Alpine, and it ultimately was required to do so when NPF XII went bankrupt.  See CS Ex. 138 at LL_000108, Liquidity Asset Purchase Agreement at §2; UAT Ex. 54, Lengel Dep. at 280-81.

NPF XII made "advance requests" to borrow amounts under the VFN, and Alpine honored

those requests. See CS Exs. 141, 142. NPF XII also occasionally paid down its debt, and the balance owed in May 2002 was $220 million. See CS Ex. 142. On June 3, 2002 NPF XII made a $100 million payment to Alpine to reduce the balance on the VFN to $120 million. See id., CS Ex. 143, UAT Ex. 54, Lengel Dep. at 285-86.

The UAT alleges that the $100 million transfer is avoidable as both a preferential transfer and a fraudulent transfer. See 28 U.S.C. §§547, 548. At the same time, the UAT concedes that the transfer represented payment on a secured debt. See UAT's Mem. in Opp'n at 196 ("[T]he $100 Million Transfer was repayment of an amount owed under the VFN . . . ."); id. at 207 ("[T]he VFN was a secured loan facility . . . .") (emphasis in original). Moreover, there is no dispute that NPF XII had sufficient collateral to fully secure the loan balance. See UAT Ex. 516.A., Hoban Preliminary Expert Rep. at Ex. 1 (calculating post-petition receipts for NPF programs at $381 million).

To prevail on a preference claim, the trustee must prove that the transfer enabled the creditor to receive more than what the creditor would have received under a Chapter 7 liquidation. 28 U.S.C. §547(b)(5). The Sixth Circuit has rejected the use of §547 to recover payments on a fully secured loan: "Payments to a creditor who is fully secured are not preferential since the creditor would receive payment up to the full value of his collateral in a Chapter 7 liquidation. Payments to an unsecured or undersecured creditor, however, are preferential." In re C-L Cartage Co., Inc., 899 F.2d 1490, 1493 (6th Cir. 1990). See also In re Southern Air Transport, Inc., 511 F.3d 526, 533 (6th Cir. 2007) ("Only pre-petition transfers to fully secured creditors are protected under the Bankruptcy Code."); In re Simms Constr. Servs. Co., Inc., 311 B.R. 479, 488 (6th Cir. B.A.P. 2004) (same). This rule reflects the fact that payments made to fully secured creditors do not diminish the estate assets available to satisfy general creditors under Chapter 7. See In re Pitman, 843 F.2d 235, 241-242 (6th Cir. 1988); In re Hale, 15 B.R. 565, 567 (Bankr. S.D. Ohio 1981). As one court explained, secured creditors are "not of the same class as the unsecured creditors represented by the chapter 7 trustee. Section 547(b)(5) is premised upon the Bankruptcy Code's acknowledgment that a valid security interest survives a liquidating bankruptcy, and to the extent that a creditor is fully secured, payment to that creditor in satisfaction of the security interest is not a preferential transfer." In re Brown, 209 B.R. 874, 885 (Bankr. W.D. Tenn. 1997). See

also In re 360nettworks (USA) Inc., 327 B.R. 187, 190 (Bankr. S.D.N.Y. 2005) ("Under § 547(b)(5), a transfer to a fully secured creditor is immunized from preference attack because the creditor would have been paid in full in a hypothetical Chapter 7 liquidation by virtue of its realization on its collateral.").

The UAT's claim for fraudulent transfer fares no better. Under §548, a trustee may avoid a transfer of an interest of the debtor in property if the transfer is made with actual intent to hinder, delay, or defraud any creditors. Credit Suisse argues that a payment does not harm other creditors when it results in a dollar-for-dollar reduction in secured, antecedent debt. Sixth Circuit authority again speaks directly to the issue. In Melamed v. Lake County Nat'l Bank, 727 F.2d 1399 (6th Cir. 1984), the trustee sought to avoid as fraudulent a payment made by the debtor to a bank on a secured line of credit. The court held that the transfer could not be avoided as a fraudulent transfer because it did not hinder, delay, or defraud other creditors: "[B]ecause of the Bank's valid security interest in accounts receivable, that transfer did not diminish the assets of the debtor which were available to its creditors." 727 F.2d at 1402. In a later unpublished opinion, the Sixth Circuit affirmed the Melamed holding as to payments made on secured debt. See In re Fisher, 296 F.App'x 494, 504 (6th Cir. 2008) (noting that Melamed would have applied to defeat a §548 claim if the creditor had retained a security interest).

Other courts have followed Melamed. The Ninth Circuit, for instance, cited Melamed in holding that "'repayments of fully secured obligations – where a transfer results in a dollar for dollar reduction in the debtor's liability – do not hinder, delay, or defraud creditors because the transfers do not put assets otherwise available in a bankruptcy distribution out of their reach.'" In re First Alliance Mortg. Co., 471 F.3d 977, 1008 (9th Cir. 2006) (quoting and adopting the holding of the district court, 298 B.R. 652, 665 (C.D. Cal. 2003)). Similarly, the court in In re CyberCo Holdings, Inc., 382 B.R. 118 (Bankr. W.D. Mich. 2008) described Melamed as "recogniz[ing] intuitively" with respect to the former statutory provision on fraudulent transfers "what Section 548(a) now states explicitly: that a debtor cannot fraudulently transfer to a creditor property that has already been pledged to that creditor as collateral. Or, as the Sixth Circuit in Melamed put it, the debtor's assets cannot be diminished if the subject property is already secured." 382 B.R. at 139. See also Bear, Stearns Securities Corp. v. Gredd, 275 B.R. 190, 195 (S.D.N.Y. 2002); In re Consol. Pioneer Mortg. Entities, 211 B.R. 704, 717 (S.D. Cal.

1997).

The UAT also seeks to recover the $100 million transfer under §544(b) as fraudulent under state law. This claim fails too because Ohio law excludes security interests from the scope of transfers that may be avoided. Ohio has adopted the Uniform Fraudulent Transfer Act, which defines a "transfer" as every method of disposing of "an asset or an interest in an asset." O.R.C. §1336.01(L). The definition of an "asset" specifically excludes property "encumbered by a valid lien," §1336.01(B)(1), and a "lien" includes "a security interest created by agreement," §1336.01(H). See Longo Constr. Inc. v. ASAP Tech. Servs., Inc., 140 Ohio. App.3d 665, 673-74, 748 N.E.2d 1164, 1170-71 (Ohio Ct. App. 2000) (holding that payment to secured creditor could not be avoided); Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc., 87 Ohio App.3d 644, 651-52, 622 N.E.2d 1113, 1119 (Ohio Ct. App. 1993) (same). See also Peltz v. Moretti, 292 F.App'x. 475, 481 n.3 (6th Cir. 2008) (noting that under Ohio law "encumbered assets cannot be the subject of a fraudulent transfer").

## V.      CONCLUSION

Accordingly, Credit Suisse's motion for summary judgment (doc. 345 in Case No. 2:04-cv-1090) is GRANTED as to all of the UAT's claims against Credit Suisse.

Credit Suisse's motion to strike certain evidence submitted in the UAT's response brief (doc. 1695 in Case No. 2:03-md-1565; doc. 356 in Case No. 2:04-cv-1090) is DENIED AS MOOT, as the court did not rely on any evidence to which Credit Suisse objected. The UAT's motion to strike new evidence submitted in Credit Suisse's reply brief (doc. 361 in Case No. 2:04-cv-1090) is also DENIED AS MOOT.

The UAT is instructed to advise the court within 30 days of its intentions to prosecute the remaining claims against the Founders and various corporate entities affiliated with the Founders.

                                                    s/ James L. Graham
                                                    JAMES L. GRAHAM
                                                    United States District Judge

DATE: April 12, 2011